**de Haan Law Firm, PLLC**
101 E Pennington
Suite 201
Tucson, Arizona 85701
Telephone: (520) 358-4089
Facsimile: (520) 628-4275
Stuart P. de Haan, State Bar No. 26664

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

Michelle Shortt and The Satanic Temple

Plaintiffs,

vs.

City of Scottsdale,

Defendant,

Case No. 18-cv-00621-DGC___

**PLAINTIFFS' RESPONSE AND CROSS-MOTION FOR SUMMARY JUDGMENT, WITH INCORPORATED BRIEFING**

## ARGUMENT

A reasonable jury can only come to one conclusion. The City disparaged Ms. Shortt's religious faith and precluded her from participating in the blessing ceremony, specifically because of her religion. This violates both the Establishment Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

### 1: The Establishment Clause prohibits governmental disparagement of a religious faith.

The Establishment Clause prohibits governmental selection of an "unfavored" religious faith. Here, the indisputable evidence shows that the City excluded TST, alone, from participating in the religious ceremony. As if that violation was insufficiently clear, the City made specific and disparaging statements about TST. There is no question about the facts. There is no question about the law. Plaintiffs are entitled to summary judgment.

### Historical and policy framework of the Establishment Clause

The Revolutionary generation emphatically applied the logic of secular liberty to the condition of religion and the churches. *Larson v. Valente*, 456 U.S. 228, 244-46, 102 S. Ct. 1673, 1683-84 (1982) (citations omitted). If Parliament lacked the authority to tax unrepresented colonists, then the newly independent States should be powerless to tax their citizens for the support of a denomination to which they did not belong. *Id.*

The force of this reasoning led to the abolition of most denominational establishments at the state level by the 1780s and led to the inclusion of the Establishment Clause in the First Amendment in 1791. *Id.* The constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause. *Id.*

Madison once noted: "Security for civil rights must be the same as that for religious rights." *Id.* Madison's vision–freedom for all religion being guaranteed by free competition between religions–naturally assumed that every denomination would be equally at liberty to exercise and propagate its beliefs. *Id.*

But such equality would be impossible in an atmosphere of official denominational preference. *Id.* Free exercise thus can be guaranteed only when legislators–and voters–are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations. *Id.*

As Justice Jackson noted in another context, "there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally." *Id.* (citing *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 112 (1949) (Jackson, J., concurring)).

### 1.1: The City cannot choose "acceptable" legislative prayers.

## Legal framework

The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another. *Id.* While the unique history of legislative prayer requires some special consideration; it does not exempt the City from its constitutional obligation to refrain from discrimination. *See Town of Greece v. Galloway*, 572 U.S. 565, 585-86, 134 S. Ct. 1811, 1824 (2014) In *Town of Greece*, it was important that "the town at no point excluded or denied an opportunity to a would-be prayer giver." *Id.*

Discrimination is not the only thing barred by the Establishment Clause. The Clause also prohibits governmental disparagement of a faith. *Marsh v. Chambers*, 463 U.S. 783, 794-95, 103 S. Ct. 3330, 3337-38 (1983); *Lynch v. Donnelly* , 465 U.S. 668, 673, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984).

The City may argue that, "technically," the councilmembers' statements were made in their individual capacities and not as government representatives. This would be ill-advised. Courts "regularly take into account the statements of governmental officials involved in a policy's enactment." *Freedom from Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1149 (9th Cir. 2018).

This is no judicial activism. Rather, "the Framers intended the Establishment Clause to require governmental neutrality in matters of religion, **including neutrality in statements acknowledging religion**." *McCreary Cty. v. ACLU*, 545 U.S. 844, 878, 125 S. Ct. 2722, 2743-44 (2005) (emphasis added).

