**SCOTTSDALE CITY ATTORNEY'S OFFICE**
3939 North Drinkwater Boulevard
Scottsdale, Arizona 85251
Telephone (480) 312-2405
Stephanie Heizer (SBN 023261)
legal@scottsdaleaz.gov
**Attorneys for City Defendants**

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| The Satanic Temple and Michelle Shortt,<br><br>Plaintiffs,<br><br>vs.<br><br>City of Scottsdale, Arizona, by its City Council, consisting of the Mayor and council members, WJ Jim Layne, Suzanne Klapp, Virginia Korte, Kathy Littlefield, Guy Phillips, David Smith,<br><br>Defendants. | Case No. CV 18-00621-PHX-DGC<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT** |

The City of Scottsdale submits its Reply in support of its Motion for Summary Judgment and Response to Plaintiffs' Cross-Motion for Summary Judgment. Because the material facts demonstrate the City's legislative prayer practice complies with Supreme Court precedent, and Plaintiffs have no substantial connection to the City, the City is entitled to summary judgment.

## I.   PLAINTIFFS' STATEMENT OF MATERIAL FACTS

1. Plaintiffs' "Material Facts" (Doc. 33-4). Although the facts themselves are not disputed, the parties disagree about which facts are material to this Court's decision. A fact is "material" for summary judgment only if it might affect the outcome of the case. Fed. R. Civ. P. 56. Thus, the material facts are those that relate to the historical and current prayer practice,

including the stated reasons for excluding Plaintiffs from giving the legislative invocation. Plaintiffs have no evidence to support their claim that the City's practice violates the Establishment Clause.[1] *Harper v. Poway Unified Sch. Dist.*, 545 F.Supp.2d 1072, 1077 (S.D. Cal. 2007), *aff'd in part*, 318 Fed.Appx. 540 (9th Cir. 2009) (absence of evidence from non-moving party can establish grounds for summary judgment.). Plaintiffs' Response/Cross Motion focus on non-material facts,[2] basing their claims on two primary theories: (1) that because Mayor and Councilmembers made statements that Plaintiffs find offensive, the City's unwritten legislative prayer practice is pretextual; and (2) because no other group had been excluded from giving the invocation, the City's practice is discriminatory and disparages Plaintiffs' faith. Neither theory is supported by the record.

2. <u>Affidavit of Michelle Shortt (Doc. 33-3)</u>. For the first time in this suit, The Satanic Temple ("TST") alleges it has unidentified "members" in Scottsdale, through the Affidavit of its chapter co-head, Plaintiff Michelle Shortt. Doc. 33-3 at ¶¶ 7, 15. The mere alleged existence of unidentified TST members that reside in Scottsdale cannot change the Court's analysis. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 486–87 (1982) (Mere fact that a group has "certain unidentified members" residing in the locale does not establish a cognizable injury where none existed before.). Moreover, Ms. Shortt would not be permitted to testify as to how those members *feel* (Doc. 33-3, ¶ 15), and the Court

---

[1] Plaintiffs have abandoned allegations that secular prayer and references to phrases religious phrases, such as "Jesus Christ", can form the basis for a constitutional violation. Doc. 33 at p. 9.
[2] The City's response to the material facts identified by Plaintiffs is attached as **Exhibit "1"**.

1    should not consider those statements in its determination.  Fed. R. Civ. P. 56; Fed. R. Evid. 801;

2    *U.S. v. Dibble*, 429 F.2d 598, 601-02 (1970).

3    ## II.    THE CITY'S PRAYER PRACTICE COMPLIES WITH SUPREME COURT
4    PRECEDENT

5           Legislative prayer, while religious in nature, has long been understood as compatible with

6    the Establishment Clause. *Marsh v. Chambers*, 463 U.S. 783 (2014). Any test as to the

7    Constitutionality of the legislative prayer practice must be by reference to historical practices

8    and understandings. *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565 (2014) (internal citations

9    and quotations omitted). There is no requirement that the City's legislative prayer practice be in

10   writing. *Town of Greece*, 572 U.S. at 571 ("town followed an informal method for selecting

11   prayer givers" from congregations listed in local directory). There is no Constitutional violation

