**de Haan Law Firm, PLLC**
101 E Pennington
Suite 201
Tucson, Arizona 85701
Telephone: (520) 358-4089
Facsimile: (520) 628-4275
Stuart P. de Haan, State Bar No. 26664

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Michelle Shortt and The Satanic Temple<br><br>Plaintiffs,<br><br>vs.<br><br>City of Scottsdale,<br><br>Defendant, | Case No. 18-cv-00621-DGC<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** |

1

**SUMMARY**

The facts are clear. The City enunciated a discriminatory intent and then precluded Plaintiffs from participating in an otherwise all-comer invocation policy. To justify Plaintiffs' exclusion, the City relies on an obviously pretextual "policy" which ostensibly requires all invocation participants to have a "substantial connection" to the City. This "policy" has no fixed criteria, is unwritten, has no neutrality-enforcing safeguards, and the record betrays 49 exceptions.

The law is clear. The Establishment Clause and Equal Protection Clause each precluded the City from discriminating against Plaintiffs on the basis of their religion. Plaintiffs are thus entitled to summary judgment.

**ARGUMENT**

**1: Preliminary issues require preliminary consideration and disposal**

The City raises various arguments that must be addressed and disposed of prior to getting to the substance of this case. This section addresses the newly raised issues.

### 1.1: Plaintiffs have standing

For the first time in this litigation, the City has raised the issue of standing in a reply brief for summary judgment. Response/reply at pp. 5-6. Standing needs to be addressed first, because it is jurisdictional. Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).

To show standing Plaintiffs must allege facts demonstrating they: (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. See Barker v. Conroy, No. 17-5278, 2019 U.S. App. LEXIS 11414, at *13-16 (D.C. Cir. Apr. 19, 2019) (citing Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016)).

#### 1.1.1: Michelle Shortt has standing

Taking Plaintiffs' side as true, Plaintiffs were excluded from an all-comer policy that permitted anyone to participate in a legislative prayer ceremony. This establishes an exclusionary "injury in fact." Id.; see also Davis v. Guam, 785 F.3d 1311, 1315 (9th Cir. 2015)

("[E]qual treatment under law is a judicially cognizable interest . . . even if it brings no tangible benefit to the party asserting it.").

That exclusion was unquestionably caused by the City. Here, it is irrelevant "which agents" of the City participated in the exclusion because the City is the defendant. Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105 (1985) (a suit against an individual in their official capacity is "in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.")

The harm can be redressed by the Court by granting injunctive relief. If the Court grants injunctive relief, then the City cannot discriminate against Plaintiffs for their religious beliefs. Michelle Shortt has pleaded facts that show all three elements of standing. She thus has standing.

### 1.1.2: The Satanic Temple has standing

The City may be questioning whether the rights of the non-party Scottsdale Satanists can be raised in this litigation. They can. The Satanic Temple has associational standing because (1) Ms. Shortt, a member, has standing; (2) the interests at stake are germane to TST's organizational purpose; and (3) neither the claim asserted nor the relief requested requires participation of individual members in the suit. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181, 120 S. Ct. 693, 704 (2000).

### 1.2: The public statements are not hearsay

The City contests that the public statements relied upon by Plaintiffs are hearsay. See response/reply at pp. 2-3, pp. 7-8. The City is wrong for two reasons. First, the public statements are statements by a party opponent. *See Kentucky*, above; see also FRE 801(d)(2).

Second, the statements are not being used to prove "the truth of the matter asserted." FRE 801(c)(2). It is Plaintiffs' purpose to use the statements as proof of discriminatory intent, not proof of the underling matter. For example, when we reference Councilmember Littlefield's statement, "I think this is taking equality too far," our purpose is to show that she objects to equal treatment of Plaintiffs as any other religion. Doc 1-1 at p. 2. Our purpose is

not to show that the Constitution would permit refusing our equal participation in an otherwise all-comer invocation ceremony, because takes equality "too far."

