1  **de Haan Law Firm, PLLC**          and   **Kezhaya Law PLC**
101 N. Stone Ave.                            1202 NE McClain Rd.
2  Suite 512                                 Bentonville, Arkansas 72712
Tucson, Arizona 85701                        phone: (479) 431-6112
3  Telephone: (520) 358-4089                 fax: (479) 282-2892
Facsimile: (520) 628-4275                    email: matt@kezhaya.law
4  Stuart P. de Haan, State Bar No. 26664    Matthew A. Kezhaya, *phv*, Ark. Bar # 2014161
5
Attorneys for Plaintiffs

6

7                        **IN THE UNITED STATES DISTRICT COURT**

8                                **DISTRICT OF ARIZONA**

9  **The Satanic Temple, Inc.** *et al.,*

10               Plaintiffs,                  Case No. 18-cv-00621-DGC

11        *v.*                                **Plaintiffs' response to motion to dismiss**

12  **City of Scottsdale**,

13               Defendant

14

15                        **INTRODUCTION AND SUMMARY**

16     At the July 29 teleconference, the City questioned if The Satanic Temple ("**TST**") is a real

17  party interest within the meaning of FRCP 17.   Contrary to its stated position at the

18  teleconference, the City's motion for lack of standing is rooted in the long-rejected premise

19  that the Establishment Clause permits, rather than prohibits, unequal treatment under the law.

20     The City then asks the Court to reinvent the definition of associational standing to add a

21  requirement that the association exist at the time the cause accrued.  The City ends by arguing,

22  without citation, that an "unincorporated" association must have at one time been

23  incorporated in order to have standing to present a claim.

24     The Court should deny the motion to dismiss because (1) Ms. Shortt and TST, both, have

25  constitutional injuries because Ms. Shortt was directly affected by the discriminatory conduct

26  complained of; (2) the City, not some third party not before the Court, did the discriminating;

27  and (3) a declaratory judgment, prospective injunction, and order to pay costs will correct the

28  issue.

1

1    TST further has associational standing because Ms. Shortt has standing, the organizational

2    purposes of TST is to fight against religious discrimination against its membership, and the

3    individual members are not needed because the material witnesses are all City personnel.

4    We address the City's mischaracterization of TST's "original beliefs" and that TST (and

5    Ms. Shortt) is afforded First Amendment protections in Section 4.  We also note that nowhere

6    in the City's motion is an argument that Ms. Shortt lacks standing on her own behalf, or that

7    any plaintiff lacks standing to raise an Equal Protection claim.

8                                          **ARGUMENT**

9    **Legal standard**

10   For purposes of determining standing, the Court must take as true that Ms. Shortt was

11   prohibited from the otherwise all-comer legislative invocation because she is a Satanist and

12   not because TST lacks the still-undefined "substantial connection" to Scottsdale.  See Naruto

13   v. Slater, 888 F.3d 418, 421 (9th Cir. 2018) ("This court reviews *de novo* dismissals under Fed.

14   R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6).  All allegations of material fact are taken as

15   true and construed in the light most favorable to the nonmoving party.") (internal quotes and

16   citations removed).

17   Additionally, the Court should note that the City's motion is no more than a veil for a

18   merits analysis.  Compare Catholic League for Religious & Civil Rights v. City & Cty. of S.F.,

19   624 F.3d 1043, 1049 (9th Cir. 2009) ("Nor can standing analysis, which prevents a claim from

20   being adjudicated for lack of jurisdiction, be used to disguise merits analysis, which determines

21   whether a claim is one for which relief can be granted if factually true.")

22   The Court cautioned the City that discovery and the Rule 12(b)(1) motion is to be limited

23   to the question of standing at both the teleconference and in the written order.  (Doc. 55)

24   (Permitting defendant to file a Rule 12 motion regarding "subject matter jurisdiction.")

25   In an abundance of caution, we rebut each of the City's arguments, even though we think

26   the bulk of them are well outside the scope of the standing analysis.  However, we respond to

27   their points out of turn because the question before the Court is whether Plaintiffs can sue,

28   not whether Plaintiffs ultimately win the suit.

**1: Ms. Shortt has standing to raise a religious discrimination claim for injunctive relief because the City subjected her to religious discrimination and the prayed-for injunctive relief will cure the issue.**

Ms. Shortt has standing to raise a religious discrimination claim for injunctive relief because the City subjected her to religious discrimination and the prayed-for injunctive relief will cure the issue.

