**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Satanic Temple, et al., | No. CV18-00621-PHX-DGC |
| Plaintiffs, | **ORDER AND JUDGMENT** |
| v. | |
| City of Scottsdale, et al., | |
| Defendants. | |

Plaintiffs sought to give an invocation at a meeting of the Scottsdale City Council, were ultimately denied, and now claim that the denial violated their rights under the Establishment and Equal Protection Clauses of the United States Constitution. The Court denied each side's motion for summary judgment, finding a dispute of fact on the reasons for the City's denial. The Court held a bench trial on January 22 and 23, 2020, and now concludes that Plaintiffs have failed to prove their claims.

This order sets forth the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure. That rule requires the Court to set forth its findings and conclusions "separately." Fed. R. Civ. P. 52(a)(1). Although line drawing can be difficult, this order will designate the Court's findings of fact simply as "Findings," its conclusions of law as "Conclusions," and mixed questions of fact and law as "Findings and Conclusions." The Court's decision is based on all of the testimony and exhibits admitted during the trial and the Court's evaluation of the credibility of witnesses.

## I. Findings and Conclusions – Legislative Prayer, Plaintiffs' Claims, and the Burden of Proof.

The City Council's invocations are a form of legislative prayer, which occupies a unique place in Establishment Clause jurisprudence. In *Marsh v. Chambers*, 463 U.S. 783 (1983), the Supreme Court found no First Amendment violation in the Nebraska Legislature's practice of opening its sessions with a prayer delivered by a chaplain paid from state funds. *Marsh* concluded that legislative prayer, while religious in nature, has long been understood as compatible with the Establishment Clause. *Id.* at 793. Such prayer has been "practiced by Congress since the framing of the Constitution" and "lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society." *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 575 (2014). "In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with a prayer has become part of the fabric of our society." *Marsh*, 463 U.S. at 792.

The relevant inquiry in legislative prayer cases, therefore, is "whether the prayer practice in [question] fits within the tradition long followed in Congress and the state legislatures." *Town of Greece*, 572 U.S. at 577. If so, it does not violate the Establishment Clause, even if the prayer is sectarian in nature. But once a local government "invites prayer into the public sphere, [it] must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian." *Id.* at 582. Legislative bodies cannot adopt "a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose," and they must maintain "a policy of nondiscrimination." *Id.* at 585.

Consistent with this settled law, Plaintiffs do not claim that the City's practice of opening City Council sessions with prayer violates the Establishment Clause. Rather, they claim that the City has discriminated against them by refusing to permit their invocation simply because of their religious views. Doc. 57 ¶¶ 47-54. The alleged injury is

discrimination – that Plaintiffs have been denied the opportunity to give an invocation when other religious groups have been allowed that privilege.[1]

Few cases have addressed the proof required for a discrimination claim under the legislative prayer portion of the Establishment Clause, but the Supreme Court has provided some guidance:

> [T]he Court disagrees with the view taken by the Court of Appeals that the town of Greece contravened the Establishment Clause by inviting a predominantly Christian set of ministers to lead the prayer. The town made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one. That nearly all of the congregations in town turned out to be Christian does not reflect *an aversion or bias on the part of town leaders against minority faiths*. So long as the town maintains a policy of *nondiscrimination*, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing.

*Town of Greece*, 572 U.S. at 585-86 (emphasis added). This language suggests that the City cannot pick and choose from among religions – it cannot favor some and disfavor others. When a city discriminates because of "an aversion or bias . . . against minority faiths," it violates the Establishment Clause. *Id.* at 585.

Similarly, "discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *see also Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016) ("Under *Arlington Heights*, a plaintiff must simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not

---

[1] There are five Plaintiffs in this case: Michelle Shortt; The Satanic Temple as "a voluntary group of persons, without an Arizona charter, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective"; The Satanic Temple, Inc., a Massachusetts religious corporation; The United Federation of Churches LLC, a Massachusetts LLC doing business as "The Satanic Temple"; and Adversarial Truth LLC, an Arizona LLC doing business as "The Satanic Temple – Arizona Chapter." Doc. 57 at 1-3. Plaintiffs draw few distinctions among the organizations, contend they are closely affiliated with the religion and beliefs known as The Satanic Temple, and have referred to them collectively throughout this case and the trial. The Court will also refer to them collectively as "Plaintiffs" in this order.

motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way.") (quotation marks and citation omitted).

