**de Haan Law Firm, PLLC**     and     **Kezhaya Law PLC**
101 E. Pennington St.                         1202 NE McClain Rd.
Suite 201                                           Bentonville, Arkansas 72712
Tucson, Arizona 85701                     phone: (479) 431-6112
Telephone: (520) 358-4089             fax: (479) 282-2892
Facsimile: (520) 628-4275               email: matt@kezhaya.law
Stuart P. de Haan, State Bar No. 26664     Matthew A. Kezhaya, *phv*, Ark. Bar # 2014161
Attorneys for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| **The Satanic Temple, Inc.** *et al.,* | Case No. 18-cv-00621-DGC |
| Plaintiffs, | |
| *v.* | **Plaintiffs' motion for supplemented and amended findings of fact, and to alter or amend the judgment** |
| **City of Scottsdale**, | |
| Defendant | |

Respectfully submitted on February 28, 2020,
On behalf of Plaintiffs

By    /s/ Stuart P. de Haan_____    and    /s/ Matthew A. Kezhaya_____
         Stuart P. de Haan,                                      Matthew A. Kezhaya,
         AZ Bar No. 026664                                   AR Bar No. 2014161 (*pro hac vice*)
         Attorney for Plaintiffs                               Attorney for Plaintiffs
         de Haan Law Firm, PLLC                         KEZHAYA LAW PLC
         101 E Pennington Avenue, Suite 201     1202 NE McClain Rd
         Tucson, Arizona  85701                          Bentonville AR 72712
Phone   (520) 358-4089                                   (479) 431-6112
Fax        (520) 628-4275                                   (479) 282-2892
Email     stu.dehaan@gmail.com                      matt@kezhaya.law

**INTRODUCTION AND SUMMARY**

**COME NOW** Plaintiffs, by and through counsel of record, who move this Court for amended and supplemented findings, pursuant to FRCP 52(b), and for an altered or amended judgment pursuant to FRCP 59.

The Court's findings should be reconsidered and amended to (1) find that the City's conduct amounts to disparaging TST's religion; (2) identify and apply the appropriate Equal Protection analysis; and (3) find that the emails are admissible.

The Establishment Clause prohibits cities form exploiting a prayer opportunity to proselytize, or to disparage, a specific religion. Rubin was concerned with governmental "proselytizing;" we are concerned with governmental "disparagement." Rubin finds a prayer selection policy did not affiliate a city with Christianity because the city had codified and enforced a litany of neutrality enforcing safeguards.

This policy, however, has no safeguards and is instead subject only to the arbitrary authority of a bureaucrat whose understanding of the policy evolved as the case progressed. Adding in the thousands of emails from the public and the public statements from City councilmembers–all objecting to TST's participation on religious grounds–leads to the inevitable conclusion that Rubin compels a finding in favor of Plaintiffs.

We also sued under the Equal Protection Clause but there is no Equal Protection analysis. Strict scrutiny applies because TST, a minority religion, was prohibited through a majoritarian political process. This policy delineates between majority and minority faiths by requiring a physical location in the metropolitan area and a "substantial" number of residents in the City.

Alternatively, if the Court holds onto the finding that TST's exclusion has no relationship to the thousands of emails and public statements in objection to TST's religion, intermediate scrutiny applies because the "substantial connection" policy affects enumerated constitutional rights. The "substantial connection" policy delineates between residents and non-residents and silences speech in, as the opinion finds, a content-neutral manner. Intermediate scrutiny applies to both.

1   Last, the exclusion of the councilmember emails is rooted in a finding that there was no
2   evidence that the emails were sent in the course and scope of the agency.   The only
3   testimony on the subject was that the two councilmembers were employees of the City,
4   they received emails to the "City Council" address, Littlefield's email shows it came from
5   her "@scottsdaleaz.gov" address, and both emails are in response to emails from the City
6   Council address.   Mr. Smith's email, even if it is hearsay, is a clear statement of intent.
7   Failing the above, the emails should be proffered for the record.

