**de Haan Law Firm, PLLC**   and   **Kezhaya Law PLC**
101 E. Pennington St.                 1202 NE McClain Rd.
Suite 201                             Bentonville, Arkansas 72712
Tucson, Arizona 85701                 phone: (479) 431-6112
Telephone: (520) 358-4089             fax: (479) 282-2892
Facsimile: (520) 628-4275             email: matt@kezhaya.law
Stuart P. de Haan, State Bar No. 26664   Matthew A. Kezhaya, *phv*, Ark. Bar # 2014161
Attorneys for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF ARIZONA

| | |
|---|---|
| **The Satanic Temple, Inc.** *et al.,*<br><br>Plaintiffs,<br><br>*v.*<br><br>**City of Scottsdale**,<br><br>Defendant | Case No. 18-cv-00621-DGC<br><br>**Plaintiffs' reply on motion for supplemented and amended findings of fact, and to alter or amend the judgment** |

Respectfully submitted on April 3, 2020,
On behalf of Plaintiffs

By   /s/ Stuart P. de Haan              and   /s/ Matthew A. Kezhaya
     Stuart P. de Haan,                       Matthew A. Kezhaya,
     AZ Bar No. 026664                        AR Bar No. 2014161 (*pro hac vice*)
     Attorney for Plaintiffs                  Attorney for Plaintiffs
     de Haan Law Firm, PLLC                   **Kezhaya Law PLC**
     101 E Pennington Avenue, Suite 201       1202 NE McClain Rd
     Tucson, Arizona  85701                   Bentonville AR 72712
Phone   (520) 358-4089                        (479) 431-6112
Fax     (520) 628-4275                        (479) 282-2892
Email   stu.dehaan@gmail.com                  matt@kezhaya.law

1

**ARGUMENT**

## 1: In absence of neutrality-enforcing safeguards, the City's prayer selection process is presumptively unconstitutional because TST was prohibited after a public outcry which was joined by councilmembers.

We first argued that there is a requirement of neutrality-enforcing safeguards in prayer selection policies and the absence of neutrality-enforcing safeguards requires judgment in favor of TST. Rubin v. City of Lancaster, 710 F.3d 1087 (9th Cir. 2013).

The City responds that Rubin does not apply, not that there are any neutrality-enforcing safeguards. Response at p. 5. But the distinction in the Rubin plaintiff's prayer for relief does not amount to a difference. In Rubin, the fundamental question is whether the "*government's*" actions betrayed an affiliation with Christianity. Rubin, 710 F.3d at 1096 (emphasis in original); see also id. at 1097 (characterizing the issue as if the city had placed its "official seal of approval on Christianity.") The threshold was if there was any "indication" of that fact. Id. at 1092-93.

The fundamental question here is the same: did the "*government's*" (not Biesemeyer's) actions betray an affiliation against Satanism? Or, stated slightly differently, did the City place its "official seal of disapproval" on Satanism? No matter the characterization, the focus is on the City. Thus, it conflates the analysis to focus exclusively on Mr. Biesemeyer.

The City also appears to respond that it was mere coincidence that Mr. Biesemeyer's involvement was preceded by 15,000+ emails objecting to TST's equal participation. Response at p. 6. But Ms. Kuester specifically testified that she brought in Mr. Biesemeyer's involvement because of those emails. The Court even found this. Opinion at pp. 12-13. This is not an "*ipse dixit*" argument, it is a settled fact.

The City also oversimplifies the argument as taking issue with the "formality" of the policy. Response at p. 4. The issue is not one of formality, but one of substance. This policy—assuming it is not just an obvious pretext—purports to provide unilateral authority to an unelected bureaucrat whose understanding of it evolved with the progress of this litigation. The policy has no identifiable factors. The policy has no appeals process. The

policy was applied to require a politically disfavored group—and only that group—to "prove" substantial connection as a prerequisite to the prayer. And, then, the requirement only arose immediately following a majoritarian objection to the organization's equal participation. And that objection was joined by four of the seven-member city council, one of whom expressed "concerns" to the individual tasked with dealing with the matter.

In the absence of neutrality-enforcing safeguards, there is nothing to stop a city from discriminatorily selecting or rejecting prayers based on political palatability. The First Amendment was crafted to avoid precisely this issue. Lemon v. Kurtzman, 403 U.S. 602, 622, 91 S. Ct. 2105, 2116 (1971) ("political division along religious lines was one of the principal evils against which the First Amendment was intended to protect.")

