1           **UNITED STATES DISTRICT COURT**

2            **FOR THE DISTRICT OF ARIZONA**

3            _____

4   **Satanic Temple, et al.,**                )
                                               )
5                    Plaintiffs,    )  **CV 18-00621-PHX-DGC**
                                               )
6        vs.                        )  Phoenix, Arizona
                                               )  **January 22, 2020**
7   **City of Scottsdale, et al.,**            )  8:52 a.m.
                                               )
8                    Defendants.    )
    _____)

9

10

11

12

13       **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

14       **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15              **BENCH TRIAL DAY 1**

16

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2

3    For the Plaintiffs:

4            Kezhaya Law, PLC
             By: **MATTHEW A. KEZHAYA**, ESQ.
5            1202 NE McClain Rd
             Bentonville, AR  72712
6
             de Haan Law Firm, PLLC
7            By: **STUART P. de HAAN**, ESQ.
             101 E. Pennington St., Ste. 201
8            Tucson, AZ  85701

9

10   For the Defendants:

11           Dickinson Wright, PLLC
             By: **SCOT L. CLAUS**, ESQ.
12           By: **HOLLY M. ZOE**, ESQ.
             By: **VAIL C.B. CLOAR**, ESQ.
13           1850 N. Central Ave., Ste. 1400
             Phoenix, AZ  85004
14

15

16

17

18

19

20

21

22

23

24

25

1

**I N D E X**

2

**OPENING STATEMENTS**

3

Plaintiff Opening Statement by Mr. de Haan          10

4

Defense Opening Statement by Mr. Claus          12

5

6

7

**EXAMINATION**

8

**WITNESS**                                              **PAGE**

9

WILLIAM JAMES LANE

10

          Direct Examination By Mr. de Haan          20

11

          Cross-Examination By Mr. Claus          36

12

          Redirect Examination By Mr. de Haan          50

13

SUZANNE KLAPP

14

          Direct Examination By Mr. Kezhaya          53

15

          Cross-Examination By Ms. Zoe          68

16

          Redirect Examination By Mr. Kezhaya          76

17

MICHELLE SHORTT

18

          Direct Examination By Mr. Kezhaya          80

19

          Cross-Examination By Mr. Claus          177

20

          Redirect Examination By Mr. Kezhaya          221

21

BRIAN BIESEMEYER

22

          Direct Examination By Mr. de Haan          246

23

24

25

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 11 | Copy of public statement by Lane | 28 |
| 13 | Copy of Lane campaign flyer | 35 |
| 10 | Article published by Suzanne Klapp, March 16, 2016 | 56 |
| 7 | Email from Kuester to Zarzycki, February 24, 2016 | 104 |
| 12 | Email from Kuester to Zarzycki, May 23, 2016 | 105 |
| 17 | Defendant's Motion to Dismiss brief in support | 108 |
| 14 | Meeting minutes 2013-2018 | 117 |
| 8 | Emails between Littlefield and Constituent, February 11, 12, 2016 | 162 |
| 6 | E-mail from Zarzycki to Kuester, February 23, 2016 | 185 |
| 76 | TST Affiliation Agreement dated 08/10/16 | 194 |
| 82 | Articles of Organization – Adversarial Truth LLC filed 04/14/17 | 201 |
| 4 | Proposed invocation The Satanic Temple intended to use at Scottsdale's city council meeting | 210 |

**P R O C E E D I N G S**

08:52:12    THE COURTROOM DEPUTY:  This is case number
CV-18-621, Satanic Temple, et al., versus City of Scottsdale,
on for bench trial.

Counsel, please announce for the record.

MR. de HAAN:  Stu de Haan for plaintiffs.

MR. KEZHAYA:  Matt Kezhaya for plaintiffs.

MR. CLAUS:  Good morning, Your Honor.  Scot Claus,
08:52:24 Dickinson Wright.  With me is Vail Cloar, Holly Zoe,
Alexandra Crandall, and our paralegal who will be helping us
with the presentation, Michelle Williamson, and our client
representative, Brian Biesemeyer, on behalf of the City of
Scottsdale.

08:52:42    THE COURT:  All right.  Good morning everybody.

Counsel, do you have matters to raise before we get
started this morning?

MR. CLAUS:  We had one, Your Honor.

THE COURT:  Go ahead.

08:52:56    MR. CLAUS:  The plaintiffs have served on the mayor,
Councilwoman Klapp, Kelli Kuester, who is an administrative
employee of the City, and Brian Biesemeyer, our client
representative, subpoenas.  I have asked plaintiffs' counsel
numerous times to provide to us not the order of witnesses
08:53:20 that they will call, Your Honor, but to let us know whom of

08:53:24   1   these city employees and city representatives can abide

2   lunchtime so they don't to have waste their entire day here

3   since the rule is invoked.  And in 27 years of doing this,

4   this has never been a problem for me, but for some reason it

08:53:38   5   is a problem for the plaintiffs to afford me that modicum of

6   courtesy.

7        So I'm going to ask you, Your Honor, to ask them to

8   do for you what they will not do for me and let you know

9   who -- it doesn't take a rocket scientist to know we will get

08:53:54  10   through two and probably be on the third witness by the time

11   lunchtime occurs.  So if they know their first three

12   witnesses, they can let me know who can be -- who can come

13   after lunch.

14        THE COURT:  Counsel.

08:54:08  15        MR. KEZHAYA:  Yes, Judge.  The issue we're having is

16   we don't know how long each of these first three witnesses

17   are.  We have a plan, we have an idea, but we don't know if

18   we will definitely be done with the third witness by the time

19   lunch rolls around.  Our concern is we get into the fourth

08:54:22  20   witness and they're nowhere to be found because they're told

21   to be here after lunch.

22        THE COURT:  Tell us your plan.

23        MR. KEZHAYA:  Pardon?

24        THE COURT:  Tell us your plan.

08:54:32  25        MR. KEZHAYA:  Our plan is to have Jim Lane go first.

08:54:37  1  We have a number of documents and impeachment to go through,

2  but if he says everything that we expect him to say, he could

3  be as short as 15 minutes.  Likewise with Klapp.  Shortt is

4  third.  Shortt will probably take on the order of an hour and

08:54:48  5  a half, we expect, inclusive of cross-examination.

6              THE COURT:  And who is after that?

7              MR. KEZHAYA:  After that is Biesemeyer, Your Honor.

8              THE COURT:  Why have you been unwilling to tell that

9  to the defense counsel?

08:54:58 10           MR. KEZHAYA:  We were concerned they would use it

11  against us in some way.

12              THE COURT:  How?

13              MR. KEZHAYA:  It would give them insight into our

14  trial strategy.

08:55:06 15           THE COURT:  Well, I strongly disagree.  I want you

16  to tell them the full order of witnesses you will call, and I

17  want the defense to do the same if you haven't already done

18  it.  That is basic.

19              MR. KEZHAYA:  Yes, Judge.  Now or --

08:55:17 20           THE COURT:  Now.

21              MR. KEZHAYA:  After -- well, the first four is Lane,

22  Klapp, Shortt, and Biesemeyer.

23              THE COURT:  And after that?

24              MR. KEZHAYA:  After that will be Kuester or Kuester

08:55:31 25  and then Misicko.

08:55:35  1          THE COURT:  Is that all of them?

          2          MR. KEZHAYA:  That will be end of them, yes,

          3   Your Honor.

          4          THE COURT:  Okay.  You didn't provide me with a

08:55:39  5   witness list either, which was required in my order.

          6          MR. KEZHAYA:  Begging the Court's pardon, Your Honor

          7   I didn't see that part.  We had put together the exhibits but

          8   we didn't see the witness list part.

          9          THE COURT:  You didn't mark the exhibits either, I

08:55:52 10   understand.

         11          MR. KEZHAYA:  Likewise, Judge, we've always had

         12   stickers provided to us by court, so we didn't think we would

         13   be applying them before the 9 o'clock start time.

         14          THE COURT:  Well, we're going to go ahead and start.

08:56:02 15   There isn't time to mark exhibits now.  We'll mark as we go

         16   this morning.  But during the first break, you need to get

         17   all of the other exhibits marked, as was indicated in the

         18   order issued in August that you were to do that.  So be sure

         19   and get that done during the morning break.

08:56:20 20          MR. KEZHAYA:  Yes, Judge.

         21          THE COURT:  Do you have other matters you want to

         22   raise before we get started?

         23          MR. KEZHAYA:  Nothing from plaintiffs, Your Honor.

         24          THE COURT:  Anything else from the defense?

08:56:30 25          MR. CLAUS:  Nothing, Your Honor, but may I have two

08:56:31  1  minutes to tell Ms. Kuester she doesn't have to be here until

2  after lunch?

3  THE COURT:  You may, and I need a minute to get

4  organized as well.

08:56:38  5  MR. CLAUS:  Thank you, Your Honor.

6  THE COURT:  Go ahead.

7  Okay.  As we previously discussed, we've set aside

8  11 hours for the trial, 5.5 hours per side.  We will start

9  with opening statements, and so let's go ahead and start with

08:58:52  10  any opening statement plaintiff wishes to make.

11  MR. de HAAN:  Good morning, Your Honor.

12  Satanic Temple is an international religious

13  organization with presence in every state in America as well

14  as numerous foreign countries.

08:59:15  15  As this trial progresses there's two things the

16  plaintiffs are going to prove.  One is that TST is a

17  religion.  Of course that's going to invoke the two causes of

18  action, the establishment clause and Equal Protection clause,

19  and that The Satanic Temple and its member, Michelle Shortt,

08:59:30  20  was discriminated against on the basis of religious animus.

21  In order to do that, we are going to show that the

22  policy that was created to apply only to Ms. Shortt was

23  pretextual.

24  We're going to show there was a injury to Ms. Shortt

08:59:46  25  and The Satanic Temple because they were denied basic

08:59:49  1   First Amendment rights with the denial to give this

2   invocation.  Additionally, we are going to show it was

3   actually the City of Scottsdale and its employees that caused

4   this injury by denying the right for the invocation to be

09:00:00  5   given, and we're going show there was redressability in that

6   the way this could be remedied is that there is a policy that

7   doesn't discriminate in that The Satanic Temple be able to

8   give invocations as any other religious organization.

9        In this there's two causes of action.  First, the

09:00:18  10   establishment clause.  The City cannot constitutionally have

11   a policy of discrimination selecting speakers based on their

12   religious orientation and cannot endorse one religion or

13   disparage another.

14        The other cause of action is equal protection, which

09:00:36  15   will be proven through the same body of evidence.

16        The City cannot treat other religions better or

17   worse than The Satanic Temple.  They were similarly situated

18   to other religious groups.  And the policy that was created

19   for this situation, it's not narrowly tailored -- narrowly

09:00:55  20   tailored to promote a compelling government state interest in

21   the least restrictive means possible.

22        What you will hear is there was religious animus

23   from the City's highest officials before the policy was

24   created, during when the policy was created, and after the

09:01:12  25   policy was created.

09:01:13   1        What you're not going to hear in this trial is that

2    there's a compelling state interest being advanced by this

3    policy because there's no showing that this policy is any

4    kind of definition that can be upheld by the courts.

09:01:29   5        At the end of the trial we're going to ask you find

6    for the plaintiffs on both counts, that they cannot

7    constitutionally prohibit the invocation given by The Satanic

8    Temple.  We're going to ask for appropriate costs and fees

9    and injunction -- injunctive relief and whatever else the

09:01:46   10   Court finds reasonable.

11        Thank you, Your Honor.

12        THE COURT:  Okay.  Thank you.

13        Opening from the defense.

14        MR. CLAUS:  Good morning, Your Honor.  Scot Claus at

09:01:59   15   Dickinson Wright on behalf of the defendants.

16        Michelle Shortt did not ask anyone at the City of

17   Scottsdale for permission to give an invocation.  You will

18   hear names during this trial, Your Honor.  You will hear the

19   name Kelli Kuester.  She was the individual responsible for

09:02:25   20   scheduling invocations.  Michelle Shortt never spoke to

21   Kelli Kuester.  Michelle Shortt never wrote Kelli Kuester an

22   e-mail, Michelle Shortt never wrote Kelli Kuester a letter,

23   Michelle Shortt had no communications with Kelli Kuester.

24        You will also hear the name during this trial

09:02:46   25   Brian Biesemeyer.  Mr. Biesemeyer was the acting city manager

09:02:53  1    in February 2016 and had been acting city manager for 2015.

2         You will hear that as acting city manager he was

3    imbued by the Charter of the City of Scottsdale with the sole

4    power to act as the chief executive of the City in charge for

09:03:18  5    making administrative decisions.  And Michelle Shortt never

6    said one word verbally, never said one word in writing, to

7    Brian Biesemeyer.

8         Michelle Shortt will be forced to admit that the

9    allegations she repeatedly made in her complaint that she

09:03:44  10   asked and that she was denied the ability to give an

11   invocation are wholly and completely false.

12        It's not just that Michelle Shortt never asked to

13   give an invocation, Michelle Shortt -- Michelle Shortt never

14   told any representative in this case, that you just heard is

09:04:09  15   about religious and viewpoint discrimination, the evidence

16   will show that Michelle Shortt never said one word to any

17   representative of the City of Scottsdale about her religious

18   beliefs, her viewpoints, the viewpoints of anything called

19   The Satanic Temple, or any religion purportedly held by any

09:04:33  20   member of The Satanic Temple.

21        She didn't tell Kelli Kuester.  She didn't tell

22   Brian Biesemeyer, she didn't tell Mayor Jim Lane, she didn't

23   tell Councilwoman Suzanne Klapp.

24        In fact, the testimony and evidence in this case in

09:04:49  25   which plaintiffs assert viewpoint discrimination will reveal

09:04:52  1  not a single representative of any of the multiple plaintiffs

2  ever uttered a single word to any representative of the City

3  of Scottsdale regarding the purported viewpoint that the

4  plaintiffs hold.

09:05:07  5        I want to repeat that, Your Honor.

6        This is a case about viewpoint discrimination, but

7  all of the testimony and evidence you hear will reveal that

8  no representative of any plaintiff ever told a representative

9  of the defendant what Ms. Shortt believed; what anyone

09:05:30  10  associated with anything called The Satanic Temple believed;

11  what the plaintiff in this case, the United Federation of

12  Churches LLC, believed; what the plaintiff in this case,

13  Adversarial Truth LLC, believed; or what the plaintiff in

14  this case, The Satanic Temple, Inc., believed.

09:05:51  15        And on this point, Your Honor, a brief footnote is

16  required because with respect to the purported beliefs or

17  viewpoints of Adversarial Truth LLC or The Satanic Temple,

18  Inc., as a matter of physics and the calendar, the testimony

19  will reveal that they could not have held a viewpoint in 2016

09:06:13  20  because they did not exist in 2016.

21        It's not just that the evidence will demonstrate

22  that the plaintiffs were utterly silent in articulating their

23  purported viewpoints or beliefs to the City, they also did

24  not provide a copy of the purported proposed invocation.  No

09:06:36  25  representative of the plaintiff described the contents of the

09:06:42  1    purported proposed invocation to any representative of the

       2    City of Scottsdale.

       3            It's not just, Your Honor, that the plaintiffs did

       4    not provide information or beliefs or viewpoints of any

09:06:57  5    plaintiff to any City representative.  Instead, the evidence

       6    will uniformly demonstrate that no representative of the City

       7    of Scottsdale obtained that knowledge from any other source.

       8            So why was this organization that called itself The

       9    Satanic Temple scheduled for an invocation and why was that

09:07:25 10    canceled?

      11            Ms. Kuester and Mr. Biesemeyer will tell you.

      12    Ms. Kuester will tell you that she was in a unique situation.

      13    Her job, as I told you, was to schedule invocations, and the

      14    tool that she used to schedule those invocations was a list.

09:07:46 15    It was a list of organizations that she created from

      16    information that she inherited when she took her job.

      17            Plaintiffs say, but she didn't investigate the

      18    connection between the organizations on that list and the

      19    City.

09:08:08 20            That's right.  Because she will tell you she did not

      21    do an investigation because the organizations on that list

      22    had already demonstrated a substantial connection to the City

      23    of Scottsdale.  She will also tell you -- this is another

      24    name you will hear, Jeremy Zarzycki.  Ms. Shortt never said

09:08:35 25    one word to a representative of the City of Scottsdale.

09:08:37 1    Instead, what Ms. Kuester will tell you is that somebody

2    named Jeremy Zarzycki asked for an invocation to be

3    scheduled.

4           She will tell you that Mr. Zarzycki's request was

09:08:49 5    the first time she had ever received an unsolicited request

6    from an outside organization to give an invocation.

7           And when she was asked, she did not inquire as to

8    the belief system held by the organization that Mr. Zarzycki

9    referenced, she did not ask about Mr. Zarzycki's belief or

09:09:11 10   his religion, she did not ask about the religion of anyone

11   who wished to give an invocation.  She scheduled.

12          Mr. Biesemeyer will tell you why he got involved.

13          Again, Your Honor, because under the Scottsdale City

14   Charter, as acting city manager Mr. Biesemeyer was the chief

09:09:34 15   executive in charge of making administrative decisions on

16   behalf of the City of Scottsdale.  He will tell you he made

17   the administrative decision to cancel the scheduled

18   invocation after utilizing the significant resources at his

19   disposal to do two critical things.

09:09:56 20          One, Your Honor, determine that the City had a

21   long-standing, not a created, practice of only allowing faith

22   groups with a substantial connection to the City of

23   Scottsdale to give invocations on behalf of the City; and,

24   two, that the organization calling itself The Satanic Temple

09:10:25 25   had no such connection --

09:10:30  1        But he didn't do an independent investigation, the

       2   plaintiffs will say.  Yes, Brian Biesemeyer, the chief

       3   executive administrative officer for the City of Scottsdale,

       4   the acting city manager, did not personally perform an

09:10:44  5   investigation.  But he will tell you under oath from the

       6   witness stand that that does not mean that others did not

       7   conduct an investigation at his behest.

       8        They did.

       9        And that investigation revealed the truth,

09:11:05 10   Your Honor, that the organization calling itself The Satanic

      11   Temple had no connection to the City of Scottsdale.

      12        Now, here's an important point, Your Honor.  How do

      13   we know that is the truth?

      14        Because Mr. Zarzycki was told of the cancellation on

09:11:30 15   May 23, 2016, in an e-mail communication, and from May 23,

      16   2016, until this moment in the universe, not a single

      17   representative of the organization calling itself The Satanic

      18   Temple, not a single representative of any of these

      19   plaintiffs, uttered one word that said or meant, no, you're

09:12:07 20   wrong, City of Scottsdale, The Satanic Temple is a thing and

      21   has a substantial connection to the City of Scottsdale, and

      22   here's why.

      23        Michelle Shortt never said that.

      24        Jeremy Zarzycki never said that.

09:12:25 25        Douglas Misicko never said that.

09:12:28  1          No representative of the United Federation of

2    churches, LLC, ever said that.

3          No representative of Adversarial Truth, LLC, ever

4    said that.

09:12:38  5          No representative of The Satanic Temple, Inc., ever

6    said that.

7          No one responded to the cancellation on May 23,

8    2016, and responded to the legitimate and actual reason for

9    the denial.

09:12:58 10          Now, I told you that Mr. Biesemeyer will tell you

11   what he did to make his decision.  He will also tell you what

12   he didn't do.

13          He did not seek or receive instruction from

14   Mayor Jim Lane at all.

09:13:21 15          He did not seek or receive instruction or direction

16   from the city council as a body, nor did he seek or receive

17   instruction from any individual member of The Satanic Temple.

18          He will also tell you that although he did seek for

19   an investigation into the long-standing practice of the City

09:13:48 20   and whether any plaintiff organization had that substantial

21   connection to the City of Scottsdale, what he did not do was

22   learn or inquire about the beliefs of any member of the

23   plaintiff, their religion or their religious viewpoint,

24   because he didn't care, Your Honor.

09:14:08 25          That evidence that I just described and that

09:14:14  1    testimony that I just described will be all you need,

2    Your Honor, to make your decision in this case.

3         But you will hear so much more.  You will hear that

4    the plaintiffs' purported belief system bears none of the

09:14:29  5    hallmarks of a religion.

6         In fact, Your Honor, you will hear that the

7    plaintiffs' organization began as a, quote, media stunt, end

8    quote, and that they represent a purely secular organization

9    advocating purely secular philosophies that are intentionally

09:14:58  10   denigrating and offensive to and mocking of sincere religious

11   beliefs.

12        For that reason, when she testifies, Ms. Shortt will

13   be forced to admit that she does not -- did not desire then

14   and will not, if the plaintiffs are afforded a remedy, give

09:15:22  15   anything called an invocation.  Instead, Your Honor,

16   Michelle Shortt will be forced to admit that she sought then

17   and she seeks relief from this Court to engage in a discourse

18   that would mock, belittle, and denigrate the sincere

19   religious beliefs of members of the council and the

09:15:48  20   Scottsdale community.

21        At the end of the day, and literally may be the end

22   of today, Your Honor, the evidence presented in this case

23   will demonstrate that the defendants did not discriminate

24   against and did not deny Equal Protection to any plaintiff.

09:16:06  25   And therefore a judgment for the defendant will be compelled.

DIRECT EXAMINATION – WILLIAM JAMES LANE

09:16:12  1          Thank you, Your Honor.

2          THE COURT:  All right.  Thank you.

3          First witness from plaintiffs.

4          MR. de HAAN:  We are invoking exclusion of

09:16:25  5   witnesses, Your Honor.  I think both sides are.

6          THE COURT:  We'll ask the witnesses to step out of

7   the courtroom, please, except the first witness.

8          MR. de HAAN:  We're going to call Jim Lane first,

9   Your Honor.

09:16:33  10          THE COURT:  All right.

11                    **WILLIAM JAMES LANE,**

12   called as a witness herein, after having been first duly sworn

13   or affirmed, was examined and testified as follows:

14               D I R E C T   E X A M I N A T I O N

09:17:19  15   BY MR. de HAAN:

16   Q   Morning, Mr. Lane.

17   A   Good morning.

18   Q   Could you please state your name and spell your last name.

19   A   It is William James Lane.  Last name is spelled L-A-N-E.

09:17:48  20   Q   And what's your occupation?

21   A   I'm the mayor of the City of Scottsdale.

22   Q   And does the mayor serve on the city council as well?

23   A   Yes, as a member of the city council.

24   Q   And your position is an elected position; is that right?

09:18:04  25   A   That's correct.

DIRECT EXAMINATION – WILLIAM JAMES LANE

09:18:05  1    Q    So are city council members?

2    A    It's a separate race, but, yes.

3    Q    Now, when someone sends an e-mail to

4    citycouncil@scottsdaleaz.gov, do you receive those e-mails?

09:18:23  5    A    Yes, I do.

6    Q    Now, there's also as part of the structure of the City, a

7    city manager; correct?

8    A    I'm sorry?

9    Q    There's also someone who works for the City, that position

09:18:33 10    is city manager.

11    A    Yes.

12    Q    Would it be fair to say they serve at the pleasure of the

13    council?

14    A    Yes, that's correct.

09:18:42 15    Q    And then there's a Kelli Kuester.

16    A    Yes.

17    Q    Are you familiar with her?

18    A    Yes, I am.

19    Q    What is her position?

09:18:50 20    A    She's a management assistant in the mayor's office.

21    Q    She works for the mayor's office?

22    A    Yes.

23    Q    Now, as far as this situation, it was –– it's her job to

24    actually schedule these invocations; is that correct?

09:19:05 25         MR. CLAUS:  Objection, Your Honor.  Foundation.

DIRECT EXAMINATION – WILLIAM JAMES LANE

09:19:08  1        THE COURT:  Overruled.

2        MR. de HAAN:  I'm sorry --

3        THE COURT:  You can answer.

4        THE WITNESS:  Thank you.

09:19:14  5        She is -- as one of her duties, yes, she does

6   schedule them.

7   BY MR. de HAAN:

8   Q   Okay.  Now, as far as anything written or published at the

9   time this occurred back at the end of 2015, there was no

09:19:31 10   written policy; is that fair to say?

11        MR. CLAUS:  Foundation, Your Honor.

12        THE COURT:  Overruled.

13        MR. CLAUS:  Vague, Your Honor.

14        THE COURT:  Overruled.

09:19:39 15        THE WITNESS:  Written policy, no, I don't believe

16   so.

17   BY MR. de HAAN:

18   Q   And there was no written prohibitions to who could give an

19   invocation; is that fair to say?

09:19:49 20   A   That's correct.

21   Q   Now, as far as the initial scheduling of The Satanic

22   Temple to do an invocation, how did you first hear about that?

23   A   Actually first heard about it in the news as related to

24   another city.

09:20:11 25   Q   Okay.  So when the invocation got scheduled in Scottsdale,

DIRECT EXAMINATION - WILLIAM JAMES LANE

09:20:16   1   was it Kuester who informed you of that?

         2   A   Honestly, I do not remember it being scheduled or

         3   otherwise.

         4   Q   Okay.  Now, at some -- do you recall at some point telling

09:20:32   5   Ms. Kuester that The Satanic Temple is to be treated as any

         6   other religion?

         7   A   I'm not sure if I quite understand.  Did I understand

         8   there was a policy to have it treated as any other religion?

         9   Q   Yes.  Did you inform Ms. Kuester that this organization,

09:20:49  10   this religious organization, would be treated the same as any

        11   other religious organization when this first occurred?

        12   A   Actually I'm not sure I made that statement, no.

        13   Q   Okay.  Were you ever informed of any substantial

        14   connection or lack thereof that The Satanic Temple had to the

09:21:19  15   City of Scottsdale?

        16   A   No.

        17   Q   But you had opinions about this invocation; is that fair

        18   to say?

        19         MR. CLAUS:  Objection.  Foundation as to time,

09:21:31  20   Your Honor.

        21         THE COURT:  Overruled.

        22         THE WITNESS:  I have opinions like anyone, yes.

        23   BY MR. de HAAN:

        24   Q   And at the time you had a website; is that correct?  In

09:21:40  25   the end of 2015, beginning of 2016, you had a website?

DIRECT EXAMINATION - WILLIAM JAMES LANE

09:21:45  1  A   If you're talking about a campaign website, yes.

2  Q   Okay.  And you actually wrote a piece called Standing Up

3  to Satanists; is that fair to say?

4  A   I think that's right.  Actually, it was a piece on -- in

09:22:04  5  that campaign.

6  Q   And that was in your campaign?

7  A   Yeah.

8  Q   Okay.  This was a piece that was to the public?

9  A   By virtue of the campaign that you're promoting, yes.

09:22:16 10  Q   Okay.

11       And you said in that piece that this invocation

12  wasn't going to happen.

13       MR. CLAUS:  Objection, Your Honor.  Foundation as to

14  time.

09:22:27 15       THE COURT:  Overruled.

16       MR. CLAUS:  And, Your Honor, best evidence.  He's

17  trying to prove the contents of a writing.

18       THE COURT:  Overruled.

19  BY MR. de HAAN:

09:22:40 20  Q   Do you recall what you wrote?

21  A   Honestly, no, I do not know exactly what was said.

22  Q   Would it refresh your recollection --

23  A   To the point it may have been a campaign piece that was

24  written by others in a sense.

09:22:52 25  Q   Okay.  Would it refresh your recollection to see it?

DIRECT EXAMINATION - WILLIAM JAMES LANE

09:22:55   1   A    Yes.

2   Q    Okay.

3          THE COURTROOM DEPUTY:  Your Honor, this is Exhibit

4   Number 11.

09:23:35   5   BY MR. de HAAN:

6   Q    Okay.  So what's being handed to you is Plaintiffs' 11.  I

7   know that first one is pretty unreadable, but is that a copy

8   of that website that you recall?

9   A    Really, from this illustration I really can't tell at

09:23:50  10   all.

11   Q    If you look on the next page there's a transcription of

12   the contents.  Does that -- if you'd take moment to look at

13   that.

14          Does that fairly and accurately represent what you

09:24:01  15   had written?

16          MR. CLAUS:  Objection, Your Honor.  Mr. de Haan is

17   referring to the third page of Exhibit 11, which is not a

18   transcription of anything.  We don't know who prepared it.

19   There's no foundation for this page of this exhibit.

09:24:17  20          THE COURT:  So what's the objection?

21          MR. CLAUS:  The objection is that it is misleading.

22   There's no foundation for this page of this exhibit.

23          THE COURT:  He can ask the witness that question,

24   which he just did.  So the objection is overruled.

09:24:32  25          Would you re-ask the question, Mr. Lane.  Pardon me,

DIRECT EXAMINATION - WILLIAM JAMES LANE

09:24:35  1    Mr. de Haan.

2    BY MR. de HAAN:

3    Q    Giving a moment for Mr. Lane to take a look, my question

4    is does that fairly reflect what you had written?

09:24:45  5    A    Again, to the point of the origin of writing it.  But

6    does it indicate some of what was expressed?  Certainly.  I

7    believe it is.

8    Q    Okay.  Okay.  Is your testimony that as far as you can

9    remember this is what you had written?

09:25:15  10    A    Yeah.  Now I -- yeah.  In general, yes.

11    Q    Okay.

12         In this you said that you've decided to send the

13    satanist side show elsewhere; is that right?

14    A    I think that's what it indicates.  I think that's

09:25:33  15    probably right.  I don't remember exactly.

16    Q    But you're not denying you said that?

17    A    Yeah.

18    Q    So you said that some things are worth fighting for, and

19    what you meant by that is to deny this group the ability to do

09:25:52  20    the invocation?

21    A    Preserve the invocation.

22    Q    And you said, "We're telling the satanists hell no."

23    A    That's -- if that's -- sure, that's probably right.

24         THE COURT:  Have you got a copy --

09:26:12  25         Excuse me, Mr. Lane.

DIRECT EXAMINATION - WILLIAM JAMES LANE

09:26:14  1          Have you got a copy for the witness?

2          MR. de HAAN:  If I may approach.

3          THE COURT:  Have you got only one copy?

4          MR. de HAAN:  I think I have one and we provided one

09:26:23  5    to the Court.

6          THE COURT:  Yeah, I have one.  You only have one

7    copy?

8          MR. de HAAN:  Yes.

9          THE COURT:  During the break or something you need

09:26:32  10   to make two copies so we don't have to keep going back and

11   forth to the witness.

12          MR. de HAAN:  Understood.

13          May I approach, Your Honor?

14          THE COURT:  You may.

09:26:38  15   BY MR. de HAAN:

16   Q   So I'll just ask the last part.  You're not denying you

17   said "we're telling the satanists hell no."

18          MR. CLAUS:  Objection, Your Honor.  Foundation as to

19   time.

09:26:49  20          THE COURT:  Overruled.

21          THE WITNESS:  Repeat that question.

22   BY MR. de HAAN:

23   Q   At the end of this article you said, "Some things are

24   worth fighting for.  We're telling the satanists hell no"?

09:27:00  25   A   It's in defense of a right to have the invocation, yes.

DIRECT EXAMINATION - WILLIAM JAMES LANE

09:27:05  1        MR. de HAAN:  Plaintiff moves to admit Plaintiffs'

2    11.

3             MR. CLAUS:  Your Honor, we renew our objections.  We

4    have no idea when this document was created; when it was

09:27:15  5    disseminated, if it was disseminated.

6             THE COURT:  What is the basis for the objection?

7             MR. CLAUS:  No foundation for the admission of the

8    exhibit, Your Honor.  As to the temporal -- and because there

9    is no foundation as to time, then it's not relevant,

09:27:27 10    Your Honor.

11             THE COURT:  Overruled on that basis.  I'll admit

12    Exhibit 11.

13        (Exhibit 11 admitted.)

14    BY MR. de HAAN:

09:27:34 15    Q   This occurred contemporaneously with the invocation being

16    requested, is that fair to say, when you wrote this?

17    A   Explain that -- I'm sorry, explain what you're saying.

18    Is it -- at the same time?

19    Q   Yes.  This piece you wrote occurred after the invocation

09:27:50 20    had been scheduled; is that fair to say?

21    A   I would presume so, if in fact during the election cycle

22    the comments were made.

23    Q   Understood.

24             Now, you personally didn't inquire as to substantial

09:28:29 25    connections to Scottsdale about The Satanic Temple?  You

DIRECT EXAMINATION - WILLIAM JAMES LANE

09:28:31  1    didn't look into that?

2    A    No.

3    Q    And you didn't advise Kelli Kuester to look into that?

4    A    No.

09:28:37  5    Q    You didn't advise Brian Biesemeyer to look into that?

6    A    No.

7    Q    Is it fair to say at the time that you wrote this, you

8    didn't know the beliefs of The Satanic Temple?

9    A    At the time this was published?

09:28:56 10    Q    Correct.

11    A    I don't know that because I don't know the time.

12    Q    And you didn't know, for instance, the organizational

13    structure of The Satanic Temple, where their headquarters were

14    in Arizona, anything like that?

09:29:13 15    A    If you're referring to the point where this -- no, I

16    don't know that.

17    Q    Okay.  Now, are you aware -- after this occurred, are you

18    aware of a public outcry that occurred about this invocation

19    being set?

09:29:30 20    A    Honestly, I don't know on the timing of that either,

21    other than the fact what had happened in Phoenix, it was in

22    the papers and there was a bit of information as far as

23    that's concerned.

24    Q    So any information you had is from the media?

09:29:45 25    A    Pretty much, yes.

DIRECT EXAMINATION - WILLIAM JAMES LANE

09:29:47   1   Q   Did you hear about all of the e-mails that got sent in to

2   the City of Scottsdale?

3            MR. CLAUS:  Objection, Your Honor.  Assumes --

4            THE WITNESS:  I don't recall.

09:29:55   5            MR. CLAUS:  -- facts not in evidence.

6            THE COURT:  Overruled.

7            THE WITNESS:  Don't recall.

8   BY MR. de HAAN:

9   Q   You don't know?

09:30:03  10   A   No.

11   Q   But you're -- would it be fair to say you knew people were

12   responding to that e-mail address and you were receiving

13   e-mails?  Do you remember that?

14   A   Are you talking about -- which e-mail address are you

09:30:16  15   talking about?

16   Q   The e-mail I had originally asked you about, the

17   citycouncil@scottsdaleaz.gov.  People were writing responses

18   to that e-mail regarding the invocation; is that right?

19            MR. CLAUS:  Foundation, Your Honor.

09:30:29  20            THE COURT:  Overruled.

21            THE WITNESS:  Generally.  Generally I am, but not

22   always.

23   BY MR. de HAAN:

24   Q   In this situation, do you recall e-mails being written to

09:30:37  25   the City?

DIRECT EXAMINATION – WILLIAM JAMES LANE

09:30:38  1    A    I honestly got to say I don't remember that one.

2    Q    Do you remember responding to any of these e-mails?

3    A    No, I do not.

4    Q    Do you recall telling people that you were repulsed by

09:31:02  5    this group?

6    A    The effort was really to retain a right to have an

7    invocation.  And that's, yes, and my opinion may have been

8    certainly expressed in those terms.

9    Q    And did you say you were repulsed by the federal

09:31:19 10    government's position on this?

11    A    Not at all.

12    Q    Would it refresh your recollection to see an e-mail you

13    wrote?

14    A    Yeah, it probably would.

09:31:47 15         MR. de HAAN:  Okay.  Your Honor, may I approach to

16    mark this exhibit?

17         THE COURT:  You may.

18         (Exhibit 18 marked for identification.)

19         THE COURTROOM DEPUTY:  Your Honor, this is

09:32:08 20    Number 18.

21         MR. de HAAN:  I should show it to Mr. Claus first.

22         I'm showing counsel what is marked for

23    identification purposes as 18.

24         MR. CLAUS:  Your Honor, Exhibit 18 has never been

09:32:27 25    identified on an exhibit list, it was never provided with an

DIRECT EXAMINATION – WILLIAM JAMES LANE

09:32:31  1  exhibit list.

2          THE COURT:  Is it in the final pretrial order?

3          MR. CLAUS:  It's not, Your Honor.

4          MR. de HAAN:  It's not, Your Honor.  This is for

09:32:36  5  impeachment only.

6          THE COURT:  The objection is sustained.

7  Impeachment-only exception does not apply to a document that

8  has some bearing on the merits of the case.  If it's only for

9  impeachment, that can be the only relevancy, and this

09:32:55  10  document is clearly relevant to other issues in the case.  So

11  I'm going to sustain the objection since this document was

12  not included in the final pretrial order.

13          MR. de HAAN:  Your Honor, may I use it to refresh

14  recollection?

09:33:06  15          THE COURT:  Not if it wasn't in the final pretrial

16  order, no.

17          MR. de HAAN:  Understood.

18  BY MR. de HAAN:

19  Q   Okay.  Do you recall at all writing e-mail or stating to

09:33:37  20  the public that if The Satanic Temple were to sue the City of

21  Scottsdale over this, the City would lose the lawsuit?

22          MR. CLAUS:  Objection, Your Honor.  Best evidence.

23          THE COURT:  Overruled.

24          THE WITNESS:  I'm sorry, the origin of this e-mail?

25

DIRECT EXAMINATION – WILLIAM JAMES LANE

09:33:53   1   BY MR. de HAAN:

2   Q    Do you recall saying that in an e-mail to anybody?

3   A    No.

4   Q    Okay.  After this, do you recall Brian Biesemeyer sending

09:34:11   5   an e-mail to the city council after the denial was to be

6   handed down to The Satanic Temple with the wording of that

7   denial?

8   A    I don't remember the wording of that denial.  I do seem

9   to remember that we were notified.

09:34:28   10   Q    So Biesemeyer notified you before Kelli Kuester sent that

11   e-mail, as far as you know?

12   A    As far as I remember, yeah.

13   Q    Okay.

14        Now, after this occurred, do you recall a reelection

09:34:49   15   pamphlet you were disseminating to the public?

16   A    After --

17   Q    After the invocation from The Satanic Temple was denied,

18   do you recall literature or a pamphlet for reelection that you

19   were disseminating to the public?

09:35:05   20   A    I think part of what we were talking about before, this

21   item I still have here, that may have been a product of that,

22   I don't know.

23   Q    Okay.  Would it refresh your recollection to see it?

24   A    If it's -- if it's not this one?

09:35:17   25   Q    If it's not that one.

DIRECT EXAMINATION - WILLIAM JAMES LANE

09:35:19   1   A   Because this, I believe, is from the campaign, which that

2   sounds to me like you're talking about the same thing.

3   Q   You don't recall a pamphlet?

4   A   I don't remember a separate one.

09:35:27   5   Q   Would it refresh your recollection to see it?

6   A   Yes, that would be fine.

7   Q   Okay.

8           MR. de HAAN:  May I approach, Your Honor?

9           THE COURT:  You may.

09:35:46  10           THE COURTROOM DEPUTY:  Your Honor, Exhibit 13.

11       (Exhibit 13 marked for identification.)

12           THE WITNESS:  Yes, I recall this as a piece of

13   campaign literature, yes.

14   BY MR. de HAAN:

09:36:14  15   Q   Okay.  And did you write that?

16   A   Again, it may be a paraphrase from something I might have

17   felt or otherwise, but it's a campaign literature.

18   Q   Okay.  And you endorsed that?

19   A   It's viewed by me before it goes out, yes.

09:36:29  20   Q   Okay.  Understood.

21           And you have -- and in that you have a number of

22   checkmarks of accomplishments; is that correct?

23   A   Yes, that's correct.

24   Q   And one of the accomplishments that you have listed is

09:36:48  25   that you denied the satanists the invocation?

CROSS-EXAMINATION – WILLIAM JAMES LANE

09:36:51    1    A    That's what it indicates, yes.

2         MR. de HAAN:  Your Honor, plaintiff moves to admit

3    Plaintiffs' 13.

4         MR. CLAUS:  Still foundation as to time, Your Honor.

09:37:03    5    Other than that --

6         THE COURT:  I'm sorry, I couldn't hear you.

7         MR. CLAUS:  Foundation as to time.  We still have no

8    timing as to this document.

9         THE COURT:  Objection is overruled.  Exhibit 13 is

09:37:12   10    admitted.

11        (Exhibit 13 admitted.)

12    BY MR. de HAAN:

13    Q    So you take agency of those accomplishments; is that fair

14    to say?

09:37:21   15    A    It's not untypical, obviously, from all of the things

16    that the City does, yes, under my leadership as mayor.  Yes.

17        MR. de HAAN:  If I could have just a moment,

18    Your Honor.

19        THE COURT:  You may.

09:37:55   20        MR. de HAAN:  No further questions, Your Honor.

21        THE COURT:  All right.

22        Cross-examination.

23        MR. CLAUS:  Just a moment, Your Honor.  Thank you.

24

25

CROSS-EXAMINATION - WILLIAM JAMES LANE

09:38:20  1               C R O S S - E X A M I N A T I O N

       2   BY MR. CLAUS:

       3   Q    Good morning, Mr. Mayor.

       4   A    Good morning.

09:38:39  5   Q    You're familiar with the charter form of the government of

       6   the City of Scottsdale?

       7   A    I most certainly am.

       8   Q    Does the Scottsdale city charter articulate the powers and

       9   duties of the mayor?

09:38:51 10   A    Absolutely it does.

      11   Q    Are the powers and duties of the mayor governed by the

      12   Scottsdale city charter?

      13   A    Yes.

      14   Q    The Scottsdale city council, is that a body politic?

09:39:03 15   A    Yes.

      16   Q    Are you familiar with Arizona's open meeting law?

      17   A    Yes.

      18   Q    Does the deliberation of a resolution, ordinance, or

      19   motion by the Scottsdale city council, does that have to be

09:39:23 20   done by the council in a duly agendized, open and noticed

      21   meeting?

      22   A    Most assuredly.

      23   Q    Let's go through the three ways that the City can act

      24   through its council pursuant to the charter and the open

09:39:37 25   meeting law.

CROSS-EXAMINATION – WILLIAM JAMES LANE

09:39:39   1        Can the Scottsdale city council deliberate or pass an

2   ordinance outside of a duly agendized, noticed meeting?

3   A    No.

4   Q    Can the City of Scottsdale city council deliberate or pass

09:39:56   5   a motion outside of a duly agendized, noticed open meeting?

6   A    No.

7   Q    Can the Scottsdale city council ever deliberate or pass a

8   resolution to deny anyone the ability to give an invocation

9   outside of a duly agendized, noticed open meeting?

09:40:15   10   A    No.

11   Q    Did the City of Scottsdale ever pass a resolution to deny

12   anyone representing the plaintiff the right to give an

13   invocation?

14   A    No.

09:40:30   15   Q    Did the City of Scottsdale ever deliberate a motion,

16   resolution, or ordinance to deny anyone representing the

17   plaintiff the right to give an invocation?

18   A    No.

19   Q    Does the charter of the Scottsdale city government allow

09:40:56   20   the mayor of the City of Scottsdale the power to do anything

21   regarding the City of Scottsdale unilaterally?

22   A    No.

23   Q    Does Article 2, Section 6 of the Scottsdale city charter

24   state that the mayor of the City of Scottsdale shall have no

09:41:25   25   regular administrative duties for the City?

CROSS-EXAMINATION - WILLIAM JAMES LANE

09:41:31  1    A    Yes.

       2    Q    Do you know, as the mayor of Scottsdale -- for how long,

       3    sir?

       4    A    In my 12th year.

09:41:40  5    Q    Do you know, sir, as having been the mayor for nearly 12

       6    years, who is the chief executive officer and responsible for

       7    administrative decisions on behalf of the City of Scottsdale?

       8    A    City manager.

       9    Q    And in February -- you were not provided any dates during

09:42:00  10   your examination by the plaintiff.

      11         In February 2016, was Brian Biesemeyer the city

      12    manager of the City of Scottsdale?

      13    A    To the best of my recollection, yes.

      14    Q    Outside of a duly agendized, open meeting of the

09:42:19  15   Scottsdale city council, do you have the power to direct the

      16    city manager to do anything with respect to his administrative

      17    functions?

      18    A    Not unilaterally, no.

      19    Q    Did the city council of the City of Scottsdale -- strike

09:42:43  20   that.

      21         Is it the city council, sitting as a body, that has

      22    the power to direct the manager to perform certain

      23    administrative functions of the City of Scottsdale?

      24    A    Yes.

09:42:57  25   Q    Is it only the council, sitting as a body, that has the

CROSS-EXAMINATION – WILLIAM JAMES LANE

09:43:03  1    power to direct the city manager to perform administrative

2    functions?

3    A    Yes.  It has another term as a council manager form of

4    government, as well as charter form of government.

09:43:16  5    Q    And with respect to any organization calling itself The

6    Satanic Temple or any representative of the plaintiff in this

7    case, did the council, sitting as a body, direct

8    Brian Biesemeyer to do anything with respect to the decision

9    to deny some organization called The Satanic Temple the

09:43:40  10   ability to give an invocation?

11   A    No.

12   Q    I asked you how long you've been mayor.  Were you a city

13   councilmember before you were mayor?

14   A    Yes.

09:43:52  15   Q    How long were you a city councilmember?

16   A    Four years.  One term.

17   Q    Since first becoming a city councilmember, has the city

18   council routinely sought invocations to be given by faith

19   groups on behalf of the City of Scottsdale?

09:44:08  20   A    Yes.

21   Q    And have you learned as a result of your tenure as

22   councilmember and mayor that the practice of the City inviting

23   religious organizations with a substantial connection to the

24   City of Scottsdale to give invocations on its behalf a

09:44:35  25   practice that predated your service as a city councilmember?

CROSS-EXAMINATION - WILLIAM JAMES LANE

09:44:40  1    A    Yes.

2    Q    As a former councilmember and now mayor, do you know why

3    the Scottsdale city council invites organizations to have

4    representatives give invocations on its behalf for each city

09:44:59  5    council meeting?

6    A    I'm sorry, the question is why?

7    Q    Yeah.  Do you know why the council makes those invitations

8    to have an invocation given by a group on its behalf before

9    city council meetings?

09:45:14  10   A    Generally to invoke a power to look after the City and

11   councilmembers and the mayor, and that generally is somewhat

12   of a unifying element of a good start to a meeting.

13   Q    A good start to a meeting.

14        Does the city council invite organizations to give an

09:45:32  15   invocation on its behalf to provide solemnity for the meeting

16   and guidance to the councilmembers?

17   A    Yes.

18   Q    And has it been your practice and your experience that

19   that long tradition of the City of Scottsdale to invite faith

09:45:47  20   groups to give an invocation on the council's behalf before

21   the invocation, does that have a unifying force, in your

22   experience?

23   A    I would say absolutely it has.

24   Q    Do you know the difference between an invocation and a

09:46:01  25   political speech?

CROSS-EXAMINATION – WILLIAM JAMES LANE

09:46:02  1   A   Yes, I would say so.

2           MR. de HAAN:  Relevance, Your Honor.

3           THE COURT:  Stand up when you object and speak into

4   the mic so we can all hear you, please.

09:46:11  5           MR. de HAAN:  I object to that question as to

6   relevance.

7           THE COURT:  Hold on just a minute.

8           Overruled.

9   BY MR. CLAUS:

09:46:20 10   Q   As long as you have been a councilmember or mayor, has the

11   council ever asked any organization to give a speech before a

12   council meeting that was a political speech rather than an

13   invocation?

14   A   No.  And to the point that political speeches to an issue

09:46:41 15   that may be something that the City deals with is forbidden

16   to use city taxpayer moneys to advance a political effort

17   within the City.  So, no, it's certainly not designated in

18   that area.  But we do have a public comments area where

19   people can, within the jurisdiction of the City, can speak to

09:47:05 20   us.

21   Q   Since you've been councilmember and mayor, has the city

22   council ever invited anyone to give an invocation that sought

23   to denigrate the sincere religious beliefs of members of the

24   Scottsdale community or members of the Scottsdale city

09:47:24 25   council?

CROSS-EXAMINATION - WILLIAM JAMES LANE

09:47:25  1        MR. de HAAN:  Objection.  Foundation.  There's no

        2  evidence of that.

        3        THE COURT:  Overruled.

        4        THE WITNESS:  No.

09:47:33  5  BY MR. CLAUS:

        6  Q   Since you've been councilmember and mayor, has the City of

        7  Scottsdale ever invited an organization to give an invocation

        8  on its behalf that proselytized to the members of the

        9  Scottsdale community or to council members?

09:47:51 10  A   No.

       11  Q   Since you've been a city councilmember and mayor, has the

       12  City of Scottsdale ever invited an organization or a

       13  representative for an organization to give an invocation on

       14  its behalf that was purposefully offensive to and mocking of

09:48:16 15  sincere religious beliefs of members of the Scottsdale

       16  community or members of the city council?

       17  A   Absolutely not.

       18  Q   In your experience, would something that called itself an

       19  invocation that was denigrating, mocking, proselytizing, and

09:48:37 20  offensive serve the purpose for which the city council sought

       21  organizations to give invocations on behalf of the City of

       22  Scottsdale before council meetings?

       23  A   I'm sorry, the lead on that was?

       24  Q   Sure.  Would something that called itself an invocation

09:48:58 25  that was denigrating to religious beliefs, offensive to

CROSS-EXAMINATION – WILLIAM JAMES LANE

09:49:04   1   religious beliefs, mocking of religious beliefs, and

2   proselytized, would that serve the purpose for which the city

3   council, as long as you've been a member, had asked

4   organizations to give invocations on its behalf to lend

09:49:21   5   solemnity and give guidance before council meetings?

6   A   Obviously we would not -- had we had that situation, yes.

7   And would we consider that an invocation, absolutely not.  I

8   hope I'm answering that correctly.  But it's certainly not

9   something we would not only foster, but we would -- we

09:49:51  10   haven't really experienced that kind of thing ever.  I'm not

11   sure what we might do to correct it if in fact it were to

12   happen.  But nevertheless, that hasn't been an issue for us.

13   Q   Well, that's a good segue, Mr. Mayor.  I want to ask you,

14   has the Scottsdale city council ever refused anyone the

09:50:16  15   ability to give an invocation based upon the beliefs or

16   religious viewpoints of the person seeking to give the org- --

17   the invocation or the organization that that person was

18   affiliated with?

19   A   Not to my knowledge ever.

09:50:32  20   Q   Do you know Brian Biesemeyer?

21   A   Absolutely, yes.

22   Q   I'm going to ask you straight up, Mr. Mayor, did you ever

23   direct Brian Biesemeyer to deny anyone representing the

24   plaintiff the ability to give an invocation before a City of

09:50:48  25   Scottsdale -- city council meeting?

CROSS-EXAMINATION - WILLIAM JAMES LANE

09:50:50  1   A    No.

          2   Q    Did you ever ask Brian Biesemeyer to deny anyone the

          3   ability to give an invocation before a Scottsdale city council

          4   meeting?

09:51:00  5   A    No.

          6   Q    Same types of questions with respect to Kelli Kuester.

          7   Did you ever direct Ms. Kuester to deny anyone representing

          8   the plaintiff the ability to give an invocation before a

          9   Scottsdale city council meeting?

09:51:15  10  A    No.

          11  Q    Did you ever ask Ms. Kuester to deny anyone representing

          12  the plaintiff the ability to give an invocation before a city

          13  council meeting?

          14  A    No.

09:51:32  15  Q    We talked about the city charter.  Outside of a duly

          16  agendized city council meeting, do you even have the ability

          17  to direct anyone to make a decision to deny someone the

          18  ability to give an invocation on behalf of the City of

          19  Scottsdale?

09:51:50  20  A    No.

          21  Q    Mayor is an elected position, you testified to, and you

          22  campaigned for mayor in 2016?

          23  A    Yes.

          24  Q    The election was in November 2016?

09:52:02  25  A    That's correct.

CROSS-EXAMINATION - WILLIAM JAMES LANE

09:52:03  1   Q   You were shown two exhibits.  I want to -- does the

2   witness have a copy of Exhibit 11 still?

3   A   I've got one of them.  Yes.

4   Q   Exhibit 11 and Exhibit 13.

09:52:21  5   A   I've got a readable transcript on 11 and a readable copy

6   of a flyer on the other.

7   Q   I want to make sure that I and the Court understands.  The

8   third page of Exhibit 11, you did not type and you did not ask

9   anyone to type the third page of Exhibit 11 --

09:52:40  10   A   No.

11   Q   -- is that correct?

12   A   I did not.

13   Q   Do you know for a fact that the third page of Exhibit 11

14   actually reflects what is written anywhere in the first two

09:52:53  15   pages of Exhibit 11?

16   A   I -- I can't tell that.

17   Q   Is there any date that you see on Exhibit 11?

18   A   Not on either the unreadable or the transcript.

19   Q   Using -- is it accurate to say that you did not deliver

09:53:27  20   any campaign material to either Brian Biesemeyer or

21   Kelli Kuester?

22   A   That's pretty -- yeah.  That would not be -- not only it

23   wouldn't be appropriate, it wouldn't be something I would

24   have in the program.

09:53:41  25   Q   And you didn't ask anyone to deliver your campaign

CROSS-EXAMINATION – WILLIAM JAMES LANE

09:53:44  1    material --

2    A    No.

3    Q    -- to Kelli Kuester or Brian Biesemeyer?

4    A    No.

09:53:49  5    Q    And, sir, you were asked about -- somewhat asked about the

6    timing of Exhibit 11.  Do you actually know if Exhibit 11 was

7    produced, the first two pages of Exhibit 11, the third page

8    was never distributed to the public, to the best of your

9    knowledge; correct?

09:54:15  10   A    Oh, absolutely, yes.

11   Q    Okay.  So I'm going to ask you about the first two pages

12   of Exhibit 11.

13        The first two pages of Exhibit 11.  Is there any way

14   for you to tell from Exhibit 11 that the first two pages were

09:54:27  15   prepared or distributed to the public at any time prior to

16   May 23, 2016?

17   A    There's no way for me to tell on this.  Nor can I even

18   sort of see where it's coming from.

19   Q    You don't know -- is it accurate to say you don't know if

09:54:51  20   the first two pages of Exhibit 11 come from any website that

21   you operated or maintained?

22   A    I don't -- yes.  I don't -- pardon me.  I don't know

23   that.

24   Q    With respect to the first two pages of Exhibit 11, is it

09:55:05  25   fair to say that you do not recall that the first two pages of

CROSS-EXAMINATION - WILLIAM JAMES LANE

09:55:09   1   Exhibit 11 were prepared or distributed to the public at any

           2   time prior to May 23, 2016?

           3   A    I have no way of knowing that.

           4   Q    Now let's talk about Exhibit 13.

09:55:31   5           Exhibit 13 looks like it's a photograph of a flyer.

           6   Does it look like that to you?

           7   A    Yes.

           8   Q    When you campaigned for mayor in 2016, did you have a

           9   challenger?

09:55:44  10   A    Yes.

          11   Q    Did you use campaign material as part of your campaign for

          12   reelection?

          13   A    Yes.

          14   Q    Now, the campaign material -- if Exhibit 11 is campaign

09:55:55  15   material and Exhibit 13, which you testified is campaign

          16   material, if campaign material was used by you, sir, was it

          17   utilized by you as mayor or was it utilized by you as a

          18   candidate for mayor?

          19   A    As a candidate.

09:56:15  20   Q    And as a candidate for mayor, did your campaign material

          21   have any ability to influence the decision-making of the chief

          22   executive administrative officer of the City of Scottsdale?

          23           MR. de HAAN:  Objection.  Speculation.

          24           THE COURT:  Overruled.

09:56:32  25           THE WITNESS:  No.

CROSS-EXAMINATION - WILLIAM JAMES LANE

09:56:37   1   BY MR. de HAAN:

2   Q    The campaign material that you've identified as Exhibit 13

3   and that may comprise Exhibit 11, is that campaign material an

4   official communication from the office of the mayor?

09:56:53   5   A    Absolutely not.

6   Q    Not to use this word in a pejorative way, sir, but when

7   you are campaigning for mayor, you are a politician?

8   A    I think that's pretty clear.

9   Q    Did you ever communicate with a woman named

09:57:15  10   Michelle Shortt?

11   A    No.

12   Q    Did she ever communicate with you, to the best of your

13   knowledge?

14   A    Unless she didn't identify herself.

09:57:23  15   Q    Did you ever communicate with an individual named

16   Jeremy Zarzycki?

17   A    No.

18   Q    To the best of your knowledge, have you ever communicated

19   anything to any representative of the plaintiff?

09:57:38  20   A    Again, to the best of my knowledge, no.

21   Q    Did you ever ask anyone what viewpoint or religious belief

22   any representative of the plaintiff held at any time, sir?

23   A    No.

24   Q    Did any representative of the plaintiff unilaterally tell

09:58:00  25   you what their viewpoints or purported religious beliefs were?

CROSS-EXAMINATION - WILLIAM JAMES LANE

09:58:07  1   A   None.  No.

2   Q   Did anyone deliver to you --

3   A   Now, I'm sorry, only what I might read in the press.

4   Q   Did anyone deliver to you any proposed invocation that was

09:58:28  5   sought to be given by any representative of the plaintiff at

6   any time prior to May 23, 2016?

7   A   I'm sorry, could you repeat that again.

8   Q   Sure.  Did anyone deliver to you any proposed invocation

9   that was purportedly sought to be given by a representative of

09:58:47  10  the plaintiff at any time prior to May 23, 2016?

11  A   No.

12  Q   How about today, up till today?  Has anyone ever delivered

13  to you the proposed invocation that the plaintiffs say they

14  sought to give?

09:59:03  15  A   No.

16  Q   Have you ever, as mayor, either sought or asked anyone to

17  condition the ability of anyone to give an invocation based

18  upon the content of that invocation?

19  A   No.

09:59:21  20  Q   And have you ever conditioned an invocation or asked

21  anyone to condition an invocation based upon the belief system

22  or viewpoints of the proposed representative giving the

23  invocation?

24  A   No.

09:59:39  25  Q   And you didn't do that in this case, did you, sir?

REDIRECT EXAMINATION – WILLIAM JAMES LANE

09:59:42  1   A    No.

2            MR. CLAUS:  That's all I have, Your Honor.  Thank

3   you.

4            THE COURT:  Any redirect?

09:59:47  5            MR. de HAAN:  Briefly, Your Honor.

6                 R E D I R E C T   E X A M I N A T I O N

7   BY MR. de HAAN:

8   Q    Now, even if you don't make rules from outside of the

9   deliberations of the city council, as an elected official you

10:00:05  10   certainly present intent and things you wish to accomplish as

11   mayor; is that fair to say?

12   A    That's true.

13   Q    That website, when you were running for mayor would be an

14   example of that; is that fair to say?

10:00:20  15   A    Well, one is accomplishments and certainly we look

16   forward as well, yes.

17   Q    As far as the accomplishments, I believe you testified

18   that it was the City as a whole under your direction; is that

19   fair to say?

10:00:32  20   A    Well, under my direction with the full council, yes.

21   Q    So you work in tandem --

22   A    But the full council does hire all of our executive team.

23   So we operate together with the managers and our charter

24   officers.

10:00:51  25   Q    That's my next question.  So you work in tandem with the

REDIRECT EXAMINATION – WILLIAM JAMES LANE

10:00:54  1   city manager?

2   A    What's that?

3   Q    You work together with him to accomplish --

4   A    Not individually, no.  As a unit, yes.  As a political

10:01:02  5   body, I should say.

6   Q    That's why Mr. Biesemeyer asked the council's approval

7   when he was going to deny the invocation?

8   A    That's right.

9            MR. CLAUS:  That assumes facts not in evidence,

10:01:14  10   Your Honor.

11            THE COURT:  Overruled.

12   BY MR. de HAAN:

13   Q    It's not the practice of the City, as far as you know, to

14   ask what the invocations are going to contain; is that fair to

10:01:24  15   say?

16   A    We haven't ever had that occasion, no.  Have never done

17   that.  We are obviously looking for an invocation.

18   Q    That's the only --

19   A    Yeah.

10:01:34  20   Q    Okay.

21            There was no -- as I believe you said, I'll ask more

22   specifically, there was no prohibition of somebody calling in

23   to ask to give an invocation; correct?

24   A    No.

10:01:47  25   Q    So an all-comer system, essentially?

REDIRECT EXAMINATION - WILLIAM JAMES LANE

10:01:50   1   A    Pretty much.  We are looking for folks who represent the
           2   community and, frankly, that are -- if it's a membership
           3   organization, that they have a following within Scottsdale.
           4   But that's not really ever been asked because it's not really
10:02:06   5   been an issue.
           6   Q    So there's no real metric, a number of people you
           7   expect --
           8   A    No.  No.
           9   Q    So all you knew about this particular group was their
10:02:16  10   name, The Satanic Temple, and what you saw in the media?
          11   A    Yes.
          12            MR. de HAAN:  I have nothing further, Your Honor.
          13            THE COURT:  All right.  Thank you, sir.  You can
          14   step down.
10:03:03  15            MR. CLAUS:  Your Honor, may I have three minutes to
          16   thank the mayor --
          17            THE COURT:  I'm sorry?
          18            MR. CLAUS:  May I have three minutes, two minutes to
          19   tell the mayor he's no longer needed and to thank him.
10:03:15  20            THE COURT:  You can have one minute.
          21            MR. CLAUS:  Thank you, Your Honor, I'll take one
          22   minute.
          23            THE COURT:  Plaintiffs' next witness.
          24            MR. KEZHAYA:  Now, Your Honor, or should we wait?
10:03:22  25            THE COURT:  We want to know who it is.  We can get

DIRECT EXAMINATION – SUZANNE KLAPP

10:03:24   1   them in here.

2            MR. KEZHAYA:  Klapp, Your Honor, Suzanne Klapp.

3            MR. CLAUS:  And, Your Honor, just so you're aware,

4   Ms. Zoe is going to be taking Ms. Klapp, so when you hear her

10:03:55   5   voice, that's why.

6            THE COURT:  All right.  Thank you.

7            THE COURTROOM DEPUTY:  State your name for the

8   record and please spell your first and last name.

9            THE WITNESS:  Suzanne Klapp.  S-U-Z-A-N-N-E,

10:04:27  10   K-L-A-P-P.

11                              **SUZANNE KLAPP,**

12   called as a witness herein, after having been first duly sworn

13   or affirmed, was examined and testified as follows:

14                  D I R E C T   E X A M I N A T I O N

10:04:45  15   BY MR. KEZHAYA:

16   Q    Good morning, Ms. Klapp.

17   A    Good morning.

18   Q    What is your current occupation?

19   A    I'm a councilwoman in the City of Scottsdale.

10:05:00  20   Q    And being a councilwoman, what does that entail?

21   A    It deals with the issues that come to the council that

22   are policy related, primarily.  We are policy makers, much

23   like a board of directors for a corporation.

24   Q    Is this a full-time position?

10:05:18  25   A    No.

DIRECT EXAMINATION - SUZANNE KLAPP

10:05:18  1   Q   Is it a compensated position?

2   A   Yes.

3   Q   How much are you paid?

4   A   $18,000.

10:05:25  5   Q   On a weekly basis, about how much time does it take out of

6   your week?

7   A   25 hours.

8   Q   Is this a publicly elected position?

9   A   Yes.

10:05:39  10  Q   When you get -- when someone sends an e-mail to the email

11  address citycouncil@Scottsdaleaz.gov, do you receive these

12  e-mails?

13  A   I should.

14  Q   You should as a general matter?  Under what circumstances

10:05:54  15  would you not receive them?

16  A   I don't know.  But if it's sent to the entire council, I

17  should receive a copy.

18  Q   Is it fair to say, then, the city council is shared by all

19  the city councilmembers.

10:06:05  20  A   Say that again, I didn't hear you quite well.

21  Q   Is it fair to say this email address is shared by all of

22  the city councilmembers?

23  A   Yes.

24  Q   I want to turn your attention to early 2016.  Do you

10:06:19  25  remember 2016 very well?

DIRECT EXAMINATION – SUZANNE KLAPP

10:06:22    1    A   Yeah, it was election year.

            2    Q   It being election year, does that impact your statements

            3    to the public?

            4    A   No.

10:06:31    5    Q   Does -- are you running for mayor right now?

            6    A   No.

            7    Q   Are you intending to run for the mayor position?

            8    A   Probably.

            9    Q   Probably.

10:06:47   10        Turning your attention to early 2016, do you remember

           11    a group called The Satanic Temple attempting to give an

           12    invocation before the city council?

           13    A   Yes, I remember.

           14    Q   Did you have any feelings about that?

10:07:01   15    A   I have published an article that said I wasn't really

           16    wanting to listen to them, but that's my feeling.  My

           17    opinion.

           18    Q   You indicated you published an article.

           19        MR. KEZHAYA:  May I approach, Your Honor?

10:07:23   20        THE COURT:  To get -- is it already marked?

           21        MR. KEZHAYA:  Yes, Your Honor.

           22        THE COURT:  Yes, you may.

           23    BY MR. KEZHAYA:

           24    Q   I'm going to hand you a document --

10:07:32   25        THE COURT:  Let's have you hand the document and

DIRECT EXAMINATION - SUZANNE KLAPP

10:07:34   1    then go back to the mic, otherwise folks can't hear you.

           2              THE COURTROOM DEPUTY:  Counsel, what number is that?

           3              MR. KEZHAYA:  This is 10.

           4    BY MR. KEZHAYA:

10:07:47   5    Q    Would you take a moment to review that article.

           6    A    Okay.  I've read it.

           7    Q    Is that a true and accurate copy of your article?

           8    A    I believe it to be.

           9    Q    Is that a yes?

10:08:39  10    A    It's a copy, so I don't know if it's correct or not, but

          11    it appears to be.

          12    Q    You wrote the article; correct?

          13    A    Yes, I wrote it.

          14    Q    Is there anything on that paper that misstates what you

10:08:49  15    wrote?

          16    A    Not that I can see by my first reading.

          17              MR. KEZHAYA:  Move to introduce Plaintiffs' 10,

          18    Your Honor.

          19              MS. ZOE:  Your Honor, I object.  Foundation.

10:09:01  20              THE COURT:  Overruled.  Exhibit 10 is admitted.

          21         (Exhibit 10 admitted.)

          22    BY MR. KEZHAYA:

          23    Q    You indicated -- first of all, when was this article

          24    written?

10:09:18  25    A    It says here March 16th.

DIRECT EXAMINATION – SUZANNE KLAPP

10:09:20   1   Q    That's what it says, but do you remember when you wrote

2   it?

3   A    Probably a few days before.

4   Q    Orienting ourselves in time, do you remember when the

10:09:30   5   initial request was made by TST?

6   A    No, I don't.

7   Q    Okay.  Establishing the background here, the initial

8   request was initially granted; is that right?

9   A    I really don't know.  I was not involved in the request.

10:09:49  10   Q    Okay.  Did you hear from anyone that it was granted?

11   A    I heard discussions about the group was asking to come,

12   but I don't remember the details of it.

13   Q    Okay.  Who were having those discussions?

14   A    Councilmembers.

10:10:05  15   Q    Were they having these discussions on the agenda, on some

16   duly agendized meeting?

17   A    No.  This was a conversation with another councilmember

18   or two somewhere outside of the council meeting.

19   Q    Were they -- were they giving any indication of how they

10:10:23  20   felt about this invocation?

21   A    No.  I don't recall.  I just remember it was mentioned.

22   I don't remember any opinions taken or given.

23   Q    Did they indicate anything about the newsworthiness?

24        MS. ZOE:  Objection.  Hearsay, Your Honor.

10:10:40  25        THE COURT:  Sustained as hearsay.

DIRECT EXAMINATION – SUZANNE KLAPP

10:10:51  1   BY MR. KEZHAYA:

2   Q   I'd like you to read the article word for word.

3   A   In its entirety?

4   Q   In its entirety.

10:10:57  5          THE COURT:  Into the record?

6          MS. ZOE:  Objection, Your Honor.

7          MR. KEZHAYA:  Yes, Your Honor.

8          THE COURT:  We don't need to do that; it's in

9   evidence.

10:11:01  10         THE WITNESS:  Okay.

11  BY MR. KEZHAYA:

12  Q   Turn your attention to the first paragraph.  "Is it fair

13  to say that enough is enough when a satanist group not even

14  based in Scottsdale wants to disrupt our meetings by giving an

10:11:14  15  invocation to the entire council meeting audience."

16          Is that in the first paragraph?

17  A   Almost.  It's the first line.

18  Q   You also indicate on the third paragraph that it's "time

19  to make it clear that a rule must be established about who can

10:11:35  20  come in" -- or "who can come and what kind of message is

21  expected."

22          Is that fair to say?

23  A   That's what it says.

24  Q   Did that accurately characterize your impressions of this

10:11:49  25  invocation at the time in question?

DIRECT EXAMINATION – SUZANNE KLAPP

10:11:52  1    A    It is my opinion, yes.

2    Q    It's your current opinion, too, then?

3    A    Yes.

4    Q    I want to turn your attention to the last sentence of this

10:12:01  5    paragraph.  "There is no current rule related to the

6    invocation."

7              Is that right?

8    A    That's what it says, yes.

9    Q    At the time around March of 2016, was there in fact any

10:12:15  10   rule surrounding who can give an invocation?

11             MS. ZOE:  Objection, Your Honor.  Foundation.

12             THE COURT:  Overruled.

13             THE WITNESS:  I was not involved in discussions

14   about invocations so I don't really know what the rules were.

10:12:27  15   BY MR. KEZHAYA:

16   Q    But you said right here there's no correct rule.

17   A    None that I knew of.

18   Q    So is it your testimony today that there was or that there

19   was not --

10:12:38  20   A    This is just my opinion.  I don't know if there was a

21   rule.

22   Q    You don't know as you sit today?

23   A    I was not involved in any discussions about the

24   invocations, so I don't know what the rule is.

10:12:49  25   Q    Ma'am, once again I'm asking you, as you sit today, was

DIRECT EXAMINATION - SUZANNE KLAPP

10:12:52  1   there a rule at the time in question?  Yes or no?

2   A   At the time that's what I thought.  That's my opinion,

3   yes.

4   Q   Turn your attention to the second-to-last paragraph.  The

10:13:07  5   first sentence reads, "I do not welcome a satanist group."

6           Is that an accurate reading of the article?

7   A   It says "I do not welcome a satanist group."

8   Q   Is that a yes?

9   A   Yes.

10:13:22  10  Q   Do you still feel that way as we sit today?

11  A   Yes.

12  Q   Why is that?

13  A   My opinion was here is that if I don't welcome them, I

14  don't want to listen to them.  And that's what I said in the

10:13:37  15  next line.

16  Q   My question to you is does it relate to their beliefs?

17  A   It relates to the messages I want to hear.

18  Q   Is that a yes or no, whether it relates to their beliefs?

19  A   It relates to my opinion of what I want to hear.

10:13:53  20  Q   Do you expect they're going to give you a statement that

21  you do not want to hear?

22  A   Yes.

23          MS. ZOE:  Objection.

24          THE COURT:  Overruled.

25

DIRECT EXAMINATION – SUZANNE KLAPP

10:14:06  1   BY MR. KEZHAYA:

2   Q    Do you have any idea what that statement would be?

3   A    Only from what I have read in the news media about the

4   organization.

10:14:14  5   Q    What is your understanding of what they would say?

6   A    I don't know what their message would be, but to me a

7   satanist group is one that is going to be talking about

8   Satan, so the message would be about Satan.

9   Q    When we talk about Satan, are we talking about the

10:14:32 10   Christian figure of the devil?

11   A    To me, yes, as a Christian, yes.

12   Q    Would you find that deeply offensive?

13   A    I don't know if I would call it offensive, I just don't

14   want to hear it.

10:14:43 15   Q    Why not?

16   A    I can choose to hear what I want to hear.  That's why.  I

17   just choose not to listen.

18   Q    And we take no position on whether you should be forced to

19   listen to it.  My question to you, though, is why don't you

10:14:59 20   want to listen to it?

21   A    Because if somebody is presenting a message about Satan,

22   I don't want to hear it.  How can I be clearer?

23   Q    Does it relate to your religious beliefs?

24   A    Yes.

10:15:12 25   Q    Do you believe that whatever the message plaintiffs would

DIRECT EXAMINATION – SUZANNE KLAPP

10:15:14  1   give would run contrary to your religious beliefs?

2   A    Yes.

3   Q    At some point there was a scheduling conflict; is that

4   right?

10:15:30  5   A    That, I don't know.

6          MS. ZOE:  Foundation.

7          THE COURT:  She said she didn't know.

8   BY MR. KEZHAYA:

9   Q    Do you know whether TST at some point was scheduled a

10:15:40  10  second time?

11  A    I don't know.

12  Q    Have you ever had any contact with Brian Biesemeyer about

13  this matter?

14  A    Not that I recall.

10:15:52  15  Q    Do you know if Brian Biesemeyer ever contacted you?

16  A    I do not recall having a conversation or him contacting

17  me.

18  Q    If Brian told you that the two of you -- if Brian had

19  previously testified that the two of you had a phone

10:16:05  20  conversation, would he be lying?

21  A    I just don't recall.

22  Q    Is that a yes or no?

23  A    I can't call someone a liar --

24         MS. ZOE:  Objection --

10:16:15  25         THE WITNESS:  -- if I don't recall --

DIRECT EXAMINATION – SUZANNE KLAPP

10:16:16  1    THE COURT:  Hold on just a minute.

2    What's the objection?

3    MS. ZOE:  He's attempting to impeach her with a

4  collateral source.

10:16:23  5    THE COURT:  I'm going to overrule the objection, but

6  don't interrupt the witness, please, Mr. Kezhaya.

7    She can answer the question.

8    MR. KEZHAYA:  Yes, Your Honor.

9  BY MR. KEZHAYA:

10:16:40  10  Q   As you sit here today, do you remember whether you

11  expressed concern to Brian Biesemeyer about the invocation?

12  A   I do not recall any conversation where I expressed a

13  concern.

14  Q   Did you receive notice prior to -- actually, let's

10:17:02  15  establish the background.

16    Strike that, Your Honor.

17    At some point the plaintiffs were denied the

18  invocation; is that fair to say?

19  A   I believe so.  I think I read it in the newspaper.

10:17:12  20  Q   Was that the first time you heard of it?

21  A   That it was denied?

22  Q   Yes.

23  A   I don't remember.  There again, I don't remember the

24  sequence of events that took place.  I recall that the

10:17:23  25  satanists were asking to come.  I don't know when it was

DIRECT EXAMINATION - SUZANNE KLAPP

10:17:25  1    denied, how it was denied.  Much of what I picked up about

2    this was just in conversations.

3    Q    Earlier you testified that the city council is the board

4    of directors for the City of Scottsdale; is that right?

10:17:43  5    A    Yes.  Yes.

6    Q    Would the city council be the one to create a policy

7    determining who and who cannot give invocations?

8    A    They never have.  Not since I've been on the council.

9    That's an administrative decision; we're a legislative body.

10:18:06  10   Q    Is it -- are you familiar with the charter for the City?

11   A    Yes.

12         MR. KEZHAYA:  May I approach?

13         THE COURT:  Yes.  What do you need?

14         MR. KEZHAYA:  We have two copies of the documents

10:18:25  15   for my own reference.  One is the city charter the other

16   defense discovery response.

17         THE COURT:  Are they up here somewhere?

18         MR. KEZHAYA:  Right up here.

19         THE COURT:  Yes, you can get those.

10:18:44  20   BY MR. KEZHAYA:

21   Q    Is it fair to say the City has powers, as a general rule?

22   A    Yes.

23   Q    Is it fair to say the powers are generally vested with the

24   city council?

10:18:54  25   A    Certain powers, yes.

DIRECT EXAMINATION - SUZANNE KLAPP

10:18:55  1   Q   As a general matter, all powers are vested with the

2   council; is that right?

3   A   As a general matter.

4   Q   As a general matter.  Yes?

10:19:06  5   A   Yes.

6   Q   Do you know of any section in the charter that removes the

7   power of determining who cannot -- or who can and cannot give

8   invocations from the city council?

9   A   I have no recollection of anything in the charter that

10:19:25  10  refers to invocations.

11  Q   So we would be falling into the general rule, then; is

12  that fair to say?

13  A   Everything that happens within the City is not in the

14  charter.  There's a lot of administrative decisions not in

10:19:38  15  the charter.  So I don't know what your question is.

16  Q   Is there a section of the charter that removes all

17  administrative powers from the city council?

18  A   I don't think it removes it, but it designates that the

19  city manager's the person who is directly responsible for

10:20:01  20  administrative matters.  We are responsible for policy

21  matters, legislative matters, those sorts of things.

22  Q   Does the city manager answer to the city council?

23  A   Yes, he does.

24  Q   Can the city council fire the city manager?

10:20:15  25  A   Sure, yes.

DIRECT EXAMINATION – SUZANNE KLAPP

10:20:16  1    Q    Does the city council set the manager's salary?

2    A    Yes.

3    Q    Is it fair to say the city manager serves at the pleasure

4    of the city council?

10:20:26  5    A    Seven members, yes.  He has seven bosses.

6    Q    If a plurality of the city council makes public

7    statements, is there any law that you're familiar with that

8    prohibits the city manager from seeing them?

9    A    From seeing -- from doing what?  Say the last part of

10:20:48  10   that.

11   Q    From seeing the public statements.

12   A    No.

13        MS. ZOE:  Objection --

14        THE WITNESS:  I don't know if I understand your

10:20:55  15   question.  Can you restate it?

16   BY MR. KEZHAYA:

17   Q    Sure.  Is there any law that you're familiar with that

18   would prohibit the city manager from seeing your article?

19   A    Oh, is that what you're talking about?  I'm sorry.

10:21:08  20   Misunderstood.  No, that would not have prohibited him from

21   seeing it.

22   Q    Did the city manager ever tell you that he is

23   intentionally avoiding any public statements from any city

24   council?

10:21:23  25        MS. ZOE:  Objection.  Hearsay.

DIRECT EXAMINATION - SUZANNE KLAPP

10:21:25  1          THE COURT:  What's your response on hearsay?

        2          THE WITNESS:  I don't --

        3          THE COURT:  Hold on just a minute, please.

        4          MR. KEZHAYA:  Your Honor, hearsay has an exception

10:21:32  5  for a declarant witness who is available for testimony.

        6  Brian Biesemeyer is an identified witness.  He can testify to

        7  that.

        8          THE COURT:  What's that exception?  I'm not aware of

        9  any such exception.

10:21:45 10          MR. KEZHAYA:  If the Court will permit me a

       11  moment --

       12          THE COURT:  Sure.

       13          MR. KEZHAYA:  It's under Rule 801.  I believe sub 3.

       14  The available declarant witness.  It's actually a carve-out

10:21:53 15  from the definition of exception -- of hearsay.

       16          THE COURT:  I'm not familiar with any such exception

       17  just because an individual is available to testify that their

       18  out-of-court statements are not hearsay.

       19          Do you have any other response to the hearsay

10:22:12 20  objection?

       21          MR. KEZHAYA:  No further responses, Your Honor.

       22          THE COURT:  Objection is sustained.

       23  BY MR. KEZHAYA:

       24  Q   Is there any governmental policy prohibiting -- not

10:22:20 25  necessarily a law, but governmental policy inside the City of

CROSS-EXAMINATION - SUZANNE KLAPP

10:22:25   1   Scottsdale, preventing city employees from viewing public

2   statements?

3   A   No.

4   Q   Did Brian Biesemeyer provide you the contents of the

10:22:43   5   message that would deny The Satanic Temple's invocation?

6   A   I don't recall seeing anything like that, no.

7          MR. KEZHAYA:  If I may have a moment, Your Honor.

8          No further questions, Your Honor.

9          THE COURT:  All right.  Cross-examination.

10:23:12  10          C R O S S - E X A M I N A T I O N

11   BY MS. ZOE:

12   Q   Thank you for being here today, Councilmember Klapp.  When

13   were you first elected to the Scottsdale city council?

14   A   Elected in 2008, took office in January 2009.

10:23:43  15   Q   So that means you've been on the council for about 11

16   years?

17   A   Almost 12 years.

18   Q   In the 12 years you've served on the council, have the

19   regular session city council meetings typically opened with an

10:23:55  20   invocation?

21   A   Yes.

22   Q   From your perspective, is that invocation offered on

23   behalf of the City?

24   A   Yes.

10:24:03  25   Q   Do you have a belief regarding the purpose of that

CROSS-EXAMINATION - SUZANNE KLAPP

10:24:06  1   invocation?

2   A    My personal belief, the invocation, the way it's

3   structured, it is on behalf of the City.  Those who speak

4   typically wish us well and hope that we don't get in any

10:24:22  5   fights during the meeting, that sort of thing.  It's kind of

6   an uplifting message for the council.

7   Q    Sure.  So it helps focus the council on doing good work

8   for the community?

9   A    Yes.

10:24:34  10   Q    And do you think that -- that an invocation that

11   disparages others' beliefs would be consistent with that

12   purpose?

13   A    No.

14   Q    I'd like to talk a little bit about some of the

10:24:49  15   invocations you've heard over the last 11 years.  First, let

16   me ask you this:  Have you ever been involved in scheduling

17   the invocations for the --

18   A    No.

19   Q    And in the 11 years you've been listening to invocations

10:25:02  20   and attending council meetings, have you ever heard an

21   invocation delivered by a group from Tucson?

22   A    I don't think so.

23   Q    Prescott?

24   A    No.

10:25:14  25   Q    Payson?

CROSS-EXAMINATION - SUZANNE KLAPP

10:25:15   1   A    No.

2   Q    Are they, in your experience, typically groups that have

3   some kind of connection to the City?

4   A    Yes.

10:25:25   5   Q    You testified a few minutes ago that you're familiar with

6   the city charter; correct?

7   A    Um-hmm.  Yes.

8   Q    Does the city charter divide the responsibilities between

9   the city council and the city manager?

10:25:37  10   A    Yes.

11   Q    What types of responsibilities are designated to the city

12   manager?

13   A    Well, he's responsible for running the -- he's the

14   operations person.  He runs the operations of the City.

10:25:51  15   Most, but not all, of the departments in the City report to

16   him.  The charter has other officers as well as the city

17   manager, so he is, in my mind, mainly the operational officer

18   of the City.

19   Q    Does the city charter permit you as a councilmember to

10:26:12  20   take action unilaterally?

21   A    No.

22   Q    Does the charter permit you to take action individually?

23   A    No.

24   Q    Is it fair to say that the only way that you are able to

10:26:24  25   take action on behalf of the city council is as part of the

CROSS-EXAMINATION – SUZANNE KLAPP

10:26:28  1   body of seven?

2   A    Yes.

3   Q    Are you familiar with Arizona's open meetings law?

4   A    Yes.

10:26:35  5   Q    Does Arizona's open meeting law permit you to take action

6   individually?

7   A    No.

8   Q    You were asked some questions about Exhibit 10.  Do you

9   still have Exhibit 10 in front of you?

10:26:47  10   A    Yes.

11   Q    Do you see at the top of Exhibit 10 it looks like there is

12   a URL there?  Do you see that?  Starts

13   HTTP://www.Scottsdale --

14   A    Oh, yes, I see it.

10:27:02  15   Q    Can you see after ScottsdaleIndependent.com it says

16   "Opinions"?

17   A    Yes.

18   Q    Why do you think it says "Opinions" right there?

19   A    Because that's exactly what it is.  I sent my opinion to

10:27:11  20   the Independent.

21   Q    So --

22   A    And they publish them as opinions.

23   Q    Is it the opinion of the entire city council?

24   A    No.

10:27:21  25   Q    Were you authorized to write an article on behalf of the

CROSS-EXAMINATION - SUZANNE KLAPP

10:27:25  1    entire city council?

2    A    No.

3    Q    Did any other councilmembers ask you to write an article

4    on their on behalf?

10:27:32  5    A    No.

6    Q    So would you characterize this as a personal opinion?

7    A    Yes.

8    Q    So you're an elected official.  Does that mean you are not

9    allowed to have personal opinions?

10:27:43  10    A    Yes, I'm allowed to have personal opinions.

11    Q    Are you allowed to express those personal opinions?

12    A    Yes.

13    Q    Through things like writing opinion pieces for the

14    Scottsdale Independent?

10:27:54  15    A    Yes.

16    Q    So if you would look at the second-to-last paragraph.

17    Begins "I do not welcome the satanist group."

18    A    Yes.

19    Q    Read it to yourself for a minute and let me know when

10:28:07  20    you're through.

21    A    Okay.

22    Q    That sentence that begins "if they do come" -- strike

23    that.

24         What did you -- what did you say in your opinion

10:28:23  25    piece that you would do if they did come?

CROSS-EXAMINATION - SUZANNE KLAPP

10:28:27  1   A   I would leave until the message was over.

2   Q   So when you wrote that, did you think that it was still

3   possible that they might come to deliver the invocation?

4   A   I thought it was possible.  That's why I said "if they

10:28:41  5   come."

6   Q   Would you have written that if you knew that they were not

7   coming?

8   A   Probably not because it wouldn't have been necessary.

9   Q   Would you have written that if you knew you did something

10:28:52  10   to cause them not to come?

11   A   No.

12   Q   You were asked -- strike that.

13        Do you know how you became aware of Mr. Zarzycki's

14   request to give an invocation to the City of Scottsdale

10:29:09  15   meeting?

16   A   I really don't remember.  It's been, what, almost three

17   years -- four years ago.  I don't recall the progression of

18   events and how the requests were made.  I just know that

19   there was a request.

10:29:21  20   Q   Um-hmm.  Do you -- you don't remember, you don't recall a

21   conversation with Brian Biesemeyer regarding --

22   A   No, I'm sorry, I don't remember.  But you have to

23   remember there's a city manager and I talk to him about a lot

24   of things.  And that was four years ago.  And we've also had,

10:29:38  25   since I've been on the city council, five city managers.  I

CROSS-EXAMINATION - SUZANNE KLAPP

10:29:41  1    didn't even remember Brian Biesemeyer was the manager during

2    this time until I was reminded during this case.

3              THE COURT:  Ms. Zoe, we're going to take a break at

4    this time.  We'll take a break for 15 minutes, then resume.

10:29:53  5    Thank you.

6          (Recess taken from 10:32 to 10:44.)

7              THE COURT:  You may continue, Ms. Zoe.

8              Please be seated.

9              MS. ZOE:  Thank you, Your Honor.

10:44:38  10   BY MS. ZOE:

11   Q    Just before the break, Councilwoman Klapp, we were

12   discussing how long it's been since 2016 when Mr. Zarzycki

13   made the invocation request.

14              In 2016, did you know there was going to be a lawsuit

10:44:50  15   filed some day about the invocation request?

16   A    No.

17   Q    In 2017, did you know that there was going to be a lawsuit

18   filed?

19   A    No.

10:44:59  20   Q    In 2016, did any of the plaintiffs ever contact you to

21   discuss the invocation request?

22   A    No.

23   Q    In 2017, did --

24   A    No.

10:45:08  25   Q    -- anyone request --

CROSS-EXAMINATION - SUZANNE KLAPP

10:45:08  1        Have you had any reason at all between 2016 and now
       2   to have to think critically about the conversations you might
       3   have had with Mr. Biesemeyer?
       4   A   Yes, I've thought about them, but I don't remember much
10:45:30  5   about them.  Yes.
       6   Q   Has either Mr. de Haan or Mr. Kezhaya asked to take your
       7   deposition in this case?
       8   A   No.
       9   Q   I'm almost done.  I have a few final questions for you.
10:45:44 10        In 2016 -- strike that.
      11        Do you remember anyone ever showing you the content
      12   of the proposed invocation that was -- that plaintiffs wanted
      13   to deliver?
      14   A   No.
10:45:57 15   Q   Do you remember -- do you remember anyone ever describing
      16   for you the beliefs or the viewpoints that plaintiffs purport
      17   to espouse?
      18   A   Someone personally describing to me, is that what you're
      19   saying?
10:46:09 20   Q   Do you remember anyone at all describing --
      21   A   No.
      22   Q   -- for you plaintiffs' --
      23   A   No.
      24   Q   Did you direct Mr. Biesemeyer to deny plaintiffs' request
10:46:18 25   to deliver the invocation?

REDIRECT EXAMINATION – SUZANNE KLAPP

10:46:21  1   A    No.

2   Q    Did you ask Mr. Biesemeyer to deny the request by

3   Mr. Zarzycki that plaintiffs deliver --

4   A    No, I would not have done that.

10:46:33  5            MS. ZOE:  I have nothing further, Your Honor.

6            THE COURT:  Any redirect?

7            MR. KEZHAYA:  Yes, Your Honor.

8              R E D I R E C T   E X A M I N A T I O N

9   BY MR. KEZHAYA:

10:46:56  10  Q    You believed that The Satanic Temple's invocation would

11  disparage someone's beliefs; is that right?

12  A    Yes, I did believe that.

13  Q    But you didn't know what the content of the invocation

14  was, did you?

10:47:08  15  A    I never know the content of an invocation.

16  Q    Okay.

17            You also testified to an open meeting law; is that

18  right?

19  A    Yes.

10:47:21  20  Q    An open meeting law prohibits discussions about

21  essentially anything of council importance; is that right?

22  A    You could discuss council items among yourselves as long

23  as you don't violate the open meeting law, which is no more

24  than three councilmembers can speak among themselves.  If

10:47:42  25  it's -- if it's the majority of councilmembers, then it has

REDIRECT EXAMINATION - SUZANNE KLAPP

10:47:45  1   to be an open meeting.

2   Q    Okay.  How many councilmembers are there again?

3   A    Seven.

4   Q    Earlier when you were testifying about you heard

10:47:54  5   discussions of councilmembers, how many were discussing?

6         MS. ZOE:  Objection, Your Honor.  This exceeds the

7   scope of my cross-examination.

8         THE COURT:  I think that's right.  Was this covered

9   in cross-examination?

10:48:07  10        MR. KEZHAYA:  Your Honor, the open meeting

11   minutes -- open meetings law was discussed at some length.

12   She testified earlier she could not have any discussions, but

13   prior to that, my direct, she testified that discussions were

14   had.

10:48:20  15        THE COURT:  Just a minute.

16         The objection's overruled.

17   BY MR. KEZHAYA:

18   Q    How many people were discussing?

19   A    It would have been no more than two others because I

10:48:32  20   don't break the open meeting law.  So I don't talk with three

21   other councilmembers about anything.

22   Q    Were you talking with these no more than three other

23   councilmembers?

24   A    Where?

10:48:43  25   Q    Were you?

REDIRECT EXAMINATION - SUZANNE KLAPP

10:48:44   1   A   Say that again.

2   Q   Were you talking with the no more than three other

3   councilmembers?

4   A   No more than two other.

10:48:52   5   Q   Pardon me.  No more than two other.

6   A   I believe someone mentioned to me that there was some

7   kind of a request, it could have been just one person.  I

8   don't remember who it was.  But I did not have a meeting

9   among four people about this issue.

10:49:08  10   Q   Do you remember when this was?

11   A   Somewhere around the time I probably wrote this article,

12   but I don't know when.

13   Q   Did you say anything to this councilperson or group of

14   councilpeople?

10:49:24  15   A   I don't remember saying much of anything other than I

16   hadn't heard about it until it was mentioned.

17   Q   Do your opinions -- do your opinions affect your council

18   determinations in any way?

19   A   This wasn't a council determination, but on other council

10:49:47  20   issues that actually come before us that we vote on, I vote

21   according to a lot of information, not just opinion.

22   Q   Okay.  But your opinion, does it influence your decision?

23   A   It can.

24   Q   You've been a councilmember since 2008 at least; is that

10:50:12  25   right?

REDIRECT EXAMINATION – SUZANNE KLAPP

10:50:13   1    A    January 2009.

2    Q    Okay.  But importantly, since 2013 you have been a

3    councilmember.

4    A    Yes.

10:50:21   5    Q    At the conclusion of each meeting, are meeting minutes

6    prepared?

7    A    Yes.

8    Q    Are meeting minutes voted upon?

9    A    At the next meeting, yes.  Or some subsequent meeting,

10:50:33  10    yes.

11    Q    If they're reduced to a final meeting minutes, then

12    affixed with the seal of the City, are they deemed meeting

13    minutes, public records?

14    A    If we vote on them and approve them, yes.

10:50:47  15         MS. ZOE:  Objection, Your Honor.  This exceeds the

16    scope of my cross-examination.

17         THE COURT:  Where are you going with this?

18         MR. KEZHAYA:  Earlier she testified that nobody had

19    ever come in from Mesa, Arizona.  We actually have --

10:51:00  20         MS. ZOE:  Objection --

21         THE COURT:  Excuse me.

22         She said Tucson, Arizona.

23         THE WITNESS:  I was not asked about Mesa.

24         THE COURT:  Hold on.  Hold on.

10:51:07  25         She said Tucson, Prescott.  I don't believe she said

DIRECT EXAMINATION – MICHELLE SHORTT

10:51:10  1    Mesa.

2            MR. KEZHAYA:  Yes, Your Honor.  We'll withdraw that

3    question, then.

4            If I may have a moment, Your Honor.

10:51:23  5            THE COURT:  You may.

6            MR. KEZHAYA:  No further questions, Your Honor.

7            THE COURT:  Okay.  Thank you.

8            You can step down, ma'am.

9            THE WITNESS:  Thank you.

10:51:40 10            MR. CLAUS:  Can I have the one minute again,

11    Your Honor?

12            THE COURT:  You can do it while we're calling the

13    next witness, that's fine.

14            Next witness.

10:51:47 15            MR. KEZHAYA:  Shortt, Your Honor.

16            THE COURT:  Michelle Shortt?

17            MR. KEZHAYA:  Yes.

18            THE COURT:  All right.

19            THE COURTROOM DEPUTY:  State your name for the

10:52:27 20    record and spell your first and last name.

21            THE WITNESS:  Michelle Shortt.  M-I-C-H-E-L-L-E,

22    S-H-O-R-T-T.

23            THE COURTROOM DEPUTY:  Great.  Have a seat right up

24    here.

25

DIRECT EXAMINATION - MICHELLE SHORTT

10:52:42  1                    **MICHELLE SHORTT,**

2    called as a witness herein, after having been first duly sworn

3    or affirmed, was examined and testified as follows:

4                    D I R E C T   E X A M I N A T I O N

10:52:53  5    BY MR. KEZHAYA:

6    Q    Please state your name for the record.

7    A    Michelle Shortt.

8    Q    And Michelle, how old are you now?

9    A    32.

10:53:17 10    Q    And have you identified as a satanist for at least since

11   2016?

12   A    Yes.

13   Q    When did you first start identifying as a satanist?

14   A    In 2001.

10:53:28 15    Q    How old were you then?

16   A    I was 14.

17   Q    Do you consider satanism to be your religious beliefs?

18   A    Yes.

19   Q    Does satanism take the place that God would in some other

10:53:46 20   people's beliefs.

21   A    Yes.

22   Q    I notice that you have some pendants across your neck.

23   Let's start with the lowest-hanging one.  What is that?

24   A    This is the Satanic Temple pendant with a Baphomet logo

10:54:03 25   and TST letters inscribed on top.

DIRECT EXAMINATION – MICHELLE SHORTT

10:54:07  1  Q   Does TST stand for The Satanic Temple?

2  A   Yes.

3  Q   And you indicated that it's our Baphomet logo.  When you

4  say "our," are you referring to The Satanic Temple?

10:54:19  5  A   Yes.

6  Q   Does The Satanic Temple have the exclusive use of

7  Baphomet?

8  A   Of this logo and the Baphomet monument.

9  Q   Okay.  But in terms of Baphomet as a concept, what is

10:54:32  10  Baphomet?

11  A   Baphomet is a symbol that represents the dueling of

12  opposites.  So he has characteristics of man and beast.  He

13  has one hand above and pointing up and one hand pointing down

14  as above, so below.  And the original drawing has breasts and

10:55:02  15  also a phallus -- a phallic symbol.  So it's always trying to

16  reconcile opposing viewpoints in this one icon.

17  Q   How far back does Baphomet go as a concept?

18  A   It was rumored the Knights Templar had worshiped Baphomet

19  or some form of Baphomet.  So since then.  Since the Crusades

10:55:29  20  it's been known.

21  Q   Were the Knights Templar persecuted for the rumors

22  surrounding their beliefs in Baphomet?

23       MR. CLAUS:  Objection, Your Honor.  Foundation.

24  Relevance.  Calls for undisclosed opinions.

10:55:46  25       THE COURT:  Overruled.

DIRECT EXAMINATION - MICHELLE SHORTT

10:55:46  1       THE WITNESS:  Yes, they were.

2   BY MR. KEZHAYA:

3   Q   As a satanist, do you identify with the persecuted?

4   A   Yes.

10:55:55  5   Q   As a satanist, are you in fact persecuted?

6   A   Yes.

7   Q   Does the Baphomet symbol have religious significance to

8   you?

9   A   Yes.

10:56:04  10  Q   Is that religious significance sincerely held?

11  A   Yes.

12  Q   You have other symbols across your neck.  Tell us about

13  the next lowest-hanging one.

14  A   Next lowest-hanging one is Pan.  He's kind of my personal

10:56:18  15  Satan.  Many people have their own personal type of Satan and

16  the one I gravitate to is the mythological creature of the

17  fawn, Pan.  He's whimsical.  He lives in the forest.  It's

18  kind of -- it relates to what I hold dear.

19  Q   Do you identify Pan as a symbol of religious significance

10:56:45  20  to you?

21  A   Yes.  Not necessarily religious.  I mean he's just

22  another interpretation, I suppose, of what my religion

23  encompasses.

24  Q   How about the next highest one up.

10:57:02  25  A   That's a fairy.

DIRECT EXAMINATION – MICHELLE SHORTT

10:57:03  1  Q   Okay.  First of all, please describe for us what is a

2  fairy to you?

3  A   Another -- a fairy is another mythological creature that

4  is usually petite in size with wings.

10:57:23  5  Q   You emphasize they're mythological.  Do fairies hold

6  religious significance to you?

7  A   No.

8  Q   How about the last closest one?

9  A   The last one is another Baphomet pendant.

10:57:41  10  Q   Okay.

11        You also have tattoos; is that right?

12  A   Yes.

13  Q   You have a number of tattoos.

14  A   Yes.

10:57:47  15  Q   As a general matter, do they hold religious significance

16  to you?

17  A   Only two.

18  Q   Which are the two?

19  A   They're located behind my ears.  I have the sigil of

10:57:58  20  Lucifer on my left ear and the sulfur cross on my right ear,

21  which is another satanic symbol.

22  Q   Are both satanic symbols?

23  A   Yes.

24  Q   And they both have religious significance to you?

10:58:15  25  A   Yes.

DIRECT EXAMINATION - MICHELLE SHORTT

10:58:15  1   Q   Was there ever a Satanic Temple of Tucson?

2   A   No.

3   Q   Is there now a Satanic Temple of Arizona?

4   A   Yes.

10:58:23  5   Q   How did Satanic Temple of Arizona come to be?

6   A   The Arizona chapter came to be in 2016 after me and my

7   co-chap- -- who ended up becoming my co-chapter head,

8   Stu de Haan, we were given the opportunity to have a chapter

9   after we had successfully handled the media during the

10:58:51  10   Phoenix invocation incident.  And after handling that

11   successfully, we were offered chapter status by the

12   cofounder, Lucien Greaves.

13   Q   Let's establish some background about the Phoenix

14   incident.

10:59:12  15          Did you make some kind of a request to Phoenix, or

16   did anyone on your behalf make a request to Phoenix, for you

17   to give an invocation before their city council?

18   A   Yes.

19   Q   You described it as an incident.  What happened?

10:59:27  20   A   We were -- we asked to give an invocation in Phoenix

21   which then caused their Phoenix city council to hold

22   emergency meetings trying to find ways to block us.

23          They ended with, I believe, having the rules changed

24   so that chaplains from the fire department and police

10:59:55  25   department could then be giving the invocations before the

DIRECT EXAMINATION – MICHELLE SHORTT

11:00:00  1    meetings.

2    Q    Did you take the understanding that they were precluding

3    you because of your religious beliefs?

4            MR. CLAUS:  Objection, Your Honor.  Foundation.

11:00:08  5    Calls for speculation.

6            THE COURT:  Overruled.  Called for her

7    understanding.

8            THE WITNESS:  Yes.

9    BY MR. KEZHAYA:

11:00:15  10   Q    Relative to the Scottsdale request, when did the Phoenix

11   request happen?

12   A    Shortly before.  Like maybe a month or two prior.

13   Q    Did you make any other requests for other city councils?

14   A    After Scottsdale?

11:00:35  15   Q    Generally.

16   A    Yes.

17   Q    About how many did you make?

18   A    Sahuarita was definitely one of them.

19   Q    So no less than three?

11:00:45  20   A    Um-hmm.

21   Q    Can you recall more offhand?

22   A    No.

23   Q    How did you come to determine which cities TST would make

24   this request of?

11:00:58  25   A    We looked to see if there were any established rules in

DIRECT EXAMINATION - MICHELLE SHORTT

11:01:04  1  regards to who could give invocations and we couldn't find

2  anything, so we just picked locations that were near us,

3  Sahuarita, Phoenix, Scottsdale.

4  Q    Okay.  Did The Satanic Temple of Arizona exist in an

11:01:27  5  informal manner prior to your request to Scottsdale?

6  A    The chapter?

7  Q    Just -- not necessarily as an official chapter, but just

8  as a group of people.

9  A    Yes.

11:01:39  10  Q    Were you all satanists?

11  A    Yes.

12  Q    Did you all identify with The Satanic Temple's brand of

13  satanism?

14  A    Yes.

11:01:49  15  Q    Were they from around the state?

16  A    Yes.

17  Q    Did you have anyone from Scottsdale?

18  A    Yes.

19  Q    Why did you choose The Satanic Temple of Arizona instead

11:02:02  20  of Satanic Temple of Tucson?

21  A    We had members throughout the state.  We didn't want to

22  have splintered groups.  We all kind of wanted to work

23  together and be able to unify the state.  And considering

24  that there's only really two major cities in Arizona --

11:02:22  25  Phoenix, and Tucson -- we thought it would be feasible to be

DIRECT EXAMINATION – MICHELLE SHORTT

11:02:27  1    able to have an entire state chapter.

2    Q    Okay.  Is there a social stigma attached to being a

3    self-identified satanist?

4    A    Yes.

11:02:45  5    Q    As a group, do you guys have regular activities?

6    A    Yes.

7    Q    Do you have meetings?

8    A    Yes.

9    Q    Do you do highway cleanups?

11:02:55  10    A    Yes.

11    Q    Do you do charity drives?

12    A    Yes.

13    Q    What kinds of charity drives do you do?

14    A    At the time?  Mostly now we just do Menstruatin' with

11:03:08  15    Satan, which is a campaign that aims to collect menstrual

16    products for those who are  most unfortunate.

17    Q    Do you have any other charity drives?

18    A    No.

19    Q    Okay.  Do you have regular meetings of any sort?  Groups

11:03:26  20    of people gathering?

21    A    Yes.

22    Q    What kinds of meetings do you have?

23    A    We have hiking excursions.  We have arts and crafts

24    nights.  We have book clubs.  We have regular old meetings

11:03:38  25    just on video chat just to discuss plans.

DIRECT EXAMINATION - MICHELLE SHORTT

11:03:45  1   Q   Do the nature of these meetings fit with your

2   understanding of fellowship?

3   A   Yes.

4   Q   Do the nature of these meetings revolve around a shared

11:03:58  5   concept of satanism?

6   A   Yes.

7   Q   Does satanism have teachings?

8   A   Yes.  We have a philosophy.

9   Q   Tell us your understanding of the philosophy of satanism

11:04:12  10   to you.

11   A   Okay.  Well, satanism to me, Satan in particular, he

12   encompasses all of the values that I personally hold dear.

13   Such as justice, the pursuit of knowledge, bodily autonomy,

14   the striving for personal sovereignty.  And within that,

11:04:41  15   within my belief in satanism, are also the seven tenets of

16   The Satanic Temple to which -- alone, like, they're general

17   overviews of ideas or nothing specific or dogmatic.  It's

18   just the values we hold dear such as justice, compassion, the

19   pursuit of knowledge, and to inspire nobility in thought and

11:05:13  20   action.

21   Q   Okay.  With your regular gatherings, do you ever have

22   religious ceremonies?

23   A   Yes, we do.

24   Q   What kinds of religious ceremonies do you provide for your

11:05:28  25   membership?

DIRECT EXAMINATION - MICHELLE SHORTT

11:05:29  1   A    Religious ceremonies take form in -- usually in a ritual

2   type of setting.  We symbolically, you know, sometimes have a

3   script, a dialogue, some sort of action to commemorate an

4   event, a special occasion, something like that.  Or even to,

11:05:52  5   you know, help ourselves to be able to overcome things in our

6   lives.

7   Q    Do these ceremonies have religious significance to you

8   personally?

9   A    Yes.

11:06:06  10   Q    Do these bring you joy --

11   A    Yes.

12   Q    Was this invocation process an effort to spread the word

13   about your existence?

14   A    Yes.

11:06:23  15   Q    And not just you being Michelle Shortt, but the Satanic

16   Temple of Arizona.

17   A    That's correct.  We wanted to show the world we can be in

18   the public sphere as anyone else.

19   Q    You have holidays?

11:06:42  20   A    Yes.

21   Q    What are some holidays you observe?

22   A    We like to celebrate Hexennacht, or also known as

23   Walpurgisnacht.  We like to celebrate our own birthdays.  To

24   us, that is the highest of all holidays.  We also like to

11:07:03  25   celebrate Lupercalia, and among other things.  Some satanists

DIRECT EXAMINATION – MICHELLE SHORTT

11:07:10   1    have additional traditions.  I personally like Devil's Night

       2    on October 30th.

       3    Q    Is satanism a particularly dogmatic religion?

       4    A    No.

11:07:23   5    Q    Is it pretty individualistic?

       6    A    Yes.

       7    Q    Is there a lot of room for individuals to determine what

       8    satanism means to them?

       9    A    Yes.

11:07:31  10    Q    Does that make it not a religion to you?

      11    A    No.

      12    Q    If someone differs from your understanding of satanism,

      13    does that make them less of a satanist?

      14    A    No.

11:07:44  15    Q    Want to turn your attention to Scottsdale specifically.

      16    What was your purpose in seeking this invocation?

      17    A    To be able to establish TST, The Satanic Temple, as a

      18    presence within the community.  And to, you know, participate

      19    in what is supposed to be my right as a citizen within the

11:08:05  20    community.

      21    Q    Was it ever your intention for Scottsdale to shut down

      22    their invocation process?

      23    A    No, it wasn't.  I had the days planned.  I had expected

      24    to be there.

11:08:24  25    Q    Okay.  Earlier you testified that you were reached out to.

DIRECT EXAMINATION - MICHELLE SHORTT

11:08:33  1    Who did the reaching out to you?

2    A    For Scottsdale?

3    Q    Specifically for the purpose of --

4    A    Giving an invocation?

11:08:41  5    Q    -- invocations, yes.

6    A    That was Lucien Greaves, our cofounder.

7    Q    And just for sake of clarity, Lucien Greaves is the

8    cofounder of The Satanic Temple; is that right?

9    A    Yes.

11:08:55  10   Q    Why you?

11   A    Why me?

12   Q    Why did he reach out to you?

13        MR. CLAUS:  Objection, Your Honor.  Calls for

14   speculation.  Calls for hearsay.

11:09:04  15        THE COURT:  I think you need to rephrase the

16   question.

17   BY MR. KEZHAYA:

18   Q    What is your understanding for why you personally were

19   reached out to for the purpose of setting out these

11:09:12  20   invocations?

21        MR. CLAUS:  Same objection, Your Honor.

22        THE COURT:  Overruled.

23        MR. CLAUS:  Calls for hearsay.

24        THE COURT:  Overruled.

11:09:19  25        THE WITNESS:  At the time when Lucien Greaves was

DIRECT EXAMINATION – MICHELLE SHORTT

11:09:23  1  looking for Arizona residents to do an invocation in Phoenix,

2  it was how me and Stu de Haan met and I had already had

3  previous interaction with Lucien Greaves.  We had been

4  introduced through another member.  And since Stu had lawyer

11:09:45  5  expertise, he thought we would be a good pair to be able to

6  lead this action.

7  BY MR. KEZHAYA:

8  Q    And when you say he would be good to lead the action, was

9  it ever your understanding that he would be the one giving the

11:10:02  10  invocation?

11  A    No.  I would give the invocation.

12  Q    How do you mean lead, then?

13  A    Like us to lead.  Like, to be able to take on this

14  endeavor.

11:10:16  15  Q    At some point someone made contact with the City of

16  Scottsdale in terms of setting up a request; is that right?

17  A    Yes.

18        MR. CLAUS:  Your Honor, foundation.  Calls for

19  hearsay.  Speculation.

11:10:30  20        THE COURT:  Overruled.

21  BY MR. KEZHAYA:

22  Q    Do you know who made that request?

23  A    One of our councilmembers at the time.  His name is

24  Jeremy Zarzycki.

11:10:41  25  Q    Okay.  And were you on the phone calls.

DIRECT EXAMINATION - MICHELLE SHORTT

11:10:43  1    A    No.

2    Q    Do you know what happened after those phone calls?  Just

3    the very next step.

4    A    No.

11:10:50  5    Q    Were you scheduled for the purpose of setting up an

6    invocation at any point?

7    A    Yes.

8    Q    Is it your understanding that you were scheduled because

9    of that phone call?

11:11:00  10   A    Yes.

11   Q    Okay.

12        Do you know if any qualifying questions were asked of

13   The Satanic Temple's substantial connection to Scottsdale?

14   A    They were not.

11:11:16  15   Q    Do you know if any qualifying questions were asked about

16   the nature of your religious beliefs?

17        MR. CLAUS:  Objection, Your Honor.  Foundation.

18   Calls for hearsay.  Speculation.

19        THE COURT:  I think you need to lay foundation for

11:11:29  20   this.

21        MR. KEZHAYA:  Yes, Judge.

22   BY MR. KEZHAYA:

23   Q    Do you remember when the initial invocation was to take

24   place?

11:11:43  25   A    Sometime prior to the second date, which was in June.

DIRECT EXAMINATION - MICHELLE SHORTT

11:11:50 1    Q    Was there a need to reschedule that first date?

2    A    Yes.

3    Q    What was the need to reschedule?

4    A    I was out of town at the time.  I was doing work in

11:11:59 5    Texas.

6    Q    And at some point there was a second scheduling; is that

7    right?

8    A    Yes.

9    Q    Do you know, do you have personal knowledge of any public

11:12:15 10   outcry that took place because of your granted first request?

11   A    Yes.

12   Q    In fact, you did a public records request at the end of

13   all of this; is that right?

14   A    Yes.

11:12:28 15   Q    And pursuant to that public records request, you were

16   provided a series of documents from the City; is that also

17   right?

18   A    Yes.

19   Q    And the City stated that those are in fact true and

11:12:40 20   accurate copies of public records; is that right?

21   A    Yes.

22   Q    And they said the same thing during this litigation, too;

23   is that right?

24   A    Um-hmm.  Yes.

11:12:52 25   Q    Did you review those documents?

DIRECT EXAMINATION – MICHELLE SHORTT

11:12:54  1    A    I did.

2    Q    Did you also hear news articles or news stories about the

3    nature of your request?

4    A    Yes.

11:13:07  5    Q    Was this a fairly widely published event?

6              MR. CLAUS:  Objection, Your Honor.  Leading.

7              THE COURT:  Overruled.

8    BY MR. KEZHAYA:

9    Q    Was there a public outcry --

11:13:19  10   A    Yes.

11   Q    -- your first request?

12             I'm going to show you a series of documents.

13             MR. KEZHAYA:  Your Honor, beginning with

14   Exhibit Number 5.

11:13:39  15             May I approach, Your Honor?

16             THE COURT:  You may.

17             THE COURTROOM DEPUTY:  Counsel, may I look at it

18   really quick.  Thank you.

19   BY MR. KEZHAYA:

11:14:06  20   Q    Do you recognize this document?

21   A    Yes, I do.

22   Q    Was this document provided to you in that packet of public

23   records responses?

24   A    Yes, it was.

11:14:16  25   Q    Is that a true and accurate copy of a document that was

DIRECT EXAMINATION – MICHELLE SHORTT

11:14:19  1    provided to you?

2    A    Yes, it is.

3    Q    Without telling us what this document says, tell us

4    generally what kind of document this is.

11:14:27  5    A    It is an e-mail correspondence by David Smith, one of the

6    councilmembers, and he states that he --

7              MR. CLAUS:   Objection --

8    BY MR. KEZHAYA:

9    Q    Don't tell us what it says.

11:14:42  10   A    Oh.

11   Q    Did I understand you correctly, you said it's from

12   David Smith and it's an e-mail?

13   A    Um-hmm.

14             MR. KEZHAYA:   Move to introduce Exhibit 5,

11:14:49  15   Your Honor.

16             MR. CLAUS:   Objection, Your Honor.   Hearsay.

17   Foundation.   Mr. Smith has not been identified as a witness.

18             The document itself, if you look at Exhibit 5,

19   Your Honor, is also misleading.   It's been redacted, I don't

11:15:03  20   know by whom, to eliminate material from the exhibit.

21   Primarily it is hearsay with no foundation.

22             THE COURT:   What's your response on hearsay?

23             MR. KEZHAYA:   I'll start with the hearsay,

24   Your Honor.

11:15:16  25             A statement by an agent of a party opponent in the

DIRECT EXAMINATION - MICHELLE SHORTT

11:15:19  1   course and scope of their agency is a statement by party

2   opponent and it's not hearsay.  I'd cite the Court to

3   Rule 801, I believe it's (d)(3).  It might be (d)(4).  Sorry.

4   801(d)(2) sub (D).

11:15:36  5          MR. CLAUS:  But that is why there's no foundation.

6   There is no foundation that this e-mail exchange is within

7   the course and scope of anybody's employment or agency on

8   behalf of the City.  There is no email address in the e-mail.

9   There is no foundation laid to establish that 802(d)(2)(D)

11:16:01 10   applies in this case, Your Honor.  They have not taken the

11   deposition of Mr. Smith.  They have not taken the deposition

12   of the recipient.  There is no indication that this is a

13   statement within an agency relationship so that it falls

14   within 802(d)(2)(D).  It is rank hearsay offered to prove the

11:16:21 15   truth of the matter asserted therein.

16          THE COURT:  What is -- what is the basis for the

17   redaction?  Or who did the redacting?

18          MR. KEZHAYA:  Your Honor, Stu de Haan did the

19   redaction for purposes of privacy.  It was his understanding

11:16:35 20   it was an obligation on his part to redact e-mail addresses

21   because it identifies who it came from.

22          THE COURT:  Do you have the unredacted document?

23          MR. KEZHAYA:  Not a copy of it, Your Honor.

24   However, we did attach an unredacted copy in responses to our

11:16:50 25   motion in limine.

DIRECT EXAMINATION - MICHELLE SHORTT

11:16:51  1      THE COURT:  But you don't have an unredacted copy in

        2  the courtroom at this time?

        3      MR. KEZHAYA:  We do not have a paper copy,

        4  Your Honor.  However, I could show Ms. Shortt a .pdf copy on

11:17:00  5  my tablet.

        6      THE COURT:  Well, we're talking about exhibits that

        7  are going to come in.  Obviously a .pdf copy cannot come in.

        8  What is the evidence that this e-mail -- there's actually two

        9  of them, it looks like -- these e-mails were written by

11:17:21 10  Mr. Smith in the scope of his role as an agent of the City of

       11  Scottsdale?

       12      MR. KEZHAYA:  Your Honor, the contents of the

       13  message is clear that it's a constituent communicating to a

       14  representative their displeasure with The Satanic Temple's

11:17:43 15  invocation.

       16      Previously it's been disclosed that all

       17  councilmembers had access to a single email address, and

       18  Ms. Shortt just indicated that, both, number one, they were

       19  produced through public records responses and, number two,

11:18:01 20  the -- Mr. Smith was a councilmember.

       21      There is an adequate showing, which is a very

       22  minimal threshold, that it's an authentic document that is a

       23  public record.  Whether David Smith was acting within the

       24  course and scope of his agency I believe is going to the

11:18:22 25  weight of the evidence.  However, it is a constituent

DIRECT EXAMINATION - MICHELLE SHORTT

11:18:26  1    communicating with a representative through their public

2    e-mails.

3                THE COURT:  Well, my concern is I can't tell from

4    looking at this document whether Mr. Smith was writing from a

11:18:37  5    Scottsdale e-mail address or whether this was his personal

6    communication with this individual who hasn't been

7    identified.  Because of that, I can't tell if it was done in

8    his official capacity as an agent of the City.

9                MR. KEZHAYA:  Yes, Your Honor.

11:18:52 10            If we are able to produce the unredacted copy,

11    perhaps after the lunch break, would this be a matter that

12    gets re-taken up?

13                THE COURT:  Well, I'll be happy to look at it then.

14    It seems to me at this point, looking just at this document,

11:19:06 15    which is all I have in front of me, I can't tell if it falls

16    within 801(d)(2)(D) because I can't confirm it was by

17    Mr. Smith in the course of his role as an agent for the City.

18                MR. KEZHAYA:  Yes, Your Honor.

19            If I could supplement my response to the hearsay

11:19:19 20    objection.  At the bottom right is an identification of Bates

21    stamping.  We do having something that could refresh the

22    witness's recollection on documents that came from the Bates

23    stamping.

24                THE COURT:  How does that help us determine the role

11:19:38 25    Mr. Smith was playing when he wrote these e-mails?

DIRECT EXAMINATION - MICHELLE SHORTT

11:19:41  1          MR. KEZHAYA:  The discovery responses specifically

2      identify they're public records.  And --

3              THE COURT:  From the defendant?

4              MR. KEZHAYA:  From the City, yes.

11:19:50  5          THE COURT:  Were these identified by the City as

6      public records, Mr. Claus?

7              MR. CLAUS:  I do not know, Your Honor, if they were

8      identified as public records.  I know that they were produced

9      as part of discovery.  Or these actually were not produced as

11:20:04 10     part of discovery, they were produced -- they were produced

11     as part of discovery in this case.  But that does not mean --

12             THE COURT:  So they were produced?

13             MR. CLAUS:  They were produced as part of discovery

14     in the case.

11:20:14 15          THE COURT:  All right, Mr. --

16             MR. CLAUS:  If I may, Your Honor.  The discovery

17     request did not ask for e-mails sent in official capacity.

18     It simply said e-mails sent by anybody.

19             THE COURT:  Do you have the discovery response that

11:20:29 20     identifies them?

21             MR. KEZHAYA:  Yes, Your Honor.

22             THE COURT:  What does it say about the documents?

23             MR. KEZHAYA:  This is in response to the Court's

24     mandatory initial discovery requests.

11:20:47 25          Response to item number 3 -- may I summarize,

DIRECT EXAMINATION – MICHELLE SHORTT

11:20:49  1    Your Honor, or do you want me to read it verbatim?

2        THE COURT:  Why don't you just bring it forward.

3    Let's mark it as an exhibit so it's in the record, and I'll

4    look at it.

11:20:57  5        MR. KEZHAYA:  Yes.

6        THE COURTROOM DEPUTY:  Your Honor, this will be

7    Exhibit 19.

8        (Exhibit 19 marked for identification.)

9        MR. KEZHAYA:  I believe it's pages 6 to 7,

11:21:43  10   Your Honor, in response to item number 3.

11       THE COURT:  Well, what it says is that these are

12   documents that are relevant to the case, and then the actual

13   statement says "in response to public records request."  Is

14   that what you're referring to?

11:22:19  15       MR. KEZHAYA:  Yes, Your Honor.  The City can't

16   possibly be holding Mr. Smith's personal e-mail account.

17   They would only producing these in pursuit of a public

18   records request.  That was my --

19       THE COURT:  Do you have evidence of that fact?

11:22:31  20       MR. KEZHAYA:  She testified earlier she made a

21   public records request.

22       THE COURT:  I understand she made a public records

23   request.  Did you collect any evidence in discovery as to how

24   the City collects or maintains e-mails?  Or what city

11:22:42  25   councilmembers' e-mails go to the City?

DIRECT EXAMINATION – MICHELLE SHORTT

11:22:46  1        MR. KEZHAYA:  We have testimony earlier, Your Honor,

2    from that particular e-mail.

3        THE COURT:  I understand that, but that's not on

4    this document.  That's not on Exhibit 5.

11:22:56  5        MR. KEZHAYA:  We have no testimony of a records

6    custodian of the City that identifies which exact documents

7    are collected and maintained in the course and scope of

8    records maintenance.

9        THE COURT:  All right.  I'm not going to admit

11:23:08 10    Exhibit 5 at this time.  If you want to present an unredacted

11    version, I'm happy to look at it and see if I think that

12    affects its admissibility.

13        MR. KEZHAYA:  Yes, Your Honor.

14        MR. CLAUS:  Your Honor, just a housekeeping matter.

11:23:27 15    May I ask, is Exhibit 19 now in evidence?

16        THE COURT:  No.  It wasn't admitted, it was just

17    part of the dialogue we just had.

18        MR. CLAUS:  Thank you, I just wanted to make sure.

19    Thank you.

11:23:36 20    BY MR. KEZHAYA:

21    Q    At some point you rescheduled; is that right?

22    A    Yes.

23    Q    When were you rescheduled to?

24    A    July?  I think I misspoke when I said June earlier.

11:24:00 25    Q    Okay.  So be it June or July, at some point you were

DIRECT EXAMINATION - MICHELLE SHORTT

11:24:07   1    notified that you would not be permitted to give this

2    invocation; is that right?

3    A    Yes.

4    Q    Hand you a document that has been previously marked as

11:24:18   5    Exhibit 7.

6            MR. KEZHAYA:  May I approach, Your Honor?

7            THE COURT:  You may.

8    BY MR. KEZHAYA:

9    Q    Do you recognize this document?

11:24:56  10    A    Yes.

11    Q    Without telling us what the document says, tell us

12    generally what kind of a document is it.

13    A    It's an e-mail confirming our scheduled date.

14    Q    And is it an e-mail from someone with an @scottsdaleaz.gov

11:25:10  15    address?

16    A    Yes.

17    Q    Okay.

18            MR. KEZHAYA:  Move to introduce Exhibit 7,

19    Your Honor.

11:25:17  20            MR. CLAUS:  I believe it's been stipulated into

21    evidence, Your Honor.

22            THE COURT:  Is there any objection?

23            MR. CLAUS:  There is no objection.  We had

24    stipulated --

11:25:24  25            THE COURT:  All right.  It's admitted.

DIRECT EXAMINATION - MICHELLE SHORTT

11:25:26  1          (Exhibit 7 admitted.)

2     BY MR. KEZHAYA:

3     Q    And is that the e-mail that indicates when your next

4     rescheduling would be?

11:25:36  5     A    Pardon?

6     Q    Is that the e-mail that identifies this is when your next

7     invocation would be?

8     A    Yes.

9     Q    And what was the date for that?

11:25:43 10     A    Either July 5th or 6th.  I think we settled on the 6th.

11     Q    Okay.

12               I'm going to show you another document, Exhibit 12.

13               MR. KEZHAYA:  May I approach?

14               THE COURT:  You may.

11:26:22 15               MR. KEZHAYA:  Your Honor, 12 has also been

16     stipulated to.

17               THE COURT:  Are you moving it into evidence?

18               MR. KEZHAYA:  Yes, Your Honor.

19               THE COURT:  Any objection?

11:26:28 20               MR. CLAUS:  None, Your Honor.

21               THE COURT:  12 is admitted.

22          (Exhibit 12 admitted.)

23     BY MR. KEZHAYA:

24     Q    That e-mail declines your invocation; is that right?

11:26:38 25     A    Yes.

DIRECT EXAMINATION - MICHELLE SHORTT

11:26:40  1    Q    What was the reason given for why you were being declined?

2    A    There wasn't any.

3    Q    There was no reason at all?

4    A    Oh.  That they're not going to deviate from their

11:26:54  5    long-standing practice.

6    Q    I notice you laughed while saying that.  Why do you find

7    that funny?

8    A    Because they had not asked us any questions to establish

9    whether or not we had substantial ties, as they claimed that

11:27:10  10   we lacked.

11   Q    Did you volunteer any information about your substantial

12   ties?

13   A    Had they asked, I would have gladly given it.

14   Q    Had they asked, would you have volunteered identifying

11:27:25  15   information about the Scottsdale resident who is a satanist?

16   A    He would have taken up the mantel had I been denied.

17   Q    Was it your understanding that there was no such policy

18   requiring a substantial connection to the Scottsdale community

19   when you made this request?

11:27:49  20   A    Yes.

21   Q    And did they ever give you any indication that you were

22   mistaken and in fact prior to this e-mail, at least, there was

23   some kind of a policy?

24   A    No.

11:28:06  25   Q    When this was e-mail written?

DIRECT EXAMINATION – MICHELLE SHORTT

11:28:13  1    A    May 23rd, 2016.

        2    Q    And this is actually of importance to the case.  At what

        3    time was this e-mail written?

        4    A    3:29 p.m.

11:28:35  5    Q    Does this e-mail make any effort to identify what a

        6    substantial connection to Scottsdale community means?

        7    A    No.

        8    Q    Have you been participating in this litigation as an

        9    active participant?

11:28:49 10    A    I don't understand the question.

       11    Q    Have you received documents that have been filed in this

       12    litigation?

       13    A    Yes.

       14    Q    Have you reviewed those documents?

11:28:59 15    A    Yes.

       16    Q    I'm going; to draw your attention to Exhibit 7.

       17              MR. KEZHAYA:  May I approach, Your Honor?

       18              THE COURT:  You may.

       19              MR. KEZHAYA:  17.  This is Number 17.

11:29:33 20    BY MR. KEZHAYA:

       21    Q    Do you recognize this document?

       22    A    Yes.

       23    Q    Was this a document that was filed by the City?

       24    A    Yes.

11:29:50 25    Q    What is the title of this document?

DIRECT EXAMINATION – MICHELLE SHORTT

11:30:01  1   A   I don't know.

2   Q   You may find it on the first page.  Should be in bold.

3   A    It says Scottsdale City Attorney's Office, United States

4   District Court, District of Arizona, Defendant's Motion to

11:30:17  5   Dismiss.

6   Q   Okay.

7        Do I understand you correctly that it is the brief in

8   support of defendant's motion to dismiss?

9   A   Yes.

11:30:27  10       MR. KEZHAYA:  Move to introduce Exhibit 17,

11   Your Honor.

12       MR. CLAUS:  Your Honor, it's hearsay.  It is legal

13   arguments of counsel which are not as a matter of law

14   evidence.

11:30:37  15       There's no foundation for the introduction of

16   Exhibit 17 as an exhibit.  There are no identified statements

17   by any defendant in –– any factual statements by any

18   defendant in Exhibit 17.

19       And to the extent that it has any probative value

11:31:03  20   whatsoever, that probative value is outweighed by the clear

21   fact that it is argumentative, and the motion to dismiss does

22   not make a fact of consequence in this matter more or less

23   likely, so it is also irrelevant.

24       THE COURT:  Objection is overruled.  Exhibit 17 is

11:31:18  25   admitted.

DIRECT EXAMINATION - MICHELLE SHORTT

09:25:03  1        (Exhibit 17 admitted.)

2     BY MR. KEZHAYA:

3     Q   I want you to turn to page 11 of this exhibit.

4            Page 9 through 10 sheds some light on what, at least

11:31:39  5     as of June of 2018, the City considered to be a substantial

6     connection; is that fair to say?

7     A   Yes.

8     Q   Could you please read the full sentence spanning from 9

9     through 11.

11:31:54 10            MR. CLAUS:  Objection, Your Honor.  Document speaks

11     for itself.

12            THE COURT:  Overruled.

13            THE WITNESS:  "Here plaintiffs do not and cannot

14     allege that they are similarly situated to the leaders of

11:32:05 15     local Scottsdale-based faith groups who have given

16     invocations in front of the city council as permitted by the

17     City's policy."

18     BY MR. KEZHAYA:

19     Q   That statement indicates the City's position is you have

11:32:19 20     to be Scottsdale-based to have a substantial connection?

21            MR. CLAUS:  Objection.  Leading.

22     BY MR. KEZHAYA:

23     Q   Is that fair to say?

24            THE COURT:  Sustained.  Leading.

25

DIRECT EXAMINATION – MICHELLE SHORTT

11:32:26    1    BY MR. KEZHAYA:

2    Q    How would you describe that?  How would you characterize

3    the statement?

4              MR. CLAUS:  Irrelevant.  Her characterization is

11:32:33    5    irrelevant, Your Honor.

6              THE COURT:  Overruled.

7              THE WITNESS:  My understanding is that those who ask

8    to give invocations, that their faith-based groups must be

9    based in Scottsdale.

11:32:48   10    BY MR. KEZHAYA:

11    Q    This usage of the word "based," do you infer from that a

12    requirement of a physical location?

13              MR. CLAUS:  Objection, Your Honor.  Relevance.  Her

14    inference and foundation.

11:33:04   15              THE COURT:  Sustained.

16    BY MR. KEZHAYA:

17    Q    You personally are familiar with that -- first of all, you

18    weren't in the room when Mayor Lane testified, did you?

19    A    No.

11:33:25   20    Q    Are you aware of a campaign flyer from Mayor Lane?

21    A    Yes.

22              MR. KEZHAYA:  Your Honor, can we have Exhibit 13.

23    BY MR. KEZHAYA:

24    Q    Exhibit 13 indicates that he stopped -- sorry.  Actually,

11:33:55   25    please read the check mark into the -- for the benefit of the

DIRECT EXAMINATION - MICHELLE SHORTT

11:33:59   1   Court.

2   A    Stopped so-called, quote, unquote, satanists from mocking

3   City Hall traditions with a, quote, unquote, prayer.

4   Q    Was it ever your intention to mock Scottsdale City Hall

11:34:17   5   traditions?

6   A    No.

7   Q    Do you find it offensive to your religious beliefs --

8   A    Yes.

9   Q    -- that they would describe your prayer as invo- -- or as

11:34:30  10   a mockery?

11   A    Yes.

12   Q    Do you find it sensitive -- do you find it offensive that

13   he puts quotes around "satanists" and "prayer"?

14   A    Yes.

11:34:41  15   Q    Do you find that belittles your religious beliefs?

16   A    Yes.

17   Q    Does that make you feel like you are less than --

18   A    Yes.

19   Q    -- in the eyes of the city government?

11:34:50  20   A    Yes.

21   Q    Do you believe this flyer would make other satanists feel

22   like they're less than?

23        MR. CLAUS:  Objection, Your Honor.  Foundation.

24   Calls for speculation.

11:35:03  25        THE COURT:  Overruled.

DIRECT EXAMINATION – MICHELLE SHORTT

11:35:04  1          THE WITNESS:  Yes.

2    BY MR. KEZHAYA:

3    Q   Were you also personally familiar with Suzanne Klapp's

4    public statement?

11:35:14  5    A   Yes.

6    Q   Do you remember it well enough that you don't need to see

7    it?

8    A   I remember it.

9    Q   The part where she says "I do not welcome a satanist

11:35:26 10    group," does that offend your religious sentiments?

11    A   Yes.

12    Q   Does that make you feel you are less than in the eyes of

13    city government?

14    A   Yes.

11:35:35 15    Q   Do you think that would make a Scottsdale satanist feel

16    like they're less than to the city government?

17          MR. CLAUS:  Foundation.  Calls for speculation.

18          THE COURT:  Overruled.

19          THE WITNESS:  Yes.

11:35:45 20    BY MR. KEZHAYA:

21    Q   In any of these materials, is the word "Tucson" ever

22    mentioned?

23    A   No.

24    Q   Did your understanding of Klapp's statement relate to your

11:36:01 25    physical location or did it relate to your religious beliefs?

DIRECT EXAMINATION - MICHELLE SHORTT

11:36:04   1   A    It related to my beliefs as a satanist.

         2   Q    Earlier we talked about the City appearing to take the

         3   position that you have to be Scottsdale-based.  Do you

         4   remember that?

11:36:23   5   A    Yes.

         6   Q    Have you gone through meeting minutes of the City of

         7   Scottsdale?

         8   A    Yes.

         9   Q    I'm going to show you a document that's been previously

11:36:35  10   identified as Exhibit 14.

        11        MR. KEZHAYA:  May I approach, Your Honor?

        12        THE COURT:  You may.

        13   BY MR. KEZHAYA:

        14   Q    Without telling us what each of these pages of this

11:37:25  15   document says, could you tell us generally what are they?

        16   A    They're the meeting minutes of Scottsdale city council

        17   spanning -- spanning from 2013 to 2018.

        18   Q    Do these meeting minutes bear the seal of the city

        19   council?

11:37:46  20   A    Yes.

        21        MR. KEZHAYA:  Introduce Exhibit 15, Your Honor.

        22   Pardon me.  14, Your Honor.

        23        MR. CLAUS:  Objection, Your Honor, for manifold

        24   reasons.  First, the witness is incorrect.  As the Court can

11:37:58  25   see from the top, I'll just use page 1 of Exhibit 14 as an

DIRECT EXAMINATION - MICHELLE SHORTT

11:38:03  1   example.  It is not meeting minutes, it says "summarized

2   minutes."  If the Court looks at the note at the bottom of

3   page 1, bottom of page 3, bottom of page 5, every one of

4   these documents has the same note that these are not -- that

11:38:20  5   these summarized minutes of the city council meeting are not

6   verbatim transcripts.

7             Secondly, Your Honor --

8             THE COURT:  Well, let me interrupt you.  Why does

9   that make this inadmissible?  Summaries are admissible.

11:38:33 10            MR. CLAUS:  Summaries are admissible if the

11   documents themselves are made available --

12            THE COURT:  Well, let me restate that.  This isn't a

13   summary under 1006.  This is a document that purports to

14   summarize city council meetings.  There's nothing about that

11:38:46 15   that makes it inadmissible.

16            MR. CLAUS:  Except for the fact it's not,

17   Your Honor.  If you look at the second page of Exhibit 14,

18   you see how it says page 2 of 12?  And then if you look at

19   the next page, pages 3 through 12 are missing.

11:39:01 20            That same -- so when the testimony was that the

21   witness's understanding -- page 4, for instance, has one

22   page.  Page 5 has one page.  Page 6 has one page.  These are

23   not either the summarized minutes or the minutes of the City

24   of Scottsdale.  These are selections that the plaintiff

11:39:25 25   picked and choosed -- chose, rather.  There's no foundation

DIRECT EXAMINATION - MICHELLE SHORTT

11:39:30  1    from any witness as to how they were picked, how they were

2    chosen, why they were chosen, how they were selected.

3    There's no foundation.

4            THE COURT:  I understand that point.  What were your

11:39:39  5    other objections?

6            MR. CLAUS:  To the extent that they -- that it is

7    offered as a monolithic exhibit, Your Honor, it is confusing.

8    To the extent it refers to statements, then those statements

9    are hearsay.

11:39:59  10           THE COURT:  What statements are you referring to?

11           MR. CLAUS:  Any statements contained in the -- I can

12   just pick one from the first page.  I don't know if it's

13   being offered to prove the truth of this, but "In inaugural

14   remarks Mayor Lane thanked his wife Joanne, his family

11:40:19  15   members, and Scottsdale citizens for their support."  There

16   are statements referred to throughout these picked and chosen

17   excerpts from summarized city council minutes.

18           But that's the point, Your Honor.  Because it's

19   being offered as a monolithic exhibit, there is no

11:40:36  20   opportunity for me to object to discrete statements within

21   each of the chosen excerpts as hearsay.

22           THE COURT:  All right.

23           Your response?

24           MR. KEZHAYA:  Your Honor.  None of those statements

11:40:50  25   are being used to prove the truth of the matter asserted.

DIRECT EXAMINATION - MICHELLE SHORTT

11:40:53  1    The only portion of these exhibits that we care about are the

       2    actually stipulated to part which says these are who, where

       3    they came from, and when they gave invocations.

       4            THE COURT:  What do you mean stipulated part?

11:41:07  5            MR. KEZHAYA:  Your Honor, there was a stipulation in

       6    the pretrial order that these meetings minutes accurately

       7    reflect the invokers on various dates all reflected on these

       8    documents.

       9            THE COURT:  Is that correct?

11:41:19 10            MR. CLAUS:  The -- the pretrial order stated that

      11    the defendants agree that the identity of the invokers is

      12    accurately reflected in Exhibit 14, but maintained all of the

      13    objections that I just stated.

      14            THE COURT:  Do you have any objection to this

11:41:35 15    exhibit being admitted solely for that purpose?

      16            MR. CLAUS:  To the extent it is misleading and

      17    incomplete, yes, Your Honor, we do.

      18            THE COURT:  No.  Solely for the purpose of showing

      19    who gave invocations on particular dates.  Do you object to

11:41:50 20    it being admitted for that purpose, to which I think you just

      21    said you stipulated.

      22            MR. CLAUS:  We do not object to that other than the

      23    objection that we preserved in the joint pretrial order that

      24    the dates are so attenuated in time as to be not relevant

11:42:07 25    because these span a significant amount of dates and

DIRECT EXAMINATION - MICHELLE SHORTT

11:42:10  1    postdates any request that is at issue in this case.

2            THE COURT:  All right.  I'm going to overrule the

3    objection as to dates.  I'm going to permit -- pardon me,

4    admit Exhibit 14 solely for the purpose of identifying who

11:42:23  5    gave invocations on particular dates.  And I won't consider

6    it for any other purpose and I won't consider any other

7    contents of Exhibit 14.

8            MR. KEZHAYA:  Your Honor, there is one other matter.

9    It's not just the name of the individual who gave the

11:42:34 10    invocation, but who they gave it on behalf of.  The last

11    part --

12            THE COURT:  By name I meant who they are and who

13    they're affiliated with, as it states.  It's admitted for

14    that purpose only.

11:42:46 15            MR. KEZHAYA:  Okay.

16        (Exhibit 14 admitted.)

17    BY MR. KEZHAYA:

18    Q    Did you go through this document in some detail?

19    A    Yes.

11:42:55 20    Q    Did you find a number of instances where people came in

21    from outside city limits of Scottsdale?

22    A    We did.  We found 93 instances.

23    Q    Okay.  In addition to the meeting minutes, did you rely on

24    some handwritten city notes for who gave invocations and when?

11:43:13 25    A    Yes.

DIRECT EXAMINATION – MICHELLE SHORTT

11:43:14  1   Q    I'm going to draw your attention to Exhibit 15.

2        MR. KEZHAYA:  May I approach, Your Honor?

3        THE COURT:  You may.

4   BY MR. KEZHAYA:

11:43:24  5   Q    Have you reviewed Exhibit 15?

6   A    Yes.

7   Q    Do you recognize that document?

8   A    Yes.

9   Q    Is that something that you received from the City about

11:43:54 10   this litigation?

11   A    Yes.

12   Q    That was something that was attached to their motion for

13   summary judgment.

14   A    Yes.

11:44:00 15        MR. KEZHAYA:  Move to introduce Exhibit 15,

16   Your Honor.

17        MR. CLAUS:  Your Honor, it is hearsay.  There has

18   been no foundation laid as to who prepared these handwritten

19   pages going back from 2018 to 2018, and the attenuation in

11:44:22 20   time makes certain portions of Exhibit 15 irrelevant.

21        THE COURT:  Was this attached to your motion for

22   summary judgment?

23        MR. CLAUS:  I do not know, Your Honor.

24        THE COURT:  Well, somebody at your table must know.

11:44:38 25        MR. CLAUS:  I'm sorry?

DIRECT EXAMINATION - MICHELLE SHORTT

11:44:39  1       THE COURT:  Somebody at your table must know.  I was
        2  going to ask -- oh, wait a minute, you weren't counsel at the
        3  time, were you?
        4       MR. CLAUS:  We were not, Your Honor, so it will just
11:44:46  5  take a second to check and see.
        6       THE COURT:  I think I'll accept counsel's avowal
        7  that it was.
        8       If it was, my question is why is this not an
        9  adoptive admission within Rule 801?
11:44:58 10       MR. CLAUS:  If you recall, Your Honor, there was a
       11  conference -- this I do know about even though I wasn't
       12  counsel at the time.  There was a conference about not having
       13  statements of fact.  It was attached -- if it was attached,
       14  it was attached just as an exhibit without any foundation
11:45:12 15  laid by any declarant in a declaration or affidavit.
       16       THE COURT:  My question is, if the City of
       17  Scottsdale asserted this in its motion for summary judgment
       18  as a document reflecting who gave invocations on what dates,
       19  why isn't that act an adoptive admission?
11:45:28 20       MR. CLAUS:  I don't know that is what was -- that's
       21  the thing, Your Honor, I don't -- the avowal wasn't what
       22  the -- that -- what Your Honor just stated what was stated in
       23  the motion for summary judgment.  Your Honor, the avowal by
       24  counsel --
11:45:39 25       THE COURT:  Let's do this, just to save some time.

DIRECT EXAMINATION - MICHELLE SHORTT

11:45:41  1    Why don't you both look at it over the lunch hour.  When we

2    come back at 1 o'clock, what I'll be interested in is exactly

3    how it was used in the motion for summary judgment.

4              Do you have arguments other than adoptive admission?

11:45:54  5             MR. KEZHAYA:  No, Your Honor.  Our position is once

6    they submitted it, attached to their motion, it says

7    "respectfully submitted by the City" this is now a statement

8    by opposing party, unless they're going to tell us they were

9    lying to the Court --

11:46:05  10            THE COURT:  Well, I think it's -- it wasn't made by

11    the lawyers who submitted it, so it would be an adoptive

12    admission.  So look at it over the lunch hour and then let's

13    talk at 1 o'clock about how it was used in the motion for

14    summary judgment.

11:46:16  15            So let's go on without discussing this until we get

16    to that point.

17            MR. KEZHAYA:  Yes, Your Honor.

18            The part that may impact the next part is we have a

19    demonstrative exhibit summarizing these two in addition to

11:46:29  20   some testimony.

21            THE COURT:  Why don't we cover -- I assume you've

22    got more than ten minutes left with Ms. Shortt?

23            MR. KEZHAYA:  I believe we can cover the testimony

24    part without addressing anything else, Your Honor, with

11:46:38  25   respect to this Exhibit 15.

DIRECT EXAMINATION - MICHELLE SHORTT

11:46:40   1              THE COURT:  All right.  Okay.

2      BY MR. KEZHAYA:

3      Q   Michelle, did you go through a series of city notes from

4      the City?

11:46:47   5      A   Yes.

6      Q   Did you go through those meetings minutes?

7      A   Yes.

8      Q   Did you use those two to prepare a list --

9              I need Exhibit 6.

11:47:01  10              Did you use those two to prepare a list of people who

11     came in from outside Scottsdale city limits?

12     A   Yes.

13     Q   Neither those city notes nor the meeting minutes gave you

14     addresses; right?

11:47:14  15     A   They didn't.

16     Q   How did you come to find whether something was in or

17     outside of the city limits of Scottsdale?

18     A   I Google mapped it.

19     Q   Is Google mapping something you would use in your regular

11:47:27  20     lay course of business?

21     A   Yes.

22     Q   Do you find it to be a reliable source of information for

23     where organizations are physically located?

24     A   Yes.

11:48:04  25              MR. KEZHAYA:  May I approach, Your Honor?

DIRECT EXAMINATION - MICHELLE SHORTT

11:48:05  1          THE COURT:  You may.

2    BY MR. KEZHAYA:

3    Q   I'm going to show you Exhibit 16.

4          I'll caution you, don't look at anything before the

11:48:20  5    year 2013, please.

6    A   Come again?

7    Q   Nothing before 2013, don't look at it.

8          Did you find an instance on February 26th, 2013, a

9    Pastor Curt whose last name I can't pronounce, unfortunately,

11:48:57  10   from Paradise Christian Church --

11   A   Yes.

12   Q   -- in the meeting minutes?

13   A   Yes.

14   Q   Did you Google Paradise Christian Church?

11:49:09  15   A   I did.

16   Q   Did that address reflect a Phoenix address?

17   A   Yes.

18   Q   Is the City of Phoenix the same thing as the City of

19   Scottsdale?

11:49:16  20   A   No.

21   Q   Would something with a Phoenix address necessarily be

22   outside of the city limits of Scottsdale?

23   A   Yes.

24   Q   Turning your attention to March 2013.  Barry Kenyon

11:49:29  25   purportedly came from Church of Jesus Christ of Latter Day

DIRECT EXAMINATION - MICHELLE SHORTT

11:49:34  1  Saints in the meeting minutes; is that right?

2  A  Yes.

3  Q  Did you find a Scottsdale address for any Church of Jesus

4  Christ Latter Day Saints?

11:49:45  5  A  No.

6  Q  In May of 2013 you found Pastor Cone of One Life Christian

7  Church in the meeting minutes.  Do you remember that?

8  A  Yes.

9  Q  Did that reflect a Mesa, Arizona, address?

11:50:01  10  A  Yes.

11  Q  Is Mesa inside city limits of Scottsdale?

12  A  No.

13  Q  On May of 2013, May 14 specifically, did you find an

14  instance again of Pinnacle Church from Pastor Caschler, I

11:50:16  15  believe?  Gaschler.

16  A  Yes.

17  Q  And I may have misspoken earlier.  That was Paradise

18  Church I was thinking earlier.  This is Pinnacle.

19        Was Pinnacle located in Tempe, Arizona?

11:50:28  20        MR. CLAUS:  Objection, Your Honor.  Foundation.

21  Misleading.  If I may voir dire the witness on this?

22        THE COURT:  You certainly can cross-examination --

23  cross-examine her.  What is the foundation objection?

24        MR. CLAUS:  She's reading from a summary that is

11:50:41  25  patently misleading.  She's taking -- Pinnacle Church,

DIRECT EXAMINATION - MICHELLE SHORTT

11:50:44   1    Your Honor, I will avow, was located at 2400 North Hayden

          2    Road in Scottsdale, Arizona, as of May 2013.  Every time

          3    Pinnacle Church gave an invocation it was located in

          4    Scottsdale, Arizona.  She is taking information she gleaned

11:51:04   5    from Google in 2019 or 2020 and applying it in a misleading

          6    way to Exhibit 16.

          7            THE COURT:  I think that is absolutely fair

          8    cross-examination and argument.  But I'm going to overrule

          9    the objection.  She can testify that that's what she

11:51:17  10    concluded.  You can point out what's wrong with it on

         11    cross-examination.

         12            MR. KEZHAYA:  May I continue, Your Honor?

         13            THE COURT:  Yes.

         14    BY MR. KEZHAYA:

11:51:27  15    Q    In October of 2013, did Dr. David Johnson give an

         16    invocation according to meetings minutes?

         17    A    Yes.

         18    Q    Did he also come out of Phoenix, Arizona?

         19    A    Yes.

11:51:39  20    Q    And in December of 2013, did a Pastor Cone come from One

         21    Life Christian Church?

         22    A    Yes.

         23    Q    And was that, according to your Google research, in Mesa,

         24    Arizona?

11:51:52  25    A    Yes.

DIRECT EXAMINATION - MICHELLE SHORTT

11:51:55  1    Q    On March of 2014, someone from East Valley Mayors Prayer

2    Breakfast Committee gave an invocation?

3    A    Yes.

4    Q    Could you find an address for that?

11:52:08  5    A    No.

6    Q    In June of 2014, a Pastor Hartke came from Trinity

7    Christian Fellowship Church, according to the meeting minutes;

8    is that right?

9    A    Yes.

11:52:24 10    Q    He came from Chandler, Arizona; right?

11    A    Yes.

12    Q    In August of 2014, Debbie DiCarlo came from Catholic

13    Charities out of Phoenix, Arizona; is that right?

14    A    Yes.

11:52:39 15    Q    On August 7, 2014, a Father Reese came from Brophy

16    Preparatory Academy in Phoenix; is that right?

17    A    Yes.

18    Q    On October 21, 2014, a Pastor Anderson came from Living

19    Word Bible Church out of Mesa, Arizona; is that right?

11:53:00 20    A    Yes.

21    Q    On February 3rd, Chaplain Ben Skelton came from Pinnacle

22    Church address at Tempe, Arizona; is that right?

23    A    Yes.

24         MR. CLAUS:   Objection, Your Honor.   There is no

11:53:14 25    foundation that this address existed in 2014 for this

DIRECT EXAMINATION – MICHELLE SHORTT

11:53:18   1   organization.  There is no foundation any of these addresses

       2   existed for these organizations on the date the invocations

       3   were given.

       4           MR. KEZHAYA:  Your Honor, may I respond to that?

11:53:31   5           THE COURT:  Yes, you may.

       6           MR. KEZHAYA:  The meeting minutes we've stipulated

       7   are the names, origins, and dates and where they came from.

       8           THE COURT:  I think his point is she didn't do the

       9   research until years later as to where they were located,

11:53:46  10   with a Google search tool years later.

      11           Right?

      12           MR. CLAUS:  Yes, Your Honor.

      13           THE COURT:  I understand the point.  I think it's

      14   fair argument in cross-examination, but I don't think it

11:53:55  15   makes the testimony inadmissible.  So I'm going to overrule

      16   the objection.

      17   BY MR. KEZHAYA:

      18   Q   On February 17th, 2015, Dr. David Joynt came from Valley

      19   Presbyterian Church in Paradise Valley, Arizona; right?

11:54:13  20   A   Yes.

      21           MR. CLAUS:  I'm going to object again on another

      22   basis.  Exhibit 16 was never disclosed to us during this case

      23   and this information was not disclosed to us during this

      24   case.

11:54:25  25           THE COURT:  Is that correct?

DIRECT EXAMINATION – MICHELLE SHORTT

11:54:26  1    MR. KEZHAYA:  Your Honor, we provided it to him in

2    the exhibit, the binder, on December 16th.  However, it's a

3    summary of the prior exhibits, other than the Google, which

4    she could testify to just as easily without the document.

11:54:40  5    THE COURT:  Is it identified in the final pretrial

6    order?

7    MR. KEZHAYA:  Yes, Your Honor.

8    MR. CLAUS:  It is identified in the final pretrial

9    order but never disclosed as part of the disclosure

11:54:49  10   obligations of plaintiffs in this case.  None of the

11   information that the witness is testifying to was disclosed

12   as part of this --

13   THE COURT:  Is that objection preserved in the final

14   pretrial order?

11:54:58  15   MR. CLAUS:  It is, Your Honor.

16   THE COURT:  Would you show me, please.

17   MR. CLAUS:  Yes, I will, Your Honor.

18   It is Exhibit A -- sorry.  It is Exhibit A to the

19   joint pretrial order.  Page 6.  Should be self-explanatory

11:55:21  20   from there, Your Honor.  This is Exhibit 16.

21   THE COURT:  Okay.  Let me read that.

22   Mr. Kezhaya, what is your response to the objection

23   that the information contained in Exhibit 16 was never

24   disclosed during the course of discovery?

11:56:03  25   MR. KEZHAYA:  Your Honor, this document did not

DIRECT EXAMINATION - MICHELLE SHORTT

11:56:05  1    exist until after the pretrial -- after the first discovery

2    deadline.  It didn't actually exist until December 16.  We

3    produced it as quickly as we could, it being the same day.

4    Actually, it may not have been exactly December 16, it may

11:56:20  5    have been a couple days before.  But it was produced as

6    quickly as we had finished it.  A partial copy of this same

7    exhibit is actually attached to our complaint, which is,

8    similarly, we had produced it while we were drafting the

9    complaint.

11:56:33  10       THE COURT:  All right.  I'm going to think about

11   that objection during the lunch break.  Let's go ahead for

12   another two minutes.

13       MR. KEZHAYA:  Yes, Your Honor.

14   BY MR. KEZHAYA:

11:56:44  15   Q   Michelle, is it fair to say that about half of the

16   instances that someone came in to Scottsdale and gave an

17   invocation, they came in from outside of the city limits of

18   Scottsdale?

19       MR. CLAUS:  Objection.  Foundation.  Disclosure.

11:57:00  20       THE COURT:  Overruled.

21       THE WITNESS:  Yes.

22   BY MR. KEZHAYA:

23   Q   You testified early earlier you found a total of 93

24   instances of people coming in from outside the city limits of

11:57:11  25   Scottsdale; is that right?

DIRECT EXAMINATION – MICHELLE SHORTT

11:57:13   1   A    Yes.

2   Q    Did the vast majority of these non-Scottsdale invokers

3   come in from the Phoenix metro area?

4   A    Many of them did, yes.

11:57:24   5   Q    Do you have a number of members in the Phoenix metro area?

6   A    Yes.

7        MR. CLAUS:  Foundation as to time, Your Honor.

8   BY MR. KEZHAYA:

9   Q    At the time in question --

11:57:33  10        THE COURT:  Overruled --

11   BY MR. KEZHAYA:

12   Q    At the time in question, did you have a number of Phoenix

13   metro area --

14        THE COURT:  What is the time in question?

11:57:41  15        MR. KEZHAYA:  Thank you, Your Honor.

16   BY MR. KEZHAYA:

17   Q    Around February of 2016, did you have a number of Phoenix

18   metro area satanists?

19   A    Yes.

11:57:53  20   Q    Anywhere in Ms. Kuester's e-mail denying the invocation

21   did it indicate anything about the Phoenix metro area?

22   A    No.

23        MR. KEZHAYA:  Your Honor, I know this is

24   time-consuming, but under Rule 1006 we have to establish the

11:58:10  25   testimony for this exhibit to be an adequate summary of the

DIRECT EXAMINATION – MICHELLE SHORTT

11:58:13  1    testimony.  So this may take a little longer than we would

2    otherwise hope it would.

3            THE COURT:  What are you proposing to do?

4            MR. KEZHAYA:  Nothing, Your Honor.  I'm just giving

11:58:27  5    the Court a heads-up that this may take a little longer than

6    we were otherwise expecting.

7            THE COURT:  What may?  I'm not understanding what

8    you're saying.

9            MR. KEZHAYA:  The fact of establishing each of these

11:58:33 10    instances.  So my point is it's going to extend through the

11    lunch hour -- after the lunch hour, that is.

12            THE COURT:  Well, you can use your time as you

13    choose, but the clock is still running.

14            We are at the noon hour.  So we will break.  We will

11:58:44 15    resume at 1 o'clock and be in adjournment until then.  Thank

16    you.

17        (Recess taken from 11:59 to 1:00.)

18            THE COURT:  Counsel, you had a matter you wanted to

19    raise?

13:00:06 20            MR. CLAUS:  Yes, Your Honor.  I wanted to renew and

21    amplify our objection both to Exhibit 16 but also to this

22    witness is testifying about Exhibit 16.

23            As you likely perceived during the examination,

24    there was a level of frustration and being caught unawares,

13:00:23 25    and if you recall how this morning started.  Ms. Shortt was

DIRECT EXAMINATION - MICHELLE SHORTT

13:00:27  1   not disclosed, and if you look -- you have the pretrial order

2   in front of you, Your Honor, on page 20, going to page 21,

3   Ms. Shortt was not disclosed or identified as a witness who

4   would testify at the trial of this matter as to the

13:00:55  5   preparation of any summary, that she engaged in the

6   preparation of any summary, that she did any post invocation

7   Google searches, that she created Exhibit 16, or even knew

8   about Exhibit 16.

9        THE COURT:  Let me interrupt you for a minute,

13:01:12  10  Mr. Claus.  Here's an issue I'm wrestling with, which

11  concerns Exhibit 16, concerns this argument, concerns the

12  summary of the minutes that was admitted into evidence that I

13  think is Exhibit 14.

14       The City has readily admitted throughout this

13:01:27  15  litigation that organizations from outside of Scottsdale were

16  allowed to give invocations.  We had a discussion about that

17  at the summary judgment argument and counsel for the City of

18  Scottsdale said that she absolutely agreed that organizations

19  from outside the City could give invocations if they had some

13:01:50  20  substantial connections to the City.  And the specific

21  organization we talked about at the summary judgment hearing

22  was Brophy Prep, which is miles from the City of Scottsdale.

23       I assume the City isn't changing its position for

24  purposes of this trial and asserting that every organization

13:02:10  25  that gave an invocation was physically located in the City.

DIRECT EXAMINATION - MICHELLE SHORTT

13:02:14  1    And if it's not, I'm having trouble understanding why we're

        2    having this big fight over the fact that the minutes list

        3    organizations outside of the City of Scottsdale in the

        4    Phoenix metropolitan area when that's really not been a

13:02:32  5    matter in dispute.  And that's really all the evidence has

        6    shown thus far that's been objected to.

        7            Would you address that?

        8            MR. CLAUS:  Yes, I will, Your Honor.

        9            First, the minutes do not reflect that any

13:02:43 10    organization is located outside of the City of Scottsdale.

       11    And the minutes do not reflect the physical address of the

       12    City of Scottsdale.  The plaintiffs are trying to -- the

       13    plaintiffs have characterized 93 organizations outside of the

       14    City of Scottsdale as having given an invocation or being

13:03:02 15    invited to give an invocation.

       16            That is not something the City of Scottsdale argued,

       17    that is not something the City of Scottsdale stipulated to,

       18    and that is the point, Your Honor.  That is patently

       19    misleading and it is not information gleaned from the

13:03:18 20    minutes.  It is not information gleaned from the information

       21    we stipulated to.  And it is not information that was

       22    disclosed as something that was going to be testified to by

       23    any witness in this matter.

       24            And I'll tell you why it prejudices --

13:03:32 25            THE COURT:  Please.  I mean, why are you concerned

DIRECT EXAMINATION – MICHELLE SHORTT

13:03:34  1    about it if you've agreed all along organizations from

2    outside of Scottsdale can say invocations?

3         MR. CLAUS:  Because if the plaintiffs would have

4    taken the position and disclosed some witness would testify

13:03:46  5    that that witness determined that 93 organizations outside of

6    the City of Scottsdale had been invited to give an invocation

7    while fact discovery was still alive, then we would have been

8    given the opportunity to take a third-party deposition, for

9    instance, of Pastor Robert Gaschler, who gave multiple

13:04:08 10    invocations on behalf of Pinnacle Church that was located in

11    the City of Scottsdale.

12         We could have taken a third-party deposition of

13    Barry Kenyon, who is both a resident of Scottsdale and could

14    have established the fallacy that the fact that no temple is

13:04:24 15    located in the City of Scottsdale does not mean the LDS

16    Church does not have meeting houses and chapels in the City

17    of Scottsdale.

18         And here's the other thing, Your Honor.  If they

19    would have said we're going to have a witness testify that

13:04:38 20    something called the Interfaith Council of Arizona was

21    invited to give invocations, then we could have done

22    discovery and we could have taken the deposition to say that

23    that is false and misleading because the Interfaith Council

24    of Arizona was never invited to do anything.  That is

13:04:52 25    apparently something made up by the plaintiffs.  The National

DIRECT EXAMINATION – MICHELLE SHORTT

13:04:55   1   Interfaith Council of Arizona, which is located or was

        2   located in Scottsdale, it doesn't exist anymore, was invited

        3   to give invocations.

        4           Here's the point, Your Honor.  This isn't -- I

13:05:08   5   have -- if you remember this morning, this morning started

        6   with me telling the Court we weren't being given information

        7   that we should have as a courtesy.  When we were delivered

        8   Exhibit 16, we asked and wondered where did this come from?

        9   How is this created?  The answer from Mr. Kezhaya on the

13:05:25  10   telephone was this is something we created.  Not something

       11   Ms. Shortt created.  Not something a witness created.

       12           We had no advanced warning until Ms. Shortt started

       13   testifying about it that a witness had prepared or was going

       14   to testify about Exhibit 16.

13:05:41  15           There has been no disclosure in the MIDP response,

       16   there's been no disclosure in the joint pretrial statement,

       17   and we're being prejudiced because it of.

       18           THE COURT:  Tell me what the prejudice is.  Is it

       19   the number 93 you're concerned about?

13:05:55  20           MR. CLAUS:  It is not just the number 93,

       21   Your Honor.  It is misleading.  The way they're attempting to

       22   use Exhibit 16 is misleading and we've been deprived the

       23   opportunity because it was never disclosed to us that this

       24   would be testified about by a witness --

13:06:10  25           THE COURT:  I understand that.

DIRECT EXAMINATION - MICHELLE SHORTT

13:06:11  1        MR. CLAUS:  -- to list a witness who could then

2  rebut that.

3        THE COURT:  I understand that.  But you're not

4  disputing the fact that multiple religious organizations who

13:06:19  5  do not have a physical presence in Scottsdale were allowed to

6  give invocations, are you?

7        MR. CLAUS:  If multiple is more than one,

8  Your Honor, then no.  But if multiple is more than ten,

9  Your Honor, then the evidence does not reflect that.  And,

13:06:34 10  more importantly, it is misleading to allow a witness who has

11  not been disclosed to testify about the matter to testify to

12  a number that is misleading.

13        THE COURT:  Well, that objection about nondisclosure

14  wasn't made until about nine minutes to noon.

13:06:52 15        MR. CLAUS:  It was lodged in our -- it was lodged --

16        THE COURT:  When she started talking about it, you

17  didn't make that objection; that came later.  I think that's

18  a legitimate objection and I want to talk about that, but I

19  wanted to understand first where you see the prejudice

13:07:06 20  because my understanding is you don't dispute that at least

21  some organizations from outside Scottsdale gave invocations.

22        MR. CLAUS:  We do not dispute that some

23  organizations that did not have a mailing address or physical

24  address inside of the City of Scottsdale gave an invocation

13:07:23 25  from time to time.

DIRECT EXAMINATION – MICHELLE SHORTT

13:07:25  1          THE COURT:  All right.

2          Let me ask a question of you, Mr. Kezhaya.  I said

3     when I heard about the nondisclosure objection that I wanted

4     to think about it during the lunch hour.  The MIDP required

13:07:40  5     to you disclose all facts material to this case and then to

6     supplement it regularly.  That would include facts such as

7     the location of organizations that gave invocations at the

8     City.  Clearly relevant information.

9          A disclosure in December of 2019, which would have

13:08:03  10     been eight or nine months after close of discovery in the

11     case clearly wouldn't be timely disclosure, in my judgment.

12     Is there some basis upon which you think that that disclosure

13     was not required by the Mandatory Initial Discovery Pilot?

14          MR. KEZHAYA:  Your Honor, we felt like our hands

13:08:24  15     were bound.  The discovery time had passed.  At the time we

16     did the first run of discovery with the predecessor opposing

17     counsel we had a very narrow understanding of what the issues

18     were.  Whether TST is a religion was not on the table.  A

19     number of issues were not on the table.

13:08:41  20          THE COURT:  Well, but the issue of what the policy

21     of the City was with respect to who could give invocations

22     was clearly on the table.

23          MR. KEZHAYA:  Yes, Judge.  And we believed that it

24     was pretty clear that a number of people were coming in from

13:08:54  25     outside city limits of Scottsdale.  And we didn't understand

DIRECT EXAMINATION – MICHELLE SHORTT

13:08:58  1    that we had to provide that to the other side that we knew

2    that these addresses were what they were.

3            THE COURT:  Why?  Why didn't you think you needed to

4    disclose facts that you had in your possession about the

13:09:09  5    location of these organizations when it's clearly relevant

6    and the MIDP calls for the disclosure of relevant

7    information?

8            MR. KEZHAYA:  Well, Your Honor, it goes to

9    timeliness.  We didn't actually possess the facts -- insofar

13:09:20 10    as we had access to Google perhaps we possessed the facts,

11    but we didn't actually use Google to find these facts

12    partially with the first amendment complaint.  If I remember

13    correctly, that was back in August or so.  That was being

14    created contemporaneously as we were drafting the complaint.

13:09:38 15    So as soon as we identified this is something that we believe

16    is something to be useful, we attached it as an exhibit.

17    It's a filed exhibit.

18            THE COURT:  Do you -- I'm sorry, go ahead.  Were you

19    going to finish the sentence?

13:09:51 20            MR. KEZHAYA:  And then we supplemented that.  We

21    basically finished the job in December, approximately two or

22    three days before the discovery disclosure.  So as to

23    timeliness --

24            THE COURT:  Well, don't you agree that the nature of

13:10:05 25    the Scottsdale policy that I know you dispute, but what

DIRECT EXAMINATION - MICHELLE SHORTT

13:10:08  1   they've said the policy was is that there had to be a

2   substantial connection.  Who gave these invocations was a

3   relevant fact.  You certainly knew during the course of

4   discovery in this case that where entities were located who

13:10:24  5   gave the invocation was a relevant fact in this case.  You

6   could have collected the information then and disclosed it if

7   you intended to use it in the case.  That's the whole purpose

8   of the MIDP disclosure.

9        Is there any reason you didn't or couldn't have done

13:10:39 10   that during the discovery period?

11        MR. KEZHAYA:  Well, the key reason, Your Honor, is

12   we didn't actually get these meeting minutes and city notes,

13   which presumably they come in later on today, until the

14   motion for summary judgment.

13:10:51 15        We have a disk which provided us approximately

16   15,207 e-mails, and then -- all the same ones that were

17   testified to in I believe it is Kuester's deposition.  But

18   then in addition to that there's about 300 or so that

19   required additional review.

13:11:11 20        THE COURT:  So you're saying that the meeting

21   minutes, some of which are in Exhibit 14, were not disclosed

22   until the summary judgment motion?

23        MR. KEZHAYA:  They were attached to the summary

24   judgment -- that's when we first found it.  That's my

13:11:24 25   understanding of the discovery that was provided.

DIRECT EXAMINATION – MICHELLE SHORTT

13:11:26  1           Stu, is that correct?

        2           THE COURT:  Well, Exhibit 14 covers 7,258 pages.

        3   They're not all in Exhibit 14 but the Bates numbers do.  You

        4   are not saying all those were attached to the summary

13:11:39  5   judgment motion?

        6           MR. KEZHAYA:  I have -- I have not had access to

        7   whatever these Bates numbers were, Your Honor.

        8           THE COURT:  It's on Exhibit 14.  It's on your

        9   exhibit.

13:11:47 10           MR. KEZHAYA:  Yes, Your Honor.  So those Exhibit

       11   Number 14, if I remember correctly, Exhibit 5 to the chief

       12   motion for summary judgment, I saw those Bates stamps.  I

       13   asked Stu, there must be something you were provided.  But

       14   he, as I recall, didn't have it.

13:12:03 15           Right?

       16           THE COURT:  Hold on just a minute.

       17           When -- what is the chief motion for summary

       18   judgment you're talking about?

       19           MR. KEZHAYA:  The first summary judgment motion,

13:12:15 20   Your Honor.  So the City filed a summary judgment --

       21           THE COURT:  The City's, you're talking about?

       22           MR. KEZHAYA:  Sorry?

       23           THE COURT:  You're talking about the City's motion.

       24   I didn't know what the chief motion was.

13:12:24 25           MR. KEZHAYA:  Sorry, Your Honor.  Yes.  The City's

DIRECT EXAMINATION – MICHELLE SHORTT

13:12:26  1    motion for summary judgment as opposed to our cross summary

2    judgment motion.

3                THE COURT:  Okay.  So you're saying, I think, the

4    documents in Exhibit 14 were not disclosed to plaintiffs

13:12:34  5    until the summary judgment motion was filed by the City; is

6    that right?

7                MR. KEZHAYA:  Sorry, Your Honor, I have trouble

8    hearing you.

9                THE COURT:  You are saying that the documents

13:12:45 10    contained in Exhibit 14 were not disclosed to plaintiffs

11    until the City's motion for summary judgment.

12                MR. KEZHAYA:  That's certainly when I first received

13    it, Your Honor.

14                THE COURT:  Mr. de Haan, is that when they were

13:13:01 15    first disclosed to plaintiffs?

16                MR. de HAAN:  I'm trying to recall when exactly that

17    particular -- the meeting minutes were disclosed.  The way we

18    saw the exhibit in question was a demonstrative of the

19    information that was already provided through the meeting

13:13:17 20    minutes.  So I would say it falls under --

21                What was it, 1006?

22                MR. KEZHAYA:  1006.

23                MR. de HAAN:  1006.  As that the information that's

24    pertinent is here are the names of the churches and

13:13:28 25    invocators.  This is just a demonstrative --

DIRECT EXAMINATION – MICHELLE SHORTT

13:13:32  1       THE COURT:  I understand that point.  I'm trying to

2   figure out if it's right that you didn't get them until they

3   filed their summary judgment motion.

4       MR. de HAAN:  Off the top of my head, I don't

13:13:40  5   recall, Your Honor.

6       THE COURT:  Okay.  How about from defense counsel.

7       MR. CLAUS:  Yes.  May I approach, Your Honor?

8       THE COURT:  Yes.  What do you have?  Show it to

9   counsel, please.

13:13:46  10       MR. CLAUS:  Absolutely.

11       It is the defendant's first supplemental --

12       THE COURT:  We need you at a mic.  Say that again.

13       MR. CLAUS:  Sorry, Your Honor.

14       It is the defendant's first supplemental disclosure

13:13:57  15   Statement served under the General Order 17-08, dated

16   January 24, 2019.

17       May I approach, Your Honor?

18       THE COURT:  Yes.

19       MR. CLAUS:  Page 6, item 3 identifies the meeting

13:14:22  20   minutes from 2013 until I believe 2018, which are exactly the

21   meeting minutes from which Exhibit 14 was culled.

22       THE COURT:  All right.  I see that.

23       MR. CLAUS:  Thank you.

24       THE COURT:  So you then go on to say these documents

13:14:41  25   are not being reproduced with this disclosure statement.  You

DIRECT EXAMINATION - MICHELLE SHORTT

13:14:47  1  identified them but you didn't produce them with it.  When

2  were they actually produced?

3  MR. CLAUS:  They were actually produced prior to

4  that, Your Honor, to the representative of the plaintiffs

13:14:58  5  when -- in the original MIDP when the documents that were

6  disclosed pursuant to the, I believe it's the Anderson, and I

7  don't remember the name of the other gentleman who did a

8  public records request, did a public records request.  All of

9  those documents were provided to opposing counsel and that

13:15:19  10  predated January.  That's why they're not reproduced, just to

11  save how ever many trees you save when you don't reproduce

12  15,000 pages of documents.

13  THE COURT:  All right.

14  Counsel for plaintiffs, the disclosure statement

13:15:35  15  dated January 24th, 2019, identifies the Bates numbers that

16  are included in Exhibit 14.

17  MR. KEZHAYA:  That explains my source of confusion,

18  Your Honor.  I have one with a certificate of service dated

19  July of 2018.

13:15:51  20  THE COURT:  What I have in front of me is dated

21  January 24th of 2019, with a certificate of service to

22  Mr. de Haan dated January 24th, 2019.

23  MR. KEZHAYA:  We are not looking at the same

24  document, Your Honor.

13:16:05  25  THE COURT:  Well, let's have you look at this.

DIRECT EXAMINATION – MICHELLE SHORTT

13:16:07  1          Christine, would you hand this to him, please.

2          Mr. de Haan and Mr. Kezhaya, look at that, if you

3     would.  It looks as though these documents were clearly

4     identified for you in January of 2019.

13:16:26  5          MR. CLAUS:  Your Honor, I just misspoke and I want

6     to correct the record.

7          THE COURT:  Wait while they look at it.

8          Now you've looked at it.  I want you to correct the

9     record and I want to hear their thoughts.

13:16:44  10         MR. CLAUS:  Thank you, Your Honor, and I apologize

11    for misspeaking.

12         The documents that are not reproduced in the MIDP

13    supplement were produced as part of defendant's response to

14    plaintiff's first discovery requests, which were served on

13:16:59  15    January 16, 2019, and I can deliver this document to you for

16    you to look, Your Honor.

17         THE COURT:  Show it to them first.

18         MR. CLAUS:  Sure.

19         THE COURT:  Show it to them again.  They need a

13:17:17  20    chance to look it over.

21         MR. KEZHAYA:  The response objects to the request,

22    Your Honor.  I'm a bit confused about that.

23         THE COURT:  Point out where it is.

24         MR. CLAUS:  Sure.

13:17:32  25         MR. KEZHAYA:  This is still not the same thing as

DIRECT EXAMINATION – MICHELLE SHORTT

13:17:34   1    that.

2          THE COURT:  No.  They're different.  He's saying

3    that one produced the documents on January 16th and one was

4    the MIDP disclosure on January 24th.

13:17:43   5          MR. KEZHAYA:  Your Honor, I'm looking at a document.

6    Page 10 is dated January 24, 2019.

7          MR. CLAUS:  That is the --

8          THE COURT:  That's the date I just mentioned.

9          MR. KEZHAYA:  Yes.  But, Your Honor, the confusion

13:17:56  10   I'm having here is this page 10 that I've just been handed --

11         THE COURT:  Those are different documents.

12         MR. KEZHAYA:  I see.  Thank you, Your Honor.

13         MR. de HAAN:  Supplemental.

14         THE COURT:  All right.  Let me see the discovery

13:18:07  15   response, please.

16         MR. CLAUS:  Yes, Your Honor.  May I approach?

17         THE COURT:  Yes.

18         Which page?

19         MR. CLAUS:  It is the flagged page, Your Honor.  It

13:18:34  20   is the last page of text.  I believe it is the last sentence

21   of the last page of text.  It's bolded.

22         THE COURT:  Okay.  Thank you.

23         This document dated January 16th, 2019, says the

24   documents with the Bates numbers that are covered by trial

13:19:05  25   Exhibit 14 were produced on January 16th of 2019.

DIRECT EXAMINATION - MICHELLE SHORTT

13:19:11   1          MR. KEZHAYA:  Your Honor, I have in my hand the only

       2    disk I've ever been provided of discovery.  Whether Stu got

       3    this discovery and has misplaced it, I don't know, but this

       4    is the only disk I've ever gotten.  All other documents I've

13:19:22   5    received were attached to summary judgment motions from the

       6    City.

       7          THE COURT:  I don't know anything about the disk

       8    you've held up.

       9          MR. KEZHAYA:  This is a disk labeled Exhibits to

13:19:31  10    City of Scottsdale's Responses to Mandatory Initial Discovery

      11    Requests.

      12          THE COURT:  Well, what I have in front of me,

      13    Mr. Kezhaya, are two documents dated January of 2019 citing

      14    the very Bates numbers that are in trial Exhibit 14, one of

13:19:45  15    which says they're being produced, showing service on

      16    Mr. de Haan, and I'm having difficulty concluding that the

      17    documents weren't produced then.

      18          MR. KEZHAYA:  Your Honor -- Your Honor, I think the

      19    operative point that we care about is people came in from

13:20:10  20    outside the City of Scottsdale.  If the City is stipulating

      21    people came in from outside the City of Scottsdale, we're --

      22    we really don't need Exhibit 16 because all of the testimony

      23    that's already been given addresses the point adequately.

      24          There's only one other issue other than being

13:20:29  25    outside the City of Scottsdale, which is something that we

DIRECT EXAMINATION - MICHELLE SHORTT

13:20:31   1   first learned in the motion to dismiss, the standing motion

2   to dismiss, that is, which is the invocation to be given was

3   nonreligious in nature and the City of Scottsdale required

4   that it be religious in nature.  Some of the instances that

13:20:46   5   we're going to cover are nonreligious invocations.

6          THE COURT:  Well, we'll cover that ground when we

7   get to it.

8          MR. KEZHAYA:  Yes, Your Honor.

9          THE COURT:  Here's my conclusion with respect to

13:21:00  10   Exhibit 16 and the testimony related to Exhibit 16, which was

11   the series of questions asked Ms. Shortt about what

12   organizations and where they were located.

13          The documents upon which the research she described

14   was based were disclosed to plaintiffs' counsel in January of

13:21:30  15   2019.  I think the Rule 34 responses that have been shown to

16   me today and the MIDP supplemental response clearly establish

17   that plaintiffs' counsel received them in January of 2019.

18          I therefore conclude, as I indicated earlier, that

19   facts plaintiffs could have collected related to where those

13:21:50  20   organizations were located were clearly at issue during the

21   discovery period, were clearly relevant during the discovery

22   period.  Plaintiffs knew it was an issue in the case.  They

23   should have been disclosed during the MIDP discovery period.

24   They weren't.  Apparently they weren't even generated until

13:22:09  25   later, until December of 2019.

DIRECT EXAMINATION – MICHELLE SHORTT

13:22:12  1          That disclosure came after the close of discovery,

2     after summary judgment had been resolved, when the final

3     pretrial order was being prepared.  Clearly beyond the period

4     of time when defendants could have done any discovery related

13:22:28  5     to those location allegations.

6          And therefore I'm not going to admit Exhibit 16.

7     I'm not going to admit the testimony that Ms. Shortt gave.

8     That is, the back-and-forth for ten or 12 locations, because

9     that was all based on the same information that should have

13:22:48  10    been disclosed.

11          But I'm also proceeding with the understanding in

12    this case that organizations from outside of the City of

13    Scottsdale gave invocations and the City's contention is that

14    that was okay because they had some connection to the City of

13:23:01  15    Scottsdale.

16          That's my ruling with respect to Exhibit 16 and the

17    testimony that Ms. Shortt gave about specific dates and

18    organizations beginning in 2013, and I think you made it to

19    about 2015.  I think that's inadmissible because those

13:23:22  20    clearly were facts that should have been developed and

21    disclosed during discovery.

22          That doesn't foreclose plaintiffs from making the

23    argument that the City allowed organizations from outside

24    Scottsdale to give invocations.  That clearly happened.  I

13:23:35  25    don't know the number.  I don't know that I can figure it out

DIRECT EXAMINATION - MICHELLE SHORTT

13:23:37  1    from what's in Exhibit 14.  But Exhibit 16 will not be

2    admitted for that purpose.

3             All right.

4             So let's carry on with -- did you have a question?

13:23:49  5             MR. KEZHAYA:  Yes, Your Honor.  We had begun

6    discussing Exhibit 15, which is the city notes.  They are

7    handwritten notes of substantially the same things as the

8    meeting minutes, but we never actually made a determination

9    whether it would be admissible.

13:24:06  10            THE COURT:  That's right.

11            The question we had there was whether it was an

12    adoptive admission, how it was used by the City --

13            MR. KEZHAYA:  Yes, Your Honor.  And in our --

14            THE COURT:  -- in its summary judgment brief.

13:24:17  15            MR. KEZHAYA:  I do want to correct the record on one

16    point, Your Honor.  I misspoke earlier.  It was not the

17    summary judgment brief, but the reply brief, the City's reply

18    brief.  I'll point the Court to Document 35-2 at page --

19    well, at page 2.

13:24:30  20            Paragraph 2 of the City's response to plaintiffs'

21    statement of material facts, I'll read at the important part,

22    "In the event the Court finds that its ruling depends on the

23    different types of faiths the City has invited to give a

24    legislative prayer, the City responds that the faith leaders

13:24:52  25    have given invocations" -- "that have given invocations are

DIRECT EXAMINATION - MICHELLE SHORTT

13:24:56  1   as stated on Docs 32-5, 32-6 through 32-14, and attached as

2   Exhibit 2."

3           The Exhibit 2 was ordered in reverse chronology.

4   Meaning, if I remember correctly, most recent to least

13:25:12  5   recent.  Exhibit -- I believe we're on 5, whatever it is that

6   we're trying to admit, is just the reverse of that.  We

7   changed it so that it is in proper chronological order.

8   Otherwise, it's the same thing.

9           THE COURT:  Well, what you just read me didn't

13:25:28  10   mention 32-3, did it?

11           MR. KEZHAYA:  Well, it's attached as Exhibit 2,

12   which is my understanding what 32-3 was.

13           THE COURT:  Oh, I thought you were reading from the

14   actual statement from the City.

13:25:39  15           MR. KEZHAYA:  This is -- yes, Your Honor.  So I'm

16   looking at 35-3.  Those are the city notes.  35-2 is the

17   statement of material facts, which in paragraph 2 states 35-3

18   is accurate.

19           THE COURT:  All right, I've got 35-2.  Which

13:26:00  20   paragraph?

21           MR. KEZHAYA:  Page 1, paragraph 2, Your Honor.  The

22   second sentence.

23           THE COURT:  Okay.  Just a minute.

24           All right.  I've looked at this.  Here's the

13:27:09  25   question for defense counsel:  So I have in front of me what

DIRECT EXAMINATION - MICHELLE SHORTT

13:27:12  1   is on the docket at Docket 35-2.  It is the City's response

2   to plaintiffs' statement of material facts and it says in

3   paragraph 2, "the City responds that the faith leaders that

4   have given invocations are as stated in" a couple of

13:27:34  5   documents "and attached Exhibit 2."

6        Attached Exhibit 2, which is at Docket 35-3, are the

7   same documents that are contained in Exhibit 15.

8        So it appears to me as though the City said in its

9   response that the faith leaders who have given invocations

13:27:53 10   are as reflected in what is now Trial Exhibit 15.

11        That looks to me like an adoptive admission.

12        MR. CLAUS:  Except, Your Honor, that Exhibit 15 has

13   35-3, not 35-2.

14        THE COURT:  35-3 is Exhibit 2 that the statement I

13:28:11 15   just read refers to.

16        MR. CLAUS:  We haven't been given a copy of the

17   reply.  We're trying to find it in our pleadings.

18        THE COURT:  Just come look at these two things.

19        MR. CLAUS:  Thank you.  May I, Your Honor?  May I

13:28:22 20   approach?

21        THE COURT:  Yeah.

22        One is Exhibit 2, the other -- and paragraph 2

23   refers to Exhibit 2.

24        MR. CLAUS:  Thank you.

13:28:54 25        I'm going to back up so I can ask you a question.

DIRECT EXAMINATION - MICHELLE SHORTT

13:28:57  1    Is it the plaintiffs' position and is it your belief

2    that when paragraph 2 of doc 35-2 refers to attached

3    Exhibit 2, it is in fact referring to Exhibit -- I see.  You

4    just handed me.  I'm sorry.  I apologize.

13:29:15  5    THE COURT:  It's the next entry in the docket.

6    Christine just printed --

7    MR. CLAUS:  Yes, Your Honor, I see.  I apologize.

8    THE COURT:  So the objection was hearsay to

9    Exhibit 15.  And Rule 801(d)(2)(B) creates a hearsay

13:29:37  10   exception for a statement that is offered against an opposing

11   party and is one the party manifested that it adopted or

12   believed to be true.

13   That seems to me Scottsdale clearly indicated it

14   believed it to be true when it said the people who gave the

13:29:53  15   invocations are as listed in Exhibit 2.

16   Do you see where that's incorrect?

17   MR. CLAUS:  I do not, Your Honor.

18   THE COURT:  All right.  So I'm going to overrule the

19   hearsay objection to Exhibit 15 and admit Exhibit 15 in

13:30:08  20   evidence.

21   I think that now covers the matters we had before

22   lunch.

23   MR. KEZHAYA:  Your Honor, there was one other matter

24   prelunch, which was the e-mail identified as Exhibit 8.  We

13:30:23  25   actually went through, I happened to have saved the disk to

DIRECT EXAMINATION - MICHELLE SHORTT

13:30:27  1   my hard drive.  The original actually is also redacted.  So

2   we cannot print another one of those.  We have another

3   substan- -- I say e-mail.  The e-mail address is redacted in

4   the produced copy.

13:30:38  5        Additionally we have another e-mail that we will get

6   into that we did get another copy printed of, one for the

7   Court, four total, which has the e-mail not redacted.  So I

8   anticipate we're going to run into the same issue with

9   substantially identical e-mails from Ms. Littlefield, which

13:30:57 10   the Court may recognize from the complaint and the summary

11   judgment briefing.

12        THE COURT:  I don't.  But so you have nothing more

13   to add on the exhibit we were discussing before lunch by

14   David Smith; right?

13:31:10 15        MR. KEZHAYA:  We do have one line of questioning.

16   It will probably be one or two questions to the effect of is

17   the face of this e-mail pretty clearly sent to the mayor and

18   city council.  The subject line states to the mayor and city

19   council.

13:31:26 20        THE COURT:  Which is the exhibit number for that?

21        MR. KEZHAYA:  As I recall, Your Honor -- is that 6

22   or 8?  Is it 5?

23        It's 5, Your Honor.

24        THE COURT:  Okay.  I've looked at Exhibit 6 again

13:33:35 25   and to that "Re" line that was just mentioned.  In fact, I

DIRECT EXAMINATION - MICHELLE SHORTT

13:33:39  1   read all of Exhibit -- I'm sorry, Exhibit 5, not Exhibit 6.

2   Here's the question for defense counsel:  The objection was

3   hearsay that I didn't rule on because I wanted to see the

4   "To" line.

13:33:54  5        In terms of authenticating this and what it actually

6   is, it seems to me that Rule 901(b)(4) applies.  The contents

7   and distinctive characteristics of this document suggests

8   that it was an e-mail addressed to the mayor and the city

9   councilmembers.  Councilmember David Smith responded, it

13:34:22 10  appears, on March 22nd and again on May 23rd.  When he

11  responded on May 23rd, it looks to me as though he quoted

12  almost verbatim the language that was included in the e-mail

13  that went to plaintiffs telling them why it was they weren't

14  going to be allowed to say the invocation.

13:34:41 15        So it seems to me that the distinctive

16  characteristics of Exhibit 5 under Rule 901(b)(4) are

17  sufficient to support a finding that this was in fact a

18  communication Mr. Smith made in his role as a councilmember

19  to an inquiry directed to the City of Scottsdale.  And if

13:35:03 20  that's true, it seems to me it wouldn't be hearsay if it was

21  a statement by an agent of the City acting within authority.

22        Your response?

23        MR. CLAUS:  May I respond, Your Honor?  Thank you.

24        The first response is to the determination that this

13:35:18 25  is an authentic e-mail under Rule 901(4) as a result of a

DIRECT EXAMINATION – MICHELLE SHORTT

13:35:22  1    "Re" line.  We do not know who used that "Re" line and we

2    certainly do not know, because no witness has testified, that

3    whatever e-mail is referred to, that is also a problem,

4    because we do not have the e-mail that has the subject line

13:35:39  5    "Urgent message for Mayor Jim Lane."

6        We do not have Ms. Sweats' e-mail.  We do not know

7    if that e-mail was delivered to the mayor.  We do not know if

8    that e-mail was delivered to the council.

9        That is issue number one, Your Honor.

13:35:57  10       With respect to hearsay and the determination that

11    this is a member that is intended to bind the council, the

12    only testimony you have heard today --

13        THE COURT:  It's not that it's intended to bind the

14    council.

13:36:07  15       MR. CLAUS:  Or intended to bind the City.

16        THE COURT:  Doesn't have to be intended to bind

17    anybody for purposes of rule 801(d).

18        MR. CLAUS:  It has to be on behalf of the City

19    because the City is the only defendant in the case.

13:36:19  20       THE COURT:  It has to be within the scope of

21    Mr. Smith's duties as a city councilmember.

22        MR. CLAUS:  And Mr. Smith does not fulfill those

23    duties unilaterally, Your Honor, according to the open

24    meeting law, and according to the charter, and according to

13:36:31  25    the only testimony you've heard today.

DIRECT EXAMINATION - MICHELLE SHORTT

13:36:34  1    And we do not know, Your Honor, if this e-mail was

2    sent to Mr. Smith's personal e-mail address.  Mr. Biesemeyer

3    can testify that council's private e-mails are maintained on

4    the City's server and would have been produced --

13:36:48  5    THE COURT:  Did you say are or are not?

6    MR. CLAUS:  Are.  And would have been produced in

7    response to a public records request.

8    And under *Bennett versus Yoshina*, the fact that an

9    individual councilmember sends an e-mail or a communication

13:37:01  10   cannot make it a communication on behalf of the defendant

11   governmental entity unless there is an indication either

12   within the communication or through competent testimony that

13   it was intended to be.

14   Again, Your Honor, we have another problem.  The

13:37:20  15   witnesses -- the plaintiffs could have identified Mr. Smith

16   as a witness.  The plaintiffs could have examined Mr. Smith

17   as a witness.  And we might not have this problem and we

18   might have the answer.

19   THE COURT:  What is that case you just cited?

13:37:35  20   MR. CLAUS:  *Bennett versus Yoshina*.  I will get the

21   citation for you.

22   It is 55 -- I'm sorry.  98 F. Supp. 2d 1139.  And

23   the pin cite is to 1154.  And it -- this *Bennett versus*

24   *Yoshina* is regarding a state employee, I'll just read --

13:38:04  25   THE COURT:  You don't need to read it.  I'm going to

DIRECT EXAMINATION - MICHELLE SHORTT

13:38:05  1    read the case.  I'm going to continue to take Exhibit 5 under

2    submission and decide its admissibility.

3        Final comment?

4        MR. KEZHAYA:  Yes, Your Honor.  Could we get that

13:38:15  5    cite again so I can also review it for purposes of argument.

6        MR. CLAUS:  Sure.  It's 98 F. Supp. 2d. 1139.  Pin

7    cite is to 1154.

8        MR. KEZHAYA:  You said 1154?

9        MR. CLAUS:  1154.

13:38:33 10        MR. KEZHAYA:  And it being F.Supp., it sounds like

11    it is either --

12        THE COURT:  It's a district court case.

13        MR. CLAUS:  I have copies for counsel.

14        THE COURT:  Okay.  Let's get back to evidence,

13:38:42 15    counsel.  I'm going to divide the last 40 minutes equally

16    between the parties in terms of the time we consumed in the

17    trial.

18        And I want to move on with the testimony.  I will

19    take Exhibit 5 under advisement and look at the *Bennett* case

13:38:59 20    and other authority and decide whether or not that's

21    admissible.

22        Let's go ahead and get Ms. Shortt back in and

23    continue.

24        MR. CLAUS:  I know I'm trying your patience,

13:39:06 25    Your Honor.  While Ms. Shortt is finding her way to the

DIRECT EXAMINATION – MICHELLE SHORTT

13:39:11  1    stand, may I please use the restroom?

2             THE COURT:  Yes.

3             MR. CLAUS:  Thank you, Your Honor.

4             THE COURT:  We can go ahead and get Ms. Shortt back

13:39:17  5    in here.

6             MR. KEZHAYA:  Yes, Your Honor.  It sounds like Stu

7    is going to grab her, Your Honor.

8             There was the other matter of the nonreligious

9    invocations.  I'm unclear on when the Court struck the

13:39:31 10   testimony related to 16, whether we could get into the

11   nonreligious part --

12            THE COURT:  I said we would cross that bridge when

13   we got to it.

14            MR. KEZHAYA:  Thank you, Your Honor.

13:39:38 15            THE COURT:  I don't know what it is or how -- what

16   the foundation is.  I'll just have to rule after you lay that

17   foundation.

18            MR. KEZHAYA:  Yes, Judge.

19            THE COURT:  Okay.

13:40:56 20            MR. KEZHAYA:  Your Honor, I have left our stapled

21   copy of unredacted Number 8 up here and it appears to have

22   gone missing.  Does the Court have it, by chance?

23            THE COURT:  Well, I've got a copy of unredacted 8.

24            We haven't talked about anything while you've been

13:41:10 25   gone, Mr. Claus.

DIRECT EXAMINATION – MICHELLE SHORTT

13:41:11  1          Is that the one you lost?

2          MR. KEZHAYA:  Let me see.

3          Yes, Your Honor.

4          THE COURT:  Okay.  Let's go ahead and continue with

13:41:33  5  the testimony.

6          MR. KEZHAYA:  Okay.

7  BY MR. KEZHAYA:

8  Q   Ms. Shortt, you indicated that you did a public records

9  request at some point.  Do you remember that?

13:41:45  10  A   Yes.

11  Q   When did you do this public records request?

12  A   I do not recall.

13  Q   Was it after the denial?

14  A   Yes.

13:41:57  15  Q   Okay.  In that public records request, did you receive a

16  number of e-mails?

17  A   Yes.

18  Q   Was one of those e-mails identified as from Kathy

19  Littlefield?

13:42:07  20  A   Yes.

21  Q   Okay.  I'm going to show you a document we've previously

22  identified as Exhibit 8.

23          MR. KEZHAYA:  May I approach, Your Honor?

24          THE COURT:  Yes, you may.

13:42:39  25          MR. KEZHAYA:  That's the original one.

DIRECT EXAMINATION - MICHELLE SHORTT

13:42:43  1        THE COURT:  So which Exhibit 8 are we presenting the

2     witness?

3            MR. KEZHAYA:  This is the produced Exhibit 8 that

4     was provided on December 16th, Your Honor.  I anticipate

13:42:51  5     we're going to get into the same issue as with Mr. Smith, but

6     I figure I need to lay out the foundation.  Otherwise, we can

7     just cut straight to the chase.

8            THE COURT:  It's not this unredacted version?

9            MR. KEZHAYA:  It is not the unredacted version yet.

13:43:06 10    It depends what comes of defense counsel's --

11           THE COURT:  Well, do defense counsel have an

12    objection to replacing redacted Exhibit 8 with unredacted

13    Exhibit 8?

14           MR. CLAUS:  We don't have an objection to the

13:43:20 15   replacement of the redacted version with the nonredacted

16    version.

17           THE COURT:  Okay.  So let's just mark the unredacted

18    version as 8 and use that.

19           MR. KEZHAYA:  Yes, Your Honor.

13:43:33 20          MR. CLAUS:  Oh, Your Honor.  I apologize.  I didn't

21    realize the actual content of Exhibit 8 had been redacted.  I

22    thought there is a second page of what -- the replacement

23    Exhibit 8 that actually contains text of an e-mail from

24    someone named Ellen Laybourne, whom I do not know --

13:43:57 25          THE COURT:  Well, on the original Exhibit 8, the

DIRECT EXAMINATION - MICHELLE SHORTT

13:43:59  1    e-mail address is redacted on the first page.

2              MR. CLAUS:  It's not the e-mail address, Your Honor.

3         It is the -- the original Exhibit 8 contains one page.  The

4         replacement Exhibit 8 contains two pages.

13:44:14  5              THE COURT:  Look at the first page of the original

6         Exhibit 8.  Right after the name Kathy Littlefield.

7              MR. CLAUS:  Yes.

8              THE COURT:  The e-mail address is redacted.

9              MR. CLAUS:  Yes.

13:44:24 10              THE COURT:  And the version they're substituting in,

11        the City of Scottsdale e-mail address is included.

12             MR. CLAUS:  But they're also trying to substitute

13        additional textual information that was not included in the

14        original Exhibit 8 and that has not been disclosed until this

13:44:40 15        moment in the universe.

16             THE COURT:  Do you care about the second page?

17             MR. KEZHAYA:  I do not, Your Honor.  I'm only

18        interested in Kathy Littlefield --

19             THE COURT:  Okay.  So we're going to take off the

13:44:49 20        second page.  And the Exhibit 8 we will use is the version

21        that has the e-mail address not redacted.

22             MR. CLAUS:  Thank you, Your Honor.

23             THE COURT:  Okay.

24             MR. KEZHAYA:  Other that now removed page 2 from

13:44:59 25        unredacted Exhibit 8, plaintiffs move to introduce the

DIRECT EXAMINATION - MICHELLE SHORTT

13:45:05  1    unredacted Exhibit 8.

2              THE COURT:  All right.  Is there any objection to

3    Exhibit 8 as just described?

4              MR. CLAUS:  Yes, Your Honor.  There is still a

13:45:11  5    foundation objection.  There is still a hearsay objection.

6    The statements of Ellen Laybourne, which are the top e-mail

7    and the bottom e-mail, are out-of-court statements by a

8    declarant.  Ms. Laybourne has not been disclosed as a

9    witness.  She's not been --

13:45:28  10             THE COURT:  Well, it's a hearsay objection.  What is

11   your response on hearsay from Ms. Laybourne?

12             MR. KEZHAYA:  Your Honor, the Court's prior rulings

13   on David Smith's e-mail are going to be the same here.  It's

14   an agency relationship.  She is Councilwoman Littlefield, she

13:45:47  15   is sending the e-mail KLittlefield@Scottsdaleaz.gov.

16             THE COURT:  Just a minute, I'm sorry.  I thought he

17   was objecting to the statements from Ms. Laybourne --

18             MR. KEZHAYA:  Oh.  I have no objection to removing

19   those, Your Honor.

13:45:57  20             THE COURT:  Those won't be considered.  What you

21   want to get in is what Ms. Littlefield said in the -- sort of

22   middle e-mail of the exhibit; is that right?

23             MR. KEZHAYA:  Yes, Your Honor.  That's all that we

24   care about.

13:46:08  25             THE COURT:  Is there an objection to that?

DIRECT EXAMINATION - MICHELLE SHORTT

13:46:10  1        MR. CLAUS:  There is an objection, Your Honor.

2    There's no foundation for that e-mail.  That e-mail is still

3    hearsay because -- for the same reasons that the e-mail from

4    an individual councilmember, David Smith, are hearsay, this

13:46:24  5    e-mail from an individual councilmember, Kathy Littlefield,

6    to someone named Ellen Laybourne is hearsay.  There is

7    nothing in the e-mail -- in fact -- in fact, Your Honor, if

8    you look --

9        THE COURT:  We don't need to argue this at length.

13:46:39 10    I just need to understand the objection.  It's hearsay --

11        MR. CLAUS:  Hearsay.

12        THE COURT:  -- to the statement from

13    Ms. Littlefield?

14        MR. CLAUS:  Yes.  And the penultimate paragraph

13:46:50 15    demonstrates that it is a personal, not an agency

16    communication.

17        THE COURT:  Your response?

18        MR. KEZHAYA:  It is signed Councilwoman Kathy

19    Littlefield and is sent from @Scottsdaleaz.gov, Your Honor.

13:47:02 20    I can't see any way for the City to make an argument that it

21    is not from a councilwoman in the course and scope of her

22    agency or relationship as councilwoman.

23        THE COURT:  All right.  I am going to overrule the

24    objection and I'm going to admit Exhibit 8, but the only

13:47:19 25    portion that I'm going to consider is the middle e-mail that

DIRECT EXAMINATION - MICHELLE SHORTT

13:47:22  1   goes from Ms. Littlefield to Ellen Laybourne.  My conclusion

2   is that it is admissible under Rule 801(b).

3       (Exhibit 8 admitted.)

4   BY MR. KEZHAYA:

13:47:36  5   Q   Michelle, do you have a copy of 8 in front of you?

6   A   Yes.

7   Q   I want you to read the second sentence of the first

8   paragraph.

9   A   The first or second e-mail?

13:47:55 10   Q   Well, after "thank you for your e-mail."  It says "first"

11   and then there's a sentence.  The second sentence after

12   "first."

13   A   "First, council hasn't had a say on this issue one way or

14   the other.  This is a decision made by the mayor's office.  I

13:48:11 15   found out about it from my e-mails after our last council

16   meeting."

17   Q   Have you been through our responses to discovery that we

18   received from the City?

19   A   I don't understand the question.

13:48:27 20   Q   Have you been through the e-mails that the City provided

21   us?

22   A   Yes.

23   Q   Did you see anything in there from e-mails to

24   Kathy Littlefield first noting about these e-mails?

13:48:44 25           MR. CLAUS:  Objection, Your Honor.  Best evidence.

DIRECT EXAMINATION - MICHELLE SHORTT

13:48:45  1    He's trying to prove the contents.

2                   THE COURT:  Overruled.

3                   MR. CLAUS:  And hearsay.

4                   THE COURT:  Overruled.

13:48:54  5                   THE WITNESS:  No.

6    BY MR. KEZHAYA:

7    Q    Okay.  The second paragraph indicates that the City

8    considered the legality of prohibiting The Satanic Temple,

9    doesn't it?

13:49:04 10                   MR. CLAUS:  Leading, Your Honor.

11                   THE COURT:  Sustained.

12    BY MR. KEZHAYA:

13    Q    Does the second paragraph -- actually, please read the

14    second paragraph in full for benefit of the Court.

13:49:16 15                   MR. CLAUS:  Document speaks for itself, Your Honor.

16                   THE COURT:  Overruled.

17                   THE WITNESS:  "Finally, I suppose we could do" --

18                   THE COURT:  That's the third paragraph.

19    BY MR. KEZHAYA:

13:49:22 20    Q    The one that starts "Second," Michelle.

21    A    Oh.  I'm sorry.

22                   "Second, after checking on the legality issue,

23    according to Supreme Court's decision our choice is to allow

24    it or discontinue all religious prayers at the beginning of

13:49:36 25    the meeting.  Personally, I like having the prayers.  Do not

DIRECT EXAMINATION – MICHELLE SHORTT

13:49:40   1   want the satanists and I think this is taking equality too

2   far.  However, we are all sworn to uphold the law and cannot

3   disobey it just because we find it undesirable and stupid."

4   Q    What was the date of this e-mail?

13:49:55   5   A    It was February 11, 2016, at 6:41 p.m.

6   Q    Okay.  Right before the signature there's one sentence

7   that starts "personally."  Could you please read that for

8   benefit of the Court.

9   A    "Personally, I do not relinquish my religious freedom of

13:50:17  10   prayer, so it is not an acceptable solution."

11   Q    And is the acceptable solution that she's referring to of

12   just shutting down all invocations?

13              MR. CLAUS:  Objection.  Leading.

14              THE COURT:  Sustained.

13:50:36  15   BY MR. KEZHAYA:

16   Q    Please read the paragraph starting "Finally," Ms. Shortt.

17   A    "Finally, I suppose we could do as Phoenix has done and

18   not have any prayers.  Our only other legal option.  However,

19   I believe that result is exactly what the satanists want, for

13:50:47  20   us to be forced to deny prayers at the start of our meetings

21   and not to be able to publicly ask for God's blessing and

22   guidance.  This is why they are going through so many

23   dif-" -- "this is why they are going to so many different

24   Arizona cities."

13:51:04  25   Q    Is that true?  Is that why you were going to these

DIRECT EXAMINATION – MICHELLE SHORTT

13:51:12  1  different Arizona cities?

2  A    No.

3  Q    You reviewed Exhibit 15, the city notes, did you?

4  A    Yes.

13:51:24  5  Q    And in reviewing the city notes, did you find instances of

6  moments of silence?

7  A    Yes.

8  Q    I'm going to direct your attention to the year 2015.

9       On October 6, the notes indicate there was a moment

13:51:44  10  of silence for Oregon shootings?

11  A    Yes.

12       THE COURT:  Where is that, Counsel?

13       MR. CLAUS:  I have in my notes, 32-5, at 5.  City

14  notes 2015, Your Honor.  10/6.

13:51:58  15       THE COURT:  Okay.

16  BY MR. KEZHAYA:

17  Q    Are you familiar with the Phoenix Indian Center?

18  A    Yes.

19  Q    On your review of the minutes, did the Phoenix Indian

13:52:08  20  Center give an invocation in November of 2016?

21  A    Yes.

22  Q    Is the Phoenix Indian Center a religious organization?

23       MR. CLAUS:  Objection, Your Honor.  Foundation.

24       THE COURT:  Sustained.

25

DIRECT EXAMINATION - MICHELLE SHORTT

13:52:19  1    BY MR. KEZHAYA:

2    Q    Do you have personal knowledge of what the Phoenix Indian

3    Center is?

4    A    They are an outreach --

13:52:30  5    Q    Yes or no?

6    A    Yes.

7    Q    What is your understanding of the Phoenix Indian Center's

8    organizational purpose?

9              MR. CLAUS:  Objection.  Relevance as to her

13:52:40 10    understanding.  And foundation.

11              THE COURT:  Was that two objections?

12              MR. CLAUS:  Yes, Your Honor.  Relevance as to her

13    understanding --

14              THE COURT:  Relevance and foundation.

13:52:49 15              MR. CLAUS:  And foundation.

16              THE COURT:  Overruled on relevance.

17              But I do think you need to lay a foundation for how

18    she knows this before you ask you her.

19              MR. CLAUS:  Yes, Your Honor.

13:53:00 20    BY MR. CLAUS:

21    Q    How are you familiar with the Phoenix Indian Center?

22    A    It was one of the addresses that I Googled.

23    Q    Okay.  Had you known about it prior to you going through

24    these exhibits and Googling addresses?

13:53:10 25    A    No.

DIRECT EXAMINATION - MICHELLE SHORTT

13:53:11  1    Q   In the course of you Googling these addresses, did you

2    investigate into the religious nature of some of the

3    organizations?

4             MR. CLAUS:  Objection, Your Honor.  Foundation.

13:53:21  5    Disclosure.

6             THE COURT:  Sustained -- well, sustained on

7    disclosure.  Same ruling as before.

8             MR. KEZHAYA:  Your Honor, as to disclosure, we

9    didn't know that -- whether TST was a religion was going to

13:53:34  10   be an issue until the 12(b)(1) motion.  Our understanding of

11   the 12(b)(1) motion was going to be the organizational

12   entities didn't exist at the time.

13            If the Court may recall the teleconference that

14   we --

13:53:44  15            THE COURT:  I remember.  I remember the

16   teleconference.

17            MR. KEZHAYA:  That was the characterization.  We

18   didn't even know to provide whether these other organizations

19   were religious because it wasn't an issue.

13:53:55  20            THE COURT:  So the purpose for this evidence is to

21   suggest that nonreligious organizations gave invocations?

22            MR. KEZHAYA:  Yes, Your Honor.  That's this entire

23   line of questioning.

24            THE COURT:  Mr. Claus, you agree, I think, that you

13:54:06  25   raised that issue after the motion for summary judgment when

DIRECT EXAMINATION – MICHELLE SHORTT

13:54:08   1   it came to the motion to dismiss.

2        MR. CLAUS:  We did raise it in the motion to

3   dismiss, Your Honor, which was in the summer, and it --

4        THE COURT:  No, the motion to dismiss wasn't filed

13:54:20   5   until the fall, well after the summary judgment moving.

6        MR. CLAUS:  But the request to file the motion to

7   dismiss where all of these issues were discussed was raised

8   in the --

9        THE COURT:  The telephone conference originally was

13:54:31  10   about capacity to sue and standing.  When you filed the

11   motion, you expanded it to include whether or not the

12   plaintiffs were a religion.

13        MR. CLAUS:  And that would have been the time, if

14   the plaintiffs had factual evidence, to disclose.  And if

13:54:50  15   they had factual evidence to present at trial, that would

16   have been the time to send me an e-mail, to call me on the

17   phone, to do something that notified me that a witness was

18   going to testify about the issues that this witness is trying

19   to testify to, not the day of trial.

13:55:14  20        THE COURT:  I'm incorrect.  The motion to dismiss

21   was filed in June, not in the fall.

22        No, I'm sorry.  That's the original motion to

23   dismiss.

24        Would you look at the docket, please, and see when

13:55:34  25   it was filed, Christine.  This is the one filed, I think, in

DIRECT EXAMINATION – MICHELLE SHORTT

13:55:37  1    the fall of 2019.

2             While she's doing that, what is your response,

3    Mr. Kezhaya, that once that issue was on the table, you had

4    an obligation under the MIDP to make disclosures of

13:55:51  5    information you intend to assert at trial?

6             MR. KEZHAYA:  Your Honor, before I answer, for the

7    benefit of the Court, it was filed on October 4.  I don't

8    have the docket number it's somewhere between 62 and 64.  I

9    imagine 63.

13:56:03 10             THE COURT:  Okay.

11             MR. KEZHAYA:  As for why we didn't produce this, the

12    discovery was done.  We had the first discovery deadline

13    where it was our understanding that the issues for trial was,

14    okay, well, what is the substantial connection policy?  Was

13:56:17 15    it really about substantial connection?  What is the

16    definition of it?  And was it applied to anyone else?  That

17    was the first wave of discovery expectations.

18             The second wave of discovery expectations, which

19    concluded prior to them filing their motion to dismiss was,

13:56:32 20    to our understanding at least, did any of these

21    organizational entities exist?  Do they have associational

22    standing?  And does Ms. Shortt have a redressable injury that

23    was caused by the defendants?

24             Our understanding of all of this was character --

13:56:47 25    not characterized, it was colored by the first wave of

DIRECT EXAMINATION - MICHELLE SHORTT

13:56:50  1   discovery by the pleadings that it did file.  Nowhere

2   anywhere did anyone say TST is not a religion, so we didn't

3   even know to provide it, and it was our understanding that we

4   couldn't provide it because it's barred.

13:57:05  5          So if we had provided this information, the nature

6   of the objection would probably be, well, they provided it

7   too late.  We still couldn't do additional discovery.  We

8   couldn't look into whether this Phoenix Indian Center is

9   religious --

13:57:18  10         THE COURT:  Let's kind of shorten up our arguments.

11   I understand the basic argument, and I mean on both sides,

12   because I don't want to consume the whole day arguing about

13   evidence issues.

14         Just a brief response, Mr. Claus.

13:57:28  15         MR. CLAUS:  Yes, Your Honor.

16         Our position in the motion to dismiss is not whether

17   other organizations are religious or whether other

18   organizations, or any organizations needed to be religious to

19   give invocations.

13:57:42  20         Our argument in the motion to dismiss and our

21   argument today is that the organization that is the plaintiff

22   is not a religion and thus is not entitled to an

23   Establishment Clause protection.  That is an element that has

24   existed since the plaintiffs filed the case.

13:57:56  25         And, again, briefly, Your Honor, this is not in the

DIRECT EXAMINATION – MICHELLE SHORTT

13:58:00  1    joint pretrial statement either.

2                The way lawyers are supposed to work is that --

3                THE COURT:  I know how lawyers are supposed to work.

4    Let's really zero in on the argument you want me to rule on.

13:58:14  5                MR. CLAUS:  Yes, Your Honor.

6                So, Your Honor, the information was never disclosed.

7    It was not part of the joint pretrial statement.  Under MIDP

8    general order 17-08, paragraph 8, the parties have a duty to

9    seasonably supplement when they come in the possession of

13:58:30  10   evidence, whether or not the discovery deadline is over.

11               Because the whole goal is to --

12               THE COURT:  I know the goal.  Thank you.

13               MR. CLAUS:  Thank you.

14               THE COURT:  I'm going to overrule the objection.

13:58:53  15   The arguments based on *Barker* and *Fields* about whether or not

16   this was a religion were first raised in October of 2019,

17   after both discovery periods had been undertaken.  The fact

18   plaintiffs had to respond and address that argument all arose

19   after October of 2019.  Therefore, I think there's a

13:59:15  20   reasonable excuse for the evidence being identified later in

21   the case.  So I'm going to allow the testimony about the

22   Indian Center.  I've forgotten the name.

23               MR. KEZHAYA:  Phoenix Indian Center, Your Honor.

24               THE COURT:  Go ahead.

25

DIRECT EXAMINATION – MICHELLE SHORTT

13:59:35  1    BY MR. KEZHAYA:

2    Q    Did you Google Phoenix Indian Center?

3    A    Yes, I did.

4    Q    What is your understanding of the nature of Phoenix Indian

13:59:43  5    Center as an organization?

6              MR. CLAUS:  Foundation and disclosure, Your Honor.

7              THE COURT:  Overruled.

8              THE WITNESS:  They are an outreach group to the

9    Native American community and are nonreligious in nature.

13:59:58  10   BY MR. KEZHAYA:

11   Q    Okay.  I want to turn your attention to the city notes

12   year 2017, which I believe is the third page.

13             Actually, they're in reverse chronology, so it might

14   be the third-to-last page, but 2017.

14:00:14  15             Specifically on May 23rd, 2017, was there a moment of

16   silence for Manchester bombing?

17   A    Yes.  On May 23rd.

18   Q    Okay.  Is Oregon in Scottsdale?

19   A    No.

14:00:29  20   Q    Is Manchester in Scottsdale?

21   A    No.

22   Q    Is Oregon in the State of Arizona?

23   A    No.

24             THE COURT:  Let's keep moving.  I know where Oregon

14:00:40  25   is.

DIRECT EXAMINATION – MICHELLE SHORTT

14:00:41  1    BY MR. KEZHAYA:

2    Q   I want to turn your attention to -- well, I have it in

3    here as 32-4, the Arizona Community Action --

4           THE COURT:  Pardon me.  Where is the reference to

14:00:50  5    the Phoenix Indian Center?

6           MR. KEZHAYA:  I have it listed as 32-10 at page 8,

7    Your Honor.

8           THE COURT:  32-10.

9           MR. KEZHAYA:  32-10 at page 8, is what my reference

14:01:02  10   is.

11          THE COURT:  There is no 32-10 in Exhibit 15.

12          MR. KEZHAYA:  Hmm.  Okay.  I believe it's

13   Exhibit 14.  The date is November 14th, 2016.

14          THE COURT:  32-10 at what page?

14:01:25  15          MR. KEZHAYA:  I have as 8.

16          MR. CLAUS:  Excuse me, Your Honor, could we just --

17          THE COURT:  I see it.

18          MR. CLAUS:  I -- I can't find it, so if we can just

19   get a Bates stamp number, it would be helpful.

14:01:43  20          THE COURT:  It is 4899.

21          MR. CLAUS:  Thank you so much, Your Honor.

22          THE COURT:  Okay.  Proceed, please.

23          MR. KEZHAYA:  Thank you, Your Honor.

24   BY MR. KEZHAYA:

14:01:51  25   Q   The Arizona Community Action Association, did you have

DIRECT EXAMINATION – MICHELLE SHORTT

14:01:55  1    occasion to Google them throughout this litigation?

2    A    Yes.

3    Q    What was your understanding --

4              THE COURT:  Which exhibit are we in now?

14:02:02  5              MR. KEZHAYA:  Oh, I'm sorry, Your Honor.

6         I have this as 32-4, page 2.  Should be 14,

7    Your Honor.

8              THE COURT:  I don't see a 32-4 in Exhibit 14.

9              MR. KEZHAYA:  Pardon me, Your Honor.  I believe it's

14:02:44 10    the city notes, then.

11              THE COURT:  So in Exhibit 15?

12              MR. KEZHAYA:  Yes, sir.

13              THE COURT:  I don't see a 32-4 there either.  It

14    goes directly from 35-3 to 32-5.

14:02:58 15              MR. KEZHAYA:  Yes, Your Honor.  We'll withdraw the

16    question as to Arizona Community Action Association.

17    BY MR. KEZHAYA:

18    Q    Are you familiar with the concept of a moment of silence?

19    A    Yes.

14:03:12 20    Q    Which deity is invoked by a moment of silence?

21              MR. CLAUS:  Objection, Your Honor.  Foundation.

22              THE COURT:  Sustained.

23    BY MR. KEZHAYA:

24    Q    If any?

14:03:22 25              THE COURT:  I understand what a moment of silence

DIRECT EXAMINATION – MICHELLE SHORTT

14:03:24  1    is, Counsel.

2        MR. KEZHAYA:  Yes.

3        THE COURT:  I understand you feel the need to cover

4    the bases on the evidence, but I don't think we need to get

14:03:31  5    evidence in on the obvious things.

6        MR. KEZHAYA:  Okay.

7    BY MR. KEZHAYA:

8    Q   Do you remember the day that you were denied the

9    invocation?

14:03:43  10   A   No.

11   Q   Do you remember the day that you learned of it?

12   A   I don't understand the question.

13   Q   How did the denial affect you?

14   A   It was extremely demoralizing.

14:03:58  15   Q   Why is that?

16   A   It made me feel like I wasn't valid.  Like I wasn't a

17   citizen or a member of the community.  It was humiliating.

18   Demoralizing.  And it just punched me in the gut.

19       MR. KEZHAYA:  Pass the witness, Your Honor.

14:04:30  20       THE COURT:  Cross-examination.

21       MR. CLAUS:  May I gather the exhibits that I'm going

22   to ask the witness about?

23       THE COURT:  I can't hear you, Counsel.

24       MR. CLAUS:  May I gather the exhibits that I'm going

14:04:37  25   to ask the witness about consistent with your order on the

DIRECT EXAMINATION – MICHELLE SHORTT

14:04:40  1    trial?

2         THE COURT:  Yeah.  Yeah.

3         MR. CLAUS:  Thank you.

4         THE COURTROOM DEPUTY:  Counsel, are you using

14:05:07  5    technology to show the exhibits or did you want me to pull

6    them?

7         MR. CLAUS:  We're going to grab them from the

8    folder, belt and suspender, just in case technology doesn't

9    work.

14:05:31  10        MR. KEZHAYA:  Your Honor, may I approach the

11   lectern?  I appear to have forgotten my water up there.

12        THE COURT:  Sure.

13        MR. KEZHAYA:  Additionally, we also have our exhibit

14   list.

14:05:42  15        THE COURT:  I'm sorry, what was that?

16        MR. KEZHAYA:  The exhibit list from this morning,

17   Your Honor.  We had completed it, but it's been up here this

18   whole time.  I apologize.

19        May I approach?

14:05:51  20        THE COURT:  Yes, you may.

21        MR. CLAUS:  May I approach, Your Honor?

22        THE COURT:  Yes.

23        THE COURTROOM DEPUTY:  Counsel, so you know, I don't

24   have an Exhibit 4 yet.

14:07:52  25        MR. KEZHAYA:  Yes, that was intentional.  We haven't

CROSS-EXAMINATION - MICHELLE SHORTT

14:07:54  1    gone there yet.

       2         THE COURTROOM DEPUTY:  So if you're looking for 4, I

       3    don't have one.  He was going to use 4.

       4         MR. KEZHAYA:  Do you need Exhibit 4?

14:08:03  5         MR. CLAUS:  I do.

       6         THE COURT:  Let's go on.  When you get to Exhibit 4,

       7    we'll deal with it.

       8         MR. CLAUS:  Thank you.

       9              C R O S S - E X A M I N A T I O N

14:08:11 10    BY MR. CLAUS:

      11    Q   Ms. Shortt, good afternoon.  My name is Scot Claus.  I

      12    represent the defendant City of Scottsdale.

      13         You ended your testimony talking about how you felt

      14    like you weren't a member of the community.  Do you recall

14:08:33 15    that?

      16    A   Yes.

      17    Q   You don't live in Scottsdale; correct?

      18    A   No.

      19    Q   You've never lived in Scottsdale; correct?

14:08:40 20    A   No.

      21    Q   That is not correct or that is correct?

      22    A   Oh.  That is correct, yes.

      23    Q   You are not a member of the Scottsdale community; correct?

      24    A   No.

14:08:52 25    Q   You testified about contact with the City of Scottsdale.

CROSS-EXAMINATION - MICHELLE SHORTT

14:08:56  1    You never spoke a single word to someone named Kelli Kuester;

2    correct?

3    A    No.

4    Q    That is correct?

14:09:07  5    A    Yes, that is correct.

6    Q    You didn't speak to her on the phone; correct?

7    A    I did not speak to her on the phone.

8    Q    Did you not speak to her in person; true?

9    A    True.

14:09:19 10    Q    You did not write her an e-mail; correct?

11    A    Correct.

12    Q    You did not send her a letter; correct?

13    A    Correct.

14    Q    The gentleman named Brian Biesemeyer, you never spoke with

14:09:33 15    Mr. Biesemeyer; correct?

16    A    No.

17    Q    By phone you never talked to him?

18    A    No.

19    Q    You keep saying no.  I'm going are to rephrase my question

14:09:43 20    to help you out.

21         Is it true that you --

22         MR. KEZHAYA:  Objection, Your Honor.  There are

23    rules of decorum for a reason.  Additionally, this is the

24    same question in four, five iterations.  It's objectionable

14:09:55 25    under Rule 403.

CROSS-EXAMINATION - MICHELLE SHORTT

14:09:57  1          THE COURT:  Overruled.

2          We do only need to ask the question once.

3          MR. CLAUS:  I'm sorry?

4          THE COURT:  We only need to ask the question once.

14:10:07  5          MR. CLAUS:  Sure.

6    BY MR. CLAUS:

7    Q   Is it true that you never contacted Brian Biesemeyer by

8    e-mail or telephone?

9    A   That is true.

14:10:13 10    Q   Is it true that you never had a face-to-face verbal

11    conversation with Brian Biesemeyer?

12    A   That is true.

13    Q   You alleged in your complaint that you contacted the City

14    of Scottsdale to give an invocation.  Do you recall alleging

14:10:29 15    that?

16    A   I do not recall.

17    Q   You alleged in paragraph 26 of your first amended

18    complaint that you contacted the City of Scottsdale to give an

19    invocation.  Do you recall that?

14:10:46 20    A   I do not recall.

21    Q   The fact of the matter is, is that you never contacted any

22    representative of the City of Scottsdale and asked to give an

23    invocation; is that true?

24    A   I did not.

14:11:05 25    Q   Is it true that you never had a written communication with

CROSS-EXAMINATION - MICHELLE SHORTT

14:11:09   1   Mayor Lane?

2   A    That is true.

3   Q    Is it true that you never had a verbal conversation with

4   Mayor Lane?

14:11:16   5   A    That is true.

6   Q    Is it true that you never had a written or verbal

7   conversation with any member of the city council?

8   A    That is true.

9   Q    Is it accurate to say that you did not tell any

14:11:32  10   representative of the City of Scottsdale at any time prior to

11   May 23, 2016, what your religious beliefs were?

12   A    Could you please rephrase the question.

13   Q    Sure.  Is it true to say that prior to May 23, 2016, you,

14   Michelle Shortt, never told a single representative of the

14:12:05  15   City of Scottsdale what your religious beliefs were?

16   A    I don't understand the question.

17   Q    You --

18   A    And the reason for doing so is because we were very

19   transparent as to who we were as an organization.

14:12:36  20   Q    No, ma'am.  I'm asking you to tell me if it's true or if

21   it's false that prior to May 23, 2016, you, Michelle Shortt,

22   never told a representative of the City of Scottsdale what

23   your religious beliefs were; correct?

24   A    Correct.

14:13:01  25   Q    You, Michelle Shortt, never delivered a copy of any

CROSS-EXAMINATION - MICHELLE SHORTT

14:13:06   1   proposed invocation to any representative of the City of

        2   Scottsdale; correct?

        3   A    Correct.

        4   Q    And you, Michelle Shortt, never described the contents of

14:13:18   5   any proposed invocation to any representative of the City of

        6   Scottsdale; that's also correct, isn't it?

        7   A    Yes.

        8   Q    You, Michelle Shortt, never told a representative of the

        9   City of Scottsdale what your viewpoints were on any matter;

14:13:41  10   correct?

       11   A    No.  No, it's -- I mean, yes, it's correct.

       12   Q    And you, Michelle Shortt, never explained to any

       13   representative of the City of Scottsdale the viewpoints that

       14   you wished to deliver during an invocation; correct?

14:14:03  15   A    Correct.

       16   Q    Is it accurate to say that up until this moment in the

       17   universe, you have never had any communication of any kind

       18   with any representative of the City of Scottsdale?

       19   A    That's correct.

14:14:37  20   Q    You did not listen to or participate in any phone calls,

       21   according to your under oath testimony on direct, in any phone

       22   calls between Jeremy Zarzycki and Kelli Kuester; correct?

       23   A    That's correct.

       24   Q    You have seen e-mails in this case?

14:15:04  25        You've seen e-mails?

CROSS-EXAMINATION - MICHELLE SHORTT

14:15:06  1   A    E-mails from who?

2   Q    You've seen e-mails between Mr. Zarzycki and

3   representatives of the City of Scottsdale?

4   A    Yes.

14:15:17  5   Q    You, Michelle Shortt, never told a representative of the

6   City of Scottsdale that your religious belief was satanism;

7   correct?

8   A    No, I did not speak to anybody.

9   Q    You never told the City of Scottsdale that the religious

14:15:40 10   belief of any representative of the plaintiff was satanism;

11   correct?

12   A    Could you rephrase the question.

13   Q    Well, you never wrote an e-mail to anyone at the City of

14   Scottsdale saying, "I wish to promote a belief in satanism,"

14:15:59 15   or words to that effect; true?

16   A    No, we did not say that.

17   Q    You did not call someone on the phone -- you used the

18   pronoun "we."  I'm talking about you right now.  You never

19   called a representative of the City of Scottsdale on the

14:16:14 20   telephone and said to a representative of the City of

21   Scottsdale, at any point in the time in the universe, that I,

22   Michelle Shortt, want to give an invocation and talk about

23   satanism; is that correct?

24   A    That's correct, I never did that.

14:16:31 25   Q    In fact, when you formed the group that you referred to in

CROSS-EXAMINATION - MICHELLE SHORTT

14:16:36  1  your first amended complaint, your common enterprise and

2  objective was not satanism, it was pluralism; correct?

3  A    Correct.

4  Q    You formed that group in January 2016; true?

14:17:00  5  A    Correct.

6  Q    And just to be clear, Ms. Shortt, no person representing

7  the City of Scottsdale ever told you in person, on the phone,

8  or in writing, that you could not give an invocation; correct?

9  A    Could you please rephrase the question.

14:17:24  10  Q    No representative of the City of Scottsdale ever told you

11  in person that you couldn't given an invocation; true?

12  A    That's true.

13  Q    No person representing the City of Scottsdale ever told

14  you on the phone that you couldn't give an invocation;

14:17:42  15  correct?

16  A    That's true.

17  Q    And no one representing the City of Scottsdale told you,

18  Michelle Shortt, in writing that you could not give an

19  invocation; correct?

14:18:05  20  A    I don't understand the question in regards to it being

21  that I was told that I wasn't allowed to give the invocation

22  on a certain day.

23  Q    No, ma'am.  My question is:  You've alleged in this case

24  you wanted to give an invocation before a City of Scottsdale

14:18:24  25  council meeting; correct?

CROSS-EXAMINATION - MICHELLE SHORTT

14:18:27  1   A    Yes.

2   Q    And you've alleged in this case that you were denied that

3   opportunity; correct?

4   A    Yes.

14:18:33  5   Q    You, you, Michelle Shortt, were never told in writing that

6   you could not give an invocation.  That is a fact that is

7   true; correct?

8   A    That is correct.

9   Q    Do you have Exhibit 6 in front of you?

14:19:00 10        MR. CLAUS:  Is that one of the ones I asked?  I

11   can't remember.

12        THE COURTROOM DEPUTY:  Should be up there.

13   BY MR. CLAUS:

14   Q    You have folders in front of you, exhibits that have been

14:19:09 15   marked for identification or that are in evidence.  My notes

16   suggest that Exhibit 6 is in evidence.  Do you have that in

17   front of you?

18        THE COURTROOM DEPUTY:  I don't have 6, actually.

19        MR. KEZHAYA:  For the benefit of the Court, 6 has

14:19:23 20   not been admitted but we have no objection --

21        THE COURT:  6 is not admitted.

22        MR. CLAUS:  I don't know if the witness has it in

23   front of her.

24        THE COURTROOM DEPUTY:  I don't have it; I haven't

14:19:32 25   given it.

CROSS-EXAMINATION – MICHELLE SHORTT

14:19:33  1          MR. KEZHAYA:  I have it.

2          MR. CLAUS:  May I approach, Your Honor?

3          THE COURT:  Yes.

4          MR. CLAUS:  Do you have a copy, Your Honor?

14:19:44  5          THE COURT:  Yes.

6          MR. CLAUS:  Thank you.

7   BY MR. CLAUS:

8   Q   Ma'am, I've handed you what's been marked for

9   identification purposes as Exhibit 6, and the defendants

14:20:00 10   stipulated to its admission.

11          MR. CLAUS:  So we move for admission of Exhibit 6,

12   Your Honor?

13          MR. KEZHAYA:  We have no objection to admission of

14   6, Your Honor.

14:20:08 15          THE COURT:  Admitted.

16       (Exhibit 6 admitted.)

17   BY MR. CLAUS:

18   Q   Please take a moment to read Exhibit 6 and let me know

19   when you're done.

14:20:20 20   A   I'm done.

21   Q   Okay.  You were not a recipient of Exhibit 6; correct?

22   A   Correct.

23   Q   You are not addressed in Exhibit 6; correct?

24   A   Correct.

14:20:28 25   Q   You, Michelle Shortt, are not mentioned in Exhibit 6;

CROSS-EXAMINATION - MICHELLE SHORTT

14:20:31  1    correct?

2    A    Correct.

3    Q    When Jeremy Zarzycki communicated to someone named Kelli,

4    Jeremy Zarzycki did not mention you at all; correct?

14:20:42  5    A    Correct.

6    Q    Exhibit 6 does not mention the religious beliefs of you or

7    any person affiliated with the plaintiffs; correct?

8    A    Correct.

9    Q    Exhibit 6 does not identify the viewpoints held by you or

14:20:54  10   any representative of any plaintiff; correct?

11   A    Correct.

12   Q    Exhibit 6 does not describe in any manner the viewpoints

13   or beliefs you wished to espouse during an invocation because

14   it doesn't mention you at all; correct?

14:21:13  15   A    Correct.

16   Q    Have you seen an e-mail in this case that mentions you at

17   all with respect to a desire to give an invocation before a

18   City of Scottsdale council meeting?

19   A    I do not recall.

14:21:35  20   Q    Have you looked -- Exhibit 7, do you have Exhibit 7?

21        MR. CLAUS:  We have stipulated to the admission of

22   Exhibit 7 in evidence, Your Honor.

23        THE COURT:  Are you moving it in?

24        MR. CLAUS:  Yes, we are moving it in, unless it

14:21:54  25   already is in.

CROSS-EXAMINATION – MICHELLE SHORTT

14:21:56  1      THE COURTROOM DEPUTY:  It's already in.

         2      THE COURT:  It's already admitted.

         3      MR. CLAUS:  Thank you.

         4   BY MR. CLAUS:

14:22:00  5   Q   Showing you, ma'am, Exhibit 7 in evidence.  Do you see

         6   Exhibit 7 as an e-mail?

         7   A   Yes.

         8   Q   Dated February 24, 2016?

         9   A   Yes.

14:22:08 10   Q   You are not an addressee on that e-mail; correct?

        11   A   Correct.

        12   Q   You were not sent the e-mail that is contained in

        13   Exhibit 7; correct?

        14   A   Correct.

14:22:18 15   Q   Exhibit 7 does not mention you at all, does it?

        16   A   It does not.

        17   Q   Exhibit 7 does not mention the viewpoints of any plaintiff

        18   organization; correct?

        19   A   Correct.

14:22:29 20   Q   Exhibit 7 does not mention the religious beliefs of any

        21   plaintiff organization; correct?

        22   A   Correct.

        23   Q   I believe you have Exhibit 12 in front of you in the

        24   folder.

14:22:56 25      I believe, Your Honor, Exhibit 12 is in evidence.

CROSS-EXAMINATION - MICHELLE SHORTT

14:23:00  1          THE COURT:  It is.

       2   BY MR. CLAUS:

       3   Q    Exhibit 12 is an e-mail dated May 23, 2016.  Do you see

       4   that?

14:23:07  5   A    Yes.

       6   Q    You are not an addressee on Exhibit 12, are you?

       7   A    No.

       8   Q    You not an intended recipient of Exhibit 12, are you?

       9   A    No.

14:23:15 10   Q    You, Michelle Shortt, are not mentioned anywhere in

      11   Exhibit 12, are you?

      12   A    I am not.

      13   Q    Your beliefs are not mentioned; correct?

      14   A    That is correct.

14:23:26 15   Q    Your viewpoint is not mentioned; correct?

      16   A    That is correct.

      17   Q    The religious beliefs that you hold are not mentioned;

      18   true?

      19   A    That is true.

14:23:36 20   Q    The religious beliefs that you might have espoused during

      21   an invocation are not mentioned; correct?

      22   A    That is correct.

      23   Q    The viewpoints and beliefs that you hold and might espouse

      24   during an invocation are not expressed anywhere in

14:23:50 25   Exhibits 12; correct?

CROSS-EXAMINATION - MICHELLE SHORTT

14:23:51  1    A    That is correct.

2    Q    Have you seen an e-mail addressed by any plaintiff to the

3    City of Scottsdale that explains to them the viewpoints that

4    Michelle Shortt intended to share with the audience during a

14:24:08  5    City of Scottsdale council meeting invocation?

6    A    I do not.

7    Q    You do not?

8    A    Or have not.

9    Q    Have you seen an e-mail?

14:24:18  10   A    No.

11   Q    No representative of the City of Scottsdale has told you

12   personally that Michelle Shortt cannot give an invocation

13   based on any belief she holds that she believes is religious;

14   correct?

14:24:44  15   A    Could you please rephrase the question.

16         THE COURT:  I think we've covered that ground,

17   Counsel.  She said nobody from Scottsdale ever communicated

18   with her.

19   BY MR. CLAUS:

14:24:54  20   Q    Nobody from Scottsdale ever communicated to any

21   representative of the plaintiff that you could not give an

22   invocation based upon the religious beliefs held by any

23   representative of the plaintiff; true?

24   A    Could you please repeat the question?

14:25:17  25   Q    Sure.  No representative of the City of Scottsdale ever

CROSS-EXAMINATION - MICHELLE SHORTT

14:25:20  1    told a representative of the plaintiff that you could not give

2    an invocation based upon the religious beliefs or viewpoint of

3    any representative of the plaintiff; correct?

4    A    That is correct.

14:25:46  5    Q    Do you still have Exhibit 12 in front of you?

6    A    Yes.

7    Q    Exhibit 12 is the e-mail dated May 23, 2016, informing

8    Jeremy Zarzycki that the City would not deviate from its

9    long-standing practice of having the invocation given by a

14:26:03 10    representative from an institution that has a substantial

11    connection to the Scottsdale community; correct?

12    A    That is what the e-mail says.

13    Q    At no time after May 23, 2016, at 3:29 p.m., did you

14    communicate with any representative of the City of Scottsdale

14:26:27 15    to tell them words that meant, no, you're wrong, we do have a

16    substantial connection to the City of Scottsdale; true?

17    A    No.

18    Q    That's not true?

19    A    Could you please rephrase the question.  Sorry.

14:26:47 20    Q    Sure.  After May 23, 2016, at 3:29 p.m., you never uttered

21    a single word to a Scottsdale representative in which you

22    attempted to demonstrate that the City was wrong about the

23    connection between or lack of connection between your group

24    and the City of Scottsdale; isn't that accurate?

14:27:21 25    A    Yes.

CROSS-EXAMINATION - MICHELLE SHORTT

14:27:23  1  Q    And as what you described as co-chapter head of the

2  Arizona chapter of The Satanic Temple, you did not direct

3  anyone to deliver a verbal or written communication to the

4  City of Scottsdale at any time after May 23, 2016, to tell the

14:27:47  5  City of Scottsdale that the Arizona chapter of The Satanic

6  Temple did, in fact, have a connection to the City of

7  Scottsdale; is that also true?

8  A    Yes.

9  Q    And after May 23, 2016, as a plaintiff in this case and as

14:28:12  10  a representative of a plaintiff in this case, you do not know

11  of a single communication from any representative of any

12  plaintiff to any representative of the City of Scottsdale

13  after May 23, 2016, that attempts to explain a connection

14  between any plaintiff and the City of Scottsdale; is that also

14:28:37  15  true?

16  A    I do not know of any such connection.

17  Q    Let's talk about timing.  Do you have Exhibit 76 in front

18  of you?

19       MR. KEZHAYA:  Your Honor, before we proceed, may I

14:29:13  20  see an example of Exhibit 76.

21       THE COURT:  Have you provided them copies of your

22  exhibits?

23       MR. CLAUS:  Yes, Your Honor.  We provided them

24  multiple --

14:29:23  25       THE COURT:  Are they tabbed?

CROSS-EXAMINATION - MICHELLE SHORTT

14:29:24   1          MR. CLAUS:  They are tabbed, Your Honor.

           2          MR. KEZHAYA:  The difficulty, Your Honor, is what we

           3   received in December of 2019 were not labeled 1 through 50 in

           4   sequence.  It's actually labeled one in sequence.  So we

14:29:37   5   don't know which one 76 is based on what we have.

           6          THE COURT:  So you haven't provided a tabbed set?

           7          MR. CLAUS:  We have provided -- that is just simply

           8   a misstatement, Your Honor.  We have provided a tabbed set.

           9          THE COURT:  When did you give it to them?

14:29:49  10          MR. CLAUS:  We provided it to them in December of

          11   2016.  And in the communication that included the tabbed set,

          12   we even gave them a concordance.  When we had our meeting

          13   with Stu de Haan, we didn't know which number we would start

          14   with.  We gave them a concordance that said --

14:30:04  15          THE COURT:  How can they tell which is Exhibit 76?

          16          MR. CLAUS:  Because we gave them the tabs that have

          17   Exhibit 76.

          18          MR. KEZHAYA:  Your Honor, we're not leveling any

          19   accusations.  All I'm asking for is which one is 76 relative

14:30:18  20   to what was formerly labeled 1 through 58.

          21          MR. CLAUS:  I'll just show them.

          22          MR. KEZHAYA:  That's all we're asking.

          23          THE COURT:  Show them.

          24          MR. CLAUS:  Your Honor, if I may I take just one

14:30:33  25   second.  I think we have a spare tabbed copy of all of our

CROSS-EXAMINATION - MICHELLE SHORTT

14:30:36  1    exhibits.

2            THE COURT:  They can get it over there.  You keep

3    going with your questions, stay on track.

4    BY MR. CLAUS:

14:30:43  5    Q    Do you have Exhibit 76 in front of you, ma'am?

6    A    Yes.

7    Q    Exhibit 76 is a document that you didn't produce until the

8    deposition that took place at the end of September 2019 in

9    this case; correct?

14:30:52 10    A    Yes.

11    Q    You didn't produce it as part of the response to the

12    mandatory initial disclosure statement; correct?

13    A    Correct.

14    Q    You didn't disclose it in response to the City's discovery

14:31:04 15    requests; correct?

16    A    Correct.

17    Q    You showed up with it for the first time during your

18    deposition; correct?

19    A    Yes.

14:31:13 20    Q    And Exhibit 76 is the affiliation agreement signed by you

21    on the last page and Mr. de Haan, dated August 10, 2016;

22    correct?

23    A    Yes.

24    Q    And on the first page, if you look at the first page,

14:31:32 25    please, ma'am, of Exhibit 76, Exhibit 76 demonstrates that the

CROSS-EXAMINATION - MICHELLE SHORTT

14:31:37  1    parties are something called the United Federation of Churches

2    LLC DBA The Satanic Temple, and you, Michelle Shortt,

3    handwritten, parentheses, chapter head; correct?

4    A    Yes.

14:31:52  5    Q    Dated as of August 10, 2016; correct?

6    A    Yes.

7    Q    The only affiliation agreement that you've produced in

8    this case is the affiliation agreement that is marked for

9    identification as Exhibit 76; correct?

14:32:12 10    A    Yes.

11          MR. CLAUS:  We move for admission of Exhibit 76

12    Your Honor.

13          MR. KEZHAYA:  No objection, Your Honor.  We actually

14    stipulated.

14:32:19 15          THE COURT:  Admitted.

16       (Exhibit 76 admitted.)

17          MR. CLAUS:  Thank you.

18    BY MR. CLAUS:

19    Q    When Mr. Zarzycki made his request to Kelli Kuester in

14:32:36 20    February 2016, Exhibit 76 didn't exist; correct?

21    A    Yes.

22    Q    When Mr. Zarzycki asked the City of Scottsdale to cancel

23    the invocation and reschedule it, Exhibit 76 didn't exist;

24    correct?

14:32:55 25    A    Correct.

CROSS-EXAMINATION – MICHELLE SHORTT

14:32:57  1   Q   On May 23, 2016, when Jeremy Zarzycki was informed of the

2   City's long-standing practice to only allow organizations with

3   a substantial connection to the City of Scottsdale to give an

4   invocation, Exhibit 76 did not exist?

14:33:15  5   A   That is correct.

6   Q   Exhibit 76 creates the affiliation between the United

7   Federation of Churches LLC and you, Michelle Shortt, as

8   chapter head; correct?

9   A   No.

14:33:41  10   Q   You just testified you know of no affiliation agreement

11   and you have produced no affiliation agreement in this case

12   other than Exhibit 76; correct?

13   A   That is correct, but --

14   Q   You understood when you signed Exhibit 76 that it was

14:33:58  15   intended to be a contract; correct?

16   A   Yes.

17   Q   A contract between you and a party called United

18   Federation of Churches LLC; correct?

19   A   Yes.

14:34:07  20   Q   And you understood when you signed Exhibit 76 that

21   Exhibit 76 was the document that would create the Arizona

22   chapter of The Satanic Temple as an affiliate of the United

23   Federation of Churches LLC; correct?

24   A   No.  Because there was another affiliation agreement that

14:34:26  25   we could not procure in time that was signed much earlier.

CROSS-EXAMINATION - MICHELLE SHORTT

14:34:32  1          MR. CLAUS:  Objection, Your Honor.  Move to strike.

       2  Nonresponsive.  It's not been disclosed.

       3          THE COURT:  Overruled.  Overruled.

       4  BY MR. CLAUS:

14:34:39  5  Q    You never disclosed any affiliation agreement other than

       6  Exhibit 76; correct?

       7  A    That is correct.

       8  Q    You testified that when Mr. Zarzycki contacted Scottsdale,

       9  you were still in the process of trying to establish the

14:34:59 10  Arizona chapter of The Satanic Temple; correct?

      11  A    That is correct.

      12  Q    Trying to establish; correct?

      13  A    In the process of forming.

      14  Q    Let's talk about the affiliate referred to in Exhibit 76.

14:35:23 15  The affiliate referred to in Exhibit 76 is the Arizona chapter

      16  of The Satanic Temple; correct?

      17  A    Yes.

      18  Q    And you testified under penalty of perjury that you do not

      19  know of any agreement signed by an authorized representative

14:35:45 20  of the United Federation of Churches LLC that confers

      21  affiliation on The Satanic Temple Arizona chapter; true?

      22  A    I did not understand the question.

      23  Q    You do not know of any agreement signed by a

      24  representative of United Federation of Churches LLC, the typed

14:36:08 25  party in Exhibit 76, that confers affiliation status on you or

CROSS-EXAMINATION – MICHELLE SHORTT

14:36:16  1    on The Satanic Temple Arizona chapter; correct?

2    A    Correct.

3    Q    After August 2016, an entity called Adversarial Truth LLC

4    was formed to operate something it called the Arizona chapter

14:36:39  5    of The Satanic Temple; correct?

6    A    Correct.

7    Q    Satanism has existed much longer than The Satanic Temple;

8    correct, Ms. Shortt?

9    A    Yes.

14:36:52 10    Q    You started your direct testimony talking about pendants

11    you wear.  You never discussed and never asked anyone to

12    discuss your Baphomet pendant or what they mean to you with

13    any representative of the City of Scottsdale; correct?

14    A    That is correct.

14:37:15 15          MR. KEZHAYA:  Your Honor, we object under Rule 403.

16    This is duplicative of the earlier testimony of she didn't

17    tell anyone at the City of Scottsdale the nature of her

18    religious beliefs.

19          THE COURT:  Overruled.

14:37:26 20    BY MR. CLAUS:

21    Q    You did not ask anyone to explain to the City of

22    Scottsdale at any time the meaning you imbued to the Lucifer

23    or sulfur cross pendants or -- strike that -- tattoos that you

24    have; correct?

14:37:39 25    A    That is correct.

CROSS-EXAMINATION - MICHELLE SHORTT

14:37:41  1    Q    You never asked anyone to deliver to the City of

2    Scottsdale any information related to the, quote, seven tenets

3    of The Satanic Temple, end quote; correct?

4    A    That is correct.

14:37:55  5    Q    You never delivered anything regarding the seven tenets to

6    the City of Scottsdale; correct?

7    A    That is correct.

8    Q    The seven tenets.  The seven tenets is something that was

9    created by The Satanic Temple, not satanism; correct?

14:38:11  10   A    Yes.

11   Q    And you know who Anton LaVey is; correct?

12   A    Yes.

13   Q    Anton LeVay is someone who promoted satanism more than 50

14   years ago; correct?

14:38:32  15   A    Yes.

16   Q    He wrote something called The Satanic Bible for satanists;

17   true?

18   A    Yes.

19   Q    You practiced LaVeyan satanism for some time; correct?

14:38:44  20   A    Yes.

21   Q    And the fundamental belief of LaVeyan satanism is that

22   practitioners can use something called magick, spelled with a

23   C-K at the end, to invoke supernatural or otherworldly powers;

24   correct?

14:38:59  25   A    That is what it says.

CROSS-EXAMINATION – MICHELLE SHORTT

14:39:00  1   Q   To effect change in the world; correct?

          2   A   That is what it says.

          3   Q   And that belief system promoted by satanism is

          4   antithetical to the tenets publicized by the group calling

14:39:15  5   itself The Satanic Temple; correct?

          6   A   That is correct.

          7   Q   You are no longer the chapter head of anything called The

          8   Satanic Temple; correct?

          9   A   Correct.

14:39:27 10   Q   You are no longer the chapter head of the Arizona chapter

         11   of The Satanic Temple; true?

         12   A   That is correct.

         13   Q   Adversarial Truth LLC was not formed until after the

         14   e-mail communications between Mr. Zarzycki and Ms. Kuester;

14:39:45 15   correct?

         16   A   Correct.

         17   Q   And Adversarial Truth LLC was the entity organized to

         18   operate the Arizona chapter of The Satanic Temple; correct?

         19   A   Yes.

14:40:01 20   Q   The Adversarial Truth LLC, the entity organized to operate

         21   the Arizona chapter of The Satanic Temple, was not organized

         22   as an entity until April 14, 2017; is that true?

         23   A   Yes.

         24   Q   Do you have Exhibit 82 in front of you, ma'am?

14:40:46 25       Just tell me when you get it in front of you, ma'am.

CROSS-EXAMINATION – MICHELLE SHORTT

14:40:49   1          You have it?

2     A    Yes.

3     Q    Exhibit 82 is the articles of organization filed by the

4     entity called Adversarial Truth LLC; correct?

14:41:01   5     A    Yes.

6     Q    Reflecting a Corporation Commission filing stamp of

7     April 14, 2017; correct?

8     A    Yes.

9     Q    Signed on the second page by the organizer, Stuart Patrick

14:41:17  10     de Haan, on April 10, 2017; correct?

11     A    Yes.

12     Q    Mr. de Haan is the lawyer who represents you in this case?

13     A    Yes.

14     Q    And if you look at page 3, ma'am, of Exhibit 82, you are

14:41:34  15     identified as the only member of Adversarial Truth LLC;

16     correct?

17     A    Yes.

18          MR. CLAUS:  We move for admission of Exhibit 82,

19     Your Honor.

14:41:47  20          MR. KEZHAYA:  Your Honor, we object because all

21     these go to the issue of standing, which the Court has

22     already addressed and denied in the 12(b)(1) motion.

23          THE COURT:  So it is a relevancy objection?

24          MR. KEZHAYA:  Yes, Your Honor.

14:41:59  25          THE COURT:  Overruled.  Exhibit 82 is admitted.

CROSS-EXAMINATION - MICHELLE SHORTT

14:42:00   1          (Exhibit 82 admitted.)

2     BY MR. CLAUS:

3     Q    You have heard satanism described as a, quote,

4     sociopolitical counter method, end quote; correct?

14:42:14   5     A    Yes.

6     Q    And you know that there is a difference between a

7     sociopolitical counter method and a religion; correct?

8     A    Yes.

9     Q    You've seen the documentary Hail Satan; correct?

14:42:37  10     A    Yes.

11     Q    You and Mr. de Haan were in and made statements in Hail

12     Satan; correct?

13     A    Yes.

14     Q    And there were no statements made by you or Mr. de Haan in

14:42:50  15     Hail Satan that were, to your knowledge, false or misleading;

16     correct?

17     A    Correct.

18     Q    When you saw the documentary Hail Satan, did you see

19     Stu de Haan refer to satanism as a, quote, sociopolitical

14:43:07  20     counter method, end quote?

21          MR. KEZHAYA:  Objection, Your Honor.  Calls for

22     hearsay.

23          THE COURT:  Sustained.

24          MR. CLAUS:  It's a statement by party opponent,

14:43:13  25     Your Honor.

CROSS-EXAMINATION – MICHELLE SHORTT

14:43:15   1                THE COURT:  He's not a party.

           2     BY MR. CLAUS:

           3     Q   Mr. de Haan -- if you have Exhibit 82, ma'am.  Exhibit 82

           4     are the articles of organization.  Exhibit 82 identifies as

14:43:33   5     the statutory agent, Stuart Patrick de Haan, on page 1,

           6     correct, for Adversarial Truth, LLC; correct?

           7     A   Yes.

           8                THE COURT:  We're going to break at this time.  We

           9     will resume at 3 o'clock.

14:43:48  10                MR. CLAUS:  Thank you, Your Honor.

          11           (Recess taken from 2:44 to 3:00.)

          12                THE COURT:  Thank you.  Please be seated.

          13                You may continue, Mr. Claus.

          14                MR. CLAUS:  Thank you, Your Honor.

15:00:17  15     BY MR. CLAUS:

          16     Q   Ms. Shortt, when we took a break I was having you look at

          17     Exhibit 82.  Could you please get that in front of you.

          18                Exhibit 82, the articles of organization, identify

          19     one agent for the plaintiff in this matter, Adversarial Truth

15:00:35  20     LLC, and that is Stuart Patrick de Haan?

          21     A   Yes.

          22     Q   And that gentleman sitting at counsel table is Stuart

          23     Patrick de Haan; correct?

          24     A   Yes.

15:00:46  25     Q   And if you'd get, please -- do you have in front of you

CROSS-EXAMINATION - MICHELLE SHORTT

15:00:50   1   Exhibit 76, which is the affiliation agreement?

2          On the last page of Exhibit 76, one of the

3   signatories of the affiliate, a plaintiff in this case, is

4   Stu de Haan.  Do you see that?

15:01:15   5   A    Yes.

6   Q    So I'll ask you again, ma'am:  You heard Stu de Haan refer

7   to satanism as a sociopolitical counter method; correct?

8   A    No.

9   Q    You testified that you had heard satanism described as a

15:01:38  10   sociopolitical counter method just moments ago; correct?

11   A    Sociopolitical countermyth.  You're misquoting.

12   Q    No, ma'am.  I asked you:  "You have heard satanism

13   described as a sociopolitical counter method; correct?"

14          And you answered you had.

15:01:56  15   A    I misheard you.  It's countermyth.

16   Q    Ma'am, you gave two depositions in this case, one as a

17   deponent for the organization called Adversarial Truth LLC;

18   correct?

19   A    Yes.

15:02:11  20   Q    I have put your deposition transcript in front of and you

21   I've provided a copy to the Judge.  It is the deposition that

22   has the green cover.  If you turn, please, to page 31.

23          THE COURT:  Have you got a copy for plaintiffs'

24   counsel?

15:02:30  25          MR. KEZHAYA:  No, Your Honor, we don't have a copy.

CROSS-EXAMINATION - MICHELLE SHORTT

15:02:32  1    But more to the point, this wasn't provided as a

2    deposition that would be used in the pretrial order.  It also

3    appears to bear on the merits.

4    THE COURT:  That's only for depositions that are

15:02:41  5    going to be presented as evidence, not for impeachment

6    purposes.

7    MR. KEZHAYA:  Yes, Your Honor.  As to the latter

8    point, though, that this appears to bear on the evidence that

9    this was not produced in the -- as an exhibit.

15:02:53 10    THE COURT:  Well, I don't think deposition

11    transcripts need to be.  Under the Federal Rules of Civil

12    Procedure, they can be used for any purpose at trial with

13    respect to a party, and Ms. Shortt is a party.

14    MR. KEZHAYA:  Yes, Judge.

15:03:07 15    BY MR. CLAUS:

16    Q    Page 31, ma'am.

17    A    Yes.

18    Q    Line 2, I asked you the question:  "Have you ever heard

19    satanism referred to as a sociopolitical counter method?"

15:03:22 20    And you gave the answer:  "I've heard people calling

21    it that, yes.  Not that I agree with it."

22    Did I read my question and your answer correctly.

23    A    Yes.

24    Q    In fact, I asked you specifically if you believe as the

15:03:40 25    designee of Adversarial Truth LLC if there was a difference

CROSS-EXAMINATION – MICHELLE SHORTT

15:03:46  1  between a religion and a sociopolitical counter method;

2  correct?

3  A    Could you repeat the question?

4  Q    I asked you as designee of Adversarial Truth LLC if you

15:04:02  5  knew as the designee that there was a -- believed as the

6  designee that there was a difference between a religion and a

7  sociopolitical counter method; correct?

8  A    There is a difference.

9  Q    So when you testified under penalty of perjury during your

15:04:20 10  deposition that you had heard of satanism referred to as a

11  sociopolitical counter method, to whom were you referring to

12  if not Mr. de Haan?

13          MR. KEZHAYA:  Objection.  Calls for hearsay.

14          THE WITNESS:  I --

15:04:36 15          THE COURT:  Hold on.

16          Is this being offered for the truth of the matter

17  asserted that it is a counter method?

18          MR. CLAUS:  No, it is not, Your Honor.  It is being

19  offered to demonstrate that she heard that and disagreed with

15:04:52 20  it.

21          THE COURT:  Why is that relevant if it's not to show

22  that it's a counter method, that's different from a religion?

23  Isn't that the point you're trying to make?

24          MR. CLAUS:  Well, because the persons that I believe

15:05:03 25  she will admit said that satanism is a sociopolitical counter

CROSS-EXAMINATION - MICHELLE SHORTT

15:05:10    1   method are persons who are representatives of the plaintiff

        2   in this case, and that certainly makes a fact of consequence.

        3           THE COURT:  Who are those people?

        4           MR. CLAUS:  I'm eliciting that testimony --

15:05:21    5           THE COURT:  There's a hearsay objection.  You want

        6   to get into evidence that somebody said this.  It's an

        7   out-of-court declaration.  It sounds to me like you're

        8   offering it for the truth of the matter asserted.  So are

        9   these other persons parties?

15:05:36   10           MR. CLAUS:  I'll ask it a different way, Your Honor.

       11           THE COURT:  Okay.

       12   BY MR. CLAUS:

       13   Q   When you testified that you heard satanism referred to as

       14   a sociopolitical counter method, were you referring to a

15:05:44   15   representative of one of the plaintiffs?

       16   A   I had heard sociopolitical countermyth.  That's what the

       17   captions on the movie say.

       18   Q   And so --

       19           MR. KEZHAYA:  Objection, Your Honor.  As a general

15:05:53   20   matter, we object to the use of the Hail Satan documentary

       21   for evidentiary purposes.  None of the filmmakers are --

       22           THE COURT:  He hasn't offered it in evidence.  She

       23   mentioned it.  So I'm going to overrule that objection.

       24   BY MR. CLAUS:

15:06:15   25   Q   When you gave your deposition in September of 2019, you

CROSS-EXAMINATION – MICHELLE SHORTT

15:06:20   1   believed that you had heard sociopolitical counter method

2   because you hadn't seen the closed-captioning either; correct?

3       MR. KEZHAYA:  Objection, Your Honor.  This is

4   clearly implicating hearsay.  The closed-captioning is

15:06:33   5   referring to the closed-captioning of the film Hail Satan.

6       MR. CLAUS:  She just testified --

7       THE COURT:  Well, but I don't think it's being

8   offered for the truth of the matter asserted.  It's as to

9   where she heard it.  Inconsistent -- or he asserts

15:06:50  10   inconsistent with what she said in her deposition.  So it's

11   overruled.

12       THE WITNESS:  What was the question?

13   BY MR. CLAUS:

14   Q   When you testified in September of 2019 that you had heard

15:07:00  15   satanism referred to as a sociopolitical counter method, you

16   had not watched Hail Satan with the closed-captioning either,

17   had you?

18   A   No, I do.  I watch movies with captions.

19   Q   Ma'am, the answer to my question is when you gave your

15:07:20  20   deposition testimony in September of 2019, where you testified

21   under oath that you had heard satanism referred to as a

22   sociopolitical counter method, the movie that you hadn't

23   watched with closed-captioning was Hail Satan; correct?

24   A   I don't recall.

15:07:46  25   Q   Between February 6, 2016, and July 6, 2016, one did not

CROSS-EXAMINATION - MICHELLE SHORTT

15:07:53   1   need to be a satanist to become a member of the Arizona

2   chapter of The Satanic Temple; correct?

3   A    That is correct.

4   Q    And when this lawsuit was filed in 2018, one did not need

15:08:09   5   to be a practicing satanist to become a member of the Arizona

6   chapter of The Satanic Temple; correct?

7   A    That is correct.

8   Q    And when you gave your deposition testimony as the

9   representative of two of the plaintiffs in this case, in

15:08:23  10   September of 2019, one did not need to be a satanist to be a

11   member of the Arizona chapter of The Satanic Temple; correct?

12   A    That is not correct.

13   Q    You testified that you were changing that, not that you

14   had changed it; correct?

15:08:46  15   A    We had -- we were in the process of not accepting

16   non-satanists.

17   Q    In the process of.  You had not finalized that process as

18   of the time you gave your under oath deposition testimony in

19   this case; correct?

15:08:59  20   A    That is correct.

21   Q    You do not believe that there is an actual Satan; correct?

22   A    Correct.

23   Q    You never told a representative of the City of Scottsdale

24   that you do not believe there is an actual Satan; correct?

15:09:17  25   A    Correct.

CROSS-EXAMINATION - MICHELLE SHORTT

15:09:21  1    Q    Or an actual God; correct?

        2    A    Correct.

        3    Q    You are an atheist, ma'am; correct?

        4    A    Yes.

15:09:29  5    Q    And as the spokesperson for the plaintiffs in this matter,

        6    you know that an organization calling itself The Satanic

        7    Temple promotes a belief system that is atheistic; correct?

        8    A    Yes.

        9    Q    You do not believe in a divine being at all; correct?

15:09:49 10    A    I do not.

       11    Q    And the speech that you say you planned to give was not an

       12    invocation on behalf of the City of Scottsdale, was it?

       13    A    Could you rephrase the question.

       14    Q    Sure.  The speech that you say you planned to give in 2016

15:10:15 15    was not an invocation that you planned to give on behalf of

       16    the City of Scottsdale council; correct?

       17    A    That is correct.

       18    Q    You wanted to give a speech on behalf of something you

       19    call satanism; correct?

15:10:33 20    A    Yes.

       21    Q    The speech you wanted to give is the same -- strike that.

       22          The speech you want to give if you prevail in this

       23    matter is not one that invokes any divine being to guide the

       24    decision-making process of the members of the Scottsdale city

15:10:55 25    council; correct?

CROSS-EXAMINATION - MICHELLE SHORTT

15:10:58  1    A    That is correct.  No divine being is called.

2    Q    The speech you want to give if you prevail in this

3    matter -- would you please get out Exhibit 4.  You should have

4    a folder in front of you.

15:11:21  5          Exhibit 4 has been marked for identification.

6    Exhibit 4 has been described as the transcribed prayer that

7    you wish to give before a Scottsdale city council meeting; is

8    that accurate?

9    A    Yes.

15:11:37 10    Q    And is that the prayer you want -- is that the speech you

11    want to give if you prevail in this matter?

12    A    Yes.

13          MR. CLAUS:  We move for admission of Exhibit 4,

14    Your Honor.

15:11:46 15          MR. KEZHAYA:  Your Honor, it's our exhibit, I don't

16    think we would object.

17          THE COURT:  Admitted.

18       (Exhibit 4 admitted.)

19    BY MR. CLAUS:

15:11:53 20    Q    The speech you want to give if you prevail in this matter

21    does not invoke any higher power to guide the city council;

22    correct?

23    A    That is correct.

24    Q    Because you specifically intend to exhort, quote,

15:12:11 25    agnosticism in all things; is that correct?

CROSS-EXAMINATION - MICHELLE SHORTT

15:12:15   1   A    Yes.

           2   Q    Do you know what agnosticism means?

           3   A    Yes.

           4   Q    Do you know what agnostic means?

15:12:23   5   A    Yes.

           6   Q    Turn please, to a folder in front of you, Exhibit 106.

           7        MR. KEZHAYA:  Your Honor, we object to reading from

           8   page 106.  This was provided after December 16.

           9        THE COURT:  I don't know what it is yet.  106 of

15:12:38  10   what?

          11        MR. KEZHAYA:  Exhibit 106 is Black's Law Dictionary,

          12   the definition of agnostic.

          13        THE COURT:  Is that in the final pretrial order?

          14        MR. CLAUS:  Yes, Your Honor.

15:12:53  15        MR. KEZHAYA:  We noted the objection in the pretrial

          16   order as well, Your Honor.  We first received it, if I

          17   remember correctly, somewhere between December 30 and

          18   January 3.

          19        THE COURT:  Why doesn't that fall to the objection

15:13:05  20   you've been making as to documents that weren't disclosed

          21   before December?

          22        MR. CLAUS:  Your Honor, we'll withdraw it.

          23        THE COURT:  All right.

          24   BY MR. CLAUS:

15:13:13  25   Q    Do you believe that agnostic means someone who believes

CROSS-EXAMINATION - MICHELLE SHORTT

15:13:18  1  that knowledge about ultimate things such as the origin of the

2  universe or the existence of a deity is not possible?

3  A    That is true.

4  Q    And therefore, when you exhorted -- strike that.

15:13:40  5       The speech you wish to give that exhorts agnosticism

6  in all things specifically will tell the audience that

7  knowledge about ultimate things such as the origin of the --

8       MR. KEZHAYA:  Objection.  We're reading from an

9  exhibit that has been excluded.

15:13:58 10       MR. CLAUS:  No, we're not.

11       THE COURT:  Start the question again, please.

12       MR. CLAUS:  Yes.

13  BY MR. CLAUS:

14  Q    When you -- if you prevail in this matter, the speech you

15:14:07 15  want to give specifically will exhort the city council and

16  those attending the meeting of the city council that knowledge

17  about ultimate things such as the origin of the universe or

18  existence of a deity is not possible; correct?

19  A    That is correct.

15:14:29 20  Q    And, in fact, that deep and imponderable matters, such as

21  the origin of the universe, are unknowable; correct?

22  A    That is correct.

23  Q    And that is why you wish to tell the council, if you

24  prevail in this matter, that only matters that are, quote,

15:14:54 25  demonstrably true, end quote, are capable of solving problems;

CROSS-EXAMINATION - MICHELLE SHORTT

15:14:59   1   true?

2   A    Could you repeat the question?

3   Q    Sure.   Take a look at Exhibit 4, which has now been

4   admitted into evidence.

15:15:18   5        Because you wished to deliver a message to the city

6   council that deep and imponderable matters are unknowable, you

7   wished to deliver a speech that told the council that only

8   matters that are, quote, demonstrably true, end quote, are

9   capable of solving problems; correct?

15:15:44  10   A    Correct.

11   Q    You testified on direct about the seven tenets.

12        Is one of those tenets, ma'am, that you have a right

13   to offend?

14   A    That is not the full context of the tenet.

15:16:06  15   Q    Ma'am, that's not my question.   Is one of the tenets that

16   you say is a tenet of one of the plaintiff organizations that

17   you have a right to offend?

18   A    Yes.

19   Q    And you know, should you prevail in this matter, that

15:16:40  20   giving a speech before a city council meeting of the City of

21   Scottsdale that calls the deeply held religious beliefs of the

22   council and the Scottsdale community a, quote, delusion of

23   old, end quote, is intended by you to be offensive; correct?

24   A    No.

15:17:05  25   Q    You do intend, should you prevail in this matter, to tell

CROSS-EXAMINATION - MICHELLE SHORTT

15:17:12  1   members of the Scottsdale city council and those in attendance

2   that their deeply held religious beliefs are what you call,

3   quote, delusion of old -- reading from Exhibit 4 -- end quote;

4   correct?

15:17:36  5   A    Could you rephrase the question.

6   Q    Sure.  Should you prevail in this matter, you intend to

7   give a speech before the Scottsdale city council and to those

8   members of the Scottsdale community in attendance that refers

9   to their deeply held religious beliefs, as I'm quoting from

15:17:58  10  you, ma'am, in Exhibit 4, a, quote, delusion of old, end

11  quote; correct.

12  A    No.

13  Q    No?

14  A    Not in the sense to offend.

15:18:41  15  Q    That wasn't my question, ma'am.  That wasn't my question.

16  Please listen to my question.  I'll ask it one more time.

17        If you prevail in this matter, you intend to give a

18  speech before a Scottsdale city council meeting that refers to

19  the deeply held religious beliefs of those who hear your

15:19:01  20  speech as a, quote, delusion of old; correct?

21  A    Yes.

22  Q    And if a member of the Scottsdale community or the members

23  of the Scottsdale city council are offended by that reference,

24  your seven tenets say it's your right to offend; correct?

15:19:30  25  A    Yes.

CROSS-EXAMINATION - MICHELLE SHORTT

15:19:38  1  Q   In fact, the speech you want to give refers to predominant

2  religious beliefs of those in the Scottsdale community and on

3  the council as, quote, arcane doctrines born of fearful minds

4  in darkened times, end quote; correct?

15:20:07  5          MR. KEZHAYA:  Objection, Your Honor.  We have no

6  demographics information of records to indicate what the

7  balance of the City of Scottsdale's religious beliefs are.

8          THE COURT:  Overruled.

9          THE WITNESS:  That was my question.

15:20:24 10          No.

11  BY MR. CLAUS:

12  Q   Ma'am, you meant to give a speech before a Scottsdale city

13  council meeting that refers specifically to, quote, arcane

14  doctrines born of fearful minds in darkened times, end quote;

15:20:49 15  correct?

16  A   Yes.

17  Q   And what you mean by that is the prevailing religious

18  belief that does believe in spiritual guidance and a higher

19  power; correct?

15:21:10 20  A   Could you rephrase the question.

21  Q   No, ma'am.  When you said -- strike that.

22          When you wrote and what you mean to say before a

23  Scottsdale city council meeting, if you should prevail, when

24  you tell the audience about, quote, arcane doctrines born of

15:21:31 25  fearful minds in darkened times, end quote, you are referring

CROSS-EXAMINATION - MICHELLE SHORTT

15:21:36   1   to a religious belief that believes in an actual God and

2   actual spiritual guidance; correct?

3   A    Yes.

4   Q    And if members of the city council and members of the

15:21:56   5   Scottsdale community are offended by your reference to their

6   authentic and sincere deeply held religious belief in a God

7   and spiritual guidance, so be it, because you have a right to

8   offend, according to your tenets; correct?

9   A    Yes.

15:22:40   10   Q    This belief system that you never told a representative of

11   the City of Scottsdale about does not purport to believe in

12   any deity; correct?

13   A    Correct.

14   Q    Does not have an official literary source of a doctrine;

15:22:58   15   correct?

16   A    Correct.

17   Q    Does not have an ordination program for pastors or

18   ministers; correct?

19   A    Correct.

15:23:09   20   Q    Does not hold mass or services; correct?

21   A    Incorrect.

22   Q    It did not hold mass or services at any time in 2016;

23   correct?

24   A    Are we referencing Adversarial Truth LLC, The Satanic

15:23:26   25   Temple Arizona?

CROSS-EXAMINATION - MICHELLE SHORTT

15:23:29  1   Q   The Satanic Temple Arizona chapter did not hold a single

2   mass or service in 2016; correct?

3   A   We had a ritual in 2016.

4   Q   That is not my question.

15:23:46  5   A   So it's incorrect.

6   Q   I'm asking you to get the deposition transcript that has

7   the green cover.  It is a transcript of the designee of

8   Adversarial Truth LLC.

9          You were the designee of Adversarial Truth LLC;

15:24:14  10  correct?

11  A   Correct.

12  Q   Turning your attention, ma'am, to page 59.

13         At line 22, keeping in mind I asked you this question

14  on September 26, 2019.

15:24:36  15         "Question:  Does the Arizona chapter of The Satanic

16  Temple hold mass or services?"

17         Did I read my question correctly?

18  A   You did not.

19  Q   I did not read my question correctly?

15:24:49  20  A   You did not -- you read your question correctly.

21  Q   What was your one word under penalty of perjury answer?

22  A   I said "No."

23  Q   Then I asked you the question:  "Did the Arizona chapter

24  of The Satanic Temple hold mass or services in February 8th --

15:25:09  25  strike that, as of February 8th, 2016?"

CROSS-EXAMINATION - MICHELLE SHORTT

15:25:15  1        Did I read that question correctly?

2  A    What line was this?

3  Q    Starting at line 25, ma'am, on page 59.  I asked you the

4  question:  "Did the Arizona chapter of The Satanic Temple hold

15:25:32  5  mass or services in February 8th -- strike that, as of

6  February 8th, 2016?"

7        Did I read my question correctly?

8  A    Yes.

9  Q    And what was your one word under penalty of perjury answer

15:25:49  10  to that question?

11  A    "No."

12  Q    And then I asked you, ma'am:  "Did the Arizona chapter of

13  The Satanic Temple hold mass or services as of July 6, 2016?"

14        Did I read that question correctly at lines 4 and 5

15:26:05  15  of page 60?

16  A    Yes.

17  Q    And what was your one word under penalty of perjury answer

18  to that question?

19  A    "No."

15:26:20  20  Q    The Satanic Temple does not espouse a belief that one must

21  be obedient to any God or higher power; correct?

22  A    That is correct.

23  Q    In fact, The Satanic Temple uses Satan as a metaphor to

24  symbolize the idea of rebelliousness to obedience; correct?

15:26:41  25  A    Yes.

CROSS-EXAMINATION - MICHELLE SHORTT

15:26:45  1    Q    The Satanic Temple espouses purely secular beliefs;

      2    correct?

      3    A    No.  Or wait.  Could you repeat the question?

      4    Q    Sure.  The Satanic Temple espouses secular beliefs;

15:27:10  5    correct?

      6         I'll ask a question.  Do you know what the word

      7    secular means?

      8    A    I might -- could use a refresher.  It's with government?

      9    Q    No, ma'am.

15:27:31  10        The Satanic Temple espouses beliefs that do not

     11    believe in the divinity of anyone or anything; correct?

     12    A    That is incorrect.  We refer as a nontheistic

     13    organization.

     14    Q    Yes.  An atheistic organization that does not believe

15:27:51  15   there is a God, does not believe there is a Satan; correct?

     16    A    Correct.  However, atheistic and nontheistic are not the

     17    same thing.

     18    Q    Ma'am, on the website of The Satanic Temple Arizona

     19    chapter, you have described The Satanic Temple as an atheistic

15:28:13  20   organization; correct?

     21    A    Nontheistic, atheistic.  Yeah.

     22    Q    The Arizona chapter of The Satanic Temple can admit any

     23    members it wishes without any obedience to The Satanic Temple

     24    in Massachusetts; correct?

15:28:41  25   A    Could you repeat the question --

CROSS-EXAMINATION - MICHELLE SHORTT

15:28:43  1   Q    Sure.

        2   A    --  or rephrase the question.

        3   Q    The Arizona chapter of The Satanic Temple can admit any

        4   members it wishes without obedience to or following the orders

15:28:56  5   of anything called The Satanic Temple in Massachusetts;

        6   correct?

        7   A    Correct.

        8   Q    There is no canonical source for the beliefs of The

        9   Satanic Temple; correct?

15:29:43 10   A    Correct.

        11   Q    You have no prayer books; correct?

        12   A    Correct.

        13   Q    No liturgical texts; correct?

        14   A    Correct.

15:29:54 15   Q    Because you have no liturgy; correct?

        16   A    Liturgy?

        17   Q    Liturgy; correct?

        18   A    Could you define liturgy?

        19   Q    Prescribed prayer.

15:30:06 20   A    Correct.

        21        MR. CLAUS:  May I have a moment, Your Honor?

        22        THE COURT:  Yes.

        23        MR. CLAUS:  I just want housekeeping, Your Honor.

        24   We did admit Exhibit 4; is that correct?

15:30:37 25        THE COURT:  Yes.

REDIRECT EXAMINATION - MICHELLE SHORTT

15:30:38  1                MR. CLAUS:  Thank you, Your Honor.

        2                That's all I have.

        3                If I could have a second to gather my --

        4                THE COURT:  While you're doing that, let me ask you

15:30:51  5     a question, Ms. Shortt.

        6                Exhibit 4, which is the speech you were going to

        7     give.  I think the question was is that what you would intend

        8     to give if you were allowed to do so.  Is that what you

        9     intended to give back in 2016 when you applied to do so?

15:31:06 10                THE WITNESS:  Yes, sir.

       11                THE COURT:  Okay.  Thank you.

       12                THE WITNESS:  Your Honor.

       13                THE COURT:  Any redirect?

       14                MR. KEZHAYA:  Yes, Your Honor.

15:31:19 15                R E D I R E C T   E X A M I N A T I O N

       16     BY MR. KEZHAYA:

       17     Q   Do satanists, at least under The Satanic Temple, use

       18     monikers from time to time?

       19     A   Excuse --

15:32:00 20                MR. CLAUS:  I missed the question.

       21                THE COURT:  Re-ask it, please.

       22     BY MR. KEZHAYA:

       23     Q   Do satanists use pen names from time to time?

       24     A   Yes.

15:32:09 25     Q   Are they sometimes called demonikers?

REDIRECT EXAMINATION - MICHELLE SHORTT

15:32:13  1    A    Yes.

2    Q    Are you familiar with a person named Sheba?

3    A    Yes.

4    Q    Is Sheba her real name?

15:32:21  5    A    No.

6    Q    Has Sheba put out a ritual book of some sort?

7    A    She has.  She has some writings in regards to ritual.

8    Q    Is that considered canon among TST?

9            MR. CLAUS:  Disclosure, Your Honor, never.  And

15:32:36 10  hearsay.

11            THE COURT:  Overruled.

12            THE WITNESS:  I wouldn't necessarily call it canon.

13  Our members are welcome to use whatever rituals or prayers

14  that they find useful for their lives.  As to it being

15:32:54 15  canonized, I couldn't tell whether or not that is true or

16  not.

17  BY MR. KEZHAYA:

18  Q    What is your understanding of the concept of canon,

19  religious canon?

15:33:05 20  A    Something that is accepted as true.  I don't know how to

21  define canon, I'm sorry.

22  Q    Would it be a fair characterization that it is mandatory,

23  in your mind?

24  A    Yeah.  That's a good word.

15:33:24 25  Q    Earlier when you testified that there are no canon ritual

REDIRECT EXAMINATION – MICHELLE SHORTT

15:33:26  1   books, is that because you don't believe that TST has

2   mandatory doctrine?

3          MR. CLAUS:  Objection.  Leading.

4          THE COURT:  Sustained.

15:33:36  5   BY MR. KEZHAYA:

6   Q   Earlier when you testified that there were no canon books,

7   was the word canon influential in your answer?

8   A   What was influential in my answer was written by members.

9   Like, does your organization have these writings or –– from

15:34:12  10  clergy or liturgy, which we don't.  But as in regards to

11  canonized literature, not written by TST, we consider

12  Paradise Lost to be canon reading.

13  Q   Okay.  Are there other texts that TST would consider

14  canon?

15:34:37  15         MR. CLAUS:  Foundation, Your Honor.

16         THE COURT:  Overruled.

17         THE WITNESS:  Anything from the Miltonic era.  We

18  have writers such as Percy Shelley, Lord Byron, Anatole

19  France.  These are all under what we like to call the

15:34:55  20  literary milieu of satanism in the romantic period.

21  BY MR. KEZHAYA:

22  Q   What is it about this particular period that makes it

23  canon?

24  A   It was during the enlightenment era when, you know, fresh

15:35:12  25  ideas and people, writers, specifically poets, artists,

REDIRECT EXAMINATION - MICHELLE SHORTT

15:35:18  1   weren't necessarily following the status quo and were

2   persecuted for it.

3   Q    And earlier you testified about persecution being a fairly

4   core belief of TST; is that right?  Or perhaps standing up for

15:35:37  5   the persecution?

6            MR. CLAUS:  Objection.  Leading.

7            THE COURT:  Sustained.

8   BY MR. KEZHAYA:

9   Q    You testified at some length that you personally never had

15:35:48  10   contact with members of the City.  Do you remember that?

11   A    Yes.

12   Q    Has anyone at the City ever personally reached out to you?

13   A    No.

14   Q    To have any communication attempt whatsoever?

15:36:04  15   A    No.

16   Q    And importantly, nobody ever inquired of you what your

17   invocation would say?

18   A    That is correct.

19   Q    Did anyone ever inquire what your religious beliefs were?

15:36:15  20   A    No.

21   Q    Did anyone ever ask you about pendants or tattoos?

22   A    No.

23   Q    Did anyone ask you anything of tenets of any sort, from

24   the City?

15:36:26  25   A    No.

REDIRECT EXAMINATION - MICHELLE SHORTT

15:36:30   1   Q   Was Jeremy Zarzycki vested with agency from The Satanic

       2   Temple of Arizona?

       3              MR. CLAUS:  Objection, Your Honor.  Leading.  Also

       4   outside the scope.

15:36:45   5              THE COURT:  Overruled.

       6              THE WITNESS:  Jeremy, at the time he was kind of

       7   like our secretary, he would take care of e-mails,

       8   correspondence, anything in regards to invocations that we

       9   were requesting.

15:37:00  10   BY MR. KEZHAYA:

      11   Q   Was there ever any question among anyone in Arizona of the

      12   Arizona satanic community of at least TST, who would be giving

      13   the invocation?

      14   A   No.

15:37:13  15              MR. CLAUS:  Objection, Your Honor.  Speculation.

      16              THE COURT:  Overruled.

      17   BY MR. KEZHAYA:

      18   Q   Was it always to be you?

      19   A   Yes.

15:37:18  20   Q   Were you the one who would do the July 6 invocation?

      21   A   Yes.

      22   Q   When the July 6 invocation was revoked, was that your

      23   invocation that was revoked?

      24   A   Yes.

15:37:33  25   Q   Do you consider Exhibit 4 to be an invocation or a speech?

REDIRECT EXAMINATION – MICHELLE SHORTT

15:37:40  1        MR. CLAUS:  Objection, Your Honor.  Relevance.

2        THE COURT:  Overruled.

3        THE WITNESS:  Do I personally consider it to be an

4   invocation or a speech?  Speech.

15:38:01  5        MR. KEZHAYA:

6   Q   Do you consider it to be a religious speech?

7   A   Yes.

8   Q   Does this speech sound from your religious beliefs?

9   A   Yes.

15:38:17 10   Q   Is a person's right to religious freedom a core belief of

11   TST?

12   A   Yes.

13   Q   As a result, does pluralism sound from a core belief of

14   individualism of TST?

15:38:34 15        MR. CLAUS:  Leading, Your Honor.

16        THE COURT:  Overruled.

17        THE WITNESS:  Yes.

18   BY MR. KEZHAYA:

19   Q   Are you a spokesperson for TST?

15:38:54 20   A   Currently?  No.  Or oh, yes, in this regard only.

21   Q   Okay.  Are you vested with authority, at least as far as

22   this litigation goes, to speak on behalf of TST?

23   A   Yes.

24   Q   When you -- well, when an invocation was made of Phoenix,

15:39:12 25   were you personally identified?

REDIRECT EXAMINATION - MICHELLE SHORTT

15:39:15  1    A    Yes -- what?

       2    Q    Were you personally identified as the person who would

       3    give the invocation to the City and council of Phoenix?

       4             MR. CLAUS:  Objection, Your Honor.  Vague.

15:39:27  5             THE COURT:  Overruled.

       6             THE WITNESS:  Yes.

       7    BY MR. KEZHAYA:

       8    Q    Did you receive any threats because of that request?

       9    A    Yes.

15:39:32 10    Q    Did you receive death threats?

      11    A    Yes.

      12    Q    Did you receive rape threats?

      13    A    Yes.

      14    Q    Because of your experience receiving threats, did that

15:39:40 15    color your decision to have someone else reach out on your

      16    behalf to Scottsdale?

      17             MR. CLAUS:  Objection.  Leading.

      18             THE COURT:  Sustained.

      19             THE WITNESS:  Yes.  I --

15:39:50 20             THE COURT:  Hold on.  I sustained that objection.

      21             THE WITNESS:  Oh, I'm sorry.

      22    BY MR. KEZHAYA:

      23    Q    Were you concerned about your safety, your personal

      24    safety?  Would you have been had you been identified by name

15:40:02 25    in any correspondence with Scottsdale?

REDIRECT EXAMINATION – MICHELLE SHORTT

15:40:05   1          MR. CLAUS:  Speculation.

           2          THE COURT:  Overruled.

           3          THE WITNESS:  Yes.

           4     BY MR. KEZHAYA:

15:40:19   5     Q   You were asked a series of questions about the affiliation

           6     agreement.  Do you remember those?

           7     A   Yes.

           8     Q   I believe one of the questions that you were asked is if

           9     that's the only affiliation agreement that ever existed.  Is

15:40:33  10     that accurate?

          11     A   It is not the only affiliation agreement that has

          12     existed.

          13     Q   What other affiliation agreements ever existed?

          14          MR. CLAUS:  Objection, Your Honor.  No disclosure,

15:40:47  15     Best evidence.  Hearsay.

          16          THE COURT:  Overruled.

          17          THE WITNESS:  There was an earlier copy that we had

          18     signed closer to the beginning of the year.  I think it was

          19     sometime in February.  We could not procure a copy of that

15:41:04  20     for -- as an exhibit.

          21     BY MR. KEZHAYA:

          22     Q   Did you look for it?

          23     A   We tried looking for it.

          24     Q   You just couldn't find it?

15:41:11  25     A   No.

REDIRECT EXAMINATION – MICHELLE SHORTT

15:41:12  1  Q   Is that why you never provided it to the City?

2  A   That is correct.

3  Q   Is that the only reason why you never provided it to the

4  City?

15:41:20  5  A   Correct.

6  Q   Have you at any time -- well, during the course of 2016

7  and beyond, have you ever been threatened with litigation for

8  appropriation of The Satanic Temple's intellectual property?

9  A   No.

15:41:41  10  Q   Has anyone ever taken issue with you saying, "I am acting

11  on behalf of The Satanic Temple"?

12  A   No.

13  Q   Have you discussed your requested invocation with Doug

14  Misicko since 2016?

15:42:05  15  A   Yes.

16  Q   Did he ever tell you that you acted outside your agency

17  authority in any way?

18          MR. CLAUS:  Objection.  Hearsay.

19          THE COURT:  Sustained.

15:42:21  20  BY MR. KEZHAYA:

21  Q   Okay.  Earlier you testified to the fact that the Arizona

22  chapter can admit members of TST Arizona even if they don't

23  consider themselves to be a satanist; is that right?

24  A   Yes.

15:42:35  25  Q   Do chapter heads have to be self-described satanists?

REDIRECT EXAMINATION – MICHELLE SHORTT

15:42:43  1  A   They do.

2  Q   Is that a necessary condition of you becoming a chapter

3  head?

4  A   Yes.

15:42:48  5  Q   Did you take that seriously?

6  A   Absolutely.

7  Q   Is that as true then as it is now?

8  A   It is.

9  Q   You were asked questions about LaVeyan satanism earlier.

15:43:02  10  Do you remember those?

11  A   I do.

12  Q   Specifically you were asked about the belief in magick; is

13  that right?

14  A   Correct.

15:43:10  15  Q   Does LaVeyan satanism, as a core doctrine, involve the

16  literal belief or the literal worship of a deity named Satan?

17  A   No.

18  Q   Is LaVeyan satanism a nontheistic religion as well?

19  A   They are.

15:43:27  20  Q   What does agnosticism mean to you in context of this

21  invocation?

22  A   Agnosticism means that we truly cannot know or assert to

23  the belief whether there is or isn't a God.  To claim that

24  you are absolutely certain, in my point of view, is a little

15:43:51  25  naive because we can't know.  However, I choose to live my

REDIRECT EXAMINATION - MICHELLE SHORTT

15:43:56  1   life as an atheist.  So that's how I see the difference in

2   agnosticism, and atheism is the belief that, sure, you cannot

3   know fully.  Therefore that is agnosticism.  But to live your

4   life according as if there is no God or devil, that's

15:44:17  5   atheism.

6   Q    Among the seven fundamental tenets of The Satanic Temple,

7   one of them are adherence to the scientific method; is that

8   right?

9   A    That is correct.

15:44:32  10   Q    What does that mean to you?

11   A    It means that our beliefs can adapt and change over time.

12   If there's new science that proves something that we didn't

13   know before, we can mold and adapt our beliefs.  And nothing

14   is really set in stone.  There's no dogma involved.  So we

15:44:50  15   just want to be accurate according to the most current

16   scientific findings.

17   Q    Can that be extended into a general doctrine of

18   open-mindedness?

19   A    Could you rephrase the question.

15:45:12  20   Q    With respect to opinions, is open-mindedness an expansion

21   of the doctrine of scientific rationalism as espoused by the

22   seven fundamental tenets?

23   A    Yes.

24   Q    Insofar as dogma, as is conceived by many other religions,

15:45:34  25   is alien to the concept of satanism because of the scientific

REDIRECT EXAMINATION - MICHELLE SHORTT

15:45:42   1    method tenet?

2    A    Correct.

3    Q    You earlier testified with some hesitation about the right

4    to offend.  Do you remember that?

15:45:54   5    A    Yes.

6    Q    You indicated that there was more to the right to offend

7    than was being elicited from you.  What more is there?

8    A    The full tenet states we have the right to offend, to

9    willfully encroach upon another's liberty is to encroach upon

15:46:13  10    our own.  However, after plenty of discussion within our

11    community, it doesn't just mean, you know, go offend

12    everybody without suffering consequences of your actions.

13    Q    Is there discourse among The Satanic Temple's membership

14    what the seven fundamental tenets mean and how they should

15:46:36  15    apply?

16    A    Oh, absolutely.  They're pretty open-ended and they can

17    be applicable to numerous people in different situations, and

18    it is how they choose to apply the seven tenets that it truly

19    makes their satanism individual.  Individualistic.

15:47:00  20    Q    You were asked about -- sorry.

21        You were asked at some length about the text on

22    Exhibit 4.  Do you remember those questions?

23    A    Yes.

24    Q    Did you actually write the text of Exhibit 4?

15:47:16  25    A    No.

REDIRECT EXAMINATION - MICHELLE SHORTT

15:47:16  1    Q    Who did?

2    A    Lucien Greaves.

3    Q    Where did you get that text?

4    A    I found it on the internet.  It was posted by Lucien

15:47:31  5    or -- it was like in a news article, and I got if from there.

6    Q    Do you adopt the language of Exhibit 4 as your -- as a

7    true expression of your religious beliefs?

8    A    Yes.

9    Q    Is that solely because Lucien said it?

15:47:59 10    A    No.

11    Q    Are you familiar with the Catholic concept of mass?

12    A    Yes.

13    Q    When you were asked questions about mass and services, did

14    the use of the word mass affect your answer?

15:48:18 15    A    It did.

16    Q    When you were asked about mass and services, did you

17    consider them in tandem?

18    A    I considered them separate.

19    Q    Okay.  With respect to mass, do any members of The Satanic

15:48:34 20    Temple, to your knowledge, engage in Catholic mass?

21    A    No.

22    Q    Is it a true statement, then, that The Satanic Temple of

23    Arizona does not engage in mass?

24    A    That is correct.

15:48:50 25    Q    What was your understanding of the use of the word

REDIRECT EXAMINATION – MICHELLE SHORTT

15:48:52   1   services when asked about mass and services?

2   A   Under -- as -- when he mentioned services, I considered

3   that such as our ritual events when we have rituals for our

4   members.  That is religious in nature.  So that's what I had

15:49:09   5   considered as a service.

6   Q   Okay.  Were you lying in your deposition when you said we

7   don't to do mass and services?

8   A   I guess I hadn't recalled the ritual.  I was pretty

9   nervous at the time.

15:49:24  10   Q   Are you nervous now?

11   A   Absolutely.

12   Q   Any inconsistencies in your statement, is it your

13   intention to deceive the Court in any way?

14   A   No.

15:49:41  15   Q   You were asked questions about a clergy program.  Do you

16   remember those questions?

17   A   Yes.

18   Q   Is it true that as of right now in this moment, there is

19   no clergy program?

15:49:51  20   A   That is correct.

21   Q   Is that clergy program in the works?

22   A   Yes.

23   Q   What rituals were performed by The Satanic Temple of

24   Arizona in 2016?

15:50:07  25          MR. CLAUS:  Beyond the scope, Your Honor.

REDIRECT EXAMINATION - MICHELLE SHORTT

15:50:08  1         THE COURT:  Overruled.

       2         THE WITNESS:  For the entirety of 2016?

       3    BY MR. KEZHAYA:

       4    Q    To the best of your knowl- -- well, let's start with the

15:50:17  5    beginning of -- how many rituals were performed in 2016, to

       6    the best of your knowledge?

       7    A    Two.

       8    Q    Do you recall when they were?

       9    A    The first one was our summer camping trip and the second

15:50:34 10    one was our November Bisbee ritual.

      11    Q    Do you recall the specific month of the summer trip?

      12    A    June.

      13    Q    June?  This would have been before the July 6 invocation,

      14    then?

15:50:51 15    A    Yes.

      16    Q    What did you do in this summer ritual?

      17    A    We performed a destruction ritual.

      18    Q    Please describe for the Court what a destruction ritual

      19    entails.

15:51:04 20    A    A destruction ritual entails the participants to bring

      21    forth an item that is a heavy burden on them.  It could be

      22    like a gift from an ex.  It could be something that -- a gift

      23    that gives them pain.  Just something that they've been

      24    holding onto for emotional reasons but aren't necessarily

15:51:28 25    healthy for them, so in order to release this negative

REDIRECT EXAMINATION - MICHELLE SHORTT

15:51:31  1    emotion that they have attached to this item, the ritual, the

2    point of the ritual is to destroy it, and along with

3    destroying this item, you are destroying whatever power or

4    hold that this item had over you.  And you can in its

15:51:49  5    destruction become liberated.

6    Q    Is this a group matter?

7    A    Yes.

8    Q    Does this destruction ritual involve explaining to the

9    group this is what this item means to me?

15:52:07  10   A    They don't need to explain what the item means to them.

11   That's personal.

12   Q    Do some choose to?

13   A    Some can.  Yeah.  It's their choice, though.

14   Q    Did you?  Participate in this destruction ritual?

15:52:25  15   A    I did.

16   Q    Did you describe what the item was and what it meant to

17   you?

18   A    I had no items to destroy.  I was dancing and speaking

19   and playing with the tambourine.

15:52:41  20   Q    I gather, then, that there was music involved as well.

21   A    Like drumming.  Like hitting stuff.  Yeah.

22   Q    Describe for the Court your emotional experience when

23   engaging in this destruction ritual?

24          MR. CLAUS:  Relevance, Your Honor.  Outside the

15:53:02  25   scope.

REDIRECT EXAMINATION – MICHELLE SHORTT

15:53:03   1        THE COURT:  Overruled.

         2        THE WITNESS:  It was cathartic.  Despite not having

         3   an item to personally destroy, the energy within the group

         4   was amazing.  Like, it was without words.  People were

15:53:19   5   crying, people were hugging each other.  Like, it was very

         6   beautiful to watch.

         7   BY MR. KEZHAYA:

         8   Q    You talked about another ritual in 2016.  What was that?

         9   A    That was our initial -- no, wait.  That was our first

15:53:41  10   ritual.  That was our Bisbee ritual.  That was the unbaptism.

        11   Q    Sorry, how do you spell the ritual itself?

        12   A    U-N-B-A --

        13   Q    Oh, sorry.  I don't mean to interrupt.  But I believe you

        14   said it was a busy or a --

15:54:02  15   A    Oh.  Bisbee.  It's the City in which we held the event.

        16   Q    Where was this relative to Scottsdale?

        17   A    This is three hours south of Scottsdale.  Three and a

        18   half hours south.

        19   Q    Is this in a remote area or a fairly populated area?

15:54:22  20   A    It's remote.  Bisbee's a tourist town in the mountains.

        21   Q    And the first ritual, where did that take place?

        22   A    The camping trip?

        23   Q    I suppose.  The destruction ritual.

        24   A    That was in Happy Jack, Arizona.

15:54:40  25   Q    And where was that relative to Scottsdale?

REDIRECT EXAMINATION - MICHELLE SHORTT

15:54:46  1   A   Two hours northeast, I think.

2   Q   Let's turn back to the -- is it Bisbee?

3   A   Yes.

4   Q   The unbaptism ritual.  Please describe for the Court what

15:55:01  5   the unbaptism ritual is?

6   A   An unbaptism ritual entails those who participate to shed

7   themselves of any hold that was placed upon them.  Usually

8   it's against their will, you know, we're baptized as

9   children, so we didn't quite have a choice in that matter.

15:55:27  10  So now as adults we choose to be unbaptized and not have

11  anybody but ourselves take on our sins and be able to take

12  ownership of our accomplishments.  So by being unbaptized you

13  assert that you don't need a savior, you are your own savior.

14  Q   Would you describe that as religious in nature?

15:55:57  15  A   Yes.

16  Q   Did you participate in this ritual?

17  A   Yes.

18  Q   How did this ritual make you feel?

19  A   Made me feel good.

15:56:08  20  Q   I'm going to turn your attention back to Exhibit 4.  I

21  notice some of these terms are -- some of these words are

22  capitalized.  Let's start with Luciferian as an adjective for

23  impulse.  What does that mean, a Luciferian impulse?  To you.

24  A   To me?  It means to be the adversary.  To not have any

15:56:37  25  fear of a godly retribution.  To have an open mind and

REDIRECT EXAMINATION – MICHELLE SHORTT

15:56:44  1   curiosity.

2   Q   Is that impacted at all by the tree of knowledge or is the

3   tree of knowledge part separate from Luciferian?

4   A   It's part of it.  You know, it's -- Lucifer is

15:57:05  5   considered, you know, to be the light bringer.  He who wanted

6   to give knowledge to the world and, you know, the tree of

7   knowledge kind of symbolizes that as, you know, he is said to

8   have shown Eve the tree of knowledge and guided her to it and

9   wanted her to eat from it so she herself could also imbue the

15:57:21  10   knowledge.

11   Q   You also indicated you would exhort to the city council

12   that they "demand that individuals be just for their concrete

13   actions and not their fealty to arbitrary social norms and

14   illusory categorizations."

15:57:41  15           What does that mean to you?

16   A   Well, it means that you're not going to give preferential

17   treatment to those who don't believe -- who -- it means that

18   you will not give preferential treatment to those who abide

19   by the social norms.  That those who are different are held

15:58:10  20   in an equal space and judged equally through their actions

21   and not because of their beliefs.

22   Q   Is it just beliefs or is it adhesion to social norms as a

23   general matter?

24   A   It includes that as well, yes.

15:58:31  25   Q   You also exhort the council to "stand firm against any and

REDIRECT EXAMINATION – MICHELLE SHORTT

15:58:34  1  all arbitrary authority that threatens the personal

2  sovereignty of" capitalized "ONE or" capitalized "ALL."

3       Let's take "one" and "all" first.  Why are those two

4  words capitalized?

15:58:50  5  A  I don't know.  But I could assume that --

6  Q  Well, I wouldn't ask you to assume.  Do they mean anything

7  particular as capitalized or not, to you?

8  A  Well, yes, when they're capitalized it shows emphasis

9  that we -- one is -- I don't know, it just puts emphasis on

15:59:17  10  it.  I can't really explain.  One is still as important as

11  all.  Like, they're still equal.  The beliefs of one are

12  still equal to that of the all.  I'm not sure if I'm

13  explaining that right.

14  Q  Okay.  Let's take the sentence as a whole.  As a whole,

15:59:37  15  what does this sentence mean to you?

16  A  The sentence means to me that we should not --

17       Okay.  So the sentence means that we should take care

18  in not making rules to prefer another -- to prefer one group

19  over another.  If one person, even one person is discriminated

16:00:34  20  against, that is an injustice as it would be if many people

21  were discriminated against.

22  Q  Is the pursuit of justice a core belief of The Satanic

23  Temple?

24  A  Absolutely.

16:00:51  25  Q  Let's take the next sentence in mind.  "That which will

REDIRECT EXAMINATION – MICHELLE SHORTT

16:00:54  1   not bend must break and that which can be destroyed by truth

2   should never be spared its demise."

3          What does that sentence mean to you?

4   A   It means that if suitable compromise can't be reached,

16:01:08  5   then something is going to have to give.  And I think that's

6   what it means by "must break."  We need to be able to adapt

7   so that all groups, all people, can coexist together and be

8   respected in their beliefs.  And those that go against such a

9   thing, those that choose to, you know, be discriminatory on

16:01:39 10   the basis of, I suppose, ignorance, that that's not good.

11   Q   You conclude with "Hail Satan."  Is that a phrase that

12   satanists use from time to time?

13   A   Yes.

14   Q   Is it charged with religious meaning to satanists?

16:01:59 15   A   Yes.

16   Q   Is it charged with religious meaning to you?

17   A   Yes.

18   Q   On balance, what is your intended message with this

19   invocation?

16:02:07 20   A   My intended message by giving this invocation?

21   Q   What is the intended message that you want the city

22   council to take away having heard this invocation?  Assuming

23   we're prevailing and we get to give it.

24   A   That we as satanists may not believe the same things as

16:02:29 25   you, but through our actions we will show that we can be

REDIRECT EXAMINATION – MICHELLE SHORTT

16:02:36  1  productive members of society and participate in invocations

2  as anybody else could.

3  Q   Is it your intent to offend them through expression of

4  your beliefs?

16:02:52  5  A   No.

6  Q   Are you concerned if they are offended by your expression

7  of beliefs?

8  A   No.

9  Q   After the May 23rd cancellation e-mail, did the City ever

16:03:17  10  indicate any appeals process?

11  A   No.

12  Q   So when Scot asks you or indicates and elicits information

13  from you that you did not provide that information, why is it

14  that you did not provide that information?

16:03:39  15  A   After --

16  Q   After the May 23rd revocation.

17  A   Because they didn't ask me.  We didn't know it was a

18  requisite to provide this information.

19  Q   To date, do you have a firm understanding of what the City

16:04:01  20  means when they say substantial connection?

21  A   No.

22  Q   Would you say The Satanic Temple of Arizona has a

23  substantial connection to Scottsdale as of today?

24  A   Yes.

16:04:12  25  MR. CLAUS:  Objection.  Foundation.  Relevance as of

REDIRECT EXAMINATION – MICHELLE SHORTT

16:04:14  1  today.

2        THE COURT:  Overruled.

3  BY MR. KEZHAYA:

4  Q   Let's start with your understanding of substantial

16:04:24  5  connection.  When you say, "I believe we have a substantial

6  connection," what is your understanding?

7  A   That members of the Arizona chapter live in Scottsdale.

8  Q   Do you know how many as of today?

9        MR. CLAUS:  Objection.  Relevance as of today.

16:04:44  10  Foundation.

11        THE COURT:  Overruled.

12        THE WITNESS:  I could not tell you exactly, but we

13  do have members that live in Scottsdale.

14  BY MR. KEZHAYA:

16:04:53  15  Q   Is there a difficulty with collecting demographics data

16  with satanists?

17  A   It is.  We don't ask, really, where they live unless they

18  become official members.  And if -- even if that, they also

19  use pseudonyms.  So anonymity is important.

16:05:17  20  Q   Why is anonymity important to the satanic community?

21        MR. CLAUS:  Objection, Your Honor.  Foundation.

22  Calls for hearsay.  Outside the scope of cross.

23        THE COURT:  Overruled.

24        THE WITNESS:  Why satanists choose anonymity?

16:05:38  25  Because it could affect your work environment, and it could

REDIRECT EXAMINATION — MICHELLE SHORTT

16:05:41   1   potentially be fired.  If they're parents, they could have

2   their parenting skills called into question.  There's a lot

3   of reasons why people choose to keep their affiliation with

4   the Satanic Temple and their religious beliefs of being a

16:05:54   5   satanist a secret.  It is usually not received well.

6   BY MR. KEZHAYA:

7   Q    Received well by who?

8   A    Society.

9        MR. KEZHAYA:  If I may be permitted a moment,

16:06:09  10   Your Honor.

11        THE COURT:  You may.

12        MR. CLAUS:  May I ask you now, Your Honor, if I can

13   scoot while we're changing a witness to go to the restroom?

14        THE COURT:  He's not done yet.  Hold on.

16:06:34  15        MR. KEZHAYA:  I have one more line of questioning,

16   Your Honor.

17   BY MR. KEZHAYA:

18   Q    Does The Satanic Temple engage in efforts to spread the

19   message about its existence and the nature of its beliefs?

16:06:48  20        MR. CLAUS:  Leading.  Exceeds the scope.

21        THE COURT:  Overruled.

22        THE WITNESS:  Could you rephrase the question.

23   BY MR. KEZHAYA:

24   Q    Does The Satanic Temple spread the message that it exists?

16:07:00  25   A    Yes.

REDIRECT EXAMINATION – MICHELLE SHORTT

16:07:02 1    Q    Does it spread the message of what its beliefs are?

2    A    Yes.

3    Q    How does it do that?

4    A    Through our actions.  And the media covers our actions

16:07:16 5    pretty heavily as well.

6    Q    Are you aware when you take certain actions that the media

7    will probably take interest in those actions?

8              MR. CLAUS:  Objection, Your Honor.  Foundation.

9    Calls for speculation.

16:07:33 10             THE COURT:  Overruled.

11             THE WITNESS:  Yes.

12   BY MR. KEZHAYA:

13   Q    Were you aware specifically when you were inquiring into

14   Scottsdale that it would probably garner media attention?

16:07:46 15   A    Yes.

16             MR. CLAUS:  Same.

17             THE COURT:  Overruled.

18             THE WITNESS:  Yes.

19   BY MR. KEZHAYA:

16:07:52 20   Q    Did that dissuade you from looking into Scottsdale?

21   A    No.

22   Q    Did it encourage to you look to Scottsdale?

23   A    No.

24   Q    Did it have any effect on you going to Scottsdale as

16:08:09 25   opposed to any other city?

DIRECT EXAMINATION – BRIAN BIESEMEYER

16:08:12  1    A    No.

        2              MR. KEZHAYA:  No further questions, Your Honor.

        3              THE COURT:  All right.  You can step down, ma'am.

        4              You can run.  We'll get the other witness on.

16:09:04  5              MR. KEZHAYA:  Your Honor, we call Brian Biesemeyer.

        6              THE COURT:  Let's get you sworn in and then we'll

        7    wait till Mr. Claus comes back in before we begin the

        8    questioning.

        9              THE COURTROOM DEPUTY:  Raise your right hand.

16:09:18 10              State your name and spell your first and last name.

       11              THE WITNESS:  Brian Biesemeyer.  It's B-R-I-A-N and

       12    B-I-E-S-E-M-E-Y-E-R.

       13              THE COURT:  Okay.  We can proceed with the

       14    questioning.

16:10:53 15              MR. CLAUS:  Thank you, Your Honor.

       16                        **BRIAN BIESEMEYER,**

       17    called as a witness herein, after having been first duly sworn

       18    or affirmed, was examined and testified as follows:

       19                   D I R E C T   E X A M I N A T I O N

16:11:17 20    BY MR. de HAAN:

       21    Q    Good afternoon.  Would you please state your name for the

       22    record.

       23    A    Sure.  It's Brian Kevin Biesemeyer.

       24    Q    And during the end of 2015, beginning of 2016, what was

16:11:28 25    your position?

DIRECT EXAMINATION - BRIAN BIESEMEYER

16:11:30   1    A    Acting city manager for the City of Scottsdale.

        2    Q    And was that -- was that a temporary situation or is

        3    that -- was that your role since then?

        4    A    No, it was -- as the name says, it was acting until a

16:11:42   5    permanent city manager would be hired.

        6    Q    And as the acting city manager did you answer to the city

        7    council for decisions?

        8    A    I was -- ultimately the city council appointed me and

        9    ultimately the city council could release me.

16:12:06  10    Q    Okay.  So but when you made any policy decisions, did you

       11    seek guidance from the city council in general?

       12         MR. CLAUS:  Objection, Your Honor.  Foundation.

       13         THE COURT:  Overruled.

       14         THE WITNESS:  Most policy decisions, no.  And

16:12:22  15    generally you get this -- the policy decisions would be

       16    handed down through agendized decision-making of the council.

       17    BY MR. de HAAN:

       18    Q    So when you were to make a decision, it was something that

       19    was handed down from the city council; is that --

16:12:37  20    A    Well, policy decisions would come down directly from

       21    council decisions and then be passed down as policy.

       22    Q    Okay.  And then would you ratify it?  Or how -- what

       23    was --

       24    A    Mine was to administer that policy of the council's

16:12:52  25    through executing that policy.

DIRECT EXAMINATION - BRIAN BIESEMEYER

16:12:55  1   Q   So city council -- just to make sure I understand.  City

2   council would make a policy and you would institute it,

3   essentially?

4   A   That's correct.

16:13:05  5   Q   Now, before this incident, were you involved in invocation

6   selection process?

7   A   I was not.

8   Q   And you weren't the one that scheduled the invocations; is

9   that right?

16:13:20  10   A   That's correct.

11   Q   Was that the job of Kelli Kuester?

12   A   Yes.

13   Q   And she worked for the mayor's office; is that right?

14   A   That is correct.

16:13:32  15   Q   And the mayor's office is separate from the city manager's

16   office?

17   A   It is.

18   Q   Now, at this time, at the end of 2015, beginning of

19   2016 -- when I say "this time" that's what I'm referring to in

16:13:47  20   general -- you weren't aware of any standing policy of how the

21   invocations were selected; is that right?

22   A   We didn't have a standing policy, that's correct.

23   Q   So when The Satanic Temple first made the request, how did

24   you hear about it?

16:14:08  25   A   I heard about it through the mayor, Kelli Kuester's

DIRECT EXAMINATION – BRIAN BIESEMEYER

16:14:13   1   office or the mayor's office, that it had been scheduled and

2   then subsequently that there was a scheduling issue.

3   Q   Okay.  So she told you which group was making the

4   invocation?

16:14:29   5   A   She did.

6   Q   Does she normally tell you which groups are giving

7   invocations?

8   A   Not normally, only because I believe of the number of

9   e-mails and other -- just the general traffic into our office

16:14:50  10   with phone calls and e-mails of this particular invocation.

11   Q   Okay.  So just to get the timeline, this invocation was

12   scheduled and then there was a lot of public or community

13   response to this?

14   A   Well -- and I apologize, I don't remember all the

16:15:08  15   timelines in that arena because there was also the uproar

16   with the City of Phoenix and that invocation, and then

17   Scottsdale.  So I don't have that down exact, but -- so I

18   guess could you repeat your question?

19   Q   Okay.  I understood.

16:15:28  20        And you might not know this, I'm not sure, but so the

21   first understanding you had was that the invocation for The

22   Satanic Temple had been scheduled; is that right?

23   A   Yes.

24   Q   Was the next thing you heard that they were rescheduling

16:15:42  25   or that there was a bunch of community uproar about this, if

DIRECT EXAMINATION – BRIAN BIESEMEYER

16:15:47  1  you recall?

2  A   No, I can't recall.  It was all pretty much the same time

3  frame in my memory.

4  Q   Okay.  So this all happening contemporaneously?

16:15:56  5  A   Yes.

6  Q   All right.  Were you aware that the invocation was then

7  rescheduled to a later date?

8  A   I was told we were looking for a later date.

9  Q   Okay.  For The Satanic Temple?

16:16:06  10  A   Yes.

11  Q   All right.  Was that the last you heard or was it

12  confirmed to you that it was rescheduled?

13  A   No, it was not confirmed to me that it was rescheduled.

14  Q   Okay.  So because there was no policy in existence, there

16:16:32  15  was never any appeals process if someone were to be denied;

16  right?

17          MR. CLAUS:  Objection, Your Honor.  Misstates

18  testimony.  Foundation.

19          THE COURT:  Overruled.

16:16:44  20          THE WITNESS:  Without a formal policy, there's no

21  formal appeals process.

22  BY MR. de HAAN:

23  Q   And after the new policy was made, there was no appeals

24  process; is that fair to say?

16:16:54  25  A   We didn't make a new policy.  We went back and reviewed

DIRECT EXAMINATION – BRIAN BIESEMEYER

16:16:57  1  practice and looked at that practice and then implemented

2  what had been our practice.

3  Q   Okay.  All right.  But -- well, let's talk about that,

4  then.

16:17:12  5           As far as substantial community ties, which is what

6  was cited to The Satanic Temple as far as their denial, let's

7  start there.  That was the cited reason for their denial;

8  correct?

9           MR. CLAUS:  Objection, Your Honor.  Misstates

16:17:23  10  evidence.

11           THE COURT:  Overruled.

12           THE WITNESS:  I'm sorry, say the question --

13  BY MR. de HAAN:

14  Q   Okay.  So the cited reason to the Satanic Temple why they

16:17:31  15  were unscheduled is because of a lack of substantial community

16  ties.  That was the cited reason; correct?

17           MR. CLAUS:  Objection, Your Honor.  May I have a

18  continuing objection to every time he says substantial

19  community ties, there's a standing objection because that is

16:17:44  20  misleading and misstating.

21           THE COURT:  Overruled.

22           THE WITNESS:  Substantial connection to the City of

23  Scottsdale.

24  BY MR. de HAAN:

16:17:52  25  Q   Right.  Okay.  But was there a verification process or

DIRECT EXAMINATION - BRIAN BIESEMEYER

16:17:57   1   criteria or anything like that for what that meant?

2   A   We didn't -- I did not do any verification process of

3   that.

4   Q   And that's for The Satanic Temple, or other groups as

16:18:15   5   well?

6   A   For any of those groups we -- I should correct myself.

7   During the time between it was originally scheduled and then

8   there was a conflict, we had the opportunity to look back at

9   our past practices.  Given those past practices, we made the

16:18:39  10   decision that there was not the substantial connection with

11   The Satanic Temple in Scottsdale.

12   Q   Okay.  But you didn't try to look into that?  You

13   didn't --

14   A   I had -- personally, I did not.  I had others.

16:18:54  15   Q   Okay.  And when you say that, are you referring to

16   Kelli Kuester?

17   A   No.

18   Q   So who did you get that information from?

19   A   From the city attorney's office.

16:19:09  20   Q   Okay.  So whose knowledge was it based on in general of

21   this long-standing practice?

22   A   It was based on research done by the city attorney's

23   office.

24   Q   Okay.  And this is only after this -- this only occurred

16:19:28  25   after this invocation request occurred; is that right?

DIRECT EXAMINATION - BRIAN BIESEMEYER

16:19:32    1    A    It was done only after the rescheduling conflict.

            2    Q    Okay.  And still there was no fixed criteria about what

            3    that means, the substantial connection?

            4    A    We didn't say X number of people or exact locations in

16:19:52    5    that, no.

            6    Q    Okay.  So at the time, as far as you know, all the

            7    invokers were physically within Scottsdale; is that right?

            8    A    The ones that I had seen, I believe were.  But I went

            9    through the research.  We'd seen that others were not located

16:20:22   10    in Scottsdale.  And again, of the -- in my deposition I went

           11    to the Brophy example, where there was a priest from Brophy

           12    who gave the invocation.  But there is a substantial number

           13    of folks in Scottsdale that have kids attend Brophy High

           14    School.

16:20:40   15    Q    Okay.  So I -- and I do recall we talked about that

           16    before.

           17              Also, that -- as far as your understanding, that was

           18    the only one you could cite; is that right?

           19    A    That was the only one recited to me after the research.

16:20:56   20    Q    Okay.  So these were cited to you.  This wasn't your own

           21    independent research?

           22    A    Yes.

           23    Q    So if I tell you a list of churches or religious

           24    organizations, you couldn't tell me where they were located or

16:21:18   25    not?  Whether they're within or withoutside -- or outside of

DIRECT EXAMINATION – BRIAN BIESEMEYER

16:21:23  1   Scottsdale, I mean?

2   A   Perhaps some.  Perhaps.  I don't have knowledge of all of

3   the churches in Scottsdale or the vicinity.

4   Q   Of the ones outside of it, only Brophy is the one that you

16:21:35  5   could say had any substantial connection?

6   A   It was the only one given to me as an example.

7   Q   Pinnacle Church in Tempe wasn't cited as an example?

8        MR. CLAUS:  Objection, Your Honor.  Misstates.

9        THE COURT:  Overruled.

16:21:48 10        THE WITNESS:  No.

11   BY MR. de HAAN:

12   Q   Okay.  Ascension Lutheran Church, do you know where that

13   is?

14   A   No.

16:21:53 15   Q   And you wouldn't be able to say what their substantial

16   community ties are or connection to Scottsdale?

17   A   I'd have to have more data about that, those individual

18   cases.

19   Q   Or Pinnacle Church, where that's located?

16:22:10 20   A   Again, I'd have to have more information.

21   Q   All right.  So I guess it's fair to say you don't have

22   independent knowledge of locations or independent substantial

23   community ties of any of these churches individually?

24   A   I was not given those examples, no.

16:22:28 25   Q   Okay.  So at the time The Satanic Temple made the request,

DIRECT EXAMINATION – BRIAN BIESEMEYER

16:22:40  1   you weren't familiar with them; is that fair to say?

2   A   That's correct.

3   Q   You didn't know where their headquarters were?

4   A   I had been informed that their headquarters was in

16:22:54  5   Tucson.  There's also information in the papers that implied

6   they were from Tucson as well.

7   Q   Is that from the media?

8   A   Yes, from the media in general.

9   Q   Okay.  Was that information from the mayor's office?

16:23:14  10   A   I believe Kelli Kuester said that they were also from

11   Tucson.

12   Q   And as far as you know, has any other group ever been

13   denied participation in the invocation?

14   A   I know of no others.

16:23:41  15   Q   So at some point -- so you're aware of the e-mails that

16   came flooding in from one church?

17   A   I'm aware there were a number of e-mails.  What church

18   they came from, I don't know.

19   Q   Okay.  So we're talking 15,000 e-mails?

16:23:53  20   A   It was in the tens of thousands.

21   Q   It actually shut down the servers at one point; is that

22   right?

23   A   That's what Ms. Kuester said.

24   Q   Okay.  And it was after that that the denial of the

16:24:08  25   invocation was handed down; is that right?

DIRECT EXAMINATION - BRIAN BIESEMEYER

16:24:11  1   A   It was after that that we did the research on our past

2   practices.

3   Q   Okay.  Now, as far as any discussions with any city

4   councilmembers, you said you had one conversation with

16:24:22  5   Councilman Klapp; is that right?

6   A   That's correct.

7   Q   Do you recall the contents of that conversation?

8   A   For the record, I have many conversations with

9   Councilman Klapp.  But for this specific topic at hand, yes,

16:24:36  10   I did have one conversation with her; correct.  And it was in

11   the context of a number of different items that she wanted to

12   talk about.

13   Q   She expressed her concern about this?

14   A   She did.

16:24:48  15   Q   Okay.  And you had stated before that you didn't remember

16   the details.

17   A   I did not.  Only that she was concerned about allowing

18   The Satanic Temple to give an invocation.

19   Q   Now, you actually -- were you the one that put together

16:25:10  20   the contents of the e-mail that was ultimately sent to the

21   representatives of The Satanic Temple?

22   A   I gave that content to Ms. Kuester.

23   Q   Okay.  And did you also clear that with city council

24   before it was sent out?

16:25:29  25   A   I didn't clear it.  I mean, I don't know the timing.  I

DIRECT EXAMINATION - BRIAN BIESEMEYER

16:25:31  1    sent them a notification that I was going to do this action.

2    I don't know if I sent it before Kelli notified The Satanic

3    Temple or not.  It was close to the same day, as I recall.

4    Q    But that's -- is that something that would be normal for

16:25:46  5    you to do is clear this type of e-mail that you were going to

6    send?  Was it normally you would clear that with city council?

7    A    It wasn't a clearance, it was a notification.  I

8    typically notify them on significant issues -- if we take

9    action on a significant issue that impacts the City as a

16:26:04 10    whole, I would notify them.

11    Q    Okay.  So you were in communication with them through this

12    process?

13              THE COURT:  Who is them?

14              MR. de HAAN:  Sorry.  The city councilmembers or the

16:26:14 15    mayor's office.

16              THE WITNESS:  I had the single conversation we

17    discussed.

18    BY MR. de HAAN:

19    Q    So that was the only cited reason -- the reason cited, the

16:26:22 20    substantial community ties, was the only reason cited to the

21    representative of The Satanic Temple; is that right?

22              MR. CLAUS:  Objection, Your Honor.  Misstates.

23              THE COURT:  Overruled.

24              THE WITNESS:  It's cited in the e-mail that we're

16:26:33 25    talking about, yes.

DIRECT EXAMINATION - BRIAN BIESEMEYER

16:26:34  1    Q    Okay.

2             MR. de HAAN:  May I have a moment, Your Honor?

3         BY MR. de HAAN:

4         Q    You had mentioned that there was some investigation from

16:27:14  5    the city attorney's office?

6         A    That's correct.

7         Q    Do you know who did that?

8         A    I do not.

9         Q    You don't remember or they didn't tell you?

16:27:23 10    A    They did not -- the city attorney, Bruce Washburn, did

11        not tell me.

12        Q    And apparently there was no documents generated about

13        this?

14        A    I didn't see any documents.

16:27:36 15    Q    And when Ms. Klapp, or Councilman Klapp, mentioned her

16        concerns, you don't recall the nature of these concerns?

17        A    No.

18        Q    And as far as the word substantial, it's just a number of

19        people?  Proximity to Scottsdale?  Or a number of brick and

16:28:06 20    mortar buildings?  Were there any criteria at all?

21        A    It was generally assumed the criteria was it was in

22        general proximity to the City and there were a number of

23        people, more than one or two, within the City that were

24        involved with that institution.

16:28:28 25    Q    Okay.  As far as the Brophy example that you've cited, did

DIRECT EXAMINATION - BRIAN BIESEMEYER

16:28:36  1    someone give that information to you or is that something you

2    knew offhand?

3    A    No.  It was provided to me through the research.

4    Q    Okay.  And that, again, was through the city attorney's

16:28:46  5    office?

6    A    City attorneys's office.

7    Q    And you couldn't say who did that?

8    A    I do not know.

9    Q    Okay.

16:29:03  10    MR. de HAAN:  No further questions, Your Honor.

11    THE COURT:  All right.  We will take up

12    cross-examination tomorrow morning.  We will break.

13    You can step down, sir.

14    THE WITNESS:  Sure.

16:29:15  15    THE COURT:  If you give me just a minute, I'll tell

16    you how much time each side has used.

17    All right, counsel, as of the end of today

18    plaintiffs have used three hours and 40 minutes.  Defendants

19    have used one hour and 54 minutes.

16:30:45  20    Let's plan to be here tomorrow morning at 8:45.

21    What is your best guess, I recognize it's only a

22    guess, as to how long this is going to go tomorrow given the

23    witnesses that are left?

24    MR. KEZHAYA:  Your Honor, from here we have Kuester.

16:31:00  25    I can't tell how to pronounce her name, but she should take

DIRECT EXAMINATION – BRIAN BIESEMEYER

16:31:03  1    about as long as the other city employees.  Then we have Doug

      2    Misicko, who should take about as long as Michelle Shortt.

      3         THE COURT:  Well, Ms. Shortt took almost two and a

      4    half hours.

16:31:15  5         MR. KEZHAYA:  Correction, Your Honor, Doug should

      6    take much less than that.  He's just here to cover the

      7    religious nature of TST.

      8         THE COURT:  All right.

      9         And then how about the from the City?

16:31:24 10         MR. CLAUS:  Your Honor, keeping in mind your

      11    admonition that you're not holding us to it necessarily, I

      12    think I have perhaps 20 minutes for Mr. Biesemeyer.  I have a

      13    similar amount of time.  So however much time they take with

      14    direct examination of Mr. Misicko, I intend to use on cross.

16:31:47 15    And if we are in a position where we need to put on a case,

      16    Your Honor, we will be calling -- oh, I'm sorry, and

      17    Ms. Kuester will take however long they take with her on

      18    direct.

      19         If we have to put on a case, Your Honor, we will

16:32:00 20    only be calling Ms. Kuester and Mr. Biesemeyer, unless

      21    something extraordinary happens between now and when

      22    plaintiffs rest.  And that will take no more than an hour

      23    cumulatively.

      24         THE COURT:  Okay.  All right.  We will see you

16:32:18 25    tomorrow.  Thank you.

16:33:08  1          Sorry, counsel, I made a mistake.  I'm double

       2    checking my math.

       3         Defendants have actually used two hours and 14 minutes,

       4    not one hour and 54 minutes.

16:33:21  5         Okay.  Thanks.

       6              MR. KEZHAYA:  Plaintiff was still correct?

       7              THE COURT:  Yeah, yours was still correct.  I just

       8    left 20 minutes off of theirs.

       9              (End of transcript.)

16:33:39 10                              *  *  *  *  *

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

1                    **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 24th day of April,

15   2020.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25