1                    **UNITED STATES DISTRICT COURT**

2                     **FOR THE DISTRICT OF ARIZONA**

3                    _____

4    **Satanic Temple, et al.,**              )
                                              )
5                         Plaintiffs,         )  **CV 18-00621-PHX-DGC**
                                              )
6            vs.                              )  Phoenix, Arizona
                                              )  **January 23, 2020**
7    **City of Scottsdale, et al.,**          )  8:45 a.m.
                                              )
8                         Defendants.         )
     _____)

9

10

11

12

13            **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

14               **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15                      <u>**BENCH TRIAL DAY 2**</u>

16

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257

24

     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

1                      **A P P E A R A N C E S**

2

3    For the Plaintiffs:

4            Kezhaya Law, PLC
             By: **MATTHEW A. KEZHAYA**, ESQ.
5            1202 NE McClain Rd
             Bentonville, AR  72712
6
             de Haan Law Firm, PLLC
7            By: **STUART P. de HAAN**, ESQ.
             101 E. Pennington St., Ste. 201
8            Tucson, AZ  85701

9

10   For the Defendants:

11           Dickinson Wright, PLLC
             By: **SCOT L. CLAUS**, ESQ.
12           By: **HOLLY M. ZOE**, ESQ.
             By: **VAIL C.B. CLOAR**, ESQ.
13           1850 N. Central Ave., Ste. 1400
             Phoenix, AZ  85004
14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2                            **EXAMINATION**

3    **WITNESS**                                            **PAGE**

4    BRIAN BIESEMEYER

5            Cross-Examination By Mr. Claus              279

6            Redirect Examination By Mr. de Haan         291

7            Examination By The Court                    298

8            Further Examination By Mr. Claus            301

9            Further Examination By Mr. de Haan          302

10   KELLI KUESTER

11           Direct Examination By Mr. Kezhaya           304

12           Cross-Examination By Mr. Cloar              335

13           Examination By The Court                    346

14   DOUGLAS ALEXANDER MISICKO

15           Direct Examination By Mr. de Haan           348

16           Cross-Examination By Mr. Claus              360

17           Redirect Examination By Mr. de Haan         440

18                             **EXHIBITS**

19   **NUMBER**    **DESCRIPTION**                        **PAGE**

20   3          The Satanic Temple IRS Letter          350

21   103        Web page of The Satanic                383
22              Temple Arizona – TST AZ – FAQ
                printed 09/17/19

23   56         Archived Web page –                    414
24              Fundamental Tenets of The
                Satanic Temple website, dated
                07/22/13

25

**(Index of Exhibits Continued)**

<u>**EXHIBITS**</u>

| <u>NUMBER</u> | <u>DESCRIPTION</u> | <u>PAGE</u> |
|---|---|---|
| 57 | Archived Web page – Fundamental Tenets of The Satanic Temple website, dated 08/05/13 | 414 |
| 58 | Archived Web page – Fundamental Tenets of The Satanic Temple website, dated 09/04/13 | 414 |
| 59 | Archived Web page – Fundamental Tenets of The Satanic Temple website, dated 11/03/13 | 414 |
| 60 | Archived Web page – Fundamental Tenets of The Satanic Temple website, dated 12/12/13 | 414 |
| 63 | Archived Web page – The Satanic Temple Beliefs, dated 04/17/14 | 418 |
| 83 | Articles of Organization for The Satanic Temple, Inc., filed 11/14/17 | 419 |
| 61 | United Federation of Churches LLC – Certificate of Organization 2014 (Michigan) filed 02/04/14 | 438 |
| 78 | United Federation of Churches LLC – Annual Report for 2015 (Michigan) filed 09/12/16 | 439 |
| 79 | United Federation of Churches LLC – Annual Report for 2016 (Michigan) filed 09/12/16 | 439 |

1

**(Index of Exhibits Continued)**

2

**EXHIBITS**

3

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 81 | United Federation of Churches LLC – Annual Report for 2017 (Michigan) file 04/03/17 | 439 |
| 85 | Restated Certificate of Organization – United Federation of Churches LLC filed 05/21/18 | 439 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

08:45:38   (Proceedings resumed in open court at 8:45 a.m.)

THE COURT:  Thank you.  Please be seated.

08:46:16   Morning, everybody.

EVERYBODY:  Morning, Judge.

THE COURT:  Counsel, I want to talk to you for a minute about Exhibit 5 that I took under advisement yesterday.

08:46:30   And I think this question also relates to Exhibit 8, which I admitted, but I've come up with this question that I want to ask you.  And it's particularly addressed to plaintiffs' counsel.

I was reminded last night as I looked at this issue 08:46:58 that Rule 801(d)(2), which is the provision under which I admitted it, has a specific requirement.  I admitted 8 and I'm being asked to admit 5 under 801(d)(2)(C), namely, that it's -- these e-mails are in effect an admission by a party opponent, the City, because they were statements made by an 08:47:28 agent within the scope of their authority.

What I was reminded of is the sentence in 801(d)(2) after subsection (E) which says "The statement must be considered but does not by itself establish the declarant's authority under (C)," which is the provision we're talking 08:47:53 about.

08:47:53  1          What that means, I think, is that if I'm going to

2   admit Exhibit 5, for example, under that provision, I need

3   more than Exhibit 5 showing that, in that case, Mr. Smith was

4   acting within the scope of his authority.  Because the

08:48:10  5   statement, the exhibit, is not itself sufficient.

6          I looked at Weinstein's on Federal Evidence last

7   night and this requirement is explained in these words.  It

8   says, "Under Rule 80(d)(2) the," and now it's just quoting

9   from the rule, "statement must be considered but does not by

08:48:30  10   itself establish the declarant's authority under (C)," close

11   quote.

12          And then Weinstein's goes on to say, "Thus, the

13   trial court will consider the declarant's statement in making

14   the preliminary determination of admissibility, but

08:48:44  15   independent proof of the existence of the declarant's

16   authority to speak for the party will also be required."

17          And so the question that I have for plaintiffs'

18   counsel is what independent proof do I have from the trial

19   that David Smith, for Exhibit 5, was authorized to speak on

08:49:07  20   behalf of the City of Scottsdale?

21          MR. KEZHAYA:  Your Honor, I'll start with answering

22   the question.  The independent proof is Councilwoman Klapp

23   said essentially the city council is the board of directors

24   with the highest elected officials of the City.

08:49:24  25          But I do want to clarify we were proposing that the

50

08:49:27  1   Court find it under (D), not (C).  (D) is the agent within

2   the course and scope of their agency.  (C) is they're

3   authorized to make a statement on the subject.

4          THE COURT:  Well, that's helpful.  But that sentence

08:49:45  5   at the end goes on to apply to (D) as well.

6          MR. KEZHAYA:  Yes, Your Honor.  And it's

7   substantially the same.

8          So we all talked with multiple witnesses about the

9   city charter, the Court can take judicial notice of the city

08:49:59  10  charter, and the city charter designates that the city

11  council is the highest echelons of city government.

12         It's pretty clear, as the Court has already found,

13  that these are public officials speaking with their

14  constituents about matters of policy concerns.  Ms. Klapp

08:50:14  15  testified "we create policy for the City."

16         And I don't know if that answers your question

17  fully, but we also had --

18         THE COURT:  Go ahead.

19         MR. KEZHAYA:  We also had testimony to the effect

08:50:30  20  from multiple witnesses, and we're going to elicit some more

21  from -- later today to the effect of when anyone e-mails this

22  citycouncil@Scottsdaleaz.gov, it goes to all of the city

23  council.  And as can be pretty clear from the statements

24  themselves, what is happening is these people are e-mailing

08:50:49  25  the city council address and individual city council members

08:50:52  1   are responding from their own non

2   citycouncil@Scottsdaleaz.gov, but, for example,

3   KLittlefield@Scottsdaleaz.gov.

4        And so while the letter itself does not prove that

08:51:05  5   Councilwoman Klapp is in fact Councilwoman Klapp, it is also

6   not in dispute -- or not Klapp, I'm sorry, Littlefield and

7   Smith in the other case.  It is also not a subject of dispute

8   whether Councilwoman Littlefield is in fact a member of the

9   city council, nor is it a matter of dispute whether

08:51:24 10   Councilman Smith is in fact a city council member for the

11   City.

12        Does this fully address the Court's question?

13        THE COURT:  It's helpful, but let me ask an

14   additional question.

08:51:34 15        And this is going to be the question to defense

16   counsel as well.

17        MR. KEZHAYA:  Yes, Judge.

18        THE COURT:  (C), which I now understand is not your

19   primary argument, requires that the individual be authorized

08:51:45 20   to make a statement.  The defense would argue city council

21   people are not authorized to make any statement on behalf of

22   the City unless they act as a body.

23        (D) is different.  (D) only requires that the

24   individual be an agent or employee and that the individual be

08:52:09 25   speaking on a matter within the scope of that relationship

08:52:12  1    while it exists.

2              What is the basis for me to conclude that

3         Councilman Smith or Councilman Littlefield were either an

4         agent of the City of Scottsdale or an employee of the City of

08:52:29  5    Scottsdale?

6              MR. KEZHAYA:  Klapp testified that the city council

7         members are paid a salary, she testified it took 25 hours per

8         week of her job.  The city charter, which again the Court can

9         take judicial notice of, specifically identifies them as the

08:52:44 10    highest echelons of the City government.  I really don't see

11        a way that the City can dispute whether the city council are

12        agents or employees of the City government.

13             With respect to these particular issues, Scot's very

14        antsy to jump up say, aha, but it wasn't in an open meeting.

08:53:01 15    That's a subject for the Court to determine whether or not

16        the open meeting specifically prohibits it and whether they

17        complied with the open meeting requirement.

18             Klapp said she had minimally heard discussions from

19        up to two council members on the subject, which were

08:53:17 20    definitely not a part of the open meeting.  So we know some

21        level of discussions were going on.

22             From the contents of the e-mails, I think it is

23        pretty clear that they deliberated on this subject, albeit

24        off the record, and made a determination that TST is a

08:53:33 25    religion and we need to provide for that or in the

08:53:36   1   alternative we can remove all of the open invocation

2   meetings.

3          So I think just from the contents of the message

4   itself, perhaps it doesn't itself establish authority, but

08:53:48   5   from the city charter, from Klapp's testimony, from I believe

6   Mayor Lane's testimony as well, I think there is ample

7   evidence to find that in fact the city council are agents and

8   employees of the City, although, to me, there's really not a

9   legal distinction to the two of relevance here.

08:54:08   10         THE COURT:  Okay.  Let me ask this question of

11   defense counsel.

12         First let me check something.

13         This is directed, Mr. Claus, to your side.  It seems

14   to me that subsection (C) of 801(d)(2) specifically requires

08:54:53   15   that the individual be authorized to speak.  801(d)(2)(D)

16   does not require that.  There's nothing in the rule that says

17   they have to be authorized to speak.  It says they have to be

18   an agent or employee at the time they make the statement.

19         My question to you is, if an individual is paid a

08:55:14   20   salary and works 25 hours a week for the City of Scottsdale,

21   how can I conclude that that person is not an employee of the

22   City?

23         MR. CLAUS:  Three, at least three reasons,

24   Your Honor.

08:55:30   25         One, individuals are paid a salary to act as members

08:55:34   1   of the council and act as the council.  That is what is

2   codified in the city charter in articles 6 and 7.  Individual

3   council members cannot act individually as agents of the City

4   according to the city charter of the Scottsdale city

08:55:56   5   government.

6          Moreover, Your Honor, there is no record, there's no

7   evidence in this case that the e-mails that comprise

8   Exhibit 5 and presumably -- I'm sorry, the e-mails that are

9   missing from Exhibit 5 but are -- looks like it was cobbled

08:56:17  10   together, an e-mail was sent and a response was sent, and

11   e-mails contained in Exhibit 8 do not reflect at all that

12   these e-mails were sent to the body at citycouncil@az.gov.

13          In fact, these e-mails suggest exactly the opposite

14   because there is at -- in Exhibit 8, at least, there is an

08:56:40  15   e-mail and a reply.

16          *Bennett versus Yoshina*, Your Honor, the case that we

17   referred to, stands for the proposition that governmental

18   actors don't act as agents for the government within the

19   course and scope of their agency merely because they make

08:56:58  20   statements while they are employed by the governmental body.

21          Moreover, Your Honor, in Exhibit 8, Exhibit 8

22   demonstrates within the body of the text that Ms. Littlefield

23   was not speaking in the course and scope of her agency as a

24   councilperson.  Instead, she states exactly the opposite.

08:57:24  25   She states her personal -- twice, Your Honor, she modifies

08:57:30  1   her statement with the word "personally."  Not as a

2   councilmember, not as a council, not within the course and

3   scope of her agency as council, but states it clearly as

4   being something she believes personally.

08:57:50  5        What Suzanne Klapp testified to is that individual

6   councilmembers do not have to check their personal opinions

7   or personal beliefs at the door when they agree to become a

8   councilmember.

9        When they act as a legislative body for the City,

08:58:10 10   they act as a whole, not individually.  There is no

11   demonstration in these e-mails whatsoever, and there is

12   certainly no evidence that has been presented by the

13   plaintiffs that any of these statements were made on behalf

14   of the City, as an agent for the City, or, and this is what's

08:58:31 15   most important, Your Honor, within the course and scope of

16   that agency because there is no -- honestly, Your Honor,

17   there is no evidence in the record that David Smith was a

18   councilmember.  We're not disputing that David Smith was a

19   councilmember at some point.  I honestly don't know if he was

08:58:49 20   a councilmember on -- what is the date of this e-mail --

21   5/23/2016.  He likely may have been.

22        But I have no idea if this e-mail, and you have no

23   idea, which is most important, whether this e-mail was sent

24   from a personal e-mail account, governmental e-mail account,

08:59:13 25   and what you do know, Your Honor, is that this e-mail bears

08:59:17  1    no indication that it was sent within the course and scope of

2    David Smith's agency relationship, if that agency

3    relationship existed.

4              THE COURT:  Well, Exhibit 14 shows David Smith

08:59:29  5    present at city council meetings in 2016.  I think that is

6    sufficient evidence that he was on the council.

7              We can talk about this a long time.  Let me ask you

8    one specific question and get your thoughts on that.

9              I'm not sure 801(d)(2)(D) requires me to find that

08:59:48 10    Mr. Smith was authorized by the City to speak about it.  The

11    question is was he an employee, which I think he was, number

12    one; number two, and this may be the heart of your argument,

13    was this matter, namely the application of the plaintiffs to

14    give the invocation, a matter within the scope of that

09:00:10 15    relationship?  Namely, was that part of his employment

16    relationship with the City?

17              If the answer to those two questions are yes, it

18    seems to me (D) is satisfied and I don't have to find that he

19    was authorized either by the City or the city charter to

09:00:28 20    speak on its behalf because it was a matter within the scope

21    of his employment.

22              MR. CLAUS:  And in fact --

23              THE COURT:  And incidentally --

24              MR. CLAUS:  I'm sorry.  I apologize, Your Honor.

09:00:38 25              THE COURT:  That's Okay.

09:00:39  1    The case you gave me focuses on agency.  It doesn't

2    drill down to this specific issue.  I read it last night.

3    But I'm interested in your thoughts on that specific one.

4          MR. CLAUS:  Sure.  I'm glad you narrowed that

09:00:50  5    question, Your Honor.  Because what the evidence reflects in

6    this case is exactly the opposite.  It compels me to answer

7    your question not yes, but no.  Because the testimony in this

8    case from Mayor Lane, the testimony in this case from

9    Councilwoman Klapp, and the testimony that has been elicited

09:01:13 10    on direct examination from Brian Biesemeyer demonstrates

11    irrefutably that the question regarding who may give an

12    invocation and if this group may give an invocation and the

13    decision-making with respect to this invocation is absolutely

14    not within the legislative course and scope of the council or

09:01:38 15    its members.  That instead, that decision was an

16    administrative decision made only by one person,

17    Brian Biesemeyer.  The testimony that has been elicited from

18    the plaintiffs demonstrates that.

19          THE COURT:  I understand that point.

09:01:55 20          MR. CLAUS:  And, Your Honor, I do have one more case

21    that stands for the proposition that the body, if the body

22    has no knowledge of the comments, or somehow takes a position

23    to ratify the comments, they should not fall within

24    801(d)(2)(D), and it is *Hernandez versus Arizona,* 702 F.

09:02:23 25    Supp. 2d 1119, 1127.

09:02:33   1          THE COURT:  Okay.  I understand those points.

           2          I want to move on.  But any last comments, just so I

           3    understand your thoughts on that specific issue we just

           4    talked about?

09:02:42   5          MR. KEZHAYA:  Your Honor, I just want to be clear

           6    that the City is arguing that a politician is categorically

           7    barred by the city charter from addressing constituents'

           8    concerns about policy.  That's their argument.

           9          These are politicians.  Their job is forming city

09:02:59  10    policy.  Constituents raise an issue about city policy, and

          11    councilmembers address those concerns by e-mails.

          12          He says, well, the decision was clearly made by a

          13    city officer, but he neglects the part where everyone's

          14    testified that the city officer serves at the pleasure of the

09:03:16  15    council.  If these e-mails get admitted, we have had four out

          16    of seven city councilmembers who have all addressed The

          17    Satanic Temple and said we don't like them because they're

          18    satanists.

          19          Would that impact the city officer's

09:03:28  20    decision-making?  He testified no, but I submit that's a

          21    subject of fact for the Court.

          22          And as for there's no proof that this was sent to

          23    the city council, I remind the Court the subject line of the

          24    e-mail that we're talking about is regarding urgent message

09:03:45  25    for Mayor Jim Lane and city councilmembers.  I don't see any

CROSS-EXAMINATION   (CONT'D) — BRIAN BIESEMEYER

09:03:49   1   way that you can argue there is no evidence that this was

           2   sent to the city council.  They're arguing it, but there's

           3   simply no basis for it.

           4           THE COURT:  Okay.  Thanks for those comments.  I

09:03:57   5   want to look at that case a little more closely and

           6   801(d)(2)(D) during the break, so I'll get you a ruling later

           7   on today.

           8           All right.  We're going to resume with the

           9   cross-examination.

09:04:11  10           Mr. Biesemeyer, you can come back to the witness

          11   stand.  You are still under oath for purposes of the trial.

          12           THE WITNESS:  Yes, sir.

          13           THE COURT:  And defense counsel, you can proceed

          14   with cross-examination.

09:04:42  15           MR. CLAUS:  May I approach?

          16           THE COURT:  Yes, you may.

          17                   **BRIAN BIESEMEYER,**

          18   recalled as a witness herein, after having been previously

          19   sworn or affirmed, was examined and testified as follows:

11:19:09  20                   C R O S S - E X A M I N A T I O N

          21   BY MR. CLAUS:

          22   Q   Mr. Biesemeyer, good morning.

          23           The courtroom deputy is handing you an exhibit that

          24   we'll talk about a little bit later.  I just wanted you to

09:05:08  25   have it in front of you.

CROSS-EXAMINATION  (CONT'D) - BRIAN BIESEMEYER

09:05:10  1          Mr. Biesemeyer, could you please explain to the Court

2     what your current position is with the City?

3     A   I'm the executive director for Scottsdale Water.

4          THE COURT:  Hold on just a minute.  Let's make sure

09:05:20  5     that mic's working.

6          THE WITNESS:  Hello?

7          THE COURT:  Yeah, we're turning it on.

8          THE COURTROOM DEPUTY:  Turning it off and on again.

9          Try tapping it.

09:05:35  10         THE WITNESS:  Testing, testing.

11         THE COURTROOM DEPUTY:  Try again now.

12         THE WITNESS:  Hello.

13         THE COURT:  Okay.  Let's start over again.

14         MR. CLAUS:  Thank you, Your Honor.

09:05:51  15    BY MR. CLAUS:

16    Q   Good morning, Mr. Biesemeyer.  I'm still Scot Claus.  I

17    still represent the City of Scottsdale.

18         Can you please explain to the Court what your current

19    position is with the City.

09:06:00  20    A   I'm the executive director for Scottsdale Water.

21    Q   You are no longer acting city manager; is that correct?

22    A   I'm no longer.

23    Q   When you were acting city manager, did you have all of the

24    powers and responsibilities of the city manager under the

09:06:14  25    Scottsdale city charter?

CROSS-EXAMINATION  (CONT'D) - BRIAN BIESEMEYER

09:06:16  1   A    I did.

2   Q    Did you familiarize yourself with the powers and duties of

3   the city manager of the Scottsdale city charter before

4   accepting the position of acting city manager?

09:06:26  5   A    I did.

6   Q    Is it accurate that you served as acting city manager on

7   two different occasions?

8   A    That's correct.

9   Q    Can you tell the Court when the first occasion was?

09:06:35  10   A    The first was the summer of 2014, I believe.  Let me get

11   my -- backtrack that.  The city manager, Fritz Behring, had a

12   stroke in that first summer, and I served for three months as

13   he recovered from his stroke.

14   Q    And then when did you become acting city manager again?

09:07:02  15   A    And then that would have been -- I -- in 2015 again, he

16   had another stroke, and then I again stepped in as acting city

17   manager.

18   Q    How long did you hold that position as acting city

19   manager?

09:07:16  20   A    The second time was for 19 months.

21   Q    You were acting city manager in February of 2016?

22   A    I was.

23   Q    And in -- up through at least May 23 of 2016?

24   A    I was.

09:07:33  25   Q    Under the Scottsdale city charter, are the powers and

CROSS-EXAMINATION   (CONT'D) - BRIAN BIESEMEYER

09:07:37   1   duties of the city manager different from the powers and

2   duties of the mayor?

3   A   Yes.   They are.

4   Q   Are the powers and duties of the council different under

09:07:50   5   the Scottsdale city charter from the duties of the city

6   manager?

7   A   They are.

8   Q   Under Article III Section 2 of the Scottsdale city

9   charter, when you were acting as city manager, sir, were you

09:08:09   10   the chief executive of the administrative branch of city

11   government?

12   A   I was.

13   Q   Were you, as the city manager, responsible for the proper

14   administration of all affairs of the City --

09:08:22   15   A   Well --

16   Q   -- not otherwise assigned by the charter to another

17   officer?

18   A   Yes.

19   Q   From January 2016 -- you were asked by Mr. de Haan about

09:08:40   20   decisions.   Is there a distinct difference between the council

21   enacting legislative policy determinations and the city

22   manager making administrative decisions?

23   A   Very clearly.

24   Q   Does the city council direct your administrative decisions

09:09:07   25   as city manager?

CROSS-EXAMINATION  (CONT'D) - BRIAN BIESEMEYER

09:09:11  1    A    They do not.

2    Q    Does the mayor direct your administrative decisions as

3    city manager?

4    A    The mayor does not.

09:09:19  5    Q    The decision that -- did you make the decision to send a

6    denial to the organization calling itself The Satanic Temple

7    regarding an invocation request in May 2016?

8    A    I did.

9    Q    Was that an administrative decision that you made?

09:09:42 10    A    It was.

11    Q    Was anyone other than the city manager -- did anyone other

12    than the city manager have the power or duty to make that

13    decision?

14    A    No.

09:10:04 15    Q    You were asked a lot about the council, acting at the

16    pleasure of the council and the mayor.  I'm going to ask you a

17    question that it's safe to answer since -- you're no longer a

18    city manager; correct, sir?

19    A    Yes, that's correct.

09:10:30 20    Q    Was it -- did you even ask to be considered to be city

21    manager when that position was posted?

22    A    I did not.

23    Q    Did you care what the mayor and council thought about your

24    administrative decision to deny the invocation request?

09:10:48 25    A    I did not.

CROSS-EXAMINATION  (CONT'D) - BRIAN BIESEMEYER

09:10:55   1   Q   There's been testimony about how unique this situation

2   was.  I want to talk to you about that.

3          Prior to learning that an organization calling itself

4   The Satanic Temple had sought to give an invocation, had you

09:11:12   5   ever been faced as acting city manager with having to make a

6   decision whether to allow a Tucson-based organization to give

7   an invocation?

8   A   I had not.

9   Q   Are you aware of any charter provision which vested in any

09:11:32  10   officer, other than you, the responsibility to determine

11   whether to allow a Tucson-based organization to give an

12   invocation?

13   A   Could you say that again?  I'm sorry.

14   Q   Sure.  Are you aware of any charter provision which vested

09:11:47  15   in any other officer of the City, other than you as acting

16   city manager, the power or responsibility to determine whether

17   to allow a Tucson-based organization to give an invocation?

18   A   No.

19   Q   When you made the decision to inform -- to direct

09:12:08  20   Kelli Kuester to inform Jeremy Zarzycki that the organization

21   calling itself The Satanic Temple would not be permitted to

22   give an invocation, were you influenced at all in your

23   decision-making process by Mayor Lane's campaign material?

24   A   I've not even seen his campaign material.

09:12:33  25   Q   That was going to be my next question, Mr. Biesemeyer.

CROSS-EXAMINATION   (CONT'D) - BRIAN BIESEMEYER

09:12:35  1   Had you even seen Mayor Lane's campaign material at the time

2   you made your decision?

3   A   I had not.

4   Q   Do you care about politicians' campaign material when

09:12:45  5   you're fulfilling your role as the chief executive

6   administrative officer for the City of Scottsdale?

7   A   No.

8   Q   Were you influenced -- I'll ask it the reverse way this

9   time.  Had you read at all any editorial opinion post by

09:13:09  10  Suzanne Klapp before you made your decision?

11  A   I did not.

12  Q   Were you influenced at all by any editorial opinion

13  written by Suzanne Klapp in making your administrative

14  decision to deny the invocation?

09:13:25  15  A   No.

16  Q   Did anyone describe to you the personal opinions held by

17  Ms. Klapp before you made your decision to deny the

18  invocation?

19  A   Not her personal opinions.

09:13:45  20  Q   Were you influenced at all by the mayor of Scottsdale,

21  Jim Lane, in making your administrative decision as chief

22  executive officer of the City of Scottsdale in denying the

23  invocation requested by one of the plaintiff representatives?

24  A   No.

09:14:05  25  Q   Were you influenced at all by the city council as a body

CROSS-EXAMINATION  (CONT'D) – BRIAN BIESEMEYER

09:14:10   1   or any individual city councilmember in making your

          2   administrative decision?

          3   A    No.

          4   Q    Had anyone delivered or described to you the contents of

09:14:26   5   any discrete e-mails sent to a member of the city council

          6   before you made your decision?

          7   A    No.

          8   Q    Had anyone described or delivered to you any e-mails

          9   written by personal city councilmembers before you made your

09:14:44  10   decision?

          11   A    No.

          12   Q    I want to have you explain to the Judge why you made the

          13   decision you made.  Can you please explain to the Judge what

          14   you did to determine that the City had a long-standing

09:15:04  15   practice of only permitting faith-based organizations with

          16   substantial connections to the City of Scottsdale to give an

          17   invocation?

          18   A    I asked for research to be done, the city attorney's

          19   office did that, on our past practices to get an understanding

09:15:23  20   what the City had done in the long term given my experience

          21   was limited in the position.

          22        When that research came back, it said that the

          23   invocations were given with organizations that had

          24   substantial ties to the City of Scottsdale.

09:15:42  25        I made the decision based on that long-standing

CROSS-EXAMINATION  (CONT'D) - BRIAN BIESEMEYER

09:15:47   1    practice.

2    Q    The phrase substantial connection, did that mean that the

3    organization had to have an address in Scottsdale?

4    A    No.

09:15:57   5    Q    Did the substantial connection mean that the organization

6    had to have physical location within the geographic limits of

7    Scottsdale?

8    A    No.

9    Q    When you made the decision, what did you think substantial

09:16:12  10    connection meant?

11    A    In the -- generally in the metropolitan area and with a

12    substantial number of citizens in Scottsdale that had

13    affiliation with that organization.

14    Q    Are you familiar with the intersection of Scottsdale Road

09:16:38  15    and McDonald?

16    A    I am.

17    Q    Does it surprise you that an organization with an address

18    at the intersection of Scottsdale Road and McDonald, while

19    technically within the confines of Paradise Valley, has a

09:16:56  20    substantial connection to the City of Scottsdale?

21    A    That would not surprise me.

22    Q    So we talked about and I asked you to explain to the Judge

23    the first part of your decision-making process and what you

24    did to reach that decision.  I want to try to talk about the

09:17:13  25    second part.

CROSS-EXAMINATION   (CONT'D) - BRIAN BIESEMEYER

09:17:14  1        What resources did you use to try and figure out if

2    the organization that had requested to give an invocation had

3    a substantial connection to the City of Scottsdale in this

4    case?

09:17:31  5    A   I, again, asked the city attorney's office to do that, as

6    I would ask many different parts of our organization to

7    research things on my behalf in other decisions.

8    Q   And what was the determination after you had that

9    investigation performed with respect to the organization

09:17:50  10   calling itself The Satanic Temple?  Did -- was there a

11   determination that that organization lacked any connection to

12   the City of Scottsdale?

13   A   That was --

14             MR. de HAAN:  Objection.  Hearsay.

09:18:03  15             THE COURT:  Hold on just a minute.

16             Overruled.

17   BY MR. CLAUS:

18   Q   Was the determination that that organization lacked any

19   connection to the City of Scottsdale?

09:18:19  20   A   That was the determination.

21   Q   And is that why you directed Kelli Kuester to write

22   Jeremy Zarzycki an e-mail May 23, 2016, to deny the

23   invocation?

24   A   It was.

09:18:32  25   Q   I keep saying the invocation.  And I've had Exhibit 4 put

CROSS-EXAMINATION  (CONT'D) – BRIAN BIESEMEYER

09:18:38  1    in front of you.  Exhibit 4 is in evidence.  Can you please

2    take a look at it.

3          Did any, anyone, connected with the plaintiff ever

4    deliver to you Exhibit 4?

09:18:57  5    A    No.

6    Q    Did anyone connected with the plaintiff ever describe to

7    you the contents of Exhibit 4?

8    A    No.

9    Q    Did anyone connected with the plaintiff tell you one word

09:19:12  10   about the viewpoint held by someone named Michelle Shortt?

11   A    No.

12   Q    Did anyone connected with the plaintiff ever tell you one

13   word about the viewpoint or belief that Ms. Shortt wished to

14   share during something that they called an invocation?

09:19:34  15   A    No.

16   Q    Did you know from any other source what the beliefs of any

17   plaintiffs were before you made your decision?

18   A    Other than what was in the general press, no.

19   Q    And did the general press tell you the viewpoints that

09:19:55  20   Ms. Shortt wished to share?

21   A    No.

22   Q    Did you know anything -- did anyone in the City of

23   Scottsdale tell you any beliefs that Ms. Shortt wished to

24   promote or describe during anything before a city council

09:20:15  25   meeting?

CROSS-EXAMINATION  (CONT'D) - BRIAN BIESEMEYER

09:20:16  1    That was a terrible question.  I'm going to strike my

2    own question and withdraw it.

3    Did anyone connected with the City of Scottsdale

4    describe to you any belief or viewpoint that Ms. Shortt

09:20:31  5    intended to share before you made your decision?

6    A    No.

7    Q    Now, the last thing I want to talk to you about is what

8    happened after May 23, 2016.

9    After May 23, 2016, did any representative of any

09:20:58 10   plaintiff contact you orally or by e-mail to try and explain

11   to you that the plaintiffs in this case actually did have any

12   connection to the City of Scottsdale?

13   A    No.

14   Q    Did Michelle Shortt ever contact you by e-mail, orally, or

09:21:31 15   any other communication to try and describe to you after

16   May 23, 2016, how she had or her organization had a

17   substantial connection to the City of Scottsdale?

18   A    No.

19   Q    Did Michelle Shortt ever contact you at all?

09:21:52 20   A    No, not at all.

21   Q    If the plaintiffs' organization had demonstrated to you

22   that they had a substantial connection to the City of

23   Scottsdale, you would have made a different decision; correct?

24   MR. de HAAN:  Objection.  Leading.

09:22:09 25   THE COURT:  Sustained.

REDIRECT EXAMINATION – BRIAN BIESEMEYER

09:22:11  1   BY MR. CLAUS:

2   Q   If the plaintiffs' organization had demonstrated to you

3   that they had a substantial connection to the City of

4   Scottsdale, would you have made a decision different than the

09:22:22  5   one you made?

6           MR. de HAAN:  Objection.  Calls for speculation.

7           THE COURT:  Overruled.

8           THE WITNESS:  Yes.

9           MR. CLAUS:  That's all, Your Honor.

09:22:31  10          THE COURT:  Redirect?

11          MR. de HAAN:  Yes, Your Honor.

12              R E D I R E C T   E X A M I N A T I O N

13   BY MR. de HAAN:

14   Q   So the invocations, the invocation system, so to speak,

09:22:52  15   this long-standing practice of having invocations, was

16   essentially an all-comer system; is that fair to say?

17   A   It was, as the parameter stated, with the substantial

18   connection to Scottsdale, but --

19   Q   But that was never on the books or anything like that?

09:23:10  20   A   That was not.

21   Q   And there was no rule prohibiting groups from requesting?

22   A   No.

23   Q   Okay.  So there was no policy made until May 23rd, 2016?

24   A   There was no policy made.

09:23:36  25   Q   Okay.  And this is only after one specific group requested

REDIRECT EXAMINATION – BRIAN BIESEMEYER

09:23:39   1   it?

2   A    Well, it was no policy made before or after.  It was a

3   adherence to long-standing practice.

4   Q    And the person that was to schedule these invocations was

09:23:53   5   Kelli Kuester?

6   A    Yes.

7   Q    And she's from the mayor's office?

8   A    Yes.

9   Q    So when you denied this group from giving an invocation,

09:24:01  10   that was basically overriding the decision of the mayor's

11   office?

12        MR. CLAUS:  Objection, Your Honor.  Leading and

13   lacks foundation.

14        THE COURT:  Overruled.

09:24:08  15        THE WITNESS:  I'm sorry, say that again.

16   BY MR. de HAAN:

17   Q    So when this group was denied the invocation based on the

18   decision that you made, this was essentially overriding a

19   decision made by someone out of the mayor's office?

09:24:21  20   A    No.  The mayor's office would schedule those.  If there's

21   a controversy, they come to the city manager for that issue.

22   For a decision.

23   Q    So essentially that's what happened, though.  You -- the

24   decision was made to schedule them, and then they were

09:24:36  25   uninvited based on your decision.

REDIRECT EXAMINATION - BRIAN BIESEMEYER

09:24:40   1   A    That's -- that's not exactly.  They were -- they requested

           2   it, and then with a conflict and requested a separate second

           3   date, and it's when the second date occurred that they were

           4   denied.

09:25:02   5   Q    After they were already scheduled the second date?

           6   A    I don't know that.

           7   Q    Okay.  Now, do you recall we did a deposition on

           8   November 30th, 2018?

           9   A    Yes.

09:25:14  10   Q    Do you recall that I asked you was there any investigation

          11   of any groups such as what their community ties were that you

          12   know of?  Do you remember being asked that?

          13   A    I thought that was --

          14           MR. CLAUS:  This is improper impeachment.

09:25:30  15           THE COURT:  How is it improper?

          16           MR. CLAUS:  Because he's reading from a deposition

          17   and he hasn't established the predicate for impeaching the

          18   witness with deposition testimony.

          19           THE COURT:  Overruled.

09:25:40  20           THE WITNESS:  I'm sorry, state again.

          21   BY MR. de HAAN:

          22   Q    Do you recall being asked before if there was an

          23   investigation about where these groups were?

          24   A    I recall being asked if I personally conducted one.

09:25:52  25   Q    Do you remember saying that there was no investigation per

REDIRECT EXAMINATION – BRIAN BIESEMEYER

09:25:54  1    se that you know of?

2    A    Oh, into -- I'm sorry --

3         MR. CLAUS:  Objection, Your Honor.  Misstates -- if

4    counsel is going to read from a deposition, the witness

09:26:02  5    should be given a copy of it.  And I'm telling you, it is

6    misleading because it misstates the deposition testimony.

7         THE COURT:  Well, it is fair that he be shown the

8    deposition testimony if you're asking about it.

9         MR. de HAAN:  May I approach?

09:26:14  10        THE COURT:  Yeah.  Do you have a copy for yourself

11   and for him?

12        MR. de HAAN:  I do.

13   BY MR. de HAAN:

14   Q    Mr. Biesemeyer, if I could direct you to page 8.

09:26:49  15        THE COURT:  Please identify the date of the

16   deposition.

17   BY MR. de HAAN:

18   Q    And Mr. Biesemeyer, are you looking at what was handed to

19   you?

09:26:56  20   A    I am.

21   Q    Do you recognize that?

22   A    Yes.

23   Q    And could you describe what that is?

24   A    States the deposition of Brian Kevin Biesemeyer dated

09:27:07  25   November 30th, 2018.

REDIRECT EXAMINATION - BRIAN BIESEMEYER

09:27:09  1   Q    Could I direct you to page 8.

2              THE COURT:  Excuse me, was that -- did you say 2018

3   or '19?

4              THE WITNESS:  This says 2018.

09:27:20  5              THE COURT:  Is that the correct date?

6              MR. de HAAN:  That's correct.

7              THE COURT:  Okay.

8   BY MR. de HAAN:

9   Q    If I could have you read from line 3.

09:27:33  10  A    Line 3, page 8.  "Question:  Okay.  Now, as far as who

11  participated, was there any investigation of any groups such

12  as what their community ties were that you know of?"

13             MR. CLAUS:  And, Your Honor, there's an objection

14  that was lodged because --

09:27:51  15             THE COURT:  What's the objection?

16             MR. CLAUS:  The objection that was lodged was an

17  objection to foundation and objection to preserve the form.

18  The question asks who participated.  Was there any

19  investigation of any groups?  There's no foundation as to

09:28:05  20  what groups Mr. de Haan was talking about.

21             THE COURT:  All right.  That objection is overruled.

22             THE WITNESS:  Sorry --

23  BY MR. de HAAN:

24  Q    You can continue from after the objection.

09:28:19  25  A    Yeah.  The witness, myself:  "I know of no investigation

REDIRECT EXAMINATION - BRIAN BIESEMEYER

09:28:24  1    per se but all the groups that I witnessed had a connection to

2    the City of Scottsdale during that time, had a substantial

3    connection to the City of Scottsdale at that time."

4    Q    And then --

09:28:34  5    A    Keep reading?

6    Q    -- what's the next question?

7         Sure.

8    A    "How do you know that?

9         "Answer:  They were either located in Scottsdale or

09:28:41 10    I can't say either located in Scottsdale or represented or

11    were nearby and represented in Scottsdale.  As far as I know,

12    when I was there, all of them were actually in Scottsdale.  I

13    don't recall it even outside Scottsdale during that time."