## Analysis

The most obvious constitutional violation is the contemporaneous, public, and surprisingly candid statements of governmental officials. Their scorn of TST is palpable: "Personally, I like having the prayers, do NOT want the Satanists, and I think this is taking equality too far;" "I wish (and intend) my deliberations on Council to be blessed and guided by God alone;" and "I do not welcome a Satanist group." Material facts at ¶¶ 12-14. The Mayor explained why it was not "good enough" for the governing members of the City to simply not participate

in the invocation: "We're standing up to this ridiculing of religion. Some things are worth fighting for." Doc 1-1 at p. 22.

These statements incur the highest culpability because they were made with full understanding that TST is protected by the Constitution. Id. at ¶ 11 (The Mayor and the City Manager told Ms. Kuester, "to treat them the way I would treat any other organization.") See also id., ¶¶ 12-13.

There is no room for disagreement in law or fact. The Establishment Clause prohibits official disparagement of a religion. The City officially–and expressly–disparaged TST on the basis of its religious beliefs and refused it equal participation in the ceremony. This is *verboten*. Summary judgment in favor of Plaintiffs is appropriate.

### 1.2: The City's "policy" is a mere pretext

When it became clear that TST was no mere "sideshow," Doc. 1-1 at p. 22, the City scrambled to create what it considered a facially valid pretextual reason that TST, alone, could be precluded. Its best efforts are insufficient. A constitutionally valid policy must be neutral, both as applied, and as to religion. Even if the Court entertains this obvious pretext with some consideration, it still fails as a matter of law because this "policy" is neither.

## Legal framework

In a case predating *Town of Greece*, the Ninth Circuit considered a constitutionally-permissible, neutral, policy. *Rubin v. City of Lancaster*, 710 F.3d 1087 (9th Cir. 2013). Preliminarily, it should be addressed that *Rubin* is still good law. *Rubin*, like *Town of Greece*, holds that legislative prayer need not be nonsectarian (i.e., saying, "Jesus," does not by itself

violate the Establishment Clause).  *Compare Rubin*, 710 F.3d at 1094 *with Town of Greece*, 572 U.S. at 582.

*Rubin* is instructive because it provides a constitutionally permissible policy.  Under that policy, the City of Lancaster proactively maintains a database of all religious congregations.  The Clerk regularly reviewed the Yellow Pages, searched the internet, and consulted the chamber of commerce and the newspaper.  Importantly, the Clerk did not probe the faith, denomination, or other religious belief of a congregation before adding its name to the list.

Next, each group receives a mailer, inviting participation in the invocation.  The mailer cautions that the participants are not to "disparage any faith or belief different from that of the invocational speaker."  *Id.*  As in *Town of Greece*, no person who has volunteered to pray was turned down, and no government official ever attempted to influence the Clerk's selection or scheduling of volunteers.

In interpreting *Marsh*, the *Rubin* court finds the "touchstone of the analysis should be whether the **government** has placed its imprimatur, deliberately or by implication, on any one faith or religion." *Id.* at 1096. Here, the City's messages to the public as well as publicly published articles, clearly and unambiguously described in detail its approval of certain religions over TST. See material facts at ¶¶ 11-13.

In giving the policy its blessing, the Ninth Circuit considered a few factors.  First, the *Rubin* Court found that Lancaster took "every feasible precaution" to ensure its own evenhandedness.  *Id.*, 710 F.3d at 1097-98.  It codified a litany of neutrality-enforcing

safeguards, prohibited governmental inquiry into the contents of any prayer to be offered, and "never removed a congregation's name from the list of invitees or refused to include one." *Id.*

Moreover, volunteers were limited to three, nonconsecutive, meetings per year. *Id.* Last, Lancaster stressed that the invocation "shall not be implemented or construed in any way to affiliate the City Council with, nor express . . . preference for, any faith or religious denomination." *Id.*

## Analysis

The City's "policy" does it no favors for two reasons. First, it is an obvious pretext. The contemporaneous statements by the City betray the true reason Plaintiffs were excluded. Second, this "policy" has zero neutrality-enforcing safeguards. Unlike in *Rubin*, the list was "handed down" from years prior and unmaintained. Unlike in *Rubin*, there are no disclaimers or cautions. Unlike in *Rubin*, there was an inquiry into the speaker–which is why TST was denied.