12   if the invocations contain words like "Holy Spirit" or "Jesus Christ". *Id*. at 582. There is no

13   Constitutional requirement that non-Christian participants be involved in giving the legislative

14   prayer. *See e.g. Marsh*, 463 U.S. 783 (Nebraska legislature paid same Christian-based chaplain

15   for 16 years to give invocations). Nor does the Constitution "require [a City] to search beyond

16   its borders for non-Christian prayer givers in an effort to achieve religious balancing." *Town of

17   Greece*, 572 U.S. at 585-586 (specifically disapproving of the appellate court's determination

18   that "[t]he town's failure to promote the prayer opportunity to the public, or to invite ministers

19   from congregations outside the town limits, all but "ensured a Christian viewpoint.").

20   Accordingly, it is likewise constitutional to limit the pool of speakers to those with a substantial

21   connection or established presence in the local community. *Id*. at 585-586 (policy constitutional

22   where speakers were chosen from local directory).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

The City has a long history[3] of opening its Council meetings with religious invocations. Doc. 33-4, ¶ 1. Historically, nearly every participant in this ceremony was Christian, albeit from numerous different sects. Doc. 33-4, ¶ 2; *see also* Doc. 32-4, 32-5. The speakers were selected by invitation from a list handed down to an administrative employee, Kelli Kuester, and no written policy has ever been formalized. Speakers came from the area in and around Scottsdale. Doc. 33-4, ¶ 4. Ms. Kuester's role was to contact individuals on the list and schedule invocations. Plaintiff TST was the only group to proactively reach out to the City and seek to give an invocation. Doc. 33-4, ¶ 5. As such, Ms. Kuester was instructed to schedule Plaintiff Shortt as she normally would. The City did not investigate the beliefs of TST or what Plaintiff Shortt would say if she gave the invocation. Doc. 33-4, ¶ 9. Ms. Shortt cancelled on the date she was originally scheduled. Doc. 33-4, ¶ 11. At TST's request, the date was tentatively rescheduled for July 6, 2016. *Id*. During the period between the first and second scheduling, the acting City Manager, Brian Biesemeyer investigated the City's historical legislative practice. He discovered that TST and Plaintiff Shortt were based in Tucson. Doc. 32-3, 16:1-7. Thereafter, on or before May 23, 2016, Mr. Biesemeyer directed Ms. Kuester to notify Plaintiff that she would not be allowed to give the invocation due to Plaintiffs' lack of substantial connection to Scottsdale. Doc. 33-4, ¶ 15. Mr. Biesemeyer's uncontradicted testimony is that he was solely responsible for the decision and he made it because "the City was not going to deviate from [its] longstanding practice" of having invocations that were given "by a group that had a connection with

---

[3] Plaintiffs imply that the "earliest record" available regarding the legislative prayer practice is from 2013. Doc. 33-4, p. 1:15-16. However, during discovery the City produced invocation logs beginning in 2008. *See* **Exhibit "2"**, invocation logs dated 2008 through 2012.

Scottsdale." Doc. 32-2, 19:6-10. He also testified that he was not aware of the statements the Mayor or Councilmembers made about Plaintiffs and that if Plaintiffs had a substantial connection to the City, "it would have been a different decision." Doc. 32-3, 14:19-21,15:22-25; 21:25-22:20.

The Arizona Chapter of the Satanic Temple and Plaintiff Michelle Shortt have never identified a substantial connection to Scottsdale. Doc. 32-2, 30:5-13; *See* **Exhibit "3"**, Plaintiffs' Mandatory Initial Disc. at 2:1-15. The TST Chapter did not exist in Arizona at the time Plaintiff Shortt made the request to give the invocation in February 2016. Doc. 33-3 at p. 2, ¶ 6. The newly formed TST Arizona Chapter is based in Tucson (Pima County), where Ms. Shortt lives. Doc. 1-2; Doc. 33-3 at p. 2, ¶ 6. There is no support for the proposition that the City had an affirmative duty to seek out a connection between TST and Scottsdale, once it found out the organization is based in Tucson. It is these facts that this Court must apply to the existing, well-established Supreme Court precedent on the constitutionality of legislative invocations.