### 1.3: The issue is "discrimination on the basis of religion in the selection of speakers for legislative prayers," not "legislative prayer" as a general matter

The City expends considerable efforts to emphasize that legislative prayer, though religious, is compatible with the Establishment Clause. Response/reply at p. 3 and 7-9. The issue raised in this case is that the City discriminated against Plaintiffs in selecting speakers for legislative prayers; not whether legislative prayer is constitutional as a general concept.

### 1.4: Islam is a "Judeo-Christian" religion

The City adamantly maintains that Islam is not "Judeo-Christian." Response/reply at p. 15 (citing *Cty. of Allegheny v. ACLU*, 492 U.S. 573, 590, 109 S. Ct. 3086, 3099 (1989)). But *Allegheny* does not find that Islam is not "Judeo-Christian," it finds that Islam is not "Christian." *See id.* ("Perhaps in the early days of the Republic these words [the Establishment Clause] were understood to protect only the diversity within Christianity, but today they are recognized as guaranteeing religious liberty and equality to the infidel, the atheist, or the adherent of **a non-Christian faith such as Islam or Judaism**.") Taking the City's position at face value, *Allegheny* would also "prove" that Judaism is also not Judeo-Christian.

## 2: The City is liable under the Establishment Clause for a religiously discriminatory prayer selection process. The City's "policy" requiring a "substantial connection" is merely pretextual

### 2.1: The "policy" is demonstrably pretextual because it lacks any neutrality-enforcing safeguards

The City conflates Plaintiffs' argument that the "policy" is an obvious pretext because the Mayor and Councilmembers "made statements that Plaintiffs find offensive." Response/reply at p. 2. Not so. The "policy" is demonstrably a pretext because it lacks any neutrality-enforcing safeguards. This "policy" is constitutionally deficient for several reasons. A selection follows.

The "policy" is unwritten.  Deposition of Ms. Kuester at 8:13 – 8:17 ("I don't have anything that was written that was given to me when I took the job") and deposition of Mr. Biesemeyer at 9:11 – 9:12 ("it was not a written policy.")

The meaning of "substantial connection" is wholly undefined.  Deposition of Ms. Kuester at 26:13 – 26:22 (Q: "[Y]ou couldn't tell me what a community tie is?" A:  "No. I don't have that information.") and deposition of Mr. Biesemeyer at 10:18 – 10:22 ("There was no fixed criteria applied.")

The "policy" has no appeals process.  Deposition of Ms. Kuester at 26:13 – 26:22 (Q: "So you wouldn't know if there was like an appeal process or anything if someone got denied?" A: "No, I wouldn't know that right off.") and deposition of Mr. Biesemeyer at 10:18 – 10:22 (Q: "[Y]ou wouldn't know if there was an appeal process or anything like that?" A: "No, I do not know.")

The "policy" is not neutrally applied.  Deposition of Ms. Kuester at 29:17 – 29:20 (Q: "Had anyone ever been denied from giving an invocation before, to your knowledge?" A: "No.") and deposition of Mr. Biesemeyer at 7:22 – 7:24 (Q: "Do you know of anyone getting denied before of doing an invocation?" A: "I do not.")  See also id. at 12:3 – 12:6 (this matter only came to the city manager's attention because "this was unique.")

The "policy" was unilaterally created by the city manager, and subject to his sole discretion.  E.g. deposition of Ms. Kuester at 26:13 – 26:22 and deposition of Mr. Biesemeyer at 15:2 – 15:3 (Q: "Was that your sole discretion to deny the group?" A: "Yes.")

It is highly suspect that the city manager ordered the scheduling clerk to deny the invocation because scheduling was not within the purview of his office.  See id. at 6:1 - 6:12 (scheduling was done out of the mayor's office, which is a different office from the city manager's.)  The scheduling clerk does not even report to the city manager.  Deposition of Ms. Kuester at 4:9-4:12 and 12:21-12:25.