The test for direct standing, as opposed to associational standing, is done in three parts. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. Spokeo, Inc. v. Robins, 136 S.Ct. 1540, 1547 (2016).

The gist of the standing question is whether a plaintiff has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination. Catholic League, 624 F.3d at 1048 (quoting Massachusetts v. EPA, 549 U.S. 497, 517, 127 S. Ct. 1438, 1453 (2007)) (internal quotes removed).

This case, like Spokeo, turns on the "injury in fact" prong.  An injury in fact must be "concrete *and* particularized."  Spokeo at 1548 (emphasis in original).  It must also be actual or imminent, not conjectural or hypothetical.  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180, 120 S. Ct. 693, 704 (2000).  Ms. Shortt was "actually" and not "hypothetically" precluded from the legislative prayer ceremony, so the "actual or imminent" prong is satisfied.

As explained in Spokeo, the requirement that injuries be "concrete *and* particularized" are two separate prongs.  A "concrete" injury is "real" and not "abstract."  Id.  Injuries need not be tangible, i.e. pecuniary, to be "concrete."  Id.

We first address why Ms. Shortt and TST both have direct standing: first, as founded on Establishment Clause concrete injuries; second, as founded on Equal Protection Clause concrete injuries.  We then address why the injuries were caused by the City and why the sought-after relief, if granted, would resolve the problem for Plaintiffs.

3

### 1.1: Ms. Shortt and TST, both, have cognizable Establishment Clause injuries because the City singled out Satanism for exclusion from an otherwise all-comer legislative prayer policy.

Ms. Shortt and TST, both, have cognizable Establishment Clause injuries because the City singled out Satanism for exclusion from an otherwise all-comer legislative prayer policy. The Establishment Clause, which primarily protects the non-economic interests of a spiritual nature, is the quintessential example of intangible harm. See Catholic League at 1049.

As collated by the Catholic League Court, Supreme Court Establishment Clause contexts where standing was adequate include: prayer at a football game, a creche in a county courthouse a creche in a public park, a Ten Commandments Monument displayed on state capitol grounds, a Ten Commandments Monument displayed at a courthouse, a cross display at a national park, school prayer, a moment of silence at school, Bible reading at public school, and a religious invocation at a graduation. See Catholic League, 1049-50 and fn. 10-19 (citations omitted for legibility).

Each of the foregoing had "concrete" injuries, even though nothing was affected but the "religious **or irreligious**" sentiments of the plaintiffs. Id. at 1050 (emphasis added) (we will circle back to the 'irreligious' point while rebutting the City's non-standing arguments on the merits in Section 4).

Also as collated by the Catholic League Court, Ninth Circuit Establishment Clause contexts with sufficient standing include: the removal include displaying crosses on government land, removing a cross from a city seal, disciplining physicians who performed surgery without blood transfusions in a lawsuit by Jehovah's Witnesses, including the words "under God" in the Pledge of Allegiance, and contracting with the Boy Scouts to administer a city recreational facility. Id. at 1050 and fn. 21-25 (citations omitted for legibility).

In addition to those collated by the Catholic League Court, this Court should take note of Rubin v. City of Lancaster, 710 F.3d 1087 (2013). Rubin was the Ninth Circuit legislative prayer case that predates Town of Greece. Further research revealed Freedom from Religion

4

Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ., 896 F.3d 1132 (9th Cir. 2018) (abbreviated as "**FFRF**,") a Ninth Circuit school-board (not "legislative") prayer case.

The common thread in all the cases that find standing is being directly affected by the policy at issue. This point is most succinctly put in Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 83 S. Ct. 1560 (1963). There, Maryland public schools were requiring students to read from the bible at the opening of each school day and reciting the Lord's Prayer. Atheists parents sued stating that the practice placed a "premium on belief as against non-belief and subjects their freedom of conscience to the rule of the majority." Id. at 212.

Unsurprisingly, the practice was a violation of the Establishment Clause. The question of standing was relegated to a footnote, which succinctly states that the parties had interests which "surely suffice" because they were "directly affected by the laws and practices against which their complaints are directed." Id. at fn. 9.

Contrast the foregoing with the Lujan and Valley Forge plaintiffs. Lujan v. Defs. of Wildlife, 504 U.S. 555, 112 S. Ct. 2130 (1992) and Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, 454 U.S. 464, 102 S. Ct. 752 (1982).