Thus, to prevail on their Establishment Clause and Equal Protection claims, Plaintiffs must prove by a preponderance of the evidence that the City's denial of their request to give an invocation was based on Plaintiffs' religious beliefs. This is what Plaintiffs alleged in their amended complaint:

> Despite the City's pretextual policy requiring an undefined "substantial connection," the public statements denouncing TST from the City's highest offices betray the true reason for excluding Ms. Shortt from participation. The Churchmembers, Councilmembers, and Mayor all objected to the "Satanists;" not the "Tucsonians."

Doc. 57 at 8.

This is also why the Court denied both parties' motions for summary judgment. The Court found that the parties' evidence presented a dispute of fact on the reason for the City's decision. Doc. 52 at 31-40. Hence this trial.

## II. Plaintiffs' Standing.

The City contends that Plaintiffs lack standing because they are not a religion and did not intend to express religious views in the invocation. Because the Court has subject matter jurisdiction only if Plaintiffs have standing to pursue their claims, it will address this issue first.

### A. Conclusions – Standing Principles.

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of L.A. v. Lyons*, 461 U.S. 95, 101 (1985) (citations omitted). "[A] plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing

- 4 -

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). In First Amendment cases, an entity establishes standing by showing that it has been directly affected by the laws or actions at the center of its complaint. *Sch. Dist. of Abington Twp., Pa. v. Schempp.*, 374 U.S. 203, 224 n.9 (1963). For purposes of the standing inquiry, the Court assumes that a plaintiff would succeed on the merits of her claim. *Barker v. Conroy*, 921 F.3d 1118, 1124 (D.C. Cir. 2019).

**B.     Standing of Michelle Shortt.**

**1.     Findings.**

On February 8, 2016, Jeremy Zarzycki called Kelli Kuester, the Management Assistant to the Scottsdale Mayor and City Council, and asked that the Arizona chapter of the Satanic Temple be placed on the City Council's invocation schedule. Michelle Shortt was designated by the Satanic Temple to give the invocation, although her name was not mentioned to Ms. Kuester. The invocation was scheduled for April 5, 2016, but was later changed to July 6, 2016 at Mr. Zarzycki's request. On May 23, 2016, Ms. Kuester sent Mr. Zarzycki an email canceling the invocation. As a result, Ms. Shortt was not permitted to give the invocation as planned.

**2.     Findings and Conclusions.**

Ms. Shortt has presented sufficient evidence to show that she suffered an "injury in fact" when she was denied the opportunity to give the invocation, that the injury is traceable to the City's actions in removing her from the invocation schedule, and that the Court could redress her injury by ordering the City to permit the invocation. *See Lujan*, 504 U.S. at 560-61. Although Ms. Shortt did not personally contact the City to arrange her invocation, the evidence shows without contradiction that she and others initiated the invocation request, Mr. Zarzycki was designated to contact the City, and Ms. Shortt was designated to give the invocation. When the City removed Plaintiffs from the schedule, Ms. Shortt lost the opportunity to give the invocation and personally sustained an injury.

The City contends that Ms. Shortt was not injured because she proposed to give a purely secular invocation. These are the words of her proposed invocation:

> Let us stand now, unbowed and unfettered by arcane doctrines born of fearful minds in darkened times. Let us embrace the Luciferian impulse to eat of the Tree of Knowledge and dissipate our blissful and comforting delusions of old. Let us demand that individuals be judged for their concrete actions, not their fealty to arbitrary social norms and illusory categorizations. Let us reason our solutions with agnosticism in all things, holding fast only to that which is demonstrably true. Let us stand firm against any and all arbitrary authority that threatens the personal sovereignty of One or All. That which will not bend must break, and that which can be destroyed by truth should never be spared its demise. It is Done. Hail Satan.

Ex. 4.