8   <u>**ARGUMENT**</u>

9   <u>**1: In absence of neutrality-enforcing safeguards, the City's prayer**</u>
10  <u>**selection process is presumptively unconstitutional because TST was**</u>
11  <u>**prohibited after a public outcry which was joined by councilmembers.**</u>

12  Plaintiffs sued under the Establishment Clause.   The Court found that <u>Rubin</u> is
13  inapposite because the claim there was "very different than the one at issue here."   Opinion
14  at p. 17.   The Court should reconsider because the relevant sentence in <u>Marsh</u> prohibits
15  governments from exploiting prayer opportunities to proselytize or to disparage.   <u>Rubin</u> is
16  concerned with proselytizing; this case is concerned with disparagement.   Both sound
17  under the Establishment Clause.

18  **Legal framework**

19  It is axiomatic that the Establishment Clause prohibits discrimination on religious lines.
20  <u>Hassan v. City of N.Y.</u>, 804 F.3d 277, 290 fn.2 (3d Cir. 2015) ("Equality before the law is
21  of the very essence of liberty, whether civil or religious") (quoting <u>Permoli v. Municipality</u>
22  <u>No. 1 of New Orleans</u>, 44 U.S. 589, 597, 11 L. Ed. 739 (1845)).

23  Specific to the legislative prayer, the inquiry looks to the selection policy.   <u>See</u> <u>Marsh</u>
24  <u>v. Chambers</u>, 463 U.S. 783, 103 S. Ct. 3330 (1983).   The Supreme Court has since
25  emphasized repeatedly that legislative prayer is no exception to the Establishment Clause.
26  <u>Town of Greece v. Galloway</u>, 572 U.S. 565, 576, 134 S. Ct. 1811, 1819 (2014) ("<u>Marsh</u>
27  must not be understood as permitting a practice that would amount to a constitutional
28  violation if not for its historical foundation;") <u>see</u> <u>also</u> <u>Am. Legion v. Am. Humanist Ass'n</u>,

3

139 S. Ct. 2067, 2088 (2019) ("the Establishment Clause permits a **nondiscriminatory** practice of prayer at the beginning of a town council session") (emphasis added).

The theme of nondiscrimination abounds in the most recent Ninth Circuit case to consider a city council prayer ceremony.  See Rubin v. City of Lancaster, 710 F.3d 1087 (9th Cir. 2013); see also Williamson v. Brevard Cty., 928 F.3d 1296 (11th Cir. 2019) (legislative prayer selection failed Establishment Clause scrutiny because "Commissioners rejected speakers based squarely on the nature of the religious beliefs they held;") Lund v. Rowan Cty., N.C., 863 F.3d 268 (4th Cir. 2017) (same).

As explained by the Rubin Court, the inquiry looks to the "*government's*" actions to determine if, in effect, the prayer policy runs afoul of the Establishment Clause.  Rubin, 710 F.3d at 1096 (emphasis in original).  There, the question was if the city had affiliated itself with Christianity because the plaintiffs were two offended listeners who did not like the sectarian messages being delivered at them.

The Rubin Court explains that this concern was met by Samuel Adams, who stated "he was no bigot, and could hear a prayer from a gentleman of piety and virtue, who was at the same time a friend to his country."  Id. (quoting Marsh, above).

**Analysis**

There is no room for doubt that TST would not have been excluded if the public and city councilmembers shared Samuel Adams's sentiments.  The operative inquiry goes back to this sentence in Marsh:

> "The content of the prayer is not of concern to judges where, as here, there is **no indication** the prayer opportunity has been exploited to proselytize or advance any one, or to **disparage** any other, faith or belief."

Id. at 794-95 (emphasis added).

The Rubin Court was concerned with whether there was "any indication" that the prayer opportunity was exploited "to proselytize."  Our claim asks if there is "any indication" that

the prayer opportunity was exploited "to disparage."  Our claim is inextricably linked to the same foundational sentence relied upon by the <u>Rubin</u> Court.

As we argued at the close of trial, <u>Rubin</u> controls this case.  There, the prayer selection process was not unconstitutional because (1) it codified a "litany" of neutrality-enforcing safeguards; (2) it took proactive measures to deliver on its promise of inclusivity; and (3) the City repeatedly stressed nonsectarian aims.  <u>Id.</u> at 1097-98.