This case is the complete antithesis of Rubin. There are no neutrality-enforcing safeguards. The City took proactive measures to exclude TST, and only TST. And then the City repeatedly stressed that TST was being excluded because of its religious beliefs.

Statements were admitted before, during, and after the announcement of this "long-standing practice" that invokers must have a substantial connection to the City. See Exhibit 10 (On March 16, Councilwoman Klapp indicated, "There is no current rule related to the invocation;") Exhibit 11 (contemporaneously with the exclusion, Mayor Lane indicated, "The city has said no" to the "so-called Satanists" because "we're standing up to this ridiculing of religion"); and Exhibit 13 (following the exclusion, Mayor Lane took credit for having "Stopped so called 'Satanists' from mocking City Hall traditions with a 'prayer.'")

**Conclusion**

The "easy button" to reconsider and find in favor of Plaintiffs is that there is a constitutional requirement of neutrality-enforcing safeguards in legislative prayer selection policies. The Court could point to Rubin, identify that this case is the antithesis on every material front, and refrain from deciding which safeguards are necessary to pass constitutional muster. It is sufficient to find that a bureaucrat cannot be given unilateral

authority, without an appeals process, to exclude a politically disfavored group following a majoritarian objection which was joined by a majority of the City's policymaking body.

Alternatively, the Court could find that, far from there being "no indication" of discrimination, Plaintiffs introduced sufficient evidence to pass the burden of persuasion to the City to show that there was no discrimination. The City failed to meet that burden.

Regardless, the opinion should be reconsidered because it is premised on the incorrect proposition that Plaintiffs must prove by a preponderance that Mr. Biesemeyer is, personally, a bigot. The inquiry focuses on the City's actions as a whole, not the individual tasked with finding a defensible basis to exclude TST.

**2: The final order needs an Equal Protection Clause analysis.**

We next argued that we brought an Equal Protection Clause argument, but there is no Equal Protection Clause analysis in the opinion. There are three levels of judicial scrutiny in an Equal Protection case but the opinion declines to select or apply any of the recognized tests.

The City responds, as a threshold matter, that an Equal Protection case turns on Plaintiffs proving the threshold issue of an intent to discriminate. Response at p. 6 (citing Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977)).

The problem is that this is not an Equal Protection plaintiff's burden. The actual burden is to prove that discriminatory purpose was a "motivating factor." Arlington Heights, 429 U.S. at 270. As explained there, "The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." The unavoidable historical background to this decision is that the rejection was immediately preceded by a massive outcry objecting to TST's equal participation, which was joined by a majority of the city council.

Compare this case with the Arlington Heights facts. There, statements by the government "focused almost exclusively on the zoning aspects." Id. And a board member was called to testify where, "Nothing in her testimony supports an inference of invidious purpose." Id.

Here, the written governmental statements focused almost exclusively on Plaintiffs' status as "Satanists" instead of "Tucsonans." Exhibits 5, 8, 9, 10, 11, and 13. Two board members were called to testify and they both candidly admitted their opposition to equal participation by Satanists. This is sufficient evidence to draw an inference of discriminatory purpose as a motivating factor.

Alternatively, the City argues, Plaintiffs have no Equal Protection claim because legislative prayer is government speech. Response at p. 8. But the Court has repeatedly rejected this argument and has found that an Equal Protection claim has been stated.

The City does cite one Ninth Circuit, which is distinguishable to say the least. Johnson v. Poway Unified Sch. Dist., 658 F.3d 954 (9th Cir. 2011). In Johnson, the Ninth Circuit reiterated the uncontroversial position that a school district can properly prohibit an elementary school math teacher from using his classroom as a pulpit. The teacher lost his Equal Protection Clause argument because, when he was in the classroom, his speech was government speech and the government "is entitled to say what it wishes and to select the views it wants to express." Johnson at 975.

Johnson teaches that teachers lack an Equal Protection claim to use their position of authority to proselytize because they are employees. Johnson does not teach that governments are free to pick and choose which religious beliefs to advance or inhibit.

Last, the City argues that it has no liability at all because municipalities are liable "*only* if a plaintiff can demonstrate that the alleged constitutionally inform conduct was undertaken pursuant to that municipality's established policy as articulated by the individual with final decision making authority." Response at p. 10 (emphasis in original).