14    Q    So a couple things.

09:29:01 15         Today you are saying that there was an investigation.

16    A    There was an investigation into our past practices.

17    Q    And that included your saying where they were located.

18         MR. CLAUS:  Objection, Your Honor, vague.  It's

19    almost leading.

09:29:17 20         THE COURT:  Overruled.

21         THE WITNESS:  Yes.

22    BY MR. de HAAN:

23    Q    Okay.  So this -- this wasn't a decision you made just by

24    yourself?

09:29:25 25    A    It was a decision I made by myself.  I didn't make it

REDIRECT EXAMINATION - BRIAN BIESEMEYER

09:29:28  1   without information.

2   Q   And as it turns out, not all of these were located in

3   Scottsdale or they -- in other churches of people that gave

4   invocations?

09:29:37  5   A   They were not.

6           MR. de HAAN:  If I may have just a moment,

7   Your Honor.

8           THE COURT:  You may.

9   BY MR. de HAAN:

09:30:19  10  Q   So it wasn't common practice that the people who give

11  invocations would submit to you their community ties?

12  A   No.

13  Q   And it wasn't practice that they would show you what the

14  invocation was ahead of time?

09:30:30  15  A   No.

16  Q   And that was never -- that was never a factor in deciding

17  who could give the invocation?

18  A   It was not.

19  Q   And you don't know the source of the list that these

09:30:51  20  invocations came from?

21  A   I personally do not.

22  Q   And this all occurred after at least one city

23  councilmember said they had concerns about that particular

24  group's invocation?

09:31:09  25  A   If you're discussing the conversation I had with

EXAMINATION - BRIAN BIESEMEYER

09:31:13  1    Suzanne Klapp, that's correct.

2    Q    Okay.  And why was there an investigation?

3    A    I'm sorry, into?

4    Q    Why was there an investigation into this one particular

09:31:38  5    group?

6    A    Why wasn't there an investigation prior to the decision

7    or --

8    Q    Why was there only an investigation about one group that

9    asked to give an invocation?

09:31:53 10    A    Because it seemed to be out of the norm of our normal

11    operation.

12    Q    Okay.

13             MR. de HAAN:  Nothing further.

14                    E X A M I N A T I O N

09:32:00 15    BY THE COURT:

16    Q    I have a couple of questions for you, Mr. Biesemeyer.

17             On that last question that was asked by plaintiffs'

18    counsel as to why the investigation occurred, could you

19    explain to me the events that led up to your feeling that you

09:32:37 20    needed to make a decision on this?  Why did it land on your

21    desk for you to make a decision?

22    A    Again, because it seemed very out of the normal for

23    someone from Tucson to give an invocation.  Obviously there

24    was a lot of conflict in the community on this as well.  So it

09:32:59 25    looked like we should look into that.  I've not seen any

EXAMINATION - BRIAN BIESEMEYER

09:33:03  1    groups that were not connected either in Scottsdale or well

2    connected with Scottsdale give invocations.  Seemed like we

3    should look into what we had been doing over a longer history

4    than my experience as city manager.

09:33:19  5    Q   What do you mean when you said there was a lot of conflict

6    in the community on this as well?

7    A   As evidenced by the e-mails that had been -- the many,

8    many e-mails that were coming in to the city manager office --

9    or, I'm sorry, the mayor's office.

09:33:38 10    Q   And what did you understand those e-mails to be saying?

11    A   I'd understood that they were on both sides of the issues,

12    but they were just very numerous and very passionate.

13    Q   How did you learn about those e-mails?

14    A   From Ms. Kuester.  From Kelli.

09:34:15 15    Q   Did you ever review the e-mails?

16    A   I did not.

17    Q   You mentioned that in response to the cross-examination

18    questions that you did not know the beliefs of any of the

19    plaintiffs except for what was in the general press.  What was

09:34:36 20    in the general press that you read before this decision about

21    the plaintiffs or their beliefs?

22    A   Only in their -- only the mention that they were from

23    Tucson and that it was The Satanic Temple.  Not specific to

24    their beliefs.  Mostly just the name.

09:35:03 25    Q   You indicated that you had a conversation with

EXAMINATION — BRIAN BIESEMEYER

09:35:07  1   Councilman Klapp.

       2   A    Yes, sir.

       3   Q    What did she say to you about this issue that you could

       4   recall?

09:35:18  5   A    That she objected to the City allowing The Satanic Temple

       6   to give an invocation.

       7   Q    Did she explain why?

       8   A    She did not.

       9   Q    Did she say anything else about her views or feelings?

09:35:32 10   A    No.

      11   Q    Did she suggest in that conversation what decision you

      12   should make?

      13   A    No.  She gave me her opinion that we should not.

      14   Q    Was it unusual for a councilwoman or a councilman to be

09:36:06 15   expressing opinions to you on matters of city administration?

      16   A    It was not unusual.  They would express their opinions,

      17   pro or con, on decisions I would make.  It was not uncommon

      18   for them to call me and —— and this conversation occurred

      19   within a number of different issues that the councilwoman was

09:36:28 20   concerned about.

      21   Q    What was your general view of what you, as the city

      22   manager, should do with those opinions that were expressed to

      23   you by members of the council?

      24   A    Generally I try to explain the process that we have in

09:36:43 25   place, how we are going about doing that, and that if there

FURTHER EXAMINATION - BRIAN BIESEMEYER

09:36:50  1    was any concerns about that, how council might want to address

2    that through policy.

3    Q   Did you have that kind of a discussion with Ms. Klapp

4    about this specific issue?

09:37:03  5    A   Not on this specific issue, no, sir.

6              THE COURT:  Okay.  Thanks.  You can step down.

7              MR. CLAUS:  May I follow up on your question?  Just

8    that one last question, Your Honor.

9              THE COURT:  Yeah, you can.  I'll let them follow up

09:37:14  10   as well.

11             MR. CLAUS:  Thank you.  That's all right.

12                 F U R T H E R   E X A M I N A T I O N

13   BY MR. CLAUS:

14   Q   I'm going to ask the question more bluntly than His Honor

09:37:22  15   did, Mr. Biesemeyer.

16             Did the council contain seven individuals with

17   different personalities who expressed different opinions to

18   you all the time about all sorts of things; correct?

19   A   Yes.

09:37:37  20   Q   Could you do your job as city manager if you cared about

21   or reacted to all of the myriad opinions that were expressed

22   to you by city councilmembers on a variety of topics?

23   A   I could not.

24   Q   I'm going to ask it bluntly.  Did you -- did you care if

09:38:06  25   the decision you made upset or displeased any individual

FURTHER EXAMINATION - BRIAN BIESEMEYER

09:38:12  1    councilmember?

2    A    No.

3              MR. CLAUS:  That's all, Your Honor.

4              THE COURT:  Plaintiffs' counsel.

11:19:09  5              F U R T H E R   E X A M I N A T I O N

6    BY MR. de HAAN:

7    Q    After the Court asked, you said, "We thought it was

8    necessary to investigate.  We felt compelled to investigate."

9              Who is "we"?

09:38:44  10             MR. CLAUS:  Your Honor, this is outside of the scope

11   of your question and it's outside the scope --

12             THE COURT:  Overruled.

13             THE WITNESS:  I guess I used -- well, would have

14   been myself and in discussion -- when -- the discussion I had

09:39:04  15   with the city attorney.

16   BY MR. de HAAN:

17   Q    And this is after the mayor's office told you about the

18   15,000 e-mails?

19   A    Yes.

09:39:16  20   Q    So you had been communicating with Ms. Klapp and the

21   mayor's office.

22   A    I've been communicating --

23   Q    About this issue specifically.

24   A    About -- there were some conversations about the issue,

09:39:28  25   yes.

FURTHER EXAMINATION – BRIAN BIESEMEYER

09:39:30   1   Q   And the conversation you had with Klapp now you're saying

2   is she specifically told you she objected to this invocation

3   being scheduled?

4   A   That's correct.

09:39:42   5   Q   Were there any communications with the mayor about this?

6   A   No.

7   Q   But it was the mayor's office that told you about the

8   community objections to this invocation?

9   A   They told me about the numerous e-mails coming in.

09:40:01   10   Q   And was this all verbal communication?

11   A   Yes.  Either verbally or via telephone.

12   Q   Via telephone.  Okay.

13        MR. de HAAN:  Nothing further.

14        THE COURT:  Okay.  Thank you, sir, you can step

09:40:13   15   down.

16        THE WITNESS:  Thank you.

17        THE COURT:  All right.  Plaintiffs' next witness.

18        MR. KEZHAYA:  Kelli Kuester, Your Honor.

19        THE COURTROOM DEPUTY:  Raise your right hand.

20                    **KELLI KUESTER,**

21   called as a witness herein, after having been sworn or

22   affirmed, was examined and testified as follows:

23        THE COURTROOM DEPUTY:  State your name for the

24   record and spell your first and last name.

09:41:03   25        THE WITNESS:  Kelli Kuester.  K-E-L-L-I.

DIRECT EXAMINATION – KELLI KUESTER

09:41:06  1    K-U-E-S-T-E-R.

2              THE COURTROOM DEPUTY:  There's no E on the end of

3    Kelli?

4              THE WITNESS:  There's no E on the end of Kelli.

09:41:19  5              THE COURTROOM DEPUTY:  Thank you.

6                    D I R E C T   E X A M I N A T I O N

7    BY MR. KEZHAYA:

8    Q    Good morning, ma'am.

9    A    Good morning.

09:41:29 10    Q    How do I pronounce your name?

11   A    Kelli Kuester.

12   Q    Kuester.  Thank you.  I've heard it many different ways,

13   so I was unsure.

14   A    That's Okay.

09:41:36 15    Q    Ms. Kuester, in early 2016 you were the management

16   assistant to the mayor and council; right?

17   A    Yes.

18   Q    What year did you start that job?

19   A    Summer of 2015.

09:41:48 20    Q    Are you still in that job?

21   A    Yes.

22   Q    As part of this job, you scheduled speakers for

23   legislative invocations; is that right?

24   A    For city council meetings, yes.

09:42:00 25    Q    Yes.

DIRECT EXAMINATION - KELLI KUESTER

09:42:03  1          And the way you scheduled these invocations was going

       2   off of some kind of a list; is that right?

       3   A    Yes, that's correct.

       4   Q    Who created that list?

09:42:14  5   A    I'm not sure exactly how it was created or who created it.

       6   It was given to me when I took the job.

       7   Q    Okay.  But you -- importantly, you did not create it?

       8   A    That's correct.

       9   Q    Did you ever add on to it or remove from it, change it in

09:42:27 10   any way?

      11   A    Each year I have added on and have kept track of the list.

      12   Q    What do you add to the list?

      13   A    I keep track of everyone who comes into the city council

      14   meetings and gives an invocation.  And as new folks come in, I

09:42:47 15   add their names, and go on each year from that.

      16   Q    How do new folks come into these invocations?

      17   A    One example may be if my boss, the chief of staff, meets

      18   somebody and presents to me their business card and asks me to

      19   contact them for an invocation.

09:43:08 20   Q    Okay.  Other than TST, has anyone ever reached out to you

      21   affirmatively to be placed on this list?

      22   A    Within the last few months I just had someone, but prior

      23   to The Satanic Temple, no.

      24   Q    Okay.

09:43:33 25          When you mentioned someone would hand their card, or

DIRECT EXAMINATION – KELLI KUESTER

09:43:37   1   rather the card would be handed to you by the chief of staff,

2   was that before The Satanic Temple came in?

3   A    Yes.

4   Q    Okay.

09:43:50   5         And when was that?

6   A    It could be any time that she may go to an event or have a

7   meeting with someone.  That could happen at any point.

8   Q    So this was more than one occasion?

9   A    Yes.

09:44:03  10   Q    How often did that happen before The Satanic Temple came

11   in?

12   A    Roughly I could give you an estimate, maybe just a few

13   times a year that could happen.

14   Q    So let's see here.  If I remember correctly, you started

09:44:17  15   summer of 2015; right?

16   A    Yes.

17   Q    So at least once before TST came into the picture in

18   February of 2016; right?

19   A    I would say that that's accurate.

09:44:30  20   Q    So are we talking two or three times?  More than that?

21   A    I wouldn't say more than that, no.

22   Q    At some point TST did come into the picture; right?

23   A    Yes.

24   Q    In fact, you got a call from a person named

09:44:46  25   Jeremy Zarzycki.  Do you remember that?

DIRECT EXAMINATION - KELLI KUESTER

09:44:51  1   A    Yes, I do.

2   Q    Do you remember when that call was?

3   A    I do not remember the exact date of when that was, no.

4   Q    Was it early February?

09:45:00  5   A    Possibly.  Yes.

6   Q    We've seen a lot of e-mails from February 9 and 10.  Was

7   it before that?

8   A    I believe so.  To the best of my memory, I think it's

9   possibly the first week of February.

09:45:13  10   Q    Okay.  And pursuant to that phone call, you scheduled an

11   invocation for TST, didn't you?

12   A    With that phone call, I did schedule the invocation, yes.

13   Q    And to be clear, we're talking about this first phone call

14   in early February?

09:45:29  15   A    Yes.

16   Q    Was there any rule against someone calling you up and

17   saying we'd like to give an invocation?

18   A    No.

19   Q    In fact, as you testified earlier, this is not the first

09:45:39  20   time that you had received some kind of notice that people not

21   on that list wanted to give an invocation; right?

22            MR. CLOAR:  Objection.  Misstates.

23            THE COURT:  Overruled.

24   BY MR. KEZHAYA:

09:46:01  25   Q    This is not the first time -- when you received that phone

DIRECT EXAMINATION - KELLI KUESTER

09:46:03  1   call from Jeremy Zarzycki, that was not the first time that

2   someone had indicated they wanted to give an invocation;

3   right?

4   A   I'm sorry, could you say that one more time.

09:46:13  5   Q   Jeremy Zarzycki was not the first person who ever

6   requested an opportunity to give an invocation; is that right?

7            MR. CLOAR:  Objection.  Misstates.

8            THE COURT:  Overruled.

9   BY MR. KEZHAYA:

09:46:26 10   Q   Is that right?

11            THE COURT:  You can answer.

12            THE WITNESS:  Jeremy Zarzycki was the first time

13   that someone had called me to request an invocation.

14   BY MR. KEZHAYA:

09:46:36 15   Q   I understand that you're saying that he was the first

16   person who's ever called you.  That's not my question.  My

17   question to you is whether anyone before Jeremy Zarzycki had

18   made a request, not necessarily of you, and not necessarily by

19   a phone call.

09:46:55 20   A   I had been directed by the chief of staff in other

21   instances to schedule invocations.

22   Q   From people who were not on the list; right?

23   A   Correct.

24   Q   Because they've requested it; right?

09:47:04 25   A   I'm not sure if they requested it of her.  I was directed

DIRECT EXAMINATION - KELLI KUESTER

09:47:08  1   by my chief of staff to schedule.

2   Q   Okay.  And she didn't give you any information about what

3   caused her to request you -- or to schedule them for an

4   invocation; is that right?

09:47:20  5   A   No.

6   Q   I may have asked an unclear question.

7         Did the chief of staff provide you this contact

8   information and additional background information for this is

9   why I'm asking you to give them an invocation?

09:47:36  10         MR. CLOAR:  Objection.  Calls for hearsay.

11         MR. KEZHAYA:  It's --

12         THE COURT:  Overruled.

13         You can answer.

14         THE WITNESS:  If she provided me a business card,

09:47:49  15   she may have just asked me to schedule an invocation.  I

16   didn't always get a complete background as to why she may

17   have wanted that done.

18   BY MR. KEZHAYA:

19   Q   I noticed you used the word always.  So sometimes she did

09:48:00  20   give you a background; right?

21   A   Correct.

22   Q   What was the background that you can recall?

23         MR. CLOAR:  Objection.  Calls for hearsay.

24         THE COURT:  What is your response to hearsay?

09:48:10  25         MR. KEZHAYA:  This is the clear agency rule, Judge.

DIRECT EXAMINATION - KELLI KUESTER

09:48:11  1   She's talking about her boss, the chief of staff, providing

2   her contact information for someone to give an invocation.

3          THE COURT:  Your response?

4          MR. CLOAR:  Your Honor, he's laid no foundation as

09:48:20  5   to whether that was within the chief of staff's scope of

6   agency; he's not invoked any exception under 801(d)(2); he's

7   not indicated which provision of 801(d)(2) he's invoking,

8   whether it's (C) or (D); and he has not provided anything

9   other than the statement itself to indicate that it is within

09:48:35 10   the scope of 801(d)(2).

11         THE COURT:  I think you need to lay additional

12   foundation.

13         MR. KEZHAYA:  Yes, Your Honor.

14   BY MR. KEZHAYA:

09:48:42 15   Q   The chief of staff is your boss; right?

16   A   Yes, that's correct.

17   Q   And early 2016 what was the name of your boss?

18   A   Rachel Smetana.

19   Q   Did you take employment instructions from your boss?

09:48:57 20   A   Employment instructions?

21   Q   If your boss told you to do something, would you do it?

22   A   Yes.

23   Q   Provided it was within the course and scope of your

24   employment; right?

09:49:06 25   A   Yes.

DIRECT EXAMINATION - KELLI KUESTER

09:49:06  1   Q    Provided that it's within the course and scope of her

2   employment to give you these instructions; right?

3   A    Yes.

4   Q    And she handed you a business card; right?

09:49:14  5   A    Yes.

6   Q    And she told you to schedule an invocation; right?

7   A    Yes.

8   Q    And you scheduled the invocation, didn't you?

9   A    Yes.

09:49:22  10  Q    What did she tell you when she gave you background around

11  the time she gave you the card?

12  A    When --

13       MR. CLOAR:  Objection, Your Honor.  Vague as to

14  time.

09:49:34  15       THE COURT:  Overruled.

16       THE WITNESS:  One example may be that she has met

17  this person at an event and she would like me to reach out to

18  them.

19  BY MR. KEZHAYA:

09:49:42  20  Q    Okay.  Is that all she told you?

21  A    In that particular instance that I can remember, yes.

22  Q    When this was instance?

23  A    I can't recall that.

24  Q    Tell me more about this instance.  Who this was person?

09:49:54  25       MR. CLOAR:  Object.  Vague.

DIRECT EXAMINATION – KELLI KUESTER

09:49:56  1          THE COURT:  Overruled.

        2          THE WITNESS:  I can't recall that either.

        3   BY MR. KEZHAYA:

        4   Q   Was this instance in 2016?

09:50:04  5   A   I do not believe so.

        6   Q   Was it before Jeremy Zarzycki gave you a call?

        7   A   I believe so.

        8   Q   As I recall, you started your employment in 2015, so it

        9   must be somewhere between summer of 2015 and February 2016.

09:50:20 10   Would you agree with that?

       11   A   Correct.

       12   Q   What was the nature of this organization's religious

       13   beliefs?

       14          MR. CLOAR:  Object.  Vague.  Which organization?

09:50:33 15          THE COURT:  Overruled.

       16   BY MR. KEZHAYA:

       17   Q   What was the nature of the religious beliefs espoused by

       18   this business card?

       19          MR. CLOAR:  Objection.  Foundation.

09:50:41 20          THE COURT:  Overruled.

       21          THE WITNESS:  The name of the organization?

       22   BY MR. KEZHAYA:

       23   Q   Let's start with the name.

       24   A   I believe it's the Islamic Speaker Bureaus of Arizona.

09:50:49 25   Q   And this was pre-2016?

DIRECT EXAMINATION – KELLI KUESTER

09:50:53   1   A   I believe so.

2   Q   There was a Muslim speaker in November of 2016.  Do you

3   remember that?

4   A   I believe -- I'm getting the years a little bit confused,

09:51:09   5   but yes.

6   Q   Okay.  Are you open to the possibility that this happened

7   after TST came in?  Or are you certain this happened before

8   Zarzycki gave the call?

9   A   It could have happened after.  Like I said, she's given me

09:51:22  10   a couple of cards.  There's been a couple of contacts.

11   Q   Okay.  So this may not be before Zarzycki, but someone

12   else was scheduled for an invocation who was not on that list

13   before Zarzycki; right?

14        MR. CLOAR:  Your Honor, best evidence.

09:51:43  15        THE COURT:  Overruled.

16        I think you should re-ask the question.  It was a

17   little confusing.

18        MR. KEZHAYA:  Yes, Judge.

19   BY MR. KEZHAYA:

09:51:49  20   Q   Let's move on.

21        During your phone call with Zarzycki, did you ask any

22   qualifying questions of The Satanic Temple?

23   A   No.

24   Q   Did you know when talking with Zarzycki that an

09:52:07  25   organization named The Satanic Temple was requesting to give

DIRECT EXAMINATION – KELLI KUESTER

09:52:10 1    an invocation?

2    A    Yes.

3    Q    Through your phone conversation with Zarzycki, did you

4    take the impression that it wouldn't necessarily be Zarzycki

09:52:19 5    who gave this invocation?

6    A    I don't believe he told me the specific person during the

7    phone call who would be giving the invocation.

8    Q    Did he indicate it would be him?

9    A    I don't believe he said he would be doing it, no.

09:52:38 10   Q    Did he just indicate that someone from TST would be giving

11   the invocation?

12   A    Correct.  To the best of my knowledge, I believe he just

13   requested that The Satanic Temple give an invocation at the

14   next Scottsdale city council meeting that was available.

09:52:54 15   Q    At the time you received that phone call, had you heard of

16   The Satanic Temple?

17   A    Yes.

18   Q    What was your understanding of The Satanic Temple in terms

19   of geographically where they're located?

09:53:07 20   A    I had heard they were in Tucson.

21   Q    And where did you hear that from?

22   A    On the news.

23   Q    Okay.  Did you have any personal knowledge?  Do you know

24   any satanists?

09:53:19 25   A    No.

DIRECT EXAMINATION – KELLI KUESTER

09:53:20   1    Q    Had you ever attended any structure that had signage that

2    said The Satanic Temple on it?

3    A    No.

4    Q    Had you ever performed any sort of an independent

09:53:31   5    investigation at all to verify whether The Satanic Temple was

6    actually based in Tucson?

7    A    No.

8    Q    Okay.

9            Earlier you testified that you did not ask any

09:53:47  10    qualifying questions of The Satanic Temple; right?

11    A    Correct.

12    Q    Did you ever ask anyone qualifying questions before

13    scheduling them?

14    A    No.

09:53:55  15    Q    When your boss handed you a card and said I want you to

16    schedule these people for an invocation, did you confirm that

17    they had some kind of substantial connection to Scottsdale

18    before scheduling them?

19    A    Beyond looking at some basic information on the card, no.

09:54:16  20    Q    Did your boss tell you that they had been through some

21    form of vetting process before telling you to give them an

22    invocation?

23            MR. CLOAR:  Objection.  Calls for hearsay.

24            THE COURT:  Overruled.

25

DIRECT EXAMINATION – KELLI KUESTER

09:54:29    1    BY MR. KEZHAYA:

2    Q    Did your boss ever tell you they had been through some

3    sort of vetting process before instructing you to permit them

4    an opportunity to give an invocation?

09:54:39    5    A    Specifically she did not state that, no.

6    Q    Did she say one way or the other?

7    A    No.

8    Q    During that phone call with Zarzycki, you didn't ask what

9    the contents of the invocation would be, did you?

09:54:53   10    A    No.

11    Q    During any of your phone calls with any of the people that

12    you've ever requested -- scheduled an invocation for, did you

13    ever request the contents of their invocation?

14    A    No.

09:55:07   15    Q    Does the City of Scottsdale have some form of policy

16    reviewing invocations for permissible religious content?

17    A    No.

18    Q    As I recall, you testified earlier that you received a

19    phone call from Zarzycki and you scheduled it; is that right?

09:55:33   20    A    Yes.

21    Q    About how long did that phone conversation last?

22    A    I would say maybe three to five minutes.  Not long.

23    Q    After you scheduled The Satanic Temple, at some point you

24    informed the mayor and the chief of staff of the decision; is

09:55:53   25    that right?

DIRECT EXAMINATION - KELLI KUESTER

09:55:54    1    A    Of the scheduling, yes.

2    Q    Yes.

3         And the mayor told you that you did the right thing,

4    didn't he?

09:55:58    5    A    Yes.

6    Q    He also told you that you needed to treat The Satanic

7    Temple as you would any other religion; is that right?

8    A    Any other -- yes.  Yes.

9    Q    Did you ever tell Biesemeyer that The Satanic Temple is

09:56:15   10    from Tucson?

11         MR. CLAUS:  Your Honor, could we have just a modicum

12    of respect and not refer to people just by their last names?

13         THE COURT:  Overruled.

14    BY MR. KEZHAYA:

09:56:31   15    Q    Did Brian Biesemeyer ever tell you -- or pardon --

16         MR. KEZHAYA:  Strike that, Your Honor.

17    BY MR. KEZHAYA:

18    Q    Did you ever tell Biesemeyer that The Satanic Temple is

19    from Tucson?

09:56:43   20    A    I don't recall telling Mr. Biesemeyer that specific

21    information.

22    Q    You said you don't recall, or affirmatively no?

23    A    I honestly can't remember having told him that specific

24    information.

09:57:10   25    Q    Okay.  If Biesemeyer testified that you did tell him that,

DIRECT EXAMINATION – KELLI KUESTER

09:57:16 1   would he be lying?

2           MR. CLOAR:  Objection, Your Honor.  He's asking her

3   to vouch --

4           THE COURT:  Objection is sustained.

09:57:23 5           MR. CLOAR:  Thank you, Your Honor.

6   BY MR. KEZHAYA:

7   Q   There was some form of public outcry following the initial

8   scheduling of The Satanic Temple, wasn't there?

9   A   The City received quite a few e-mails, yes.

09:57:39 10  Q   Were the bulk -- well, were several of these e-mails

11  objecting to The Satanic Temple giving invocation?

12          MR. CLOAR:  Objection.  Best evidence.

13          THE COURT:  Overruled.

14          THE WITNESS:  I'm sorry, what was the question?

09:57:53 15  BY MR. KEZHAYA:

16  Q   Were these e-mails objecting to The Satanic Temple giving

17  an invocation?

18          MR. CLOAR:  Objection.  Hearsay.

19          THE COURT:  What's your response on hearsay?

09:58:13 20          MR. KEZHAYA:  Uh --

21          THE COURT:  Is it being offered for the truth of the

22  matter asserted?

23          MR. KEZHAYA:  No, Your Honor.  The important thing

24  is we're leading into the part where she tells Biesemeyer,

09:58:23 25  Mr. Biesemeyer, that there's a lot of e-mails.  Something

DIRECT EXAMINATION – KELLI KUESTER

09:58:29  1    happened that caused an investigation in the process.  So

2    we --

3                THE COURT:  I'm going to overrule the objection.

4    Whether or not the person writing the e-mail personally

09:58:38  5    objected, and that was their actual belief is not the issue.

6    The issue is whether they received e-mails that objected, and

7    so it's not being offered for the truth of the matter

8    asserted.

9                MR. CLOAR:  Thank you, Your Honor.

09:58:51  10   BY MR. KEZHAYA:

11   Q    Were they?

12   A    I would say the majority of the e-mails were upset that

13   the invocation was scheduled.

14   Q    Do you remember the number of e-mails that the City

09:59:03  15   received in the span of a morning?

16               MR. CLOAR:  Objection.  Foundation.

17               THE COURT:  Overruled.

18               THE WITNESS:  I know one organization was able to

19   generate over 15,000 e-mails.

09:59:16  20   BY MR. KEZHAYA:

21   Q    Was the correct number 15,207?

22   A    That sounds accurate from the one organization.

23   Q    Okay.  So in fact there was more than 15,207, it just so

24   happens that this one organization sent 15,207?

09:59:33  25   A    That's correct.

DIRECT EXAMINATION – KELLI KUESTER

09:59:34   1    Q    What was this organization?  Was it a church?

2    A    I believe so.

3    Q    Do you remember which church?

4    A    I do not.

09:59:50   5    Q    Did the volume of this predominantly negative feedback

6    crash city servers?

7               MR. CLOAR:  Objection.  Foundation.

8               THE COURT:  Overruled.

9               THE WITNESS:  It created a problem so our IT

10:00:06  10    department had to make sure all the e-mails with a particular

11    subject line were redirected to my e-mail in-box.

12    BY MR. KEZHAYA:

13    Q    Would you describe that problem as crashing the City?

14    A    That is how it was described to me by the IT department.

10:00:29  15    Q    At some point you were actually the recipient of all these

16    e-mails; is that right?

17    A    Yes.

18    Q    What caused that?

19    A    There were so many e-mails going into the mayor and

10:00:41  20    council e-mail in-boxes, so IT asked that all e-mails with the

21    subject line be diverted to my in-box so that the mayor and

22    council could still receive their day-to-day e-mails so that

23    they weren't so flooded.

24    Q    What was the subject line, do you remember?

10:01:01  25    A    To the best of my memory, I believe it said "No Hail Satan

DIRECT EXAMINATION - KELLI KUESTER

10:01:07  1   prayer."

2   Q    You responded to some of these e-mails, didn't you?

3   A    I responded to the non-form letter e-mails that were

4   received.  The 15,207, I did not respond to those.

10:01:30  5   Q    Ones that had individualized feedback, did you respond to

6   those?

7   A    I made every attempt to respond to as many as possible.

8   Q    Was the nature of your response to the effect of the mayor

9   and some members of city council have asked me to thank you

10:01:45  10   for your input?

11           MR. CLOAR:  Objection.  Best evidence.

12           THE COURT:  Overruled.

13   BY MR. KEZHAYA:

14   Q    Was it?

10:01:51  15   A    I believe so, yes.

16   Q    In that response, did you also indicate that if the mayor

17   and city council don't allow this, they have to end the

18   practice of having invocation?

19           MR. CLOAR:  Same objection, Your Honor.

10:02:11  20           THE COURT:  Overruled.

21           THE WITNESS:  That does sound -- that does sound

22   familiar, to the best of my memory, yes.

23   BY MR. KEZHAYA:

24   Q    Do you also recall giving feedback or giving responses to

10:02:24  25   this feedback to the effect of "the mayor finds this whole

DIRECT EXAMINATION - KELLI KUESTER

10:02:27  1  affair personally repugnant and does not condone this group,

2  its belief, or mission"?

3         MR. CLOAR:  Same objection.

4         THE COURT:  Overruled.

10:02:38  5         THE WITNESS:  Yes, I think I did have that in some

6  of my responses, yes.

7  BY MR. KEZHAYA:

8  Q   Did you prepare a form response to aid you

9  administratively in getting these responses out?

10:02:52 10  A   I believe the chief of staff formed it, got the mayor's

11  approval.  It was then given to me to help send out responses

12  quickly, yes.

13  Q   Do you remember when these -- when this response was being

14  sent?  Was it at least in February?

10:03:10 15  A   I believe so, yes.

16  Q   Was it also in May?

17  A   I can't honestly recall how long that lasted.

18  Q   Okay.  In terms of this public outcry, help me understand,

19  what was the duration of it?  This was like a two- or

10:03:32 20  three-day kerfuffle or was this a wider campaign?

21  A   I would say it lasted longer, two -- more than two to

22  three days.  I would say more in the weeks to months,

23  possibly.

24  Q   So at some point there was a need of a rescheduling; is

10:03:59 25  that accurate?

DIRECT EXAMINATION – KELLI KUESTER

10:04:00    1    A    Yes.

2    Q    Did you receive a second phone call from Zarzycki?

3    A    No.  I Received an e-mail from Mr. Zarzycki.

4         MR. KEZHAYA:  Your Honor, we've introduced

10:04:19    5    Exhibit 6; is this right?

6         THE COURT:  You mean is it admitted in evidence?

7         MR. KEZHAYA:  Yes, Your Honor.

8         THE COURT:  Yes.

9         MR. KEZHAYA:  Could we show the witness Exhibit 6,

10:04:29   10    please?

11         THE COURT:  Yes.

12    BY MR. KEZHAYA:

13    Q    Ms. Kuester, is this the e-mail you're referring to that

14    you received from Zarzycki?

10:04:47   15    A    Yes.

16    Q    It notes just confirming that TST cannot attend to do the

17    April 5 invocation; is that right?

18    A    Yes.

19    Q    Was this the first you heard of this need of rescheduling?

10:05:04   20    A    Yes.

21    Q    Okay.  And then you ultimately did reschedule, then,

22    cutting to the chase, for July 6; is that right?

23    A    Yes.

24    Q    When you made this rescheduling decision, was it prompted

10:05:22   25    by any determination what The Satanic Temple's substantial

DIRECT EXAMINATION – KELLI KUESTER

10:05:28  1  connection to Scottsdale was?

2       MR. CLOAR:  Your Honor, could you have counsel

3  re-ask the question?  He stepped away from the mic.  I

4  couldn't hear.

10:05:36  5       THE COURT:  The mic -- I couldn't follow it either.

6       MR. KEZHAYA:  Beg your pardon, Your Honor.

7  BY MR. KEZHAYA:

8  Q   When rescheduling, did you perform any sort of

9  investigation into The Satanic Temple?

10:05:43  10  A   No.

11  Q   Did you request any information from the Satanic Temple

12  about why should we let you give an invocation?

13  A   No.

14  Q   Did you request where are you physically located?

10:05:56  15  A   No.

16  Q   Did you request what is your membership?  Where are they

17  and how many?

18  A   No.

19  Q   Did you request the nature of their religious beliefs?

10:06:08  20  A   No.

21  Q   Did you request the contents of the proposed invocation?

22  A   No.

23  Q   Is all of your discussions regarding rescheduling the

24  Exhibit 6 that you just saw, and then a response that looks

10:06:24  25  like the next day providing him additional dates?

DIRECT EXAMINATION - KELLI KUESTER

10:06:31   1    A    Yeah, I provided the July 6 date as an opportunity for

2    them to reschedule.

3    Q    Other than that first phone call, did you ever have any

4    subsequent phone calls from Zarzycki?

10:06:44   5    A    No, I don't believe so.

6    Q    Did you ever notify the city manager of the volume of

7    public feedback on the decision to schedule The Satanic

8    Temple?

9    A    I don't remember if I was the one that specifically told

10:07:07  10    Mr. Biesemeyer the amount of public input we had received.   I

11    can't recall that.

12    Q    Did you tell someone else who you believed told

13    Biesemeyer?

14          MR. CLOAR:  Objection.  Calls for speculation.

10:07:21  15          THE COURT:  Overruled.

16          THE WITNESS:  I kept in touch with my chief of

17    staff, as well as the councilmembers, to the amount of input

18    that we had been receiving.

19    BY MR. KEZHAYA:

10:07:32  20    Q    So in terms of the chain of command, so to speak, it goes

21    you, chief of staff, and -- I'm making a poor record.  You are

22    at the bottom tier importantly for this.  The next level up is

23    chief of staff.  And then the next level, at least one level

24    up from chief of staff is the city council.  Where does

10:07:53  25    Biesemeyer fall in that framework?

DIRECT EXAMINATION - KELLI KUESTER

10:07:55  1          MR. CLOAR:  Objection.  Foundation.

         2          THE COURT:  Overruled.

         3    BY MR. KEZHAYA:

         4    Q    And by Biesemeyer, I mean the city manager.

10:08:06  5    A    The city manager reports to the mayor and city

         6    councilmembers.

         7    Q    Okay.  So does the chief of staff report to the city

         8    manager?

         9    A    No.

10:08:12 10    Q    Okay.  So is the city manager's office separate from the

        11    mayor's office?

        12    A    Yes.

        13    Q    Earlier you testified that your job title was management

        14    assistant to the mayor and city council; is that right?

10:08:26 15          MR. CLOAR:  Objection.  Misstates.

        16          THE COURT:  Overruled.

        17    BY MR. KEZHAYA:

        18    Q    Is that right?

        19    A    In 2016 my title was management assistant to the mayor,

10:08:35 20    city council.

        21    Q    And city council?

        22    A    Um-hmm.  Yes.

        23    Q    You clarified 2016.  Is it something different now?

        24    A    My current job title is management assistant to the mayor.

10:08:49 25    Q    Okay.  The mayor -- well, we don't care about that.

DIRECT EXAMINATION – KELLI KUESTER

10:08:52  1        So the city manager's office is separate from the

2    mayor's office; is that right?

3             MR. CLOAR:  Objection.  Asked and answered.

4             THE COURT:  Overruled.

10:09:06  5  BY MR. KEZHAYA:

6    Q    Is -- sorry, is that a yes?

7    A    The city manager's office is separate from the mayor's

8    office.

9    Q    Is the mayor a full-time position?

10:09:17 10  A    Yes.

11   Q    Okay.

12        Your administrative role as management assistant to

13   the mayor and city council at this relevant time, what were

14   your duties for the city council?

10:09:37 15            MR. CLOAR:  Objection.  Vague as to "this relevant

16   time."

17            THE COURT:  Overruled.

18            THE WITNESS:  To respond to constituent complaints,

19   concerns, and input that the mayor and city council receive.

10:09:50 20  BY MR. KEZHAYA:

21   Q    Is that the full scope of your -- the job duties?

22   A    That's the majority of my job duties, I would say, not the

23   full scope.

24   Q    When you respond to constituents, do you receive

10:10:03 25  instructions from, for example, the mayor and maybe individual

DIRECT EXAMINATION - KELLI KUESTER

10:10:09  1   city councilmembers for how they would like you to respond?

2   A   That's a difficult question to answer.  Not so much from

3   the city councilmembers, no.  My job is mainly to let the

4   constituent know that we've received their concern and to try

10:10:29  5   to resolve the issue.

6   Q   Okay.

7   A   Not to share opinions of mayor and councilmembers.

8   Q   That's not your normal job, to share the opinions of mayor

9   and councilmembers; is that right?

10:10:42  10  A   I do not share their opinions.

11  Q   Earlier you testified that some of your feedback was to

12  the effect of the mayor finds this organization repugnant and

13  does not -- pardon me, give me just a second to find the quote

14  again.

10:10:56  15      "The mayor finds this whole affair personally

16  repugnant and does not condone this group, its belief or

17  mission."

18      Earlier you testified this was some of the feedback

19  that you were giving constituents.  Do you remember that?

10:11:17  20  A   You are correct.  My apologies.  In that case I was

21  directed to do so by the chief of staff who gave me that

22  information that was approved by the mayor.

23  Q   Okay.  What was different about this time?  As opposed to

24  your normal run-of-the-mill constituent feedback?

10:11:39  25  A   That's a great question.  I'm not sure.  I did what I was

DIRECT EXAMINATION - KELLI KUESTER

10:11:43  1   told.

2   Q   At some point you were instructed to deny, or rather

3   revoke the invitation extended to The Satanic Temple; is that

4   right?