Third, it is not neutrally applied. Thirty-eight of the City's invitees lie outside the bounds of Scottsdale. Doc. 32-4 at pp. 2-7. What distinguishes TST from these 38 "acceptable" speakers from outside Scottsdale? The City has no answers. The only proffered explanation is that TST is "unique." Material facts at ¶ 18. But this "distinction" only arouses constitutional suspicion.

Most offensively, this "policy" is entirely undefined and unwritten. What procedures are required to apply? When does a congregation have a "substantial connection" to the Scottsdale community? Who makes that determination? What do they base the determination

on? What appeal rights does a rejected applicant have? None of these basic questions have any answers. **Exhibit 2** (deposition of Brian Biesemeyer) at 6:23-9:22.

The simple truth is that this "policy" was created about six weeks after the rescheduling. See material facts at ¶ 15. This "policy" has only been applied to preclude one religion, TST. See id. at ¶ 5 (everyone else was proactively invited); **Exhibit 1** at 7:23-25 and **Exhibit 2** at 7:22-24 (nobody else was denied). By precluding TST, the City has distinguished itself from all cases that upheld legislative prayers: the City cannot deny equal participation in this religious ceremony consistent with the Equal Protection Clause. *E.g. Rubin*, *Town of Greece*.

This is not the first time the judiciary has considered a government categorically excluding a faith from legislative prayer. It appears to be an issue of first impression for the Ninth Circuit, but the Eleventh Circuit and the Fourth Circuit have both considered the question of whether it violates the First Amendment. For obvious reasons, each finds it does.

In *Pelphrey v. Cobb Cty.*, 547 F.3d 1263, 1282 (11th Cir. 2008), the Eleventh Circuit upheld Establishment Clause liability because the County "categorically excluded" wide swaths of faiths. Similarly, the Fourth Circuit has found that "the Framers sought to prevent government from choosing sides on matters of faith and to protect religious minorities from exclusion or punishment at the hands of the state." *Lund v. Rowan Cty., N.C.*, 863 F.3d 268, 275-76 (4th Cir. 2017) (en banc) (cert. denied, 201 L. Ed. 2d 1123) Time and again, the dictate of the Establishment Clause is made clear: government cannot use religion as an instrument of division. *Id.* at 272.

This is precisely what the City did. The City permitted religion to operate as an instrument of division by singling out TST for exclusion. This, they cannot do. The Court should grant Plaintiffs summary judgment.

### 1.3: Only Judeo-Christians were invited prior to TST's request

The City claims to have "invited" non-Judeo-Christians to give invocations. Doc 32 at p. 5. (emphasis in original). The City goes on to clarify that it thinks adherents of Islam are "non-Judeo-Christian." Id. at pp. 7-8. Any imam would beg to differ. See, generally, Aaron W. Hughes (2012). "Abrahamic Religions: On the Uses and Abuses of History." Oxford University Press. pp. 57–75.

First, the State has presented no evidence to suggest that any non-Judeo-Christians were ever invited. The only non-Judeo-Christian religion presented in the exhibits is an indigenous American representative. Doc. 32-5 at p. 70 (on November 16–eight months after TST was excluded). The meeting minutes give no indication on how this presentation came to be.

Further, it is offensive to point to a singular instance of one non-Abrahamic religion being "allowed" to participate as proof-positive that "all" non-Abrahamic religions are fairly represented.

And, even if the City did invite Mr. Johnson–there is no evidence of that–it does not save the City from the fact that it officially singled out TST for disparagement and discrimination. Plaintiffs' cause of action accrued on March 23, 2016, when they were excluded from participation in the ceremony. Mr. Johnson's invocation, being after that, is irrelevant at best.