## III.   ARTICLE III STANDING

If the City is constitutionally permitted to limit its selection of invocation givers to those with a substantial connection to the City, the Court must address whether Plaintiffs have Article III standing. *Catholic League for Relig. and Civ. Rights v. City and County of San Francisco*, 624 F.3d 1043, 1049 (9th Cir. 2010) (court must ensure standing before reaching the merits of a case). Standing requires a plaintiff to prove: (1) an injury in fact, (2) a causal connection between the injury and the complained of conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. *Id.*; *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104, (1998) (burden of proof on standing). Not all constitutional provisions are enforceable by any

citizen simply because "citizens" are the general beneficiaries of the constitutional protections. *See Valley Forge*, 454 U.S. at 485; *see also Catholic League*, 624 F. 3d at 1048 (noting that a Protestant in Pasadena would not have standing to challenge an anti-Catholic statute passed by the City of San Francisco).

It is evident that even if the City's prayer practice is found unconstitutional on some ground other than the substantial connection requirement, Plaintiffs cannot show an injury that would be redressed by a decision in their favor. *See e.g.*, *Barker v. Conroy*, -- F. 3d --, No. 17-5278 2019 WL 1746154, at *9 (DC Cir. Apr. 19, 2019) (where plaintiff claimed he was discriminated against by being excluded from giving invocation because he was atheist, court found plaintiff would not be entitled to any relief, even if it were true, because House could permissibly limit its opening prayer to religious prayer). Because Plaintiffs have no substantial connection to Scottsdale, the Court could not order it to allow Plaintiffs to deliver the invocation.

## IV. THE CITY'S LEGISLATIVE PRAYER PRACTICE IS NOT PRETEXUAL OR DISCRIMINATORY

Even if the case is not resolved due to Plaintiffs' lack of ties to the community, the facts show that the City's historical and present practice is not pretextual or discriminatory.

### A. Choosing Acceptable Prayer

Plaintiffs rely primarily on the allegedly "candid" statements made by the Mayor and Councilmembers, asking the Court to find that these statements prove a Constitutional violation. Courts may consider statements of government officials who enact legislation when determining the *purpose* of legislation under the Establishment Clause. *See e.g.*, *Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1143 (9th Cir.

2018). Establishing "purpose" of legislation is one of the prongs of the three-prong test that the Supreme Court established in *Lemon v. Kurtzman*, 403, U.S. 602 (1971). But the *Lemon* test is not applied to legislative prayer cases. *See e.g.*, *Barker*, 2019 WL 1746154, at *7. (recognizing that *Marsh* eschewed reliance on the *Lemon* test); *Freedom From Religion Found., Inc.*, 896 F.3d at 1143 (in deciding school board prayer violated Establishment Clause, court applied the *Lemon* test only after it distinguished *Marsh* and *Town of Greece*, finding that they did not apply because school board was not a "legislative" body).

This Court is bound to apply *Marsh* and *Town of Greece* to these facts. The critical question is whether the City's practice comports with the directives set out therein. The undisputed testimony here is that the City Manager decided to prohibit Plaintiffs from giving the invocation after he found that the organization was based in Tucson with no connection to Scottsdale. Doc. 32-3, 16:1-7. The Mayor and Councilmembers had no say in the matter and thus their statements are immaterial. *Id*. at 14:22-15:1; 17:24-18:2. Moreover, Plaintiffs lack foundation for those statements and they are inadmissible. *U.S. v. Dribble*, 429 F.2d at 602 ("foundation laid for receiving a document in evidence by testimony of witness with personal knowledge"). Even if the Court considers the statements, when they are read in the context in which they were made, they do not support a finding that the Mayor or Council either: (1) enacted the City's historical legislative prayer practice; or (2) directed how it was applied to Plaintiffs.

Councilmember Klapp: As to the "opinions" article (Doc. 1-1 at 10) published in the Scottsdale Independent, Ms. Klapp plainly acknowledges she has no say in whether TST gives an invocation. In fact, she indicates she will exercise her personal right to leave the meeting "if

they do come." While she acknowledges that she would prefer the City adopt a written policy, she does not deny the existence of the informal policy that could allow TST to give the invocation. The article obviously expresses her personal opinions.