The policy involves no investigation process.  Deposition of Ms. Kuester at 10:16 – 10:23 (the scheduling clerk did not have a list of questions to determine a group's "community ties" to Scottsdale and had no elemental concerns to satisfy)  and deposition of Mr. Biesemeyer at

10:10 – 10:13 (the decision to deny was based on the city manager's own knowledge of the community ties.)

The policy involves no verification process. Deposition of Ms. Kuester at 8:18 – 8:21 (the scheduling clerk had no verification system or list of questions or criteria) and deposition of Mr. Biesemeyer at 10:14 – 10:17 (there was no verification process of "substantial connection.")

The policy undermines prior instructions to the scheduling clerk to treat Plaintiffs as "any other faith organization," Deposition of Ms. Kuester at 13:10 – 13:12 (the scheduling clerk scheduled and rescheduled Plaintiffs because she was directed to "treat [Plaintiffs] the way I would treat any other organization;") see also Doc. 1-1 at p. 8 (scheduling clerk's email reciting her instructions).

Last, the policy and was only formed after City Councilmembers joined a chorus of objections to Plaintiffs' participation in the invocation ceremony, and those objections sounded exclusively in Plaintiffs' religion. Compare Doc. 1-1 at p. 1 (Feb. 11 - Kathy Littlefield's objection); p. 10 (Mar. 16 - Suzanne Klapp's "opinions" article); p. 12 (Mar. 22 - David Smith's objection) with p. 14 (May 23 – Plaintiffs are excluded); and deposition of Ms. Kuester at 24:20-25:7 (noting 15,207 emails voicing objections, all sent within a couple hours). See also deposition of Mr. Biesemeyer at 11:21 – 14:9 (Mr. Biesemeyer had a telephone conversation with Councilwoman Klapp before the denial. In that conversation, Ms. Klapp "expressed her concern for allowing it to be scheduled.")

Far from being the "only" proof the policy was a pretext, the fact that the councilmembers and the mayor made contemporaneous and disparaging statements about Plaintiffs' religious beliefs merely forecloses any doubt about whether the policy is a pretext.

### 2.2: The City's response is unavailing

In the City's response/reply, the City was supposed to explain the above deficiencies. Instead, the City faults Plaintiffs for being unable to explain how they fit within the utterly undefined meaning of "substantial connection." This is an impossible task. Instead, the City does raises some arguments which can be easily disposed of.

### 2.2.1: Both witnesses testified that physical location controlled the understanding of "substantial connection"

The City now claims that the definition of "substantial location" is not tied to the "*physical location*" of the permitted speakers. Response/reply at p. 12 (emphasis in original). The City is wrong. The scheduling clerk and the city manager both testified that physical location controlled the City's understanding of "substantial connection." See deposition of Ms. Kuester at 29:6 – 29:8 (Q: " [Scottsdale Bible Church, the prototypical "acceptable" speaker] are **physically located in Scottsdale**?" A: "Correct") (emphasis added) and id. at 29:22-23 ("To the best of my knowledge, everyone had a connection to Scottsdale, was **in Scottsdale**") (emphasis added); see also deposition of Mr. Biesemeyer at 8:13 – 8:18 ("[A]ll of them were actually **in Scottsdale**.") (emphasis added).

The City, itself, even argued that the relevant determination was the physical location of the faith groups. See Doc. 8 (motion to dismiss) at p. 10 ("Plaintiffs do not, and cannot, allege that they are similarly situated to the leaders of **local, Scottsdale-based** faith groups who have given invocations in front of the City Council") (emphasis added) and p. 11 ("Plaintiffs likewise fail to allege that other **non-Scottsdale** faith groups were not subject to the same facially neutral policy") (emphasis added).

Whereas "substantial connection" initially meant "in Scottsdale," a review of the meeting minutes from 2013-2018, shows 38 instances of non-Scottsdale speakers. Now that the City has provided records dating back to 2008, Plaintiffs have found another 11 instances of non-Scottsdale speakers. In sum, 49 speakers are from outside Scottsdale. What distinguishes Plaintiffs from these "permissible" speakers? The only answer can be political palatability.