In Lujan, the wildlife conservation plaintiffs sought a declaratory judgment to require environmental regulation in foreign nations. See id., 504 U.S. at 558-59. One of the members averred that she saw wildlife habitats abroad and "intend[s] to go back," though she had no current plans. Id. at 563-64. The problem was that they believed their ability to enjoy the habitats would be encumbered by development. Id.

This was insufficient because the members did not have an "imminent" harm. Id. at 564 ("Such 'some day' intentions – without any description of concrete plans, or indeed even any specification of *when* the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require") (emphasis in original). As explained in Lujan, "standing depends considerably upon whether the plaintiff is **himself** an object of the action at issue." Id., at 561 (emphasis added).

Likewise, the Valley Forge plaintiffs complained of a property transfer in Chester County, Pennsylvania, but lived in Maryland and Virginia. Id. 454 U.S. at 487. They learned of the

1    transfer from a news release.  Id.  As best explained by the <u>Valley Forge</u> Court, "Their claim

2    that the Government has violated the Establishment Clause does not provide a special license

3    to roam the country in search of governmental wrongdoing and to reveal their discoveries in

4    federal court."  Id.

5        Another interesting case explaining the ease of passing this standing test is <u>Naruto v. Slater</u>,

6    888 F.3d 418 (9th Cir. 2018).  In <u>Naruto,</u> a crested macaque (an Old World monkey) was the

7    "author and owner" of several photographs of himself with the defendant's camera which had

8    been left unattended.  Id. at 420.  The defendant published those photographs in a book and

9    claimed entitlement to the copyrights.  Id.  People for the Ethical Treatment of Animals

10   ("**PETA**") sued as next friends of the monkey on a copyright infringement claim.  Id.

11       The monkey had Article III standing.  Id. at 424-25.  He had a concrete and particularized

12   economic harms as a result of the copyright infringement and was entitled to money—at least

13   according to the complaint.  Id.  Unfortunately for the monkey, however, the Copyright Act

14   only vests humans with a cause of action for copyright infringement.  Id. at 425-426.

15   **Analysis**

16       Bearing the above standards in mind, Ms. Shortt and TST both have suffered injuries in

17   fact which are (1) concrete and particularized, as opposed to abstract; and (2) actual, as

18   opposed to hypothetical.

19       Unlike the <u>Lujan</u> and <u>Valley Forge</u> plaintiffs, and like all the Establishment Clause plaintiffs

20   described above, Ms. Shortt and TST were directly affected by the conduct complained of.

21   Ms. Shortt did not read about the City's invocation practice and file a complaint.  She was

22   singled out for special scrutiny and exclusion on the basis of her religion, leading to the City

23   revoking her invitation to speak.  If a monkey has standing to sue for copyrights to its selfies,

24   Ms. Shortt has standing to complain of the religious discrimination as described by our

25   complaint.

26       As to the second prong, causation, it is indisputable that the City did the precluding.  Recall

27   that Ms. Kuester, the City employee in charge of scheduling invocations, informed Plaintiffs

28   that their invitation had been revoked.  Deposition of Ms. Kuester (Doc. 32-2) at 18:23-19:19.

6

She did so at the direction of the City Manager.  Deposition of Mr. Biesemeyer (Doc. 32-3) at 15:4-15:6.  The City makes no argument that "someone else" did the precluding, so we need not discuss this point further.  Compare <u>Lujan</u>, at 560 ("the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.")

As to the third prong, redressibility, Plaintiffs seek a declaration that the City's conduct was unlawfully discriminatory and an injunction to permit Ms. Shortt to give the invocation that she was wrongly barred from, as well as attendant costs of the litigation or having to raise this issue to the Court's attention.  The City makes no argument that, assuming the preclusion amounted to unlawful discrimination, an injunction to preclude further discrimination would not resolve the issue.  Compare <u>Lujan</u> at 561 ("[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.')

Moreover, a declaratory judgment that the City's actions were unconstitutional—just as in Catholic League—would communicate to the people of Scottsdale that their government is constitutionally prohibited from condemning Plaintiffs' religion and that any such condemnation itself is to be condemned.  <u>Catholic League</u>, 624 F.3d at 1053.