This invocation is secular rather than religious. It does not invoke the aid of a divine being, and in fact suggests that belief in such a being is a holdover from darkened times, a "comforting delusion." Although the proposed invocation ends with "Hail Satan," Ms. Shortt testified that The Satanic Temple holds nontheistic beliefs. They do not believe in a literal Satan. She characterized the invocation as a "speech" to promote agnosticism.

The City claims that Ms. Shortt was not injured when she was denied an opportunity to give a nonreligious speech at a time and place reserved for religious prayer, but the City presented no evidence concerning the types of invocations given at its council meetings. The evidence admitted at trial includes summaries of council meetings and lists of invocations for various years. *See* Exs. 14, 15. Although most were given by religious groups or leaders, the list includes moments of silence to remember various events such as mass shootings (Ex. 15 (Doc. 32-5 at 5)), an invocation by the Phoenix Indian Center (Ex. 14 (Doc. 32-8 at 2)), and an invocation by a council member (Ex. 15 (Doc. 32-5 at 4)). The City presented no evidence that these were religious prayers.[2] The Court therefore cannot conclude that Ms. Shortt's proposed secular invocation was so outside the City Council's practice that denying her request inflicted no injury. Courts have held that denial of a secular invocation can satisfy the requirements of standing. *See Barker*, 921 F.3d at 1125-26 (Barker's "inability to deliver a secular prayer before the House as a result of

---

[2] Mayor Lane testified that the City Council has never asked any organization to give a political speech rather than an invocation, but he did not address the content of the invocations that have been given.

his exclusion from the guest chaplain program qualifies as a cognizable injury in fact, and that injury would be redressed by a decision declaring the current practice unconstitutional and ordering Conroy to schedule Barker to give an invocation as soon as possible") (citations and quotation marks omitted).[3]

### C. Prudential Standing.

#### 1. Conclusions.

In addition to Article III standing, Plaintiffs must establish prudential standing. "Prudential standing" is a doctrine encompassing "at least three broad principles: 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004)). The City focuses on the third of these principles – the Supreme Court's statement that a plaintiff's complaint must "fall within 'the *zone of interests* to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) (emphasis added) (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970)). The City argues that Plaintiffs do not fall within the zone of interests protected by the Establishment Clause because they are not religious.

Whether Plaintiffs' beliefs qualify as religious, the City contends, is controlled by the factors set forth in *Alvarado v. City of San Jose*, 94 F.3d 1223, 1226-31 (9th Cir. 1996). Doc. 74-1 at 19. But *Alvarado* itself observed that "[a]ttempting to define religion, in general and for the purposes of the Establishment Clause, is a notoriously difficult, if not

---

[3] The City also seems to argue that Ms. Shortt's proposed invocation denigrates religion and could be excluded by the City on that basis. *See Town of Greece*, 572 U.S. at 585 (legislatures cannot adopt "a pattern of prayers that over time denigrate" other religions). But that is not why the City denied the invocation. *See* Ex. 12. And if the City denied the invocation on the basis of religious discrimination, as Ms. Shortt alleges, the fact that the City could have acted on a permissible basis does not eliminate the fact that she was discriminated against on the basis of her religious beliefs.

impossible, task." 94 F.3d at 1227. The City nonetheless asserts that a religion can be identified by four factors recognized in *Alvarado*:

> (a) any plaintiff or "The Satanic Temple" is a system of belief and worship of a superhuman controlling power involving a code of ethics and philosophy requiring obedience thereto;
>
> (b) any plaintiff or "The Satanic Temple" addresses fundamental and ultimate questions having to do with "deep and imponderable matters;"
>
> (c) any plaintiff or "The Satanic Temple" maintains a belief system that is "comprehensive in nature;" and
>
> (d) any plaintiff or "The Satanic Temple" is a religion that can be recognized by formal and external signs such as formal services, ceremonial functions, the existence of clergy, structure and organization, efforts at propagation, observance of holidays and other similar manifestations associated with the traditional religions.