The <u>Rubin</u> Court found it noteworthy that "the clerk has never removed a congregation's name from the list of invitees."  <u>Id.</u> at 1098.  And there was "nothing in the record or in the prayer policy to indicate that the City has affiliated itself with Christianity."  <u>Id.</u> at 1099-1100.

Here, none of these factors can be found.  First, unlike the <u>Rubin</u> policy, there is not a single neutrality-enforcing safeguard.  It is unwritten, it has no appeals process, and it was not neutrally applied.  Taking the City's word at face value–as the Court does–it is subject only to the arbitrary authority of an unelected official, whose understanding of the "selection policy" evolved as this litigation progressed.

Second, unlike the <u>Rubin</u> policy, there was no effort to deliver on its promise of inclusivity.  The <u>Rubin</u> policy involved actively maintaining a list of local religious groups by the city clerk and mass mailing them an invitation to participate.  Ms. Kuester specifically testified that she did nothing to continuously update the list of invokers.  Her invitations were limited to the list.  The only evidence that the list was "maintained" involved organizations who had made personal contact with Ms. Kuester's boss, who then directed Ms. Kuester to add that one organization.

The last factors can be addressed together.  Here, there is no indication the City stressed nonsectarian aims.  To the contrary, the Mayor's statements that "we've decided to keep our traditional invocations" and bragging that he, "Stopped so called 'Satanists' from mocking City Hall traditions with a 'prayer'" can only be read as "us vs. them" in nature.  And it can't be overemphasized that TST was invited and then uninvited, which stands in stark contrast to the <u>Rubin</u> facts where nobody was removed from the list.

Rubin is also compelling because it emphasizes repeatedly that the "*government's*" actions determine the matter.  Rubin, 710 F.3d at 1096 (emphasis in original).  The opinion discounts entirely that the City is the defendant, and instead turns on a determination that Mr. Biesemeyer is not, individually, a bigot.  Opinion at p. 17.  This conflates the analysis.

It is unavoidable that the sequence of events ending in TST's exclusion was prompted by thousands of emails in objection to a Satanic–not a "Tucsonan"–invocation.  That cacophony of majoritarian objection was joined by public statements of the City's highest elected officials–again, on religious grounds.  This led to Mr. Biesemeyer's involvement and, shortly thereafter, the "substantial connection" policy was "discovered" by an unnamed city attorney in anticipation of litigation.  Thus, TST was excluded.

Conclusion

Plaintiffs sued the City under the Establishment Clause on the argument that the City exploited a prayer opportunity to disparage TST's religious beliefs.  The City cannot escape liability for prohibiting TST, and only TST, from the legislative invocation by assigning all blame to a silent patsy.  Whether Mr. Biesemeyer is a bigot is irrelevant to the analysis because the inquiry looks to the City's conduct, which includes the councilmember statements.  TST was the only group to ever be prohibited and, then, only after a loud and conspicuously religious objection.  The Court's finding that Rubin is inapposite should be reconsidered and resolved in Plaintiffs' favor.

**2: The final order needs an Equal Protection Clause analysis.**

Plaintiffs also sued the City under an Equal Protection theory but the final order lacks an analysis under any of the three recognized levels of scrutiny.  The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike.  Plyler v. Doe, 457 U.S. 202, 216-17, 102 S. Ct. 2382, 2394 (1982).  In a religious discrimination case, a the Ninth Circuit recently declined to decide what tier of scrutiny applies.  Catholic League for Religious & Civil Rights v. City & Cty. of S.F., 624 F.3d 1043 (9th Cir. 2009) (en banc).

The Equal Protection Clause has three levels of judicial scrutiny: strict scrutiny, intermediate scrutiny, and rational basis. Below, we provide the Court with the framework for a decision along each of the three lines.