This is wrong for two reasons. First, municipalities are liable for constitutional injuries "inflicted pursuant to city policy, **regulation**, **custom**, or **usage.**" Chew v. Gates, 27 F.3d 1432, 1444 (9th Cir. 1994) (emphasis added). Liability does not only attach to constitutional harms visited by a formal process; informal processes can incur liability for cities as well. Even then, a policy "causes" an injury where "the city itself is the

wrongdoer." Id. As the Court found at the motion to dismiss stage (the first one), the City is the proper defendant and not the individual employees involved in excluding TST.

### 2.1: : Strict scrutiny applies to classifications that either disadvantage a suspect class or impinge upon the exercise of a fundamental right. Strict scrutiny applies because the "substantial connection" policy does both.

We next argued that strict scrutiny applies because the "substantial connection" policy disadvantages a suspect class and impinges upon the exercise of a fundamental right.

### 2.1.1: The Court has an obligation to look past the face of the policy to determine if the City's actual purpose was to disapprove of Satanism.

The City first responds that strict scrutiny cannot apply "because the practice at issue is a facially neutral policy." Response at p. 10. There are two problems with this. First, the policy is not facially neutral. It delineates between those faiths which have the money to place a physical location and have a "substantial" number of adherents in Scottsdale city limits. As we explained in the motion, the policy raises immediate red flags of drawing an improper line between those faiths that are "big enough," and those that aren't.

The second problem is that facial neutrality does not control the matter. The question is whether the "government's actual purpose was to endorse **or disapprove** of religion." Wallace v. Jaffree, 472 U.S. 38, 56, 105 S. Ct. 2479, 2489 (1985) (emphasis added); see also Washington v. Trump, 847 F.3d 1151, 1167-68 (9th Cir. 2017) ("It is well established that evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims") and cited cases.

As we touched on earlier, proof of discrimination as a motivating factor is not something that a plaintiff proves by a preponderance of the evidence, but something that a plaintiff introduces "any evidence" of, and from which an inference of invidious intent is drawn. Ibid.; see also Arlington Heights, 429 U.S. at 265-66 ("When there is **a proof** that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified") (emphasis added).

The phrase "a proof" is not a typo: the Arlington Heights Court makes clear that any proof of discriminatory intent shifts the burden to the City. Evidence was entered from two members of the City's policymaking body which explicit objections to Plaintiffs' equal participation because they are Satanists. Exhibits 10 and 11. The Court also found that Mr. Biesemeyer's involvement was prompted by the 15,000+ emails objecting to Plaintiffs' equal participation because they are Satanists. The burden passed to the City.

### 2.1.2: The clear preponderance of the evidence was that Plaintiffs are a suspect class.

We also argued that these facts clearly demonstrate Plaintiffs are a suspect class because they were on the wrong side of a majoritarian political process. The First Amendment was specifically designed to preclude this debate. Lemon, above.

In response. the City oversimplifies the case by equating Ms. Shortt to an Alaskan Inuit. Response at p. 11. But the City's hyperbolic hypothetical does not account for any of the material facts of this case. The hypothetical does not address the fact that the "Inuit" was given an invitation, until a majoritarian objection led to a substantive departure in requiring the "Inuit"—and only the "Inuit"—prove something that nobody else had to. These omitted facts require application of the strict scrutiny test.

### 2.1.3: The "material" contentions at issue are in the order.

Rather than proffer any argument that Plaintiffs are *not* a suspect class, the City complains that the argument was not sufficiently detailed in the pretrial order. Response at p. 11. But the order requires only a recitation of "material" issues. It does not require TST to identify with particularity every baby step of the analytical framework.

The material issue is: "Did the City violate the Establishment Clause or Equal Protection Clause when various public officials made statements objecting to Plaintiffs' participation in the legislative invocation on the basis of their religion, shortly before denying Plaintiffs' participation in the legislative invocation?" Pretrial order at pp. 11-12 (Issue #1); see also, e.g., Issues ##6-8 (all pertaining to the Equal Protection claim).