10:11:58  5   A   Correct.

6   Q   Who was the person that ordered you to send the e-mail?

7   A   Mr. Biesemeyer.

8   Q   And earlier you testified that Mr. Biesemeyer is in a

9   separate office from your office; is that right?

10:12:10  10  A   Yes.

11  Q   Did Mr. Biesemeyer have authority to tell you what to do?

12          MR. CLOAR:  Objection.  Foundation.

13          THE COURT:  Overruled.

14          THE WITNESS:  As the city manager, I am able to take

10:12:22  15  direction from him, yes.

16  BY MR. KEZHAYA:

17  Q   Help me understand the chain of command, then.

18          So Mr. Biesemeyer's in a separate office.  Does he

19  have his own separate staff?

10:12:32  20  A   Yes.

21  Q   Does he have his own analog to you, people who can send

22  e-mails on his behalf?

23  A   Yes.

24  Q   So why you?  Why were you the one sending this e-mail?

10:12:49  25  A   My assumption would be is that I'm the one who schedules

DIRECT EXAMINATION - KELLI KUESTER

10:12:52  1  the invocations.

2  Q    Okay.  What other instructions do you take in the regular

3  course of your job from the office of the city manager?

4  A    If we receive a constituent concern regarding something

10:13:08  5  that is going on in the City, I may reach out to the city

6  manager's office and staff for assistance in getting something

7  resolved.

8  Q    Okay.  And so you'll reach out to the office of the city

9  manager.  But my question to you was when do you take

10:13:23  10  direction from them.  So you'll reach out to them for help,

11  then what?

12       Help me draw a line from your reaching out to them

13  for help and then their telling you what to do.

14  A    It's the city manager's office.  They assist, they give

10:13:43  15  direction on a regular basis.

16  Q    Did you coordinate the contents of this message with

17  Brian Biesemeyer, the cancellation e-mail?

18  A    My recollection is that Mr. Biesemeyer gave me the

19  language to use in that message.

10:14:07  20  Q    I have an e-mail.

21       Do you recall sending an e-mail on May 23rd to

22  Brian Biesemeyer at 3:08 p.m.?

23  A    No, I don't recall this particular one that you're talking

24  about.

10:14:45  25  Q    Would it refresh your recollection to see a document that

DIRECT EXAMINATION – KELLI KUESTER

10:14:49  1    appears to be an e-mail from Kelli Kuester to

2    Brian Biesemeyer?

3              MR. CLOAR:  Objection, Your Honor.  Whatever

4    counsel's about to attempt to refresh the witness's

10:14:58  5    recollection with is not in the joint pretrial and is not on

6    the exhibit list.

7              MR. KEZHAYA:  Judge, we're just trying to refresh

8    her recollection.  I'm just trying to get her to recall what

9    the facts of this case were.

10:15:10  10             THE COURT:  It's an exhibit you want to use during

11   the trial, though; right?

12             MR. KEZHAYA:  I don't actually want to introduce the

13   exhibit, Your Honor.  I just want to refresh her recollection

14   of whether she sent this e-mail.

10:15:20  15             THE COURT:  Have you said anything in the final

16   pretrial order that indicates to the defense that you

17   intended to use this exhibit during trial?

18             MR. KEZHAYA:  No, Your Honor.  This was something

19   that we didn't actually intend to use.

10:15:36  20             THE COURT:  I'm going to sustain the objection.

21             MR. KEZHAYA:  Yes, Judge.

22   BY MR. KEZHAYA:

23   Q   Please help me remember your testimony.  Did you say that

24   Brian Biesemeyer provided you the contents of the e-mail?

10:15:54  25   A   To the best of my memory, yes.

DIRECT EXAMINATION - KELLI KUESTER

10:15:57  1   Q   Okay.  And did you get the impression whether that e-mail

2   had been cleared by the city council and the mayor?

3         MR. CLOAR:  Objection.  Speculation.

4         THE COURT:  Overruled.

10:16:08  5   BY MR. KEZHAYA:

6   Q   Yes or no?

7   A   I didn't --

8         THE COURT:  If you can answer yes or no.

9         THE WITNESS:  I didn't get any impression.  I was

10:16:15  10  just given an e-mail to send.

11  BY MR. KEZHAYA:

12  Q   Okay.  Was this process of The Satanic Temple's invocation

13  a politically difficult process for the office of the mayor

14  and the office of the city manager?

10:16:33  15        MR. CLOAR:  Objection.  Speculation.

16        THE COURT:  Overruled.

17        MR. CLOAR:  Lack of foundation.

18        THE COURT:  Overruled.

19        THE WITNESS:  As a city employee, getting involved

10:16:40  20  in politics is not really part of my scope.

21  BY MR. KEZHAYA:

22  Q   Earlier you mentioned that the majority of your scope is

23  just replying to constituent concerns.  Do you remember that?

24  A   Yes.

10:16:52  25  Q   What are the nature of constituent concerns that typify

DIRECT EXAMINATION – KELLI KUESTER

10:16:56   1   your responses?

2          MR. CLOAR:  Objection.  Vague.

3          THE COURT:  Overruled.

4          THE WITNESS:  I'm sorry, can you say that one more

10:17:05   5   time?

6   BY MR. KEZHAYA:

7   Q   Earlier you testified that the bulk of your job is

8   responding to constituent concerns; right?

9   A   Yes.

10:17:12   10   Q   What is the typical constituent concern that you're

11   responding to?

12   A   There is no typical --

13   Q   There is no typical --

14   A   -- constituent concern.

10:17:19   15   Q   Okay.

16   A   It's everything from the aviation department down to the

17   water department.

18   Q   Okay.  Do they generally revolve around matters of policy?

19   A   To be honest, there is no general when it comes to a

10:17:35   20   constituent concern.  It's flight path noise to potholes.

21   Q   As a general matter, when you are responding to

22   constituent concerns, are you responding to approximately

23   15,207 e-mails from one organization?

24   A   That is not a typical response or a typical day, I would

10:18:00   25   say, no.

DIRECT EXAMINATION - KELLI KUESTER

10:18:06  1   Q   Okay.  Had you ever denied anyone an invocation before The

2   Satanic Temple?

3   A   No.

4   Q   To your knowledge, has anyone at the City ever denied a

10:18:26  5   religious organization an invocation?

6   A   No.

7   Q   And that's not just before The Satanic Temple, that

8   includes after The Satanic Temple?

9   A   Correct.

10:18:44  10   Q   When you -- do you recall the cancellation e-mail?

11   A   I don't recall the wording that was used, no.

12       MR. KEZHAYA:  Could we provide the witness with

13   Exhibit 12, Your Honor?

14   BY MR. KEZHAYA:

10:19:24  15   Q   Do you recall this e-mail?

16   A   Yes.

17   Q   Nowhere in that e-mail provides any kind of appeals

18   process, does it?

19   A   No.

10:19:32  20   Q   Nowhere in that e-mail does it invite The Satanic Temple

21   to demonstrate their substantial connection, does it?

22   A   No.

23   Q   Nowhere in that e-mail does it define what a substantial

24   connection is in particular terms, does it?

10:19:50  25   A   No.

CROSS-EXAMINATION – KELLI KUESTER

10:19:57  1          MR. KEZHAYA:  If I may have a moment, Your Honor?

        2          THE COURT:  You may.

        3          MR. KEZHAYA:  Pass the witness, Your Honor.

        4          THE COURT:  All right.

10:20:03  5          Cross-examination.

        6          MR. CLOAR:  Could we give the witness Exhibit 15, as

        7  well, please, and Exhibit 7 if she doesn't already have it.

        8          THE COURTROOM DEPUTY:  7?

        9          MR. CLOAR:  7.  6, 7, 12, and 15.

10:20:40 10          Could we have the video monitor switched over to

       11  defendants' side, please.

       12          Thank you.

       13               C R O S S - E X A M I N A T I O N

       14  BY MR. CLOAR:

10:20:51 15  Q    Good morning, Ms. Kuester.

       16  A    Good morning.

       17  Q    Ms. Kuester, there's been a lot of discussion about a list

       18  this morning.  And I want to clear up a little bit of

       19  confusion for the Court about the list.

10:21:01 20          In front of you should be a folder labeled

       21  Exhibit 15.  Do you have that in front of you?

       22  A    Yes.

       23          MR. CLOAR:  Michelle, could you publish Exhibit 15

       24  on the monitors, please.

       25

CROSS-EXAMINATION - KELLI KUESTER

10:21:10  1   BY MR. CLOAR:

2   Q   Since becoming management assistant to the mayor, you've

3   invited folks to come give invocations on behalf of the city

4   council before regular city council meetings; right?

10:21:19  5   A   Yes.

6   Q   Using a list that you maintain?

7   A   Yes.

8   Q   I want you to take a look at Exhibit 15 and familiarize

9   yourself with it.  Is Exhibit 15 that list?

10:21:31  10  A   Yes.

11  Q   Now, can you tell the Court if there are any pages of

12  Exhibit 15 that you personally created?

13  A   Page 5 of 8, Invocation 2015.

14  Q   So the fourth page of Exhibit 15?  I know the numbering

10:22:07  15  makes it rather confusing, but I believe it is the fourth?

16  A   Yes.  That page to the end is what I have created.

17  Q   Is it fair to say all of the typewritten pages are the

18  pages you created?

19  A   Yes.

10:22:21  20  Q   You took the job of management assistant to the mayor in

21  summer of 2015; right?

22  A   Yes.

23  Q   Can you explain to the Court when you took the job of

24  management assistant to the mayor, how you went about creating

10:22:33  25  the first page, which is Invocation 2015 of Exhibit 15, how

CROSS-EXAMINATION – KELLI KUESTER

10:22:37  1    you created that list.

2         THE COURT:  It's not the first page of Exhibit 15.

3         MR. CLOAR:  Fourth page, Your Honor.

4         THE COURT:  It's --

10:22:45  5         MR. CLOAR:  If I said the first page, I misspoke.

6         THE COURT:  It's not the fourth page.  It's about

7    the 15th page of what is marked as Exhibit 15.  If you're

8    talking about Bates number 7323; is that right?

9         MR. CLOAR:  Yes, Your Honor.

10:23:03  10        THE COURT:  Okay.  That's about 12 pages in, because

11   the handwritten pages are before it in the exhibit.  I

12   understand the page you're on now.

13        MR. CLOAR:  My apologies, Your Honor.  I will use

14   Bates stamps for the rest of the cross-examination.

10:23:17  15        THE COURT:  That would help.

16   BY MR. CLOAR:

17   Q   Ms. Kuester, could you explain to the Court how you went

18   about creating -- the small numbers in the right-hand corner

19   are called Bates stamps.  Will you understand if I refer to

10:23:27  20   those as Bates stamps?  It says COS-ST-007323.

21   A   The bottom right-hand corner, yes.

22   Q   Yes.  Okay.

23   A   Yes.

24   Q   Was the Bates stamp ending in terminal number 7323 the

10:23:40  25   first version of this list that you were in charge of

CROSS-EXAMINATION - KELLI KUESTER

10:23:43 1    creating?

2    A    Yes.

3    Q    Could you explain to the Court how you went about creating

4    what is labeled as page 7323 of Exhibit 15.

10:23:52 5    A    Yes.  So when I started in the summer of 2015, we still

6    had some dates that we needed to fill for the rest of 2015.

7    So I went back to, I think, the previous two years and I

8    collected the contact information that we had, and I sent an

9    e-mail blast out that showed the remaining dates that we had.

10:24:15 10   And I asked our -- anyone who was on that list to sign up for

11   the remaining dates.

12         In October of 2015, I believe I received the new

13   city council meeting dates for 2016, so again I took the

14   contact information that I had from the two previous years

10:24:31 15   and I asked that they just sign up for any dates that they

16   were interested in providing an invocation for 2016.

17         And that's how I continued my processing forward.

18   Q    I'd like to break that down into pieces.  So typically you

19   send out what you've referred to as an e-mail blast.  Do you

10:24:48 20   mean one large e-mail to everybody whose contact information

21   is on page 7323 with Exhibit 15, for instance?

22   A    Yes.  That, and maybe the page before, possibly, if I

23   needed additional names.

24   Q    And when you send out that e-mail blast, do you give them

10:25:07 25   the invocation dates available for -- the invocation dates

CROSS-EXAMINATION - KELLI KUESTER

10:25:10  1    available for the next calendar year?

2    A    Yes.

3    Q    And it's every regular city council meeting; right?

4    A    Yes.

10:25:18  5    Q    And does your -- you may have answered this already, but

6    does your list change from year to year?

7    A    Yes, it could change from year to year.

8    Q    To your knowledge, did any of the entities or people

9    listed on Exhibit 15 lack a substantial connection to the City

10:25:34  10   of Scottsdale?

11   A    No.

12   Q    From the day you started scheduling invocations until

13   February 8, 2016, did any group contact you asking to give an

14   invocation on behalf of the Scottsdale city council without

10:25:52  15   you asking them first?

16   A    No.

17   Q    To your knowledge, have you been the only point of contact

18   from the City for scheduling invocations?

19   A    Yes.

10:26:02  20   Q    Have you ever once asked what a party asking -- strike

21   that.

22          Have you ever asked once -- strike that again.

23          Have you ever asked anybody who was scheduled to give

24   an invocation what their religious beliefs were?

10:26:16  25   A    No.

CROSS-EXAMINATION - KELLI KUESTER

10:26:17  1    Q    Did you care?

       2    A    No.

       3    Q    To your knowledge, has the City ever declined an

       4    invocation because of the god or gods whom the invoker called

10:26:26  5    upon?

       6    A    No.

       7    Q    Now, Mr. Zarzycki contacted you February 8th, 2016; right?

       8    A    Yes.

       9    Q    Not somebody named Michelle Shortt?

10:26:39 10    A    No.

      11    Q    Have you ever spoken to somebody named Michelle Shortt?

      12    A    No.

      13    Q    Prior to this litigation, had you ever even heard the name

      14    Michelle Shortt.

10:26:50 15    A    No.

      16    Q    So Mr. Zarzycki's phone call on February 8th, 2016, that

      17    was the first time you received a request to give an

      18    invocation without you reaching out first; true?

      19    A    Yes.

10:27:06 20    Q    Did Mr. Zarzycki ever tell you any of his religious views?

      21    A    No.

      22    Q    Did you ask him?

      23    A    No.

      24    Q    Did Mr. Zarzycki ever tell you the views of any of the

10:27:16 25    plaintiff entities that are here today?

CROSS-EXAMINATION – KELLI KUESTER

10:27:18   1    A    No.

         2    Q    Did you ask Mr. Zarzycki about the religious views of any

         3    of the plaintiff entities?

         4    A    No.

10:27:27   5    Q    Did anyone ever describe the contents of any proposed

         6    invocation to you?

         7    A    No.

         8    Q    You did schedule Mr. Zarzycki's group to give an

         9    invocation before a Scottsdale city council meeting; right?

10:27:43  10    A    Yes.

        11    Q    Do you remember the date of that meeting?

        12    A    The original date was April 5th of 2016.

        13    Q    Did Mr. Zarzycki's group give an invocation April 5th,

        14    2016?

10:27:55  15    A    No.

        16    Q    Why not?

        17    A    They requested to reschedule.  They needed to cancel

        18    April 5th.

        19    Q    I'd like you to grab Exhibit 6 in front of you.

10:28:06  20         MR. CLOAR:  Michelle, if you could publish Exhibit 6

        21    on the monitors, please.

        22    BY MR. CLOAR:

        23    Q    I'm showing you Exhibit 6.  Is that the e-mail

        24    Mr. Zarzycki sent you asking you to reschedule?

10:28:17  25    A    Yes.

CROSS-EXAMINATION - KELLI KUESTER

10:28:18  1   Q   After Mr. Zarzycki sent you Exhibit 6, did you respond to

2   Mr. Zarzycki?

3   A   Yes, I did.

4   Q   Did you give Mr. Zarzycki alternate dates?

10:28:30  5   A   Yes, I did.

6   Q   I'd like you to grab Exhibit 7 now in front of you.

7            MR. CLOAR:  And Michelle, if you could publish

8   Exhibit 7.

9   BY MR. CLOAR:

10:28:37  10   Q   Is Exhibit 7 the response you sent to Mr. Zarzycki?

11   A   Yes.

12   Q   What alternate days did you give him?

13   A   July 5th or July 6th.

14   Q   Do you know which date he picked?

10:28:50  15   A   July 6th.

16   Q   Did Mr. Zarzycki's group give an invocation on July 6th?

17   A   No.

18   Q   Why not?

19   A   I was asked by Mr. Biesemeyer to cancel the invocation for

10:29:01  20   July 6th.

21   Q   Have you ever asked a Tucson-based group to give an

22   invocation on behalf of the Scottsdale city council before a

23   regular city council meeting?

24   A   No.

10:29:14  25   Q   What about a group from Payson?

CROSS-EXAMINATION - KELLI KUESTER

10:29:16  1    A    No.

       2    Q    Prescott?

       3    A    No.

       4    Q    Bisbee?

10:29:20  5    A    No.

       6         THE COURT:  We're going to break at this point.  We

       7    will resume in 15 minutes at a quarter to the hour.

       8         (Recess taken from 10:29 to 10:45.)

       9         THE COURT:  Please be seated.

10:45:59 10         MR. KEZHAYA:  Your Honor, one quick point of order.

      11    How much time do we have?

      12         THE COURT:  I'll let you know at noon.

      13         MR. KEZHAYA:  Yes, Judge.

      14         THE COURT:  And if I can do it during the

10:46:07 15    questioning, I'll do it, but --

      16         Actually, hold on a minute.  Yours is all on my

      17    iPad, I think.

      18         You have used 52 minutes today so far.

      19         MR. KEZHAYA:  Okay.  Yes, Judge.

10:46:31 20         THE COURT:  Okay.

      21         MR. CLOAR:  Thank you, Your Honor.

      22    BY MR. CLOAR:

      23    Q    Just a few more questions I think, Ms. Kuester.  Okay?

      24    A    Okay.

10:46:37 25    Q    Ms. Kuester, did you ever have any conversation with any

CROSS-EXAMINATION – KELLI KUESTER

10:46:40  1    member of the city council where they directed you to cancel

2    the requested invocation?

3    A    I'm sorry, can you say that one more time?

4    Q    Sure.  Did you ever have any conversations with any member

10:46:51  5    of the Scottsdale city council where they directed you to

6    cancel Mr. Zarzycki's requested invocation?

7    A    No.

8    Q    Did you ever have a conversation with the mayor,

9    Mayor Lane, where he asked you to cancel Mr. Zarzycki's

10:47:04 10    requested invocation?

11    A    No.

12    Q    Did Mr. Biesemeyer ever say words to you to the effect of

13    I dislike the Satanic Temple, or words to that effect?

14    A    No.

10:47:23 15    Q    Did Mr. Biesemeyer ever say anything to you that gave you

16    the impression that he disliked The Satanic Temple or a --

17              MR. KEZHAYA:  Objection, Your Honor.

18    BY MR. CLOAR:

19    Q    -- calling itself The Satanic Temple?

10:47:30 20              MR. KEZHAYA:  All these questions of what did

21    Mr. Biesemeyer tell you is hearsay.

22              MR. CLOAR:  It's not being offered --

23              THE COURT:  Hold on.

24              MR. CLOAR:  My apologies, Your Honor.

10:47:38 25              THE COURT:  Overruled.

CROSS-EXAMINATION - KELLI KUESTER

BY MR. CLOAR:

Q    Would you like me to re-ask the question?

A    Yes, please.

Q    Of course.  Did Mr. Biesemeyer ever say words to you that you took to mean that Mr. Biesemeyer disliked The Satanic Temple?

A    No.

Q    After you -- after the -- strike that.

        After the May 23rd, 2016, e-mail where The Satanic Temple was informed they would not be permitted to give an invocation, did you ever hear from anybody affiliated with plaintiffs ever again?

A    No, I did not.

Q    Between May 23, 2016, and the commencement of this litigation, have you heard one word from anybody associated with the plaintiffs at all?

A    No.

Q    Between May 23, 2016, and the commencement of this litigation, has anybody ever contacted you, in the universe, and asserted that The Satanic Temple has some connection with the City of Scottsdale?

A    No.

Q    Between the time you began scheduling invocations on behalf of the city council and May 23, 2016, did you ever schedule a non-faith-based speech to be given before a

EXAMINATION – KELLI KUESTER

10:49:03  1   Scottsdale city council meeting?

2   A    No.

3            MR. CLOAR:  If I may have one moment, Your Honor.

4            THE COURT:  You may.

10:49:26  5            MR. CLOAR:  Nothing further at this time,

6   Your Honor.

7            THE COURT:  Redirect?

8            MR. KEZHAYA:  No questions, Your Honor.

9                    E X A M I N A T I O N

10:49:35  10  BY THE COURT:

11  Q    I have a question for you, Ms. Kuester.

12           I'm looking at Exhibit 15 and sometimes under the

13  invocation list, such as page 7320, if you look at the lower

14  right-hand side, it has councilmember in the place of, it

10:50:09  15  appears, the individual giving the invocation.

16           Was it your understanding in those instances that a

17  member of the council gave the invocation?

18  A    To the best of my memory, that may have been an instance

19  where it was a councilmember doing a moment of silence.

10:50:33  20  Q    Okay.  That leads to the second question I had.  Above it

21  on that page is two moments of silence.  What was your

22  understanding of the intent or what was done during a moment

23  of silence before the council?

24  A    A councilmember would just request a moment of silence.

10:50:59  25  Q    Is that everything you know about what was intended by

EXAMINATION – KELLI KUESTER

10:51:02   1   moment of silence, is that it would be requested by a

           2   councilmember?

           3   A   Yes.

           4   Q   Did you attend the council meetings?

10:51:09   5   A   Most counsel meetings I attend, yes.

           6   Q   Were you there when moments of silence were observed?

           7   A   I have been there, yes.

           8   Q   Can you just describe what happens at that time?

           9   A   When we've had moments of silence, for example, on that

10:51:25 10   page on February 20th for the Florida school shooting, that

        11   was a particular instance where the mayor wanted to recognize

        12   that particular event and other -- in other instances it was

        13   just, for lack of a better word, generic moment of silence

        14   where nothing was really being recognized, it was just a

10:51:48 15   moment of silence that was being requested.

        16           THE COURT:  All right.  Thank you.

        17           You can step down.

        18           MR. KEZHAYA:  The Court's question does not prompt

        19   any questions from us, Your Honor.

10:52:07 20           MR. CLOAR:  None from the defense, Your Honor.

        21           THE COURT:  All right.  Next witness.

        22           MR. de HAAN:  Your Honor, plaintiffs call

        23   Doug Misicko.

        24           MR. CLOAR:  Your Honor, I left my water cup.  Might

10:52:56 25   I grab it --

DIRECT EXAMINATION – DOUGLAS ALEXANDER MISICKO

10:52:58  1          THE COURT:  You may.

       2          Hold on, sir.

       3          You can get your water.

       4          **DOUGLAS ALEXANDER MISICKO,**

       5  called as a witness herein, after having been sworn or

       6  affirmed, was examined and testified as follows:

       7          THE COURTROOM DEPUTY:  State your name for the

       8  record and spell your last name.

       9          THE WITNESS:  My name is Douglas Alexander Misicko,

10:53:33 10  M-I-S-I-C-K-O.

      11          THE COURTROOM DEPUTY:  Great.  Have a seat up here,

      12  sir.

      13              D I R E C T   E X A M I N A T I O N

      14  BY MR. de HAAN:

10:53:55 15  Q   Good morning.  Would you please state your name for the

      16  record.

      17  A   My name is Douglas Alexander Misicko, M-I-S-I-C-K-O.

      18  Q   Thank you.

      19          And do you typically go by a pen name or pseudonym?

10:54:07 20  A   Correct.

      21  Q   What is that?

      22  A   I'm also known as Lucien Greaves.

      23  Q   Lucien Greaves.  Okay.

      24          Now, what is your role with The Satanic Temple?

10:54:16 25  A   I cofounded The Satanic Temple and I act as its lead

DIRECT EXAMINATION – DOUGLAS ALEXANDER MISICKO

10:54:20 1   spokesperson.

2   Q    And when did that occur?

3   A    2013.

4   Q    And when would you say The Satanic Temple became codified

10:54:30 5   as a religion?

6   A    After I became involved with it in 2013.

7   Q    And as far as any codified tenets, when did that occur?

8   A    After my formal involvement in 2013.

9   Q    And could you briefly describe what's your code, what's

10:54:58 10  your tenets or what have you.  How many are there, things like

11  that.

12  A    There are seven tenets.  I can recite them if you'd like.

13  Q    Have -- in the history of The Satanic Temple as codified,

14  has there been anything other than the seven tenets as far as

10:55:12 15  that?

16  A    There have not.

17  Q    Now, at some point was The Satanic Temple recognized by

18  the IRS as a 501(c)(3)?

19  A    That is correct.

10:55:28 20  Q    And did you receive a letter to that purpose?

21  A    We did.

22          MR. de HAAN:  May I approach, Your Honor?

23          THE COURT:  You may.

24  BY MR. de HAAN:

10:55:47 25  Q    If you could please look at that document.

DIRECT EXAMINATION – DOUGLAS ALEXANDER MISICKO

10:55:55   1          MR. CLAUS:  Could I just ask what document?

        2          THE COURT:  What's the exhibit?

        3          MR. de HAAN:  Number 3.

        4          THE COURT:  All right.

10:56:03   5   BY MR. de HAAN:

        6   Q    Could you describe what that letter is?

        7   A    This is the letter conferring upon us recognition by the

        8   federal government as a establishment of religion.

        9   Q    And was that letter signed by a public official?

10:56:27  10   A    Correct, it was.

       11   Q    And is that a true and correct copy of what The Satanic

       12   Temple received from the IRS?

       13   A    Yes.  From what I see, this is the letter that we

       14   received.

10:56:38  15          MR. de HAAN:  Plaintiff moves to admit Exhibit 3.

       16          MR. CLAUS:  No objection, Your Honor.

       17          THE COURT:  Admitted.

       18       (Exhibit 3 admitted.)

       19   BY MR. de HAAN:

10:56:46  20   Q    Now, in order to obtain this tax-exempt status, did you

       21   have to go through a number of steps?

       22   A    Yes.

       23   Q    How long did that take?

       24   A    I believe it took about two years.

10:56:58  25   Q    What kinds of things did you need to produce to be

DIRECT EXAMINATION – DOUGLAS ALEXANDER MISICKO

10:57:00  1   recognized as a religion?

2   A    We needed to establish that we had a place that was used

3   as something of a -- of a place of worship or where we

4   congregated, that we engaged in ritual religious practices and

10:57:22  5   that we held services, and various other points that I think

6   we qualified for each and every one upon.

7   Q    Okay.  So I'm going to kind of just list things to you.

8   You said you had to show religious practices?

9   A    Correct.

10:57:36  10  Q    Is that in the form of ceremony or ritual, or how did you

11  do that?

12          MR. CLAUS:  Objection.  Leading, Your Honor.

13          THE COURT:  Overruled.

14          THE WITNESS:  All of the above, ceremony or ritual

10:57:45  15  services, spiritual guidance, I believe, that type of thing.

16  BY MR. de HAAN:

17  Q    Does the Satanic Temple have its own unique iconography?

18  A    It does.

19  Q    Does The Satanic Temple have a monument?

10:58:00  20  A    Satanic Temple does have more than one monument.

21  Q    Are there certain texts that are considered doctrinal to

22  The Satanic Temple?

23  A    There are.  We have a list of canonized texts that include

24  things like Milton's Paradise Lost, Anatole France's Revolt of

10:58:18  25  the Angels, and others from the literary satanic tradition.

DIRECT EXAMINATION - DOUGLAS ALEXANDER MISICKO

10:58:23  1   Q   And when you say literary satanic tradition, how far back
        2   are we talking?
        3   A   We're talking about around 17th century, starts with
        4   Milton's Paradise Lost.
10:58:36  5   Q   So is it fair to say you did not invent satanism?
        6   A   I did not invent satanism.  And I feel that The Satanic
        7   Temple just better describes satanism.
        8   Q   Does the Satanic Temple have an ordination program?
        9   A   The Satanic Temple is rolling out its ordination program.
10:58:59  10  We've been working on it for about four years now so that we
        11  can have qualified and competent people to represent satanism,
        12  performing services, and acting as clergy and chaplains.
        13  Q   Do people visit -- well, first, where is the physical
        14  location headquartered?
10:59:27  15  A   The Satanic Temple headquarters in located in Salem,
        16  Massachusetts.
        17  Q   And do people come to visit it?
        18  A   There are many people regularly come to visit The Satanic
        19  Temple headquarters in Salem and refer to that as a
10:59:44  20  pilgrimage.
        21  Q   Does the Satanic Temple recognize holidays?
        22  A   We do.
        23  Q   Does The Satanic Temple engage in any kind of charity or
        24  public services?
11:00:00  25  A   We do.

DIRECT EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:00:01  1    Q    Could you describe maybe a couple of those.

2    A    Yeah.  Sometimes some of our chapters will collect

3    clothing for the homeless.  Many chapters have collected

4    menstrual hygiene products for those who can't afford them.

11:00:20  5    And other such charity work, from beach cleanups to helping

6    out at animal shelters.

7    Q    And are these things organized with the main hierarchy of

8    The Satanic Temple?

9    A    They all gain the approval of the national council of The

11:00:42  10   Satanic Temple.  Often they're proposed by the individual

11   chapters themselves.

12   Q    How many chapters in the United States, if you know

13   offhand?

14   A    I don't know offhand, but we have a presence of either

11:00:59  15   mass and probationary chapters or officially formally

16   recognized chapters in each of the 50 states.

17   Q    Do you have to be an official member of The Satanic Temple

18   to adhere to the Satanic Temple's beliefs?

19   A    No.  We have allies who identify with other religious

11:01:21  20   beliefs, but not all of them choose to identify as satanists.

21   Q    And to be in a leadership position in The Satanic Temple,

22   do you have to identify as a satanist?

23   A    You do.

24   Q    I know we talked briefly about the hierarchy.  Is there a

11:01:40  25   hierarchical structure?

DIRECT EXAMINATION – DOUGLAS ALEXANDER MISICKO

A   There is, yeah.   There is the executive ministry, which would consist of me and the other cofounder.   There's a council that we have that deliberates over issues related to chapter requests, activities they want to engage in, and then there's the chapter heads themselves, their media liaisons, and the active chapter members.

Q   Now, as far as national chapter, are these permanent positions?

A   They're not.

Q   And is there some kind of process by which someone wants to do public speaking or be a chapter head that -- is there an approval process?

A   Yes, there is.

Q   Okay.   Now I want to take you to around the end of 2015, beginning of 2016.   Was The Satanic Temple in operation?

A   Yes.

Q   And were there chapter heads around the country?

A   There were.

Q   Do you -- or who has permission to grant somebody the ability to either public speak or be a chapter head?   Who has the authority to do that?

A   Either executive ministry or the council.

Q   And how many people are in the council?

A   Currently, I'm not sure, but we had kind of capped the number at nine.   I think there's seven now.

DIRECT EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:03:05  1  Q    Okay.

2          In 2015 -- do you know Michelle Shortt?

3  A    I do.

4  Q    When did you come to know Michelle Shortt?

11:03:21  5  A    I believe that was 2015.

6  Q    Now, how did this invocation situation come about?  Why

7  would you want to do -- why would you want members to do

8  invocations?

9  A    The impetus to do invocations came not only from asserting

11:03:43  10  pluralism in light of the *Greece versus Galloway* Supreme Court

11  decision which stated that public invocations could be given

12  before public meetings so long as there was no religious

13  discrimination against which religious groups could do so and

14  no discrimination against nonbelievers as well.

11:04:05  15          But beyond just asserting pluralism, we were also a

16  new religious organization and wanted to make people aware

17  that we have an affirmative message and we have concerned

18  people within our ranks willing to engage in a positive way

19  with their communities.

11:04:30  20  Q    And do you know, can you say with any certainty how many

21  members The Satanic Temple has?

22  A    I cannot say with any certainty, but to say it numbers in

23  the hundreds of thousands.

24  Q    Is that just in the United States?

11:04:45  25  A    No.  It's internationally.

DIRECT EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:04:48    1    Q   Now let's turn to Scottsdale.

        2            At some point, did anyone in Arizona request to be an

        3    invocator or someone that gives invocations?

        4    A   I believe I was in contact with Michelle Shortt about an

11:05:12    5    invocation in Phoenix.  And the Phoenix invocation, they

        6    decided to move to a policy of silence, whereupon I believe it

        7    was Michelle who decided to apply to give an invocation in

        8    Scottsdale, being that Scottsdale had no prerequisites for who

        9    was allowed to deliver the invocation that would prevent her

11:05:41   10    from doing so.

       11    Q   Who authorized her to do this?

       12    A   I did.

       13    Q   Is she a member of The Satanic Temple in good standing?

       14    A   She was.

11:05:52   15    Q   She's no longer -- or as far as you know, it came out

       16    she's no longer a chapter head; is that your understanding?

       17    A   Correct.  She's no longer a chapter head.

       18    Q   Is she still authorized to speak on behalf of The

       19    Satanic Temple?

11:06:03   20    A   She is.

       21    Q   Now, let's talk about the invocation itself that was

       22    discussed.  Do you know the invocation in question?

       23    A   I do.

       24            MR. de HAAN:  May I approach?

11:06:30   25            THE COURT:  You may.

DIRECT EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:06:30  1   BY MR. de HAAN:

2   Q    What is the source of that invocation?

3              MR. CLAUS:  Objection, Your Honor.  I don't know

4   what he's showing the witness.

11:06:55  5              THE COURT:  You need to identify the exhibit.

6              MR. de HAAN:  Number 4.  Plaintiffs' 4.

7              MR. CLAUS:  Thank you.

8   BY MR. de HAAN:

9   Q    Do you see the document in front of you?

11:07:09  10  A    I do.

11  Q    Do you recognize that?

12  A    I do.

13  Q    Could you describe what it is?

14  A    I'm sorry?

11:07:14  15  Q    Could you describe what it is?

16  A    It is the invocation that Michelle Shortt intended to

17  deliver in Scottsdale.

18  Q    And what is the source of it?

19  A    I'm the source of it.  I authored it.

11:07:28  20  Q    And when did you do that?

21  A    I did that after the Supreme Court decision *Greece versus*

22  *Galloway* in response to a journalist from the Los Angeles

23  Times reaching out to me and asking what a Satanic invocation

24  might look like.

11:07:48  25  Q    Is this, to you, a religious invocation?

DIRECT EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:07:51  1    A    It is.

2    Q    Now, as far as the contents of this invocation, what is

3    the intent?

4              MR. CLAUS:  Objection, Your Honor.  Foundation.

11:08:00  5    Relevance as to his intent.

6              THE COURT:  Overruled.

7              THE WITNESS:  The intent, I think, is one of

8    personal empowerment and liberation.  An affirmative message

9    for people to kind of look within regardless of whatever

11:08:21 10    indoctrination they might have gone through or whatever

11    presumptions they might have, and look at the best available

12    evidence and move forward.

13    BY MR. de HAAN:

14    Q    Now, the word agnosticism is in there.

11:08:38 15    A    Correct.

16    Q    What does that mean to you?

17    A    To me that means that you should withhold judgment the

18    best you can until you have the best available evidence with

19    which to weigh it by.

11:08:49 20    Q    What do you mean when you say "arcane doctrines born of

21    fearful minds in darkened times"?  What is that referring is

22    to?

23    A    That refers to any doctrine --

24              MR. CLAUS:  Objection.  Relevance as to his intent.

11:09:03 25              THE COURT:  Overruled.

DIRECT EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:09:05  1        THE WITNESS:  That refers to any doctrines that

2    would put somebody in a position of subjugation or silence,

3    and it needs to be taken -- the sentence needs to be taken in

4    its entirety and needs to be taken actually by the individual

11:09:22  5    and how they perceive what an arcane doctrine from darkened

6    times might be.  For one person, one doctrine might be

7    something that demands their servitude.  For other people it

8    might be a metaphorical statement about some type of internal

9    universal struggle.

11:09:40  10        So for that reason it doesn't put a fine point upon

11   distinguishing any particular doctrine or religious

12   viewpoint, it just tries to imbue people with the sense of

13   personal empowerment that if there are such doctrines that

14   they feel subjugate them, they should feel to librate

11:10:00  15   themselves from those.

16   BY MR. de HAAN:

17   Q    Now, you had mentioned that this is religious to you.  Is

18   The Satanic Temple theistic?

19   A    It is not.

11:10:11  20   Q    What is the difference between identifying as a

21   Satanic Temple satanist and being an atheist?

22   A    Well, I think The Satanic Temple's beliefs speak to

23   something more generalized that is uninformed by, untouched

24   by, and I would argue untouchable by science, in that it views

11:10:39  25   this universal struggle against tyranny and autonomy, it puts

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:10:43   1   this kind of value upon balance that can't be proven, but it

2   does speak to universal truths of the utmost importance.

3         MR. de HAAN:  May I have a moment, Your Honor.

4         No further questions, Your Honor.

11:11:23   5         THE COURT:  Cross-examination.

6         MR. de HAAN:  Your Honor, briefly, may I approach

7   to --

8                C R O S S - E X A M I N A T I O N

9   BY MR. CLAUS:

11:15:19  10   Q   Good afternoon, Mr. Misicko.

11         The first thing I want to talk to you about is you

12   were excluded from the courtroom pursuant to the invocation of

13   the rule on exclusion; correct?

14   A   I don't know.

11:15:38  15   Q   You were sitting outside abiding your testimony; correct?

16   A   Correct.  By my choice of sitting outside of the

17   courtroom.

18   Q   I see.

19         I put some exhibits in front of you.  Could you

11:15:54  20   please get the folder with Exhibit 76 in it, please.

21         Do you have Exhibit 76 in front of you, sir?

22   A   I do.

23   Q   Do you see how Exhibit 76 has the title Affiliation

24   Agreement?

11:16:26  25   A   Correct.

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:16:26  1   Q   If you go to the last page, sir.

        2   A   Okay.

        3   Q   Do you see how the affiliation agreement is signed by

        4   Michelle Shortt and Stu de Haan?

11:16:39  5   A   I do.

        6   Q   You have never provided in this litigation any affiliation

        7   agreement between the United Federation of Churches LLC and

        8   anything calling itself the Arizona Chapter of The Satanic

        9   Temple that is signed by any authorized party of the United

11:16:58 10   Federation of Churches LLC; correct?

       11   A   Correct.

       12   Q   And you have not produced in this litigation any

       13   affiliation agreement at all; correct?