The argument isn't even good for the City. All it does is show that the City realized it was violating the First Amendment by limiting inclusion to one "flavor" of religion, to the exclusion of all others. Had Plaintiff raised this argument, it would be barred by Rule 407 as a "subsequent remedial measure." See Church of Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 540, 113 S. Ct. 2217, 2230-31 (1993) (courts consider the true governmental objective "from both direct and circumstantial evidence.")

By pointing to this token non-Abrahamic speaker, the City has only revealed that it re-evaluated the constitutional permissibility of its invocation procedure after TST brought the issue to light. Also, inviting other minority religions to the exclusion of TST only proves that the City is singling out TST, alone, for exclusion.

### 1.4 This is about discrimination, not sectarianism. You can say "Jesus" without offending the Constitution. But you cannot preclude someone else from saying "Satan."

The City repeatedly states that it can permissibly invite speakers to say "Jesus Christ" without offending the Establishment Clause. City's brief at pp. 4-11. That is not the issue. The City incurred liability because they "decided to keep our traditional invocations and we've decided to send this Satanist sideshow elsewhere." Statement of material facts at ¶ 20. The City did not incur liability because its speakers were saying "Jesus." It incurred liability because it precluded TST an equal opportunity to say "Satan."

## 2: The Equal Protection Clause prohibits governmental discrimination on the basis of religion.

The City's actions also incur Equal Protection liability. We added the Equal Protection claim because Establishment Clause jurisprudence is in a state of "disarray," to put it lightly.

See *Rowan Cty. v. Lund*, 138 S. Ct. 2564 (2018) (the same *Lund* as above) (Thomas, J., dissenting from denial of cert.); see also Gellman, Susan & Looper-Friedman, Susan, "Thou Shalt Use the Equal Protection Clause for Religion Cases (Not Just the Establishment Clause)," Journal of Constitutional Law 10:4, 702.

In dissenting from the denial of certiorari, Justices Thomas and Gorsuch highlight the very problem with exclusively relying on the Establishment Clause in religious freedom cases. There is no clear test. Sometimes, the focus is whether a "reasonable observer" would think a government practice endorses religion. *Id.* Other times, the question is whether a practice is supported by "history and tradition." *Id* Sometimes, the *Lemon* test applies. *See Lemon v. Kurtzman*, 403 U.S. 602, 91 S. Ct. 2105 (1971). Other times, it doesn't. *Marsh*, above.

This is all too confusing for practitioners and courts alike–to say nothing of our clients. There is an easier way. The Equal Protection clause gives all the same freedom benefits as the Establishment Clause, with none of the confusing jurisprudence.

### 2.1: The City cannot enact special disabilities on a "suspect class"

## Legal framework

The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike. *Plyler v. Doe*, 457 U.S. 202, 216-17, 102 S. Ct. 2382, 2394 (1982). This Clause was intended as a restriction on state legislation inconsistent with elemental constitutional premises. Acts are presumptively unconstitutional if they disadvantage a "suspect class." *Id.*

A suspect class is one historically "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process. *Id.*, 457 U.S.

at 217, fn. 14. Legislation imposing special disabilities upon groups disfavored by virtue of circumstances beyond their control suggests the kind of "class or caste" treatment that the Fourteenth Amendment was designed to abolish. *Id.* Religion is a suspect class. *Ass'n of Christian Sch. Int'l v. Stearns*, 362 F. App'x 640, 646 (9th Cir. 2010).

If a suspect class is disadvantaged by a governmental action, the government must show that its classification has been "precisely tailored to serve a compelling governmental interest." *Plyler*, 457 U.S. at 216-17, 102 S.Ct. 2394-95. If it fails, then the act is unconstitutional as against the Equal Protection Clause. *Id.*