<u>Mayor's campaign documents</u>: The City questions the Court's ability to even consider these documents because they are inadmissible hearsay and lack foundation. Fed. R. Civ. P. 56; Fed. R. Evid. 801; *Dibble*, 429 F.2d at 602. There is nothing in the record to establish the date of these materials,[4] how they were distributed, or that they were written by the Mayor (as opposed to a campaign advisor or manager). Even so, the statements were obviously part of a re-election campaign, and by their very nature are political speech, not attributable to the Mayor as being made in his official capacity, or as an official statement of the City.

<u>Councilmember emails</u>: The remaining two statements attached to Plaintiffs' Complaint were made by two Councilmembers in response to citizen emails concerning Plaintiffs being scheduled to give an invocation. Doc. 1-1 at pp. 2, 12. For instance, the statement made by then-Councilmember Smith [Doc. 1-1 at p. 12] was made in response to a single citizen in an email– and acknowledges the person's concerns, while denying he had any say in the scheduling: "I am informed that permission was given, relying on a Supreme Court opinion…" Doc. 1-1 at p. 12. Similarly, Councilmember Littlefield's responsive email states: "the Council hasn't had a say on this issue one way or another." Doc. 1-1 at p. 2.

Moreover, the content of the statements does not support the inference that these officials were involved in *establishing* the City's legislative prayer practice or creating the list of

---

[4] They were likely created in the fall of 2016, well after the events here occurred, during campaign season and distributed before the November mayoral election.

invocation givers utilized by Ms. Kuester to schedule. These are elected officials, who regularly address and respond to their constituents. As far as council meetings are concerned, the Council could only have made the substantive rules about how speakers are chosen in an open meeting. *See* A.R.S. § 38-431.01 ("All legal action of public bodies shall occur during a public meeting."). Thus, while they can make the procedural decisions regarding how council meetings are conducted, such as *whether* to have an invocation at the beginning of a Council meeting, the record does not contain evidence that Council established the City's legislative prayer practice.

Plaintiffs' only claim against the City involves a challenge to its <u>legislative prayer practice</u>. Doc. 1 at p. 7, ¶ 43. Their claim of "disparagement" in this context is not well founded as they rely solely on the statements described above that were not made during the legislative prayer, or even during a Council meeting. "Disparagement", in this context refers to invocations that, over time "advance or disparage" a particular faith. *Marsh*, 463 U.S. at 794–95 ("[t]he content of the prayer is not of concern to judges where . . . there is no indication that the prayer opportunity has been exploited to . . . advance [or] disparage any other, faith or belief."). This record is bare as to the content of any legislative prayers that disparaged Plaintiffs' faith.

Rather, Plaintiffs' play is an emotional one, seeking to invalidate the City's practice based upon allegedly "offensive" statements. However, not every such statement gives rise to a constitutional violation. For instance, the Wiccan plaintiff in *Simpson v. Chesterfield County Bd of Sup'rs*, complained that the county's act of excluding her from giving an invocation was discriminatory because one board member, without knowing what Wicca was, called the faith a "mockery" and stated, "I hope she's a good witch like Glenda." 484 F.3d 276, 288, 290, n. 4 (2005). While the court noted that these statements may be ill-advised and disrespectful, they did not

override that the county had a "broad and inclusive legislative invocation practice" and did not create an Establishment Clause violation. *Id*. Likewise, the statements made here may be perceived by Plaintiffs as disrespectful, but given the absence of facts to imply that the officials knew anything about Plaintiffs' religious beliefs, and in light of the fact that the decision to prohibit Plaintiffs from participating was not made by them, the remarks do not form the basis for a constitutional violation.

**B.      The City's Practice is not "pre-text"**

1.      <u>Historical practice</u>. The City's historical practice of scheduling invocations existed long before Plaintiffs came around. The policy could not have been <u>formed</u> as a pre-text to exclude Plaintiffs as the records date back to at least 2008. While Councilmember Klapp expressed an opinion desiring to adopt a written policy on the subject–that fact does not establish that the City's *existing* historical practice was created as a pre-text. The case relied upon by Plaintiffs, *Ruben v. City of Lancaster*, does not support a different conclusion. There, plaintiffs sued because they attended a Council meeting where the speaker had invoked the name "Jesus." 710 F.3d at 1091. They challenged the content of the prayer, as well as the City's practice. *Id*. at 1090. The court found plaintiffs had no claim based upon the utterance of the word "Jesus." *Id*. at 1095. The finding is consistent with the Supreme Court's later holding in *Town of Greece*.