### 2.2.2: Whether the City Council developed the policy is irrelevant at best; at worst, it is willful ignorance

The City also appears to argue that, because the policy was not voted on by the City Council, it somehow absolves the City of liability. See response/reply at pp. 7-9. There are two problems with this argument.

Case 2:18-cv-00621-DGC   Document 39   Filed 05/17/19   Page 8 of 13

First, as explained in *Kentucky v. Graham*, above, the City is the defendant; not the individual councilmembers. It is irrelevant "which" city officer created the constitutional violation because the selection policy, itself, is on trial. Not particular individuals.

Second, the city council is, collectively, the direct superior of the city manager. See City Charter, available at https://www.scottsdaleaz.gov/council/charter, Art. 3 § 1 ("The council shall appoint as officers of the city the following: the city manager.")

To suggest that the city manager did not credit an express phone conversation by Councilwoman Klapp, his boss, is no more than willful ignorance. See also id. ("Officers of the city . . . report directly to the council [and] serve at the pleasure of the council.")

Last, the argument that the City Council "had no say" in this policy is simply wrong. Contrast response/reply at p. 7 with City Charter at Art. 2 § 17 ("Whenever, by any provisions of this charter, it is prescribed that any power, duty or procedure shall or may be exercised, performed or adopted in the manner established by any law of this state, and there be no procedure established by law therefor, then the council may prescribe the procedure.")

As if the above left any room for doubt, it cannot go ignored that the mayor credited the "city" with excluding Plaintiffs when touting his accomplishments in office. Doc. 1-1 at p. 22.

### 2.2.3: *Simpson* is inapposite because it conflicts with *Town of Greece*

Again, the City heavily and erroneously relies on *Simpson v. Chesterfield Cty. Bd. of Supervisors*, 404 F.3d 276 (4th Cir. 2005). Response/reply at pp. 9, 18, and 19; compare motion to dismiss, Doc. 8, at p. 8. In *Simpson*, the Fourth Circuit found a selection policy acceptable where it (1) required a non-sectarian message; and (2) permitted religious discrimination on the basis of whether the speaker was monotheistic. *Simpson*, 404 F.3d at 278 and 286. There are two problems with this.

First, *Simpson* conflicts with the teachings of *Town of Greece* that (1) governments cannot, consistent with the Establishment Clause, control the contents of legislative prayers; and (2) governments cannot, consistent with the Establishment Clause, discriminate among religions in the selection of speakers. *Town of Greece*, 572 U.S. at 580 and 585-86.

7

Second, it is preposterous to propose that a governmental official can, consistent with the Establishment Clause, use his office to disparage a specific religion. Contrast response/reply at pp. 9, 18, and 19 with *McCreary Cty. v. ACLU*, 545 U.S. 844, 878, 125 S. Ct. 2722, 2743-13 44 (2005) ("the Framers intended the Establishment Clause to **require** governmental neutrality in matters of religion, including **neutrality in statements acknowledging religion**.") (emphasis added).

### 2.2.4: *Barker* is inapposite because the plaintiff stopped short of arguing the rules were unconstitutionally discriminatory

The City cites *Barker v. Conroy*, No. 17-5278, 2019 U.S. App. LEXIS 11414, 2019 WL 1746154, (D.C. Cir. Apr. 19, 2019). See response/reply at pp. 6 and 7. *Barker* includes helpful discussion about the analytical framework of a post-*Town of Greece* legislative prayer case. But *Barker* is of little help beyond that.

To the extent the City might be tempted to rely on *Barker* at oral argument, this would be ill-advised because the *Barker* plaintiff stopped short of arguing that the exclusion of a secular prayer violated the Establishment Clause. *Id.* at 28-29 ("[R]ather than disputing that the House interprets its rules as requiring a religious prayer, he simply argues that the rules themselves compel no such interpretation.")