As for TST, it also has a direct claim for an Establishment Clause injury.  Ms. Shortt was giving the invocation on behalf of TST with explicit permission from a co-founder of TST.  Exhibit C 37:6-14.  The resulting public condemnations by City officials were not just as against Ms. Shortt, but also as against the "Satanists."  See Doc. 1-1 at, e.g., p.2 (email from City Council member Kathy Littlefield) ("Personally, I like having the prayers, do NOT want the Satanists, and I think this is taking equality too far); p. 10 (public article by City Council member Suzanne Klapp) ("I do not welcome a Satanist group;") p. 12 (email from City Council member David Smith) ("I wish (and intend) my deliberations on Council to be blessed and guided by God alone;") p. 17 (Mayor Lane's reelection flyer).

1
2
3

<u>1.2: Ms. Shortt and TST, both, have Equal Protection opportunity injuries because the City scrutinized Satanism's "substantial connection" to Scottsdale, but did not subject other religions to the same scrutiny.</u>

4
5
6

Ms. Shortt and TST, both, have Equal Protection opportunity injuries because the City scrutinized Satanism's "substantial connection" to Scottsdale, but did not subject other religions to the same scrutiny.

7
8
9
10
11

The Equal Protection Clause, which primarily ensures equal treatment under the law, is another example of intangible "concrete" harm.  See <u>Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville</u>, 508 U.S. 656, 666, 113 S. Ct. 2297, 2303 (1993) ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.")

12
13
14
15
16

Under the Equal Protection Clause, Ms. Shortt and TST both have direct and cognizable opportunity injuries because Ms. Shortt, who would give an invocation for TST, was subjected to a scrutiny not forced on other groups.  Accord deposition of Kelli Kuester at 10:16-23 and deposition of Brian Biesemeyer at 12:3-6 and 21:8-10 (TST received special scrutiny because they are "unique.")

17
18
19
20
21

The remaining standing tests, causation and redressability, follow the same analytical approach as above.  As to the former, the City, not someone else, subjected Ms. Shortt and TST to special scrutiny.  As to the latter, an injunction and an order to pay costs of the litigation will resolve it.  As for TST it also has a direct claim for an Equal Protection Clause injury.  TST, not just Ms. Shortt, was the subject of the special scrutiny.

22
23
24
25
26

**2: TST further has associational standing because Ms. Shortt has direct standing, the interests are germane to the organizational purpose, and the individual members are not required for the suit. There is no requirement that the association exist at the time the cause accrued.**

27
28

Associational standing is explained in <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 181, 120 S. Ct. 693, 704 (2000).  The requirements are (1) a member

8

can sue in their own right; (2) the interests at stake are germane to the organizational purpose; and (3) neither the claim asserted nor the relief requested requires participation of individual members of the suit.

The City's motion argues without citation that the Court should add a fourth requirement: that the association exist at the time the cause accrued. See motion at pp. 12. There is no such requirement. As explained in Sections 1.1 and 1.2, Ms. Shortt has direct standing to pursue claims for violation of her Establishment Clause and Equal Protection Clause rights. Assuming for sake of argument that the Court agrees, we move on to the next prong.

The second prong is self-evident: TST's organizational purpose is to promote pluralism by demanding equal rights as majority religion, to lead by example, and lending aid to public affairs that might benefit from rational, Satanic insights. See https://thesatanictemple.com/pages/about-us. See also Exhibit B at 40:13-20; Exhibit C at 28:11-16 and Exhibit D at p. 7.

Often, TST's organizational purposes lead it to demanding equality for its membership. Other than the facts that led to this case, TST has responded to Ten Commandments Monuments with requests for equal representation. See Prescott v. Okla. Capitol Pres. Comm'n, 2015 OK 54, 373 P.3d 1032; Cave v. Thurston, No. 4:18-cv-00342-KGB (E.D. Ark. 2019) (ongoing). Similarly to the Catholic League in Catholic League, TST is an "advocacy group," the only difference being between the "flavor" of religion being advocated. Catholic League advocates for Catholics, The Satanic Temple advocates for Satanists. Just as the Catholic League has associational standing to sue on official disparagement of Catholics, TST has associational standing to sue on official discrimination against Satanists.

The last prong is also self-evident. The individual members have nothing to add that Ms. Shortt and the public record does not already prove. The material witnesses, those with personal knowledge of the pertinent facts, are all City personnel.