*Id.*

The Ninth Circuit's decision in *Alvarado* does not include the City's first factor. *See* 94 F.3d at 1229-31. Indeed, the words "a system of belief and worship of a superhuman controlling power" do not appear in *Alvarado*. *Id.* The City seems to have found that language in *PLANS, Inc. v. Sacramento City Unified School District*, 752 F. Supp. 2d 1136, 1138 (E.D. Cal. 2010), but *PLANS* cites the parties' final pretrial order as its source. *See id.* To the extent the final pretrial order in *PLANS* attributed the first factor to *Alvarado*, it was simply mistaken.[4]

*Alvarado* does discuss factors (b) through (d) of the City's test. It obtained them from Judge Adams' concurrence in *Malnak v. Yogi*, 592 F.2d 197 (3d Cir. 1979), which was later applied by the Third Circuit in *Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025, 1032 (3d Cir. 1981). *See Alvarado*, 94 F.3d at 1229. Significantly, the Adams concurrence concluded that belief in and worship of a divine being is not required for a

---

[4] The City notes that the Ninth Circuit affirmed the district court's decision in *PLANS*, *see PLANS Inc. v. Sacramento City Unified Sch. Dist.*, 476 F. App'x 684, 685 (9th Cir. 2012), but the Ninth Circuit decision did not address this issue.

- 8 -

religion to be protected under the Establishment Clause. *See Malnak*, 592 F.2d at 207 (Adams, J., concurring) ("It would thus appear that the constitutional cases that have actually alluded to the definitional problem, like the selective service cases, strongly support a definition for religion broader than the Theistic formulation of the earlier Supreme Court cases."). The Third Circuit expressed the same view in *Africa. See* 662 F.2d at 1031 ("The Supreme Court has never announced a comprehensive definition of religion for use in cases such as the present one. There can be no doubt, however, that the Court has moved considerably beyond the wholly theistic interpretation of that term[.]") (footnote omitted).

In short, *Alvarado* and the sources on which it relies do not require a group to possess "a system of belief and worship of a superhuman controlling power" in order to qualify as a religion. *Alvarado* does discuss the other three factors proposed by the City, but it does not adopt them as a hard-and-fast test. Indeed, Judge Adams, the original source of the three factors, cautioned that "they should not be thought of as a final 'test' for religion." *Malnak*, 592 F.2d at 210 (Adams, J., concurring). Without attempting to resolve their place in Establishment Clause jurisprudence, the Court will address the three factors as the only viable indicia of religion identified by the City.[5]

### 2. Findings.

Ms. Shortt testified that she considers her beliefs and satanism as she practices it to be a religion, even though she does not believe in a literal God or Satan. She testified that satanism encompasses all the values she holds dear: justice, the pursuit of knowledge, bodily autonomy, and person sovereignty. She testified that her beliefs include seven tenets that encompass compassion, nobility of character, justice, and the pursuit of knowledge. Douglas Misicko, a founder of The Satanic Temple, testified that the beliefs have been

---

[5] The City also cites the Ninth Circuit's decision in *Peloza v. Capistrano Unified School District*, 37 F.3d 517 (9th Cir. 1994), but that case is not helpful. *Peloza* held that evolution is not a religion and that a high school biology teacher therefore could not prevail on his claim that the school district's requirement that he teach evolution constituted an unconstitutional establishment of religion. *See* 37 F.3d at 520-22. *Peloza* did not attempt to adopt a general definition of religion for Establishment Clause purposes.

codified in seven tenets he wrote, and that the tenets "speak to universal truths of the utmost importance." *See* Court's Livenote Transcript (hereafter "LT"), 1/23/20, at 91.

### 3. Findings and Conclusions.

Given this evidence, the Court concludes that Ms. Shortt's beliefs satisfy the first and second elements of the *Alvarado* test. They concern "fundamental and ultimate questions having to do with 'deep and imponderable matters'" and make up a belief system that is "comprehensive in nature." *See* 94 F.3d at 1229-31.[6]

The evidence also suggests that Ms. Shortt's beliefs satisfy the third *Alvarado* factor: formal and external signs such as formal services, ceremonial functions, the existence of clergy, structure and organization, efforts at propagation, observance of holidays and other similar manifestations associated with the traditional religions. She testified to various symbols she wears as jewelry and tattoos, to ceremonies and holidays in which The Satanic Temple participates, and to the structure and organization of the Arizona chapter. Mr. Misicko testified that the headquarters of The Satanic Temple is in Salem, Massachusetts, that it has a structure and organization, and that it is in the process of establishing an ordination system.