As a preview, strict scrutiny should apply if the Court finds TST is a suspect class, or if TST was subjected to a special hurdle not otherwise placed in front of other religious groups. This is our preferred test because Ms. Kuester testified nobody else was subjected to the "substantial connection" scrutiny. Everyone else was permitted participation without question until a heckler's veto crashed city servers. This is constitutionally suspect.

Alternatively, intermediate scrutiny should apply if the Court finds that TST's religious message had nothing to with its preclusion and, instead, the "substantial connection" policy was neutral in both intent and application as to TST's religion, instead focusing only on whether the speaker is a resident of the City. This is our next preference. Even taking the City's story as true—as the Court has—the policy silences speech and gives preferential treatment to residents over non-residents. This impacts enumerated constitutional rights, to which the intermediate scrutiny test applies.

The last option is rational basis. At minimum, there is a constitutional guaranty against irrational laws. We can conjure no argument for what legitimate governmental purpose is furthered by the "substantial connection" policy and the City has offered none. It falls to the Court to do the City's job and determine what rational relationship this policy has to any legitimate governmental interest. We posit that there is no rational relationship between this policy and any legitimate purpose.

The final order should be amended to select one of the tests. Regardless which test the Court applies, the Court should find an Equal Protection violation and grant the prayer for relief in the amended complaint.

2.1: Strict scrutiny applies to classifications that either disadvantage a suspect class or impinge upon the exercise of a fundamental right. Strict scrutiny applies because the "substantial connection" policy does both.

As we argued in the reply in support of cross motion for summary judgment at pp. 10-12, strict scrutiny applies because TST is a minority religious group which was subjected to special scrutiny because of their religion.

**Legal framework**

The Plyler Court explains, "we would not be faithful to our obligations under the Fourteenth Amendment if we applied so deferential a standard [as rational basis] to every classification." Id. After all, "the Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional premises." Id.

As a result, classifications that disadvantage a "suspect class" or impinge upon the exercise of a "fundamental right" are presumptively unconstitutional. Id. A group is a suspect class if they "have historically been relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." Id. at fn. 14 (internal quotes omitted).

A "fundamental right" is one explicitly or implicitly stated in the Constitution. Plyler, 457 U.S. at 217, fn. 15. The right to be free from religious discrimination is a fundamental right. See U.S. Const. Amend. I (the Establishment Clause and the Free Exercise Clause).

If legislation, or even simply a "practice" as this Court found, disadvantages a suspect class, then the practice is presumptively unconstitutional. Id., 457 U.S. at 217; see also Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (§ 1983 is a mechanism to constitutionally scrutinize "customs" just as much as "legislation.")   To survive a constitutional challenge, such classifications must be "precisely tailored to serve a compelling governmental interest." Id.

Sometimes a classification is facially neutral. In these cases, courts must not begin and end their analysis with whether the defendant admits to being a bigot under oath. Instead, courts must make a "sensitive inquiry into such circumstantial and direct evidence of intent

8

as may be available."  See De La Cruz v. Tormey, 582 F.2d 45, 58-59 (9th Cir. 1978) (citing Washington v. Davis, 426 U.S. 229, 96 S. Ct. 2040, 48 L. Ed. 2d 597 and Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S. Ct. 555, 50 L. Ed. 2d 450); see also Washington v. Trump, 847 F.3d 1151, 1167-68 (9th Cir. 2017) ("It is well established that evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims;") and Church of Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 534, 113 S. Ct. 2217, 2227 (1993) ("Facial neutrality is not determinative;") Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 308, 120 S. Ct. 2266, 2278 (2000) ("it is nonetheless the duty of the courts to distinguish a sham secular purpose from a sincere one.") (internal quotes omitted).

The relevant considerations include everything from the historical background of the decision, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.  Church of Lukumi Babalu Aye, 508 U.S. at 540; see also id. at 535 ("the effect of a law in its real operation is strong evidence of its object.") Another consideration includes "substantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."  Arlington Heights, 429 U.S. at 267.

The bottom line is to determine whether the "government's actual purpose was to endorse **or disapprove** of religion."  Wallace v. Jaffree, 472 U.S. 38, 56, 105 S. Ct. 2479, 2489 (1985) (emphasis added).