It would be absurd to require the parties write a pretrial order enumerating each sentence of each side's pretrial brief, and then expound upon their contentions and objections in paragraph format. As for the City's cited case of Patterson v. Hugest Aircraft Co., 11 F.3d 948, 950 (9th Cir. 1993), that reliance is misplaced. In Patterson, the parties stipulated to a material fact, but the district court refused to find that fact because there was no proof of it. Id. This was error because, "The parties are bound by their agreement to limit the issues to be tried." Id. (emphasis added). For Patterson to aid the City's argument, the parties would have had to stipulate that TST is not a suspect class. That didn't happen.

### 2.1.4: The City does not address the substantive departure.

Tellingly, the City also does not address the substantive departure issue. As explained by the Arlington Heights Court, "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." Id. at 267.

Here, the norm was that a three-to-five minute phone call always resulted in a prayer opportunity without a special determination of the organization's "substantial connection" to Scottsdale. See Kuester deposition at 13:10-11; see also Exhibit 10 (On March 16, about two months before the exclusion, the "substantial connection" policy did not exist).

At first, TST was granted a prayer opportunity without further inquiry after a three-to-five minute phone call. But, after the outcry, there was a substantive departure. Suddenly, there was a "long standing practice" which required proof of a "substantial connection" and, as a result, TST's invocation opportunity was summarily rescinded. Exhibit 12.

**Conclusion**

There is no ground to dispute that Plaintiffs were on the wrong side of a majoritarian political process. The Court should find that strict scrutiny applies because Plaintiffs, a suspect class, were subjected to a special burden not put upon other religions. That Plaintiffs were initially granted the prayer opportunity without inquiry into their "substantial connection," only to have it revoked after the outcry, proves discrimination.

The Court should enter a new judgment which performs the strict scrutiny analysis and finds that the City failed to sustain its burden to show how the substantial connection policy is "precisely tailored to serve a compelling governmental interest."

> 2.2: Intermediate scrutiny applies when an enumerated constitutional right is impacted by a classification. The "substantial connection," even assuming it is content-neutral, still impacts free speech and the right to travel.

We next addressed intermediate scrutiny. No case prohibits application of the intermediate scrutiny test in a discrimination case. See Catholic League for Religious & Civil Rights v. City & Cty. of S.F., 624 F.3d 1043 (9th Cir. 2009) (en banc); Christian Sci. Reading Room Jointly Maintained v. San Francisco, 784 F.2d 1010 (9th Cir. 1986).

In response, the City renews its spurious argument that the government can advance or inhibit religious beliefs at will through the prayer selection policy because the prayer is government speech. Response at p. 13. This argument runs afoul of basic constitutional doctrine. E.g. Marsh v. Chambers, 463 U.S. 783, 103 S. Ct. 3330 (1983) (prohibiting the prayer selection policy from being used to advance or inhibit religious beliefs), Town of Greece v. Galloway, 572 U.S. 565, 134 S. Ct. 1811 (2014) (same), and Am. Legion v. Am. Humanist Ass'n, 139 S. Ct. 2067, 2088 (2019) (same). It merits no further discussion.

The point missed by the City's response is not that the Free Speech Clause or the Privileges and Immunities Clause prohibits this discrimination. Instead, the point is that there is a defensible basis for the Court to apply intermediate scrutiny by analogizing caselaw from these clauses.

Assuming the Court finds that TST was not excluded based on its religious beliefs, the next possibility is that TST was excluded because TST is not based in Scottsdale. This is what the City has argued all along. In that event, factually similar cases have applied intermediate scrutiny. That places the burden on the City to defend the policy, and the City failed to meet that burden by proffering a "substantial" interest with a "close relationship" to this policy.

**Conclusion**

The Court could find that intermediate scrutiny applies. If the Court does not find that religious discrimination took place, as Plaintiffs claim, then the Court might find that Plaintiffs were discriminated against, in a content-neutral manner, on the basis of their status as "non-residents" of the City. In that event intermediate scrutiny applies.

Content-neutrality does not end the inquiry, it merely sets the stage for intermediate scrutiny. The City refuses to address the argument by proffering, much less proving, a "substantial reason" which bears a "close relationship" to this policy. Thus, if the Court finds intermediate scrutiny applies, the Court should amend the judgment to apply an intermediate scrutiny analysis and find the City failed to carry its burden of proof.

> 2.3: The policy fails to survive even rational basis because the City never advanced a legitimate public purpose behind limiting invokers to those organizations in the Phoenix metro area with a "substantial" number of members in the Scottsdale community.