       14   A   I don't understand.

11:17:11 15   Q   You have not produced in this litigation any affiliation

       16   agreement between the United Federation of Churches LLC and

       17   The Satanic Temple.  You, meaning Mr. Misicko.

       18   A   Oh, I don't know.  For all I knew I had provided this one.

       19   Q   Okay.  Is Exhibit 76 the "this one" to which you are

11:17:35 20   referring?

       21   A   Yes.

       22   Q   Is Exhibit 76 the only affiliation agreement that you have

       23   produced in this litigation?

       24   A   My understanding is that it is not, but I'm not certain.

11:17:49 25   Q   You have not produced an affiliation agreement between the

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:17:53  1   United Federation of Churches LLC and Michelle Shortt or The

2   Satanic Temple Arizona that contains an authorized signature

3   of the United Federation of Churches LLC; correct?

4   A   I'll take your word for it.

11:18:08  5   Q   No, sir, I'm asking you to testify under penalty of

6   perjury, have you --

7   A   I'm under the impression that every statement I give is

8   under penalty of perjury.

9   Q   It is, sir.  And that's why I'm asking you to testify, not

11:18:22  10   taking my word for it.

11          Do you know, sir, that you have not produced in this

12   litigation anything called an Affiliation Agreement other than

13   Exhibit 76?

14   A   No, I don't recall what all we handed over to you.

11:18:38  15   Q   You've never spoken with Mayor Jim Lane; correct?

16   A   Correct.

17   Q   For any reason; correct?

18   A   Correct.

19   Q   You've never spoken with a Councilwoman Suzanne Klapp;

11:18:49  20   correct?

21   A   Correct.

22   Q   For any reason?

23   A   Correct.

24   Q   You've never spoken with any member of the Scottsdale city

11:18:55  25   council who was a member in 2016; correct?

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:18:59   1   A    That is correct.

         2   Q    And you've never spoken with a member of the Scottsdale

         3   city council that was a member of the city council in any

         4   year; true?

11:19:07   5   A    True.

         6   Q    You have never requested the opportunity for anyone to

         7   give an invocation before a Scottsdale City council meeting;

         8   is that correct?

         9   A    I never directly contacted the city council about an

11:19:23  10   invocation.

        11   Q    And you've never spoken with any employee of the City of

        12   Scottsdale for any reason; correct?

        13   A    Correct.

        14   Q    You've never delivered a written communication to the City

11:19:33  15   of Scottsdale describing the beliefs of the organization

        16   calling itself The Satanic Temple; is that correct?

        17   A    I personally did not.

        18   Q    And you never directed anyone to send any written

        19   communication on behalf of the United Federation of Churches

11:19:50  20   LLC doing business as The Satanic Temple, you never directed

        21   anyone to send any written communication to a representative

        22   of the City of Scottsdale describing the beliefs of the

        23   organization calling itself The Satanic Temple; true?

        24   A    I believe that I gave Stu and Michelle explicit permission

11:20:13  25   to do that kind of correspondence and reach out and ask to

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:20:17  1    give the invocation.  But I directly did not.

       2    Q    At no time have you delivered a written communication to

       3    the City of Scottsdale describing any connection between the

       4    organization that calls itself The Satanic Temple and the City

11:20:35  5    of Scottsdale; correct?

       6    A    There is no reason I would do so.

       7    Q    So you did not; correct?

       8    A    We were never asked.

       9    Q    You did not; correct?

11:20:43  10   A    Correct.

       11   Q    Let's talk about the organization.  You claim to be a

       12   cofounder of The Satanic Temple?

       13   A    I am.

       14   Q    And you just testified, quote, there have not, end quote,

11:20:58  15   ever been anything other than the seven tenets with respect to

       16   The Satanic Temple.  Do you recall that testimony?

       17   A    There was never any other codified set of beliefs in the

       18   founding of The Satanic Temple.

       19   Q    United Federation of Churches LLC owns the trademark The

11:21:22  20   Satanic Temple; correct?

       21   A    Correct.

       22   Q    The United Federation of Churches LLC owns the domain name

       23   www.thesatanictemple.com; correct?

       24   A    Correct.

11:21:36  25   Q    You know as a matter of historic fact that you were

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:21:41   1    involved with The Satanic Temple as of July 22, 2013; correct?

2    A    Correct.

3    Q    And you know as a matter of fact that as of July 22, 2013,

4    the website www.thesatanictemple.com stated that there are

11:22:03   5    nine fundamental tenets, with nine being a significant satanic

6    number; correct?

7    A    Correct.  That was a placeholder website preceding my

8    involvement with the Satanic Temple.

9    Q    No, sir.  July 22, 2013, was a day on which you had

11:22:21  10    already become involved in the Satanic Temple.

11    A    Yes.  Well, not everything happened on one day at one

12    time.

13    Q    That wasn't my question, sir.

14         As of July 22, 2013, you had been involved with The

11:22:32  15    Satanic Temple for nearly seven months; correct?

16    A    And we had not yet changed the placeholder website.

17    Q    Sir, that wasn't my question.  If you could answer my

18    question.

19    A    Say again.

11:22:46  20    Q    Sure.  As of July 22, 2013, you --

21    A    Yes, as of that date --

22    Q    -- you had --

23    A    -- we had not changed the placeholder website.

24    Q    Let me ask my question, please.

11:22:59  25    A    Carry on.

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:23:00  1    Q    As of July 22, 2013, you had been associated with The

       2    Satanic Temple as its so-called spokesperson for nearly seven

       3    months.  Is that a true statement or a false statement?

       4    A    It could be either.  I'm not that certain on the timeline.

11:23:22  5    Q    Could you please look at Exhibit 56.

       6              MR. CLAUS:  In fact, could you get Exhibits 57, 58,

       7    59, and 60, as well.

       8              THE WITNESS:  I do not have a 56.

       9              MR. CLAUS:  Oh.

11:23:49  10             And 56 apparently.

       11             I apologize.

       12   BY MR. CLAUS:

       13   Q    I have asked the courtroom deputy to give you Exhibits 56,

       14   57, 58, 59, and 60.

11:24:26  15             You know that as of August 5, 2013, you were involved

       16   as a purported spokesperson for The Satanic Temple; correct?

       17   A    Correct.

       18   Q    And do you know that as of September 4, 2013, you had been

       19   involved with The Satanic Temple as its purported

11:24:47  20   spokesperson; correct?

       21   A    Yeah, I believe so.

       22   Q    And you know that as of November 3, 2013, you were

       23   involved as the purported spokesperson for The Satanic Temple;

       24   correct?

11:25:01  25   A    Correct.

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:25:01  1    Q    And you know that as of December 12, 2013, you were

2    involved as a spokesperson for something that called itself

3    The Satanic Temple; correct?

4    A    Correct.

11:25:15  5    Q    And you also know that on July 22, 2013, August 5, 2013,

6    September 4, 2013, November 3, 2013, and December 12, 2013,

7    the domain name and website owned and controlled by the United

8    Federation of Churches LLC, www.thesatanictemple.com,

9    represented that there are nine fundamental tenets, with nine

11:25:48  10   being a significant satanic number associated with the thing

11   calling itself The Satanic Temple; correct?

12   A    Yes, from --

13             MR. de HAAN:  Objection.

14             THE WITNESS:  -- from a placeholder website --

11:26:01  15             THE COURT:  Hold on, please.

16             What's the objection?

17             MR. de HAAN:  Your Honor, this is not relevant.

18   This has been disavowed multiple times as not being relative

19   to The Satanic Temple from an archive website.  Additionally,

11:26:09  20   it is more prejudicial than probative because this has no

21   relevant value to the founders' statement of what The Satanic

22   Temple is.

23             THE COURT:  Overruled.

24   BY MR. CLAUS:

11:26:19  25   Q    You testified, on questioning by your counsel, when you

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:26:24  1  were asked have there ever been anything other than seven

2  tenets, you testified under penalty of perjury, quote, there

3  have not, end quote; correct?

4  A   Yes, I have testified everything under penalty of perjury.

11:26:38  5  And I will tell you again that that was a placeholder website

6  and nobody viewed any of that as codified –– a codified part

7  of the religion.

8  Q   It was a placeholder website in July of 2013 when you were

9  acting as spokesperson?  August, September, November, and

11:26:55  10  December of 2013, when you were acting as spokesperson?

11  A   Yes.  It was a placeholder website until it was changed to

12  the formal website with the codified tenets.

13  Q   But in 2013, the thing that called itself The Satanic

14  Temple had already been engaging in activities; correct?

11:27:20  15  A   Those activities probably prevented me from doing any web

16  work.

17  Q   You know who Malcolm Jarry is; correct?

18  A   Correct.

19  Q   Malcolm Jarry is a fake name; correct?

11:27:33  20  A   It's a pseudonym.

21  Q   Mr. Jarry's real name is Cevin with a C, C-E-V-I-N,

22  Soling?  True?

23  A   Yes.

24  Q   Cevin Soling, who also uses the name Malcolm Jarry, is the

11:27:52  25  managing member of the United Federation of Churches LLC; is

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:27:56  1    that correct?

2    A    Correct.

3    Q    And UFC, United Federation of Churches LLC, not only owns

4    the domain name for The Satanic Temple, owns the trademark for

11:28:09  5    The Satanic Temple, but also owns all of the other trademarks

6    used and associated with The Satanic Temple; correct?

7    A    Correct.

8    Q    You know that Malcolm Jarry, aka -- or rather

9    Cevin Soling, aka Malcolm Jarry has the authority to act and

11:28:32  10    speak on behalf of the United Federation of Churches LLC;

11    correct?

12    A    Correct.

13    Q    You also know that Malcolm Jarry has admitted that The

14    Satanic Temple was founded --

11:28:53  15            MR. de HAAN:  Objection.  Hearsay.

16            THE COURT:  What's your response on hearsay?

17            MR. CLAUS:  He has just established that one of the

18    plaintiffs in this case, the United Federation of Churches

19    LLC --

11:29:05  20            THE COURT:  Just tell me what your response is.

21    Under what rule?

22            MR. CLAUS:  801(2)(D)(2) -- 801(d)(2)(D),

23    801(d)(2)(C) it is not definitionally hearsay.

24            THE COURT:  Objection is overruled.

25

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:29:23    1   BY MR. CLAUS:

            2   Q   You know that Malcolm Jarry has stated that The Satanic

            3   Temple was founded as, quote, a media stunt to expose what you

            4   view as religious hypocrisy; correct?

11:29:40    5   A   I do not believe that he ever said that.

            6   Q   You do not believe that Malcolm Jarry ever said that The

            7   Satanic Temple was founded as a media stunt?

            8   A   I do not know what leads you to believe that and I don't

            9   know that I've ever heard that.

11:30:00   10   Q   You have seen the movie Hail Satan?

           11   A   I have.

           12   Q   You were in the movie Hail Satan?

           13   A   I was.

           14   Q   The movie Hail Satan that uses your likeness; correct?

11:30:13   15   A   Correct.

           16   Q   Uses your pseudonym; correct?

           17   A   Correct.

           18   Q   You authorized the makers of Hail Satan to use your name

           19   and pseudonym; correct?

11:30:21   20   A   Correct.

           21   Q   The movie Hail Satan uses the trademark protected symbols

           22   and words and phrases of the United Federation of Churches

           23   LLC; correct?

           24   A   Correct.

11:30:33   25   Q   And authorization was given for that as well; correct?

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:30:36   1   A    Correct.

2              MR. CLAUS:  Can you pull up Exhibit 105.

3              Time stamp 4:30 to 4:50.

4              MR. de HAAN:  Your Honor, I'm going to object as to

11:30:59   5   hearsay.  He's about to show a documentary that was not

6   created by The Satanic Temple, that was created by a director

7   that's not present to testify who's -- their own creative

8   expression --

9              THE COURT:  I hear your hearsay objection.

11:31:14  10             Are you going to seek admission of Exhibit 105?

11             MR. CLAUS:  I'm going to seek admission of the

12   statement of Malcolm Jarry, and then the statements of

13   Doug Misicko in Exhibit 105.  And for that --

14             THE WITNESS:  I can guarantee you --

11:31:26  15             THE COURT:  Hold on.  Hold on, sir.

16             MR. CLAUS:  And I'm not going to show --

17             THE COURT:  What's your response to the hearsay

18   objection?

19             MR. CLAUS:  I'm not going to show any hearsay and

11:31:34  20   I'm not going to ask for admission of any hearsay portions of

21   Exhibit 105.  We had provided --

22             THE COURT:  The film is hearsay.

23             MR. CLAUS:  The film -- the film is not hearsay to

24   the extent it contains the statements of Mr. Misicko, the

11:31:49  25   statements of Mr. Jarry, the statements of Ms. Shortt.

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:31:53  1          THE COURT:  There's a double hearsay problem here.

2    We've got statements of -- I believe you're going to show

3    Mr. Jarry, but there's a second level of hearsay, which is

4    the film created by somebody else.  How do you overcome that

11:32:06  5    hearsay problem?

6          MR. CLAUS:  I'm not offering the film to prove the

7    truth of the statements made in the film.  I'm offering the

8    statement of Malcolm Jarry to demonstrate that Mr. Misicko is

9    not telling Your Honor the truth about Malcolm Jarry, the

11:32:29 10    manager of the United Federation of Churches --

11          THE COURT:  So you are offering the film to prove

12    the truth of what Mr. Jarry said?

13          MR. CLAUS:  Malcolm Jarry's statement, Your Honor.

14          THE COURT:  How do you overcome the second level of

11:32:41 15    hearsay?

16          MR. CLAUS:  There is no second level of hearsay,

17    Your Honor, because we're not -- the second level --

18          THE COURT:  Let me give you this example.  Let's say

19    we have a police report that is hearsay, and within it is

11:32:51 20    quoted the statement of somebody that is also hearsay.  That

21    is a double hearsay problem.

22          What we have here in effect is a document, a film,

23    that is hearsay, and we have within it a second statement of

24    Mr. Jarry that is hearsay.  That is a double hearsay problem.

11:33:06 25    And for the film, with that statement to be admitted, you

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:33:09   1   have to overcome both levels of hearsay.

2        So my question is how do you overcome the film

3   hearsay problem?

4        MR. CLAUS:  I overcome it by using at least the

11:33:18   5   generalized exception.  There is no -- there is no question

6   as to the authenticity of the film that Mr. Misicko just

7   said --

8        THE COURT:  What do you mean by general exception?

9   Are you talking about the residual exception?

11:33:34  10        MR. CLAUS:  No, Your Honor.  The general exception

11   that permits the Court to allow out-of-court statements so

12   long as there is an ample demonstration that those

13   out-of-court statements -- the purpose of the hearsay rule,

14   Your Honor, is to protect against out-of-court statements.

11:33:54  15        THE COURT:  I think you're talking about the

16   residual exception, Rule 807; is that right?

17        MR. CLAUS:  Yes, Your Honor.

18        This statement has a circumstantial guarantee of

19   trustworthiness.  The film is a transmittal media.  It's a

11:34:16  20   recording mechanism for his statement.

21        And I will say, Your Honor, on this point, they did

22   not produce to us the recorded statements of Mr. Misicko.

23        THE COURT:  That's not relevant to the hearsay

24   issue.  Let's stay on Rule 807.

11:34:34  25        MR. CLAUS:  Yes.  There is no question as to the

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:34:39    1    circumstantial guarantee of trustworthiness of the Hail Satan

2    documentary in which Mr. Misicko, Ms. Shortt, Mr. Soling,

3    Mr. de Haan made statements.

4         THE COURT:  I think I understand your argument.  Do

11:34:56    5    you have additional points to make?

6         MR. CLAUS:  I do not have additional points,

7    Your Honor.

8         THE COURT:  What is your response on 807?

9         MR. de HAAN:  Your Honor, under 807(a)(2), there's

11:35:05   10    got to be a showing that this is more probative on point than

11    any other relevant evidence.  He could have subpoenaed

12    Mr. Jarry.  He's going to take, conceivably out of context,

13    part of an entire documentary for one statement, which also

14    raises a 403 objection.

11:35:20   15         So I would submit there's still double hearsay,

16    which this isn't the most probative evidence he could have

17    for this when -- when -- if he knew who Mr. Soling was the

18    entire time, he could have subpoenaed him.

19         THE COURT:  I understand your point.

11:35:31   20         You could have deposed Mr. Jarry; correct?

21         MR. CLAUS:  I could not have deposed Mr. Jerry,

22    Your Honor.

23         THE COURT:  Why?

24         MR. CLAUS:  Because this film was not released until

11:35:39   25    April 27, 2019.  There is a body of people who knew about the

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:35:44  1    statements long before the close of discovery.  We were not

2    one of them.

3              THE COURT:  You answered the question.

4              Was discovery closed by April of --

11:35:53  5              MR. CLAUS:  Yes, it was, Your Honor.

6              THE COURT:  What is your response, Mr. de Haan?

7              MR. de HAAN:  First of all, this is a documentary

8    that was in production for three years where there's been

9    significant changes, there's an entire arc of the story of

11:36:03 10   this documentary that has things that are absolutely not

11   relevant --

12             THE COURT:  He's not seeking to admit the whole

13   document.  My question is, is it true that this film wasn't

14   produced and released until after the close of discovery in

11:36:16 15   this case?

16             MR. de HAAN:  My recollection -- which date are we

17   talking about?

18             THE COURT:  He said April 2019.

19             MR. KEZHAYA:  Your Honor, may I?

11:36:40 20             THE COURT:  Yes.

21             MR. KEZHAYA:  Mr. Misicko was deposed in the second

22   wave of discovery.  If I remember correctly, it was

23   approximately September of 2019.  If they were aware of this

24   documentary, and they reasonably could have been since it was

11:36:56 25   produced in -- it was released, I should say, in April of

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:36:58   1   2019, and they had the expectation that they might want to

           2   use some of these statements to prove -- I gather that the

           3   general relevance of this is that TST is not a real religion,

           4   and they could have deposed Mr. Soling.

11:37:10   5           THE COURT:  Is it right that you deposed Mr. Misicko

           6   during the second wave of discovery?

           7           MR. CLAUS:  I did depose Mr. Misicko and found out

           8   about Hail Satan during that.

           9           THE COURT:  So you could have deposed Mr. Jarry

11:37:22  10   during that period as well.

          11           MR. CLAUS:  No, Your Honor.  Because your order

          12   limited us to four depositions.  Or strike that.

          13           Your order limited us to four depositions of an hour

          14   apiece only on the issue of standing and the issue of subject

11:37:37  15   matter jurisdiction.  We could not have, under your Court's

          16   order.  And discovery ended, Your Honor, in this case, on

          17   February 1, 2019.  I will point out that to the best of my

          18   knowledge, Mr. Soling is a Massachusetts resident and not

          19   subject to the subpoena power of this Court.

11:38:04  20           THE COURT:  Well, of course he is.  Of course he is

          21   for a deposition.

          22           MR. CLAUS:  No, no, no, Your Honor, for trial.  One

          23   of the arguments was that we could have subpoenaed Mr. Soling

          24   for trial.

11:38:12  25           THE COURT:  Okay.

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:38:14   1            MR. CLAUS:  We could not.

        2            THE COURT:  Well, I assume Exhibit 105 was listed in

        3   the final pretrial order?

        4            MR. CLAUS:  It was, Your Honor.

11:38:21   5            THE COURT:  Can you tell me where it's described.

        6            MR. CLAUS:  It's -- it is in Exhibit A -- I'm sorry,

        7   strike that, your Honor.

        8            THE COURT:  A is the --

        9            MR. CLAUS:  Yes --

11:38:38  10            THE COURT:  -- exhibit list of the plaintiffs.

       11            I've got it in front of me.

       12            MR. CLAUS:  Thank you, Your Honor.  You're better at

       13   this than I am.

       14            THE COURT:  Actually, I'm not -- what I have is

11:39:02  15   defendants' exhibit list, but there's no objections.

       16            MR. CLAUS:  The objections are on page 28 of the

       17   final pretrial order, which show what we have described it as

       18   excerpts from Hail Satan video.

       19            THE COURT:  Okay.  Let me look at that.

11:39:42  20            That's where the objection is.  Where is your

       21   description of Exhibit 108 and how you intended to use it at

       22   trial?

       23            I'm asking this because of the requirement in

       24   Rule 807(b).

11:40:06  25            MR. CLAUS:  One second, Your Honor.

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:40:52  1          I have this, Your Honor.  May I approach?

       2          THE COURT:  You may.

       3          That's what I've got as well.  But my copy doesn't

       4   show any docket number so I don't know if that came from the

11:41:06  5   final pretrial order.

       6          I think -- isn't this your trial exhibit list,

       7   Mr. Claus?

       8          MR. CLAUS:  We're searching, Your Honor.

       9          I apologize, Your Honor, that -- here's our copy of

11:41:28 10   our -- the joint pretrial order does not have our exhibit

      11   list.

      12          THE COURT:  All right.  How much longer do you have

      13   in your questioning?

      14          MR. CLAUS:  Of Mr. Misicko?

11:41:39 15          THE COURT:  Yeah.

      16          MR. CLAUS:  Approximately 45 minutes.

      17          THE COURT:  Let's carry on.  We'll deal with this

      18   during the lunch hour so we don't keep everybody waiting.

      19          MR. CLAUS:  Thank you, Your Honor.

11:41:54 20   BY MR. CLAUS:

      21   Q   You got involved with Malcolm Jarry and the thing called

      22   The Satanic Temple because you are casting actors for a

      23   mockumentary; correct?

      24   A   Incorrect.

11:42:05 25   Q   A film project, sir?

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:42:08  1    A    I was not casting actors for a film project.

2    Q    You got involved with Mr. Jarry for The Satanic Temple

3    because you were involved in some degree in the film project

4    that was to be a mockumentary; correct?

11:42:20  5    A    I was consulting as a satanist on a project involving the

6    concept of satanism.

7    Q    And you knew that Malcolm Jarry was producing a film

8    project to be a mockumentary; correct?

9    A    I knew he was producing a film project about satanism.

11:42:44  10   Q    Well, you knew that Mr. Jarry cast an actor pretending to

11   be the head of The Satanic Temple; correct?

12   A    That is correct.  And as a satanist, I was helping consult

13   on the authentic nature of satanism so it could be best

14   portrayed.

11:43:01  15   Q    Well, the actor pretending to be the head of The Satanic

16   Temple wasn't a satanist; correct?

17   A    He was not.

18   Q    The goal of The Satanic Temple is to mock religion and

19   those who hold deeply and sincere religious beliefs; correct?

11:43:25  20   A    That is incorrect.  I'm not sure where you heard that.

21   Q    The Satanic Temple doesn't have an actual temple; true?

22   A    Well, that's debatable.  We have our headquarters in Salem

23   that we could refer to as a temple.

24   Q    You could refer to as a temple.  But on your website that

11:43:46  25   you published as of today, you don't refer to it as a temple,

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:43:50  1   you refer to it as a museum; correct?

2   A   I refer to it as The Satanic Temple.

3   Q   That is a museum and a gift shop; correct?

4   A   It is the Satanic Temple headquarters.

11:44:02  5   Q   That has a museum and a gift shop; correct?

6   A   It has a museum and a gift shop.

7   Q   The Satanic Temple doesn't worship Satan; correct?

8   A   Depends on what you mean by worship.

9   Q   Well, The Satanic Temple does not believe that Satan

11:44:19 10   exists as an actual thing; correct?

11   A   As an actual conscious entity, no.

12   Q   No, I'm wrong?  Or no, you don't believe that it exists?

13   A   Please rephrase.

14   Q   Sure.  The Satanic Temple does not espouse a belief in an

11:44:37 15   entity or being referred to as Satan; correct?

16   A   Not an isolate discrete conscious entity known as Satan,

17   no.

18   Q   The Satanic Temple does not espouse a belief system that

19   calls for the worship of a superhuman controlling power;

11:45:03 20   correct?

21   A   That is correct.

22   Q   Because The Satanic Temple espouses beliefs that shun a

23   belief in a superhuman controlling power; correct?

24   A   Depends what you mean by shun.

11:45:18 25   Q   Well, The Satanic Temple tells the world that it, quote,

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:45:21  1  does not wish to have anyone succumb to religious groupthink,

2  end quote; correct?

3  A   I don't know where that quote is from.

4  Q   Do you have Exhibit 103 in front of you, sir?

11:45:43  5  A   I do.

6  Q   The Satanic Temple Arizona chapter is authorized to use

7  the intellectual property owned by the United Federation of

8  Churches LLC; correct?

9  A   Correct.

11:46:05  10  Q   Is authorized to use a website directing the public to the

11  website maintained by The Satanic Temple Arizona; correct?

12  A   Correct.

13  Q   And The Satanic Temple, you, take very seriously the way

14  in which chapters utilize the brand of The Satanic Temple;

11:46:33  15  correct?

16  A   Correct.

17  Q   If you'd turn to page 2 of Exhibit 103.

18       You see how -- strike that.

19       Exhibit 103 is an FAQ, a frequently asked questions

11:46:56  20  printout of the website of The Satanic Temple Arizona.

21  A   I see it.

22       MR. CLAUS:  Move for admission --

23  BY MR. CLAUS:

24  Q   Er, I'm going to impeach you first.

11:47:06  25       Do you see there is bolded language "Does TST."  You

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:47:15 1   see that bolded language?

2   A   Yes.

3           THE COURT:  Are you moving this document into

4   evidence?

11:47:19 5           MR. CLAUS:  I will, Your Honor.  I just want to

6   focus the witness and then I'll ask --

7           THE COURT:  You can't use it until it's in evidence.

8           MR. CLAUS:  I understand, Your Honor.  I just wanted

9   to focus the witness of where I was going.

11:47:30 10           MR. de HAAN:  I have an objection to its admission.

11           THE COURT:  If he asks him any question about the

12   document, I'll require it be admitted first.

13           MR. CLAUS:  We move for admission of Exhibit 103.

14           THE COURT:  All right.  What's the objection?

11:47:40 15           MR. de HAAN:  He's not the author of this document

16   as far as has been established, as far as I know.  Also, I --

17   relevance.  More prejudicial than probative.  It's an excerpt

18   of the entire thing.  I don't know how this is admissible.

19           THE COURT:  Well, what is the basis for your

11:47:54 20   objection?

21           MR. de HAAN:  First, relevance.  I don't see --

22           THE COURT:  Well, relevancy is overruled.

23           MR. de HAAN:  Okay.

24           THE COURT:  What else is the basis for your

11:48:02 25   objection?

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:48:03  1         MR. de HAAN:  Also, I don't think he's established

2    that he had personal knowledge that this particular page of a

3    website existed that he didn't author.

4         THE COURT:  Well, that's not a basis for opposing

11:48:12  5    the admissibility of a document.  It may be a basis for

6    objecting to a question.

7         MR. de HAAN:  Okay.  Understood, Your Honor.

8         THE COURT:  Those are all of your objections?

9         MR. de HAAN:  Yes, Your Honor.

11:48:23 10         THE COURT:  I'll admit Exhibit 103.

11       (Exhibit 103 admitted.)

12         MR. CLAUS:  Thank you, Your Honor.

13    BY MR. CLAUS:

14    Q    Now, directing you to that bold heading in the center of

11:48:30 15    the page that starts with the words "Does TST."  Do you see

16    that?

17    A    Yes.

18    Q    So I'm going to ask you again, The Satanic Temple tells

19    the world that it does, quote, not wish to have anyone succumb

11:48:51 20    to religious groupthink, end quote; correct?

21    A    The Satanic Temple Arizona apparently has that, but this

22    is the first I'm seeing it.

23    Q    Sir, as the purported spokesperson of The Satanic Temple,

24    you just told the Court that you take very seriously the way

11:49:09 25    in which chapters use your brand and your trademarks; correct?

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:49:15  1  A   Correct.  And that does not conflict with my statement

2  that I had not read this before.

3  Q   The Satanic Temple is a trademark that is owned by United

4  Federation of Churches LLC; correct?

11:49:27  5  A   Correct.

6  Q   Chapters of The Satanic Temple are authorized to operate

7  websites by you; correct?

8  A   Correct.

9  Q   And chapters of The Satanic Temple are authorized to use

11:49:45  10  the trademarks and intellectual property of The Satanic

11  Temple, that is actually the United Federation of churches

12  LLC, by you; correct?

13  A   Correct.  Nonetheless, this is the first I'm seeing this

14  page.

11:50:05  15  Q   Do you see how this page told the public that, quote, The

16  Satanic Temple does not proselytize to the public nor do we

17  wish to have anyone succumb to religious groupthink"?

18  A   Yes, I'm seeing that now for the first time.

19  Q   And that statement is in response to a question, "Does TST

11:50:35  20  offer any public services, i.e., church, sermons," question

21  mark; correct?

22       MR. de HAAN:  Objection.  He has not established a

23  time that this was published.

24       THE COURT:  Overruled.

11:50:51  25       THE WITNESS:  I'm sorry, ask again.

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:50:52  1    BY MR. CLAUS:

2    Q    Sure.  That statement that The Satanic Temple does not

3    proselytize to the public nor do we wish to have anyone

4    succumb to religious groupthink, was in response to the

11:51:05  5    question above it, "Does TST offer any public services, i.e.,

6    church," comma, "sermons," question mark; correct?

7    A    I am seeing that on this page that I'm now viewing for the

8    first time.

9    Q    Local chapters of the Satanic Temple did not have any

11:51:29  10   physical locations as of May 23, 2016; correct?

11   A    I'm unsure.

12   Q    As of the date this lawsuit was filed, Arizona chapter of

13   The Satanic Temple did not have any physical location;

14   correct?

11:51:53  15   A    I don't know that that's correct.

16   Q    Look at the first page of Exhibit 103, sir.

17        Do you see a date at the bottom of the page on the

18   right-hand side?

19   A    I do.

11:52:17  20   Q    9/17/2019; correct?

21   A    I believe that would be the date it was printed.

22   Q    And this lawsuit had been filed as of 9/17/2019; correct?

23   A    Correct.

24   Q    Well, since you raised that, sir, do you see on

11:52:33  25   Exhibit 103, above the date there's a heading called "Recent

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:52:44   1   Posts"; correct?

2   A    Correct.

3   Q    And the post refers to TST AZ chapter head Michelle Shortt

4   resigns; correct?

11:52:52   5   A    Correct.

6   Q    And there is a date for that as well; correct?

7   A    Correct.

8   Q    What is that date, sir?

9   A    June 11, 2019.

11:53:00  10   Q    As of June 11, 2019, this lawsuit had been filed; correct?

11   A    Correct.

12   Q    Assuming that the website promulgated by The Satanic

13   Temple Arizona with your permission follows the laws of

14   physics, it would have been impossible for Exhibit 103 to

11:53:19  15   publish a post about Michelle Shortt's resignation on June 11,

16   2019, unless Exhibit 103 postdated that date; correct?

17   A    You really don't need me up here to answer these

18   questions.  Anybody could be looking at this.  I'm seeing this

19   for the first time.

11:53:37  20           THE COURT:  I'm not understanding your point,

21   Mr. Claus.

22   BY MR. CLAUS:

23   Q    The point is you can now deduce that the statement that

24   The Satanic Temple local chapters do not have physical

11:53:50  25   locations is a statement that was made after the lawsuit in

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:53:54  1    this case was filed; correct?

2    A    I don't see -- I don't recall you pointing out there was a

3    statement that we don't have physical locations.

4    Q    Okay.  Why don't you go to page 2 of Exhibit 103.

11:54:14  5          Above the bolded centered text, "Does TST offer any

6    public services, i.e., church, sermons," there is a sentence

7    that starts with the word "currently"; correct?

8    A    Correct.

9    Q    "Currently local chapter" --

11:54:29 10          THE COURT:  What page are you on?

11          MR. CLAUS:  Page 2 of Exhibit 103.

12          THE COURT:  Okay.

13    BY MR. CLAUS:

14    Q    "Currently local chapters of The Satanic Temple do not

11:54:40 15    have physical locations."

16          Correct?

17    A    Right, it says that on this page.

18    Q    And you testified that The Satanic Temple referred to its

19    physical headquarters as the temple.  Do you recall that

11:54:53 20    testimony you just gave?

21    A    Correct.

22    Q    If you look at the first page of Exhibit 103, the question

23    "where's the temple located" is answered with the words "The

24    Satanic Temple headquarters, also known as the Salem Art

11:55:18 25    Gallery in Salem, Massachusetts, is open to the public."

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:55:23   1           Correct?

        2   A   Correct.

        3   Q   You talked, when you were being examined by Mr. Haan, that

        4   The Satanic Temple engages in worship.  Do you remember that

11:55:41   5   testimony?

        6   A   I do not.

        7   Q   It's a true statement that worship is antithetical to

        8   satanism; correct?

        9   A   I'm not sure where you're getting this quote that I said

11:55:56  10   we engage in worship.

       11   Q   It's true, is it not, sir, that worship is antithetical to

       12   satanism; correct?

       13   A   Depends on how you define worship.

       14   Q   If you turn to Exhibit 103, again page 2.

11:56:24  15           The third line from the bottom of the text above the

       16   inverted house.  The words that say "worship is antithetical

       17   to satanism and we worship no beings save ourselves."

       18           When you authorized The Satanic Temple Arizona to use

       19   your brand, your trademark, and your intellectual property,

11:56:49  20   did you have any idea what was meant by worship when you

       21   authorized The Satanic Temple Arizona to say worship is

       22   antithetical to satanism and --

       23   A   You would have to speak to the author of this particular

       24   text.

11:57:08  25   Q   That wasn't my question, sir.

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

11:57:10  1   A   I did not directly authorize these words.  This is the

2   first time I'm seeing this text.  If you want answers about

3   this text, you would have to speak to the person who authored

4   this text.

11:57:23  5           MR. de HAAN:  I'm going to object at this point to

6   relevance.  I'm not sure what the relevance of any of this

7   is.

8           THE COURT:  I'm not sure either.

9           MR. CLAUS:  Your Honor, he testified on direct that

11:57:33  10  The Satanic Temple did engage in worship.  That's the point.

11  BY MR. CLAUS:

12  Q   You talked to Mr. de Haan about rituals performed by The

13  Satanic Temple.  Do you recall that testimony?

14  A   Yes.

11:57:50  15  Q   The rituals performed by The Satanic Temple are completely

16  ad hoc; correct?

17  A   Incorrect.

18  Q   Well, they are rituals that you and Mr. Jarry have

19  invented; is that correct?

11:58:02  20  A   That is incorrect.

21  Q   You and Mr. Jarry have invented rituals that are intended

22  to mock individuals who actually hold deeply religious

23  beliefs; true?

24  A   That is not true.

11:58:20  25  Q   Well, you and Mr. Jarry created something that you called

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

11:58:24  1    a Pink Mass; correct?

2    A    That is correct.

3    Q    That was one of the rituals of The Satanic Temple;

4    correct?

11:58:33  5    A    That is correct.

6    Q    That you and Mr. Jarry invented; correct?

7    A    Correct.  We authored that.

8    Q    And the Pink Mass was designed specifically to demonstrate

9    your contempt for Fred Phelps of the Westboro Baptist Church;

11:58:57  10   correct?

11   A    Incorrect.

12   Q    Well --

13           THE COURT:  We're going to break at this point,

14   Mr. Claus.  We're at the noon hour.  We will resume at

11:59:03  15   1 o'clock.

16           You can step down, sir.

17           I will give you the time you've used --

18           MR. CLAUS:  Thank you, Your Honor.

19           THE COURT:  -- before you leave the courtroom.

11:59:14  20          Folks can leave if you want to.  We're going to be

21   here just a minute.  Or you can stay.

22           MR. CLAUS:  Your Honor, I noticed Mr. --

23           THE COURT:  All right.  Counsel, as of now,

24   plaintiffs have used four hours and 51 minutes.  Defendants

12:02:09  25   have used three hours and 38 minutes from the time -- that

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

12:02:14  1    means there's a total of about two and a half hours remaining

2    in the 11 hours we set aside for the trial.

3         What I'd like you to do during the noon hour is,

4    unless you've already done it, identify the disclosure that

12:02:28  5    you made in the final pretrial order about Exhibit 105.

6         MR. CLAUS:  Yes.

7         THE COURT:  And then we'll address Exhibit 105 after

8    the lunch hour.

9         Are there other matters we need to address?

12:02:39 10         MR. CLAUS:  May we have an admonishment that counsel

11    should not be speaking with Mr. Misicko about his examination

12    while cross is pending, please.

13         THE COURT:  Well, he can prepare him for redirect.

14    We established at the final pretrial order -- at the final

12:02:55 15    pretrial conference that he can do that.

16         MR. CLAUS:  That's fine.  Thank you.

17         MR. KEZHAYA:  There was one other matter,

18    Your Honor.  It was my understanding of the Court's final

19    pretrial scheduling order that we had to produce a physical

12:03:06 20    copy of all of our exhibits on December 16 for them to be

21    admissible.  Is that a correct understanding?

22         THE COURT:  What is the point you're getting at?

23         MR. KEZHAYA:  We did not receive a physical copy of

24    the Hail Satan documentary until much later than December 16,

12:03:21 25    as I recall.

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

12:03:22   1          THE COURT:  You knew it was -- what the documentary

       2    was?

       3          MR. KEZHAYA:  We were aware of the documentary, but

       4    on December 16 we did not get any kind of a notification of

12:03:30   5    these are what our exhibits are, as I recall.  And I have to

       6    say "as I recall," Your Honor.

       7          THE COURT:  Was it listed as an exhibit to be used,

       8    the Hail Satan documentary?

       9          MR. KEZHAYA:  It was not, Your Honor.  We have a

12:03:42  10    document that was actually produced as we were creating the

      11    final pretrial order that has a list of what was originally

      12    produced on Exhibit -- on December 16 as a sequential

      13    beginning with 1, and then during the course of finalizing

      14    the pretrial order it was renumbered.  The ones that are

12:03:59  15    blank are the ones that were not produced to us on

      16    December 16.

      17          THE COURT:  You had them by the time of the final

      18    pretrial order?

      19          MR. KEZHAYA:  I do have it in front of us, yes,

12:04:09  20    Your Honor.

      21          THE COURT:  So --

      22          MR. KEZHAYA:  The pretrial order I do not currently

      23    have in front of us.

      24          THE COURT:  You filed the pretrial order

12:04:16  25    January 3rd.  Are you saying you didn't know their exhibits

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

12:04:18  1  by January 3rd?

2       MR. KEZHAYA:  No, Your Honor.  I may be mistaken.

3  I'm talking about the amended scheduling order that indicated

4  we, as I recall, had on December 30 was the initial timeline,

12:04:29  5  and two weeks before we had to provide --

6       THE COURT:  I understand that.  I'm not

7  understanding what your concern is.  You knew by the time of

8  the final pretrial order that they were going to try to admit

9  that documentary or portions of it.