Establishment Clause jurisprudence borrows from the Equal Protection requirement that statutory requirements be "neutral as applied." *See Walz v. Tax Com. of N.Y.*, 397 U.S. 664, 696, 90 S. Ct. 1409, 1425 (1970). Discriminatory intent lies in the heart of an Equal Protection Clause violation. *Memphis v. Greene*, 451 U.S. 100, 119, 101 S. Ct. 1584, 1596 (1981). Discriminatory intent can be evidenced by contemporaneous statements made by the decisionmaking body. *Hialeah*, 508 U.S. at 540, 113 S.Ct. 2230-31. It can also be deduced by the specific series of events leading to the enactment of the policy, and the history of the policy itself. *Id.*

## Analysis

Here, the City selected a particular class of people for special and negative treatment on the basis of their religion. This is most abundantly clear by simply reading the contemporaneous, spite-filled, statements made by the City Councilmembers and the Mayor.

There is no room for confusion. These governmental decisionmakers were specifically addressing only one group for exclusion. The "Satanists."

Under this Equal Protection analysis, the City's "policy" of requiring a "substantial connection with Scottsdale" is laid bare for what it really is: a vehicle for generally discriminating against non-Abrahamic religions and specifically TST.

The events that led up to the city manager's "research" into the City's "long-standing policy" give further weight to this finding. It was not until TST asked to be included in the invocation ceremony that the City began expanding its invitations to include two imams and one Native American spiritualist in a two-and-a-half year period.

The majoritarian political process had a hand in the City's decision. One church sent "thousands of emails" which crashed the City's servers. **Exhibit 1** at 25:18-22. In all, the City received about 15,000 emails objecting to TST's equal participation in the ceremony. **Id.** This, alone, establishes Plaintiffs' reliance on the Court for extraordinary protection.

Further, the "neutral-as-applied" analysis reveals this "policy" for the pretext that it is. Ms. Shortt practices her faith outside the city limits of Scottsdale, but so do 38 of the "permitted" speakers. There is no constitutionally permissible distinction between the two. Yet, it is Ms. Shortt, alone, who is precluded.

Finally, the Equal Protection Clause requires the City to show a "compelling governmental interest" in excluding TST. None has been offered. And even if the City creates one, doubtlessly just in time for their response/reply deadline, the City will not be able to show that the "policy" is narrowly tailored to serve the "compelling interest."

### 2.2: No binding precedent exempts legislative prayer from Equal Protection

The City argues that "equal protection analysis does not apply to individual claims of exclusion from the opportunity to give an invocation." Doc. 32 at p. 12. The City exclusively relies on nonbinding authority. See id. (string citing five cases; four of which are district court cases, and none of which lie in the Ninth Circuit). Conspicuously missing from the City's brief is any argument for why its cited cases are even persuasive. Plaintiffs decline the City's invitation to do all the arguing for it. The Equal Protection analysis applies because the City enacted a special disability upon a suspect class and coupled it with contemporaneous statements that the disabilities were enacted because of Plaintiffs' minority religious beliefs.

### 2.3: Plaintiffs are similarly situated as the "permitted" speakers

The City argues that Plaintiffs cannot show that they are "arguably indistinguishable" from what the City deemed "acceptable" speakers. Doc. 32 at p. 13. Stated differently, the City has alleged a policy, refused to define its terms, and expects Plaintiffs to "disprove" why the policy should *not* apply to specifically exclude TST. We'll do our best. Despite the City's claims, TST does have members who live in Scottsdale. **Exhibit 3**.

The City's argument puts it in an unwinnable position. Because this "policy" is not objectively defined, it is entirely in the arbitrary discretion of the City to determine what arises to a "substantial" connection. Under the Equal Protection analysis, it is the City's obligation to show that the policy is "neutral;" it is not the Plaintiffs' job to define and apply the City's arbitrary "policy."

The City cannot show that its policy is "neutral" because it failed to perform any investigation into TST. Simultaneously, that very inquiry would have run afoul of the "neutral as applied" framework. The City never investigated any other religions. Thus, this argument damns the City for not performing its investigation and would have damned the City if it had.