The court also upheld Lancaster's written policy. *Id*. at 1101-02. The policy consisted of many provisions, including directives that no one was required to participate in prayer, neither the council nor the clerk could engage in any review of the content of the prayer, and the clerk had never removed a congregation's name from the list of invitees who were chosen from religious congregations with an "established presence" in Lancaster. *Id*. at 1097-1099. Those congregants received mailers inviting them to participate. *Id*. at 1089. While approving of this

neutral policy, the court did not seek to prescribe constitutional "minimums" as to what might be required for compliance with the Establishment Clause.[5]

The first holding plainly undermines Plaintiff Shortt's claim that the City's "sectarian invocations" and references to "Jesus" violate her "First Amendment rights to religious liberty", particularly where she has never alleged that she attended a Council meeting. Doc. 1 at p. 3, ¶ 10, 18. Indeed, Plaintiffs appear to have ceded that argument. *See* n. 1, *supra.* The second holding also does not assist Plaintiffs. While Lancaster chose to mail an invitation to local congregants with an established presence, there is no indication the court's finding turned on that decision. Even if sending a mailer (or other form of affirmative contact) were constitutionally required, Plaintiffs' claims would fail. If the City were to send a mailer to those with an "established presence" in Scottsdale, Plaintiffs would not be on that list, based on the facts before this Court.

2. <u>Inquiry into speaker</u>. Plaintiffs argue the City impermissibly made an "inquiry into the speaker" contrary to the policy approved in *Lancaster*. *Id*. at 1097 (where policy directed city employees not to engage in inquiry into the "content of the prayer to be offered."). That case prohibited inquiry into the prayer *content*, not the *speaker* and is thus inapplicable. Even so, Plaintiffs' organization is called "The Satanic Temple" and that fact was plainly disclosed to the City in the email regarding scheduling. Doc. 1-1 at p. 4. And even though Mayor and Councilmembers later made statements that disapproved of the "Satanists", they did so without reference to any particulars about Plaintiffs' beliefs. The name - The Satanic Temple - possibly

---

[5] The written policy considered by the Court had been recently enacted. *Id*. at 1089. The Court did not decide the constitutionality of the city's previous unwritten policy.

conjures stereotypical images about what its beliefs *might* be–but Plaintiffs seem to use this stereotype to further their goals.[6]

Plaintiffs also challenge the City's selection procedures, arguing that other speakers have been located outside the city limits.  Doc. 33 at 7:14-16. The City Manager, who researched the City's prayer practice, never testified that each invocation giver must have an *address* or *physical location* in the City. A number of speakers have been from "outside" the City's corporate limits—38 according to Plaintiff. Doc. 33 at 7:14-16. This does not establish as a matter of law that those speakers had no substantial ties to the community, and the record gives no basis to imply otherwise. The City Manager testified that no set criteria were in place because the City had "never had a request [from someone] outside of the Scottsdale" community, and that he would make the determination based upon the relationship between the [invocation giver] entity and the City of Scottsdale." Doc. 32-3 at 9:2-10:22; *see also* Doc. 32-2 at 10:6-11.

Likewise, Ms. Kuester's regular practice of scheduling the speakers from the existing list of invocation givers does not imply improper motives. *See e.g.*, *Town of Greece*, 572 U.S. at 597 (Alito, J., concurring) ("The informal, imprecise way in which the town lined up guest chaplains is typical of the way in which many things are done in small and medium-sized units of local government."). It makes sense that Scottsdale has not previously dealt with this issue. Why would an organization, not from within the community and having no obvious interest in the decisions made by the local government, request to give an invocation?

---

[6] One of Plaintiffs' stated organization missions is to separate religion from politics. *See* https://thesatanictemple.com as referenced in Doc. 33-4, at 2, ¶¶ 6-7: "Anti-authoritarian and democratic in principle, The Satanic Temple disregards Social Darwinism and engages directly in politically charged campaigns to fight back against theocratic impositions into politics."