## 3: The City is liable under the Equal Protection clause because it imposed a special burden on Plaintiffs because of their religion

### 3.1: The Equal Protection clause applies

In response to the Equal Protection argument, the City begins with a mere denial that Equal Protection can apply. Response/reply at pp. 17-18. The Court previously overruled this claim in denying dismissal of Plaintiffs' Equal Protection claim. The City cites no new law which would preclude finding that Equal Protection prohibits discrimination on the basis of religion in selecting speakers for a legislative prayer.

Instead, the law is well-settled that religion is not an acceptable basis to discriminate. E.g. U.S. Const. Amend. XIV § 1. A plaintiff is not limited to arguing one either Establishment

8

Clause or Equal Protection Clause.  *E.g. Walz v. Tax Com. Of New York*, 397 U.S. 664, 696 (1970) (Harlan, J., concurring) ("Neutrality in its application requires an **equal protection** mode of analysis.") *see also Larson v. Valente*, 456 U.S. 228, 234 (1982) (striking down a statute for violating both the Establishment Clause and the Equal Protection clause.)

### 3.2: Strict scrutiny applies because Plaintiffs, a minority religious group, were subjected to special scrutiny because of their religion.

Strict scrutiny applies because Plaintiffs, a minority religious group, were subjected to special scrutiny because of their religion.  The evidence is clear that Plaintiffs, and only Plaintiffs, were scrutinized for a "substantial connection" to Scottsdale and that the question about "substantial connection" only occurred to the City because Plaintiffs are "unique."

What made Plaintiffs unique?  It is their "*religion.*"  Doc. 1-1 at p. 12. (David Smith's March 22 email) (mocking emphasis in original).  The objection to Plaintiffs' physical location did not arise until after the "substantial connection" policy was invented.  Compare Doc. 1-1, pre-May 23 at 3:29 pm, and post-May 23 at 3:29 pm; c.f. id. at p. 10 (it is no coincidence that Suzanne Klapp both (1) floated the idea that a new selection rule focus on "an established physical location" in Scottsdale and (2) "voiced her concerns" to the city manager).

In its response, the City assumes its conclusion that the policy was not a pretext. Response/reply at pp. 18-19 ("Because the only undisputed material facts prove that Plaintiffs were excluded for lacking a substantial connection to Scottsdale and not because of their religious beliefs.")

The problem with this assumption is that there is a prima facie showing that the policy is pretextual.  At that point, strict scrutiny attached.  *Phyler v. Doe*, 457 U.S. 202, 216-17, 102 S. Ct. 2382, 2394-95 (1982).

The City relies on *Honolulu Weekly, Inc. v. Harris*, 298 F.3d 1037 (9th Cir. 2002) to support its proposition that rational basis review applies.  The problem with relying on *Honolulu* is that in *Honolulu*, there was "no indication" that the regulation in question was designed to favor programming of particular subject matter, viewpoint, or format.  Id. at 1044.  Here, there is

significant evidence that Plaintiffs' status as a "*religion*" informed the objections.  See generally Doc. 1-1.  Strict scrutiny thus applies.

### 3.2: Plaintiffs need not prove hate to support a religious discrimination claim

Assuming the Court agrees that strict scrutiny applies, the City loses because it has failed to sustain its burden to prove its justification with objective evidence.  *See Plyler*, above.  Instead, the City appears to argue that it is entitled to summary judgment because none of the witnesses admitted under oath to a religious animus behind the exclusion.  E.g. response/reply at pp. 16-17.

But Plaintiffs have no such burden because the City has the burden to prove its justification with objective evidence.  *See Hassan v. City of N.Y.*, 804 F.3d 277, 305-06 (3d Cir. 2015) ("the burden of justification under both intermediate and strict scrutiny is demanding and rests entirely on the State") (internal quotations omitted) (citing *United States v. Virginia*, 518 U.S. 515, 533, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996) and *Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2419, 186 L. Ed. 2d 474 (2013)).