The City's motion argues that TST is not governed "good enough" to be an association. Motion at p. 17 (complaining that TST does not collect dues, allow chapters to determine leadership rather than demand they be internally elected, or demand that its membership

adhere to an arbitrary level of dogma).  In doing so, the City has distinguished this case from the trade association in <u>Hunt</u> without providing any citation that these are elemental requirements.  See <u>Hunt v. Wash. State Apple Advert. Comm'n</u>, 432 U.S. 333, 343 (1977).

The City has provided no citation because there is no such citation.  The elemental requirements are addressed above.  As explained above, TST fulfills the requirements.  TST has associational standing, regardless of "which entity" brings the suit.

## **3: There is no requirement that unincorporated associations be incorporated at some prior point.**

The City ends its argument with a claim that every unincorporated association must exist previously as a corporation.  Motion at p. 15.  None of the City's cited cases indicate that a requirement of being an unincorporated association is to have been incorporated previously.

Such a requirement would lead to absurd results.  An "unincorporated" association, necessarily, is not incorporated.  To read into the rules of civil procedure a requirement that the association be incorporated as a condition precedent that it be deemed "unincorporated" leads to an impossible Catch-22.

As explained by the Arizona Appeals Court, unincorporated associations could not sue at common law in absence of a statute or rule of practice because the association had no legal existence distinct from its members.  See <u>Associated Students of Univ. of Ariz. v. Ariz. Bd. of Regents</u>, 120 Ariz. 100, 102, 584 P.2d 564, 566 (Ct. App. 1978) (citing 6 Am.Jur.2d, Associations and Clubs, § 51).

Rule 17(b)(3) is the "rule of practice" which corrects the injustice of subjecting every individual Scottsdale Satanist to the rigors of a Federal civil lawsuit to enforce their right to be free from religious discrimination and be subject to the personal ramifications of being publicly identified as a Satanist and be subjected to depositions.  See Exhibit C at 61:2-6 ("There generally is a social stigma to being recognized as a Satanist.")

This is the "catch-all" category that gives TST the procedural means to sue.  At various times, TST has been given corporate structure through various entities.  It is irrelevant whether we construe "The Satanic Temple, Inc.," a 501(c)(3) charity, or "United Federation of

1   Churches, LLC dba The Satanic Temple," or "Adversarial Truth LLC."  All are interrelated

2   with the same organizational purposes and same membership.

3   **4: Disposing of meritless arguments**

4       The question of standing is fully addressed by the above.  The remaining arguments are

5   issues the City raises on the merits.  We rebut them only out of an abundance of caution.

6                   4.1: The rough draft of TST's website does not bear on standing

7       Throughout the motion, the City repeatedly emphasized disavowed contents of TST's

8   website from its earliest stages.  See motion at pp. 2-3 ("original belief structure.")  The

9   testimony uniformly explains that those statements were never part of TST's belief structure.

10  E.g. Exhibit A at 39:2-9.

11      A simple search of the word "placeholder" provides 17 instances, itself, where the

12  witnesses explained that the material relied upon by the City was never intended to

13  communicate TST's ideology.  E.g. Exhibit A at 35:14-17, 42:1-8, 52:7-11, 55:4-6, 59:4-13;

14  Exhibit C at 50:1-23, 65:1-16, 68:20-69:22, 69:7-12, and 69:22-70:1.

15      Doug Misicko, better known by his pseudonym Lucien Greaves, explained that the beliefs

16  of TST were not formalized until he joined the organization in 2013.  Exhibit C at 65:1-16.

17  By February 8, 2016, "that old Web site material had no relevance to The Satanic Temple."

18  Exhibit C at 66:14-18.

19      Not that it would matter if the prior material was a new set of organizational beliefs.

20  Organizations sometimes change their mind.  TST makes no claim to infallibility.  See Tenet

21  6 ("People are fallible.  If we make a mistake, we should do our best to rectify it and resolve

22  any harm that may have been caused.")  The City provides no citation to suggest a rough draft

23  or a change in doctrine, depending on who you believe, forever bars a religious organization

24  from complaining about discrimination and we refuse to waste time looking for authority on

25  the subject.

26

27

28

1

2

### 4.2: Town of Greece prohibits a government from using legislative prayer to discriminate as between religions, or even between religion and nonreligion

3

4

5

6

The bulk of the City's motion is, all binding authority to the contrary, that none of the Plaintiffs have standing to pursue an Establishment Clause claim for being precluded from giving a legislative prayer because the intended invocation was "not religious." E.g. motion at p. 8.