With the three *Alvarado* factors satisfied and no other controlling definition proposed by the City, the Court concludes that Ms. Shortt's beliefs and practices are religious for purposes of her religious discrimination claims. These beliefs and practices would also be considered religious under other cases. *See, e.g.*, *United States v. Seeger*, 380 U.S. 163, 185 (1965) (to qualify as religious, beliefs must be "sincerely held" and, "in the claimant's scheme of things, religious in nature"); *Torcaso v. Watkins*, 367 U.S. 488, 495 n.11 (1961) ("Among religions in this country which do not teach what would generally be considered a belief in the existence of God are . . . Ethical Culture, Secular Humanism[,] and others."); *Kaufman v. McCaughtry*, 419 F.3d 678, 684 (7th Cir. 2005)

---

[6] Judge Adams noted that the second factor – a belief system that is "comprehensive in nature" – makes clear that strongly held views "confined to one question or one moral teaching" do not necessarily constitute a religion. *Malnak*, 592 F.2d at 209 (Adams, J., concurring). The testimony presented by Ms. Shortt and Mr. Misicko made clear that their beliefs are not limited to a single issue and instead attempt to provide meaning for their lives.

(inmate's atheism qualified as a "religion" for purposes of First Amendment); *United States v. Ward*, 989 F.2d 1015, 1018 (9th Cir. 1992) ("Religious beliefs, then, are those that stem from a person's moral, ethical, or religious beliefs about what is right and wrong and are held with the strength of traditional religious convictions." (quotation marks and citation omitted)); *Am. Humanist Ass'n v. United States*, 63 F. Supp. 3d 1274, 1283 (D. Or. 2014) (finding that Secular Humanism is a religion for Establishment Clause purposes).

Throughout this litigation, the City has cited two recent decisions on legislative prayer, *Fields v. Speaker of Pennsylvania House of Representatives*, 936 F.3d 142 (3d Cir. 2019), and *Barker v. Conroy*, 921 F.3d 1118 (D.C. Cir. 2019). These cases do not alter the Court's conclusion that Ms. Shortt's beliefs are religious for purposes of prudential standing. *Fields* held that the Pennsylvania Legislature did not violate the Establishment Clause when it allowed only theistic prayers at its sessions. 936 F.3d at 163. It held that such a legislative decision is constitutional, but did not hold that nontheists can never be deemed a religion for Establishment Clause purposes. To the contrary, *Fields* acknowledged that "[t]he nontheists here may be members of 'religions' for First Amendment purposes," noting that "the Supreme Court has moved considerably beyond the wholly theistic interpretation of the term 'religion.'" *Id.* at 153. *Barker* held that an atheist had standing to challenge the U.S. House of Representatives' policy of limiting invocations to religious prayers, but could not prevail on the merits because "the House does not violate the Establishment Clause by limiting its opening prayer to religious prayer." 921 F.3d at 1131.

*Fields* and *Barker* do not suggest that Ms. Shortt lacks standing. The City has presented no evidence that it has a policy of excluding nontheists or atheists from giving invocations, and it did not deny Plaintiffs' request for that reason. Because the Court concludes that Ms. Shortt has standing to bring this case, it need not address the standing of the other Plaintiffs. *Brown v. City of L.A.*, 521 F.3d 1238, 1240 n.1 (9th Cir. 2008) ("[T]he presence in a suit of even one party with standing suffices to make a claim justiciable."); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en

banc) ("[W]e consider only whether at least one named plaintiff satisfies the standing requirements[.]").

**III.    The Merits – Plaintiffs Have Failed to Carry Their Burden of Proof.**

Plaintiffs assert that the City denied their invocation request because of their religious briefs, but the evidence at trial did not prove this allegation by a preponderance of the evidence.