Further support for the strict scrutiny analysis can be found in another provision of the First Amendment, the Free Speech Clause.  In a Free Speech analysis, the principal inquiry is whether the government has adopted a regulation of speech without reference to the content of the regulated speech.  Madsen v. Women's Health Ctr., 512 U.S. 753, 763, 114 S. Ct. 2516, 2523 (1994).

The First Amendment "strictly limits" the power of governments to selectively shield the public from some kinds of speech on the ground that they are more offensive than

others.  Erznoznik v. Jacksonville, 422 U.S. 205, 209, 95 S. Ct. 2268 (1975).  If a regulation was adopted to silence the content of speech, then it must survive strict scrutiny.  United States v. Playboy Entm't Grp., 529 U.S. 803, 813, 120 S. Ct. 1878, 1886 (2000)

Once it is shown that discriminatory intent was a "motivating" factor behind enacting the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor.  Hunter v. Underwood, 471 U.S. 222, 228, 105 S. Ct. 1916, 1920 (1985).

**Analysis**

When applying the above framework, there is no room for doubt that the strict scrutiny test applies to the "substantial connection" policy.  As we discussed above, strict scrutiny applies when the classification disadvantages a "suspect class" or impinges upon the exercise of a "fundamental right."  This policy does both.

Strict scrutiny applies if TST is a suspect class or if the right to be free from religious discrimination is implicated by the substantial connection policy.  This is true regardless whether the Court finds Mr. Biesemeyer was lying when he testified about "his reason," i.e. not the City's reason, for denying Plaintiffs' invocation request.  Opinion at pp. 16-17.

The relevant considerations provided by a tapestry of Equal Protection cases make clear that the Court's "duty to distinguish a sham secular purpose from a sincere one" is not discharged by ending the analysis at determining that Plaintiffs failed to prove that Mr. Biesemeyer, personally, is a bigot.  Santa Fe, above.

Instead, the analysis turns on whether an outside observer would believe that, after the following sequence of events, the City expressed a "message of . . . disapproval" about TST.  Lynch v. Donnelly, 465 U.S. 668, 688, 104 S. Ct. 1355, 1367 (1984) (O'Connor, J., concurring); see also Catholic League for Religious & Civil Rights v. City & Cty. of S.F., 624 F.3d 1043, 1057 (9th Cir. 2009) (a message of disapproval "is all it takes for it to be unconstitutional.")

1. Ms. Kuester scheduled TST, as she did with all other groups, without inquiry into their religious views.  Opinion at p. 15.

10

2. "Thousands" of emails objecting to Plaintiffs' equal participation on religious grounds crashed City servers.  Id. at p. 17.

3. City councilmembers expressly stated that they objected to Plaintiffs' equal participation, again on religious grounds.  Id. at pp. 15-16.

4. The Mayor informed the public that he found TST "repugnant" and "did not condone The Satanic Temple."  Id. at p. 15.

5. Plaintiffs were precluded from participation.  Id. at pp. 13-14.

6. The Mayor informed the public that was "standing up to Satanists," meaning, "**The city** has said no" to Plaintiffs.  Id. at p. 15; see also Exhibit 11 (emphasis added).

7. The Mayor bragged in reelection literature that he "Stopped so called 'Satanists' from mocking City Hall traditions with a 'prayer.'" Exhibit 13.

Beyond the above governmental disparagement of TST as a religion, the "substantial connection" policy impacts TST as a suspect class.  The City's consideration of whether there are a "substantial number" of residents in the religious group, opinion at p. 13, raises immediate red flags that the policy is being used to delineate between majority and minority faiths.  Whatever "substantial" means, it is an improper line between those faiths that are "big enough," and those that aren't.

Additional red flags are raised by the requirement that the organization be physically located in the metropolitan area.  Id.  A physical location costs money, and minority faiths lack the financial resources to establish a physical location in every metropolitan area.

Further, the overwhelming public response–joined by the City's highest elected officials–in opposition to our invocation is proof-positive that we were on the wrong end of a "majoritarian political process."  Plyler at fn. 14.  This means our circumstances, "command extraordinary protection" by the judiciary.  Id.