Last, we addressed rational basis. The City's proffered interest is "adding solemnity, gravity, a [sic] fostering a just and peaceful public discourse." Response at p. 15. This fails for two reasons.

First, at no point prior to the City's response has there been any factual basis that the "substantial connection" policy was created to advance the interests identified in the response. This runs afoul of the rule that the Court be "careful not to attribute to the government purposes which it cannot reasonably be understood to have entertained." Reading Room, 784 F.2d at 1013 (rejecting "patently make-weight" arguments concocted only after the fact). To the contrary, the only evidence was that Mr. Biesemeyer was brought in to address the majoritarian response objecting to TST's equal participation.

Second, there is no argument for how religious groups with a "substantial number" of residents and a physical location add "solemnity," etc., but those which don't tend to upend solemnity. There has to be rational relationship between the policy and the interest. The

City offers no argument on that point.  The City has offered the Court half of an excuse, which is insufficient.

Instead, the City's argument lays bare that the basis of the decision begins and ends with half of one sentence from <u>Town of Greece</u>: "**So long as the town maintains a policy of nondiscrimination**, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." <u>Town of Greece</u>, 572 U.S. at 585-86; but see response at p. 15 (omitting the bolded language).

There is only one reasonable conclusion here: the city attorney identified that sentence as a passable post-hoc explanation for why TST, and only TST, could be excluded.  This does not amount to a legitimate governmental interest.  <u>Romer v. Evans</u>, 517 U.S. 620, 634, 116 S. Ct. 1620, 1628 (1996) ("If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.")

**Conclusion**

The Court should reject the City's proffered explanation.  At no point has there been any factual basis to find that Scottsdale considered "adding solemnity, gravity, a [sic] fostering a just and peaceful public discourse" as a basis in creating the substantial connection policy.  Even if it had, there has been no showing that this policy bears any rational relationship to that end.  Instead, this policy was clearly borne of a bare desire to harm a politically unpopular group.  That is not a legitimate governmental interest.

**<u>3: The emails should have been admitted because they are responding to emails which all the councilmembers received.</u>**

We also requested admission of two more emails, sent by councilmembers to their constituents. Exhibits 5 and 8.  In response, the City relies on a case that the Court rejected as "unhelpful."  The City does not argue how the emails are nonhearsay statements by party opponent.  Nor does the City respond to the point that Exhibit 8 is a clear statement of intent.  See id. ("I want and intend to be blessed and guided by God alone.")

11

Instead, the City argues that 7.2 requires this motion to have been filed within 14 days of the opinion. But Rule 7.2 is preempted by Rule 59 on these facts. Rule 59 provides a 28-day deadline for postjudgment motions to reconsider, which we satisfied.

Last, the City claims the motion is "utterly futile" because the Court determined that the exhibits would only have an impact if Mr. Biesemeyer admitted he saw the materials. We respectfully disagree. Discriminatory statements from members of the City's policymaking body, made contemporaneously with the crafting of the policy, are a factor in the analysis. E.g. Washington v. Trump, 847 F.3d 1151, 1167-68 (9th Cir. 2017) and cited cases

## **CONCLUSION**

**WHEREFORE** the Court should find Rubin applies because both this case and Rubin rely on the same sentence in Marsh: Governments cannot use a prayer selection policy to proselytize or to disparage. Rubin's focus on proselytization is not meaningfully different from our focus on disparagement. Rubin's requirement of neutrality-enforcing safeguards, which are absent here, is the easy button for the Court to find for Plaintiffs.

Otherwise, strict scrutiny should apply because TST is a suspect class who had to overcome a special hurdle not put before other religions. That TST originally received the invitation without reference to "substantial connection" proves a substantive departure from the norm. The City failed to carry its burden to satisfy strict scrutiny.

Alternatively, intermediate scrutiny might apply if this is a content neutral policy that only discriminates against nonresidents. The City failed to carry its burden to satisfy intermediate scrutiny. Rational basis does not apply because there is no predicate to determine "solemnity" was a consideration and, even then, "solemnity" bears no logical relationship to a policy which facially excludes minority faiths.

## **CERTIFICATE OF SERVICE**

I certify that on April 3, 2020 I electronically transmitted this document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the appropriate CM/ECF registrants. /s/ Stuart de Haan