12:04:44  10       MR. KEZHAYA:  Yes, Your Honor, and our objection is

11  noted in the pretrial order.

12       THE COURT:  And are you saying that because you

13  didn't get a physical copy on December 16th, I should

14  preclude them from using it here?

12:04:53  15       MR. KEZHAYA:  It's noncompliance with the order.  I

16  just wanted to bring it to the Court's attention.

17       THE COURT:  Okay.  You've done that.

18       MR. KEZHAYA:  Okay.  Thank you, Your Honor.

19       THE COURT:  We'll see you at 1 o'clock.  Thanks.

12:05:08  20     (Recess taken from 12:05 to 1:00.)

21       THE COURT:  Thank you.  Please be seated.

22       All right, folks, let me just remind everybody in

23  the courtroom that phones cannot be used in the courtroom.

24  Tablets and computers can be used by counsel or if there's a

13:01:23  25  reporter, if they're on airplane mode, but phones should not

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:01:27  1    be used in the courtroom.

2         I want to come back to Exhibit 105, assuming you're

3    still wanting to admit portions of it.

4              MR. CLAUS:  Yes, Your Honor.

13:01:39  5              THE COURT:  The question or the argument that's been

6    made is that the film is admissible under the residual

7    exception 807.

8         I should make clear on the record that I believe

9    statements by Mr. Jarry are not barred by the hearsay rule

13:01:59 10   because the testimony in the case clearly indicated that

11   Mr. Jarry was authorized to speak on behalf of The Satanic

12   Temple and is, I think, a manager of The Satanic Temple.  So

13   I think that falls within rule 801(d)(2)(C) and 801(d)(2)(D).

14        But we still have, in my view, a double hearsay

13:02:19 15   problem with the film.

16        I don't know if you all are looking at current

17   versions of Rule 807.  It was amended five weeks ago.  And

18   one of the comments made me think you might be looking at an

19   older version.  So I printed out the recent version that was

13:02:40 20   amended effective December 1st.

21        Mr. Claus, sounds like you've got the current

22   version.

23             MR. CLAUS:  I do, Your Honor.  Thank you.

24             THE COURT:  We'll hand the other new version to

13:02:50 25   plaintiffs' counsel.

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:02:57  1        As far as the new Rule 807 is concerned, I think the

        2  first part of (A) is satisfied -- well, this doesn't go to

        3  admissibility, but I don't think it's admissible under any

        4  other exception in 803 or 804.

13:03:11  5        So the question is whether it has sufficient

        6  guarantees of trustworthiness and whether it is more

        7  probative on the point for which is it is offered than any

        8  other evidence that the proponent can obtain through

        9  reasonable efforts.  We talked about that before lunch.  I

13:03:27 10  understand the parties' arguments.

       11        And then there is the notice requirement in

       12  subsection B.  I wanted to find out what the notice was.  If

       13  I could --

       14             MR. CLAUS:  I could pull that up, Your Honor.

13:03:37 15             THE COURT:  Okay.

       16             MR. CLAUS:  Oh, can we ask for our monitors to be

       17  on?

       18  BY MR. CLAUS:

       19  Q   The written notification will be contained in the e-mail

13:03:48 20  that should be on your screen on December 16, 2019, at

       21  3:03 p.m.  "Hi Stu.  Our packet and documents inadvertently

       22  omitted one exhibit from our list because it is not in paper

       23  form.  We intend to use as an exhibit excerpts from the

       24  documentary Hail Satan, which we will either send by a disk or

13:04:10 25  e-mail once we figure out the technical components of the

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:04:13  1   exhibit."

2            THE COURT:  What's the date of that?

3            MR. CLAUS:  December 16.

4            THE COURT:  Okay.

13:04:18  5            MR. CLAUS:  Can you see, Your Honor, on your screen?

6            THE COURT:  I couldn't read the date.

7            There, I see it now.  Okay.

8            What is your thought, Mr. Claus, with respect to

9   807(a)(1)?  That is, that the statement is supported by

13:04:34 10  sufficient guarantees of trustworthiness after considering

11  the totality of circumstances under which it was made and

12  evidence, if any, corroborating the statement?

13           MR. CLAUS:  Sure.  Mr. Misicko, the witness, has

14  testified that he not only made statements in the documentary

13:04:54 15  Hail Satan, but did so only after providing a release on his

16  own behalf for the use of his likeness, image, and

17  statements.

18           He testified that the statements of Malcolm Jarry

19  were made as the manager, the only manager of the United

13:05:10 20  Federation of Churches LLC and that United Federation of

21  Churches LLC also gave the waiver for the use of the

22  intellectual property, brand, and statements contained

23  therein.

24           As far as the circumstantial guarantees of

13:05:32 25  trustworthiness, I think that's the real inquiry.  There

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:05:38  1   doesn't seem to be any legitimate debate that Mr. Misicko and

       2   Mr. Jarry and Ms. Shortt and Mr. de Haan made the statements

       3   that they made in Hail Satan.

       4        To satisfy any concern the Court may have over

13:05:56  5   trustworthiness, before we play any sound we can put the

       6   image of Mr. Misicko or Mr. Jarry, although he is blacked out

       7   but it says Malcolm Jarry on the screen, and have Mr. Misicko

       8   either admit or deny that he is the person depicted in the

       9   video.

13:06:20 10        There is a corollary to my argument with respect to

      11   807(a)(1) and that does get back to the MIDP that required

      12   written or recorded statements known by the plaintiff to be

      13   disclosed.  Mr. de Haan said that this had been in the works

      14   for three years, that written and recorded -- or recorded

13:06:39 15   statements had existed for three years.

      16        And in their MIDP response to paragraph 2, which

      17   required them to state the names and addresses of persons who

      18   have given written or recorded statements, they responded

      19   with the name "all relevant recorded statements are in the

13:07:01 20   form of e-mail correspondence, public statements by or with

      21   the City of Scottsdale and public statements made by or

      22   behalf of City of Scottsdale."

      23        If they had disclosed in the MIDP response the

      24   existence of these recorded statements, we could have done

13:07:19 25   discovery to add any requirements necessary that the Court

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:07:24   1   believes are necessary to bring this -- these statements in

2   under 807.  But I believe on the record that you have before

3   you, Your Honor, 807(A) and 807(B) are satisfied.

4            THE COURT:  All right.  Response from plaintiffs'

13:07:37   5   counsel.

6            MR. de HAAN:  First of all, Your Honor, this

7   documentary was made by a filmmaker that's in New York.  The

8   documentary has people's faces blanked out.  The documentary

9   has stories told in the past tense.  There's a whole context

13:07:58  10   between scenes of how TST started, where it went from there.

11            As far as trustworthiness, this is an artist's,

12   essentially, story about TST from the outside regarding an

13   entire history of an organization that was spanning over

14   years.  As far as the context, I just don't see how -- first

13:08:21  15   of all, it has any bearing to this case, but also how it

16   still gets over the double hearsay in that this isn't made by

17   The Satanic Temple.  This is someone's outside view of The

18   Satanic Temple.  And the way that it's put together is that

19   artist's view within contexts throughout the film that, you

13:08:39  20   know, are their views, not ours.  How it's put together

21   necessarily.

22            Also, as far as whatever statement that he wishes to

23   play, without context, it's just a statement in a vacuum by

24   someone who's not here to be cross-examined, and that's the

13:08:55  25   problem with the trustworthiness.

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:08:58   1          THE COURT:  Okay.

         2          Mr. Claus, exactly what is it you propose to play

         3   from Exhibit 105?

         4          MR. CLAUS:  The statem- -- and that is the issue,

13:09:06   5   Your Honor.  We're not asking to play --

         6          THE COURT:  I'm asking what exactly you propose to

         7   play.

         8          MR. CLAUS:  The statements of Mr. Misicko, the

         9   statements of Mr. Jarry.  I believe there's a statement of

13:09:18  10   Stu de Haan.  I believe there is a statement of

        11   Michelle Shortt.  Those are the statements that we wish to

        12   play.  None of the artistic gloss on those statements, merely

        13   the statements.  And this witness can be cross-examined.

        14          THE COURT:  All right.

13:09:38  15          As I've indicated, I believe that the statements of

        16   Mr. Jarry are admissible under Rule 801(d)(2)(C) and (D).  If

        17   there's an objection to other individuals who might be shown

        18   from the film, that hearsay objection can be made and I'll

        19   consider whether their statements come within a hearsay

13:09:58  20   objection.

        21          My conclusion is that the video itself, Exhibit 105,

        22   to the limited extent it will be used, is admissible under

        23   Rule 807.

        24          I conclude that there are sufficient guarantees of

13:10:12  25   trustworthiness in that the only thing to be shown will be

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:10:17  1    the statements of individuals, not the artistic construction

2    of the film or any other messages in the film.  And the fact

3    that it's apparent that the -- from Mr. Misicko's testimony

4    that the individuals with The Satanic Temple were willing

13:10:33  5    participants in the creation of the video.

6         I also conclude that it's more probative on the

7    point of what they said in the video than any other evidence

8    that could reasonably be obtained because the video wasn't

9    released until after the close of discovery in this case.

13:10:49 10         And I conclude that the December 16th e-mail

11   satisfies the written notice requirement of Rule 807(B).

12         When we get to playing those excerpts, Trish, I'm

13   going to ask you, if you can, to take down what is said in

14   the film.  If you have trouble with that, let me know.  I

13:11:06 15   want to have a clear record of what exactly was played at

16   trial and I think the easiest way to do that is to have it

17   transcribed.  But we'll see how clear it is as it comes out.

18         All right.  With that ruling, you can proceed.

19         MR. CLAUS:  Thank you, Your Honor.  May I just have

13:11:22 20   one brief to set up with my --

21         THE COURT:  Yes.

22         MR. CLAUS:  Thank you.

23   BY MR. CLAUS:

24   Q    Mr. Misicko.

13:11:44 25   A    Hi.

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:11:44  1  Q    Still Scot Claus, still with Dickinson Wright, still

2  representing the City of Scottsdale.

3        I'm going to go back and ask you about your initial

4  involvement with The Satanic Temple.  Your initial involvement

13:11:55  5  was regarding a film project to film a rally regarding

6  Governor Rick Scott of Florida?

7  A    My initial involvement was as a consultant, as a satanist

8  informing a project about satanists.

9  Q    And that project included a rally ostensibly for

13:12:23 10  Rick Scott, the governor, or the then governor of Florida?

11  A    Correct.

12  Q    That utilized an actor to portray the head of The

13  Satanic Temple.

14  A    Correct.

13:12:32 15  Q    And that was the first activity that you were involved in

16  with The Satanic Temple; correct?

17  A    I was involved in consulting on what constitutes authentic

18  satanism.

19  Q    Right.  I'm glad you used the word authentic.

13:12:49 20        That activity, which was your first involvement with

21  The Satanic Temple, was started, according to Mr. Jarry, as a,

22  quote, media stunt, end quote, to expose what The Satanic

23  Temple believed was religious hypocrisy; is that correct or

24  incorrect?

13:13:15 25  A    That is incorrect.  You're quoting the wrong person.

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:13:19 1          MR. CLAUS:  Could you pull up clip 2.

2          This is Exhibit 105, clip 2.

3      (Clip 2 played as follows:

4       PERSON IN FILM:  The Rick Scott rally was a media

13:13:29 5      stunt to show the hypocrisy of what Rick Scott was

6      doing and it required a spokesperson.)

7          THE WITNESS:  That was not Malcolm Jarry.

8  BY MR. CLAUS:

9  Q    That --

13:13:42 10  A    I guarantee you.  Watch the film.  You said you watched it

11  during my deposition.

12  Q    Is that Cevin Soling, sir?

13  A    That is not.

14          MR. de HAAN:  Object.  Move to strike, Your Honor.

13:13:59 15          THE COURT:  What is it you're moving to strike?

16          MR. de HAAN:  Whatever it was just played was not

17  what counsel purported to be playing.

18          THE COURT:  There is no evidence before me, is

19  there, Mr. Claus, that the individual who just spoke was

13:14:10 20  Mr. Jarry?

21          MR. CLAUS:  There is, Your Honor -- there is not in

22  that clip, Your Honor.  We'll get to -- there are other clips

23  that have that same figure with -- I'll just ask the witness.

24  BY MR. CLAUS:

13:14:22 25  Q    Who is that?

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:14:23  1   A    I guarantee you that is not Malcolm Jarry.

2   Q    Who is it?

3        THE COURT:  Let's wait for a question, please.

4        THE WITNESS:  Certainly.

13:14:29  5   BY MR. CLAUS:

6   Q    Who is it?

7   A    It is a man who went by the name of Nicholas Crowe, listed

8   as an original collaborator in the film, if you watch the

9   film.

13:14:38  10  Q    Original collaborator in The Satanic Temple film?

11  A    Correct.

12  Q    And he was authorized to make those statements; correct?

13  A    No.  He was on his own.

14       THE COURT:  Okay.  On the basis of the current --

13:14:53  15       MR. CLAUS:  We'll withdraw, Your Honor.

16       THE COURT:  -- record, I'm not going to consider

17  clip 2 of Exhibit 105.

18       MR. CLAUS:  We'll withdraw it, Your Honor.

19  BY MR. CLAUS:

13:15:03  20  Q    You and Mr. Jarry created something called the Pink Mass?

21  A    Correct.

22  Q    Now, the Pink Mass was -- and that was the first ritual in

23  which you were involved as the spokesperson of the thing you

24  call The Satanic Temple; correct?

13:15:15  25  A    Correct.

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:15:16  1   Q   And the Pink Mass was designed specifically to demonstrate

2   your contempt for a Baptist church; correct?

3   A   Incorrect.

4   Q   Well, the creation of the Pink Mass was intended as a

13:15:30  5   mockery of the deeply held religious beliefs of adherence to

6   the Mormon church; correct?

7   A   Wildly incorrect.

8   Q   So you and Mr. Jarry did not create the Pink Mass to mock

9   the belief by followers of the LDS faith in post death

13:15:54  10  baptism?

11  A   It is correct that we did not create the Pink Mass to

12  disparage the LDS church.

13          MR. CLAUS:  Clip 4, please.

14          Before we play much, I'm just going to confirm when

13:16:09  15  we start playing that it is Malcolm Jarry.

16      (Clip 4 played as follows:

17      MALCOLM JARRY:  One of the things that I wanted to

18      play on is, you know, the Mormons have the belief --)

19          THE COURT:  Stop it there.

13:16:18  20  BY MR. CLAUS:

21  Q   That is Malcolm Jarry; correct?

22  A   That is Malcolm Jarry; correct.

23          MR. CLAUS:  So can we go back to the beginning and

24  play it?

13:16:26  25          MR. de HAAN:  Your Honor --

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:16:27  1          THE COURT:  Hold on just a minute.

       2          This is clip 4?

       3          MR. CLAUS:  Clip 4 of Exhibit 105.

       4          MR. de HAAN:  I'm objecting to this as well for the

13:16:35  5    same issues.  I don't know who's exactly going to be played

       6    in this clip, I don't know who's going to be speaking, I

       7    don't know what the relevance is of it either.

       8          THE COURT:  Well, he just identified it as Malcolm

       9    Jarry as the speaker.  So I assume that's all we're going to

13:16:48 10    see in this clip.

      11          MR. CLAUS:  It is, Your Honor.

      12          THE COURT:  All right.  Objection is overruled.

      13      (Clip 4 played as follows:

      14      MALCOLM JARRY:   One of the things that I wanted to

13:16:53 15        play on is, you know, the Mormons have the belief that

      16        they can baptize the dead and do this postmortem

      17        conversion, so that I propose that every time a

      18        same-sex couple kisses, that she's pleasured in the

      19        afterlife.)

13:17:09 20    BY MR. CLAUS:

      21    Q   Who was going to be pleasured in the afterlife using the

      22    deeply held religious beliefs of the LDS church in post death

      23    baptism, sir?

      24    A   This has nothing to do with the LDS church.

13:17:22 25    Q   Sir --

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:17:22   1   A   I'm not sure --

2   Q   -- who was going to, according to the Pink Mass you

3   invented, going to be pleasured in the afterlife based upon

4   the deeply held religious belief --

13:17:34   5   A   You're wildly cherrypicking and taking things wildly out

6   of context.

7              THE COURT:  Excuse me, let him finish the

8   question --

9              THE WITNESS:  Okay.

13:17:40  10              THE COURT:  -- and he'll let you finish the answer.

11              THE WITNESS:  Okay.

12              THE COURT:  Re-ask the question, please.

13              MR. CLAUS:  I will, sir.

14   BY MR. CLAUS:

13:17:48  15   Q   Who, whose mother were you seeking to baptize in the

16   afterlife?

17   A   Nobody's.

18   Q   Right.  Because there was nothing sincere at all about

19   actually baptizing anyone in the afterlife; correct?

13:18:05  20   A   Depends on how you define sincerity.

21   Q   Well, you were using this thing you created called a Pink

22   Mass that utilized the deeply held religious beliefs of

23   members of the LDS faith in post death baptism to not actually

24   baptize anyone; correct?

13:18:25  25   A   It had nothing to do with the LDS church.

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:18:29  1    Q    Well, it had to do with you mocking deeply held religious

       2    beliefs and the pastor of a Baptist church; correct?

       3    A    No.  This is where you're wildly cherrypicking and taking

       4    things wildly out of context.

13:18:45  5    Q    So there --

       6    A    The overall message --

       7              THE COURT:  Let him finish.

       8              THE WITNESS:  Exactly.

       9    BY MR. CLAUS:

13:18:50 10    Q    Since I'm wildly cherrypicking --

      11    A    Yes.

      12    Q    -- tell the Judge over whose grave your invented Pink Mass

      13    was held?

      14    A    Okay.  So since you want the full context of this, we

13:19:02 15    decided up front that we would never engage in activities that

      16    were meant to just disparage a particular religious belief or

      17    person, but that we'd always assert our own affirmative

      18    values.

      19              MR. CLAUS:  Move to strike as nonresponsive.  I

13:19:15 20    asked for who.

      21              THE COURT:  Please respond to the question.  Your

      22    counsel can ask for elaboration on redirect.  But please

      23    respond to that question.

      24              THE WITNESS:  Okay.

13:19:23 25              Well, what -- sorry, what was your question?

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:19:25  1    BY MR. CLAUS:

2    Q    Over whose grave was this Pink Mass that you created

3    performed?

4    A    Catherine Johnston.

13:19:34  5    Q    And who was Catherine Johnston?

6    A    A resident of Mississippi.

7    Q    And mother of whom, sir?

8    A    Fred Phelps.

9    Q    And Fred Phelps was the pastor of what, sir?

13:19:45  10   A    The Westboro Baptist Church.

11   Q    So you -- and you performed the Pink Mass only over the

12   grave of Fred Phelps' dead mother; correct?

13   A    Explicitly -- explicitly with the intention of celebrating

14   same-sex unions.

13:20:03  15   Q    And you personally, as an act of this thing you call The

16   Satanic Temple, showed your contempt for sincere actual

17   religious belief by placing your bare testicles on the

18   gravestone of Fred Phelps' mother; correct?

19   A    No.  I was showing my acceptance of same-sex unions.

13:20:26  20        MR. de HAAN:  Your Honor, I don't know how this

21   weights into this litigation at all.

22        THE COURT:  What is the relevancy, Mr. Claus?

23        MR. CLAUS:  Because a religion has to exist to bring

24   an Establishment Clause claim.  A religion is not predicated

13:20:40  25   upon mocking the deeply held religious beliefs of others.

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:20:44  1    That is not a religion.  That is a sociopolitical

2    countermyth.

3              THE COURT:  The objection is overruled, but I don't

4    think we ought to spend a great deal of time on this.

13:20:53  5              MR. CLAUS:  We're almost done, Your Honor.

6              THE COURT:  All right.

7    BY MR. CLAUS:

8    Q   So you testified that the reason you put your bare

9    testicles on a pastor's dead mother's grave was, you just

13:21:10 10    testified, to celebrate same-sex unions?

11   A   Correct.  In contrast to the hateful message put out by

12   the Westboro Baptist Church specifically.

13   Q   And was putting your bare testicles on the mother -- the

14   dead mother of a pastor part of a religious ritual, according

13:21:35 15   to you, sir?

16   A   You're going to have to rephrase the question.

17   Q   No -- I will ask it again.

18   A   Okay.  Then no, that played no part of it.

19   Q   The Satanic Temple has also engaged in what it calls

13:21:53 20   rituals to mock adherence to the Catholic church, as well;

21   correct?

22   A   Wildly incorrect.

23   Q   You were involved in something called a Black -- that you

24   called a Black Mass; correct?

13:22:07 25   A   Correct.

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:22:07   1   Q   Was the Black Mass described in Hail Satan as a, quote,

2   deliberate perversion of Catholic mass, end quote?

3   A   By who?

4   Q   No, sir.  My question is, was --

13:22:22   5            MR. de HAAN:  Objection.  Hearsay.

6            THE COURT:  Sustained, unless the individual is

7   identified.

8   BY MR. CLAUS:

9   Q   Did Malcolm Jarry describe Black Mass as a deliberate

13:22:34  10   perversion of Catholic mass?

11   A   I can guarantee you he did not.

12   Q   Did someone involved with The Satanic Temple, one of the

13   plaintiffs in this case, describe Black Mass as a, quote,

14   deliberate perversion of Catholic mass, end quote?

13:22:48  15            MR. de HAAN:  Objection.  Hearsay.

16            THE COURT:  Sustained.

17   BY MR. CLAUS:

18   Q   Did you authorize anyone or did Malcolm Jarry authorize

19   anyone to state with the release that was given for Hail Satan

13:23:07  20   that Black -- the Black Mass held by The Satanic Temple was a

21   deliberate perversion of a Catholic mass?

22   A   No.  Nobody ran that past me.

23   Q   Your organization promotes a philosophy that's not

24   theistic at all; correct?

13:23:25  25   A   Correct.

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:23:26  1    Q    Purely secular; correct?

2    A    Correct.

3    Q    You got involved in the Black Mass because you believed

4    that religion constitutes superstition; correct?

13:23:37  5    A    That was not why I became involved with the Black Mass.

6    Q    So you stated that you intended to put on the Black Mass

7    and be a part of the Black Mass as a, quote, declaration of

8    independence from superstition, end quote; correct?

9    A    That is correct.

13:24:04 10    Q    The Satanic --

11    A    I believe it was a personal declaration of independence

12    from superstition.

13    Q    The Satanic Temple is not itself a religion; correct?

14    A    That's wildly incorrect.

13:24:51 15         MR. CLAUS:  May I approach your courtroom deputy,

16    Your Honor?

17         THE COURT:  You may.

18    BY MR. CLAUS:

19    Q    Sir, do you recall being designated as a Rule 30(b)(6)

13:25:55 20    designee for the organization called the United Federation of

21    Churches LLC?

22    A    Yes.

23    Q    And you sat for a deposition as the designee on

24    September 24, 2019?

13:26:08 25    A    Correct.

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:26:08   1   Q    Do you recall also being designated as a Rule 30(b)(6)

          2   designee for the organization called The Satanic Temple, Inc.?

          3   A    Yes.

          4   Q    And you also sat for that deposition on September 24,

13:26:23   5   2019?

          6   A    Correct.

          7   Q    I've handed you the deposition transcripts that have

          8   different colored covers.  The deposition of the 30(b)(6)

          9   designee of The Satanic Temple, Inc., has a red cover.  And

13:26:41  10   United Federation of Churches LLC has an orange cover.  So I

         11   will try and help you by referring to the color of the covers.

         12            MR. KEZHAYA:  Your Honor, could we get copies of

         13   these?  We don't have red or -- looking at the first page of

         14   this, it's not apparent which deposition is which.

13:27:01  15            MR. CLAUS:  I will also state on the record which

         16   one is which.

         17            THE COURT:  Will that help?

         18            MR. KEZHAYA:  Possibly, Your Honor.  Depends on -- I

         19   have an 83-page copy and a 59-page copy.  There are two

13:27:12  20   depositions.  Which one is the 83?

         21            THE COURT:  The 83 is the United Federation of

         22   Churches.

         23            MR. KEZHAYA:  Thank you, Your Honor.

         24            Ah.  Thank you.

         25

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:27:26    1    BY MR. CLAUS:

2    Q    So just to remind you of the question I asked to which you

3    responded absolutely not, or words to that effect, The Satanic

4    Temple is not itself a religion.

13:27:41    5            And you answered?

6    A    You tell me.  I'm saying it is.

7    Q    Okay.  I'm going to have you look at the deposition

8    transcript of The Satanic Temple, Inc., which is the

9    red-covered transcript which has 59 pages.

13:28:20   10            At line 9, on page 36, sir, I'll let you get there.

11    Just look up when you get to page 36.

12            I'll read the question that I asked you.

13            "What is the religion promoted by the corporation

14    identified in Exhibit 18?  I will avow Exhibit 18 is the

13:28:42   15    articles of incorporation for The Satanic Temple."

16            Did I read that question correctly?

17    A    Yes.

18    Q    And your answer was "Satanism;" correct?

19    A    Correct.

13:28:55   20    Q    And then my question was:  "So accurately characterized,

21    satanism is the religion, not the Satanic Temple; correct?"

22            And your answer was:  "Satanism is the religion of

23    The Satanic Temple."

24            Do you see that?

13:29:10   25    A    I do.

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:29:12  1   Q   The seven tenets, you wrote the seven tenets; correct?

2   A   I co-authored the satanic tenets.  Or the seven tenets.

3   Q   Who was the co-author, was that Mr. Jarry?

4   A   Correct.

13:29:28  5   Q   The seven tenets are unique to the Satanic Temple;

6   correct?

7   A   I would argue that they describe something that was

8   pre-existing, but we were the first ones to really put it down

9   in codified form.

13:29:42  10   Q   Well, even your own website, up through December of 2013,

11   did not have the seven tenets; correct?

12   A   Correct.

13           MR. CLAUS:  By the way, Your Honor, I'd like to move

14   to admit Exhibits 57, 58, 59, 60, 63.  I'm sorry.

13:30:10  15           THE COURT:  You need to speak into a mic, please.

16           MR. CLAUS:  I apologize, Your Honor, I thought that

17   was picking me up.

18           I would like to move to admit, Your Honor,

19   Exhibits 56, 57, 58, 59, and 60.

13:30:28  20           MR. de HAAN:  I'm just going to renew the objection

21   as to relevance and more prejudicial than probative since

22   this has been disavowed.

23           THE COURT:  I'm going to overrule the relevance and

24   403 objections and admit Exhibits 56 through 60.

13:30:47  25       (Exhibits 56 through 60 admitted.)

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:30:59  1      MR. CLAUS:  Could you also, unless you already have,

2  give the witness Exhibit 61 and Exhibit 63.

3  BY MR. CLAUS:

4  Q   Before we get to those exhibits, Mr. Misicko, you know

13:31:36  5  what the Church of Satan is; correct?

6  A   Correct.

7  Q   And the Church of Satan does not promote or prescribe the

8  seven tenets you and Mr. Jarry wrote in the last seven years;

9  correct?

13:31:46  10  A   Correct.

11  Q   And you know what a theistic satanist is; correct?

12  A   Correct.

13  Q   And you know that theistic satanists practice a religion

14  they call satanism; correct?

13:31:59  15  A   I don't know of any theistic satanic organizations, but I

16  do know that that is the definition.  A theistic satanist is

17  somebody who venerates an actual Satan.

18  Q   And the seven tenets you wrote are not prescribed by

19  theistic satanists; correct?

13:32:18  20  A   I don't know.  In fact, there are some who do embrace the

21  seven tenets who I have met out when giving public lectures

22  and the like.

23  Q   Well, theistic satanists would believe that there is an

24  actual God and an actual Satan; correct?

13:32:31  25  A   Correct.

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:32:32  1    Q    And those tenets, your seven tenets, specifically eschew

2    that notion; correct?

3    A    Not necessarily.

4    Q    But you're familiar with LaVeyan satanism; correct?

13:32:49  5    A    Correct.

6    Q    And LaVeyan satanists do not prescribe or promote the

7    seven tenets you wrote seven years ago with Mr. Jarry;

8    correct?

9    A    They do not promote any concept of satanism that runs

13:33:01  10   outside of the satanic bible as authored by Anton LaVey.

11   Q    I'm going to have you look now, sir, at Exhibit 63.

12              As of April 17, 2014, it is accurate to say that you

13   had been acting as a spokesperson for The Satanic Temple for

14   more than a year; correct?

13:33:29  15   A    Maybe.  But I was then.

16   Q    And if you look at Exhibit 63, is an internet archive of

17   the domain name owned at that time by the United Federation of

18   Churches LLC for TheSatanicTemple.com; correct?

19   A    Yes, this is the same placeholder website we went over

13:33:52  20   ad nauseam an hour ago.

21   Q    In fact, Mr. Misicko, while I appreciate your commentary,

22   my question was that Exhibit 63 is an archived website for the

23   domain name owned by the United Federation of Churches LLC

24   SatanicTemple.com; is that correct or incorrect?

13:34:13  25   A    I don't know that United Federation of Churches existed at

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:34:17   1    the time of the website.  It certainly didn't exist at the

       2    time this website was posted.

       3    Q    The United Federation of Churches LLC owned the --

       4    A    Yes, it's still owned, the Web domain --

13:34:34   5                THE COURT:  Wait --

       6                THE WITNESS:  -- where the placeholder was.

       7                THE COURT:  Excuse me.  Wait for the question,

       8    please.

       9                THE WITNESS:  Sorry.

13:34:38  10    BY MR. CLAUS:

      11    Q    The United Federation of Churches owned and controlled,

      12    according to your prior testimony, the website

      13    www.SatanicTemple.com; correct?

      14    A    Yes, it owned the domain where the placeholder site

13:34:53  15    resided before it was revised.

      16    Q    And as of April 17, 2014, the website owned and controlled

      17    by the United Federation of Churches described God as

      18    supernatural and outside of this sphere; correct?

      19    A    Correct.

13:35:18  20    Q    It also described the website owned and controlled by the

      21    United Federation of Churches as of April 17, 2014, described

      22    satanists subordinate to God but mankind's only conduit to the

      23    dominion beyond the physical; correct?

      24    A    Correct.  But to be fair, I would still describe God as

13:35:42  25    supernatural, even though I don't believe in a supernatural

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:35:45  1  god.

2  Q    And as of April 17, 2014, the website owned by the United

3  Federation of Churches LLC told people who accessed the

4  website owned and controlled by the organization called The

13:35:57  5  Satanic Temple, quote, only Satan can hear our prayers and

6  only Satan can respond; correct?

7  A    Yes, that was a placeholder website that pre-existed the

8  formal establishment of The Satanic Temple and was not revised

9  until later on thereafter.

13:36:33  10  Q    Let's talk about The Satanic Temple, Inc., one of the

11  entities that is a plaintiff in this matter.

12         The Satanic Temple, Inc., was not organized as a

13  corporate entity until November 14, 2017; correct?

14  A    I believe that's correct.

13:36:51  15  Q    If you look at Exhibit 83, please, it should be in a

16  folder in front of you.

17         MR. CLAUS:  Before we move on, Your Honor, I move to

18  admit Exhibit 63.

19         THE COURT:  Is there an objection to Exhibit 63?

13:37:06  20         MR. KEZHAYA:  Did you say 83 or 63?

21         THE COURT:  He just moved 63.  The one we've been

22  talking about.

23         MR. de HAAN:  No objection.

24         THE COURT:  Admitted.

09:25:03  25         (Exhibit 63 admitted.)

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:37:17   1    BY MR. CLAUS:

2    Q   Now I'm having you look at the folder with Exhibit 83,

3    Mr. Misicko.

4        Is Exhibit 83 the Articles of Organization for the

13:37:23   5    Satanic Temple, Inc.?

6    A   I'm so sorry, I keep doing that.  I apologize.

7    Q   Is Exhibit 83 the Articles of Organization for The Satanic

8    Temple, Inc.?

9    A   Yes.

13:37:46  10        MR. CLAUS:  I move to admit Exhibit 83, Your Honor.

11        MR. de HAAN:  No objection.

12        THE COURT:  Admitted.

13        MR. CLAUS:  Thank you.

14      (Exhibit 83 admitted.)

13:37:52  15    BY MR. CLAUS:

16    Q   Michelle Shortt has never been an officer or director of

17    The Satanic Temple, Inc.; correct?

18    A   I don't know how you would describe her through the

19    affiliate agreement.

13:38:07  20    Q   Would you please -- do you recall describing for me during

21    the deposition of The Satanic Temple, Inc., on September 24th,

22    2019, that Michelle Shortt was not an officer or director of

23    The Satanic Temple, Inc.?

24    A   No.

13:38:23  25    Q   It is the deposition with the red cover, the deposition of

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:38:26  1   Satanic Temple, Inc.  I'm going to ask you to turn to page 24.

       2   Just let me know when you've gotten there, please.

       3   A   Okay.

       4   Q   Please follow along with me as I read the question

13:38:51  5   starting at line 5.

       6           "No, I want to know if Michelle Shortt has ever held

       7   a position as an officer of the corporation The Satanic

       8   Temple, Inc."

       9           Did I read that question correctly, sir?

13:39:07 10   A   Correct.

      11   Q   What was your one word answer?

      12   A   My answer was "No."  But here I'd offer the caveat that I

      13   was referring to The Satanic Temple, Inc., as the overarching

      14   organization.  I'm not a corporate lawyer so I don't know how

13:39:22 15   that fits in with the affiliate agreement and those agreements

      16   thereafter.  I know we gave them the trademark rights and the

      17   right to speak on behalf of us.  But, I mean, our corporate --

      18   our incorporation documents are something put together by

      19   lawyers with the most useful structure for what we're doing in

13:39:41 20   mind.

      21   Q   I know you don't like me reminding you that when you

      22   testify, you testify under penalty of perjury, but when I took

      23   your deposition and asked you if Michelle Shortt has ever held

      24   a position as officer in the corporation The Satanic Temple,

13:39:55 25   Inc., you did not say any of the words you just said; correct?

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:39:59  1   A   Correct.

2   Q   You said "No"; correct?

3   A   Correct.  But I'm offering you the caveat now.

4   Q   And when I asked you, sir, "Has Michelle Shortt ever held

13:40:09  5   a position as a director of The Satanic Temple, Inc.," you

6   gave me the one word answer "No"; is that true or is that

7   false?

8   A   It's true along with the caveat that you are pointing

9   exactly to the people who signed the paperwork as director and

13:40:26  10  as officer, pointing out that none of them were

11  Michelle Shortt, and I was agreeing with you.

12  Q   No, sir, I wasn't pointing to anything.  I asked you a

13  question and you responded with no caveats and nothing other

14  than a one word answer, "No"; true?

13:40:44  15  A   Yes, if you take -- if you take this script in isolation,

16  we see that I said no to that question.

17  Q   Yep.  That's how it works.

18          The Satanic Temple, Inc., has never filed a

19  certificate with the Arizona Corporation Commission; is that

13:41:02  20  correct?

21  A   I'm not actually certain of that.  I don't know how the

22  affiliate agreements work; I'm not a corporate lawyer, I

23  didn't set up the corporate structure.

24  Q   When I asked you -- if you'd turn to the next page,

13:41:17  25  please, page 25, beginning at line 12, "Has The Satanic

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:41:24    1    Temple, Inc., ever filed a document with the Arizona

            2    Corporation Commission," you answered, "Not that I -- not that

            3    I'm aware of, no."

            4         Correct?

13:41:37    5    A    Correct.

            6    Q    And when I asked you, sir, if The Satanic Temple had ever

            7    filed a document with the Arizona Secretary of State, you

            8    answered, "Not to my knowledge, no."

            9         Correct?

13:41:50   10    A    Correct.

           11    Q    The Satanic Temple, Inc., has no written agreement with

           12    the owner of the trademark The Satanic Temple, the

           13    intellectual property comprising The Satanic Temple, or any

           14    other agreement with the United Federation of Churches LLC;

13:42:13   15    correct?

           16    A    I'm sorry, say again.

           17    Q    Sure.  The owner of the intellectual property for The

           18    Satanic Temple is the United Federation of Churches LLC.

           19    You've testified to that numerous times today; correct?

13:42:29   20    A    Correct.

           21    Q    There is no written agreement between the United

           22    Federation of Churches LLC and the organization The Satanic

           23    Temple, Inc.; correct?

           24    A    I don't know.

13:42:44   25    Q    You knew on September 24th, 2019, sir, if you turn to

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:42:50   1   page 33 of the transcript of the deposition with the red

2   cover, the same transcript we've been talking about.

3           I asked you -- are you there, sir?

4           I asked you at line 25 of page 33, "Do you know if

13:43:18   5   The Satanic Temple has any written agreements with the United

6   Federation of Churches LLC?"

7           And you answered, as the only designee for that

8   entity, "Not that I -- not that I know of.  I don't think

9   there's formal paperwork --"

13:43:39  10           I interrupted.  I apologized for that.

11           "Okay."  And you finished your answer "-- elucidating

12   that."

13           Do you see that, sir?

14   A   No.  Is this -- you say this is page 33?

13:43:49  15   Q   Page 33, starting at line 25.  The very last line.

16           I asked you, as the only designee of The Satanic

17   Temple, Inc., "Do you know if The Satanic Temple, Inc., has

18   any written agreements with the United Federation of Churches

19   LLC?"

13:44:08  20           And your answer, beginning at line 3, was:  "Not that

21   I -- not that I know of.  I don't think there's formal

22   paperwork elucidating that."

23           Correct?

24   A   Correct.  I didn't know then and I don't know now.

13:44:25  25   Q   The Satanic Temple, Inc. -- strike that.

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:44:32  1        The United Federation of Churches LLC, that entity
2    does not play any role in determining or governing who may
3    become a member of the Arizona chapter of The Satanic Temple;
4    true?
13:44:48  5    A    I don't know what you mean by that.
6    Q    I'll ask it again.
7         The United Federation of Churches LLC does not play
8    any role in governing or determining who may be a member of
9    the Arizona chapter of The Satanic Temple.  Is that a true
13:45:04  10   statement or false statement?
11   A    I don't know because I don't know what that means.
12   Q    If you get out the deposition transcript with the
13   orange -- imagine that -- the deposition transcript of the
14   United Federation of Churches LLC, that is the 83-page
13:45:28  15   deposition.
16        If you turn, please, to page 55 of that deposition
17   transcript and just let me know when you're there.
18        You knew on September 24, 2019, when I was asking you
19   as the only designee of the United Federation of Churches LLC
13:46:01  20   that the United Federation of Churches has never played a role
21   in governing or determining who may be a member of The Satanic
22   Temple; correct?
23   A    Correct.
24   Q    And you told me then, because it was true then, that the
13:46:20  25   United Federation of Churches LLC has never played a role in

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:46:26  1    governing or determining who may be a member of the Arizona

2    chapter of The Satanic Temple; correct?