### 2.4: The test requires the City show a "compelling" interest, not a "reasonable" one

The City conflates the relevant test as requiring Plaintiffs to show that the relevant interest is "unreasonable." Doc. 32 at p. 14. That is not the test. Under *Plyler*, the City must show that it has a "compelling" interest and that the policy is "narrowly tailored" to suit that interest.

The City's proffered interest is limiting speakers to those "who serve the community and represent the citizens and patrons of Scottsdale." As with the "invitation" problem, above, there is no evidence to evidence that claim. What has the "acceptable" speakers done, which TST hasn't? The City has nothing to prove any allegations. This is just a last-minute flailing attempt to bolster the policy.

### 2.5: There is evidence that the policy was inconsistently applied

Last, the City argues there is no evidence that other groups were not subject to the same policy. Doc. 32 at p. 14. This is patently untrue. Both deposition transcripts lay bare that it was TST, alone, who was subjected to the City's scrutiny into "substantial ties." **Exhibit 1** at 7:23-7:25 and 10:16-23 and **Exhibit 2** at 7:22-7:24.

## CONCLUSION

The indisputable fact is that the City exclusively invited Abrahamic religions, all but two being Christian, to pray over city council meetings. This was not clearly a constitutional

problem until TST requested participation in the ceremony. The City denied TST equal participation in the ceremony and governmental officials recited the very clear reason why. To paraphrase: "We do NOT want Satanists; we want (and intend) to be blessed and guided by God alone." This sentiment was amplified by the 15,000 emails which crashed City servers.

This accrued a constitutional cause of action under the Establishment and Equal Protection Clauses. The City then further evidenced that constitutional cause of action by "permitting" two imams and one token non-Abrahamic religion to participate.

The City's "policy" affords it no protection. First, this "policy" cannot retroactively cure the circumstances in which it was created. The contemporaneous statements by governmental officials and the events leading up to the "policy" unequivocally require a finding that the policy is a pretext.

But even when looking past the obviously pretextual nature of the policy, it lacks any safeguards. In every respect, this policy is unlike *Rubin*. This list is unmaintained, it permits inquiry into the religious beliefs of the speaker, it has no limits on consecutive speaking, and–most importantly–it rejected TST.

From an Equal Protection perspective, the City has enacted special disabilities on a suspect class. No other religions were required to show "substantial ties." The requirement that TST, alone, do so was a special disability. It was a further special disability that TST, alone, was precluded from equal participation in the prayer ceremony. Ms. Shortt was not the only speaker whose congregation lies outside of the city limits of Scottsdale. Thirty-eight other "permissible" speakers did, too. The City has offered no religiously-neutral distinction.

The City must show that its policy of requiring TST, alone, to show "substantial ties to the community" is narrowly tailored to suit a compelling governmental interest. If and when it fails, the Court should find an Equal Protection violation.

As relief, the Court should grant a declaratory judgment that the City has violated the Establishment Clause and the Equal Protection Clause, grant a permanent injunction which prohibits the City from prohibiting any religious invocations before City Council meetings, grant nominal damages to Plaintiffs, and grant judgment for attorney's fees and costs.

Respectfully submitted on March 29, 2019,
On behalf of Plaintiffs

By /s/ Stuart P. de Haan
Stuart P. de Haan,
AZ Bar No. 026664
Attorney for Plaintiffs
de Haan Law Firm, PLLC
100 N Stone Avenue, Suite 512
Tucson, Arizona 85701
phone (520) 358-4089
fax (520) 628-4275
email stu.dehaan@gmail.com

and /s/ Matthew A. Kezhaya
Matthew A. Kezhaya,
AR Bar No. 2014161 (*pro hac vice*)
Attorney for Plaintiffs
KEZHAYA LAW PLC
1202 NE McClain Rd
Bentonville AR 72712
(479) 431-6112
(479) 282-2892
matt@kezhaya.law

## CERTIFICATE OF SERVICE

I certify that on March 29, 2019 I electronically transmitted this document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the appropriate CM/ECF registrants.

/s/ Stuart de Haan