3. <u>No categorical exclusion of faith</u>. Finally, Plaintiffs allege the City's policy is a pre-text because it "categorically excluded" their faith. The undisputed testimony shows that once the City Manager determined that Plaintiffs were Tucson-based, he made the decision to deny their request to give an invocation. That is the extent of record surrounding the City's historical practice of excluding "Satanists." As discussed above, the record does not support an inference that the officials, whose statements Plaintiffs find so offensive, created the practice that the City utilizes to select speakers. The City Manager also did not create the practice, but merely identified the historical practice. Doc. 32-3, 8:21-9:10. Further, he testified that if Plaintiffs had a substantial connection to the City, "it would have been a different decision." Doc. 32-3, 21:25-22:6.

Neither the Eleventh, nor the Fourth Circuit cases cited by Plaintiff are on point. In *Pelphrey v. Cobb City*, the court affirmed a finding that, for a period of time, the commission's selection process for scheduling prayer givers "categorically excluded" certain faiths because the copy of the local Yellow Pages the clerk relied on to "compile the list of potential speakers . . . had [lines drawn] through certain categories of faiths, including 'Churches–Islamic,' 'Churches–Jehovah's Witnesses,' 'Churches–Jewish,' and 'Churches–Latter Day Saints.'" 547 F.3d 1263, 1267, 1279-80, 1282 (11th Cir. 2008). During the offending two-year time period, no one from any of these "crossed out" faiths had given a prayer. *Id*. at 1279. One can hardly imagine better evidence of intent to exclude certain faiths located within the community. At the same time, the court approved the prayer selection process in place during a different time frame where prayers were offered by members of the Jewish, Unitarian, and Muslim faiths, who had an established presence in the community. *Id*. at 1277. The Court stated, "this diversity of

speakers, in contrast with the chaplain of one denomination allowed in *Marsh*, supports the finding that the County did not exploit the prayers to advance any one religion." *Id.*

Likewise, the holding in *Lund v. Rowan City, N.C.*, does not provide meaningful instruction. 863 F.3d 268 (4th Cir. 2017) *en banc*, *cert. denied*, 138 S. Ct. 2564 (2018). There, the county's board of commissioners personally led the invocations and referenced "one and only one" faith for years on end, instead of inviting members of the community. *Id.* at 272. Three long-time residents of the county, who had attended multiple meetings, filed suit. *Id.* at 273. The Fourth Circuit, using *Marsh* and *Town of Greece* as its guideposts, found that the practice violated the Establishment Clause in part because the elected representatives so clearly identified with a single faith, year after year. Moreover, the court analyzed specific examples of the content of the prayers to determine that over time, the prayers and situation implied that the "adherents of other faiths were in some ways condemned." *Id.* at 285. The case is clearly distinguishable because it involves a discussion of the content of prayers given by the elected officials of the same faith, over the course of many years.

These holdings do not support Plaintiffs' claims that they were "categorically excluded" based on their religious beliefs. Supreme Court precedent does not require a local government to open its legislative prayer opportunity to anyone that asks; the opposite is true. *Town of Greece*, 572 U.S. at 585-586 (town not required to look beyond its borders for prayer givers).

### C.     Prior Invocation Givers – Judeo vs. Non-Judeo Christians

Plaintiffs point to the City's listed prayer givers as all Judeo Christian and theorize a nefarious motive, claiming the City either intentionally mis-categorized certain religions as non-

Christian[7], or by inviting a Native American to give an invocation *after* Plaintiffs made their request. The record does not support any finding other than a diversity of faiths have given invocations before the City Council, both before and after Plaintiffs made their request. Doc. 32-5. Plaintiffs condemn the City, stating: "State has presented no evidence to suggest that any non-Judeo-Christians were ever invited." The City does not have the burden to 'present evidence' that it invited non-Judeo Christians, even if that were a constitutional requirement. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (summary judgment may be granted upon showing absence of evidence to support the opposing party's case); *Marsh*, 463 U.S. 783 (Nebraska legislature paid same Christian-based chaplain for 16 years to give invocations). Plaintiffs' lack understanding on the issue as they erroneously focus on the faith of the *speaker* rather than the *content* of the prayer. *City of Lancaster*, 710 F.3d at 1099–100 (focusing on "policy's neutrality . . . not on the number of volunteers from a particular sect.") (internal citations and quotations omitted).