Even still, the City conflates "intent" with "motive."  As explained best in *Hassan*, above, "intentional discrimination" need not be motivated by "ill will, enmity, or hostility" to contravene the Equal Protection Clause.  *Hassan*, 804 F.3d at 298 (3d Cir.) (citing *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 694 (6th Cir. 2006) and *Garza v. County of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring in part and dissenting in part)).

The relevant evidence shows that governmental officials objected to Plaintiffs' status as Satanists. Doc. 1-1 at p. 2 ("Personally, I like having the prayers, **do NOT want the Satanists**, and I think this is taking equality too far;") Id. at p. 12 ("Please be assured I share your sentiments.  I am informed permission was given, relying on a Supreme Court opinion that this '***religion'*** is protected by the First amendment…an absurd notion, even if not surprising.  I wish (and intend) my deliberations on Council to be blessed and guided by God alone;") and at p. 10 ("I do not welcome a **Satanist** group;") and at p. 17 ("Stopped so called '**Satanists'**

from mocking City Hall traditions with a '**prayer**.'") and at p. 22 ("This group's thinking is that cities want to avoid any possible conflicts and would choose to do away with traditional invocations **rather than allow someone to extol the virtues of Satan** before a city council meeting. . . . In Scottsdale we've decided to keep our **traditional** invocations and we've decided to send this **Satanist sideshow** elsewhere . . . Some say just let them do a '**Satanic Prayer**' and walk out. That's not good enough. Rather than walk out, we're standing up to this **ridiculing of religion**. Some things are worth fighting for") (emphasis added).

### 3.3: The "policy" fails to pass strict scrutiny

The final outstanding question in an Equal Protection case is determining whether the policy is "precisely tailored to advance a compelling government interest." E.g. *Plyler*, 457 U.S. at 217, 102 S. Ct. at 2395. Here, the selection policy fails to be "precisely tailored to advance a compelling governmental interest" because it has no neutrality-enforcing safeguards.

The City's proffered justification again assumes its own conclusion. See response/reply at pp. 18-19 ("The City has a rational basis in limiting its speakers to those with a connection to the community.") Stated differently, the City's argument for a "compelling government interest" is "requiring a substantial connection is compelling because we say so." As with the pretext issue, the City demands Plaintiffs prove a negative. This is still an impossible task.

## **CONCLUSION**

Despite all its nuances, this case can be reduced to an issue of timing. This case would be difficult if the City had created a selection policy that had some neutrality enforcing safeguards and required a "substantial connection" to Scottsdale before Plaintiffs requested placement on the speakers list. Instead, the City created its selection policy in response to Plaintiffs' request, with a preexisting stated purpose of excluding Plaintiffs on the basis of their religion. This, they cannot do.

[**remainder intentionally left blank; signatures and certificate following**]

Respectfully submitted on May 17, 2019,
On behalf of Plaintiffs

By  /s/ Stuart P. de Haan              and   /s/ Matthew A. Kezhaya
    Stuart P. de Haan,                       Matthew A. Kezhaya,
    AZ Bar No. 026664                        AR Bar No. 2014161 (*pro hac vice*)
    Attorney for Plaintiffs                  Attorney for Plaintiffs
    de Haan Law Firm, PLLC                   Kezhaya Law PLC
    100 N Stone Avenue, Suite 512            1202 NE McClain Rd
    Tucson, Arizona  85701                   Bentonville AR 72712
phone   (520) 358-4089                       (479) 431-6112
fax     (520) 628-4275                       (479) 282-2892
email   stu.dehaan@gmail.com                 matt@kezhaya.law

## CERTIFICATE OF SERVICE

I certify that on May 17, 2019 I electronically transmitted this document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the appropriate CM/ECF registrants.

/s/ Stuart de Haan