7

8

9

The City is wrong for two reasons. First, the premise is wrong: TST is religious. Second, the conclusion does not even follow its premise: even taking as true that TST is not "religious," the Establishment Clause still protects it.

10

### 4.2.1: TST is religious

11

12

13

14

15

16

17

18

19

20

21

22

The City's argument that Plaintiffs lack standing because they are not religious is wrong because TST is religious. This is not the first case to construe whether Satanism is entitled to Establishment Clause protections. See Cave v. Thurston, No. 4:18-cv-00342-KGB, ___ WL _____ (E.D. Ark. 2018) (Doc. 38) (order granting intervention) at pp. 22-27 (deciding TST has Establishment Clause protections in a Ten Commandments monument case); see also id. at pp. 25-26 compiling Semla v. Snyder, No. 03-cv-00015-JPG, 2006 WL 1465558, at 11 (S.D. Ill. 2006) (noting that the Illinois Department of Corrections recognized Satanism as a religion); Carpenter v. Wilkinson, 946 F. Supp. 522, 525-28 (N.D. Ohio 1996) (examining but not deciding whether Satanism is a religion for purposes of the First Amendment); Howard v. United States, 864 F. Supp. 1019, 1024 (D. Colo. 1994) (issuing an injunction allowing a prisoner to practice Satanic rituals where the parties agreed Satanism was a religion; the Bureau of Prisons treated Satanism as a religion).

23

24

25

26

The common thread of these cases is compelling: Satanism is a "religion" within the meaning of First Amendment. The City's brief minimizes Plaintiffs as "a group of individuals [who] met at a pizza parlor for the sole purpose of promoting pluralism." Motion at pp. 6, 7, and 16. This disregards the various ceremonious and charitable activities TST engages in.

27

28

1    Ceremonious activities are depicted throughout the documentary, "Hail Satan?" (2019).

2    See also Exhibit A at 33:7-15 ("We have rituals;") id. at 57:22-25 ("They have weekly services

3    at the headquarters.  I don't know if it's described as mass, but they do have services.")

4    Charitable          activities          include,          e.g.,          adopting          highways

5    (https://www.wthr.com/article/satanic-temple-adopts-stretch-boone-county-highway);

6    donating  women's  hygiene  products  (https://thesatanictemplearizona.com/menstruatin-

7    with-satan-charity-campaign-2018/); and distributing coloring books related to anti-bullying

8    and    religious    tolerance    (https://www.orlandosentinel.com/news/education/os-satanic-

9    temple-coloring-book-20141030-post.html).

10    The City's argument also disregards the fact that The Satanic Temple, Inc. is recognized as

11    tax exempt under IRC § 501(c)(3).  **EXHIBIT 1**; see also IRC § 170(b)(1)(A)(i) (providing a tax

12    deduction for contributions to "a church or a convention or association of churches.")

13    ### 4.2.2: Even if TST is not religious, the Establishment Clause

14    ### still protects it

15    Even if the Court finds that TST is not "religious" because it does not literally worship a

16    deity, the Establishment Clause still affords it protections.  The City's "TST isn't a 'real'

17    religion" argument falls decidedly outside of the jurisdictional limitations, explained above,

18    and instead falls squarely within the "nonconstitutional limitations on standing to be applied

19    in appropriate circumstances."  Gladstone, Realtors v. Bellwood, 441 U.S. 91, 100 n.6, 99 S.

20    Ct. 1601, 1608 (1979) (specifying the "zone of interests" prudential consideration pushed by

21    the City); see also United States v. Richardson, 418 U.S. 166, 196 n.18, 94 S. Ct. 2940, 2956

22    (1974) and Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 154, 90 S. Ct.

23    827, 830 (1970) ("A person or a family may have a spiritual stake in First Amendment values

24    sufficient to give standing to raise issues concerning the Establishment Clause and the Free

25    Exercise Clause.")

26    In other words, the City's argument that "TST doesn't have standing because it isn't a 'real'

27    religion" is an appeal to the Court's discretion, not to the Court's subject matter jurisdiction.