**A.    Findings – Biesemeyer Testimony.**

Brian Biesemeyer was the acting City Manager when Plaintiffs' request was denied. He had assumed this role when the City Manager had a stroke.[7] Even though he was only acting in this role, Mr. Biesemeyer testified that he possessed all powers of the City Manager. He was the chief executive of the administrative branch and was responsible for administration of all City affairs not assigned to another City officer.

Mr. Biesemeyer drew a distinction between legislative policy and administrative decisions. The City Council (of which the Mayor is a member) decides legislative policy. The City Manager makes administrative decisions. The Council and Mayor do not direct administrative decisions.

Mr. Biesemeyer testified that the decision on whether Plaintiffs would be permitted to give an invocation was administrative. He was responsible for making the decision, and testified that no other person within the City had the power or duty to decide the issue. He is not aware of anything in the City Charter that vested such a decision in any other person or entity.[8]

Invocation scheduling normally was handled by Kelli Kuester, the Management Assistant to the Mayor and City Council at the time of the events in this case. Although Mr. Biesemeyer normally was not involved in such scheduling matters, he became

---

[7] This was the second time Mr. Biesemeyer assumed the role of acting City Manager, having done so previously in 2014.

[8] Consistent with this testimony, Mayor Jim Lane testified that Article 2, Section 6 of the Scottsdale City Charter provides that the Mayor shall have no regular administrative duties for the City. He testified that the City Manager is the City's chief executive, the Mayor cannot direct the City Manager on how to discharge his duties, and only the City Council – sitting as body – has power to direct the City Manager.

- 12 -

involved when Plaintiffs were scheduled to give the invocation and the City received thousands of emails in response. One church orchestrated the sending of more than 15,000 emails in opposition to Plaintiffs' proposed invocation. The volume became so great that the City's email system "crashed" and the information technology department was required to direct all such emails to Ms. Kuester rather than to the City's general email address.

Ms. Kuester brought the matter to Mr. Biesemeyer's attention. This was not unusual; Ms. Kuester typically would reach out to the City Manager when issues arose within the City. The City Manager gave her direction on a regular basis.

When Mr. Biesemeyer learned about the issue regarding Plaintiffs' proposed invocation, he contacted the City Attorney's office for guidance. That office researched the matter and informed Mr. Biesemeyer that the City had a longstanding practice of permitting invocations only by organizations that have substantial ties to the City. The practice was not contained in a written policy and, to Mr. Biesemeyer's knowledge, had never been used to deny an invocation request, but the City Attorney advised him that it was a longstanding practice. Mr. Biesemeyer understood the practice to mean that an organization had to be located in the general metropolitan area and have a substantial number of City residents as members. He specifically recalled discussing Brophy Preparatory Academy with the City Attorney's office – a Catholic school located in neighboring Phoenix and attended by a number of City residents.

Mr. Biesemeyer also learned that Plaintiffs lacked any substantial connection to the City. Newspaper reports indicated that Plaintiffs were from Tucson, approximately 120 miles to the south, and the City Attorney's Office reported the same location. Mr. Biesemeyer decided to deny Plaintiffs' request because they did not meet the longstanding practice of having a substantial connection to the City. On May 23, 2016, he directed Ms. Kuester to send this email to Mr. Zarzycki:

> The City Manager has asked me to inform you that he has decided that the City is not going to deviate from its long standing practice of having the invocation given only by representatives from institutions that have a

substantial connection to the Scottsdale community. Therefore we are making other arrangements for the invocation to be given on July 6th.

Ex. 12. Plaintiffs had no further communications with the City. They filed this action almost two years later on February 26, 2018.[9]

Mr. Biesemeyer testified that he did not make the decision at the direction of the City Council or the Mayor and did not seek their approval. Mr. Biesemeyer had a discussion with Councilwoman Suzanne Klapp, during which she stated her opposition to an invocation by Plaintiffs, but he testified that this was one of several topics discussed during the conversation and that it was not unusual for City Council members to express views to him on various subjects. Ms. Klapp did not ask Mr. Biesemeyer to deny Plaintiffs' request, and he felt free to make his own decision. He further testified that he did not feel beholden to the City Council or the Mayor and was not seeking permanent appointment to the City Manager position. He is still with the City, directing its water department. The Court found his testimony credible.[10]