Second it is firmly rooted in our constitutional jurisprudence that people have the right to participate in the public process without governmental consideration of their faith, i.e. to be free from religious discrimination.  See Trump, 847 F.3d 1167-68 (cert denied sub nom. Golden v. Washington, 138 S.Ct. 448 (2017)).

It is an inescapable fact that the substantial connection policy was first enunciated immediately following a deluge of objections, joined by a majority of the City's highest-elected officials, to TST's equal participation.  Thus, TST's faith was a consideration in establishing a precedent that organizations must have a "substantial connection" in order to participate.

Beyond that, it is compelling if not dispositive under the <u>Arlington Heights</u> "substantial departure" test that TST was granted an invitation in the first place.  Ms. Kuester testified that the normal course of conduct for scheduling an invocation was a 3-5 minute phone call which consisted only of the identity of the speaker and when the invocation would take place.

The undisputed evidence was that no religious organizations had to answer any questions about their number of adherents in ~~Scottsdale~~ the Phoenix metro area or their physical establishments.  Nor did TST, until Ms. Kuester was directed otherwise.  Thus, it ran afoul of the Equal Protection Clause for the City to create a condition that TST, but nobody else, "prove" an ever-shifting definition of "substantial connection."

**Conclusion**

The only question is if the City has met its burden and explained to the Court how the substantial connection policy is "precisely tailored to serve a compelling governmental interest."  At no point has the City sustained that burden.  The judgment should be amended to provide a strict scrutiny analysis and find that Plaintiffs are entitled to Equal Protection Clause relief.

> **2.2: Intermediate scrutiny applies when an enumerated constitutional right is impacted by a classification. The "substantial connection," even assuming it is content-neutral, still impacts free speech and the right to travel.**

The next possibility is intermediate scrutiny.  In an Equal Protection case, the intermediate scrutiny analysis is famously employed to consider gender issues.  E.g. <u>Craig v. Boren</u>, 429 U.S. 190, 97 S. Ct. 451 (1976).  But the test is not limited to gender classifications.  Broadly, the intermediate scrutiny test appears to apply when important,

12

but not fundamental, constitutional rights are impacted.  See District of Columbia v. Heller, 554 U.S. 570 (2008) (gun rights) see also, e.g., United States v. O'Brien, 391 U.S. 367, 88 S. Ct. 1673 (1968) (content-neutral regulations of speech).

As explained in Heller, enumerated constitutional rights are entitled to no less than an intermediate scrutiny analysis.  See Heller, 554 U.S. at fn. 27 (rejecting the rational basis test because, otherwise, the guarantees of the Bill of Rights would be "redundant with the separate constitutional prohibition on irrational laws.")

One constitutionally enumerated but non-fundamental right is the Privileges and Immunities Clause, U.S. Const. Amend. IV § 1, which broadly protects the right to travel and prohibits states from the disparately treating people based on whether they are a citizen of the state.  See Saenz v. Roe, 526 U.S. 489, 500, 119 S. Ct. 1518, 1525 (1999).

Just as citizens have the "right to be treated as a welcome visitor rather than an unfriendly alien while temporarily present" in their sister states, id., they also have the same right while traveling to sister cities.  United Bldg. & Constr. Trades Council v. Camden, 465 U.S. 208, 222, 104 S. Ct. 1020, 1029 (1984).

Under Camden, cities cannot, without a "substantial reason," discriminate in favor of their residents; and, even then, the discrimination must bear a "close relation" to the reason. Id.  This is the intermediate scrutiny test.

The intermediate scrutiny test requires the government to proffer an interest and prove it is "substantial."  See Cincinnati v. Discovery Network, 507 U.S. 410, 416, 113 S. Ct. 1505, 1510 (1993) (commercial speech case).  To do so, the government must prove that it developed a basis in fact to find that the substantial interest is furthered by the policy at issue.  Id.  This requires some form of study.  See Krantz v. City of Fort Smith, 160 F.3d 1214, 1222 (8th Cir. 1998).