3    A    I think what's going on here is that --

4    Q    I want you to answer my question --

13:46:39  5    A    -- I might not have known what you're talking about then,

6    and I don't think I know what you're talking about now.  I'm a

7    designee of the United Federation of Churches.  I spoke

8    directly with Michelle Shortt and Stu de Haan giving explicit

9    permission --

13:46:53 10            THE COURT:  Hold on.  Hold on.  That's not the

11    question.

12            THE WITNESS:  Okay.

13            THE COURT:  If he asks you to answer a question yes

14    or no, do so if you can.  If you can't, tell him you can't

13:46:59 15    answer it yes or no.

16            THE WITNESS:  I understand.

17            THE COURT:  And then if your counsel wants to give

18    you time to elaborate, they'll do that.

19            THE WITNESS:  Thank you.

13:47:08 20    BY MR. CLAUS:

21    Q    Sir, you just testified about your lack of understanding.

22    But I want to take to you line 9 on page 55 of the

23    September 24th, 2019, deposition of you as the only 30(b)(6)

24    designee of the United Federation of Churches LLC.

13:47:26 25            When I asked you at line 9: "Okay.  Does the United

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:47:29  1   Federation of Churches LLC play any role in governing or

2   determining who may be a member of the Arizona chapter of The

3   Satanic Temple," you did not tell me in response that you were

4   confused; correct?

13:47:48  5   A    Correct.

6   Q    You did not tell me in response that you did not

7   understand my question; correct?

8   A    Correct.

9   Q    You did not tell me in your response that you could not

13:47:57  10   answer my question because it required you to exceed the

11   knowledge that you had as a designee; correct?

12   A    Correct.  And in that light, I can tell you what I think I

13   meant --

14   Q    No, sir, I'm not asking --

13:48:08  15   A    -- which is that the United States -- United Federation of

16   Churches --

17        THE COURT:  Hold on.  I know it's frustrating to

18   you, but you need to answer his questions.

19        THE WITNESS:  Okay.

13:48:18  20   BY MR. CLAUS:

21   Q    No, sir.  The answer that you gave me was, "No.  The

22   Arizona chapter is autonomous in that regard."

23        Is that the answer you gave me?

24   A    Correct.

13:48:33  25   Q    Thank you.

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:48:37  1   A    However --

2   Q    You --

3   A    -- that does not speak to the --

4   Q    No, sir --

13:48:40  5   A    -- membership the chapter has in management of that

6   chapter as a member.

7         THE COURT:  Mr. Misicko, please confine your answer

8   to the question.

9   BY MR. CLAUS:

13:48:49  10  Q    In fact, sir, chapters of The Satanic Temple are given a,

11  quote, maximum of autonomy; correct?

12  A    I see what you're misunderstanding is here.

13  Q    No, sir, I'm asking --

14  A    There's a difference between membership and management.

13:49:06  15        MR. CLAUS:  Your Honor --

16        THE COURT:  Ask the question --

17        MR. CLAUS:  -- I'm going to move to strike that

18  response as nonresponsive.

19  BY MR. CLAUS:

13:49:10  20  Q    And ask:  Chapters of The Satanic Temple are given, quote,

21  a maximum of autonomy.  Is that incorrect or is that a correct

22  statement?

23  A    The maximum that we can allow within --

24  Q    Thank you.

13:49:22  25  A    -- certain limitations.

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:49:24  1  Q   One does not need to be a satanist to be a member of the

2  Arizona chapter of The Satanic Temple; true?

3  A   You'd have to ask the management of The Satanic Temple who

4  are all identified as satanists.

13:49:40  5  Q   The Satanic Temple, Inc., talking about The Satanic

6  Temple, Inc., has never communicated with the City of

7  Scottsdale; correct?

8  A   Not to my knowledge, no.

9  Q   As of today -- strike that.

13:49:55  10      As of September 2019, you believed that there were

11  450 members of The Satanic Temple who lived in Arizona;

12  correct?

13  A   Correct.

14  Q   And you assumed that all 450 of those members were

13:50:16  15  secularists; correct?

16  A   I assumed nothing.

17  Q   Well, you told me during the deposition of you as the

18  30(b)(6) designee of The Satanic Temple, Inc., that you did

19  assume that all 450 were secularists; correct?

13:50:36  20  A   Where's this?

21  Q   Sure.  The deposition with the red cover, the

22  September 24, 2019, deposition of you as the 30(b)(6) designee

23  of The Satanic Temple, Inc.  Please turn to page 53.

24      Strike that.

13:50:58  25      We'll start at 52 to put it in context.

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:51:04   1          Just tell me when you're there.

        2    A   I'm there.

        3    Q   I asked you, starting at line 18:  "Today, as the designee

        4    of The Satanic Temple, Inc., do you know how many members of

13:51:24   5    The Satanic Temple reside in the State of Arizona?"

        6          You answered:  "I don't know but I can give you a

        7    minimum number."

        8          I interrupted.

        9          "If I check my -- my phone here, a minimum number of

13:51:42  10    450."

       11          Did I read my question and your answer correctly,

       12    sir?

       13    A   Correct.

       14    Q   And then I asked you, beginning at line 9:  "Do you know,

13:51:52  15    of the members in Arizona today, those 450, how many are

       16    secularists?"

       17          Did I read that correctly?

       18    A   Correct.

       19    Q   Please tell the Court what you answered on that day.

13:52:09  20    A   On that day I said, "I assume they're all secularists."

       21    Q   Thank you.

       22          Being a member of the organization called The Satanic

       23    Temple is not only available to a practicing satanist, but

       24    also to those who wish to merely advance secularism or are

13:52:28  25    advocating for individual liberty; correct?

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:52:34    1   A   Are you asking if that was your question or is that your

            2   question now?

            3   Q   Sir, I'm asking you.

            4           THE COURT:  Clarify, please.

13:52:42    5           MR. CLAUS:  I will, thank you.

            6   BY MR. CLAUS:

            7   Q   Being a -- I'm asking you the question, standing here

            8   right now.

            9           Being a member of the organization called The Satanic

13:52:48   10   Temple is not only available to practicing satanists but also

           11   to those who wish to merely advance secularism or advocate for

           12   individual liberty.  Is that a true statement or false

           13   statement?

           14   A   That's true.

13:53:09   15   Q   You do not know how many members of The Satanic Temple

           16   resided in Scottsdale, Arizona, as of February 2016; correct?

           17   A   I knew there were members in Scottsdale.

           18   Q   Sir, that's not my question.  You do not know how many

           19   members of The Satanic Temple resided in Scottsdale, Arizona,

13:53:28   20   as of February 2016.  Is that true or is that false?

           21   A   I did not have an exact number.  No.

           22   Q   In fact, you cannot testify under penalty of perjury that

           23   any members of The Satanic Temple resided in Scottsdale as of

           24   February 8, 2016; correct?

13:53:50   25   A   I believe that I can.

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:53:52   1   Q   Sir, take out the deposition with the orange cover.

2           Please turn to page 13.  Tell me when you're there.

3           Are you there, sir?

4   A   I'm there.

13:54:23   5           MR. CLAUS:  Let the Judge get there as well.

6           THE COURT:  I'm good.

7   BY MR. CLAUS:

8   Q   I asked you at line 15:  "Do you know, under penalty of

9   perjury, if any members of the Satanic Temple resided in the

13:54:38  10   City of Scottsdale, Arizona, as of February 8, 2016?"

11          And you responded at line 19:  "I -- I could not tell

12   you that with 100 percent certainty."

13          That was my question and that was your answer when

14   you sat as the only designee of the United Federation of

13:54:55  15   Churches LLC on September 24, 2019; correct?

16   A   Well, this is going to be a procedural issue because I've

17   done research since then and I don't know where the Court

18   stands on me introducing that into testimony.

19          MR. CLAUS:  I know where I stand, Your Honor.  And

13:55:13  20   it has not been disclosed ever.

21          THE COURT:  You're asking the questions.

22          MR. CLAUS:  I'm asking --

23          THE COURT:  Witnesses don't have to disclose

24   testimony ahead of time.  You don't have every witness coming

13:55:25  25   forward disclosing information.  If you choose to ask it, he

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:55:27   1   can give the answer.

2           MR. CLAUS:  But my question was as of September 24,

3   2019.

4           THE COURT:  Well, and as of the deposition.

13:55:36   5           MR. CLAUS:  Right.

6           THE COURT:  That was his answer as of the

7   deposition.

8   BY MR. CLAUS:

9   Q   And that was your answer as of the deposition; correct?

13:55:42  10   A   As of the deposition; correct.

11   Q   Michelle Shortt has never been a manager of the United

12   Federation of Churches LLC; correct?

13   A   Correct.

14   Q   The United Federation of Churches LLC, the organization

13:55:55  15   that owns and controls all of the trademarks and intellectual

16   property of The Satanic Temple, has never sought tax-exempt

17   status; correct?

18   A   I'm sorry, who has not?

19   Q   The United Federation of Churches LLC, which owns and

13:56:11  20   controls all of the trademarks and intellectual property of

21   The Satanic Temple, that entity has never sought tax-exempt

22   status; correct?

23   A   I don't know if it's considered tied in with that through

24   its relationship to The Satanic Temple, Inc.  Again, I'm not a

13:56:30  25   corporate lawyer, I don't know how these things are

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

13:56:33  1    intertwined.

2    Q    You had no problem answering my question during the time

3    you testified as the designee on September 24, 2019.  If you

4    look at the orange deposition --

13:56:44  5           THE COURT:  Excuse me.  Is that a question?

6    BY MR. CLAUS:

7    Q    -- at the orange deposition --

8           THE COURT:  Let's ask the question, please.

9    BY MR. CLAUS:

13:56:50 10    Q    The orange deposition, sir.  Page 28.

11           Are you there?

12    A    Yes.

13    Q    At line 17, I asked you the question:  "Has the United

14    Federation of Churches LLC ever sought tax-exempt status from

13:57:25 15    the IRS?"

16           And you answered as the Rule 30(b)(6) designee:  "To

17    my knowledge, that was never, never, the route we pursued that

18    with."

19           That was your answer; correct?

13:57:40 20    A    I believe that was also my answer this time.

21    Q    Cevin Soling, who goes by the name Malcolm Jarry, is the

22    only manager of the United Federation of Churches LLC;

23    correct?

24    A    Correct.

13:58:00 25    Q    You do not know of any document that permits The Satanic

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:58:03  1   Temple, Inc., to lawfully use the trademarks and intellectual

2   property owned by the United Federation of Churches LLC;

3   correct?

4   A   I do know of such a document.

13:58:17  5   Q   Sir, when you testified as the Rule 30(b)(6) designee of

6   the United Federation of Churches LLC you told me you knew of

7   no such document; correct?

8   A   Right.  As of deposition, I did not know of such a

9   document.

13:58:32  10   Q   If you look at page 34, line 23, of the orange-covered

11   deposition.

12        "Question:  Okay.  Do you know if the United

13        Federation of Churches LLC has entered into a licensing

14        agreement with The Satanic Temple, Inc., whereby The

13:59:07  15        Satanic Temple, Inc., is permitted to lawfully use the

16        trademark, quote, The Satanic Temple?"

17            And your answer was, "Again, let me say I know of no

18   legal documentation that would -- that would confer that

19   right."

13:59:27  20            Correct?

21   A   Correct.

22   Q   And you knew --

23   A   Now I do.

24   Q   -- you knew when you were sitting for your deposition on

13:59:34  25   September 24, 2019, that you had been designated as the only

CROSS-EXAMINATION – DOUGLAS ALEXANDER MISICKO

13:59:39  1   deponent knowledgeable about the topics listed in the notice

2   of Rule 30(b)(6) deposition; correct?

3   A    Incorrect.

4   Q    Turn, sir, to page 6 of the orange-covered deposition, the

14:00:07  5   deposition of United Federation of Churches LLC.  I'm going to

6   start at line 19 on page 6.

7           "Exhibit 7 is the notice of 30(b)(6) deposition of

8   the United Federation of Churches LLC.  Do you see that?

9           "Answer:  Yes.

14:00:30  10          "Question:  And please take a look at Exhibit A to

11  Exhibit 7, which is the list of topics for which you've been

12  designated as deponent.  Exhibit A to Exhibit 7.

13          "Answer:  Okay.  Yes.

14          "Question.  Do you agree that you are the person

14:00:49  15  most knowledgeable about the topics listed in Exhibit A of

16  Exhibit 7?"

17          And your answer was:  "The most knowledgeable

18  representative of the company in question."

19          And I clarified.  "Question:  Of the United

14:01:09  20  Federation of Churches LLC?"

21          And you answered:  "Correct, yeah."

22          Right?

23  A    I see no discrepancy in my answer today.

24  Q    You sat for the Rule 30(b)(6) deposition of the United

14:01:25  25  Federation of Churches as the only designee produced with

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

14:01:30 1    knowledge about the topics identified in the notice of

2    deposition.  That is a true statement; correct?

3              MR. de HAAN:  Objection.  Relevance at this point,

4    Your Honor.  Also asked and answered.

14:01:41 5              THE COURT:  Overruled.

6              THE WITNESS:  As the only knowledgeable

7    representative of the company in question.

8    BY MR. CLAUS:

9    Q    Which --

14:01:49 10   A    The lawyers who put together the paperwork, they would be

11   more knowledgeable, they would be more knowledgeable

12   deponents.  I cannot say that I would be the most

13   knowledgeable deponent about the corporate structure of The

14   Satanic Temple.  But as a representative of the company

14:02:03 15   itself, I'm what we've got.

16   Q    You know, as the designee of the United Federation of

17   Churches, that Michelle Shortt never asked the manager of the

18   United Federation of Churches LLC for authority to speak on

19   behalf of that organization; correct?

14:02:22 20   A    Incorrect.

21   Q    Could you please turn to page 35 of the orange colored

22   deposition, the deposition of you as the designee of the

23   United Federation of Churches LLC.

24            Starting at line 25.

14:02:59 25            "okay.  Prior to February 8, 2016, did

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

14:03:05  1    Michelle Shortt ever ask Cevin Soling, as the manager of the

2    United Federation of Churches LLC for permission to speak on

3    behalf of that legal entity?"

4         And your answer was:  "Not that I'm aware of."

14:03:21  5         Correct?

6    A    Again, I'm not seeing the discrepancy.  I'm still not

7    aware of it today.  But I'm not making the absolute claim that

8    she did not.

9    Q    The operating agreement for the United Federation of

14:03:36 10   Churches LLC does not confer agency authority on anyone other

11   than the manager of that entity; correct?

12   A    Correct.

13   Q    You do not know the date that Michelle Shortt became a

14   member of The Satanic Temple, do you?

14:03:59 15   A    I do not.

16        MR. CLAUS:  Let me just check, Your Honor, and I

17   think I'm done.

18   BY MR. CLAUS:

19   Q    Do you --

14:04:34 20        MR. CLAUS:  I'm sorry, can I ask for the witness,

21   unless he's already been given it, Exhibit 61.

22        THE WITNESS:  I've got it.

23        THE COURT:  He has it, Christine.

24        MR. CLAUS:  Oh.  Okay.  Thank you.

25

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

14:04:58  1  BY MR. CLAUS:

2  Q   Sir, I've asked for you to be handed Exhibit 61.  Can you

3  take a look at it, please.

4  A   Yes.

14:05:09  5  Q   Do you recognize Exhibit 61 to be the certificate of

6  organization for the entity called the United Federation of

7  Churches LLC?

8  A   Yes.

9  Q   And dated February 4, 2014?

14:05:25  10  A   Correct.

11  Q   Which predated Exhibit 63, which identified God and Satan

12  as supernatural on April 17, 2014; correct?

13  A   Correct.

14          MR. CLAUS:  I move for admission of Exhibit 61,

14:05:42  15  Your Honor.

16          MR. de HAAN:  If I may have a moment to examine

17  this, Your Honor.

18          No objection.

19          THE COURT:  Admitted.

14:06:06  20     (Exhibit 61 admitted.)

21          MR. CLAUS:  Could you hand the witness Exhibit 78,

22  please.  And 79.  And 81.  And 85.

23          This is just getting it in evidence.  I apologize,

24  Your Honor.

14:06:37  25          THE COURTROOM DEPUTY:  Any others?

CROSS-EXAMINATION - DOUGLAS ALEXANDER MISICKO

14:06:38  1          THE COURT:  Why don't you ask plaintiffs' counsel if

2  they object to the admission of any of those.

3          MR. CLAUS:  Thank you.

4          THE COURT:  Give them the numbers.

14:06:46  5          MR. CLAUS:  I will.  I'm going to actually bring it

6  over to them if Your Honor will allow.

7          THE COURT:  That's fine.

8          MR. CLAUS:  Thank you.

9       (Counsel confer.)

14:07:25 10          MR. de HAAN:  No objections.

11          THE COURT:  All right.  What are those exhibits

12  again?

13          MR. CLAUS:  78, 79, 81, 85, Your Honor.

14          THE COURT:  All right.  Those exhibits are admitted.

14:07:48 15       (Exhibits 78, 79, 81, and 85 admitted.)

16          MR. CLAUS:  We can just -- if you can put

17  Exhibit 85, I just have a couple of questions about it, in

18  front of the witness.

19  BY MR. CLAUS:

14:08:14 20  Q   Exhibit 85 is a restated certificate of organization for

21  the United Federation of Churches LLC that was submitted to

22  the Massachusetts Corporations Division on May 21, 2018.  Do

23  you see that?  The last page.  Certification from

24  William Galvin, Secretary of the Commonwealth.

14:08:41 25  A   Correct.

REDIRECT EXAMINATION – DOUGLAS ALEXANDER MISICKO

14:08:43  1   Q   And in box 3, the United Federation of Churches LLC is

2   asked to describe the general character of the business and if

3   the limited liability is organized to render professional

4   service, the service to be rendered; correct?

14:09:04  5   A   Correct.

6   Q   And in the general character of business in the restated

7   certificate of organization filed with the Commonwealth of

8   Massachusetts on 5/21/2018, the United Federation of Churches

9   LLC, did not mention religion at all; correct?

14:09:23  10  A   Correct.

11  Q   The lawsuit in this case had been filed as of May 21,

12  2018; true?

13  A   Correct.

14          MR. CLAUS:  That's all I have for this witness,

14:09:35  15  Your Honor.

16          THE COURT:  Redirect?

17          MR. CLAUS:  It will just take me a second to get my

18  many binders out of the way here.

19              R E D I R E C T   E X A M I N A T I O N

14:10:26  20  BY MR. de HAAN:

21  Q   In order to do anything public, public facing in The

22  Satanic Temple, does there have to be permission sought by the

23  organization?

24  A   There does.

14:10:45  25  Q   Which, if someone were to request to do a ritual or

REDIRECT EXAMINATION – DOUGLAS ALEXANDER MISICKO

14:10:48  1    invocation -- well, I'll ask one at a time, someone to do a

2    ritual that were illegal, would you authorize it?

3    A    We would not.

4    Q    If someone was to give a public invocation that was

14:11:02  5    intentionally offensive to a specific religion, would you

6    allow it?

7    A    Absolutely not.  We have language in our affiliation

8    agreement that lets all our chapters know that we must advance

9    our affirmative values with every public facing thing we do

14:11:17  10   and not disparage other religious viewpoints or individuals.

11   Q    And have you had people do that?

12   A    We have had people act outside the boundaries of our -- of

13   our -- of our permission to do things in our name.

14   Q    And what happened to them within the organization?

14:11:41  15   A    They have gotten kicked out from the organization.

16   Q    As far as the Pink Mass that was referenced, was that a

17   Satanic Temple maneuver or was that you personally?

18   A    That was part of the very nascent origins of The Satanic

19   Temple which have been documented by religious scholars that

14:12:08  20   take us seriously as a religion and a documentarian who came

21   away making a documentary from us concluding that we are an

22   authentic religion.

23   Q    Has anything like that ever happened since?

24   A    It has not.

14:12:30  25   Q    Is being a secularist and a satanist mutually exclusive?

REDIRECT EXAMINATION – DOUGLAS ALEXANDER MISICKO

14:12:35   1   A    It is not.

2   Q    Would you authorize anybody, any member of The Satanic

3   Temple to do -- to lead a public ritual or give an invocation

4   that did not openly identify as a satanist?

14:12:54   5   A    I would not.

6   Q    And you said how many people -- how many people did you

7   testify approximately are in The Satanic Temple?

8   A    We're in the hundreds of thousands now.

9   Q    And do you know every one of them?

14:13:10  10   A    I do not.

11   Q    Do you know when any of them joined or all of them joined?

12   A    I do not.

13   Q    Do you maintain chapter websites?

14   A    I do not.

14:13:24  15   Q    Do you know if's it's easy or difficult to maintain

16   demographics on satanists?

17   A    It is difficult given the reticence of many to identify

18   publicly as satanists.

19   Q    In order to become a satanist, do you have to speak to the

14:13:47  20   manager?

21   A    You do not.

22   Q    Is there an entire system of vetting leadership?

23   A    There is a very thorough vetting process.

24   Q    Do you appoint officers within a chapter?

14:14:10  25   A    I do not.  I appoint -- I can appoint chapter heads and

14:14:17   1   weigh in on -- see, we'd have to go to time.  At the

           2   beginning, I was appointing chapter heads, and later on we

           3   moved that to a council and the council deliberates upon who

           4   is qualified and who best advances our message.

14:14:34   5   Q   And who appoints officers within a chapter?

           6   A   The chapter leadership.

           7   Q   Is it common for there to be certain officers, such as a

           8   treasurer or a secretary or something like that?

           9   A   It is.

14:14:55  10   Q   If someone wants to give an invocation, is there a

          11   prescribed invocation or could they -- could anybody giving an

          12   invocation go outside of that?

          13   A   They can choose what they want, but they're going to have

          14   to run it by us before they deliver it in our name.

14:15:11  15   Q   And if it was off message, so to speak, what would happen?

          16   A   We would not allow the invocation to be delivered in our

          17   name.

          18   Q   You said that as of now you are aware of members within

          19   Scottsdale that were members at the time of late 2015, early

14:15:41  20   2016?

          21   A   I know that we had members in Scottsdale then.

          22   Q   Do you know if there are now?

          23   A   I have not kept track.

          24           MR. de HAAN:  Nothing further.

14:16:06  25           THE COURT:  All right.

14:16:06   1          Thank you, sir.  You can step down.

2          MR. de HAAN:  Plaintiffs rest.

3          THE COURT:  All right.

4          MR. CLAUS:  Your Honor, we'll be making a motion for

14:16:24   5     judgment as a matter of law.  We'll make it orally.

6          May I use the restroom before we do that, please?

7          THE COURT:  Yeah.

8          How long do you think the motion will take?

9          MR. CLAUS:  Less than 15 minutes.

14:16:40  10          THE COURT:  Why don't we go ahead and take the

11     afternoon break now, then.  We will resume at 2:35.

12          MR. CLAUS:  Thank you, Your Honor.

13        (Recess taken from 2:17 to 2:32.)

14          THE COURT:  Thank you.  Please be seated.

14:32:57  15          Mr. Claus, you wanted to make a motion?

16          MR. CLAUS:  Yes, Your Honor.  May I -- I don't know,

17     if you haven't calculated it, then I don't want you to take

18     up time doing it.  But if you have calculated, remaining

19     time, please.

14:33:08  20          THE COURT:  I haven't.  I can do it pretty quickly.

21     Would it help both sides?

22          MR. KEZHAYA:  It would aid the plaintiffs, as well,

23     Your Honor.

24          THE COURT:  All right.  Give me just a minute.

14:34:27  25          All right.  As of now plaintiff has used four hours

14:34:32   1   and 59 minutes.  Defendants have used four hours and 41

2   minutes.

3           MR. CLAUS:  Thank you, Your Honor.

4           Pursuant to Rule 52(c) of the Federal Rules of Civil

14:34:50   5   Procedure, Your Honor, we ask the Court to enter judgment as

6   a matter of law against the plaintiffs for a host of reasons.

7           The first argument I want to touch on involves the

8   various plaintiffs and it relates to the Court's ongoing duty

9   to assure itself that it has subject matter at every stage of

14:35:15  10   the litigation and recognizing that standing is a component

11   of subject matter jurisdiction.

12           Your Honor, when it entered its motion to dismiss on

13   the motion that was filed with respect to subject matter

14   jurisdiction indicated that there was no evidence at the time

14:35:40  15   whether Michelle Shortt was a member of The Satanic Temple.

16   Mr. Misicko just testified that he could not testify under

17   penalty of perjury that Michelle Shortt was a member of The

18   Satanic Temple at any time prior to the filing of this

19   lawsuit.

14:36:01  20           Your Honor had a question in a footnote, I believe

21   it was footnote 2 of the order on the motion to dismiss, as

22   to whether the unincorporated association that purports to be

23   a plaintiff in this case ceased to exist when the Adversarial

24   Truth LLC was formed, and the Court was provided that answer

14:36:25  25   in the irrefuted testimony of Michelle Shortt when she

14:36:30   1    testified that Adversarial Truth LLC was formed for the

         2    purpose and did, in fact, operate the Arizona chapter of The

         3    Satanic Temple.

         4          Along those lines, Your Honor, you both saw and you

14:36:48   5    heard that the Adversarial Truth LLC did -- still to this day

         6    does not have an affiliation agreement with the only entity

         7    that controls The Satanic Temple, the United Federation of

         8    Churches LLC.  And the unilaterally signed affiliate

         9    agreement, which is Exhibit 76, demonstrates that that

14:37:19  10    affiliation did not exist in February 2016 when the purported

        11    invocation was sought, did not exist in May 2016 when the

        12    purported invocation was denied.

        13          The Satanic Temple, Inc., one of the plaintiffs in

        14    this case, did not exist until November 2017, according to

14:37:49  15    the testimony of Mr. Misicko.

        16          With respect to Michelle Shortt, Michelle Shortt

        17    must show that her injuries were caused by the conduct of the

        18    City to show standing, that she suffered a concrete and

        19    particularized injury, she suffered a concrete and

14:38:14  20    particularized injury as a result of the conduct of the City,

        21    and that that injury is redressable.

        22          On that issue, Your Honor, there is a surfeit of

        23    testimony that Michelle Shortt never spoke to a

        24    representative of the City of Scottsdale, never sought the

14:38:35  25    ability to do anything from the City of Scottsdale.

14:38:40    1          Mr. Zarzycki, according to the only evidence in this

            2     courtroom, never identified Michelle Shortt as a proposed

            3     speaker.  And most importantly, Your Honor, there is no

            4     testimony in this case that the City of Scottsdale ever

14:38:56    5     caused injury to Michelle Shortt by denying her the ability

            6     to give an invocation because no one in this courtroom

            7     testifying on behalf of the City of Scottsdale knew who

            8     Michelle Shortt was until this lawsuit was filed.

            9          Critically, Your Honor, on the Establishment Clause

14:39:20   10     claim, the evidence adduced in this case demonstrates as a

           11     matter of law that the plaintiffs cannot prevail on their

           12     Establishment Clause claim.

           13          An invocation is, by definition, government speech.

           14          Ms. Shortt testified on examination by her own

14:39:43   15     lawyer whether Exhibit 4 constituted an invocation or

           16     constituted a speech.  She testified that it constituted

           17     speech.  A speech, not an invocation.

           18          And we know that's true because she also testified

           19     that she did not seek to give that speech on behalf of the

14:40:12   20     City of Scottsdale city council.  Yet, as a matter of law

           21     according to *Town of Greece* and *Marsh*, that is exactly what

           22     an invocation is.  In fact, courts have recognized that

           23     invocations are a unique type of government speech because

           24     the governmental body, not the public, is the primary

14:40:38   25     audience for that invocation.

14:40:45   1      Because the invocation constituted government speech

2      as a matter of law, the plaintiffs had no protectable right

3      in that speech, Your Honor, according to *McGowan*, Supreme

4      Court decision, which is supported by *Simpson*, the Fourth

14:41:08   5      Circuit decision.

6           With respect to the denial of the invocation itself,

7      there is no evidence in this case adduced by the party who

8      has the burden of proof that any representative of the City

9      of Scottsdale was ever told any belief, viewpoint, or idea

14:41:40  10      either held by or sought to be espoused by any plaintiff.

11          And critically, the person who made the decision to

12     deny the invocation is one person, Brian Biesemeyer, who

13     testified that no representative of any plaintiff ever

14     informed him of any belief, viewpoint, or religion that the

14:42:08  15      plaintiffs seek to espouse during an invocation.

16          The plaintiffs have the burden of proof, Your Honor.

17     The plaintiffs have offered no proof that Mr. Biesemeyer knew

18     of the existence of Michelle Shortt, that Mr. Biesemeyer

19     based his decision on anything other than the information

14:42:28  20      that he sought to be delivered to him so he could fulfill his

21     role as the chief executive officer in charge of

22     administrative decisions.

23          And that point is also critical, Your Honor.  This

24     was not, according to the only testimony in this case, a

14:42:44  25      legislative decision.  It was an administrative decision.

14:42:51   1    And there was one person in charge of that administrative

           2    decision, Brian Biesemeyer.  And according to the only

           3    testimony you've heard in this case, no councilmember, the

           4    mayor, and the council sitting as a whole could not direct

14:43:08   5    Mr. Biesemeyer to alter his administrative decision.  And in

           6    any event, there is no evidence, there is simply no evidence

           7    in this case that Mr. Biesemeyer's decision, administrative

           8    decision was influenced by any statement made by the mayor or

           9    any statement made by the council.

14:43:32  10         So the plaintiffs have not met the burden that would

          11    be necessary to get this case to a jury if a jury had been

          12    impaneled, which means that they have not met their burden.

          13    That should preclude the Court from entering the judgment as

          14    a matter of law.

14:43:53  15         That's all, Your Honor.

          16         THE COURT:  Plaintiffs' counsel.

          17         MR. KEZHAYA:  Thank you, Your Honor.  May it please

          18    the Court.

          19         I'll begin by noting that the City did not raise a

14:44:12  20    52(c) motion on our Equal Protection claim.

          21         As for summary judgment -- subject matter

          22    jurisdiction, Your Honor, the question is standing.  Standing

          23    involves three parts:  Injury, causation, redressability.

          24    There is also another requirement, which is, is TST a real

14:44:32  25    religion.  I'll cover each in turn.

14:44:35  1          Was Michelle Shortt injured by the City revoking the

2     invocation?  The answer is yes.

3          How do we know?  It was undisputed that she was the

4     one to perform the invocation.  The City may have not talked

14:44:44  5     to her specifically, they may not have talked to Mr. Misicko

6     individually, but she was the one to give the invocation.  An

7     invocation was scheduled for July 6, and that invocation was

8     revoked.

9          We have submitted some evidence, which is all that

14:45:01 10     we have to do to survive a 52(c) motion, that the reason

11     behind the revocation was due to religious animus, not to

12     this nebulous substantial connection policy.  So we have an

13     injury.

14          The next question is do we have causation?  The

14:45:20 15     answer is yes.  How do we know that?  The city manager was

16     the chief executive officer of the City.  At all stages

17     throughout this litigation, up until about three weeks ago,

18     it was always undisputed that the city manager was acting on

19     behalf of the City.  They may try to insulate the city

14:45:37 20     council and the mayor from the fact that this decision was

21     made.  However, it is beyond dispute that it was the City

22     that did the revoking of the invitation.

23          The last question is redressability.  Can the Court

24     redress this injury?  The answer once again is yes.  How?

14:46:03 25     Enjoin the City from precluding The Satanic Temple from

14:46:06  1    giving an invocation.  The Court can also order costs of this

2    litigation and the Court can also attorneys' fees of this

3    litigation.  That will, as a practical matter, resolve this

4    issue for the plaintiffs.

14:46:20  5            The last issue, which I think is the real issue for

6    today's trial, or the past two days trial, is, is TST a real

7    religion.  Have we submitted some evidence about whether TST

8    is a religion?  We believe emphatically the answer is yes.

9            Michelle Shortt testified, if I remember correctly,

14:46:39 10    approximately two hours, mostly on the issue of does she

11    believe the seven fundamental tenets and her concept of what

12    we call The Satanic Temple, is that a religion?  Yes.  She

13    testified, "This organization takes the same place that God

14    does for me as it would for other people."

14:47:00 15            She testified at length about iconography.  She

16    showed us her pendants.  She described her tattoos.  She

17    described ceremony.  She described the feelings that she felt

18    when engaging in ceremony.  She described fellowship.  In

19    every conceivable way, TST is a religion as established by

14:47:20 20    Michelle Shortt.

21            Not only did we establish that TST is a real

22    religion through Michelle Shortt, Mr. Misicko, the cofounder

23    of the organization, testified at length today about the

24    religious nature of the organization.

14:47:33 25            Not only did we testify at length about the

14:47:36  1   religious nature of the organization, we testified at length

2   about the religious nature of the invocation.

3        In short, this is a religious organization.  It was

4   always a religious organization.  It was never a dispute

14:47:48  5   about whether this is a religious organization.

6        The Court has subject matter jurisdiction for the

7   foregoing reasons.

8        The next question is do we have an Establishment

9   Clause case.  He indicates -- Mr. Claus indicates that the

14:48:02  10  invocation is not religious because Ms. Shortt testified that

11  she would not give it on behalf of the city council.  That

12  misconstrues Ms. Shortt's testimony.  She was saying that she

13  would not give it on behalf of the city council because she

14  was testifying that she would give it on behalf of The

14:48:16  15  Satanic Temple.

16       And once again, Mr. Misicko testified at length

17  about the intended meaning behind the religious invocation.

18  He also testified at length about the fact that this is not

19  intended to offend anyone, although it may offend some

14:48:35  20  people; that is not their problem.

21       Mr. Claus also argued that there is no document

22  conferring authority, at least that has been produced today,

23  between the LLC, Adversarial Truth LLC, and The

24  Satanic Temple, Inc.  This is a governance issue, Your Honor.

14:48:57  25  There's no argument before the Court that they did not have

14:49:00  1   authority.  In fact, Mr. Misicko testified at some length

2   that he is the top of TST, along with the cofounder, and he

3   gave express authority to Ms. Shortt and Stu de Haan.  So

4   there is express authority, and the ensuing events in this

14:49:18  5   litigation show ratification, as if there's any doubt.

6          Mr. Claus also argues that there was nobody of the

7   City was told about the religious beliefs of TST or the

8   invocation or substantially pretty much anything else about

9   TST.  Once again, Your Honor, this misconstrues the issues.

14:49:40  10  The testimony showed very clearly that they didn't ask anyone

11  anything of any of their religious invocations before

12  scheduling them.  This goes to show religious animus.

13         For the foregoing reasons, Your Honor, we have

14  standing, we have an Establishment Clause case, and to

14:49:55  15  whatever extent that was a 52(c) motion our Equal Protection

16  Clause issue, we also have an Equal Protection case.

17         THE COURT:  All right.  I'm going to take the motion

18  under advisement.  I'm sure your closing arguments will touch

19  on some of these points as well.  But I think, because I'm

14:50:11  20  not going decide it now, we ought to go ahead with the

21  defense evidence.

22         MR. CLAUS:  The first thing we would like to do,

23  Your Honor, is to make our offer of proof with respect to

24  Mr. de Haan.

14:50:28  25         THE COURT:  You want to take time on the record to

14:50:30  1   do it?  I thought you said you were going to do that in

2   writing.

3              MR. CLAUS:  I -- I do want to take the time to do it

4   on the record because it's not going to be very long.

14:50:39  5              THE COURT:  All right.

6              MR. CLAUS:  If permitted to be called as a witness

7   in this case, Mr. de Haan will be expected to admit the

8   following:

9              That the plaintiff entities represent a

14:50:55  10  sociopolitical countermyth, not a religion.

11             That the plaintiff entities are not a religion

12  because they are, in fact, a political activist organization

13  focused on challenging governmental practices that they

14  believe implicate the First Amendment.

14:51:17  15             He would be forced to admit that he has previously

16  indicated that he enjoys the attention afforded to him by

17  plaintiffs' myriad publicity stunts, calling himself at one

18  point, quote, a publicity whore, end quote.

19             Mr. de Haan would be expected to admit the

14:51:36  20  plaintiffs do not engage in worship, which is what

21  Mr. de Haan would admit is the, quote, antithesis of what

22  humans are meant to do, end quote.  And that rather than

23  being a religion, Mr. de Haan would admit that plaintiffs',

24  quote, entire purpose is, quote, free speech, end quote.

14:52:03  25             Mr. de Haan would be expected to admit that

14:52:05  1   plaintiffs have no unified system of belief, no worship

2   service, no canonical text, and no system of ordination.

3         Mr. de Haan would be expected to admit that plaintiff

4   Adversarial Truth LLC did not exist at any relevant point in

14:52:24  5   time during the litigation.

6         That there was no written authorization for

7   Ms. Shortt to act on behalf of any plaintiff until after the

8   intended invocation.

9         And Mr. Shortt would be forced to admit -- or, I'm

14:52:36  10   sorry, strike that.  Mr. de Haan would be forced to admit that

11   he is unable to identify any conversations that he has had or

12   was aware of with representatives of the City in which

13   representatives of the City demonstrated or expressed animus

14   toward any plaintiff or any religious view they have.

14:52:56  15         Mr. de Haan would be expected to admit he has no

16   belief in a higher power or deity and expressly rejects such

17   belief.

18         Mr. de Haan would be expected to describe the belief

19   system to which he and others ascribe associated with the

14:53:15  20   plaintiffs as being void of the characteristics typical of

21   religious beliefs.

22         Mr. de Haan would be expected to admit that the

23   plaintiffs' attempt to give an invocation was part of an

24   organized campaign to disrupt municipal government.  That he

14:53:34  25   was a co-chapter head of the Arizona chapter of The

14:53:35  1   Satanic Temple, and that that Arizona chapter of The

2   Satanic Temple was not formed until August 2016.

3           Mr. de Haan would be forced to admit that prior to

4   August 2016, neither Michelle Shortt nor The Arizona chapter

14:53:53  5   of The Satanic Temple had the right to use the trademarks

6   owned by the United Federation of Churches LLC, including the

7   trademark The Satanic Temple.

8           Finally, Your Honor, if Mr. de Haan is allowed to be

9   called, he would be expected to admit that he never

14:54:06 10   communicated the beliefs or viewpoints of any plaintiff to any

11   representative of the City of Scottsdale.

12           THE COURT:  All right.  And as I indicated at the

13   final pretrial conference, you've made a record on that.  I'm

14   not going to consider any of those facts that Mr. de Haan

14:54:24 15   would have testified to.  I would consider them if they came

16   from other witnesses because I believe the defendants waited

17   far too long in this litigation to designate opposing counsel

18   as a witness.