Even if the Court considers the religious "identity" of the past speakers in this case, the record lacks evidence that those persons listed in the City's log of invocation givers (Doc. 32-4), and the speakers who have given invocations (Doc. 32-5) would not adequately represent those faiths with a substantial connection to the Scottsdale community. *See e.g.*, *Town of Greece*, 572 U.S. at 585–86 (so long as policy is not discriminatory, "the Constitution does not require [town] to search beyond its borders for non-Christians").

---

[7]  The Supreme Court has also referred to "Islam" as "non-Christian." *See County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 590 (1989), *abrogated by Town of Greece, N.Y. v. Galloway, supra*.

The Complaint seems to imply that the "State" of Arizona is the relevant local community for this Court's analysis. Doc. 1 at p. 4, ¶ 15 ("meetings are open to the public and are a primary means for State citizens to observe and participate in … local government."). The law does not support this proposition. The considerations of local governments are vastly different than those of State or Federal government. The reasonable inference from Scottsdale's policy that there be a 'substantial connection' is to make sure the City includes those who have an interest in the outcome of the City Council's actions. *See e.g.*, *Town of Greece*, 572 U.S. at 586 ("Citizens attend town meetings . . . to accept awards; speak on matters of local importance; and petition the board for action that may affect their economic interests."). It is a stretch of common sense to assume Plaintiffs, based out of Tucson (Pima County) have such an interest in these local government affairs, or even the standing to challenge the City's policy. *Valley Forge*, 454 U.S. at 484–86 (where plaintiffs fail to identify any personal injury suffered as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees, there is no injury sufficient to confer standing). Additionally, the logical extension of a holding in Plaintiffs' favor is that, as a matter of law, any City or Town in Arizona that begins council meetings with legislative prayer is Constitutionally required to allow Plaintiffs to give the invocation. Established precedent contradicts such a finding. *See*, *e.g.*, *Town of Greece*, 572 U.S. at 585-586; *City of Lancaster*, 710 F.3d at 1089.

## D.    City did not probe into the content of Plaintiffs proposed invocation

Plaintiffs' final Establishment Clause argument is that the City "incurred liability because it precluded TST an equal opportunity to say 'Satan'" while inviting others to say "Jesus". Doc.

33 at 10:14-19. While a novel idea, Plaintiffs have no facts to support that the City knew Plaintiffs planned to say "Satan" during the invocation. The uncontradicted testimony is that the City does not inquire into the content of invocation and did not do so here. Plaintiffs even fault the City for not investigating TST, beyond the fact of determining that it and Plaintiff Shortt were based in Tucson. Docs. 33-3 at p. 2, ¶ 9; 33-4 at p. 3, ¶ 11-12. The City's prayer practice based upon *content* of prayers is not properly before this Court.

## V.  THE EQUAL PROTECTION ANALYSIS DOES NOT APPLY TO LEGISLATIVE PRAYER CLAIMS

The Supreme Court in *Marsh* and *Town of Greece* set forth a distinct test for lower courts to utilize when determining the constitutionality of legislative prayer. The test is not based upon an Equal Protection analysis. The "state of disarray" as to any other type of Establishment Clause jurisprudence is not relevant here. *Town of Greece,* 572 U.S. at 575 ("*Marsh* is sometimes described as carving out an exception to the Court's Establishment Clause jurisprudence, because it sustained legislative prayer without subjecting the practice to any of the formal tests that have traditionally structured this inquiry") (internal citations and quotations omitted). Justice Thomas recently noted in his dissent from the Supreme Court's denial of certiorari in *Rowan County, N.C. v. Lund*, that "happily" the legislative prayer cases tended to "focus on whether the government practice is supported by this country's history and tradition." 138 S. Ct. 2564, 2564-65 (2018) (memorandum opinion). The dissenting Justices clearly disapproved of the Fourth Circuit's decision to use some "combination of factors" to find a board's prayer practice unconstitutional because the court had been "unfaithful to our precedents" in doing so. *Id*. at 2566. Consequently, one can infer the Supreme Court (or at least these Justices) would conversely approve of the Fourth

Circuit decision in *Simpson*, which rejected an Establishment Clause claim made by a Wiccan resident who was denied opportunity to give invocation at a county meeting, finding in part, that invocations are government speech "subject only to the proscriptions of the Establishment Clause". 484 F.3d at 288 (*citing Rosenberger v. Rector*, 515 U.S. 819, 833 (1995)).