28    As a result, it lies outside the contours of a Rule 12(b)(1) motion and is untimely.

1    Conspicuously absent from the City's argument is a citation to binding authority which

2    holds that a legislative prayer must appeal to a divine authority in order to qualify for freedom

3    from discrimination.  Town of Greece v. Galloway, 572 U.S. 565, 585-86 (2014) ("**So long as**

4    **the town maintains a policy of nondiscrimination**, the Constitution does not require it to

5    search beyond its borders for non-Christian prayer givers in an effort to achieve religious

6    balancing") (emphasis added).

7    A plain reading of binding precedent indicates the City's approach is unfounded.  In both

8    Marsh and Town of Greece, governments are cautioned against using the prayer opportunity

9    to denigrate other religions.  Town of Greece at 583 (distinguishing itself from a hypothetical

10   where "the course and practice over time shows that the invocations **denigrate nonbelievers**

11   **or religious minorities**;") accord Marsh v. Chambers, 463 U.S. 783, 794-95 (1983) (The

12   content of the prayer is not of concern to judges where, as here, there is no indication that the

13   prayer **opportunity** has been exploited to proselytize or advance any one, or to disparage any

14   other, faith or **belief**;") see also Fields v. Speaker of the Pa. House of Representatives, 936

15   F.3d 142 at 164 (Restrepo, J., dissenting).

16   Judge Restrepo's dissent in Fields, notes that, at least as of 1853, in the selection

17   congressional chaplains "no faith was excluded by law, nor any favored."  Id. at 165-66

18   (quoting Town of Greece at 576.)  Explaining the unconscionability of the City's argument,

19   the dissent points out that Buddhism, another atheistic religion and coincidentally the fourth

20   largest by membership, would be precluded by the same position.  Id. at 167.

21   Constitutional rights are not a popularity contest, they are protections from majoritarian

22   rule.  See Larson v. Valente, 456 U.S. 228, 244-46, 102 S. Ct. 1673, 1683-84 (1982).  Legislators

23   may not devise mechanisms, overt or disguised, designed to persecute or oppress a religion or

24   its practices.  Church of Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 547, 113 S. Ct.

25   2217, 2234 (1993).

26   The City wrongly claims that the Establishment Clause only recognizes and protects

27   "*religious*," as opposed to secular, beliefs.  Motion at p. 9.  But this argument wholly disregards

28   well-settled (and binding) law that, "Neither [a State nor the Federal Government] can

14

constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." Torcaso v. Watkins, 367 U.S. 488, 495, 81 S. Ct. 1680, 1683-84 (1961).

As explained in Watkins, at fn. 11, "Among **religions** in this country which do not teach what would generally be considered a belief in the existence of God are Buddhism, Taoism, Ethical Culture, **Secular Humanism** and others." (emphasis added). Contrary to the City's argument, the Establishment Clause recognizes and protects the secular as well as the religious.

The City's confusion about whether the Establishment Clause protects the secular, as opposed to the "*religious*" was firmly dispelled nearly 35 years ago in Wallace v. Jaffree, 472 U.S. 38, 52-53 (1985). ("[T]he First Amendment embraces the right to select any religious faith or **none at all**") (emphasis added). And again, 51 years ago, in Epperson v. Arkansas, 393 U.S. 97, 104, 89 S. Ct. 266, 270 (1968) ("The First Amendment mandates governmental neutrality between religion and religion, and between religion and **nonreligion**") (emphasis added).

The only binding case cited by the City on this argument is Wisconsin v. Yoder, 406 U.S. 205, 215-16 (1972). See motion at p. 9. The City claims that Yoder supports the argument that "secular values 'however virtuous and admirable' do not implicate the Religion Clauses of the First Amendment." This quote omits some important context.

The critical fact, missing from the City's brief, is that Yoder analyzes the Free Exercise Clause and not the Establishment Clause. In Yoder, Amish parents were convicted of violating a compulsory school-attendance law. They argued the law conflicted with their religious beliefs. We do not dispute that a Free Exercise Clause argument that one should be exempt from a criminal statute involves some scrutiny into the nature of the religious beliefs.

The language pointed to by the City, in context, is that people cannot claim religious discrimination from a law that is generally applicable, reasonable, and secular. The quote beings with "A way of life," not "secular values." Id. at 215. The remainder of the sentence clarifies that "a way of life" is no defense to reasonable state regulation, it must be "religious."