### B. Findings – Kuester Testimony.

Ms. Kuester testified that she was the Management Assistant to the Mayor and City Council and was responsible for scheduling the invocations. She maintained a list of organizations that had given invocations in the past, and usually contacted them to ask if

---

[9] Plaintiffs asserted during trial that they have members in the City, but they did not identify the members, provide the number of members, identify any method by which the City could have known of the members, or show when they became members. After receiving the email from Ms. Kuester, Plaintiffs never contacted the City to assert that they did, in fact, have a substantial connection to the City.

[10] Mayor Lane testified on redirect examination by Plaintiffs' counsel that the City Council works together with the City Manager to operate the City. In a quick exchange, Plaintiffs' counsel then asked: "That's why Mr. Biesemeyer asked the council's approval when he was going to deny the invocation?" In response, the Mayor said "That's right." LT, 1/22/20, at 46. This testimony was inconsistent with the Mayor's earlier testimony that the City Council never passed a resolution regarding Plaintiffs' requested invocation, in or out of a duly noticed meeting, never deliberated about that issue, and never directed Mr. Biesemeyer to deny the invocation request. *Id.* at 32-34. It also contradicts Mr. Biesemeyer's testimony that he did not seek approval from the City Council. What is more, Plaintiffs presented no evidence that the matter was ever addressed at a City Council meeting, despite placing the minutes of numerous council meetings in evidence. *See* Ex. 14. The Court does not find that the single, passing statement during the Mayor's redirect examination accurately states the facts. The Court found Mr. Biesemeyer credible when he testified that he did not seek City Council approval of the decision.

- 14 -

they would give another. Ms. Kuester never inquired about religious views and never sought or received a copy of an invocation in advance. No organization ever contacted her to request an invocation before Plaintiffs.

Mr. Zarzycki contacted Ms. Kuester in early 2016 and asked that Plaintiffs be scheduled to give an invocation. Ms. Kuester placed Plaintiffs on the schedule, as The Satanic Temple, for April 5, 2016. After she had done so, Mayor Lane told her she had done the right thing – that the City had to treat Plaintiffs as it would any other religion. Mr. Zarzycki contacted her again on February 23, 2016 to reschedule the invocation. Ms. Kuester offered the dates of July 5 or 6, 2016, and Mr. Zarzycki chose July 6.

As noted above, the City received numerous emails about Plaintiffs' scheduled invocation. The emails supported and opposed the invocation, with a majority opposing. Ms. Kuester attempted to respond to all emails that were not form-emails. At the direction of the Chief of Staff, she sent a response thanking the senders for their input, stating that if the City did not permit the invocation it would have to end all City Council invocations, and stating that the Mayor found the whole affair personally repugnant and did not condone The Satanic Temple.

Ms. Kuester was the point person for scheduling Plaintiffs' invocation and later cancelling it. She testified that no member of the City Council or the Mayor ever asked her to cancel Plaintiffs' invocation. She further testified that she never heard Mr. Biesemeyer make any statement suggesting that he disfavored Plaintiffs or their views. The Court found Ms. Kuester's testimony credible.

    **C.    Plaintiffs' Evidence and Arguments.**

        **1.    Findings.**

Plaintiffs elicited testimony about the numerous emails received by the City in response to their invocation request. Plaintiffs introduced undated campaign materials from Mayor Lane which asserted that he was "standing up to Satanists." Ex. 11. Plaintiffs introduced an editorial written by Councilwoman Klapp, which stated that she did not welcome a Satanist group to the City and would leave the room if they gave an invocation

at a City Council meeting. Ex. 10. Mr. Biesemeyer testified credibly, however, that he had not seen Mayor Lane's campaign material at time of his decision, has not read Ms. Klapp's editorial, and was not influenced by campaign material or the editorial.