**Analysis**

Here, the City's position all along has been that all religions with a "substantial connection" to the City may speak at the ceremony.  This amounts to either of two arguments which both end in the intermediate scrutiny test.

13

First, it could mean that the "substantial connection" policy is a content-neutral regulation of who may speak.  Or, it could mean that "our residents are favored over non-residents."  Either way, intermediate scrutiny applies.

The intermediate scrutiny analysis is straightforward.  The City failed to sustain its burden to show that it studied the matter, found an evil, and propounded a regulation makes a classification which shares a close relationship with curing that evil.  The City didn't conduct a study, didn't enunciate any evil at all, and has never made any argument for how the "substantial connection" policy furthers any governmental purpose.

> 2.3: The policy fails to survive even rational basis because the City never advanced a legitimate public purpose behind limiting invokers to those organizations in the Phoenix metro area with a "substantial" number of members in the Scottsdale community.

The last level of judicial scrutiny is "rational basis."  As the <u>Plyler</u> Court explains, the initial discretion to determine what is "different" and what is "the same" resides in the legislatures of the States.  <u>Id.</u>  States must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived which accommodates competing concerns both public and private.  <u>Id.</u>  For this group of actions, the constitution only seeks assurances that "the classification at issue bears some fair relationship to a legitimate public purpose."  <u>Id.</u>

The rational basis test is notoriously difficult for a plaintiff to overcome because the Court can fashion its own legitimate governmental interest and how that interest is rationally related to the policy at issue, provided only that the Court is "careful not to attribute to the government purposes which it cannot reasonably be understood to have entertained."  <u>Christian Sci. Reading Room Jointly Maintained v. San Francisco</u>, 784 F.2d 1010, 1013 (9th Cir. 1986) (internal quotes omitted) (rejecting "patently make-weight" arguments concocted only after the fact).

But, despite that "most" governmental classifications will survive the rational basis test, this does not mean there is no meaningful judicial review.  In <u>Heller</u>, above, it was

14

explained that citizens are constitutionally guaranteed to be free from irrational laws. Heller at fn. 27; see also Reading Room, above (concluding that an airport's eviction of a reading room, because it is religious, does not even survive the rational basis test).

**Analysis**

Here, the City never offered a legitimate governmental interest and never offered explanation for how the policy is rationally related to any legitimate interest. Assuming the Court does not apply the strict scrutiny test or the intermediate scrutiny test, it falls upon the Court to perform the City's argument for them.

Supplemented findings and conclusions are necessary to identify the legitimate governmental interest furthered by a policy which requires a religion have a physical presence in the Phoenix metropolitan area and have a "substantial number" of religious adherents within the City boundaries. Opinion at p. 13.

On this record, there is no legitimate interest that does not run afoul of at least one of the above constitutional restrictions. The interest cannot be "avoiding controversy," for that would run afoul of the rule against yielding to a heckler's veto. Nor can the interest be "suppressing a minority religion" because that would run afoul of the rule against governmental disparagement of a religion and religious discrimination. Nor can the interest be "favoring our citizens over another ~~city's~~ metropolitan area's citizens" because this would run afoul of the privileges and immunities clause.

**Conclusion**

The City offered no evidence of the any legitimate governmental purpose furthered by the "substantial connection" policy. That is because there is none. Cities cannot give disparate treatment to religious minorities, cannot yield to heckler's vetoes, and cannot give favorable treatment to residents over non-residents. This policy fails even rational basis review.

<u>Conclusion: the policy fails no matter what test the Court selects</u>

Plaintiffs sued under the Equal Protection Clause but the final judgment lacks an Equal Protection analysis.  No matter which tier applies, the "substantial connection" policy fails to survive constitutional scrutiny.

The strict scrutiny test applies because the "substantial connection" policy, even assuming it isn't an obvious pretext, was applied to prohibit a minority religion after a public outcry on religious grounds was joined by disparaging statements by the City's highest officials.  This policy impacts a suspect class and fundamental constitutional rights.

Alternatively, the intermediate scrutiny test should apply because the "substantial connection" policy silences speech and treats residents better than non-residents.  This policy impacts enumerated, if not fundamental, constitutional rights.