19           But that's on the record, so you've made your offer

14:54:39 20   of proof.

21           MR. CLAUS:  Thank you, Your Honor.

22           THE COURT:  So let's go ahead with the evidence you

23   wish to present.

24           MR. CLAUS:  The defense rests, Your Honor.

14:54:42 25           THE COURT:  Okay.  Anything -- well, there is no

14:54:44  1    rebuttal because there's been no defense evidence.

       2            All right.  Then what I want to do is hear what else

       3    you want to make in the way of arguments, if any, besides

       4    what you just covered.  Then I will have a few questions for

14:54:58  5    you.

       6            MR. KEZHAYA:  Yes, Your Honor.  Thank you.  And once

       7    again, may it please the Court.

       8            THE COURT:  Yes.

       9            MR. KEZHAYA:  The Court's very well versed in the

14:55:15 10    law in this matter, but there's a case that was cited as

      11    *Malnak* 2 of the *Alvarado* case, if the Court remembers the

      12    *Alvarado* case from the order denying motion to dismiss for

      13    lack of standing.

      14            *Alvarado*'s a very interesting case to me because it

14:55:32 15    goes to the issue of when is something a religion.  It

      16    doesn't really answer it, but it does give us few indicia,

      17    which is what they called it helpful indicia.  It's not a

      18    test for helpful indicia.

      19            *Malnak* goes into substantially more detail.  And the

14:55:49 20    gist of it is you don't have to believe in God to be a

      21    religion.  That is a very well settled fact in First

      22    Amendment jurisprudence.

      23            Now, Scot, Mr. Claus, will argue that while that's

      24    technically true under *Town of Greece*, this is something of

14:56:08 25    an island in First Amendment jurisprudence.  That's not

14:56:14 1    entirely true, Your Honor.  The recent *Bladensburg Cross*

2    case, the -- I believe there was *AHA versus American Legion*,

3    specifically addressed that idea and said no*, Town of Greece*

4    does not make something that would otherwise be

14:56:25 5    unconstitutional okay.  It's just that you have to take a

6    very special notice of the historical nature of invocations.

7            THE COURT:  Did you cite that case in your proposed

8    findings?

9            MR. KEZHAYA:  Not that I recall, Your Honor, but it

14:56:41 10   was cited in the order denying motion to dismiss.

11           THE COURT:  *Bladensburg* was?

12           MR. KEZHAYA:  Yes, Your Honor.  That's the *AHA*

13   *versus American Legion*.  It was published in 2019, June of

14   2019, by SCOTUS.

14:56:58 15          Bearing these legal points in mind, I think it's

16   necessary for context on what is the evidence of this case.

17   Well, the evidence is fairly clear --

18           THE COURT:  I want to have you pause for a minute

19   because --

14:57:09 20          MR. KEZHAYA:  Yes, sir.

21           THE COURT:  -- I want to make sure that I'm

22   remembering the case you talked about.

23           I'm not remembering that name.  Could you give me

24   the cite to that case?

14:57:51 25          MR. KEZHAYA:  Yes, Your Honor.

14:58:22  1           THE COURT:  Are you referring to the Supreme Court

       2   case about the cross in Maryland?

       3           MR. KEZHAYA:  Yes, Your Honor.  This is the

       4   Bladensburg Cross, I believe it's actually Bladensburg,

14:58:33  5   Maryland.

       6           THE COURT:  Okay.  I didn't remember citing it

       7   before.  I don't see it in my order, but I just wanted to

       8   make sure I understood which case you were referring to.

       9           MR. KEZHAYA:  Was I mistaken?  Did the Court not

14:58:44 10   cite that in its order?

      11           THE COURT:  I don't know.  I just looked through my

      12   order and I couldn't see it.  I didn't remember citing it,

      13   but I will certainly consider it.

      14           MR. KEZHAYA:  Thank you, Your Honor.

14:58:53 15           Just in case the Court did not cite it, I may have

      16   found it separately in my own research and I'll submit to the

      17   Court --

      18           THE COURT:  It's easy to find.

      19           MR. KEZHAYA:  Yes, Your Honor.

14:59:02 20           So bearing these legal issues in mind, I think the

      21   real question for this case is the facts, what can we

      22   actually prove.  And here's what we can prove.

      23           Zarzycki made a call to Kelli Kuester in early

      24   February of 2019.  She testified as much.  She talked to him.

14:59:18 25   It was a three- to five-minute phone conversation that in

14:59:21   1    summary was, who are you, when do you want to do it, okay,

2    we'll see you there.

3         Importantly is what was not in that phone

4    conversation.  There was no question of what is the

14:59:31   5    Satanic Temple's beliefs.  What will the invocation be.  How

6    many members do you have in the City of Scottsdale.  How many

7    physical locations do you have in the City of Scottsdale.

8    None of these questions were asked.  She instead treated them

9    just as she would any other religion and she scheduled them

14:59:49  10    for the invocation.

11         A public outcry happened.  Such volume of public

12    feedback came out that it crashed city servers.  Ms. Kuester

13    was appointed the person to field this volume of public

14    feedback, and it sounds like it's actually the primary scope

15:00:09  15    of her case, and she coordinates with the mayor and the city

16    council what her messaging would be to the public.

17         And importantly, that messaging included that the

18    mayor found TST to be repulsive or repugnant and he does not

19    condone its beliefs, mission, or purposes.

15:00:31  20         This is very clear showing of religious animus.

21    It's circumstantial, but it's a very clear showing of

22    religious animus.

23         Some more time goes on, and a rescheduling takes

24    place.  Somewhere in the mix of all of this the mayor

15:00:45  25    publishes a statement to the effect of we're not going to let

them do this, let the satanists do this.

Ms. Klapp, Councilwoman Klapp, writes an article to the effect of there is no current policy requiring who can come in and when can they give invocations, but there should be one, and that she does not welcome the satanists group. More circumstantial evidence of racial -- religious animus.

Some more time goes on.  It sounds like the public outcry became more fevered, particularly around the rescheduling, culminating in Ms. Kuester coordinating with the chief of staff of the City who coordinated with the city manager of the City, a separate office, and the city manager stepped in, took control, and arranged an investigation with the city attorney's office to find out a way to keep The Satanic Temple out with a facially neutral basis for why it would be constitutional.

The problem with this ostensibly neutral basis is that it was never applied to anyone else.  Nobody was ever inquired of how many members they have or how many physical locations they have.  Nobody was ever inquired of what is the nature of your religious beliefs or what invocation would you give.  Only The Satanic Temple was subject to these requirements.  Only The Satanic Temple was ever denied.

The other way that we know that this substantial connection policy is a pretext is that every time someone sits down to try to define it, one of two things happens:

15:02:28  1   Either the definition shifts or they refuse to give a

       2   definition.

       3          In February 2018 -- er, pardon me, June of 2018,

       4   Exhibit 17, City says, oh, well, they're all Scottsdale

15:02:38  5   based.  They're all based in Scottsdale.  But that didn't

       6   turn out to be true.

       7          Later, when Mr. Biesemeyer testified in

       8   deposition --

       9          THE COURT:  What is the June of 2017 reference

15:02:48 10   you're making?

      11          MR. KEZHAYA:  Pardon, Your Honor, I may have

      12   misspoke.  I meant Exhibit 17.  It's June of 2018.  This is

      13   the motion to dismiss filed -- er, the brief in support of

      14   the motion to dismiss filed by the City.

15:03:00 15          About nine months later, Mr. Biesemeyer testifies in

      16   deposition and he says, okay, well, maybe they weren't all

      17   strictly inside of Scottsdale.  There was this one

      18   organization, Brophy, that was just a couple miles out, but

      19   we had enough people in there.  I can't tell you how many

15:03:16 20   people we had of the City of Scottsdale in this thing, this

      21   Brophy Academy, but it had a substantial connection.

      22          Well, what is substantial connection.  There were no

      23   real elements.  This is the gist of his testimony.

      24          Then, about a year later, we had a motion to dismiss

15:03:35 25   for lack of standing.  The substantial connection policy

15:03:39   1   shifts once again.  And it's, well, are you a real religion.

2   What is the nature of your invocation going to be?

3        But once again the facts don't prove this up because

4   a moment of silence is not a religious invocation.  They

15:03:50   5   argue you have to invoke a literal deity.  There are no

6   literal deities invoked by a moment of silence.  That's what

7   a moment of silence is.

8        It is very clear that the substantial connection

9   policy is in their pretext.  We have, assuming the Court

15:04:08   10   admits Exhibits 5 and 8, four out of seven city

11   councilmembers who published or otherwise made public records

12   of statements that objected to TST, not because they

13   considered TST from Tucson, but because they considered TST

14   to be offensive to their religious beliefs.  There is no

15:04:27   15   question that religious animus had a substantial motivating

16   factor behind the substantial connection policy.

17        If the Court takes that as true, the burden now

18   shifts under an Equal Protection Clause analysis.  Equal

19   Protection says if you have a minority religion and religious

15:04:48   20   beliefs taking part of the creation of a policy, then the

21   government must show strict scrutiny.  Under strict scrutiny,

22   the government has a compelling state interest that is

23   narrowly tailored to meet that end.

24        But what does this policy have that is compelling?

15:05:07   25   They have never to date advanced any compelling interest.

15:05:13   1   They have never to date identified how this policy is

           2   narrowly tailored to that interest.

           3          There is no question that we have an Equal

           4   Protection Clause claim.

15:05:25   5          The only question that they have raised is do they

           6   have an Establishment Clause claim.  And the only way that

           7   they can get there, in my opinion, is by saying that TST is

           8   not a real religion.  The problem with that is that all of

           9   the documentary evidence, the e-mails from the councilpeople

15:05:41  10   specifically address the question of whether the City

          11   considers TST to be a religion.  And they find that they do.

          12          We have an Establishment Clause claim, we have an

          13   Equal Protection Clause claim, and we believe we have met our

          14   burden of proof.

15:05:55  15          Does the Court have any questions?

          16          THE COURT:  I do.  Give me, if you would, what you

          17   believe your -- what the law's precise definition of a

          18   religion is for purposes of this case.

          19          MR. KEZHAYA:  In terms of a precise definition

15:06:07  20   Your Honor, I don't think we have one.  *Malnak* 2 --

          21   importantly I should clarify it's not *Malnak* 2 the majority,

          22   it's *Malnak* 2 the Adams concurrence.  Judge Adams out of the

          23   Third Circuit spends, if I remember right, approximately 15

          24   pages in 1979 at least trying to identify what exactly is a

15:06:28  25   religion.

15:06:29   1        Judge Adams goes at some length talking about, well,

        2   initially it started with it required a belief in God, but I

        3   believe it was the *Torcaso* case out of 1954, among a couple

        4   of others.  *Shempp* was another one we cited at length in the

15:06:44   5   motion for summary judgment.

        6        Well, clearly -- clearly the belief in God is not

        7   requisite for -- it's something to be considered a religion.

        8        *Alvarado* gives us the three helpful indicia, which

        9   is do they address the fundamental and imponderable matters.

15:07:00  10   Well, clearly yes.  The reason being that all of this talk

       11   waxing poetical about justice and rebellion against tyranny

       12   and the internal struggle, basically everything that

       13   Mr. Misicko testified to, all go to that first point with

       14   great clarity.

15:07:19  15        Number two, if I remember correctly, was the

       16   formalism.  That's mostly what Michelle Shortt's testimony

       17   was for, the iconography, the religious ceremony.  The fact

       18   that TST has an ordination program that albeit it is still

       19   working on.

15:07:35  20        What we have here is an organization that I think in

       21   every way meets the definition, certainly of *Alvarado*, but,

       22   you know, Your Honor, if you ask me for a succinct

       23   definition, I would say is it a religion if they believe in

       24   God.  And I think that if they believed in a literal Satan,

15:07:54  25   none of us would be here today.  The only question do they

15:07:57    1    have to believe in God, and *Malnak* 2 very clearly says no,

2    among a number of other SCOTUS cases.

3        THE COURT:  Do you agree that the plaintiffs must be

4    a religion to assert their Establishment Clause and Equal

15:08:11    5    Protection claims?

6        MR. KEZHAYA:  I don't agree with that, Your Honor.

7        There's the SCOTUS case, if I remember right it was

8    1942.  This was the one where I think it was the State of

9    Kentucky required school prayer and a number of atheists said

15:08:23   10    we don't want our kids reciting school prayer.  The Supreme

11    Court made it very clear you cannot discriminate among

12    religion versus religion and you cannot discriminate among

13    religion and nonreligion.  The Establishment Clause prohibits

14    the advancement of religion and prohibits the inhibition of

15:08:42   15    religion.  This becomes, I think, more of a theological

16    question than I'm allowed to speak to.

17        THE COURT:  It sounds like you disagree with the

18    book club hypothetical I put into the ruling on the motion to

19    dismiss.

15:08:55   20        MR. KEZHAYA:  I'm not sure I do, Your Honor, because

21    I think it goes to -- the Court cited, I think very aptly,

22    which is do they -- I think, really, do they consider

23    themselves to be a religious belief.  I think it also rolls

24    into the Alvarado club.  I don't think that a Thoreau club by

15:09:10   25    itself, a Thoreau book club by itself, is a religion.  But

15:09:14  1  once they start bringing in iconography, I don't know, let's

2  say there's symbolism of Thoreau that I'm not familiar with,

3  they start tattooing themselves, they start generating

4  pendants of it, they start putting monuments of it together,

15:09:27  5  they start having Thoreau ceremonies, this is becoming very

6  clearly a religion.

7          THE COURT:  You'd say, then, that the Hells Angels,

8  who have a lot of iconography and a lot of ceremony, are a

9  religion?

15:09:40  10          MR. KEZHAYA:  I would say no, Your Honor, because I

11  don't think they consider the Hells Angels to take the same

12  place God does in other groups.  So I think that's what the

13  distinguishing factor is between, for example, a gang and a

14  religion.

15:09:58  15          THE COURT:  But you would then say that the book

16  club can make out an Establishment Clause claim if they're

17  denied the right to do a Thoreau reading if they have tattoos

18  and ceremony.

19          MR. KEZHAYA:  If they have tattoos, ceremony, in our

15:10:11  20  case at least an ordination program being rolled out, ritual

21  services, all of the -- basically if we change satanism to, I

22  suppose, Thoreauism and analogized everything that we've

23  testified to over the past couple days, I believe that this

24  organization would be a religion.

15:10:31  25          But now we've substantially deviated from the

15:10:35  1    hypothetical.

2              If it benefits the Court, I'd like to add an

3    additional point I think is, for me, compelling, which is the

4    organization of TST.  We're not talking about ad hoc people

15:11:20  5    who consider themselves satanists.  We're talking about the

6    undisputed testimony is in the hundreds of thousands, if I

7    remember correctly, members of an organization very top-down

8    controlled with what is the messaging going to be.

9              There is -- notwithstanding Ms. Shortt's testimony,

15:11:37 10    in my opinion, there is doctrine of this canon.

11             THE COURT:  Well, sort of along those lines, have I

12   received any evidence in this trial that would make the

13   unincorporated association a religion?

14             MR. KEZHAYA:  I think yes, Your Honor.  Ultimately,

15:11:53 15    TST transcends the corporate form.  We have this

16   unincorporated organization that may or may not have been

17   incorporated into the LLC, but, frankly, I don't think the

18   law's very clear on when does a group of people stop existing

19   as an unincorporated association.

15:12:15 20             THE COURT:  I could be wrong, but I don't remember

21   any evidence about the unincorporated association in the last

22   two days, other than Ms. Shortt's agreement that they formed

23   for secular purposes.

24             Was there any other evidence about that association,

15:12:28 25    what they believed, what organization they had, what

15:12:33  1   membership they had, how they practiced?  Anything like that?

2   MR. KEZHAYA:  Well, the incorporated association,

3   Your Honor, is The Satanic Temple.  What we were attempting

4   to do is provide the Court with the entities that attempted

15:12:45  5   to give structure to The Satanic Temple, and then we threw in

6   this extra one because if we were wrong about all of the

7   entities, there was this unincorporated association.

8   All of it is The Satanic Temple.  That's why we've

9   always been referring to them as The Satanic Temple

15:13:00  10   regardless of which particular entity.

11   THE COURT:  Adversarial Truth and the

12   Satanic Temple, Inc., were both formed after the City of

13   Scottsdale said no; right?

14   MR. KEZHAYA:  Yes, sir.

15:13:16  15   THE COURT:  Am I correct that the only basis upon

16   which you assert standing is associational standing?

17   MR. KEZHAYA:  You are correct, Your Honor.

18   THE COURT:  Okay.

19   MR. KEZHAYA:  All of the entities are there solely

15:13:26  20   as an associational standing.

21   THE COURT:  With respect to associational standing,

22   what evidence has been presented that shows that Ms. Shortt

23   is a member of Adversarial Truth, LLC?

24   MR. KEZHAYA:  Your Honor, the testimony was all that

15:14:13  25   she was a member of The Satanic Temple and that The Satanic

15:14:16  1    Temple is -- The Satanic Temple is the core set of beliefs

       2    that I don't think is properly enshrined in any of the

       3    organization to the exclusion of any of the other

       4    organizations.

15:14:30  5         This is a fairly complex body that, in my opinion,

       6    has been perhaps in mishmash form creating entities as has

       7    been needed from a couple of people who are clearly not

       8    corporate lawyers, as the clear testimony of Mr. Misicko was.

       9    They're doing their best to create corporate governance, but

15:14:55 10    that doesn't mean they don't have standing.

      11         THE COURT:  Well, I think I understand your argument

      12    that if she's a participant in the Satanic Temple, she's a

      13    member of Adversarial Truth.

      14         Besides that, is there any specific evidence that

15:15:09 15    Ms. Shortt is a member of Adversarial Truth that would give

      16    Adversarial Truth associational standing?

      17         MR. KEZHAYA:  I believe there was no testimony that

      18    she identifies as a member of Adversarial Truth, Your Honor.

      19         Allow me to correct that.  I believe the testimony

15:15:35 20    was that she formed Adversarial Truth and she created it, and

      21    that she identifies as a satanist in Arizona.  And the

      22    chapter of the TST Arizona is given structure by the

      23    organization.

      24         In terms of the formal legal requirements of is the

15:15:55 25    LLC a proper nonprofit corporation with proper members, I

15:15:58   1   don't know the answers to these questions, candidly.  But I

2   think to the extent that this group is an unincorporated

3   association, I think that's what -- I think that's really how

4   it plays in.

15:16:12   5          THE COURT:  A related question is what evidence is

6   there that Adversarial Truth LLC that limited liability

7   corporation, is a religion?

8          MR. KEZHAYA:  We would incorporate all of the same

9   arguments of TST, Your Honor.  This is what I'm getting at.

15:16:35  10   Well, the governance was, I think at all times, including

11   perhaps today, not attended to in the way that perhaps I

12   would.

13          THE COURT:  It is true -- well, let me state it

14   differently.  There's been no evidence that Adversarial Truth

15:16:53  15   has received tax-exempt status; is that right?

16          MR. KEZHAYA:  Yes, Your Honor.

17          THE COURT:  And there's been no evidence that United

18   Federation of Churches has received tax-exempt status?

19          MR. KEZHAYA:  I'm less clear on that one,

15:17:07  20   Your Honor.  Tax-exempt status, as I understand it, I'm not a

21   tax lawyer, but there's a -- it's cited in the IRS letter, is

22   a particular provision that says essentially, you are a

23   church.  TST, I believe, Inc., is a church.

24          My understanding of churches is that they're able to

15:17:22  25   confer their tax-exempt status to non-tax-exempt entities

15:17:28  1    basically as a tax-exempt way to flow money through it.

2        So if The Satanic Temple, Inc., for example, let's

3    say someone in Arizona wants to donate to The Satanic Temple

4    Arizona, they could give their money to TST, Inc., TST, Inc.,

15:17:47  5    can give that person a tax deduction, and then that money can

6    then go to TST Arizona.

7        THE COURT:  Is there any evidence that's been

8    presented during the trial that The Satanic Temple, Inc., has

9    conferred its tax-exempt status on United Federation of

15:18:07  10   Churches or has made United Federation of Churches an arm of

11   the TST church or anything of that sort?

12       MR. KEZHAYA:  Yes, Your Honor.  This goes to

13   Mr. Misicko's testimony expressly permitting Ms. Shortt to

14   create the TST Arizona chapter of the affiliation agreement.

15:18:28  15       THE COURT:  I'm talking about TST and the United

16   Federation of Churches.

17       MR. KEZHAYA:  Oh, I'm sorry, Your Honor.

18       THE COURT:  Is there any evidence that TST has done

19   anything to make United Federation of Churches an appendage

15:18:40  20   of the church or the money arm of the church or anything like

21   that?

22       MR. KEZHAYA:  I don't believe that question was

23   relevant to the legal issue.  To at least our understanding

24   of the legal issues before the Court, so no.

15:18:57  25       THE COURT:  So what evidence do I have, then, that

15:19:00  1    UFC is a church?  Or, pardon me, is a religion.  United

2    Federation of Churches?

3         MR. KEZHAYA:  Your Honor, the United Federation of

4    Churches is -- the testimony was Mr. Misicko established The

15:19:14  5    Satanic Temple.  The other testimony was that he created or

6    at least is identified as an owner of the LLC, as I recall

7    through the documentary exhibits that Mr. Claus introduced,

8    the articles of organization and whatnot.

9         There was also evidence that he created The Satanic

15:19:34 10    Temple, Inc.  He testified at some length --

11         THE COURT:  Well, you can see a question coming so

12    you stopped.

13         MR. KEZHAYA:  Yes, Your Honor.

14         THE COURT:  There certainly are lots of people

15:19:44 15    affiliated with churches who form for-profit corporations --

16         MR. KEZHAYA:  Yes, sir.

17         THE COURT:  -- that might have some business related

18    to the church, but those for-profit corporations are not

19    deemed to be religious, are they?

15:19:56 20         MR. KEZHAYA:  Yes, Your Honor.

21         THE COURT:  They are deemed to be religious?

22         MR. KEZHAYA:  Oh, I'm sorry, I was confused by

23    the --

24         THE COURT:  Yeah, it was a bad question.

15:20:03 25         I mean, let's assume hypothetically, just because it

15:20:05   1   comes to mind, the historical example of a religious leader

2   who was on television a lot back in the East and who formed

3   some sort of big theme park, Disneyland-type theme park.  It

4   was owned by a for-profit corporation.  The fact that he

15:20:22   5   formed it or even used it in his ministry didn't make that

6   for-profit corporation a church, did it?

7          MR. KEZHAYA:  I'm not familiar with this news

8   article.  On those facts alone, no, it is not a church.  I

9   assume, being a minister, presumably he's creating a park

15:20:43  10   that espouses religious beliefs, so that may change things.

11          THE COURT:  Well, the reason I'm asking that

12   question is when I said what makes UFC a church, you said it

13   was formed by Mr. Misicko.

14          MR. KEZHAYA:  Oh, I --

15:20:52  15          THE COURT:  And I don't see how his forming of it

16   makes it a church.  It seems to me I need more evidence that

17   UFC does things that would make it a religion.  And I'm

18   asking what evidence is there.  I think the only thing I

19   heard about it was it owns a museum.  It owns the

15:21:11  20   headquarters.  It owns the copyright.  Well, the trademarks.

21   The websites.

22          MR. KEZHAYA:  And the trademarks are used to espouse

23   religious beliefs.

24          THE COURT:  Sure.  Well, I guess my question is, I

15:21:25  25   understand that argument, is there any other evidence that

15:21:28  1    you would put forward that shows that UFC is a religion?

2             MR. KEZHAYA:  That we would put forward?

3             THE COURT:  I mean that you have put forward.

4             MR. KEZHAYA:  That we have put forward?

15:21:39  5             THE COURT:  Right.

6             MR. KEZHAYA:  Well, Your Honor, this again goes back

7    to the use of this phrase, The Satanic Temple.  The Satanic

8    Temple is a trademark owned by UFC, LLC.  If, for example,

9    someone in Arizona gives a Menstruatin' with Satan, I believe

15:21:56  10   the testimony was a drive for the purpose of creating a

11   charity event, then -- and if that is a religious event, then

12   I think that logically it is tied back ultimately to UFC,

13   LLC.

14            This is all done with his express permission.

15:22:13  15   Mr. Misicko testified at some length that if not him

16   personally, then someone in the organization, be it the

17   council or the chapter head or someone, approves this.

18            So I think that the evidence is pretty clear that

19   UFC LLC takes its trademarks very seriously, it controls its

15:22:36  20   trademarks very seriously, and anyone doing anything in its

21   name, unless it takes issue with it, is espousing religious

22   beliefs.  Thus, logically, UFC is espousing religious

23   beliefs.

24            It's an agency theory, Your Honor.

15:23:02  25            THE COURT:  Okay.  Thanks.

15:23:06  1        Mr. Claus.

2             MR. CLAUS:  May we first ask to toggle over to the

3        defense presentation.

4             Thank you.

15:23:32  5        Good afternoon, Your Honor.  Scot Claus,

6        Dickinson Wright, along with my colleagues on behalf of the

7        Defendant City of Scottsdale.

8             I want to start my argument, Your Honor, by doing

9        something that may -- that might at first blush seem odd.  I

15:23:47  10       want to talk about the remedy that the plaintiffs seek if

11       they prevail in this case in which they claim they were

12       denied the ability to give an invocation.

13            And to do that, I want to bring up Exhibit 4,

14       please.

15:24:10  15       Exhibit 4 contains the text that Michelle Shortt,

16       upon examination by her own counsel, admitted was not an

17       invocation, but was a speech.

18            You recall, Your Honor, Ms. Shortt was sitting there

19       testifying and Mr. de Haan asked her, he gave her the binary

15:24:35  20       proposition, would you call this an invocation or a speech?

21            Her response, a speech.

22            And we know that Ms. Shortt was telling the truth

23       because it is not -- Exhibit 4 is not an invocation in any

24       sense.  It is not an invocation in plain meaning and it is

15:25:00  25       not an invocation as a matter of law.

15:25:05   1          Ms. Shortt admitted that she sought to invoke

        2    nothing.  She sought to invoke guidance from nothing and from

        3    no one.

        4          She sought to invoke guidance from nothing to guide

15:25:25   5    the decision-making of the city council.

        6          She sought to invoke neither the name nor the spirit

        7    of any divine being or divine idea to lend solemnity to,

        8    assist, or unify the Scottsdale city council.

        9          Instead, she sought to give a speech that she

15:25:53  10    admitted referred to the deeply held religious beliefs of the

       11    members of the Scottsdale community that's, quote, delusions

       12    of old.

       13          That referred to the religious beliefs of not only

       14    the Scottsdale community, but the members of the council as,

15:26:12  15    quote, arcane doctrines born of fearful minds in darkened

       16    times.

       17          And when I asked her if members of the community and

       18    members of the council might be offended by that speech, by

       19    having their religious beliefs chided as delusions, by having

15:26:34  20    their sincere religious beliefs mocked as being arcane

       21    doctrines born of fearful times and darkened minds, she told

       22    you under oath she did not care.

       23          That is why Exhibit 4, the speech that

       24    Michelle Shortt wanted to give in 2016 and wants to give if

15:27:00  25    she prevails, is not an invocation as a matter of law.

15:27:06   1          The United States Supreme Court recognized in *Marsh*

2    *versus Chambers* that to be an invocation, one must, quote,

3    invoke divine guidance on a public body entrusted with making

4    the laws, end quote.

15:27:25   5          And that such an invocation is not only permissible,

6    but laudable because, quote, we are a religious people whose

7    institutions presuppose a supreme being.

8          And that cite is 463 U.S. 783 at 794 and '95.

9          *Marsh* is not the only legal guidance on which the

15:27:57  10   Court should rely to determine that as a matter of law,

11   Exhibit 4 did not in 2016 and cannot, if the court grants any

12   relief, be an invocation.

13         *Town of Greece versus Galloway* recognizes that

14   invocations have been practiced by Congress -- and now I'm

15:28:15  15   quoting, practiced by Congress since the framing of the

16   Constitution.  To, quote, lend gravity to public business,

17   remind lawmakers to transcend petty differences in pursuit of

18   a higher purpose and express a common aspiration to a just and

19   peaceful society.

15:28:36  20         In *Fields versus Speaker of the Pennsylvania House of

21   Representatives*, 936 F.3d 142 at 149, the Third Circuit Court

22   of Appeals recognized that, quote, as a matter of traditional

23   practice, a petition to human wisdom and the power of science

24   does not capture the full sense of 'prayer' historically

15:29:02  25   understood.  At bottom, legislative prayers seek divine

15:29:08   1   guidance in lawmaking.

2   The Fourth Circuit, Your Honor, in *Simpson versus*

3   *Chesterfield County Board of Supervisors*, 404 F.3d 276,

4   determined not only what an invocation was but also recognized

15:29:28   5   that an invocation is government speech, quote, intended to

6   solemnize the occasion, end quote.  And that it was within the

7   province of the governmental body on whose behalf the

8   invocation was given to decide the message to be delivered.

9   And -- and that is a critical point, Your Honor.  As

15:29:49   10   a matter of law and undisputed testimony, the invocations that

11   were sought to be given by the city council expressed in

12   Exhibit 4 was not sought to be given on behalf of the

13   government or a governmental body to lend solemnity to the

14   council proceedings and to provide a unifying message.

15:30:11   15   Michelle Shortt testified that she -- when asked

16   directly, did you seek to give an invocation on behalf of the

17   city Council, she answered no.

18   And from the text of Exhibit 4, the Court can

19   absolutely conclude without her testimony that she did not

15:30:34   20   seek to provide solemnity to the proceedings of the council or

21   to provide a unifying message to the council.

22   Instead, she testified that she recognized her speech

23   might cause offense that is empathetical to unity and

24   solemnity and that she didn't care.

25   Under *Matal versus Tam*, Your Honor, Supreme Court

15:31:06   1   case, 137 Supreme Court Reporter 1744, the Scottsdale city

2   council meetings -- strike that -- the Scottsdale city council

3   invocations are government speech because the invocations are

4   intended, as Mayor Lane testified, as Suzanne Klapp testified,

15:31:24   5   to convey messages for the purposes desired by the city

6   council.

7           That's the thing, Your Honor.  This is -- this is the

8   time for proof.  This is the trial in this matter in which the

9   plaintiffs, not the defendants, bear the burden of proof.  The

15:31:42  10   plaintiffs, each of the plaintiffs, bears the burden of proof

11   on each element of each plaintiff's claims.

12           And here, Your Honor, they have not challenged the

13   testimony of Mayor Lane that the purpose of invocations, as

14   long as he can remember, before he became a councilmember 16

15:32:07  15   years ago, is to have someone speak on behalf of the council,

16   to lend solemnity to the occasion, and to give a unifying

17   message.

18           I think his testimony was, Your Honor, it brings us

19   all together.

15:32:27  20           Suzanne Klapp gave not the same, but similar

21   testimony, that it is the city council that invites

22   organizations with a substantial connection to give an

23   invocation, and it is within the purview of the City council

24   to do so.

15:32:45  25           Because, as the *Fields* court recognized, and I'm

15:32:49  1    quoting, Your Honor, the government may control what is or is

2    not expressed in order to convey its own message in an

3    invocation because, quote, the prayer is what a chosen agent

4    of the government says as part of the government's own

15:33:08  5    operations.

6         Why?  Why?  Because as the Supreme Court recognized

7    in *Town of Greece*, the government is not only seeking to have

8    the invocation given on its behalf, but, quote, the principal

9    audience for invocations is not indeed the public, but

15:33:28 10    lawmakers themselves.

11        Because of this, Your Honor, the City may limit

12    invocations opening city council meetings to those which are

13    religious in nature.  That is recognized in the cases I have

14    just cited and also *Barker versus Conroy*, 921 F.3d at 1131.

15:33:55 15        Also, Your Honor, *Barker* stands for the proposition

16    that is exactly the opposite of what was told to you by

17    plaintiffs' counsel.

18        The *Barker* court recognized that it has never

19    suggested that legislators must allow secular as well as

15:34:17 20    religious prayers.

21        On this point, Your Honor, the evidence again is

22    categorical and unrefuted.  Ms. Shortt testified numerous

23    times that the organization on whose on behalf she sought to

24    give the invocation in 2016 was a purely secular organization.

15:34:40 25        Mr. Misicko testified that he believed that all 450

15:34:47   1   members of The Satanic Temple who resided in Arizona as of the

2   time of his deposition in September of 2019 were secularists.

3            Every message, Ms. Shortt admitted, sought to be

4   conveyed was a secular message.  The city council has the

15:35:08   5   right pursuant to the law of this land to limit invocations to

6   religious and not secular message.

7            THE COURT:  Let me interrupt you and ask a couple of

8   questions.

9            MR. CLAUS:  Sure.

15:35:22  10            May I get some water, Your Honor?

11            THE COURT:  Yeah, you can.

12            MR. CLAUS:  I'm going steal this.  They were from my

13   colleagues.

14            THE COURT:  Looking specifically at the facts of

15:35:42  15   this case, how can I conclude that the invocations of the

16   City of Scottsdale council meetings were intended to be

17   speech on behalf of the council if the council did nothing to

18   review them in advance, to inquire about the substance, to

19   screen them in any way?  They didn't know what these people

15:36:01  20   were going to say when they came in.  How, then, can I

21   conclude that it was the policy of the council in this case

22   to have all invocations be on their behalf?

23            MR. CLAUS:  Because that is the only under oath

24   testimony you have received that has been unrefuted in this

15:36:19  25   case.  Mr. -- Mayor Lane was asked that question

15:36:23   1   specifically.

2          THE COURT:  I know he said that it was on behalf,

3   but I don't understand how that's possible if they didn't

4   look at if first and say, yeah, that represents our views,

15:36:33   5   that's speech by us.

6          MR. CLAUS:  Oh, Your Honor, but -- but that's a

7   different question.  The -- the practice of allowing

8   religious and not secular invocations is -- does not mean

9   that the council as a body or each councilor or the mayor has

15:36:50  10   to agree or ratify the viewpoint to be expressed.

11          The point is that it goes to what Your Honor has not

12   received in evidence.  The only evidence you have is that

13   Ms. Kuester maintained a list of faith-based organizations

14   from which she invited participants to give invocations.  The

15:37:13  15   fact that Ms. Kuester maintained a list of faith-based

16   organizations demonstrates that the City of Scottsdale

17   maintained a list of faith-based organizations to give an

18   invocation.

19          And both Mayor Lane and Ms. Klapp not only testified

15:37:33  20   that they -- Your Honor, it -- and this goes to -- this is

21   the most important word, perhaps, in this part of the Court's

22   analysis, the word invitation.

23          The testimony is unrefuted that the City has never

24   invited anyone to give an invocation.  I hope you'll recall

15:37:56  25   this back-and-forth.  Both the mayor and Ms. Klapp were asked

15:38:03  1    if the City had ever invited a group to deliver a secular

       2    message for an invocation to the council, and they testified

       3    that that had not occurred.

       4          So the issue, Your Honor, is what evidence do you

15:38:18  5    have that the City had a practice of inviting faith-based

       6    organizations to give an organization for the purpose of

       7    unifying and bringing together the council, that is the only

       8    evidence you have, Your Honor.

       9          THE COURT:  A second question.  You cite several

15:38:39 10    cases -- *Marsh*, *Fields*, and *Simpson* -- for the proposition

      11    that an invocation must invoke divine guidance.

      12          Other than the few questions I asked Ms. Kuester, I

      13    don't believe I received any evidence about the moments of

      14    silence that are reflected in the city council minutes.

15:39:02 15          If the city council was holding moments of silence,

      16    can I conclude that the invocation policy was limited to

      17    actions which invoked divine guidance?

      18          MR. CLAUS:  Your Honor, a moment of silence is not,

      19    either in plain meaning or as a matter of law, an invocation.

15:39:23 20          And, again, it's skews to suggest it --

      21          THE COURT:  That is not an invocation?

      22          MR. CLAUS:  A moment of silence is not an

      23    invocation.

      24          THE COURT:  Even though it is listed in the City's

15:39:35 25    documents as an invocation?

15:39:37   1          MR. CLAUS:  Yes.  Your Honor, it is -- that is not

2    the evidence that you have received.  The evidence that you

3    have received is that a list was given that identified times

4    and dates.  Not that a moment of silence was by definition of

15:39:50   5    the council an invocation.  It was an administrative list

6    that was maintained that filled in blanks, and the blank

7    is -- column that you were referring to is a column that

8    has -- it says "invocation," and the moment of silence

9    demonstrates that it is not an invocation because if it was

15:40:14  10    an invocation, that would be filled in with something other

11    than moment of silence.  That demonstrates that a moment of

12    silence is not an invocation.

13          And, Your Honor, there is nothing that compels the

14    city government to not have a moment of silence?  To not have

15:40:35  15    a moment of silence to recognize the victims of the Oregon

16    school shooting in lieu of an invocation?  That's what *Marsh*

17    and *Fields* and *Galloway* and all of these cases recognized, is

18    that because it's government speech, the government gets to

19    choose the message that it wants to hear.  And if it wants to

15:40:57  20    hear no message during a particular council meeting, it can

21    make that choice too.

22          THE COURT:  I don't have any evidence that a moment

23    of silence was viewed by the City as a non-invocation, do I?

24          MR. CLAUS:  You don't have any evidence that a

15:41:13  25    moment of silence was viewed by the City, by the party with

15:41:16  1   the burden of proof, that a moment of silence was considered

2   as an invocation.

3          THE COURT:  Well, it's on the list of invocations

4   for each year.  That could be viewed as evidence that it was

15:41:25  5   viewed as an invocation.

6          MR. CLAUS:  Except that the words demonstrate that

7   it is not a moment of -- that it is not an invocation

8   because -- I'll get the list, Your Honor.

9          THE COURT:  Look at Exhibit 15, page 7323.

15:41:42 10          MR. CLAUS:  Sure.

11          Right.  Moment of silence.

12          You see, Your Honor, the entry demonstrates that the

13   person who filled out that page, that entry from whom the

14   Court has no evidence, did not indicate all of the

15:42:13 15   information that was indicated before an invocation.  That

16   instead, in lieu of an invocation, a moment of silence was

17   taken for the Oregon shootings.

18          There is no evidence to the contrary, Your Honor.

19   There is no evidence by the plaintiffs, who bear the burden

15:42:31 20   of proof.

21          I don't want to interrupt if you have any other

22   questions, Your Honor.