The Supreme Court does not appear inclined to use any other analysis when considering legislative prayer. Consider the potential result of applying both clauses to the same prayer practice: A finding that the City's legislative prayer practice does not violate the Establishment Clause but does violate the Equal Protection clause would create an untenable inconsistency by thwarting the standard developed by the Supreme Court for analyzing the constitutionality of legislative prayer.

### A. Level of Scrutiny – Plaintiffs are not members of a suspect class

"The government must treat all similarly situated persons alike." *Green v. City of Tucson*, 340 F.3d 891, 896 (9th Cir. 2003). If this Court is inclined to accommodate Plaintiffs and perform an Equal Protection analysis, the Court must first factually determine the basis upon which Plaintiffs were excluded from giving an invocation to determine the level of scrutiny to apply. *Honolulu Weekly, Inc. v. Harris*, 298 F.3d 1037, 1047 (9th Cir. 2002). Courts apply strict scrutiny when *distinctions* are made on the basis of a suspect class, like religion. *Id*. Strict scrutiny requires the challenged law to be "narrowly drawn to serve a compelling state interest." *Id*. If the law was not applied on the basis of a suspect class, then the law only need be "rationally related to a legitimate governmental purpose." *Id*.

Because the only undisputed material facts prove that Plaintiffs were excluded for lacking a substantial connection to Scottsdale and not because of their religious beliefs, of which no one at the City knew or inquired into, the City's prayer practice as applied to Plaintiffs is only subject to

the rational basis test. The City has a rational basis in limiting its speakers to those with a connection to the community. The prayers are directed at the Councilmembers, the purpose is to wish them guidance and wisdom in their governing of the community. *See Town of Greece*, 572 U.S. at 570. It seems rational then, that the speakers could constitutionally be limited to those who truly have a connection with the City and have a vested interest in the decisions made by the local government.

**B.    The City's practice does not discriminate against Plaintiffs based on their religious beliefs**

Plaintiffs rely again upon the statements of the Mayor and Councilmembers, outside the context of the legislative meeting to support claims of discrimination. As discussed at length above, there are no facts to support that these officials created the informal prayer practice that Plaintiffs allege is discriminatory or were responsible for applying it to them. Not every offending statement causes a constitutional violation. *See Simpson*, 484 F.3d at 290, n. 4. Even if the Court considers the officials' statements, comprised of one article published in a newspaper's opinion section, re-election campaign materials, and two emails sent by councilmembers in response to citizens, in none of the statements do the speakers purport to know anything about the "Satanists" beliefs.  The name surely does not correspond with their beliefs, because, according to the TST website, they do not worship any higher power, or believe in Satan.[8] As such, it is unclear how Plaintiffs can show that City's officials have discriminated against them based upon their religious beliefs.

/ / /

/ / /

---

[8] https://thesatanictemple.com/pages/faq.

## VI.     CONCLUSION

For the foregoing reasons, the City is entitled to summary judgment on Plaintiffs' claim that the City's legislative prayer practice violates the Establishment or Equal Protection Clauses.

DATED this 26th day of April, 2019.

**SCOTTSDALE CITY ATTORNEY'S OFFICE**

By: /s/ *Stephanie Heizer*
    Stephanie Heizer, Assistant City Attorney
    3939 North Drinkwater Boulevard
    Scottsdale, Arizona 85251
    Attorneys for City Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of April, 2019, I electronically transmitted the attached document to the Clerk's office using CM/ECF System for filing, and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Stuart P. de Haan
de Haan Law Firm, PLLC
100 N Stone Ave., Suite 512
Tucson AZ, 85701
Attorneys for Plaintiffs

Matthew A. Kezhaya
Kezhaya Law PLC
1202 NE McClain Rd.
Bentonville, AR  72712
Attorneys for Plaintiffs

By: _/s/ Vickie Frost_
An Employee of the Scottsdale City Attorney's Office