1    The City also relies on <u>Barker v. Conroy</u>, 921 F.3d 1118 (D.C. Cir. 2019).  While Plaintiffs

2    disagree with the outcome of that decision on the merits, the standing analysis speaks for itself.

3    <u>See</u> <u>id.</u> at 1124-28.   Barker had standing because (1) he was precluded from giving his

4    invocation on the basis of his religion (i.e. injury); (2) the <u>Barker</u> defendant did the precluding

5    (i.e. causation); and (3) sought prospective injunctive relief (i.e. redressibility).  The City is

6    quick to buttress its citation to <u>Barker</u> with a conclusory statement that Barker is analytically

7    incorrect for failure to cite the City's preferred authority on the issue of prudential standing.

8    Motion at fn. 7.

9    **Analysis**

10   Ms. Shortt received a constitutional injury because—taking her side as true—she was

11   precluded from giving her invocation on the basis of her religion.  Compare <u>Barker</u>.  Ms.

12   Shortt was injured because she was "directly affected" by the laws and practices she complains

13   of.  Compare <u>Schempp</u>, at fn. 9.

14   Taking her side as true, if she adhered to an Abrahamic faith like the 54+ instances of

15   "permissible" speakers coming in from outside of Scottsdale city limits, she would have been

16   permitted to give her invocation.  A finding that Ms. Shortt has no injury because she has no

17   "religion," as proffered by the City, would require disregarding more than half of a century's

18   Establishment Clause jurisprudence.  E.g. <u>Watkins</u>, <u>Marsh</u>, and <u>Town of Greece</u>.

19   The City's reliance on <u>Fields</u> further betrays that the true purpose of its motion was to

20   backdoor a motion for summary judgment under the guise of a "standing" argument.  See

21   motion at p. 11.  <u>Fields</u> does not even address the question of standing.  The same can be said

22   for its reliance on <u>Williamson v. Brevard Cty.</u>, 928 F.3d 1296 (11th Cir. 2019).  Compare

23   motion at p. 9.

24                                    <u>**CONCLUSION**</u>

25   Standing is a three part test: injury-in-fact, causation, and redressability.  Ms. Shortt has an

26   injury in fact under the Establishment Clause and the Equal Protection Clause because the

27   City unconstitutionally discriminated against her on the basis of her religion, subjected her to

28   special scrutiny not applied to other (Christian) out-of-town speakers, and by revoking her

invitation to give a legislative prayer at an otherwise all-comer event.  Ms. Shortt has established causation because her injury was caused by the City and not some third party not before the Court.

Ms. Shortt has established redressability because her prayed-for relief is to declare the City's conduct unconstitutional, to prevent similar unconstitutional conduct in the future, and to make the City pay the costs incurred by this action.  Because she, personally, was affected by the City's wrongful conduct, she clearly has standing.

Similarly, TST has direct standing because its spokesperson, which it sent for the purpose of giving the invocation, was subjected to unconstitutional discrimination on the basis of her religion.  Both were subjected to official condemnation by the City immediately prior to the revocation.

Further, TST has associational standing to pursue the claim because Ms. Shortt was directly affected by the special scrutiny, demanding equal participation in religious activities is TST's modus operandi, and the non-Shortt members are not necessary to pursue the claim.

The remaining arguments raised by the City are not worth repeating.  We refer the Court to Sections 3 and 4.

Respectfully submitted on October 18, 2019,
On behalf of Plaintiffs

| By | /s/ Stuart P. de Haan | and | /s/ Matthew A. Kezhaya |
|---|---|---|---|
| | Stuart P. de Haan, | | Matthew A. Kezhaya, |
| | AZ Bar No. 026664 | | AR Bar No. 2014161 (*pro hac vice*) |
| | Attorney for Plaintiffs | | Attorney for Plaintiffs |
| | de Haan Law Firm, PLLC | | KEZHAYA LAW PLC |
| | 100 N Stone Avenue, Suite 512 | | 1202 NE McClain Rd |
| | Tucson, Arizona  85701 | | Bentonville AR 72712 |
| phone | (520) 358-4089 | | (479) 431-6112 |
| fax | (520) 628-4275 | | (479) 282-2892 |
| email | stu.dehaan@gmail.com | | matt@kezhaya.law |

### CERTIFICATE OF SERVICE

I certify that on October 18, 2019 I electronically transmitted this document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the appropriate CM/ECF registrants. /s/ Stuart P. de Haan

17