### 2. Findings and Conclusions.

Plaintiffs also sought to admit emails from Council members Cathy Littlefield and David Smith, addressed to private individuals, in which Littlefield and Smith expressed opposition to Plaintiffs giving an invocation at a City Council meeting. *See* Exs. 5, 8. The parties dispute whether these out-of-court statements, offered for the truth of the matters asserted, are admissible under Rule 801(d)(2)(D). The Court concludes that they are not admissible under this rule and are barred as hearsay because Plaintiffs presented the emails alone, with no evidence that either Ms. Littlefield or Mr. Smith was acting within the scope of their employment as City Council members when they wrote the emails. *See* Fed. R. Evid. 801(d)(2) ("The statement must be considered but does not by itself establish . . . the existence or scope of the relationship under (D)"); *see also Bennett v. Yoshina*, 98 F. Supp. 2d 1139, 1154 (D. Haw. 2000) ("Plaintiffs' reading of Rule 801(d)(2) to cover all state employees would mean that any state official could always be said to be speaking on behalf of the state even if the statement intentionally contravened established state policy or was unrelated to the state official's function."), *aff'd*, 259 F.3d 1097 (9th Cir. 2001). But even if the emails were admitted, they would not alter the outcome of this case. Plaintiffs presented no evidence that Mr. Biesemeyer ever saw or knew about the emails or spoke with Ms. Littlefield or Mr. Smith about their views. Mr. Biesemeyer testified that he did not see the emails and was not influenced by the views of City Council members.

### 3. Further Findings.

At the end of the day, Plaintiffs ask the Court to find that Mr. Biesemeyer was lying when he testified about his reason for denying Plaintiffs' invocation request. Plaintiffs argue that his reason is belied by the thousands of emails received by the City in opposition to the invocation, the Mayor's campaign material, the Mayor's email statement (at the direction of the Chief of Staff) that the whole matter was repugnant to him, Ms. Klapp's

- 16 -

editorial, Ms. Klapp's conversation with Mr. Biesemeyer, and the emails of Council members Littlefield and Smith. But Plaintiffs presented no evidence that Mr. Biesemeyer knew about five of these sources – the Mayor's campaign material, the Mayor's email statement, Ms. Klapp's editorial, and the emails of Littlefield and Smith. And when the credibility of Mr. Biesemeyer's and Ms. Kuester's testimony is taken into account, the Court finds that the other two matters – the thousands of emails and Ms. Klapp's statement to Mr. Biesemeyer – do not prove by a preponderance of the evidence that Mr. Biesemeyer acted on the basis of Plaintiffs' religious beliefs, or even that those beliefs were a substantial motivating factor in his decision. Plaintiffs have not carried their burden of proof.

### 4. Conclusions.

Finally, Plaintiffs asserted in their closing arguments that the Court should rule in their favor if it finds that the City did not have sufficient procedural safeguards to ensure the neutrality of its longstanding practice. Plaintiffs cited *Rubin v. City of Lancaster*, 710 F.3d 1087 (9th Cir. 2013), and argued that the Court should rule against the City because its practice does not contain all of the safeguards of the policy in *Rubin*. But the plaintiffs in *Rubin* brought a very different claim than the one at issue here. They made a broad challenge against the City of Lancaster's legislative prayer policy, arguing that it had the effect of placing the city's "'official seal of approval' on Christianity." *Id.* at 1097. Plaintiffs have never made a similar claim. They instead assert that they were discriminated against on a specific occasion. *Rubin* discussed the City of Lancaster's procedures in deciding whether its policy was truly neutral, but it did not hold that such procedures are required by the Establishment Clause or are necessary to withstand a claim of specific-instance discrimination. The question here is why the City denied Plaintiffs' invocation request. The Court has resolved that issue above. *Rubin* does not require a different result.[11]

---

[11] Plaintiffs also argued at the close of trial that if their religious beliefs played any part in the City's decision, then the City must provide a compelling reason for the decision. LT, 1/23/20, at 190. Without deciding whether this is a correct statement of the law, the Court finds that Plaintiffs have not proven that their religious beliefs played a part

**IT IS ORDERED** that judgment is entered in favor of Defendants on all of Plaintiffs' claims.

Dated this 5th day of February, 2020.

*David G. Campbell*
David G. Campbell
Senior United States District Judge

---

in Mr. Biesemeyer's decision.