But even if rational basis applies, the policy still fails because the clear evidence was that Mr. Biesemeyer's attention was called to the matter by the "thousands" of emails which crashed City servers.  Neither avoiding controversy nor silencing a minority religion are legitimate governmental interests.  Nor is giving preferential treatment to non-residents.

**<u>3: The emails should have been admitted because they are responding to emails which all the councilmembers received.</u>**

Last, a simple housekeeping argument.  The Court excluded two emails, Exhibits 5 and 8, as hearsay on the finding that there was no evidence outside the emails that either Ms. Littlefield or Mr. Smith were acting within the scope of their employment as City Council members when they wrote the emails.  Opinion at p. 16.

The Court should reconsider.  There was testimony by Ms. Kuester and Councilwoman Klapp that Ms. Littlefield and Mr. Smith were city councilmembers and received emails to the "citycouncil@scottsdaleaz.gov" email address.  The subject emails are in response to emails sent to that address.

Further, a review of both emails makes clear that both are addressing matters of public concern with constituents which is indisputably within the scope of a councilmember's agency.  Any doubt that Ms. Littlefield was emailing in her capacity as councilwoman is

foreclosed by the fact that it is signed "Councilwoman Kathy Littlefield" and is sent from her "klittlefield@**scottsdaleaz.gov**" email address.  Exhibit 5 (emphasis added).

Similarly, Mr. Smith's email is in reference to the subject "Re: Urgent Message for Mayor Jim Lane **and City Council Members**."  Exhibit 8 (emphasis added).  Moreover, even if Mr. Smith's email is hearsay, it is a clear statement of intent.  Compare id. ("I wish (and **intend**) my deliberations on Council to be blessed and guided by God alone") with FRE 803(3) (excluding from hearsay statements "of the declarant's then-existing state of mind (such as motive, **intent**, or plan")) (emphasis added).

As to the Court's finding that the above are irrelevant to the analysis, opinion at p. 16, we respectfully disagree.  We believe the above constitutional jurisprudence makes clear that it the inquiry is into why TST was prohibited.  These exhibits further bolster the argument that the City's highest officials objected to TST, not because Ms. Shortt lived 120 miles away, but because Ms. Littlefield found TST's equal participation to be "taking equality too far" and because Mr. Smith indicated an intent that his deliberations would be "blessed and guided by God alone."

## CONCLUSION

For a few reasons, the Court should alter or amend the judgment pursuant to FRCP 52(b) and FRCP 59.  First, the Establishment Clause analysis should be amended to focus on the City's conduct, not whether Mr. Biesemeyer is personally a bigot.  The "substantial connection" policy is essentially the opposite of the permissible Rubin policy in every material way.

Under Rubin, it is clear that the "substantial connection" policy fails constitutional muster because it lacks any neutrality-enforcing safeguards, has no inclusion element, was used to exclude TST–and only TST–from an otherwise all-comer policy, and is subject only to the arbitrary discretion of an unelected bureaucrat whose understanding of the policy evolved as the litigation progressed.

Second, the opinion lacks an Equal Protection analysis.  The Court should amend the judgment to analyze the "substantial connection" policy through any of the three recognized tiers of constitutional scrutiny.

Strict scrutiny applies if the Court finds that TST's exclusion was borne of a majoritarian objection to TST's religious beliefs, or if the Court finds that TST is a suspect class, or if the "substantial connection" policy delineates between majority and minority faiths.

Alternatively, intermediate scrutiny applies if the Court finds that TST's exclusion had nothing to do with TST's religious beliefs and, instead, that the policy impacts only a content-neutral regulation on speech or the right to travel.

Last, the emails should have been admitted because there was testimony, independent from the emails themselves, that the councilmembers sent the emails in the course and scope of their employment as councilmembers.  Mr. Smith's email, even if it is hearsay, is a clear statement of intent.

## CERTIFICATE OF SERVICE

I certify that on February 28, 2020 I electronically transmitted this document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the appropriate CM/ECF registrants. /s/ Stuart de Haan

18