23          THE COURT:  No.  Go back to your argument, please.

24          MR. CLAUS:  Sure.

15:42:44 25          The invocation -- the practice of the City of

15:42:50 1    Scottsdale is undeniably constitutionally permissible.  And

2    the speech Ms. Shortt intended to give is not religious or an

3    invocation in any sense because it disparages those who

4    maintain religious beliefs as being deluded and arcane.

15:43:12 5         THE COURT:  Well, let me interrupt you there on that

6    point as well because I've heard you assert that and it

7    raises a question.

8         The *Town of Greece* says that a city council does not

9    need to and in fact should not tolerate prayers that

15:43:32 10   disparage religious belief.

11        There is no evidence that that's the reason the City

12   in this case turned down this invocation; correct?

13        MR. CLAUS:  That is absolutely correct, Your Honor.

14   That's why I said I was starting my argument with what would

15:43:45 15   happen if the relief was granted.  No, that -- you're exactly

16   right, Your Honor, there is no evidence because it's not true

17   that the City denied the invocation that she sought to give

18   because Exhibit 4 disparages the hearers.

19        But it is why the Court can't grant the remedy

15:44:06 20   plaintiffs seek because you're right, on that point an

21   exclamation point is required because, as the Supreme Court

22   recognized in *Marsh*, a legislative prayer violates the

23   Establishment Clause if that prayer has, quote, been

24   exploited to proselytize or disparage any other faith or

15:44:29 25   belief.

15:44:30  1       So my point is not, Your Honor, that the

2       irreligiosity of Exhibit 4, the denigrating nature of

3       Exhibit 4, the mocking nature of Exhibit 4, the

4       non-invocation nature of Exhibit 4 was a reason why

15:44:53  5       Michelle Shortt was denied in the first instance.

6            Instead, my point, Your Honor, is that the

7       plaintiffs in this case have asked for relief to compel the

8       City to allow Exhibit 4 to be given before a City of

9       Scottsdale council meeting, and that remedy would violate the

15:45:21 10       United State's Constitution.

11            And you don't need to make that conclusion, because

12       Ms. Shortt testified that she recognized that her speech may

13       be offensive to the hearers of the speech that are on the

14       council and that her speech may be offensive to the hearers

15:45:40 15       of her speech that are in the public body -- that are -- that

16       are in the gallery listening.

17            That is precisely why the Court can't grant the

18       relief the plaintiffs seek because that relief would require

19       the City to violate the Establishment Clause.

15:45:56 20            But more importantly, Your Honor, with respect to

21       the invocation practice itself, because the invocation is

22       government speech, on their Equal Protection claim as a

23       matter of law they must fail, because as the Ninth Circuit

24       recognized in *Johnson versus Poway Unified School District*,

15:46:16 25       658 F.3d 954 at 970, individuals, quote, have no personal

15:46:30  1   interest in government speech on which to base an Equal

2   Protection claim, end quote.

3        That same conclusion is bolstered by the

4   United States Supreme Court's decision in *Rosenberger versus*

15:46:42  5   *Rector and Visitors of Virginia*, 515 U.S. 819, 833,

6   Your Honor, where the Supreme Court recognized, quote, we

7   have permitted the government to regulate the content of what

8   is or is not expressed when it enlists private entities to

9   convey its own message, end quote.

15:47:13  10        The only evidence you have heard in this case is

11   that the city council seeks when it asks for an invocation

12   for those invocations to be given on its behalf.  The only

13   evidence you have heard in this case is that --

14        I didn't know if you had a question.

15:47:31  15        THE COURT:  I'm waiting.  I do have one.  Go ahead

16   and finish your sentence.

17        MR. CLAUS:  -- is -- the only evidence you have in

18   this case, Your Honor, is that the city council asks for

19   invocations to be given to guide its decision-making process.

15:47:45  20        THE COURT:  That argument would necessarily mean

21   that if the City of Scottsdale said, "We're going to have

22   Baptists give invocations but not Catholics," that could

23   never be an Equal Protection violation; correct?

24        MR. CLAUS:  Your Honor, I recognize that that is an

15:48:11  25   odd conclusion and one that seems counterintuitive, but under

15:48:16  1    the current state of Establishment Clause jurisprudence, from

2    the Supreme Court on down --

3              THE COURT:  You mean Equal Protection jurisprudence;

4    right?

15:48:25  5              MR. CLAUS:  Oh.  I did.  I'm sorry, Your Honor.

6              -- Equal Protection jurisprudence from the Supreme

7    Court on down -- in fact, *Simpson*, the *Simpson* case is the, I

8    will admit, Your Honor, jarring illustration that the answer

9    to the Court's question is yes.  That during that limited

15:48:49  10   time, when it is the government that is asking an entity to

11   speak on the government's behalf, the government may choose

12   not only who says it, but what is said.

13             But that is an extreme -- that is an extreme -- that

14   is an in extremis conclusion that has no bearing on this case

15:49:12  15   and the Court does not need to wrestle with based upon the

16   established Equal Protection jurisprudence.

17             THE COURT:  Were either *Johnson* or *Rosenberger*

18   legislative prayer cases?

19             MR. CLAUS:  I do not know, Your Honor.  I do not

15:49:33  20   know.

21             THE COURT:  Okay.

22             MR. CLAUS:  So with respect to the Equal Protection

23   claim, Your Honor, the Court must conclude that the

24   invocations sought to be given by the city council are

15:49:59  25   government speech, that because they are government speech

15:50:04 1    that the plaintiffs have no interest.  That's the only

2    conclusion that we are asking the Court to reach, not that

3    the city council may choose between Catholics and Baptists,

4    but instead that the plaintiffs have no personal

15:50:20 5    individualized interest in government speech as a matter of

6    law and, therefore, their Equal Protection claim must fail.

7            But, also, Your Honor, because the unrefuted

8    testimony of Michelle Shortt, in fact elicited through her

9    own counsel, is that Exhibit 4 is not an invocation but is

15:50:42 10   intended instead a speech that will offend the deeply held

11   religious beliefs of those members of the council and members

12   of the community that hold deeply held religious beliefs, the

13   Court cannot grant the Equal Protection remedy sought.

14           I'd like to turn to the discrimination claim,

15:51:06 15   Your Honor, if that's all right.  Unless you have any other

16   questions on Equal Protection.

17           THE COURT:  No.  Please go ahead.

18           MR. CLAUS:  With respect to the discrimination

19   claim, Your Honor, I want to remind the Court of the

15:51:19 20   admonition it would almost certainly give a jury if a jury

21   were the trier of fact in this case rather than the Court.

22   The admonition the Court will almost certainly give is that

23   the jury can only rely on and consider evidence that has been

24   presented in the case.  And more importantly, Your Honor,

15:51:36 25   that the jury should not engage in speculation or conjecture.

15:51:44   1   But that is precisely what the plaintiffs have asked this

2   Court to rely on, pure speculation.

3        I told you in opening statement, Your Honor, that

4   the plaintiffs would offer not one whit of evidence

15:52:00   5   demonstrating that Michelle Shortt's beliefs, viewpoints, or

6   the contents of her speech in Exhibit 4 were described or

7   delivered in any way to any representative of the City of

8   Scottsdale.  And that is precisely what Michelle Shortt

9   admitted to.

15:52:18  10        I told Your Honor in my opening statement that the

11   plaintiffs would not offer the slightest jot of evidence that

12   Brian Biesemeyer, the chief executive of the City in charge

13   of its administrative decision-making, was directed by the

14   mayor or councilmembers to deny an invocation, was not

15:52:36  15   requested by the mayor or councilmembers to deny an

16   invocation, and it was not influenced in any way by the mayor

17   or any councilmember to deny an invocation.

18        That is exactly what the mayor testified to, that is

19   exactly what Suzanne Klapp testified to, and, most

15:52:55  20   importantly, that is what Brian Biesemeyer testified to.

21        On your pointed questioning, Your Honor, you asked

22   Mr. Biesemeyer if he was influenced in any way by the

23   opinions expressed by Suzanne Klapp, and he told you no.

24        Then I asked him an even more pointed way.  I asked

15:53:17  25   him if he even cared what the opinion of Suzanne Klapp or any

15:53:21  1    other councilmember was, and he testified no.  Of course he

2    testified no.

3         If a city manager, and this was brought out during,

4    interestingly, redirect examination, that the city manager is

15:53:36  5    faced with opinion after opinion after opinion after opinion

6    by individual councilmembers on myriad issues.  And if the

7    city manager or acting city manager had to act in deference

8    to every individual opinion that was expressed to him or her,

9    the city manager could never fulfill the function imposed

15:54:04 10    upon the city manager and not fulfill the rights and duties

11    of the city manager and only the city manager under the

12    Scottsdale city charter.

13         But what about the e-mails, they say.  The 15,207

14    e-mails.

15:54:19 15         Well, you asked Mr. Biesemeyer about those e-mails.

16    And what he told you was he did not see any of them.  He

17    didn't respond to any of them.  There's no testimony in this

18    case that anyone described the content of any of those 15,207

19    e-mails to Brian Biesemeyer.  There is no evidence in this

15:54:47 20    case that Brian Biesemeyer was influenced to the slightest

21    degree by the number of or content in those e-mails.

22    Instead, Mr. Biesemeyer testified exactly the opposite.

23         THE COURT:  Before you move on, let me ask you a

24    question, not about the last point you made, but the one you

15:55:06 25    made just before that.

15:55:08   1          MR. CLAUS:  Yes.

         2          THE COURT:  You've elicited a lot of testimony in

         3   this case that none of the plaintiffs ever communicated to

         4   Scottsdale what their religious beliefs were.

15:55:24   5          I'm not sure I understand the relevancy of that for

         6   this reason.  Let's assume hypothetically that the City of

         7   Scottsdale, or Mr. Biesemeyer for that matter, sees The

         8   Satanic Temple on the invocation list and says, I'm not going

         9   to have anybody affiliated with Satan saying an invocation in

15:55:45  10   the City of Scottsdale.  Tell them no.

        11          Wouldn't that be discrimination re the *Town of

        12   Greece*, assuming the religion element is required, without

        13   them having to know anything about their specific beliefs or

        14   the precise prayer that they would offer?

15:56:03  15          MR. CLAUS:  Well, no, Your Honor.  No, Your Honor.

        16          There can't be viewpoint discrimination without a

        17   viewpoint.  But more critically, Your Honor --

        18          THE COURT:  Doesn't the name of this organization

        19   communicate a viewpoint?

15:56:18  20          MR. CLAUS:  It does not, Your Honor.

        21          THE COURT:  Satanic Temple clearly shows they are

        22   affiliated with, that they are focused on, that they are

        23   representing Satan in some way.  If that was the basis for

        24   the City saying no, that would constitute religious

15:56:33  25   discrimination whether or not they knew the seven tenets,

15:56:35   1   wouldn't it?

2          MR. CLAUS:  But there is no evidence that that was

3   the basis for the City saying no.

4          THE COURT:  I understand that.  I understand your

15:56:41   5   argument that Mr. Biesemeyer didn't do it for that reason.

6          What I'm not understanding is what appeared to be

7   argument you were setting up, which is unless they told him

8   exactly what they believed or told the City exactly what they

9   were going to pray, this couldn't be religious

15:56:58   10   discrimination, and I don't see that argument.

11          MR. CLAUS:  This is an invocation, that denial that

12   we are talking about, Your Honor.  So it is within a certain

13   realm of Establishment Clause jurisprudence.  They -- if you

14   look at *Town of Greece*, what *Town of Greece* stands for, the

15:57:18   15   proposition is that the City cannot deny a religious

16   organization from giving an invocation based upon the

17   viewpoint to be communicated during the invocation.

18          THE COURT:  So you're saying they have to know the

19   religious beliefs and the nature of the invocation before

15:57:36   20   they can run afoul of *Town of Greece*?

21          MR. CLAUS:  It's not the invocation.  They need --

22   I'm sorry, it's not the religious beliefs.  They need to at

23   least know the viewpoint to be shared in the invocation

24   before they can discriminate --

15:57:49   25          THE COURT:  That means your position would be that

15:57:50  1    if the City of Scottsdale said, we're not going to let

2    anybody with the name Muslim in the title pray because we

3    don't like Muslims, that wouldn't be religious

4    discrimination, assuming they didn't know specific beliefs;

15:58:03  5    right?

6              MR. CLAUS:  No, Your Honor.  That's not right.

7    Because you -- your hypothetical just established not only a

8    fact that is different from the previous hypothetical, but a

9    fact that doesn't exist in this case, that -- the -- there

15:58:19 10    is -- first of all, if an organization with the name Muslim

11    in it was denied because the City doesn't like Muslims,

12    Muslims are a recognized religious people by over 1.2 billion

13    people in the world.  There is no religion of Satan.  So

14    if -- if -- let me -- let me answer your question with a

15:58:50 15    different hypothetical which also isn't in evidence in this

16    case.

17              If Brian Biesemeyer had been told this organization

18    wants to give an invocation because they want to espouse the

19    doctrine of satanism, and he said and made the determination

15:59:05 20    and there was evidence in the case, oh, well, I don't like

21    satanism, I'm not going to allow that invocation to be given,

22    then -- then there may be a colorable claim.  But simply

23    because the word Satan is in the Temple of Satan, that --

24              THE COURT:  You're suggesting that a reasonable

15:59:24 25    person can't infer from Satanic Temple that they believe in

satanism; right?

MR. CLAUS:  No, Your Honor.  What I'm arguing to you
is that there is no evidence in this case and it is pure
conjecture that because the word Satan is in the Temple of
Satan, that that is a basis upon which a denial of the
invocation was made.

THE COURT:  Well, I understand your argument about
the basis for the denial.  And I've heard what you said on
that argument.  So let me not interfere further.  You can go
on with your argument.

MR. CLAUS:  Thank you, Your Honor.

Mr. Biesemeyer did testify that he did not read and
he did not know about the e-mails that were sent.  And I told
you Mr. Biesemeyer would say that, and that is what he
testified to without variation.

I told Your Honor that Brian Biesemeyer, in my
opening statement, would explain to you the investigation
that he had performed on his behalf as to the existence of
the long-standing practice of the City of Scottsdale to only
invite faith organizations with a substantial connection to
the City of Scottsdale to perform an invocation.

And, too, whether the organization calling itself
The Satanic Temple through February or May 2016 had any such
connections, and that is exactly the testimony that
Mr. Biesemeyer delivered.

16:00:59  1          And, no, Your Honor, as Mr. Biesemeyer explained,

2     substantial connection did not mean that the organization had

3     to have a physical plant within the specific geographic

4     limits of the City of Scottsdale.

16:01:11  5          Instead, contrary to what you were told by the

6     plaintiffs, Mr. Biesemeyer testified precisely what was meant

7     by substantial connection.  It meant that the organizations

8     served a significant portion of the Scottsdale community or

9     had a number of members within the Scottsdale community.  It

16:01:29 10    is a low bar, Your Honor.  And it is a bar importantly that

11    the plaintiffs never tried to meet.

12         Ms. Shortt was asked about appeal processes.

13         They knew they could make a request to give an

14    invocation because they made a request to give an invocation.

16:01:53 15         For two years they said nothing, Your Honor.  For

16    two years they said nothing because it is true, this is a

17    media stunt.  This is a stunt that has nothing to do with

18    deeply held religious beliefs.  It is a stunt that, if it was

19    sincere at all, if there was any sincerity behind the

16:02:21 20    plaintiffs' motivations or if there was any sincerity at all

21    behind what Ms. Shortt said she wanted to give as an

22    invocation, a reasonable juror and a reasonable judge should

23    conclude that on May 24, 2016, if there was a substantial

24    connection between her organization and the City of

16:02:40 25    Scottsdale, she would have written an e-mail and said, oh,

16:02:45  1    you misunderstand, we have the following members in

2    Scottsdale.

3         And if that had been the case, if The Satanic

4    Temple, the organization calling itself The Satanic Temple,

16:02:58  5    if Ms. Shortt had said to anyone at the City of Scottsdale,

6    oh, no, you're wrong, we do have a substantial connection to

7    the City of Scottsdale, and demonstrated that substantial

8    connection, Mr. Biesemeyer told you what his decision would

9    be.  It would be completely different than the decision he

16:03:16 10    made.

11         So how could, if Mr. Biesemeyer would make -- and

12    that -- that testimony, Your Honor, was not only unrefuted,

13    it was unchallenged.  And the reason it was unchallenged is

14    because that question stems from something that was asked

16:03:33 15    during his deposition by opposing counsel.

16         So why -- how could -- how could the plaintiffs

17    plausibly suggest that Mr. Biesemeyer, the decision-maker,

18    held a religious animus toward the group on which Ms. Shortt

19    claims she wanted to give a speech when, if she would have

16:03:54 20    demonstrated the one element he said was missing, he would

21    have made a different decision?

22         They cannot plausibly suggest that because they

23    never challenged it.

24         They never said to Mr. Biesemeyer, you know, we do

16:04:09 25    have a substantial connection and here's why.

16:04:11   1          They never said to Ms. Kuester, you know, we do have

        2   a substantial connection and here's why.

        3          Instead, they waited the two years for their

        4   limitations period to almost run and filed a lawsuit.

16:04:30   5          I told Your Honor that the factual truth of

        6   Mr. Biesemeyer's expressed rationale would be revealed by the

        7   evidence, and it was.

        8          Ms. Shortt admitted she's not a member of the

        9   Scottsdale community and has never been a member of the

16:04:46  10   Scottsdale community.  Ms. Shortt could not identify anyone

       11   who was a member of the Scottsdale community when she sought

       12   to give the invocation.

       13          She admitted that she did not respond to the e-mail

       14   delivered to her which is -- I'm sorry, that Ms. Shortt did

16:05:06  15   not respond to the e-mail that was delivered to Mr. Zarzycki

       16   on May 23, 2016, Exhibit 12.  She didn't direct anyone,

       17   including Mr. Zarzycki, to tell any representative of the

       18   City, as the purported chapter head of the Arizona chapter of

       19   The Satanic Temple, that any -- that the plaintiff

16:05:37  20   organization had a substantial connection to the City of

       21   Scottsdale.

       22          Your Honor, I don't believe it is appropriate now,

       23   given your rulings, to refer to Exhibit 5 or Exhibit 8, so

       24   I'm going to ask for guidance from the Court on that.  The

16:05:55  25   plaintiffs rested while Exhibits 8 and Exhibit 5 had not yet

16:06:02  1    been admitted.

2              THE COURT:  That's still true.

3              MR. CLAUS:  Thank you.

4              THE COURT:  I haven't decided that.

16:06:08  5          But I will tell you I didn't find the *Hernandez* case

6    helpful that you gave me the cite on.  I did read it and I

7    didn't think it was on point, but I still need to wrestle

8    with that issue.

9              MR. CLAUS:  In any event, Your Honor, what the

16:06:22 10   plaintiffs have not shown the Court is any e-mail or any

11   communication by any councilmember that expressed anything

12   other than those councilmembers' personal beliefs as

13   contraposed to their beliefs as a council or on behalf of the

14   council.

16:06:45 15         Most critically, Your Honor, not only did the

16   plaintiffs fail to demonstrate, but Mr. Biesemeyer directly

17   refuted that he did not know of and had never seen

18   Mayor Lane's campaign literature, Suzanne Klapp's editorial

19   piece, or any other e-mail or communication in which

16:07:14 20   councilmembers expressed personal views and personal

21   viewpoints, and he was not influenced by any such

22   communications.

23             THE COURT:  I'm going to ask you, if you would, to

24   wrap up in about seven minutes so that I can give plaintiffs

16:07:27 25   an opportunity for reply.

16:07:29  1          MR. CLAUS:  I will, Your Honor.

      2          On that point, Your Honor, Mayor Lane testified that

      3    his campaign literature was not written or published by him

      4    as a mayor or on behalf of the City, but was published on

16:07:45  5    behalf of himself as a candidate.

      6          So what evidence has the plaintiff presented to meet

      7    their burden of proof?  And the answer is none.

      8          Instead, they asked the Court to engage in a

      9    practice that the Court would admonish a jury not to, engage

16:08:04 10    in speculation and conjecture not supported by the evidence.

     11    And, in fact, is undermined by the only evidence actually

     12    admitted in this matter, Your Honor.

     13          But this is an exercise that the Court would not

     14    condone if the jury were trying the case and it's not an

16:08:22 15    exercise that the Court should engage in now.

     16          Instead, the Court should determine, based upon the

     17    only evidence before it, that Mr. Biesemeyer and only

     18    Mr. Biesemeyer made the decision to deny the organization

     19    calling itself The Satanic Temple the ability to give an

16:08:41 20    invocation for the reason that they were told.  That

     21    organization lacked any substantial connection to the City of

     22    Scottsdale.  And that was the long-standing practice of the

     23    City of Scottsdale.

     24          The plaintiffs can point to no evidence admitted in

16:09:00 25    this matter that would rationally or reasonably lead to any

16:09:03  1   other conclusion.  And for this reason, Your Honor,

2   plaintiffs' discrimination claim fails and the Court should

3   enter judgment in defendant's favor on all of plaintiffs'

4   discrimination claims.

16:09:16  5          I do want to address just two more things briefly,

6   Your Honor.  And that has to do with the representation that

7   was made to you regarding school prayer cases.

8          School prayer cases engage in a completely different

9   analysis of -- than Establishment Clause cases like this one,

16:09:38  10  because school children, according to the courts, constitute

11  a captive audience.

12         And the cite is *Freedom from Religion Foundation*

13  *versus Chino Valley Unified School District*, 396 F.3d 1132.

14  And that is a 2018 Ninth Circuit opinion.

16:10:00  15         THE COURT:  It's not 2018 if it's 396 F.3d, I don't

16  think.

17         MR. CLAUS:  Is it -- is that 8 or 3?

18         I may be misreading.

19         We're double-checking on that, Your Honor.

16:10:20  20         THE COURT:  Okay.

21         MR. CLAUS:  The last thing has to do with a question

22  that you asked counsel, how do I determine what a religion

23  is?  And the defendants have provided to you exactly the

24  question as to how you determine not only what a religion is,

16:10:38  25  but also if any of the plaintiffs satisfy the definition of a

16:10:45   1   religion.

2                   Whether a belief system is a religion --

3                   It is 896 F.3d 1132.  I apologize, Your Honor.

4                   Whether a belief system is a religion is controlled

16:11:01   5   by the factors set forth in *Alvarado versus City of San Jose*.

6   And an explanation of -- an explication of those factors is

7   most aptly articulated in *Plans, Inc. versus Sacramento City*

8   *Unified School District*, which is 752 F. Supp. 2d 1136, which

9   was affirmed by the Ninth Circuit at 476 Federal Appendix

16:11:24  10   684.

11                   The plaintiffs bore the burden of proving that each

12   plaintiff, each plaintiff, represented a system of belief and

13   worship of a superhuman controlling power involving a code of

14   ethics and philosophy requiring obedience thereto.

16:11:49  15                   I'm just going to interject here, Your Honor,

16   Ms. Shortt testified that the seven tenets specifically

17   eschew obedience because they exhort agnosticism in all

18   things and no obedience to arbitrary authority.

19                   Second, the plaintiffs had to prove that each of the

16:12:18  20   plaintiffs sought to address fundamental and ultimate

21   questions having to do with, quote, deep and imponderable

22   matters, end quote, and, again, Ms. Shortt's testimony

23   reveals that is the exact opposite.  She testified that her

24   seven tenets mean that her organization do not question and

16:12:40  25   do not analyze deep and imponderable matters.

16:12:44  1         Next, Your Honor, second to last, each of the

2    plaintiffs had to demonstrate that each plaintiff maintained

3    a belief system that was, quote, comprehensive in nature, end

4    quote.

16:12:55  5         And what did Ms. Shortt tell you?  Every time she

6    was asked, even when she was led by her own lawyer, that

7    these are not comprehensive in nature, that each individual

8    decides how each individual applies any one or more of these

9    tenets in their own lives.

16:13:11 10         Finally, Your Honor, the plaintiff bore the burden

11   of proving -- each plaintiff bore the burden of proving that

12   they possessed formal and external signs of a religion, such

13   as formal services.  Ms. Shortt admitted those did not exist.

14         Ceremonial functions.  Ms. Shortt admitted those did

16:13:36 15  not exist.

16         The existence of a clergy, I've heard innumerable

17   times today that it's in the process, but we're in trial now

18   and those don't exist as of today and they didn't exist in

19   May of 2016.

16:13:50 20         Structure and organization.  Your Honor, it's

21   impossible to even keep track who the plaintiffs are talking

22   about.  Some monolithic TST is a nothing.  There is no

23   structure and organization.  It is purely ad hoc, and that

24   has been the testimony.

16:14:08 25         Efforts at propagation, observance of holidays, and

16:14:10   1   other similar manifestations associated with traditional

2   religions.  I'll end on this, Your Honor.

3          An organization that was founded that had as its

4   only and first ritual something that was intended to be

16:14:27   5   mocking and offensive to a pastor of a Baptist church, even

6   if they do not agree at all with the beliefs of that pastor,

7   is not an organization that has the manifestations of

8   organizations associated with traditional religions.

9          Your Honor, they have not met their burden of

16:14:52  10   proving that they are a religion for Establishment Clause

11   purposes.

12          They have not met their burden of proving that the

13   invocation is not government speech or that they have an

14   individualized interest in an invocation.

16:15:06  15          They have not proven that the invocation or the

16   speech that is Exhibits 4 sought to be given by Ms. Shortt

17   was anything other than a screed designed to insult and

18   offend.

19          And, Your Honor, they have not presented one iota of

16:15:20  20   evidence, of actual evidence, demonstrating a discriminatory

21   animus or a manifestation of a discriminatory animus on

22   behalf of the only decision-maker in this case,

23   Brian Biesemeyer.

24          Thank you.

16:15:34  25          THE COURT:  All right.  Thank you.

16:15:34  1          Mr. Kezhaya.

2          MR. KEZHAYA:  Thank you, Your Honor.  May it please

3     the Court.

4          There's an issue that is recurring in our

16:16:05  5     jurisprudence under the Establishment Clause, which is to

6     what extent does the government properly get to inquire into

7     religious beliefs.

8          *Town of Greece* had this to say:  The request to

9     promote a, quote, diversity of religious views, end quote,

16:16:21 10     would require the town, quote, to make wholly inappropriate

11     judgments about the number of religions it should sponsor and

12     the relative frequency with which it should sponsor each.

13          Omitting citation.

14          A form of government entanglement with religion that

16:16:40 15     is far more troublesome than the current approach.

16          It's *what Town of Greece* has to say.  That's 572,

17     Your Honor, U.S. at 586.

18          I cited in our cross-motion for summary judgment

19     *Larson versus Valente*.  It had this to say:  The clearest

16:16:55 20     command of the Establishment Clause is that one religious

21     denomination cannot be officially preferred over another.

22          You asked Mr. Claus if he -- if he agreed with the

23     premise that if a government permitted all Baptists but not

24     Catholics -- and I may have them reversed, I apologize --

16:17:17 25     would that be permissible?  The answer is clearly no under

16:17:21  1    *Larson versus Valente.*

2         With respect to the Equal Protection analysis, I

3    think the answer is also clearly no.  Equal Protection very

4    clearly says you cannot treat one group of similarly situated

16:17:32  5    people differently than another.

6         That's what happened here.  Everyone else got one

7    benefit.  You call up, you get your schedule, come on in.

8    Only TST was subjected to this additional scrutiny of, well,

9    what is your substantial connection.

16:17:50  10        There is a point that Mr. Claus keeps harping on

11   that I take issue with.  He keeps misquoting Ms. Shortt.  She

12   did not say it was a speech.  She clarified it was religious

13   speech.  I think that's critical.

14        This point that he repeatedly raises with respect to

16:18:07  15   although it wasn't an invocation because it wasn't literally

16   invoking a deity is disposed of also by *Town of Greece*

17   wherein the court notes nonbelievers were permitted to

18   participate in the invocation.

19        I think that disposes of that line of argument.

16:18:27  20        He keeps citing this *Fields* and *Simpson* case.  First

21   of all, I believe it was *Simpson versus Board of*

22   *Chesterfield,* it's a 2005 case out of the Fourth Circuit.  I

23   believe that case is abrogated by *Town of Greece*.  There are

24   two important holdings that run afoul of *Town of Greece*.

16:18:42  25        Number one, a county government can look into the

16:18:46   1   contents of the invocation to determine whether or not it is

2   permissible.  *Town of Greece* says you cannot discriminate.

3   In this *Board of Chesterfield* case, they discriminated

4   against a Wiccan.  They said you have to be monotheistic, you

16:19:00   5   cannot be polytheistic.  I think that runs very clearly

6   contrary to the *Town of Greece*.

7           The other one is that the county government can

8   require that the invocation be nonsectarian, meaning don't

9   say Jesus.  That is also -- actually the language I cited

16:19:19   10  earlier by *Town of Greece* very specifically removed by *Town*

11  *of Greece*.  Congress says you cannot control what someone is

12  going to say.  Wholly inappropriate because it's entanglement

13  with religion.

14          Mr. Claus also gave the jury instructions.  One

16:19:42   15  other jury instruction that we might give is that credibility

16  is solely within the province of the fact finder.  So while

17  it may be true that Mr. Biesemeyer said he didn't see those

18  articles and if he had seen them it wouldn't have affected

19  his opinion, that is a subject of the Court's opinion.  I

16:19:57   20  think that if he did know about four of seven of his bosses

21  making very clear statements that they did not want this

22  Satanic Temple, I think that would absolutely bear on his

23  determination.

24          There's another point that Mr. Claus keeps raising

16:20:15   25  which is, well, if the city council would have been offended,

16:20:18   1   they get to exclude it.  Once again this runs afoul of *Town*

       2   *of Greece*.  The city council cannot inquire into permissible

       3   and nonpermissible religious prayers.  You either let them

       4   all in or you let none of them in, but you can't pick and

16:20:32   5   choose which ones are okay.

       6           I also pointed out *Fields*.  Your Honor, *Fields* is, I

       7   believe, a Third Circuit case, perhaps a Fourth Circuit case.

       8   It is not SCOTUS and it's not the Ninth Circuit.  This Court

       9   is not bound by it.  The only question is if the Court is

16:20:52  10   persuaded by it, and I haven't heard anything persuasive

      11   about this case.  It seems to suggest that a government can

      12   take some religions, but not others.  You must have a belief

      13   in a literal religious deity, which is to say spiritual

      14   deity, or you don't get to have an invocation.  I think that

16:21:16  15   runs afoul of very much jurisprudence on the issue of the

      16   Establishment Clause.

      17           I think that this case, Your Honor, is most easily

      18   disposed of by *Rubin*.  If it were me, this is how I would

      19   rule.  *Rubin* says you need to have neutrality-enforcing

16:21:28  20   safeguards.  There's no appeals process.  There is no written

      21   policy.  There is no definition for what substantial

      22   connection is.  There being no neutrality-enforcing

      23   safeguards, *Rubin* gives the Court an easy shortcut.

      24           Does the Court have any questions of me?

16:21:44  25           THE COURT:  Yeah.  What's the citation for *Rubin*?

16:21:55  1          MR. KEZHAYA:  Yes, Your Honor, let me find that real

      2  quick.

      3          Does the Court recall *Rubin* --

      4          THE COURT:  Did you cite it in your proposed

16:21:57  5  findings and conclusions?

      6          MR. KEZHAYA:  I don't believe that I did, but we

      7  cited it at length in our cross-motion for summary judgment.

      8          *Rubin versus City of Lancaster,* 710 Federal 3d 1087.

      9  It's a Ninth Circuit case out of 2013.

16:22:13 10          To refresh the Court's recollection, the City of

     11  Lancaster had an invocation policy.  It was written.  I don't

     12  remember all the rest of the neutrality-enforcing safeguards,

     13  but they described it as, if I remember correctly,

     14  practically all of them.

16:22:31 15          So I think that is the easiest way to win in this

     16  case, Your Honor.

     17          Other than the citation question, does the Court

     18  have any questions of me?

     19          THE COURT:  Well, I want to ask a question about

16:22:44 20  what you just said about Ruben, which I don't remember.  I'll

     21  have to read it again.

     22          MR. KEZHAYA:  Yes, sir.

     23          THE COURT:  Are you saying that if I find as a

     24  matter of credibility that I believe Mr. Biesemeyer said no

16:22:59 25  to The Satanic Temple because it did not have a substantial

16:23:02   1   connection, I should find an Establishment Clause violation

2   because the City didn't have enough procedural safeguards?

3          MR. KEZHAYA:  Yes, Your Honor.  That's what *Rubin*

4   is.  The only problem with *Rubin* is that it says that that

16:23:16   5   City did have enough safeguards such that there was no

6   Establishment Clause violation.  I think the opposite is true

7   here.

8          THE COURT:  Is that a legislative prayer case?

9          MR. KEZHAYA:  Yes, Your Honor.  It's a legislative

16:23:29  10   invocation.  It was city council.  They have invocations.

11   Again, I don't recall all of the safeguards but it was --

12          THE COURT:  Was it challenged by somebody who wanted

13   to abolish --

14          MR. KEZHAYA:  Yes.

16:23:39  15          THE COURT:  -- the invocations?

16          MR. KEZHAYA:  Yes, Your Honor.

17          THE COURT:  So it wasn't a religious discrimination

18   case?

19          MR. KEZHAYA:  It -- it was to that person,

16:23:47  20   Your Honor.  It was a religious discrimination case insofar

21   as the City was entangling itself with religion by permitting

22   these religions to have prayer.

23          THE COURT:  Did the plaintiff in *Rubin* seek to say

24   an invocation?

16:24:04  25          MR. KEZHAYA:  That, I don't recall, Your Honor.  I

16:24:05   1   don't believe there's any Ninth Circuit case where someone

2   was precluded.  Precluding someone from a legislative

3   invocation is something that was apparently very rare in the

4   law.  The *Town of Greece* case repeatedly notes that nobody

16:24:18   5   had ever been declined.

6         *Rubin* actually, as we're talking about it, also

7   notes repeatedly nobody had ever been declined.

8         I'm very hard-pressed to think of any cases, even

9   district court.  There was the Broward County case out of

16:24:35  10   Florida, which I believe we may have cited in our motion in

11   limine response.

12         THE COURT:  Yeah, I agree there's very few

13   discrimination cases.  But the problem I'm having with what I

14   think is your argument is, it's one thing for a plaintiff to

16:24:46  15   challenge a city's or a city council's invocation policy

16   because it doesn't have enough protections to ensure

17   compliance with the Establishment Clause.  It's a different

18   thing to come in and say, I was discriminated against.  I was

19   turned away because of my religious beliefs.  Which is what

16:25:09  20   you are saying.

21         MR. KEZHAYA:  Yes, Your Honor.

22         THE COURT:  And if the answer is no, you weren't

23   turned away because of your religious beliefs, if I decide

24   that Mr. Biesemeyer's testimony is credible, I don't see how

16:25:20  25   a discrimination case becomes a discrimination because there

16:25:25  1    weren't sufficient safeguards to survive a challenge that

2    would seek to abolish the practice altogether.

3                MR. KEZHAYA:  I would have to go further into

4    reading about Ruben to respond to the question, Your Honor.

16:25:41  5    I don't recall whether the prayer for relief there was

6    abolish it entirely or I want in too.

7                THE COURT:  All right.

8                MR. KEZHAYA:  I think that -- I think that does turn

9    it.

16:25:47  10               THE COURT:  I will read Ruben carefully.

11               MR. KEZHAYA:  Yes, Your Honor.

12               THE COURT:  Did you have other points you wanted to

13   make?

14               MR. KEZHAYA:  I had no other points, Your Honor.

16:25:56  15               THE COURT:  Okay.  I do have -- I have a question.

16   You had Ms. Shortt make reference to something that I think

17   she described as an Indian outreach center.

18               MR. KEZHAYA:  Yes, Your Honor.

19               THE COURT:  In Exhibit 15.  And I looked through

16:26:15  20   Exhibit 15 and I couldn't find it.  Could you -- well, do you

21   believe it's in Exhibit 15 and, if so, could you show me

22   where.

23               MR. KEZHAYA:  If the Court permits me a second, I

24   could find it, I believe.

16:26:26  25               THE COURT:  That's fine.

16:26:28    1          MR. KEZHAYA:  In producing what was excluded as

        2   Exhibit 16, the Court may remember it's a 11-page exhibit of

        3   various Google addresses for people who came in from outside

        4   the town, one of which was Phoenix Indian Center.

16:26:43    5          So one of the exhibits that we relied upon but

        6   neglected to include in the pretrial order was a list of

        7   individuals that we actually believed was the list that

        8   Ms. Kuester was talking about.  It was attached to the City's

        9   summary judgment.

16:26:58   10          Does the Court remember what I'm talking about?

       11          THE COURT:  Well, yeah, but that's not in evidence.

       12   What I have in evidence is Exhibit 15.  And when I looked

       13   through it, I couldn't see a reference to an Indian outreach

       14   center.

16:27:08   15          MR. KEZHAYA:  I have the date of 11/14/2016, 32-10

       16   of --

       17          THE COURT:  What was that date again?

       18          MR. KEZHAYA:  11/14/2016, Your Honor.

       19          THE COURT:  There's something called Phoenix Indigo

16:27:26   20   Center.

       21          MR. KEZHAYA:  Indigo?

       22          THE COURT:  On Exhibit 15.

       23          MR. KEZHAYA:  I believe that may be a typo,

       24   Your Honor.

16:27:34   25          THE COURT:  Well --

16:27:34  1          MR. KEZHAYA:  Unless --

2          THE COURT:  I just didn't --

3          MR. KEZHAYA:  -- someone --

4          THE COURT:  I just didn't know where it was in the

16:27:37  5   exhibit.  That was -- you've answered my question.

6          MR. KEZHAYA:  Yes, Your Honor.  Unless, of course,

7   the City's position is that a dyer of denim is a religious

8   organization.

9          THE COURT:  The last thing, I just want to make a

16:27:50  10  point on the record, there were numerous exhibits from the

11  defense side on the best evidence rule.  I overruled them all

12  because of Rule 1004(d).  Just so that's on the record.

13         All right.  Thank you for your arguments and your

14  presentations.  I will take this under advisement and I will

16:28:06  15  get you a decision as soon as I can.  Thank you all.

16         MR. CLAUS:  Thank you, Your Honor.

17         MR. KEZHAYA:  Your Honor, I have a housekeeping

18  matter.  Does the Court want to us come back tomorrow or are

19  we adjourned?

16:28:22  20         THE COURT:  No need to come back tomorrow.

21         MR. KEZHAYA:  Thank you, Your Honor.

22         (End of transcript.)

23                         *  *  *  *  *

24

25

# **C E R T I F I C A T E**

I, PATRICIA LYONS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 24th day of April, 2020.

s/ Patricia Lyons, RMR, CRR
Official Court Reporter